# Exhibit 23

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4      G.W.,                        )
                                    )
5           Plaintiff,              )
                                    )
6        vs.                        )  CIVIL ACTION FILE
                                    )  NO. 1:20-CV-05232
7      NORTHBROOK INDUSTRIES,       )  NO. 1:20-CV-05231
       INC.,d/b/a United Inn        )  NO. 1:20-CV-05233
8      and Suites,                  )
                                    )
9           Defendants.             )
                                    )
10

11

12

13

                      CONFIDENTIAL
14

15              VIDEOTAPED DEPOSITION OF

16                   TAHIR SHAREEF

17               February 22, 2023

18                    9:20 a.m.

19            191 Peachtree Street, NE

                   Suite 2900

20               Atlanta, Georgia

21

             Lamarra George, CCR-2582

22

23

24

25

CONF Tahir Shareef                                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 2

```
1          APPEARANCES OF COUNSEL
2
     On behalf of the Plaintiffs:
3      G.W., A.G., and J.G.
4      DAVID BOUCHARD, ESQ.
       Finch McCranie, LLP
5      229 Peachtree Street, NE
       Suite 2500
6      Atlanta, Georgia 30303
       404-658-9070
7      David@finchmccranie.com
8    On behalf of the Defendant:
       Northbrook Industries, Incorporated
9
       WILLIAM R. STORY, ESQ.
10     MARGARET DALY, ESQ.
       Hall Booth Smith, P.C.
11     191 Peachtree Street, NE
       Suite 2900
12     Atlanta, Georgia 30303
       404-954-5008
13     Wstory@hallboothsmith.com
       Mdaly@hallboothsmith.com
14
     On behalf of the Defendant:
15     Northbrook Industries, Incorporated
16     EMILY C. WARD, ESQ.
       Smith Gambrell Russell
17     1105 West Peachtree Street, NE
       Suite 1000
18     Atlanta, Georgia 30309
       404-815-3575
19     Eward@sgrlaw.com
20
21   Also Present:
22     Bryan Robinson, Videographer
23
24
25
```

Page 3

```
1          INDEX TO EXHIBITS
2
3    Exhibit        Description          Page
4
5    Exhibit 1   Amended Notice of 30(b)(6)      17
                 Deposition for Defendant Northbrook
6                Industries
7    Exhibit 2   Blue Campaign Hospitality Toolkit    55
                 Manual
8
     Exhibit 3   PowerPoint prepresentation from Luz   65
9                Borrero
10   Exhibit 4   Defendant Northbrook, Inc.'s    74
                 Responses to Plaintiff's Request
11               for Admissions in plaintiff G.W.'s
                 case
12
     Exhibit 5   Atlanta Constitutional Journal   80
13               Constitutional article
14   Exhibit 6   Copy of an e-mail from Steven A.   83
                 Coachman, dated March 9th, 2020
15
     Exhibit 7   Document from the DeKalb County   85
16               Police Department
17   Exhibit 8   Police report dated August 12, 2015   114
18   Exhibit 9   Police report dated June 2, 2017    115
19   Exhibit 10  Police report dated June 20, 2017   117
20
     Exhibit 12  Google reviews         135
21
     Exhibit 13  Google review from Maurice Hambrick   138
22
     Exhibit 14  Google review from Mond Miller    140
23
     Exhibit 15  Google review from Dante Blackwood   143
24
     Exhibit 16  Yelp Review            144
25
```

Page 4

```
1    Exhibit 17  A commercial insurance application   172
                 dated June 21, 2017
2
     Exhibit 18  Photograph            210
3
     Exhibit 19  Photograph            211
4
     Exhibit 20  Photograph            212
5
     Exhibit 21  Photograph            213
6
     Exhibit 22  Initial Disclosures        221
7
     Exhibit 23  State of Georgia corporation annual   231
8                registration form from 2011 for
                 Northbrook Industries
9
     Exhibit 24  State of Georgia 2012 corporate    232
10               annual registration form for AS&TS
                 Investments, Inc.
11
     Exhibit 25  Consent and Assumption Agreement    242
12               with Limited Release
13
14
15
16
17
18
19
20
21
22
23       (Exhibits 1 through 25 have been attached to
24   the original transcript.)
25
```

Page 5

```
1          INDEX TO EXAMINATIONS
2    Examination                    Page
3    Examination by Mr. Bouchard            16
4
5
6
7
8
9                    - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
800.808.4958                                         770.343.9696

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 6

1    VIDEOGRAPHER: We are on the record.
2    The time is 9:20 a.m., on February 22nd,
3    2023. And this is the 30(b)(6) video
4    deposition of Northbrook -- Northbrook
5    Industries, Incorporated, doing business as
6    United Inn and Suites, and also the
7    deposition of Tahir Shareef in his personal
8    capacity.
9        Would counsel present please
10   identify themselves for the record.
11       MR. BOUCHARD: Good morning. David
12   Bouchard for plaintiff G.W. in Case
13   No. 120-CV-05232, as well as for plaintiff
14   A.G. in Case No. 120-CV-05231, and
15   plaintiff J.G. in Case No. 120-CV-05233.
16       MR. STORY: Good morning. My name
17   is Will Story. I'm an attorney at Hall
18   Booth Smith. I represent Northbrook
19   Industries, Incorporated, d/b/a United Inn
20   and Suites in the cases brought by
21   plaintiffs A.G. and G.W. Along with me
22   today is Meg Daly, who is provisionally
23   accepted to practice in the State of
24   Georgia and is an attorney at our firm who
25   we firmly believe passed the bar exam in

Page 7

1    Georgia yesterday. And I've got to give
2    kudos to her for being here.
3        MS. WARD: Seriously.
4        MR. STORY: And I will -- I'll let
5    Emily do her introduction.
6        MS. WARD: Good morning. Emily Ward
7    on behalf of Northbrook Industries, Inc.,
8    d/b/a United Inn and Suites in the case
9    brought by G.J.
10       VIDEOGRAPHER: Thank you, Counsel.
11   Would the court reporter please swear in
12   the witness.
13           TAHIR SHAREEF,
14   having been first duly sworn, was examined and
15   testified as follows:
16       MR. BOUCHARD: Good morning,
17   Mr. Shareef.
18       THE WITNESS: Good morning.
19       MR. BOUCHARD: My name is David
20   Bouchard. I'm an attorney for three
21   different plaintiffs who have filed
22   lawsuits against Northbrook Industries,
23   Inc. d/b/a United Inn and Suites. Do you
24   understand that, sir?
25       THE WITNESS: I understand that.

Page 8

1    MR. BOUCHARD: It's nice to meet you
2    this morning, sir.
3        THE WITNESS: Certainly.
4        MR. BOUCHARD: We have not met prior
5    to today, that's correct; right, sir?
6        THE WITNESS: No.
7        MR. BOUCHARD: And just to state a
8    few things for the record, Mr. Sharif,
9    before I start asking you some questions,
10   this deposition today is taken on behalf of
11   plaintiff G.W. in Case No. 120-CV-05232.
12   This deposition has also been cross-noticed
13   in Case No. 120-CV-05231, which is A.G.'s
14   lawsuit. And it has also been cross
15   noticed in Case No. 120-CV-05233, which is
16   J.G.'s lawsuit. Counsel for the defendants
17   in all three cases are present after
18   receiving reasonable notice of the
19   deposition. All objections to questions in
20   today's deposition, other than to the form
21   of a question or to an issue of privilege,
22   are preserved. Is that agreeable?
23       MR. STORY: That is agreeable.
24       MS. WARD: Yes.
25       MR. BOUCHARD: This deposition is

Page 9

1    taken pursuant to properly served
2    deposition notices and cross notices, and
3    is taken for all purposes permitted under
4    the federal rules of civil procedure and
5    the Georgia Civil Practice Act, including
6    but not limited to preservation of
7    testimony and cross-examination.
8        Is that agreeable?
9        MR. STORY: That's agreeable.
10       MS. WARD: It is.
11       MR. BOUCHARD: I'm going to mention
12   something again, Madam Court Reporter, that
13   I mentioned before we went on the record.
14   Because the plaintiffs in these cases were
15   minors at the time in question, there are
16   confidentiality protective orders entered
17   in each of the three respective cases
18   protecting their identities and keeping
19   their identifies anonymous. For purposes
20   of today's deposition, I'm going to refer
21   to the plaintiffs by their full names, but
22   when you're preparing the deposition, I'd
23   ask that you both mark the deposition
24   transcript as confidential and insert the
25   initials of the plaintiffs' names in lieu

Veritext Legal Solutions
800.808.4958                                                    770.343.9696

CONF Tahir Shareef                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 10

1   of the actual full name of each respective
2   plaintiff, wherever it appears in the
3   deposition.
4        Sir, you understand, Mr. Shareef,
5   that today we're going to be talking about
6   the United Inn and Suites on Memorial
7   Drive; is that --
8        THE WITNESS:  Yes.
9        MR. BOUCHARD:  -- correct?
10       THE WITNESS:  Yes.
11       MR. BOUCHARD:  And throughout the
12  day today, I may get loose or kind of less
13  technical and refer to it as the United Inn
14  or refer to it as "the hotel."  Can we
15  agree that when I'm referring to either the
16  United Inn and Suites, the United Inn, or
17  the hotel, we're talking about the same
18  place on Memorial Drive?
19       THE WITNESS:  Yes.
20       MR. BOUCHARD:  And the address of
21  that hotel is 4649 Memorial Drive?
22       THE WITNESS:  Yes.
23       MR. BOUCHARD:  In Decatur, Georgia?
24       THE WITNESS:  That's right.
25       MR. BOUCHARD:  Have you ever had

Page 11

1   your deposition taken, sir?
2        THE WITNESS:  Deposition taken, no.
3        MR. BOUCHARD:  Have you ever sat for
4   a proceeding like this with a court
5   reporter and a videographer?
6        THE WITNESS:  No.
7        MR. BOUCHARD:  Let me sort of walk
8   through some of the ground rules with you.
9   Obviously you're represented by very able
10  counsel.  I'm sure they've explained to how
11  today will proceed, but let me just
12  reiterate a couple of basic rules.
13       Obviously there is a court reporter
14  here transcribing our conversation.  Do you
15  understand that?
16       THE WITNESS:  I understand.
17       MR. BOUCHARD:  And you understand
18  that you're under oath during our
19  conversation today?
20       THE WITNESS:  I understand.
21       MR. BOUCHARD:  Just like you would
22  be if you were in a court of law in front
23  of a judge?
24       THE WITNESS:  Right.
25       MR. BOUCHARD:  And you understand

Page 12

1   there's a videographer taking a videotape
2   recording of your deposition today?
3        THE WITNESS:  Right.
4        MR. BOUCHARD:  I will be asking you
5   a series of questions today, sir, and you
6   will be providing answers to those
7   question.  Do you understand that?
8        THE WITNESS:  Yes.
9        MR. BOUCHARD:  The goal today is to
10  have a clean record.  And what I mean by
11  that is, please, sir, wait until I'm done
12  with a question before you start answering
13  the question.  Does that make sense?
14       THE WITNESS:  Sure.
15       MR. BOUCHARD:  And I will endeavor
16  to do my very best to wait until you are
17  done answering a question to start asking
18  you a new one.  Okay?
19       THE WITNESS:  Okay.
20       If I ever interrupt you, please let
21  me know that you are not done with your
22  answer, and I will stop talking and let you
23  finish your answer.  Okay, sir?
24       THE WITNESS:  Okay.
25       MR. BOUCHARD:  And I'm going to ask

Page 13

1   you to do the same.  If you interrupt me
2   before I'm done with a question, I will let
3   you know --
4        THE WITNESS:  Uh-huh.
5        MR. BOUCHARD:  -- ask you to stop so
6   that I can finish my question.  Okay?
7        THE WITNESS:  I understand that.
8        MR. BOUCHARD:  Because there's a
9   record that's being prepared of our
10  conversation, we have to use verbal
11  communication.  We can't do thumbs up or
12  nod.  We have to actually provide a verbal
13  spoken answer.
14       THE WITNESS:  Yes.
15       MR. BOUCHARD:  Is there any reason
16  today, Mr. Shareef, that you are not able
17  to provide clear and accurate testimony?
18       THE WITNESS:  Is there a reason?
19  There's no reason.
20       MR. BOUCHARD:  Are you under the
21  influence of any substances or alcohol
22  today?
23       THE WITNESS:  No.
24       MR. BOUCHARD:  Okay.
25       MR. STORY:  And David, if I can

4 (Pages 10 - 13)

CONF Tahir Shareef                          February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 14

1  interject real quick just to put in my
2  standing objection --
3       MR. BOUCHARD:  Yeah.
4       MR. STORY:  -- before we get
5  started?  Sorry, I should have done this in
6  the beginning.
7       On behalf of the Northbrook
8  Industries in the A.G. and G.W. cases, I
9  just want to assert a standing objection to
10 all questions that ask about incidents or
11 events that occurred after June and July of
12 2017, which are the -- which is the time
13 period relevant in the A.G. and G.W. case.
14      And furthermore, the parties have
15 agreed that, should any of these cases go
16 to trial, the parties will work together to
17 determine the capacity of Mr. Shareef's
18 deposition testimony, whether that be in
19 his personal capacity or his capacity as a
20 30(b)6 representative for Northbrook
21 Industries, at a time before trial.
22 Thanks.
23      MR. BOUCHARD:  That makes sense.
24 And on the time objection and the relevance
25 of certain times, I just note for the

Page 15

1  record that the timing in the J.G. matter,
2  as Mr. Story already referenced or at least
3  implied, is different than the timing in
4  the A.G. and G.W. matters.
5       MS. WARD:  While we're making sure
6  our record is clear, just wanted to also
7  put into the record that we have agreed
8  that an objection for one is an objection
9  for all.
10      MR. BOUCHARD:  Mr. Shareef, I think
11 I have one other, sort of, preliminary
12 matter to cover, and then we can get into
13 the deposition.
14      THE WITNESS:  Uh-huh.
15      MR. BOUCHARD:  You understand, sir,
16 that you are here pursuant to a notice for
17 your individual deposition, as well as a
18 separate notice for the corporate
19 representative's testimony on behalf of
20 Northbrook Industries, Inc., d/b/a, United
21 Inn and Suites.  Do you understand that?
22      THE WITNESS:  Yes.
23      MR. BOUCHARD:  And so today, you are
24 providing testimony both in your individual
25 capacity as Mr. Tahir Shareef who has

Page 16

1  factual knowledge relating to the hotel,
2  but you are also providing testimony as a
3  corporate representative of United Inn and
4  Suites.  Do you understand --
5       THE WITNESS:  Yes.
6       MR. BOUCHARD:  -- that.
7       THE WITNESS:  Yes.
8       MR. BOUCHARD:  Okay.
9       MR. STORY:  Mr. Shareef, will you
10 put your phone in your pocket?  You don't
11 want it to accidentally pick up on the
12 video.
13      THE WITNESS:  Oh, okay.
14      MR. STORY:  Thank you.
15           EXAMINATION
16 BY MR. BOUCHARD:
17      Q.   And let the record reflect, I'm showing
18 Mr. Shareef what's been marked as Plaintiff's
19 Exhibit 1.
20      MR. BOUCHARD:  Will, I have one copy
21 of this.
22      MR. STORY:  Okay.  Okay.
23      MR. BOUCHARD:  I think I will have
24 more --
25      MR. STORY:  Yeah, yeah.

Page 17

1       MR. BOUCHARD:  -- copies of others.
2       MR. STORY:  I got you.
3       MR. BOUCHARD:  I'm sure you've seen
4  this one.
5       MR. STORY:  Yeah.
6       MR. BOUCHARD:  Okay.
7       (Exhibit No. 1 was marked for
8  identification.)
9       Q.   (By Mr. Bouchard) So, Mr. Shareef, I've
10 handed you what's been marked as Plaintiff's
11 Exhibit 1, which is Amended Notice of 30(b)(6)
12 Deposition for Defendant Northbrook Industries.
13      Do you see that it?
14      A.   Yes.
15      Q.   And you understand that you have been
16 designated as the 30(b)(6) representative for
17 Northbrook Industries, correct?
18      A.   Yes.  Uh-huh.
19      Q.   And if you flip, sir, to the attachment to
20 this document, Exhibit A, the last two pages includes
21 a list of 18 topics for which you have been
22 designated as the 30(b)(6) representative of
23 Northbrook Industries.  Do you see that?
24      A.   Yes.
25      Q.   And so it says, for example, for the years

5 (Pages 14 - 17)

CONF Tahir Shareef                                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 18

1    2014 to 2020, United Inn and Suites' operations.
2        A.   Right.
3        Q.   So for that topic, you are Northbrook's
4    corporate representative.  You agree with that?
5        A.   Yes.
6        Q.   And the same is true for the rest of the
7    topics in the list here.  Do you agree with that?
8        A.   Yes.
9        Q.   You were shown this notice before today's
10   deposition, I presume?
11       A.   This one?
12       Q.   Have you seen this list of topics prior to
13   today?
14       A.   I -- I don't know, but I think -- if he
15   send it to me, I just browse through, I guess.
16       Q.   Okay.
17       A.   But I -- I didn't pay attention much.
18       Q.   Mr. Shareef, where do you live?
19       A.   I live in Jacksonville, Florida.
20       Q.   How long have you lived there?
21       A.   Since 2001 --
22       Q.   What's your -- sorry.
23       A.   2001.
24       Q.   What's your address in Jacksonville?
25       A.   3020 Pescara, P-E-S-C-A-R-A, Drive, in

Page 19

1    Jacksonville, Florida, 32246.
2        Q.   Have you lived at that address since 2001?
3        A.   No.  I just move to this new location, but
4    I still live in Jacksonville before that.
5        Q.   Okay.
6        A.   Two years before.
7        Q.   So you moved in 2021; is that what you're
8    saying?
9        A.   Yes.
10       Q.   And the address that you lived at in 2021
11   was what address?
12       A.   14130 Pleasant Point Lane, Jacksonville,
13   Florida, 32225.
14       Q.   And did you live at that address for about
15   20 years?
16       A.   Yeah.
17       Q.   Do you work anywhere in Jacksonville?
18       A.   Not right now, but I always work in
19   Jacksonville, too.
20       Q.   Around the time period 2017, 2018, 2019,
21   were you working anywhere in Jacksonville?
22       A.   I know I ran hotel, so on and off.  When
23   there was a need for me, I go there.
24       Q.   What -- what hotels were you involved with
25   in Jacksonville from 2017 to 2019?

Page 20

1        A.   The hotel called Bay Meadows Inn.
2        Q.   Any others?
3        A.   No.
4        Q.   Bay Meadows Inn is in Jacksonville?
5        A.   Yeah.
6        Q.   You said there when there was a need for
7    me to go there, I would go.
8        A.   Right.
9        Q.   Who would tell you there was a need for
10   you to go there?
11       A.   There are, you know, few other people
12   managing it.  And they -- you know, whenever they
13   need me, they can tell me.
14       Q.   Who are those people?
15       A.   Those are -- you need the name of those
16   people?
17       Q.   Yes, sir.
18       A.   Okay.  Okay.  The guy name, Mr. Ajube, is
19   one of the partner.  And the -- Ay Ajube, Ajube.  And
20   there is another guy named Fasil, F-A-S-I-L. Fasil.
21       Q.   Are you an owner of Bay Meadows Inn?
22       A.   Part owner.
23       Q.   What's your stake in Bay Meadows Inn?
24       A.   About 15 percent.
25       Q.   And when did you become an owner of Bay

Page 21

1    Meadows Inn?
2        A.   In 2014, I guess.
3        Q.   And have you remained an owner since 2014?
4        A.   No.  We then sold the property in 2018.
5        Q.   So you became an owner at -- of Bay
6    Meadows Inn in 2014, and you sold your ownership
7    interest in 2018?
8        A.   Yeah.
9        Q.   Since 2018, have you worked for any hotels
10   in Jacksonville?
11       A.   No.
12       Q.   What's your connection to the United Inn
13   and Suites?
14       A.   I'm the owner of the United Suites.
15       Q.   When did you become an owner of the United
16   Inn and Suites?
17       A.   2006.
18       Q.   How did -- how did it come to be that you
19   became an owner of the United Inn and Suites?
20       A.   I don't know what you're trying to ask.
21       Q.   In 2006, you became an owner?
22       A.   Yes.
23       Q.   You were living in Jacksonville at the
24   time?
25       A.   Right.

6 (Pages 18 - 21)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 22

1    Q.  How did you even become aware of the
2    United Inn and Suites in Decatur, Georgia?
3        A.  Oh, we -- we saw the ad in -- with one of
4    the broker.  And we pursued to buy it.  And we bought
5    it.
6        Q.  Who's we?
7        A.  That's me and my partner.  He live in New
8    York.
9        Q.  What's his name?
10       A.  His name is Mr. Sabarwal, S-A-B-A-R-W-A-L,
11   Sabarwal.
12       Q.  His first name?
13       A.  Saab, S-A-A-B.
14       Q.  When did you become partners with
15   Mr. Sabarwal?
16       A.  2006, February.
17       Q.  How did you meet him?
18       A.  Through a mutual friend.
19       Q.  You met through a mutual friend?
20       A.  Yeah.
21       Q.  Are you related to him?
22       A.  No.  No.
23       Q.  He lives in New York?
24       A.  Yes.
25       Q.  And so how did it come to be that you

Page 23

1    decided to enter a partnership with this person that
2    lived in New York and who you met through a mutual
3    friend?
4        A.  It's just a mutual understanding.
5        Q.  Mutual understanding of what?
6        A.  Of the business relation.
7        Q.  Did you discuss an interest in acquiring
8    hotels?
9        A.  Yeah.
10       Q.  And you hired a broker to help you
11   identify properties?
12       A.  Right.
13       Q.  And is that how you discovered that United
14   Inn and Suites?
15       A.  Yes.
16       Q.  So what's your ownership stake in the
17   United Inn and Suites?
18       A.  At that time, 50/50.
19       Q.  Okay.
20       A.  50 percent ownership.
21       Q.  When did it change?
22       A.  In 2014.
23       Q.  And what did it change to in 2014?
24       A.  He became a 19 percent ownership.  And I
25   became a 81 percent ownership.

Page 24

1    Q.  Why was there a change?
2        A.  Because we refinance it, and he said he no
3    longer wanted have any type of loan on his name.  So
4    the loan was in my name.  And I, you know, kind of
5    bought his shares and put the loan in my name.
6        Q.  He didn't want to have the loan on his
7    personal name; is that what you're saying?
8        A.  Yeah.
9        Q.  And so the loan was then on your personal
10   name?
11       A.  Right.
12       Q.  Is there a written partnership agreement
13   between you and Mr. Sabarwal or was this an oral --
14       A.  We have a corporation, the -- this
15   Northbrook Industries.  That's the corporation
16   resolution.
17       Q.  And in terms of the ownership stake, the
18   50/50 or 81/19, is that written in a partnership --
19       A.  Yeah.
20       Q.  -- agreement somewhere?
21       A.  Yeah.
22       Q.  So there's a document that says, that?
23       A.  That's right.
24       Q.  That you signed and that he signed?
25       A.  That's right.

Page 25

1    Q.  So were there any other partners to -- the
2    owners of United Inn and Suites since 26 -- since
3    2006, have been you --
4        A.  No.
5        Q.  -- and Mr. Sabharwal?
6        A.  That's right.
7        Q.  Has there been anybody else at any time
8    since 2006 who's been involved in ownership?
9        A.  No.
10       Q.  Just you and Mr. Sabharwal?
11       A.  That's right.
12       Q.  So, one owner lives in Jacksonville,
13   Florida; another owner lives in New York; and the
14   hotel that they own is in Decatur, Georgia; is that
15   right?
16       A.  That's right.
17       Q.  Did either you or Mr. Sabharwal regularly
18   go to the hotel?
19       A.  No.  Only me, I go regularly to the hotel.
20   And I stays months and months at the hotel.
21       Q.  You would live at the hotel?
22       A.  Yeah.
23       Q.  Mr. Sabharwal would not do that?
24       A.  No.
25       Q.  Was that part of the understanding you had

7 (Pages 22 - 25)

CONF Tahir Shareef                          February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 26

1    --
2        A.    Right.
3        Q.    -- with Mr. Sabharwal?
4        A.    Right.
5            MR. STORY:  And, Mr. Shareef, I know
6    it's hard, but just for the sake of her
7    creating a record, let him get his question
8    out.
9            THE WITNESS:  Okay.
10           MR. STORY:  I know you know where
11   he's going.
12           THE WITNESS:  Okay.
13           MR. STORY:  And in normal
14   conversation, it's normal and we just --
15   she's got to have a clean record.  So,
16   thank you.
17       Q.    (By Mr. Bouchard) Has -- to your
18   knowledge, Mr. Shareef, has Mr. Sabharwal ever been
19   to the property?
20       A.    Maybe 3 times in last 17 years.
21       Q.    And approximately how many months per year
22   would you be at the property from 2017 to 2019?
23       A.    You talking about how many months in a
24   year, or how many total months?
25       Q.    Or how many days?  Whatever is easier for

Page 27

1    you to answer.
2        A.    I --
3        Q.    Let's take 2017.
4        A.    I stays approximate 15 to 25 days here at
5    the property.
6        Q.    15 to 25 days per year?
7        A.    No, per, per, month.
8        Q.    Per month.  On average?
9        A.    Yeah.
10       Q.    You would be at the hotel?
11       A.    That's right.
12       Q.    Living there?
13       A.    That's right.
14       Q.    Was that true in 2017, 2018, and 2019?
15       A.    That's right.
16       Q.    And has that been true from 2006 to
17   present?
18       A.    That's right.
19       Q.    So you're effectively living at the United
20   Inn and Suites, even though your residential address
21   is in Jacksonville, Florida?
22       A.    That's right.  Yeah.
23       Q.    Do you receive mail at the United Inn and
24   Suites?
25       A.    On what?

Page 28

1        Q.    Do you receive personal mail at the United
2    Inn and Suites?
3        A.    As far as my personal mail, no.
4        Q.    So your mailing address, your personal
5    mailing address is still the Jacksonville, Florida,
6    address?
7        A.    Yes.
8        Q.    Are you married?
9        A.    Yes.
10       Q.    Does your wife live in Jacksonville or at
11   the United Inn and Suites?
12       A.    Live in Jacksonville, but she sometimes
13   travels with me.
14       Q.    So is there a residence at the United Inn
15   and Suites, or where do you stay at the hotel itself?
16       A.    Yeah, there is a one bedroom apartment
17   there.
18       Q.    And where is that apartment located?
19       A.    On the third floor.
20       Q.    Can you tell me a little bit more about
21   that.  It's a big hotel, right?
22       A.    Yes.
23       Q.    So where -- where in the hotel?
24       A.    On the third floors above the Room 247.
25   And I can say behind the elevator.

Page 29

1        Q.    Are there regular hotel guest rooms on
2    either side of the -- this apartment?
3        A.    On the backside of the apartment, there
4    are regular rooms.  But the -- beside the apartment,
5    no.
6        Q.    Does -- this one bedroom apartment that
7    you're describing, does it face Memorial Drive?
8        A.    No.
9        Q.    Is it on the backside of the hotel?
10       A.    Yes.
11       Q.    When you are working at the United Inn and
12   Suites for 15 to 25 days per month on average, what
13   -- what are you doing at the hotel?
14       A.    I -- I manage the payroll, I take care of
15   the, you know, the maintenance, take care of the
16   cleaning staff, the front desk staff, all aspects of
17   the -- managing the hotel.  Including sometimes,
18   working at the front desk.
19       Q.    You oversee the property?
20       A.    That's right.
21       Q.    You monitor the property?
22       A.    Yes.
23       Q.    Do you supervise the staff at the hotel?
24       A.    Yes.
25       Q.    Would you call yourself the manager of the

8 (Pages 26 - 29)

CONF Tahir Shareef                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 30

1  hotel?
2      A.  Yes, I can say that.
3      Q.  What is Ashar Islam's title?
4      A.  He is there when I'm not there, but he's
5  also there when I'm there.  So he -- he also do
6  exactly the same thing what I do.
7      Q.  Does he report to you?
8      A.  Yes.
9      Q.  Are you his boss?
10     A.  Yes.
11     Q.  Do you have a boss?
12     A.  No.
13     Q.  Do you report to Mr. Sabharwal?
14     A.  No.
15     Q.  Do you update him on the operations of the
16  hotel?
17     A.  No.
18     Q.  Does he receive information about the
19  revenues of the hotel?
20     A.  He receives K-1, K11?  What it's called?
21  I mean...
22     Q.  A partnership income statement?
23     A.  Partnership, yeah.
24     Q.  So you never talk -- whether it's via
25  text, phone, e-mail, letter, any other way, you never

Page 31

1  talk to Mr. Sabharwal about the operation of the
2  hotel?
3      A.  I don't want to say never talk, but we do
4  talk, you know.  I ask what movie he's watching, you
5  know, something like that.
6      Q.  Well, I'm not -- I'm not talking about
7  talking about random things, I'm talking about the
8  hotel.  Do you discuss the hotel with Mr. Sabharwal?
9      A.  No.
10     Q.  So when you are not at the United Inn and
11  Suites, is Ashar Islam functioning as the head
12  manager of the hotel?
13     A.  That's right.
14     Q.  And what if Ashar Islam is off because he
15  can't work 24 hours a day, every day, who would be
16  the other person who would be the manager?
17     A.  Whoever is at the front desk, you know,
18  they are the one that take care of it.
19     Q.  When you say that sometimes you work
20  behind the front desk, can you describe that for me?
21  Is the front desk in a lobby where you would walk
22  into the front desk, or is there a different
23  arrangement?
24     A.  Yes.  It's a lobby.  The peop- -- the
25  customer walk into us, and we check in, check out,

Page 32

1  you know, the customers.
2      Q.  Is there also a window that people can
3  walk up to with a store behind the window?
4      A.  Yes.
5      Q.  Can people use that window to check into
6  the hotel?
7      A.  That's right.
8      Q.  How do you decide whether you're going to
9  have potential guests and customers come up to the
10  window versus the lobby?
11     A.  Window open only at night, but during the
12  COVID time, we strictly do business through the
13  window.
14     Q.  So you --
15     A.  So the front desk is -- front desk door is
16  basically closed, and we run the business through the
17  window.
18     Q.  So during COVID, you basically shut down
19  the lobby?
20     A.  Right.
21     Q.  At nighttime, you basically shut down the
22  lobby?
23     A.  That's right.
24     Q.  And only do business through the window?
25     A.  Yes -- no, but during the COVID, shut down

Page 33

1  the lobby at all.
2      Q.  Right.
3      A.  24/7.
4      Q.  Right.
5      A.  But like now, we open in the daytime, you
6  know, until like at 9 p.m. through the lobby.  And
7  after that, we work through the window.
8      Q.  Was it the same in 2017 to 2019?
9      A.  Yes.
10     Q.  So from about 9 p.m. until --
11     A.  6, 6 a.m.
12     Q.  So from 9 p.m. until 6 a.m., in the years
13  2017 to 2019, if somebody was going to rent a room or
14  buy a drink or food or condoms or something else,
15  they would go to the window --
16     A.  Yes.
17     Q.  -- to buy them; is that right?
18     A.  That's right.
19     Q.  So, I think -- I think we have
20  established, Mr. Shareef, that when you're at the
21  United Inn and Suites from 2006 until present, on
22  average, you're there about 15 to 25 days per month,
23  right?
24     A.  That is right.
25     Q.  And you're living on the property when

9 (Pages 30 - 33)

CONF Tahir Shareef                                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 34

1    you're there?
2        A.    That is right.
3        Q.    Are you working 40-hour weeks, or would
4    you say you're working more than that because you're
5    living there?
6        A.    Working more than that.  Yeah.
7        Q.    So we're talking about, basically, the
8    last 20 years, 17 years you've been at the United Inn
9    and Suites a lot.
10       A.    Yes.
11       Q.    Would you say that anybody's been at the
12   property more than you during that time period?
13       A.    When you say "anybody," I -- I don't know
14   what you talking about.
15       Q.    Well, any other person, any other person
16   who works at the United Inn and Suites.  Has anybody
17   been at the property for longer than you have?
18       A.    No.
19       Q.    Would you say you're more knowledgeable
20   about the property than anybody else?
21       A.    Yes.
22       Q.    Because you've spent more time there than
23   anybody else has?
24       A.    Yes.
25       Q.    You know better than anybody else does,

Page 35

1    then, I take it, the staff at the hotel from 2017 to
2    2019?
3        A.    Yes.
4        Q.    The guests at the property during that
5    period?
6        A.    Yes.
7        Q.    The police officers who came by the
8    property during that period?
9        A.    Yes.
10       Q.    How did you come to know Tahir -- I'm
11   sorry.  How did you come to know Ashar Islam?
12       A.    He's a family member.
13       Q.    A family member of yours?
14       A.    Yes.
15       Q.    What is the family relationship?
16       A.    He is my nephew.
17       Q.    Nephew.  At -- at some point, he becomes
18   the registered agent for Northbrook Industries; is
19   that right?
20       A.    Yes.
21       Q.    Did you ask him to do that because he was
22   your nephew, or why did you ask him to do that?
23       A.    I don't know, but on one time -- I don't
24   know how that happened, but of course we ask him
25   that, you know, we need his name for the agent.  And

Page 36

1    he had no objection, so he said that's fine.  I don't
2    know why.
3        Q.    Who are the officers of Northbrook
4    Industries, Inc.?
5        A.    Myself and Sabharwal.
6        Q.    Anybody else?
7        A.    No.
8        Q.    And what's your title as an officer?
9        A.    The president.
10       Q.    Was it true in 2017 to 2019, that the only
11   officers of United Inn and Suites was you and
12   Mr. Sabharwal?
13       A.    Yes.
14       Q.    Is the United Inn and Suites a chain?
15       A.    No.
16       Q.    Is it affiliated with any other hotels?
17       A.    I used to have another hotel called United
18   Inn and Suites in Macon, Georgia.
19       Q.    When was that?
20       A.    Since 2012 through 2021.
21       Q.    From 2012 to 2021, you had a property
22   called the United Inn and Suites in Macon, Georgia?
23       A.    Yes.
24       Q.    And you were the owner of that hotel?
25       A.    Yes.

Page 37

1        Q.    With Mr. Sabharwal?
2        A.    No.
3        Q.    Sole owner?
4        A.    Yes.
5        Q.    And I assume you identified that property
6    through a broker again?
7        A.    Yes.
8        Q.    Was there a relationship between the
9    United Inn and Suites in Macon and the United Inn and
10   Suites in Decatur?
11       A.    On -- on what relation?  On what basis?
12       Q.    Well, they had the same name.
13       A.    Right.
14       Q.    So did they share employees?
15       A.    No.
16       Q.    Did you work at both hotels?
17       A.    Yes.
18       Q.    Did Mr. Shareef work at both hotels?
19       A.    Who?
20       Q.    Did Mr. Islam work at both hotels?
21       A.    No.
22       Q.    Does your wife work at the United Inn and
23   Suites?
24       A.    Yes.
25       Q.    So when she travels with you from

10 (Pages 34 - 37)

CONF Tahir Shareef                           February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 38

1    Jacksonville, she will work at the hotel with you?
2        A.   Yes.
3        Q.   Did she work at the Macon, Georgia, United
4    Inn and Suites?
5        A.   Yes.
6        Q.   Do you have any other family members who
7    work at the United Inn and Suites in Decatur,
8    Georgia?
9        A.   Not right now.
10       Q.   In 2017 to 2019, did you have any family
11   members?
12       A.   Yes.
13       Q.   And who were your family members who
14   worked at the United Inn and Suites during that time
15   period?
16       A.   There is gentleman name called Saad Iqbal,
17   S-A-A-D I-Q-B-A-L.
18       Q.   Anybody else?
19       A.   No.
20       Q.   Who is Saad Iqbal?
21       A.   He's a nephew.
22       Q.   Is he a brother of Tahir?
23       A.   A brother of?
24       Q.   I'm sorry, I keep -- I'm sorry.  I had it
25   in my mind that I was going to be deposing Mr. Islam

Page 39

1    first, and so it's taking me some time because we've
2    not met.  Is he a brother of Ashar Islam?
3        A.   He is his nephew.  I can say it that way.
4        Q.   So you are related to both?
5        A.   Yes.
6        Q.   Got it.  And what was Saad's job at the
7    United Inn and Suites in Decatur?
8        A.   He works at the front desk.
9        Q.   He no longer works there, but in 2017 to
10   2019 he did?
11       A.   He did -- say it again, please.
12       Q.   I thought you said that Saad Iqbal
13   previously worked at the United Inn and Suites --
14       A.   Yes.
15       Q.   -- right?  And he worked at the front desk
16   at the hotel?
17       A.   Right.
18       Q.   And that was from around 2017 to 2019?
19       A.   Yes.
20       Q.   Did he also, Saad Iqbal, work at the
21   United Inn in Macon, Georgia?
22       A.   Yes.
23       Q.   What was his job there?
24       A.   Working at the front desk.
25       Q.   And how would he know which United Inn he

Page 40

1    was supposed to go work at?  Would you tell him where
2    you needed his help?
3        A.   Yes.
4        Q.   Same thing with your wife, would -- how
5    would she know which hotel to be working at?
6        A.   She basically travel with me, so wherever
7    I am, well, she's there to help me.
8        Q.   Is there anybody else, other than you,
9    your wife, and Saad Iqbal, who worked at both United
10   Inn in Decatur and the United Inn in Macon?
11       A.   No.
12       Q.   Who -- who decides whether to hire
13   somebody to work at the United Inn and Suites in
14   Decatur, Georgia?
15       A.   Either myself or Ashar.
16       Q.   Was that true from 2017 to 2019?
17       A.   Yes.
18       Q.   In other words, from that time period,
19   2017 to 2019, you and Ashar Islam were the people
20   with responsibility for hiring staff at the hotel?
21       A.   Yes.
22       Q.   Tell me about how you would go about
23   hiring staff.  Is there an interview?
24       A.   Yes.
25       Q.   Do you do a criminal history check?

Page 41

1        A.   Yes.
2        Q.   And do you get some kind of documentation
3    of the criminal history check?
4        A.   Yes.
5        Q.   That you keep in a file?
6        A.   Yes.
7        Q.   I can represent to you, Mr. Shareef, that
8    there have been documents produced in this case, and
9    I haven't seen any criminal history check records.
10   Do you know why that would be?
11       A.   Because maybe I have those people they
12   come with the reference.  So that could be the
13   reason.
14       Q.   Are you saying that if somebody came with
15   a reference, you wouldn't do a criminal history
16   check?
17       A.   No.
18       Q.   So you would not do one if somebody was
19   referred to you?  Are you saying yes, that's correct,
20   I would not do one?
21       A.   Yes.
22       Q.   Would you do one of a family member?
23       A.   A criminal history check?
24       Q.   Correct.
25       A.   When I hired these people, I did not do

11 (Pages 38 - 41)

CONF Tahir Shareef                                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 42

1   the criminal check.
2       Q.   You said when somebody was referred to
3   you, you wouldn't do a criminal history check.  How
4   would somebody have been referred to you?
5       A.   Through some friend.  Maybe the hotel
6   owner.
7       Q.   Mr. Sabharwal?
8       A.   No.
9       Q.   So who do you mean when you say the other
10  hotel owner?
11      A.   Other hotel owner in the area.
12      Q.   Okay.
13      A.   In DeKalb County or Atlanta area.
14      Q.   Are you familiar with the owners of other
15  hotels in DeKalb County?
16      A.   Few of them, yes.
17      Q.   Is it a professional acquaintance or
18  personal friendship, or how would you describe it?
19      A.   Of course they are personal friends, but
20  they are professional, you know, owning some
21  businesses, some hotels.
22      Q.   And how did you get to know various other
23  hotel owners in DeKalb County?
24      A.   Just through other people.  Maybe meeting
25  -- somewhere we meet together and have a lunch

Page 43

1   together, dinner together.
2       Q.   Are you a member of any organizations for
3   hotel owners?
4       A.   AAHOA, I used to be.
5       Q.   The Asian American Hospitality --
6       A.   Yes, yes.
7       Q.   -- Hotel Owners --
8       A.   Right.
9       Q.   -- Association?  Okay.
10          Are you a member of the American Hotel and
11  Lodging Association?
12      A.   No, not that.
13      Q.   Are you a member of any other hospitality,
14  lodging, hotel associations or organizations?
15      A.   No.
16      Q.   When were you a member of AAHOA?
17      A.   Kind of off and on in 2000 -- 2000, maybe
18  -- probably in 2020, '19.  From 1998.
19      Q.   Until 2019?
20      A.   Off and on.
21      Q.   Off and on?
22      A.   Yes.
23      Q.   When did you first start working in
24  hotels, Mr. Shareef?
25      A.   1998.

Page 44

1       Q.   And at what hotel?
2       A.   There was a hotel in Jacksonville,
3   Florida.
4       Q.   Called?
5       A.   Called Day's Inn.
6       Q.   And how long did you work there?
7       A.   I own that one from 1998 to 2000.
8       Q.   Did you own any other hotels other than
9   the Day's Inn, at the time you owned the Day's Inn?
10      A.   No.
11      Q.   After you sold the Day's Inn, did you
12  purchase another hotel?
13      A.   Yes.
14      Q.   What was that?
15      A.   It called Travel Inn.
16      Q.   Was that in Jacksonville?
17      A.   Right.
18      Q.   How long did you own that?
19      A.   From 2000 through 2005.
20      Q.   So right now, I have that you, at
21  different points in time, have owed -- owned the
22  United Inn and Suites in Decatur, United Inn and
23  Suites in Macon, the Bay Meadow Hotel in
24  Jacksonville, the Travel Inn in Jacksonville, and the
25  Day's Inn in Jacksonville.  Is that correct?

Page 45

1       A.   Yes.
2       Q.   Are there any other hotels that I didn't
3   just mention that you owned at any point in time?
4       A.   No.
5       Q.   Are there any hotels that you ever worked
6   at as an employee, not as an owner?
7       A.   No.
8       Q.   So the very first hotel that you ever had
9   any affiliation or involvement with was the Day's Inn
10  in 1998?
11      A.   That's right.
12      Q.   Did -- have you at any point, Mr. Shareef,
13  participated in any training on how to run a hotel?
14      A.   Yes.
15      Q.   Through -- through what organization or
16  organizations were you trained?
17      A.   Through AAHOA, through Day's Inn.
18      Q.   Anything else?
19      A.   No.
20      Q.   So you received training through Day's Inn
21  on how to run a hotel?
22      A.   Yes.
23      Q.   Were you the manager of the Day's Inn,
24  during the time --
25      A.   Manager/owner, yes.

12 (Pages 42 - 45)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 46

1    Q.  -- you owned it?
2    A.  You can say manager, too.
3    Q.  And you also received training on hotel
4 operations through AAHOA?
5    A.  Yes.
6    Q.  When did you receive the training on hotel
7 operations from AAHOA?
8    A.  That is on and off.  Whenever they offer a
9 training and it's the time permitted on the --
10 sometime the training is for a few months, sometimes
11 it's few weeks, but on and off, they offer a training
12 session.  And I took the advantage.
13    Q.  Was that in person or online?
14    A.  At that time, it was on -- not online.  It
15 was all in person.
16    Q.  So when is the last time that you
17 participated in a training on running a hotel?
18    A.  I can say maybe 2002.
19    Q.  So, since 2002, you do not believe you
20 have participated in any trainings on running hotels?
21    A.  The training, I -- I participate in
22 meeting with the DeKalb County.  And they have
23 presented, you know, some of the rules and
24 regulation, you know, and the little bit talk about
25 staff training and the safety procedure of the hotels

Page 47

1 in the DeKalb County.  And that is meetings for half
2 a day.  And this only couple of times.
3    Q.  Who in DeKalb County provided those
4 trainings?
5    A.  The DeKalb County.  I believe that's
6 DeKalb County some -- I think they call it tourism
7 department.
8    Q.  Are you saying that you think you attended
9 more than one half-day training with the DeKalb
10 County Tourism Department?
11    A.  Yes.
12    Q.  And would that have been after 2002?
13    A.  Yeah, in 2000 -- maybe '13, '14, something
14 like that.
15    Q.  Do you recall who led those trainings?
16    A.  No.
17    Q.  Have you ever participated in any
18 trainings led by the DeKalb County Police Department?
19    A.  There was a police department there at the
20 training.  They have police chief and they have bunch
21 of other police officer there.  And they talk about
22 it.
23    Q.  Do you have any documents from any of the
24 trainings that you attended?
25    A.  They -- they give you handout, so I have

Page 48

1 those.
2    Q.  You do have those?
3    A.  Yeah.
4    Q.  Where are those?  Are they at your house
5 or are they at the hotel or...
6    A.  No, they are at the -- at the business.
7 But we kind of, you know, take whatever the bullets
8 point and have our own, kind of, guidelines.
9    Q.  Because those have not been provided in
10 discovery, so I'm just trying to understand if you
11 know why that would be.
12    A.  Because they are bunch of handouts, and we
13 had our -- well, like our own, kind of, guidelines.
14 So we are using that.
15    Q.  Other than you wife, Ashar Islam, and Saad
16 Iqbal, are there any other family members of you,
17 Tahir Shareef, whoever worked at the United Inn and
18 Suites in Decatur?
19    A.  No.
20    Q.  It's only those three?
21    A.  Right.
22    Q.  And let's take 2017 as an example,
23 Mr. Shareef.  When you were at the property in 2017,
24 who -- how many people would be working during any
25 given shift?

Page 49

1    A.  Each shift has one person at the front
2 desk, and then bunch of housekeepers, and the
3 maintenance person, and the cleaning staff, the
4 ground cleaning staff.
5    Q.  That sounds like a lot of people working
6 during a shift.
7    A.  Yes.
8    Q.  And so how many people is that?
9    A.  Any given shift, we have five
10 housekeepers, one front desk person, and one cleaning
11 staff taking care of the yard work.
12    Q.  So at any given point in time, there would
13 be seven people working during a shift?
14    A.  In the daytime, yes.
15    Q.  In the daytime shift?
16    A.  Yes.
17    Q.  What about during the nighttime shift?
18    A.  Nighttime, there is only one person who
19 work at the front desk.  And the -- the police
20 officer come late at night.
21    Q.  So, the nighttime shift would be one hotel
22 staff member at the front desk.
23    A.  Right.
24    Q.  And then for a certain portion of the
25 night, a police officer; is that correct?

13 (Pages 46 - 49)

CONF Tahir Shareef                              February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 50

1    A.   Yes.
2    Q.   Anybody else working at the hotel?
3    A.   No.
4    Q.   And we've already established that during
5  the nighttime, the hotel lobby's shut down, so the
6  person working would be working behind the window?
7    A.   That's right.
8    Q.   When your wife and your nephews have
9  worked at the United Inn and Suites, I assume that
10 you're the one supervising them; is that right?
11   A.   Yes.
12   Q.   There's not somebody else who supervises
13 them because they're you're family members?
14   A.   Ashar is there to supervise also.
15   Q.   But they're his family members, too,
16 right?
17   A.   Yeah.
18   Q.   When -- looking at 2017 to 2019, and
19 focusing on that time period, Mr. Shareef, during
20 that time window, did you have responsibility for
21 training staff at the United Inn and Suites?
22   A.   Yes.
23   Q.   Did Mr. Islam have responsibility for
24 that, too?
25   A.   Yes.

Page 51

1    Q.   And you, earlier, outlined your
2  responsibilities at the hotel generally.  And you
3  said they included monitoring the property,
4  supervising staff, and you listed some other items.
5  Would you say that Mr. Islam's responsibilities were
6  identical to yours when he was working?
7    A.   Yes.
8    Q.   What's your understanding of why we're
9  here today, Mr. Shareef?
10   A.   To answer your questions, I guess.
11   Q.   Well, do you have an understanding of why
12 I noticed your deposition for today and what the
13 lawsuits in these cases are about?
14   A.   Yes.  It's -- there are three girls,
15 they -- you know, they sue us that they are living
16 sometime at the property.
17   Q.   Do you understand why they've sued?
18   A.   I don't know how to answer that.  I mean,
19 I -- I -- I don't know how to answer that.
20   Q.   Well, do you have an understanding of what
21 they're alleging happened at the property?
22   A.   Yes, I understand that.
23   Q.   What is it that you understand they've
24 alleged happened to them that property?
25   A.   Says they are minor and they are doing

Page 52

1  prostitution there.
2    Q.   What do you consider prostitution?
3        MR. STORY:  Object to the form.  You
4    can answer.
5        THE WITNESS:  I -- I -- I don't know
6    if prostitution, a common word, I guess.
7    Q.   (By Mr. Bouchard) What does it mean to
8  you?
9    A.   Prostitution, they take money for the sex.
10   Q.   Are you familiar with the term sex
11 trafficking?
12   A.   I -- I read through the -- some papers
13 says sex trafficking.
14   Q.   What do you understand that term to mean?
15   A.   Meaning the prostitution, you know, same
16 thing.
17   Q.   Do you think there's a difference between
18 prostitution and sex trafficking?
19   A.   I don't --
20       MR. STORY:  Object to the form.  You
21   can answer.
22       THE WITNESS:  -- think so.
23   Q.   (By Mr. Bouchard) When did you first heard
24 -- hear the term "sex trafficking"?
25   A.   You know, see news, here and there, you

Page 53

1  know, about the sex trafficking.
2    Q.   So you have heard the term prior to this
3  lawsuit, I take it?
4    A.   Yeah, yeah.  It shows -- like I said,
5  there was a -- the meetings with the DeKalb County,
6  so this thing come up, you know, sex trafficking and
7  prostitution.
8    Q.   Were those topics discussed at the DeKalb
9  County trainings that you attended?
10   A.   I believe so, yes.
11   Q.   Do you remember what was said about those
12 topics?
13   A.   Yes.  The people, you know, use the hotel
14 to rent a room and do the prostitution there.
15   Q.   So by 2017, did you understand that hotels
16 were places used for prostitution and sex
17 trafficking?
18   A.   Yes.  I can say yes.
19   Q.   Did the trainings through DeKalb County
20 provide you with signs and red flags and things to
21 look for that would indicate victims of sex
22 trafficking on your hotel property?
23   A.   Yes, that was a part of that, you know,
24 conversation.
25   Q.   What did you understand those signs and

14 (Pages 50 - 53)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 54

1  red flags and indicators of sex trafficking to be?
2      A.  For me, I believe it's the same as a, you
3  know, prostitution.  Sex trafficking is the same.
4      Q.  And I heard you say that earlier.  I'm
5  asking a slightly different question.
6      A.  Uh-huh.
7      Q.  I think you said that at the DeKalb County
8  trainings, one of the things they discussed in the
9  trainings was things that you could look for as a
10  hotel owner and observe with your -- with your
11  eyes --
12     A.  Right.
13     Q.  -- to make an assessment as to whether or
14  not somebody may be a victim of sex trafficking.  And
15  I thought you said yes, that that was an aspect of
16  the training.
17     A.  Uh-huh.
18     Q.  Is that correct?
19     A.  Yeah.
20     Q.  So what did they tell you about what you
21  could look for with your eyes that would be an
22  indication that somebody is a victim of sex
23  trafficking?
24     A.  Yeah, it was told that, you know, somebody
25  coming and complain to you, you go and, you know,

Page 55

1  call the police, DeKalb County police, and just
2  direct to them that this person is complaining.  Or
3  if you observe that there's a -- in any particular
4  room, there are people, you know, going in and out
5  more than they're supposed to and you check it, and
6  then, you know, if it's necessary, then call the
7  police.
8      Q.  Anything else that you recall about the
9  trainings?
10     A.  That's kind of it.
11     Q.  I'm showing you what's been marked as
12  Plaintiff's Exhibit 2, which is Bates-stamped
13  Plaintiff 24763 to 24768.
14         (Exhibit No. 2 was marked for
15         identification.)
16     Q.  (By Mr. Bouchard) Do you see what I've
17  just handed you, Mr. Shareef?
18     A.  Yes.
19     Q.  And do you see the first page at the top
20  also says, Blue Campaign?
21     A.  Uh-huh.
22     Q.  Do you see that in the middle of the first
23  page, it says Hospitality Toolkit?
24     A.  Right.
25     Q.  And then do you see on the bottom left of

Page 56

1  the first page, it says, Who we are.  The Blue
2  Campaign is the unified voice for the U.S. Department
3  of Homeland Security's efforts to combat human
4  trafficking.  Working with law enforcement,
5  government, and nongovernmental and private
6  organizations, the Blue Campaign strives to protect
7  the basic right of freedom and bring those who
8  exploit human lives to justice.  Do you see that?
9      A.  Uh-huh.
10     Q.  Are you familiar with the Blue Campaign?
11     A.  Not on this one, no.
12     Q.  If you take a look at the second page of
13  Plaintiff's Exhibit 2, do you see that there are
14  three bullet points in the top half of the page?
15     A.  Uh-huh.
16     Q.  One also says sex trafficking --
17     A.  Uh-huh.
18     Q.  -- do you see that?
19     A.  Yes.
20     Q.  And I want to read to you what it says
21  under sex trafficking.  It says, Victims of sex
22  trafficking are manipulated or forced to engage in
23  sex acts for someone else's commercial gain.  Sex
24  trafficking is not prostitution.
25         Do you see that?

Page 57

1      A.  Yes.
2      Q.  Do you agree with that?
3      A.  Yes.
4      Q.  You're not disputing what the Department
5  of Homeland Security says in this Blues campaign --
6      A.  No.
7      Q.  -- statement, right?
8      A.  I agree with that.
9      Q.  And do you see in the next section here it
10  says, Anyone under the age of 18 engaging in
11  commercial sex is considered to be a victim of human
12  trafficking.
13         Do you see that?
14     A.  Yes.
15     Q.  And then you see it says in bold, No
16  exceptions?
17     A.  Yes.
18     Q.  Do you see that?
19     A.  Uh-huh.
20     Q.  Do you agree with that?
21     A.  Yes.
22     Q.  You're not saying that you have a
23  different view on sex trafficking than what's stated
24  in this form right here?
25     A.  Huh-uh.

15 (Pages 54 - 57)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 58

1    Q.   Is that correct?
2    A.   Yes.
3    Q.   So do you agree that anyone under the age
4  of 18 engaging in commercial sex is a victim of human
5  trafficking?
6    A.   Yeah, I agree.
7    Q.   Do you agree that sex trafficking is not
8  prostitution?
9    A.   Yeah, I agree it says.
10   Q.   Do you understand that the plaintiffs in
11 each of these cases, J.G, A.G., and G.W., were under
12 the age of 18 at the time that they were at the
13 United Inn and Suites?
14   A.   I understand that.
15   Q.   And do you understand that each of those
16 three young women have alleged that they were engaged
17 in commercial sex activity at the hotel?
18   A.   That's what they, yeah, alleging, yes.
19   Q.   Are you saying that's not true?
20   A.   No, but I don't know.  I find out, you
21 know, when see this lawsuit.  But I don't know at
22 that time, no.
23   Q.   I assume you would defer to the
24 conclusions of law enforcement and a judge --
25   A.   Yes.

Page 59

1    Q.   -- as to whether or not they were sex
2  trafficked?
3        MR. STORY:  Object to the form.  You
4    can answer.
5        THE WITNESS:  I -- I -- I don't know
6    that time about this case.  These people
7    never come to me, you know, so I don't have
8    any knowledge.
9    Q.   (By Mr. Bouchard) You don't know one way
10 or another if they were sex trafficked at the hotel.
11 Is that what you're saying?
12   A.   Yes.
13   Q.   Mr. Shareef, the -- the time period that
14 we're focusing on in today's deposition is 2017 to
15 2019.  I may ask you questions about other time
16 periods, but I'd like to really focus in on those
17 years.
18   A.   Okay.
19   Q.   During that time period, that is 2017 to
20 2019 --
21   A.   Uh-huh.
22   Q.   -- would you say that it was true or false
23 that the United Inn and Suites had a high level of
24 crime?
25   A.   I -- I can say that I find -- find it, you

Page 60

1  know, that the -- when I see your report.  But, of
2  course, we have this area that's a pretty high crime
3  area.
4    Q.   And I'm not -- I appreciate the answer.
5  I'm not asking generally about Memorial Drive or
6  DeKalb County as a whole, or even metro Atlanta.
7    A.   Uh-huh.
8    Q.   I'm asking specifically about the United
9  Inn and Suites at 4649 Memorial Drive.
10   A.   Uh-huh.
11   Q.   Did that hotel, in your opinion, from 2017
12 to 2019, have a high level of crime?
13       MR. STORY:  Object to the form.  You
14   can answer.
15       THE WITNESS:  I have -- you know, I
16   have found out, you know, after that, you
17   know, when I see those reports.  Because I
18   can say that, you know, we -- you know,
19   when we need the police officer for any
20   type of help, so I believe we call almost
21   two calls a week, maybe three calls a week.
22   But the list, what I see there, this is --
23   happened after, you know, the something
24   happened.  I did not know most of these
25   incidents.

Page 61

1    Q.   (By Mr. Bouchard) When you say "the list,"
2  what list are you referring to?
3    A.   I see a list about the, you know, the --
4  something happened in -- back in June 2018, something
5  happened in July '19.  So the cases, they -- the date
6  of some incident happened.
7    Q.   Are you talking about the complaints --
8    A.   The complaint.
9    Q.   -- of these lawsuits?
10   A.   Not the complaints of these lawsuits.
11   Q.   You're talking about a different document?
12   A.   Not the different document.  I see a list
13 of -- bunch of, you know, reports.
14   Q.   The police reports?
15   A.   It says -- that was -- is a list.  I don't
16 know.  I see that one.
17       MR. STORY:  He's referring to
18   Requests for Admissions.
19       MR. BOUCHARD:  Oh, okay.
20       MR. STORY:  That you sent.
21       MR. BOUCHARD:  Okay.
22       MR. STORY:  -- and the list of the
23   prior crimes that --
24       MR. BOUCHARD:  Understood.
25       MR. STORY:  -- have been --

16 (Pages 58 - 61)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 62

1    MR. BOUCHARD: Okay.
2    MR. STORY: -- admitted. That's
3 when -- he's referring to the list --
4    THE WITNESS: Yeah, that's -- that's
5 the one. Yeah.
6    MR. BOUCHARD: Okay.
7    MR. STORY: Correct me if I'm wrong,
8 but that is --
9    MR BOUCHARD: Thanks, Will. Yeah.
10    MR. STORY: -- what he -- sorry, I'm
11 not trying to --
12    MR. BOUCHARD: No, no.
13    Q. (By Mr. Bouchard) So discovery request
14 that we sent --
15    A. Right.
16    Q. -- in this case or these cases, that's the
17 list you're talking about?
18    A. Yes, that is.
19    Q. Okay.
20    A. That's --
21    Q. Got it. From 2017 to 2019, is it your
22 opinion that activities like prostitution were common
23 at the United Inn and Suites?
24    MR. STORY: Object to the form. You
25 can answer.

Page 63

1    THE WITNESS: After looking at that
2 report, I can say yes. I don't know.
3    Q. (By Mr. Bouchard) Well, you're saying
4 after looking at that report, but you've told me,
5 Mr. Shareef, that in 2017 and 2019, you were spending
6 15 to 25 days at the hotel.
7    A. Right.
8    Q. Every month?
9    A. Yes.
10    Q. And that you were working more than
11 40 hours a week because you were living at the hotel?
12    A. Yes.
13    Q. And your wife, oftentimes, was with you
14 also working at the hotel?
15    A. Yes.
16    Q. And you had multiple family members
17 working at the hotel, right?
18    A. Yes.
19    Q. And you talked to staff who you supervised
20 about the operations at the property, right?
21    A. Yes.
22    Q. So I'm not asking you to take my list for
23 it. I'm asking you for your observations during that
24 time, either based on conversations you had with your
25 wife or Saad Iqbal or Ashar Islam, or any other staff

Page 64

1 member, or based on something that you yourself
2 observed.
3    Did you believe that from 2017 to 2019,
4 that activities like prostitution were common at the
5 United Inn and Suites?
6    MR. STORY: And can I just get a
7    clarification of when are we talking about
8    his knowledge. His knowledge right now or
9    his knowledge in 2019?
10    Q. (By Mr. Bouchard) Well, you can answer
11 however you see fit.
12    A. I can say I'm not aware of it.
13    Q. You're not aware of it?
14    A. Yeah.
15    Q. So your testimony is, I was not aware of
16 there being any prostitution at the United Inn and
17 Suites from 2017 to 2019?
18    MS. WARD: Objection --
19    THE WITNESS: At that time.
20    Q. (By Mr. Bouchard) At that time?
21    A. Yeah.
22    Q. That's your testimony?
23    A. Yeah.
24    Q. Under oath?
25    A. Yeah.

Page 65

1    Q. You had no knowledge of any prostitution
2 at the hotel?
3    A. No.
4    Q. And would your wife's testimony, do you
5 believe would it be the same?
6    A. Yes.
7    Q. Do you believe there would be staff
8 members at the hotel who would testify differently?
9    A. I don't know, but -- I don't know how
10 they...
11    (Exhibit No. 3 was marked for
12    identification.)
13    Q. (By Mr. Bouchard) Showing you what's been
14 marked as Plaintiff's Exhibit 3. You see that this
15 is a PowerPoint prepresentation from Luz Borrero, who
16 I can represent to you, Mr. Shareef, was the deputy
17 operating officer for development for DeKalb County.
18 You see that on the first page of Plaintiff's
19 Exhibit 3?
20    A. Yes.
21    Q. Do you know Ms. Borrero?
22    A. No.
23    Q. She's now involved with running MARTA for
24 the City of Atlanta, so she's gotten some promotions
25 along the way. But in 2015, she was working in

17 (Pages 62 - 65)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 66

1  DeKalb County in the office of development. Is it
2  possible that this is the office that provided
3  trainings that you were referring to earlier? You
4  said it -- you thought it might be the office of
5  tourism.
6      A.  I don't know.
7      Q.  You don't know one way or another?
8      A.  No.
9      Q.  You see that this is entitled Extended
10 Stay Hotels and Motels Intervention Strategy Steering
11 Committee. You see that?
12     A.  Yes.
13     Q.  And it says underneath that, An initiative
14 to address crime, health, and code compliance issues
15 in hotels, motels, and extended stay establishments
16 within DeKalb County. Do you see that?
17     A.  Uh-huh.
18     Q.  And then you see on the next page, sir, it
19 says, Methodology utilized produced a total of ten
20 hotels and motels ranked with the highest number of
21 crimes, code, and health violations. Do you see
22 that?
23     A.  Yes.
24     Q.  And you see there's a list here of the top
25 ten hotels with the highest number of crimes, code,

Page 67

1  and health violations, true?
2      A.  Yes.
3      Q.  And number four on the list is United Inn
4  and Suites; is that right?
5      A.  Right.
6      Q.  4649 Memorial Drive, correct?
7      A.  Uh-huh.
8      Q.  Do you -- is that a yes, sir?
9      A.  Yes.
10     Q.  I'm just going to remind politely, sir, I
11 realize in --
12     A.  Yes.
13     Q.  -- normal conversation we speak that way,
14 but please use "yes" or "no" for the record.
15         So that's a yes?
16     A.  Yes.
17     Q.  Do you dispute that?
18         MR. STORY: Object to the form. You
19 can answer.
20         THE WITNESS: I don't know how to
21 answer.
22     Q.  (By Mr. Bouchard) I mean, are you sitting
23 here saying I can't believe that's true, that has to
24 be wrong, there's no way United Inn and Suites was
25 the fourth worst hotel in DeKalb County based on --

Page 68

1      A.  Right.
2      Q.  -- the number of crimes, code, and health
3  violations?
4      A.  Right.
5      Q.  You are saying that has to be wrong?
6      A.  Yes.
7      Q.  So that's your testimony?
8      A.  Uh-huh.
9      Q.  Okay.
10     A.  Yes.
11     Q.  You see on the next slide, it says, A
12 significant number of these establishments are
13 located near or along I-285 and I-20.
14         Do you see that?
15     A.  Yes.
16     Q.  And it says, The convenience and access
17 provided by the proximity of interstate highways
18 facilitates visibility and customer mobility.
19         Do you see that?
20     A.  Yes.
21     Q.  And it says, From the data collected, it
22 appears that the hotels/motels with the highest
23 concentration of code violations are in north DeKalb.
24 The higher concentration of crime was documented in
25 establishments located in south DeKalb.

Page 69

1          Do you see that?
2      A.  Yes.
3      Q.  And according to this map, the United Inn
4  and Suites is kind of right there in the middle
5  between north DeKalb and south DeKalb. Do you see
6  that?
7      A.  Yes.
8      Q.  The next slide -- we're on slide seven now
9  on Plaintiff's Exhibit 3, says, Troubled
10 establishments hinder economic development and
11 negatively impact quality of life.
12         Do you agree with that?
13     A.  Yes.
14     Q.  Do you see it says, Some of the 58 hotels
15 -- and let me just stop there. Do you know how many
16 hotels and motels are in DeKalb County? Do you
17 believe it to be approximately 58?
18     A.  I don't know.
19     Q.  You have no idea what the number is?
20     A.  No.
21     Q.  It says, Some of the 58 hotels and motels
22 within unincorporated DeKalb County are in state of
23 disrepair and lack compliance with county codes.
24         Do you see that?
25     A.  Yes.

18 (Pages 66 - 69)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 70

1    Q.    And it says, Some of these properties have
2  become a convenient haven for criminal activities.
3  Do you see that?
4    A.    Yes.
5    Q.    Do you believe that the United Inn and
6  Suites became a convenient haven for criminal
7  activities?
8    A.    I -- I don't know.  I -- I don't believe
9  so.
10    Q.    Did you ever ask the DeKalb County Police
11  Department what their view of the hotel was?
12    A.    I ask my police officer when -- all the
13  time, you know.
14    Q.    Your police officer?  What do you mean by
15  that?
16    A.    Meaning the -- the two police officer,
17  they are working for me for the longer period of
18  time.
19    Q.    What are their names?
20    A.    One is Officer McClelland, and the other
21  one is officer Webber.
22    Q.    When did they work for you?
23    A.    They work every day.  Every night.
24    Q.    Yeah, but during what time period?
25    A.    They are -- they are there at nighttime,

Page 71

1  you know.
2    Q.    Well, I'm asking during what years.
3    A.    Oh, what year.  Oh, what year.  They are
4  working since -- I always have police officer, but
5  these two, they are here longer days.  I think they
6  are here since 2016.
7    Q.    So, you would ask Officer McClelland and
8  Officer Webber about their perspectives on the hotel
9  property?
10    A.    Right.  Right.
11    Q.    Were they off-duty DeKalb County Police
12  Department officers?
13    A.    They are off duty, yeah, I think so.  But
14  they usually come in their uniform.  I don't know how
15  to consider off duty, but --
16    Q.    Did they work for the DeKalb County Police
17  Department?
18    A.    Yes.
19    Q.    Did you have a contract with these
20  gentleman or how -- how did you find them?
21    A.    I just hire them.  They come and work for
22  me.
23    Q.    You paid them directly?
24    A.    I paid them directly.
25    Q.    There was not a company, a security

Page 72

1  company that you hired?
2    A.    No.
3    Q.    You just paid these gentlemen, correct --
4    A.    Yes.  Yes.
5    Q.    Did you just pay them cash?
6    A.    I pay them check.  Yeah, check.
7    Q.    Did you have a written contract with them?
8    A.    No.
9        MR. STORY:  And David, I don't want
10  to --
11        MR. BOUCHARD:  Yes.
12        MR. STORY:  -- interrupt at a bad
13    time, we've been going a little over an
14    hour.  If we can take a five minute break
15    -- we don't have to do it now, but once you
16    get to the --
17        MR. BOUCHARD:  Yeah, sounds good.
18    Q.    (By Mr. Bouchard) Let's look at slide 11
19  on Plaintiff's Exhibit 3, Mr. Shareef.  It calls out
20  the United Inn and Suites here.  And in the bottom
21  right-hand corner, it talks about code violation
22  notes.  Do you see that?
23    A.    You said bottom which corner?
24    Q.    Bottom right-hand corner.
25    A.    Oh, right.  Yeah.  Okay.

Page 73

1    Q.    And it says, Interior and exterior
2  structure problems; is that right?
3    A.    Yes.
4    Q.    And it says, Roach, rat infestation?
5    A.    Yes.
6    Q.    Did the hotel have a roach/rat
7  infestation?
8    A.    I know I have roach, but I don't know
9  where the rat come from.  But I have roaches problem.
10    Q.    During the time that we're focused on,
11  which is 2017 to 2019, is it your opinion that the
12  hotel, that is the United Inn and Suites, regularly
13  violated DeKalb County codes?
14    A.    Yes.
15    Q.    Like health codes?
16    A.    Yeah.
17    Q.    All right.  Let's --
18    A.    If I can say one thing here.
19    Q.    Sure.
20    A.    They have -- they have one inspection on
21  that period.  And it's like a -- it's not regularly,
22  it's like once-a-year inspection.  And that time,
23  they wrote a bunch of tickets.
24    Q.    How often would the county come out to
25  inspect for code violations?

19 (Pages 70 - 73)

CONF Tahir Shareef                              February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 74

1    A.   They come in whenever they have a
2  complaint, but they come in once a year for the
3  regular inspection.
4    Q.   Okay.
5        MR. BOUCHARD:  Okay.  We can take a
6  break here.
7        MR. STORY:  Okay.
8        VIDEOGRAPHER:  Off the record at
9  10:33.
10       (Recess was taken.)
11       VIDEOGRAPHER:  Back on the record at
12  10:46.
13       (Exhibit No. 4 was marked for
14  identification.)
15    Q.   (By Mr. Bouchard) Mr. Shareef, I'm handing
16  you what's been marked as Plaintiff's Exhibit 4,
17  which is a copy of Defendant Northbrook, Inc.'s
18  Responses to Plaintiff's Request for Admissions in
19  plaintiff G.W.'s case.  I can represent to you that
20  in J.G.'s and A.G.'s cases we also served Request for
21  Admissions that are substantially similar to these,
22  if not identical.
23       Have you seen these before?
24    A.   Yes.
25    Q.   And I wanted to direct your attention

Page 75

1  specifically to Request for Admission No. 78, which
2  is on page 30 of Plaintiff's Exhibit 4.  And let me
3  know when you get to page 30.  Are you there?
4    A.   Yes.
5    Q.   Do you see that it says in Request for
6  Admission 78, Admit that in 2018, the DeKalb County
7  Commission cited the property, which is the United
8  Inn and Suites, for 447 violations of county, fire,
9  health, and building codes.
10    A.   Yes.
11    Q.   Do you see that?
12    A.   Yes.
13    Q.   And the answer provided is admitted.  Do
14  you see that?
15    A.   Yes.
16    Q.   Do you agree with that answer?
17    A.   Yeah.
18    Q.   It's a correct answer, in other words?
19    A.   Yes.
20    Q.   Do you see that it says, in Request for
21  Admission No. 79, Admit that you paid $60,000 --
22  $60,345 to DeKalb County in 2018, because of the
23  violations referenced in the foregoing paragraph.
24    A.   Yes.
25    Q.   And the response is admitted.  Do you see

Page 76

1  that?
2    A.   Yes.
3    Q.   Is that a correct answer?
4    A.   Yes.
5    Q.   Can you tell me what these 447 violations
6  concerned?
7    A.   These are the broken wall, chipped wall,
8  paint, paint wall, carpet, roaches, people are
9  smoking in the room, some of the smoke alarm not
10  working.  So these are the violations.
11    Q.   Were you acting as the manager at United
12  Inn and Suites --
13    A.   Yes.
14    Q.   -- at the time that these violations were
15  occurred?
16    A.   Right.  Right.
17    Q.   Did anybody at United Inn and Suites get
18  fired because of these violations?
19    A.   No.
20    Q.   Did anybody get reprimanded on the staff
21  at the hotel because of these violations?
22    A.   No.
23    Q.   Did anybody's pay get cut because of these
24  violations?
25    A.   No.

Page 77

1    Q.   I think you told me that, you know, during
2  the daytime shift, you have one front desk person,
3  five housekeepers persons, and one maintenance
4  cleaning groundskeeper person; is that true?
5    A.   That's right.
6    Q.   About seven people working the daytime
7  shift is typical for the United Inn and Suites --
8    A.   Right.
9    Q.   -- right?
10       So, who was not doing their jobs?  I mean,
11  somebody must have not been doing their job properly
12  if there were 447 code violations, or do you disagree
13  with that?
14       MS. WARD:  Objection.
15       THE WITNESS:  I disagree with that.
16    Q.   (By Mr. Bouchard) You think everybody was
17  doing their job properly?
18    A.   That's right.
19    Q.   So, was United Inn and Suites fine with
20  receiving 447 code violations from DeKalb County or
21  was that concerning to you?
22    A.   It was concerning.
23    Q.   Why did it concern you?
24    A.   Because I believe from 475, 400 of them --
25  440 of them, they're just no good, you know,

20 (Pages 74 - 77)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 78

1    violations. They should not even write it.
2        Q.   So how many do you think were legitimate
3    violations?
4        A.   Maybe 10, 15.
5        Q.   10 -- 10 or 15 out of 447?
6        A.   Yeah.
7        Q.   But you paid $60,345 anyway?
8        A.   Yes.
9        Q.   Did you object to the code violation
10   assessments, or did you agree that you were
11   responsible?
12       A.   I objected.
13       Q.   But you decided to pay the full fine
14   violation anyway?
15       A.   Yes.
16       Q.   Do you have an explanation for why the
17   code enforcement at DeKalb County would have been
18   citing your hotel improperly?
19           MR. STORY:  Objection. You can
20       answer.
21           THE WITNESS:  I don't have what they
22       have in mind.
23       Q.   (By Mr. Bouchard) Are you saying that you
24   think the DeKalb County Code Enforcement team was
25   improperly citing your hotel for code violations?

Page 79

1        A.   Yes, sir.
2        Q.   Who do you think was responsible for
3    improperly citing your hotel?
4        A.   Whatever they did that year and next year,
5    that's totally unfair. Totally unfair.
6        Q.   Do you know the names of the people?
7        A.   I have the names, but nothing I can do.
8        Q.   Well, what are the names?
9        A.   I have bunch of name there.
10       Q.   Where?
11       A.   At my office. They left their business
12   card and stuff. And bunch of them are fired.
13   They're not -- no longer working at the code
14   enforcement.
15       Q.   How do you know that they were fired?
16       A.   Because I find out they're not coming
17   anymore.
18       Q.   You recognize that because somebody's not
19   coming anymore doesn't necessarily mean they were
20   fired.
21       A.   Well, I -- I did kind of find out they're
22   not there, but I have no proof.
23       Q.   I'm showing you what's been marked as
24   Exhibit 5.
25           (Exhibit No. 5 was marked for

Page 80

1        identification.)
2        Q.   (By Mr. Bouchard) This is a -- Plaintiff's
3    Exhibit 5 is an AJC article, an Atlanta Journal
4    Constitutional article, entitled DeKalb News,
5    Extended Stay Hotel Inspections lead to 2,397
6    citations.
7            Do you see that?
8        A.   Yes.
9        Q.   And there's a portion of this article that
10   talks about the United Inn and Suites. If you go to
11   page 2 of the article towards the bottom, the second
12   --
13       A.   Page number?
14       Q.   Page 2?
15       A.   2, okay.
16       Q.   The second to last paragraph towards the
17   bottom of the page starts with "The worst offender."
18       A.   Uh-huh.
19       Q.   Was United Inn and Suites in Decatur,
20   which paid $60,345 in fines after receiving 447
21   citations last year. It was among four hotels along
22   Memorial Drive that made the list.
23           Do you see that?
24       A.   Yes.
25       Q.   Are you aware of whether you had guests

Page 81

1    complain to DeKalb County about the conditions of the
2    hotel?
3        A.   Had guest complain to DeKalb County. I --
4    I know the -- you know, like a -- I can say, the
5    prior year, 20, you know, '16 or '14, or '15, maybe
6    the inspector come once or twice a year, those extra
7    when guest complain, to the DeKalb County. And they
8    came and checked the room for some, you know -- or
9    some roaches violation or maybe leaky faucet.
10       Q.   Have you ever been trained on the DeKalb
11   County code?
12       A.   Trained on DeKalb County codes?
13       Q.   Yeah.
14       A.   No.
15       Q.   I mean, are you saying that you are an
16   expert in the DeKalb County codes that the
17   enforcement team was assessing compliance with --
18       A.   Well, I'm not expert, but I -- I totally
19   disagree with them.
20       Q.   I want to look back at Plaintiff's
21   Exhibit 3, which is this PowerPoint presentation we
22   looked at from Luz Borrero with the Office of
23   Development in DeKalb County. And slide seven, which
24   we looked at in Plaintiff's Exhibit 3 -- you with me?
25       A.   Yes.

21 (Pages 78 - 81)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 82

1    Q.  It says, Some of the 58 hotels and motel
2  complexes within unincorporated DeKalb County are in
3  state of disrepair and lack compliance with county
4  codes.  Some of these properties have become a
5  convenient haven for criminal activities.
6        You agree with me this presentation seems
7  to suggest that there's a relationship with not being
8  in compliance with county codes and becoming a haven
9  for criminal activities?
10    A.  Yes.
11    Q.  Did that occur at United Inn and Suites
12  where there was noncompliance with DeKalb County
13  codes and the hotel became a haven for criminal
14  activities?
15    A.  I'm talking about their -- their behavior,
16  the inspectors' behavior.  Because a year before,
17  when they come in, they have -- they find six
18  violations, seven violations.  Same condition.  And
19  they tell me I have a perfect carpet.  And they tell
20  me no, this is no good, they wrote me a ticket.  I
21  have -- the smoke alarm is there working, but the
22  customer touch it and it's hanging, and they wrote me
23  a ticket.  They wrote the ticket for no reason.  So
24  just collect -- just collect a bunch of money from
25  me.

Page 83

1    Q.  So you think the 447 citations were
2  written for no reason?
3    A.  That's right --
4        MS. WARD:  Objection.
5        THE WITNESS:  That's right.
6    Q.  (By Mr. Bouchard) Let's take a look at
7  Plaintiff's Exhibit 6, which is Bates-stamped
8  plaintiff 31057 to 31058.  I'm handing you
9  Plaintiff 6.
10      (Exhibit No. 6 was marked for
11      identification.)
12    Q.  (By Mr. Bouchard) So Plaintiff's Exhibit 6
13  is an e-mail chain.  And if you look at the bottom of
14  the first page, Mr. Shareef, you'll see the very
15  first e-mail in the chain.  It's from a Steven A.
16  Coachman.  Do you see that?  The bott-- the bottom
17  of the first page, there's an e-mail from Steven A.
18  Coachman.
19    A.  Okay.
20    Q.  And if you go to the top of the second
21  page, you'll see that he signs his e-mail as Sergeant
22  Coachman.  If you go to the second page --
23    A.  Yeah.
24    Q.  -- see he signed it as Sergeant Coachman?
25    A.  Uh-huh.

Page 84

1    Q.  Do you know Sergeant Coachman?
2    A.  No.
3    Q.  Do you see that he wrote this e-mail here
4  on March 9th, 2020, and the subject is Operation
5  Safeguard.  "This plan will be a daily initiative for
6  all shifts/units until further notice, at least the
7  next six weeks.  There are eight stores and ten
8  hotels that have been identified as target areas.  We
9  will focus daily in these areas to reduce criminal
10  activity.  Please list the address of the target
11  location on your PATS when you patrol the location.
12  (Example: 6201 Memorial Drive, Texaco; 4649 Memorial
13  Drive, United Inn.)
14        If you make any cases in the target areas
15  (citation/arrests), please advise your supervisor so
16  it can be entered on the daily summary.  Thank you
17  for all your hard work and dedication.
18        Do you see that?
19    A.  Yes.
20    Q.  Were you aware, at any point in time prior
21  to today, that the United Inn and Suites was a target
22  area for the DeKalb County Police Department to
23  reduce criminal activity?
24    A.  No.
25    Q.  This is the first time you've ever heard

Page 85

1  of that?
2    A.  Right.
3    Q.  At any point in time prior to today,
4  Mr. Shareef, did you become aware that the DeKalb
5  County Police Department considered the United Inn
6  and Suites to be a high crime area?
7    A.  I -- I don't know.  When I see this
8  report, I feel like that it is.
9    Q.  Showing you what's been marked as
10  Plaintiff's Exhibit 7.
11        MR. STORY:  Are you done with 6
12  right now?
13        MR. BOUCHARD:  For now, yes.
14      (Exhibit No. 7 was marked for
15      identification.)
16    Q.  (By Mr. Bouchard) So Plaintiff's Exhibit 7
17  that I just handed to you, Mr. Shareef, is a document
18  from the DeKalb County Police Department that we
19  received in response to an open records request.  And
20  you see at the top of the document, it says,
21  Operation Safeguard, Tucker gas station/store/motel
22  suppression?
23    A.  Yes.
24    Q.  And it says -- in the first section there,
25  it says, Situation: An analysis of the top eight gas

22 (Pages 82 - 85)

CONF Tahir Shareef                           February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 86

1  stations/convenient stores and motels was compiled to
2  identify high crime locations.
3       Do you see that?
4     A.  Yes.
5     Q.  And if you go to the next page, it says,
6  Tucker precinct top motels.  And do you see at the
7  top of the list is United Inn?
8     A.  Yes.
9     Q.  And it says underneath that little table,
10  These locations have the highest crime rate within
11  our business community.  The Tucker precinct will
12  increase daily enforcement to reduce these crimes.
13  Increase trust and respect among the owners,
14  managers, and community members who shop and live at
15  these locations.
16       Do you see that?
17     A.  Yes.
18     Q.  And so is it still your testimony that
19  prior to today, you had no knowledge that the DeKalb
20  County Police Department, at any point in time,
21  considered the United Inn and Suites to be a high
22  crime area?
23     A.  No, the -- the area is a high crime, but
24  they -- they are targeted my hotel.  I mean, the
25  whole area, I mean, if you walk in the DeKalb County,

Page 87

1  of course there's a high crime, you know, just
2  walking there.
3     Q.  Are you saying that all of DeKalb County
4  is a high crime area?
5     A.  No, that -- the Memorial Drive, I'm just
6  talking about, you know, where -- where we are.  If
7  you walk on DeKalb -- you know, the Memorial Drive
8  where my hotel is, I have so much problem with the
9  homelessness, you know.  We kick people out every
10  day, and we call the police maybe couple of times
11  yesterday.  Is that considered, meaning crime area?
12     Q.  So you're saying that you recognize that
13  neighborhood that the United Inn and Suites is
14  situated in is a high crime area?
15     A.  I -- yeah.
16     Q.  But you have never considered the hotel
17  itself, 4649 Memorial Drive, to be a high crime area?
18  That what you're saying?
19       MS. WARD:  Objection.
20       THE WITNESS:  I -- I don't know how
21    to answer this.
22     Q.  (By Mr. Bouchard) Well, do you not
23  understand the question or what -- what's the issue?
24     A.  Well, my consideration -- I mean, I live
25  there.  I live -- I literally live there.  This time

Page 88

1  I'm there for last 45 days, and I call the cops maybe
2  10 times myself.
3     Q.  Right.  So --
4     A.  But, you know, I have to run a business
5  there, so I'm -- whenever I need help, I call them.
6  So more call I make, the more put me on the crime
7  area.  I don't know how -- where to go.  So DeKalb
8  County police is my last resort, so I call them.  I
9  don't know if that put me on that on a high crime area,
10  I don't know, but I keep calling them.
11     Q.  I'm asking for your opinion as the manager
12  of the hotel if you consider the hotel to be a high
13  crime area.
14       MS. WARD:  Objection.
15       THE WITNESS:  I'm -- I don't know
16    how to answer.
17     Q.  (By Mr. Bouchard) You have no opinion on
18  that?
19     A.  No.  I -- I'm in the high crime
20  neighborhood, so my hotel is in high crime area, you
21  know.  Of course I -- I keep telling -- you know,
22  when I see those homeless, when I see the people out,
23  you know, just, you know, making noise, you know,
24  drinking outside, I kick them out.
25     Q.  Is there a gate to get into the United Inn

Page 89

1  and Suites?
2     A.  No.
3     Q.  So you can just walk in off of the
4  Memorial Drive onto the parking lot --
5     A.  Yes.
6     Q.  -- that is the property of United Inn and
7  Suites, correct?
8     A.  Yes.
9     Q.  So is it fair to say that the high crime
10  area that surrounds United Inn and Suites can also
11  spill over into United Inn and Suites?
12       MR. STORY:  Objection.
13       THE WITNESS:  I don't know how to
14    answer that.
15     Q.  (By Mr. Bouchard) Well, do you think the
16  high crime that occurs around United Inn and Suites
17  stops at the boundary of United Inn and Suites, or do
18  you think it comes into the boundaries of United Inn
19  and Suites?
20       MS. WARD:  Objection.
21       MR. STORY:  Objection.
22       THE WITNESS:  I cannot stop them.
23     Q.  (By Mr. Bouchard) You said that you
24  oversee the security for the property and monitor the
25  property, so I'm just confused about you saying that

23 (Pages 86 - 89)

CONF Tahir Shareef                                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 90

1  you can't answer whether you think the property is
2  high crime or not. I mean, help me, Mr. Shareef.
3  How do you decide how many security guards to hire if
4  you don't have an opinion about how whether or not
5  the hotel is high crime or low crime or no crime or
6  moderate crime? How do you know how many security
7  guards to hire and when they should be working?
8      A. I call the DeKalb County, that's my --
9  that's my last resort. And they coming. Sometime,
10 they move the people when I ask them to remove a
11 certain person or the homeless. And sometimes they
12 take them there and leave at the road, right in front
13 of me, so.
14     Q. In 2017, 2018, and 2019, did the DeKalb
15 County Police Department own the United Inn and
16 Suites?
17     A. What happened?
18     Q. In 2017, 2018, and 2019, did the DeKalb
19 County Police Department own the United Inn and
20 Suites?
21     A. Own United? No.
22     Q. You did with Mr. Sabharwal, right?
23     A. Yes.
24     Q. So you had authority and ownership of the
25 hotel during --

Page 91

1      A. Yes.
2      Q. -- those years, right?
3      A. Uh-huh.
4      Q. Not -- is that correct?
5      A. Yes.
6      Q. Not the -- not the DeKalb County Police
7  Department, right?
8      A. Yes.
9      Q. Are you familiar with the fact that some
10 hotels do have gates?
11     A. I am. I saw, yeah, a lot of hotel has a
12 gate.
13     Q. But you've never done that at your hotel;
14 is that correct?
15     A. I cannot do it.
16     Q. You've never done it; is that correct?
17     A. I never done it because I cannot do it.
18     Q. You don't have guards at the hotel 24/7;
19 is that correct?
20     A. I don't have a guard there 24/7.
21     Q. And you've never had a guard there 24/7,
22 right?
23     A. No.
24     Q. Is that correct?
25     A. That's right.

Page 92

1      Q. Have you ever had more than one guard
2  working at the hotel at a time?
3      A. No.
4      Q. And what hours does this one guard work at
5  the hotel?
6      A. 10:00 to 2:00.
7      Q. From 10:00 p.m. at night to 2 a.m. in the
8  morning --
9      A. Yes.
10     Q. -- is that correct?
11     A. Yes.
12     Q. Was that true from 2017 to 2019?
13     A. Yes.
14     Q. So during the other 20 hours of the day,
15 there is no guard at the United Inn and Suites; is
16 that correct?
17     A. No.
18     Q. And there was no guard for the other
19 20 hours of the day from 2017 to 2019; is that
20 correct?
21     A. Yes.
22     Q. Does the only crime that occurs at the
23 United Inn and Suites occur from 10 p.m. at night
24 until 2 a.m. in the morning?
25     A. I don't know.

Page 93

1      Q. Well, how did you pick 10 p.m. to 2 a.m.,
2  that four-hour window?
3      A. That the -- that's the time I -- I need
4  it, and the -- that's the time I can get the -- their
5  police office service.
6      Q. What do you mean that's the time you need
7  it?
8      A. I don't know how to answer that, you know,
9  but that's the time I need their service. And that's
10 the time they're available, the police officers.
11     Q. Do you believe that you needed security
12 guards at other hours of the day?
13     A. No, I'm there, you know, or the front desk
14 people there, or, you know, whole staff is there.
15     Q. Yeah, but you clearly made some decision
16 along the way, we need a security guard from 10 p.m.
17 to 2 a.m. --
18     A. Yes.
19     Q. -- but not for the other 20 hours.
20     A. Yes.
21     Q. What was that decision based on?
22     A. That is based on, I think, our -- my -- I
23 can say my observation that I see how people are.
24 You know, before they go to bed, they hang out and
25 they just, you know, make noise and listen to music.

24 (Pages 90 - 93)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 94

1  And that's the time we bring some calm to the -- to
2  the area.
3      Q.  Why not have a security guard for the
4  other 20 hours a day?
5      A.  Because like I said, I am there or someone
6  there to observe.  And if we -- you know, if we need
7  help, we call the DeKalb County police.
8      Q.  But you told me that you typically worked
9  the day shift, which is what hours, sir?
10     A.  From -- let's say from 6 a.m. to 2 p.m.
11  Sometimes it goes to late night.
12     Q.  So, from 9 p.m. until 6 a.m. is the night
13  shift, I thought is sort of the way you described to
14  me earlier.
15     A.  Yeah.
16     Q.  Is that true?
17     A.  Uh-huh.
18     Q.  Is that right?
19     A.  Right.
20     Q.  And it's from 9 p.m. to 6 a.m., you told
21  me, that there's generally one person working on the
22  property other than the security guard.
23     A.  Right.
24     Q.  And that one person working is behind the
25  window because the lobby's closed?

Page 95

1      A.  Right.
2      Q.  So when the security guard goes home at
3  2 a.m. --
4      A.  Uh-huh.
5      Q.  -- there is one human being working at the
6  property and they're behind a window --
7      A.  Right.
8      Q.  -- is that right?  True?
9      A.  Yes.
10     Q.  They're not walking around the property,
11  right?
12     A.  No, they walk around the property, you
13  know, on a needed basis.  They have the camera system
14  there, we have bunch of cameras, and they can watch
15  the cameras.  And they can see something, somebody
16  standing outside, out of -- they look someone who is,
17  you know, they think is not a guest, they, you know,
18  tell them to, you know, leave the property.
19     Q.  So, how many hours a day is there one
20  person working at the United Inn and Suites?
21     A.  Are you asking a night shift person?
22     Q.  No.  I'm just asking how many hours in a
23  24-hour day is there one person working at the United
24  Inn and Suites.
25     A.  At the front desk, only one person working

Page 96

1  at the front desk.
2      Q.  No.
3      A.  Okay.
4      Q.  I think we're -- so, in a 24-hour day,
5  there's a day shift and there's a night shift --
6      A.  Yes.
7      Q.  -- right?
8      A.  Yes.
9      Q.  Right.  And the day shift always has more
10  than one person?
11     A.  Yes.
12     Q.  Right.  The night shift may only have one
13  person if the security guard's gone home.
14     A.  Right.
15     Q.  Is that correct?
16     A.  Yes.
17     Q.  And so from 9 p.m. until 10 p.m., the
18  security guard is not there; is that correct?
19     A.  10 p.m. to, like, a 9 a.m., yes, that's
20  right, security guard is not there.
21     Q.  9 to 10 p.m., the security guard is not
22  there --
23     A.  No, no, no.
24     Q.  From 9 p.m. --
25     A.  9 p.m.

Page 97

1      Q.  -- to 10 p.m., the security guard is --
2      A.  Yeah.
3      Q.  -- not at --
4      A.  Yeah.
5      Q.  -- the hotel?
6      A.  Yeah.
7      Q.  And from 2 a.m. to 6 a.m., the security
8  guard is not at the hotel, right?
9      A.  That's right.
10     Q.  We've been talking about staffing and
11  whether there's one person at the hotel.  Was all of
12  that true from 2017 to 2019?
13     A.  Yes.
14     Q.  So what we've been discussing about when
15  the security guard worked and when there was one
16  person at the front desk, that was true from 2017 to
17  2019?
18     A.  Yes.
19        MR. STORY:  And David, I just want
20     to provide a point of clarification here.
21     I think a little -- so there was a shift
22     change at some point post these events.
23     During these events, my understanding is
24     that there was three shifts.  There are
25     now, at United Inn, two shifts.

25 (Pages 94 - 97)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 98

1      MR. BOUCHARD: Okay.
2      MR. STORY: So, in breaking down the
3   24-hour time period, I just wanted to --
4      MR. BOUCHARD: Yes.
5      MR. STORY: -- clarify what time
6   frame we were in.
7      MR. BOUCHARD: Okay.
8      MR. STORY: And Mr. Shareef, if I've
9   mischaracterized something, please --
10  please correct me, but that is my
11  understanding.
12     THE WITNESS: Right.
13     Q.   (By Mr. Bouchard) So from 2017 to 2019,
14  were there three shifts?
15     A.   Three shifts, yes.
16     Q.   What were the hours of those shifts?
17     A.   The 6 a.m. to 2 p.m. And then 2 p.m. to
18  10 p.m. And then 10:00 p.m. to 6 a.m.
19     Q.   So, taking a look back at Plaintiff's
20  Exhibit 7, which was this Operation Safeguard
21  document that listed the United Inn at the top of the
22  list here for Tucker precinct top motels; do you see
23  that?
24     A.   Yes.
25     Q.   Do you agree that the presentation that

Page 99

1   we've talked about already, which was Plaintiff's
2   Exhibit 3, which listed United Inn and Suites as the
3   fourth worst hotel in DeKalb County in terms of crime
4   and health and code violations?
5      A.   Yes.
6      Q.   Do you remember that?
7      A.   I see it.
8      Q.   And you see that Plaintiff's Exhibit 7
9   here identifies United Inn as a top hotel in Tucker
10  for crime. Do you see that?
11     A.   Yes.
12     Q.   Do you agree that, from 2015 to 2020,
13  there was pervasive crime at the United Inn and
14  Suites?
15     MR. STORY: Objection.
16     THE WITNESS: I don't know how to
17  answer this. When you say "pervasive
18  crime," what does that mean?
19     Q.   (By Mr. Bouchard) High crime.
20     A.   If I call the police and tell them that
21  this person is not a guest and they need to be
22  removed from the property, and there's a police
23  report, I don't know if that considered a high crime.
24  I don't know. But it is a high crime area, so...
25     Q.   During that time period, that is from

Page 100

1   2015, when that DeKalb County Commission PowerPoint
2   presentation is dated, to 2020, which is when this
3   Operation Safeguard Tucker document is dated, during
4   that time period, do you believe that there were
5   gangs operating at the hotel?
6      A.   There is who operating?
7      Q.   Gangs, criminal gangs.
8      A.   No.
9      Q.   Do you believe that there were people on
10  the property who were carrying weapons?
11     A.   If -- if I see one carrying a weapon,
12  again, you know, we call the cops and tell them, you
13  know. If it happened couple of time, we call the cop
14  and tell them, you know, this guy is carrying a
15  weapon and he need to be removed.
16     Q.   During the time that you've been
17  affiliated with the United Inn and Suites, how many
18  homicides have there been at the hotel?
19     A.   Homicide. And homicide do -- what is a
20  homicide?
21     Q.   A murder.
22     A.   A murder. I am aware of one. And they
23  caught the guy later on.
24     Q.   You're talking about the one from 2016?
25     A.   No, that was way earlier.

Page 101

1      Q.   You're talking about the one from 2011,
2   then?
3      A.   I believe so.
4      Q.   In 2011, there was a criminal action
5   against a man who killed a woman at the United Inn
6   and Suites and then had sex with her body for two
7   days. Is that the case you're talking about?
8      A.   I don't know about the having sex with the
9   body for two days, but the -- I'm aware of one person
10  and we did go to court, you know. I believe the FBI
11  was involved, so that's the one case I knew.
12     Q.   Are you not familiar with the 2016 case at
13  the United Inn and Suites where there was a murder at
14  the property?
15     A.   No.
16     Q.   How many shootings do you think there have
17  been at the property, to your recollection, since
18  you've been affiliated with the hotel?
19     A.   How many shootings? I don't know.
20     Q.   What do you think? I mean, give me an
21  estimate. More than one?
22     A.   Yes.
23     Q.   More than five?
24     A.   I don't know.
25     Q.   Do you know how many armed robberies there

26 (Pages 98 - 101)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 102

1    have been at the hotel since you've been affiliated
2    with it?
3         A.    Armed robberies are, I'm -- I find out
4    after, you know, the police arrest the person that
5    the person was armed and he trying to rob someone.
6    Couple of times, I believe.
7         Q.    Couple of times in the last 20 years, you
8    think there have been --
9         A.    That's what I --
10        Q.    -- armed robberies?
11        A.    Yeah, yeah, what I found out.
12        Q.    Did any staff at the hotel ever express
13   concerns to you about crime?
14        A.    Well we always talk about the crime.
15        Q.    What did you talk about --
16        A.    We say --
17        Q.    What did you talk about?
18        A.    We talk about that whenever they have any
19   complaint, they need to, you know, call the sheriff
20   department and get the help.
21        Q.    You say you always discuss crime. How
22   often were you talking about crime with staff at the
23   hotel?
24        A.    On a weekly basis, I guess.
25        Q.    Why would you be bringing it up on a

Page 103

1    weekly basis, or why would they be bringing it up on
2    a weekly basis?
3         A.    Because we call the cops on -- on, like,
4    every other day.
5         Q.    But you never thought about hiring another
6    security guard to work the rest of the day?
7         A.    I -- yeah, I think about it.
8         Q.    Did you not do it because it would save
9    you money, Mr. Shareef, to not have to pay another
10   security guard?
11        A.    No, but the -- I have -- I have -- you
12   know, I have this officers, they come in and I have
13   the DeKalb County come in, and they, you know, help
14   us out. So sometimes they -- sometimes they arrest,
15   you know, someone like, someone is doing, you know,
16   something, you know, which you think they don't
17   belongs to the guest list, so they remove it, you
18   know, from the property.
19        Q.    I asked you if any of the other hotel
20   staff expressed concern to you about crime at the
21   hotel. And you talked to me about well, we discussed
22   crime regularly and that they should call the police
23   if they saw a crime.
24        A.    Yeah.
25        Q.    I'm asking did anybody who ever worked at

Page 104

1    the hotel come to you and say, Mr. Shareef, I'm
2    concerned about crime at the hotel, there seems to be
3    a lot of crime at the hotel, I don't feel safe at the
4    hotel? Anything like that?
5         A.    I mean, I have a guest living there for
6    weeks and weeks. And if they have, you know, like --
7    you know, when I see a crime, I have a concern that
8    this -- this -- this is tough neighborhood, so we do
9    talk about it. And we are talking to, again, our --
10   these two officers, so finding a -- maybe a good
11   security company to use it.
12        Q.    You're aware that as part of discovery in
13   this case, we've taken depositions of a police
14   officer from DeKalb County?
15        A.    I don't know it, yes.
16        Q.    So, you're not -- you have not reviewed a
17   deposition transcript from a police officer --
18        A.    Not on that detail.
19        Q.    I want to read to you a portion of
20   testimony that he provided when he was deposed in
21   this case. Okay, Mr. Shareef? And I want to ask you
22   some questions about it, but I'm just going to read
23   to you for now the deposition testimony.
24        A.    Okay.
25        Q.    So I asked him, Question: So this is a

Page 105

1    list of hotels in the Tucker precinct area that have
2    a high crime rate. And I was talking about
3    Plaintiff's Exhibit 7, which you've seen, right?
4         A.    Uh-huh.
5         Q.    Answer: Yes. Question: And which hotel is
6    at the top of the list? Answer: The United Inn.
7    Question: Do you understand that to mean the United
8    Inn had the highest crime rate in Tucker precinct of
9    all the hotels in the Tucker precinct? Answer: Yes,
10   I can believe that, yes, of all of them. Uh-huh.
11   Question: Did the crime that occurred at the United
12   Inn and Suites include commercial sex activity, like
13   prostitution and sex trafficking? Answer: Yes.
14   Question: Did you consider commercial sex activity
15   like prostitution and sex trafficking to be common at
16   the United Inn and Suites? Answer: Yes. Question:
17   Did you consider it -- commercial sex activity, like
18   prostitution and sex trafficking, to be a problem at
19   the United Inn and Suites from 2015 to 2021? Answer:
20   Yes.
21             Did you understand what I just read to
22   you?
23        A.    Yes.
24        Q.    Do you agree with what I just read to you?
25             MR. STORY: Object to the form.

27 (Pages 102 - 105)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 106

1    THE WITNESS: I don't know how to
2 answer that. This is -- this is
3 somebody's, you know, testimony. So, I
4 don't know.
5    Q. (By Mr. Bouchard) He testified, as I just
6 read to you, that he --
7    A. Yeah.
8    Q. -- considered prostitution and sex
9 trafficking to be a problem at the United Inn from
10 2015 to 2021. Do you agree with that? Do you have
11 no opinion on that? Do you not know? This is the
12 only opportunity I have to --
13    A. Yeah.
14    Q. -- talk with you before trial.
15    A. Yeah, I understand. I understand that.
16 The -- I mean, I -- when I come here at the property,
17 I live there, you know. And I have no problem
18 walking around the property any time 24/7. But when
19 I see a crime, I, you know, do whatever need to be
20 done. But -- but, you know, I don't know what is in
21 the room, and I just cannot knock somebody's room and
22 says, look, something happening there, what's going
23 on. This is people's privacy. I cannot knock, you
24 know, anybody's room for no reason. But if there is
25 a reason, we remove the people.

Page 107

1    Q. Did you consider commercial sex activity
2 like prostitution and sex trafficking to be a problem
3 at the hotel from 2015 to 2021?
4    A. I mean, it is a problem. And I don't want
5 that thing to happen. But again, you know, they --
6 somebody rent the room and they are in the room. I
7 don't know, you know, what -- what I can do, you know
8 when I don't know what is going to be happening in
9 the room.
10    Q. Well, you're assuming that all of that
11 takes place in the room. Are you aware that
12 plaintiff J.G. has testified under oath that she had
13 sex, as a 16-year old girl, in cars parked in the
14 parking lot at the United Inn and Suites with dozens
15 of men for over a month?
16    A. I don't believe it.
17    Q. So you think that she's lying?
18    A. Of course.
19    Q. Let's take a look at Plaintiff's
20 Exhibit 7 -- 4, excuse me, Plaintiff's Exhibit 4,
21 which was United Inn and Suites Responses to
22 Plaintiff's Request for Admissions. This is the
23 document we looked at previously, Plaintiff's
24 Exhibit 4. Let me know when you are looking at
25 Plaintiff's 4.

Page 108

1    MR. STORY: He's got it.
2    THE WITNESS: I got it.
3    MR. BOUCHARD: Okay.
4    Q. (By Mr. Bouchard) Let's take a look at
5 Request No. 45.
6    A. Page 15.
7    Q. And Request 45 says, Admit that law
8 enforcement officials from the DeKalb County Police
9 Department notified you of prostitution on the
10 property. Response: Defendant objects to this
11 request as it is not limited in scope of time.
12 Subject to this objection and without waiving same,
13 admitted.
14    Do you see that?
15    A. Yes.
16    Q. Do you agree with that response?
17    A. Police department notified you of the
18 prostitution. So, I don't know the specific date, I
19 don't know the specific time. I don't know what kind
20 of request, what one -- what kind of notification was
21 that. So I don't recall this thing. But if they
22 come in and tell me that, hey, we remove this person
23 from the room because they are doing a prostitution,
24 so what I do, I put them do not rent list again, and
25 they don't -- they no more, you know, come to my

Page 109

1 property.
2    Q. I don't think I got an answer to the
3 question that I was trying to ask you, Mr. Shareef,
4 which is: Do you agree with this response to Request
5 No. 45?
6    A. So my answer was, you know, objected to
7 the request.
8    Q. Right. But at the end of the -- last
9 sentence of the response says, Subject to this
10 objection and without waiving same, admitted.
11    A. I mean, if the police officer says
12 something happened there, of course, you know, they
13 are there, they are not lying.
14    Q. Well, let me do it this way: Did the
15 DeKalb County Police Department ever notify you,
16 Mr. Tahir Shareef, of prostitution at the United Inn
17 and Suites? Yes or no?
18    A. No, they notify me, but when they -- when
19 they say tat, look, we are taking out this person
20 because there was sex trafficking, then, of course,
21 you know, that's a notification. So, I don't know if
22 that's the answer for your question. But if they
23 tell me watch out this room, there is something
24 happening, and I -- again, you know this -- these
25 people working for me, I tell them the same thing,

28 (Pages 106 - 109)

CONF Tahir Shareef                              February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 110

1  you know, they need the watch out because they are
2  the police officer and they tell me, look, we check
3  the room, we talk with the people, and there is
4  nothing going on.
5        Q.   How many times do you think you had
6  conversations with the DeKalb police Department about
7  prostitution?
8        A.   I had maybe five, six times.
9        Q.   During what time period?
10       A.   For last so many years.
11       Q.   And how many times did you talk to the
12  DeKalb County Police Department about sex
13  trafficking?
14       A.   About the sex trafficking, I don't think I
15  ever talked to them.
16       Q.   So are you saying that the DeKalb County
17  Police Department would come talk to you about
18  prostitution after they had already been on the
19  property to arrest somebody relating to prostitution?
20       A.   The answer is yes, but those -- those --
21  some of those times, I call, or my front desk call,
22  or the -- my manager call to the police officer, and
23  tell them, look, we -- we think there is a, you know,
24  too much traffic going on, there is some suspicious
25  stuff going on.  So, we don't want to go to the room,

Page 111

1  but help us.  So they came and they tell us, look,
2  you know, we are telling you to, you know, remove
3  these people from here and we are going to arrest
4  them, or they may have the warrant.  So they take
5  them with them.  So sometimes we call them and they
6  take out the people.  And then, you know, they --
7  they did tell me, you know, like, look, you know,
8  this women doing prostitution and we -- we find out
9  this in our record, so we taking them off there.  Or
10 sometime they come in for their own, and they arrest
11 people and take them away.
12       Q.   After you had conversations with the
13 DeKalb County Police Department about prostitution,
14 did you ever say, you know, as the owner and manager
15 of this hotel, I need to consider what steps I can
16 take to try to prevent that from happening on this
17 property?
18       A.   Yes.
19       Q.   What steps did you take?
20       A.   No, I asked them what should I do.  And
21 they said look, you know, you need to call us, don't
22 try to, you know, involve with the commotion, don't
23 put yourself -- yourself in, you know, jeopardize
24 position, call us.
25       Q.   Did they say don't hire any more security

Page 112

1  guards?
2        A.   No, they -- they said, you know, you
3  should hire security guard.
4        Q.   They said that?
5        A.   Yeah, they said some, you know.
6        Q.   But you decided not to?
7        A.   Yeah, I did not do it so far.
8        Q.   Did the DeKalb County Police Department
9  ever notify you in writing that there was
10 prostitution on the property?
11       A.   No.
12       Q.   All of these communications that you're
13 describing were oral communications?
14       A.   Right.
15       Q.   Do you have any written correspondence of
16 any type with the DeKalb County Police Department?
17       A.   Correspondence meaning?
18       Q.   Meaning letters, e-mails, faxes.
19       A.   No.
20       Q.   Do you have an e-mail that you maintain
21 for the United Inn and Suites?
22       A.   Yes.
23       Q.   What is that e-mail address?
24       A.   It's called UnitedInn4649@gmail.com.
25       Q.   What do you use that e-mail address for?

Page 113

1        A.   I use it for sending e-mail to, you know,
2  like a -- some customer, you know.  If they need --
3  you know, sometimes they need to authorize me, you
4  know, that sometime they have -- and it's not
5  sometime, it's, you know, a few times.  The owner of
6  the credit card, you know, send me the information
7  because they are sending their conception group.  And
8  they send their information, they send the custom
9  group's information.
10            And that's -- I talk to some of customer,
11 you know.  If they have a complaint, they send me,
12 you know, we need service, you know, that day or we
13 need extra service.  So they communicate, you know,
14 once a while like that.
15       Q.   Do you use that e-mail address to send and
16 receive e-mails related to the business operations of
17 the hotel?
18       A.   Yes.
19       Q.   Did that e-mail address exist in 2017?
20       A.   Yes.
21       Q.   Was it in use at that time?
22       A.   I believe so.  Yes.
23       Q.   You said that the DeKalb County Police
24 Department recommended hiring security guards; they
25 said that you could call them, the DeKalb County

29 (Pages 110 - 113)

CONF Tahir Shareef                           February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 114

1  Police Department, any time you saw a crime on the
2  property.
3       A.  Right.
4       Q.  Did they recommend that you take any other
5  steps on the property to try to reduce crime, reduce
6  prostitution?
7       A.  They recommended to me?  No, that's the --
8  pretty much, you know, like when they come in, we
9  have conversation, you know, that this thing can --
10  and this is their -- and their response is, look, you
11  know, this is, you know, the neighborhood we have,
12  you know, on the Memorial Drive, you know.  Crime
13  happen.
14       Q.  I'm going to show you what's been marked
15  as Plaintiff's Exhibit 8, which is Bates-stamped
16  Plaintiff 194 and 195.
17          (Exhibit No. 8 was marked for
18       identification.)
19       Q.  (By Mr. Bouchard) This is a police report,
20  Mr. Shareef, dated August 12th, 2015.  Do you see
21  that?
22       A.  Uh-huh.  Yes.
23       Q.  Have you seen this report before?
24       A.  No.
25       Q.  I'll represent to you -- you can see on

Page 115

1  the first page at the very top in the left, it says,
2  Incident type: Prostitution.  And I'll represent to
3  you on the narrative on page 2, that this report
4  documents that a woman was arrested for prostitution
5  at the hotel after meeting two undercover officers in
6  the parking lot, and then walking to Room 101 of the
7  hotel.  The woman didn't have a key to the room.  The
8  report says, she walked to the front desk to get one,
9  and then went back to Room 101 to have commercial sex
10  with these undercover officers, and they arrested
11  her.
12          Do you agree that there was prostitution
13  at the United Inn and Suites as of August 2015?
14       A.  Yeah, looking at this report, I agree.
15       Q.  I'm going to show you what's been marked
16  as Plaintiff's Exhibit 9.
17          (Exhibit No. 9 was marked for
18       identification.)
19       Q.  (By Mr. Bouchard) And this is
20  Bates-stamped Plaintiff 1379 to 1383.  Mr. Shareef,
21  this is a police report, Plaintiff's Exhibit 9 that
22  dated June 2nd, 2017.  Do you see that?
23       A.  Yes.
24       Q.  And I trust you have not seen this report
25  before, or have you seen it before?

Page 116

1       A.  No, I don't have any recollection.
2       Q.  And you can see in the top left, the
3  incident type is identified as simple assault,
4  interference with government property.  And I can
5  represent to you, sir, that if you go to page 1382,
6  which is really the fourth page of the document -- or
7  I'm sorry, page 1383, which is really the fifth page
8  of the document, that the assault involved a man
9  beating a woman in Room 345 at the hotel over monies
10  owed for sexual favors.
11          MR. STORY:  One more page.  It's on
12  the next page.  You're on 1383, David?
13          MR. BOUCHARD:  Yes, Will, I am.
14  Sorry, I jumped.
15          MR. STORY:  No, that okay.
16          THE WITNESS:  82?
17          MR. BOUCHARD:  I'm on 83.
18          MR. STORY:  Yeah, you're on the
19  right one.  Okay.
20       Q.  (By Mr. Bouchard) So this report says in
21  summary, Mr. Shareef, that a man was arrested after
22  beating a woman in Room 345 over monies owed for
23  sexual favors.  Do you agree that in June 2017, there
24  was prostitution on the property at United Inn and
25  Suites?

Page 117

1       A.  I mean, looking at this report, yes.
2       Q.  I'm showing you what's been marked as
3  Plaintiff's Exhibit 10, which is Bates-stamped 1398 to 1401.
4          (Exhibit No. 10 was marked for
5       identification.)
6       Q.  (By Mr. Bouchard) And this is a police
7  report, Mr. Shareef, dated June 20th, 2017.  Do you
8  see that?
9       A.  Yes.
10       Q.  And the incident type in the top left is
11  simple assault and then criminal trespass.  And if
12  you turn to the narrative section on page 1399, I'll
13  represent to you that the police here responded to a
14  fight between a prostitute and her pimp in Room 101
15  at the United Inn.  The pimp left this prostitute's
16  room after the fight to go stay at another woman's
17  room at the hotel.
18          Do you agree that as of June 20th, 2017,
19  there was prostitution at the United Inn and Suites?
20       A.  Yes, after looking at this report.
21       Q.  Showing you Plaintiff's Exhibit 13, which
22  is Bates-stamped Plaintiff 1432 to 1433 --
23          MR. STORY:  David, Plaintiff 11.
24          MR BOUCHARD:  Thanks, Will.  I'm
25  going to need that help, so don't hesitate

30 (Pages 114 - 117)

Page 118

1    to offer.
2         MR. STORY:  You gave it in mine, so
3    it's fine.
4         MR. BOUCHARD:  Yes.
5    Q.   (By Mr. Bouchard) Plaintiff's 11, this is
6    a police report dated July 21, 2017.  Do you see
7    that, Mr. Shareef?
8    A.   Yes.
9    Q.   And the incident type is prostitution; do
10   you see that?
11   A.   Yes.
12   Q.   And if you look at page 1433, it says in
13   the first paragraph, about halfway through the first
14   paragraph, "On July 20th, 2017, the DeKalb County
15   Vice Unit and the Federal Bureau of Investigation
16   Metro Atlanta Child Exploitation Task Force, with
17   help from the North Central Precinct Neighborhood
18   Enforcement Team, conducted an operation in reference
19   to a child and an adult prostitution at 4649
20   Memorial, United Inn and Suites, Decatur, Georgia.
21   Do you see that?
22   A.   Yes.
23   Q.   As of July 20th, 2017, do you agree that
24   prostitution was occurring at the United Inn and
25   Suites?

Page 119

1    A.   Yeah, after see this report, yes.
2    Q.   So you're saying that at the time, you
3    didn't know about any of this prostitution going
4    on --
5    A.   No.
6    Q.   -- that we just talked about?
7    A.   No.
8    Q.   Is that correct, you did not know what
9    --
10   A.   I did not.
11   Q.   -- you said?
12   A.   Yes.
13   Q.   So I'm going to go back to this deposition
14   that I was telling you about from the DeKalb County
15   Police Department officer.  And I want to read you
16   some other portions of it and get your reactions to
17   it.
18        So I asked him about that August 12th,
19   2015, report, which was the first police report we
20   just looked at, Plaintiff's Exhibit 8.  And you'll
21   see one of the officers' names on that report is
22   Officer Schofield.  And I asked -- I'm now quoting
23   from the deposition transcript.  Question: How was it
24   that you and Schofield ended up investigating this
25   prostitution at the United Inn as of August 12th,

Page 120

1    2015?  Answer: United Inn is/was one of the -- one of
2    the problem hotels that we had in the DeKalb County
3    for drug and prostitution anyway, so it was like a
4    radar hotel that we knew about due to the fact that a
5    lot of arrests were made, several arrests were made
6    for narcotics and prostitution prior, for several
7    years at the hotel.  And any time that we got a
8    female that we located off of Backpage.com and they
9    gave us that address number, we immediately know the
10   hotel, that it was United Inn.
11        Do you understand what I just read to you?
12   A.   Yes.
13   Q.   Does that surprise you?
14   A.   Yes.
15   Q.   Because you, as of August 12th, 2015, did
16   not understand that prostitution was commonly
17   occurring at the United Inn and Suites?
18   A.   Yes.
19   Q.   And prior to today, at no point in time,
20   you're testifying, did you believe that United Inn
21   and Suites had a problem with prostitution; is that
22   correct?
23   A.   Yeah.  After seeing these reports, yes.
24   Q.   So prior today, you never, at any point in
25   time, believed that prostitution was a problem at the

Page 121

1    hotel?
2    A.   No.  We call the cop many times, you know,
3    when -- in last, you know, 20 years, 18 years, you
4    know, that there's a -- there people that is coming
5    -- too many people going to the room, so there must
6    be something wrong, so we need some help.  And they
7    came and they, you know, removed the people and they
8    tell us, yes, that's a -- I mean, the woman is doing
9    prostitution, so we going to take her out.
10   Q.   And who would be the one who would observe
11   traffic to the room?  I mean, I assume if you --
12   A.   We have --
13   Q.   -- if you're working behind the front
14   desk, would you see traffic going to a room, or would
15   it be another hotel staff member who could see that?
16   A.   It's combination of both.  We see in the
17   cameras, or the other hotel staff, they came at the
18   front desk and tell us, you know, this room, you
19   know, we have so many people coming in and out, you
20   know.  So that's how we, you know, get some help from
21   the DeKalb County police.
22   Q.   So I wanted to read another portion to
23   you, sir, from this police officer's deposition from
24   DeKalb County.
25        Question: Is it fair to say that there

31 (Pages 118 - 121)

Page 122

1 were a number of women, in your experience, working
2 at the United Inn doing commercial sex activities?
3 Answer: Yes. Question: And was that true during the
4 entire time period that you were a member of the vice
5 unit from 2015 to 2021? Answer: Yes.
6       That -- that answer surprises you?
7    A.  Yes.
8    Q.  I asked him, Question: Are you familiar --
9 over the course of your time in law enforcement with
10 your work at the United Inn and Suites, are you
11 familiar with there being pimps at the hotel who were
12 working with prostitutes at the hotel? Answer: Yes.
13 Question: Were you familiar with there being pimps at
14 the United Inn and Suites who were overseeing
15 multiple prostitutes at the same time? Answer: Yes.
16 Question: Is the period of 2015 to 2021 when you were
17 familiar with there being pimps at the United Inn
18 overseeing multiple prostitutes? Answer: Yes.
19       That answer, again, surprises you, I take
20 it, Mr. Shareef?
21    A.  That's right.
22    Q.  Because you had no knowledge of there
23 being pimps overseeing multiple prostitutes at the
24 hotel; is that correct?
25    A.  I have no knowledge, yes.

Page 123

1    Q.  So from 2017 to 2019, you had no knowledge
2 of there being multiple pimps at the hotel overseeing
3 multiple prostitutes at the hotel?
4       MR. STORY:  Objection.  You can
5    answer.
6       THE WITNESS:  I don't know how to
7    answer it.
8    Q.  (By Mr. Bouchard) Are you familiar with
9 the website Backpage?
10    A.  No.
11    Q.  You have no knowledge of the website
12 Backpage?
13    A.  No.
14    Q.  Did you know that there are websites on
15 the Internet that exist for the purposes of
16 advertisements for commercial sex activities?
17    A.  I don't know, but there must be a bunch of
18 them. I don't know.
19    Q.  Well, do you know that or do you not know
20 that, that there are websites that exist for purposes
21 of advertising commercial sex?
22    A.  No, I believe there may be so many, but,
23 you know, I -- I don't know the specific, you know --
24 I never been to, you know, all these website and see
25 what's going on.

Page 124

1    Q.  Well, as a hotel owner and manager, did
2 you ever participate in any trainings or receive any
3 materials educating you about the popularity of
4 websites being used to advertise commercial sex at
5 hotels like the United Inn and Suites?
6    A.  I did not participate any, but other than
7 that, I -- I don't know.
8    Q.  So I'm going to read to you, again, a
9 portion of question and answer I had with this police
10 officer.
11       Question: When you were working with the
12 vice unit, you said that you would go on websites
13 like Backpage and ListCrawler, correct? Answer: Yes.
14 Question: And when you went on those websites, did
15 you occasionally see advertisements for women who you
16 believed to be under the age of 18, that is, minors?
17 Answer: Yes. Question: Do you believe that some of
18 those women worked in commercial sex activity at the
19 United Inn and Suites? Answer: Yes.
20       Does that surprise you?
21    A.  Yes, surprise me.
22    Q.  I also asked him, Question: Do you know if
23 you can filter on Backpage to identify advertisements
24 in a certain area, and if that was only available to
25 you as a police officer or if that was available to

Page 125

1 everyone in the general public using that website.
2 Answer: Everyone in the general public can type it
3 in. If you know how to navigate through the
4 Backpage.com at the time, you could utilize it.
5       Did you know that?
6    A.  No.
7    Q.  Did you know that this police officer
8 testified that when he would filter on Backpage.com
9 for commercial sex advertisements around Memorial
10 Drive, nine out of ten of the posts would be coming
11 from United Inn and Suites?
12       MR. STORY:  Object to the form.
13       THE WITNESS:  So what is your
14    question then?
15    Q.  (By Mr. Bouchard) Did you know that he
16 testified to that?
17    A.  You're telling me he testified that.
18    Q.  I am telling you he testified --
19    A.  Yes.
20    Q.  -- to that.
21    A.  But I did not know after.
22    Q.  Did you know that Backpage had a filter
23 that you could use to try to locate where
24 advertisements were coming from?
25    A.  No.

32 (Pages 122 - 125)

CONF Tahir Shareef                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 126

1    Q.   And did your security guards ever tell you
2  that?
3    A.   No.
4    Q.   Did you ever become aware that your
5  security guards were checking Backpage to try to
6  ensure that the hotel wasn't being used for
7  commercial sex acts?
8    A.   I asked them many, many times that, you
9  know, that there is people, you know, they have this
10  thing here like -- like, you know, we have the police
11  officer came, we're arresting this prostitute.  And I
12  ask my officer, you know, later on that, you know,
13  don't you know, you know, to go to this website and
14  you know, whatever.  They -- and they said, look, you
15  know, we can go there now.  So they have, you know --
16  they check something on their phone, but they said
17  look, this is nothing here for the -- for the
18  property right now.  And they said they check it
19  bunch of time.  My officer, they check bunch of time.
20    Q.   Mr. Shareef, I'm confused, because I
21  thought, you know, no more than five minutes ago, you
22  told me that you weren't familiar with Backpage or
23  ListCrawler and you weren't really sure that there
24  were websites that advertised commercial sex.  And
25  now I think you're telling me that you had direct

Page 127

1  discussions with the hotel security guards about
2  needing to check those websites.
3    A.   No -- of course, they -- when I tell them,
4  they said there is nothing there, you know, which
5  says, you know, United Suites has certain room rented
6  and this type thing.
7    Q.   Well, let's take a step back.
8       Were you familiar, as of 2017 through
9  2019, with there being websites that were used to
10  advertise commercial sex at hotels like the United
11  Inn and Suites?  Were you familiar with the existence
12  of such websites?
13    A.   As far as I concern, I don't know.  But
14  when I talked to the officer sitting, you know, in
15  the office, and they said they check it and there is
16  nothing going on there.
17    Q.   So you're saying that Sergeant Webber --
18    A.   Webber.
19    Q.   -- and McClelland --
20    A.   Yeah.
21    Q.   -- would tell you that they had checked
22  websites to make sure that there was nobody
23  advertising for commercial sex at the United Inn and
24  Suites?
25    A.   Right.

Page 128

1    Q.   Your testimony under oath is that they
2  would tell you that?
3    A.   Yeah.
4    Q.   When did you become aware that there were
5  websites that could be used to advertise for sex at
6  hotels like the United Inn?
7    A.   No, this is when I talk with them.
8    Q.   Right.  When did you become --
9    A.   That how these people, you know, have this
10  thing that, you know, police officer came and they
11  arrest someone, and how people have this knowledge so
12  they keep coming to my hotel.  And they said, okay,
13  there are some website and we can check it now.  So
14  they check it on their phone, and they find out
15  nothing.
16    Q.   So you don't have an explanation, then,
17  for the DeKalb County officer testifying that he
18  would regularly find advertisements for women at the
19  United Inn and Suites on websites like Backpage?
20       MR. STORY:  Object to the form.
21       THE WITNESS:  I -- I don't know
22    that's his testimony.  So if -- when my
23    officer says -- telling me that, you know,
24    there's nothing we find out now, so I
25    believe, you know, whatever was doing

Page 129

1  crime, they already arrested and gone.  So
2  it's done.  Finished.
3    Q.   (By Mr. Bouchard) As the manager of the
4  hotel, did you not have concerns about why -- why do
5  I keep having to calling the police about
6  prostitution?  What steps can I take to try to
7  prevent prostitution from happening again in the
8  future?  Not just to react to prostitution that's
9  already happened, but to prevent prostitution in the
10  future.  Did you have that concern as the manager of
11  the hotel, what can I do to prevent prostitution?
12    A.   Yeah, I heavily relied on my officers, you
13  know, they are working for me.  So the -- whatever
14  information I have, I pass to them and say, look,
15  this is what happened today, and we need to check it
16  out, what's going on.  So they put somebody in jail
17  because of the prostitution, I'm happy, you know,
18  they put somebody in jail.
19    Q.   Right.  But I'm asking you a slightly
20  different question, Mr. Shareef.  If -- if I'm
21  running a hotel, and there's a murder at the hotel,
22  just to use a hypothetical, on a Monday, and then
23  another murder on a Tuesday, and then another murder
24  on a Wednesday, at some point in time, I might ask
25  myself, as the manager of the hotel, Jeez Louise,

33 (Pages 126 - 129)

CONF Tahir Shareef                          February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 130

1  there seem to be a lot of murders at this hotel.
2  What steps could I take to try to prevent future
3  murders from happening at my hotel that I manage?
4  Not the DeKalb County Police Department, because they
5  don't manage the hotel.  So that's what I'm asking
6  is: Did you ever, as the manager at the United Inn
7  and Suites, think to yourself, what can I do to
8  prevent prostitution from happening in the future at
9  this hotel?
10     A.  We have those steps.  We have
11  surveillance, we have the police officer come in, we
12  can call the DeKalb County.  So those are the steps
13  we are taking.
14     Q.  We talked about the -- and we'll take a
15  break here soon.  We talked about the code
16  violations, Mr. Shareef, the 447 code violations.
17     A.  Uh-huh.
18     Q.  I asked the police officer who I've
19  referred to about those code violations.  I said,
20  "Does the fact that the United Inn and Suites receive
21  more DeKalb County Code Enforcement Violations than
22  any other DeKalb hotel in 2018 surprise you based on
23  your time and experience at the hotel?  Answer: No,
24  it does not surprise me.  Question: Why do you say
25  that?  Answer: Every time you go to the hotel, there

Page 131

1  was a lot going on at the hotel.  When you have a lot
2  of loitering, people loitering around the hotel, it
3  wasn't clean from the outside, also not clean in the
4  inside, had a lot of abandoned vehicles on the
5  backside of the parking lot, like I said, a lot of
6  drug activity was going on because we also made
7  several narcotics arrests and did several
8  prostitution operations that lead to arrests at that
9  place also."
10     Does that answer surprise you?
11     MR. STORY:  Object to the form.  You
12  can answer.
13     THE WITNESS:  I mean, whatever
14  answer he got, this is his opinion.  But
15  again, you know, if -- if I see any abandon
16  vehicle, I remove it in like ten minutes.
17  The property, you know, we had a person who
18  clean the property on a regular basis.
19  They come in, you know, 6:00 in the
20  morning.  They go home 2 p.m., and then the
21  other person come in.  And, I mean,
22  somebody is just passing those remarks.  I
23  don't believe it.
24     Q.  (By Mr. Bouchard) Do you agree that there
25  was a lot of loitering at the hotel from 2017 to

Page 132

1  2019?
2     A.  I mean, people come in, you know, that --
3  people come in that -- you know, they throw trash and
4  stuff, you know.  They -- this thing, you know -- and
5  we have the staff to clean it, but we just cannot
6  stop --
7     Q.  I'm not asking about littering, I'm asking
8  about loitering.  People standing outside their rooms
9  in the hallways, in the stairwells, and the parking
10  lots.  Do you agree that there was high amount of
11  loitering at the hotel from 2017 to 2019?
12     A.  I believe, you know, we have -- if you go
13  to compare to any, you know, Holiday Inn or, you
14  know, those hotel, you know, of course, you know, we
15  have people standing there and this is their
16  tendency.  And we keep, you know, pushing them to go
17  stay in the room.
18     Q.  So are you saying, I think our amount of
19  loitering was about normal for a hotel, it wasn't
20  unusually high?
21     MS. WARD:  Objection.
22     THE WITNESS:  I don't know how to,
23  you know, answer that, but we keep telling
24  people, you know, they need to go stay
25  inside the room.

Page 133

1     Q.  (By Mr. Bouchard) Do you agree that the
2  hotel was not clean on the inside or the outside?
3     A.  No, I don't agree.
4     Q.  Do you agree that the hotel had a lot of
5  abandoned vehicles in the back parking lot?
6     A.  No, I don't agree.
7     Q.  Do you not agree with me, Mr. Shareef,
8  that there are photographs of abandoned vehicles with
9  flat tires from the DeKalb County forcement -- Code
10  Enforcement's visit to the hotel in 2018?
11     A.  This is -- again, I answer it before.
12  This is unnecessary, those violation.  Like I have
13  zero abandon vehicle from 2006 to 2018.  And all of a
14  sudden in 2018, I have six abandon vehicles.  Of
15  course, you know, this is poor neighborhood.
16  Somebody has a flat tire and they said, you know, we
17  can either tow the car today or tomorrow, so they tow
18  the car.  And I average, I tow two cars a month.  So
19  people, you know, do that.
20     Q.  Okay.
21     MR. BOUCHARD:  Let's take a break
22  here.
23     VIDEOGRAPHER:  Off the record at
24  12:02.
25     (Recess was taken.)

34 (Pages 130 - 133)

CONF Tahir Shareef                                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 134

1    VIDEOGRAPHER: Back on the record at
2    12:20.
3    Q.  (By Mr. Bouchard) Mr. Shareef, I can
4    represent to you that as part of the discovery
5    process in this case, Northbrook Industries has
6    answered questions that we provided to them about
7    various issues in the case. Okay? And one of the
8    issues that we asked about was who monitors online
9    reviews at the hotel. And the response provided was
10   that you and Mr. Islam monitor reviews. Is that
11   correct?
12   A.  Yes.
13   Q.  Did somebody ask you to monitor online
14   reviews at the hotel, or did you take it upon
15   yourself to do that?
16   A.  Took it upon ourself, yeah.
17   Q.  Which websites would you monitor reviews
18   from?
19   A.  On the Google.
20   Q.  Any other websites?
21   A.  No.
22   Q.  Like Expedia on Priceline, Orbitz?
23   A.  No, we don't do that.
24   Q.  Just Google?
25   A.  Yeah.

Page 135

1    Q.  How did you decide to just do Google?
2    A.  I think it would come automatically to
3    you, so that's what happened.
4    Q.  Why did you look at online reviews?
5    A.  To see, you know, what's going on, and if
6    there is something that we can do to fix it. That's
7    the reason.
8    Q.  To try to get feedback from the customers?
9    A.  Yeah.
10   Q.  I want to show you Plaintiff's Exhibit 12,
11   which is a Google -- some Google reviews.
12       (Exhibit No. 12 was marked for
13       identification.)
14   Q.  (By Mr. Bouchard) And do you see
15   Plaintiff's Exhibit 12, Mr. Shareef --
16   A.  Yes.
17   Q.  -- there's four reviews called out here on
18   the bottom half of the Document. One says, Full of
19   mess, drugs. Another one from Angela Monroe Wood
20   says, They cook drugs here. It's a no for me, dog.
21   Been coming here -- around here for nine months to
22   visit family who stay here, and this is horrific.
23   And then the last review says, Full of drug dealers
24   and addicts, had roaches there, costs too much a
25   week.

Page 136

1    Do you see that?
2    A.  Yes.
3    Q.  Did you see these reviews prior to today?
4    A.  I had said -- I don't know about these
5    reviews, but the -- if these guests are -- if these
6    people are in our guest list, so we, you know, find
7    out and, you know, find the number from the -- from
8    our -- the check-in system from the record, and call
9    them and ask them that, you know, they gave us, you
10   know, this -- like a full of drugs. So what did the
11   -- what did they find out? So, it's like maybe, you
12   know, if I call them, they say, oh, you know what,
13   somebody knock my door and try to sell drug, and I
14   didn't like it. So we'll apologize that and, you
15   know, just to see if there is something that we can
16   fix it.
17       Sometimes they give us review that they
18   are -- they are there living there, and we fix their
19   problem right away.
20   Q.  So I noticed that, for example, in
21   Plaintiff's Exhibit 12, there's no written response
22   here from the hotel --
23   A.  Uh-huh.
24   Q.  -- to the review.
25   A.  Right.

Page 137

1    Q.  Right? Was it your practice to not write
2    a response on Google?
3    A.  Yes.
4    Q.  Are you saying that you would call people
5    --
6    A.  Call, yes.
7    Q.  -- who left negative reviews?
8    A.  Yes.
9    Q.  And you would --
10       MR. STORY: Try to let him get his
11       question out.
12       THE WITNESS: Oh, I'm sorry.
13       MR. STORY: You're good. Try again
14   --
15   Q.  (By Mr Bouchard) So, are you saying you
16   would do that every time?
17   A.  No.
18   Q.  Sometimes?
19   A.  Yes.
20   Q.  Who would actually make the phone call,
21   Mr. Shareef? Would you personally?
22   A.  I did.
23   Q.  To try to address whatever it was that
24   caused the negative review?
25   A.  Yes.

35 (Pages 134 - 137)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 138

1    Q.   Let me show you what's been marked
2    Plaintiff's 13.
3        (Exhibit No. 13 was marked for
4        identification.)
5    Q.   (By Mr. Bouchard) This is a Google review.
6    And it says, Staff is friendly, rooms are clean as
7    well.  However, lots of hustlers stand out front of
8    hotel during the night, not to mention a hotspot for
9    prostitution.  This review is from a gentleman named
10   Maurice Hambrick.
11       Do you see that?
12   A.   Yes.
13   Q.   Are you familiar with this review?
14   A.   No.
15   Q.   Do you recall talking with Mr. Hambrick
16   about why he said "a hotspot for prostitution"?
17   A.   No.
18   Q.   Do you ever recall, Mr. Shareef, convening
19   a staff meeting after reading an online review or
20   multiple online reviews and saying we need to talk as
21   a staff about issues that are repeatedly arising in
22   online reviews about our hotel?
23   A.   I talked to my manager, Ashar, because he
24   have the reports after each shift.  You know, he
25   talked to the staff regularly.  And when I'm here, I

Page 139

1    talk to them regularly and, we talk about it.  Like
2    this is people are standing outside, and we -- we do
3    have people standing outside.  And we tell them, you
4    know, whatever room they belongs to, they go in and
5    they stay inside.  The people sometime listen, they
6    go to their room very politely.  And sometime they
7    keep, you know, standing there and talking to each
8    other.  But if, you know, like someone says, hotspot
9    for the prostitution, anybody can say -- anybody can
10   remarks, you know, anything.  So -- but we do talk
11   to, you know, the people, you know, on a regular
12   basis, you know.  They stand outside and, you know,
13   oh, I'm just having fresh air, you know.  We tell
14   them to go inside and stay inside the room.
15   Q.   Right.  But I was just asking if you had
16   ever called a staff meeting and say, hey, we've been
17   getting a lot of reports of prostitution and
18   loitering and drugs at the hotel in online review
19   after online review, and what are we doing to address
20   that.
21   A.   Yeah, we -- we don't have like a staff
22   "meeting" meeting.  But each time when we have a
23   shift changing, then at least we have, you know, two
24   people.  One is on -- going out shift, one is
25   incoming shift, and myself or Ashar.  And we talk to

Page 140

1    them and explain to them because, any -- any given
2    time, those four people are over almost 50 percent of
3    the staff.
4    Q.   So, let's look at what I've marked as
5    Plaintiff's Exhibit 14.
6        (Exhibit No. 14 was marked for
7        identification.)
8    Q.   (By Mr. Bouchard) This is another Google
9    review.  This one is from a gentleman named Mond
10   Miller.  And it says, There was way too much
11   commotion going on on the front side of the building
12   on the ground level.  Beginning from the time we
13   pulled up, we were afraid to even get out to look for
14   the front office because of the back-and-forth pacing
15   thugs and hustler keeping up loud conversations as if
16   some people aren't there to actually rest and wind
17   down.  Every one of them wasn't getting a room to
18   turn up or to just have sex and get high or whatever
19   it is they were doing to keep them pacing all night
20   until the sun was back up.
21       Do you see that?
22   A.   Yes.
23   Q.   Do you remember this review from
24   Mr. Miller?
25   A.   No, I don't remember.

Page 141

1    Q.   Do you recall talking with staff about
2    this review to try to take some action in response to
3    it?
4    A.   Again, not this specific review, but we --
5    we talk, kind of, on a regular basis when we see a
6    review.  Like today, when I was -- no, not today,
7    yesterday, I was sitting with the -- my staff, and I
8    asked them what you have done really good, you know.
9    I got -- you know, in one day, I got, you know, two
10   reviews, which is -- you know, one is five star, one
11   is four star.  So I said what you have done?  You
12   know, somebody saying really good thing about the
13   hotel.
14       And the -- because it's so new, you know,
15   something just post review, and I said, I think, you
16   know, this guy has short, you know, couple of dollar.
17   So I said look, I'll put it from my pocket, don't
18   worry about that.  So people are happy.  And the same
19   way we talk about -- you know, like this kind of
20   review, talk about generally, hey, people are
21   complaining too many people are outside.  So, keep an
22   eye, you know, keep telling people go -- you go
23   outside and tell the people to go in the room.
24   Q.   I don't read this as him saying he's just,
25   you know, concerned about people taking a breath of

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 142

1  fresh air or taking a stroll outside. He's
2  describing that he's concerned about there being
3  people who appear to be criminals outside hanging out
4  all night long, which is a little different than
5  saying, hey, I'm just going to go outside and get a
6  breath of fresh air. Do you agree with that?
7       MS. WARD: Objection.
8       THE WITNESS: I -- like I said, I
9  live there. I go any time of night. So,
10  this guy's opinion is his opinion. I don't
11  know what to say.
12       Q. (By Mr. Bouchard) When you're at the
13  hotel, what schedule do you keep? And I'm talking
14  2017, 2019. During that time period, what schedule
15  would you personally --
16       A. Usually --
17       Q. -- keep?
18       A. Usually in the daytime.
19       Q. You would work during the day, and I
20  assume you would sleep at night?
21       A. Yeah.
22       Q. What hours would you sleep during the
23  nighttime from 2017 to 2019?
24       A. Just the regular hours.
25       Q. What does that mean?

Page 143

1       A. When I go to bed at like a maybe 10,
2  11:00.
3       Q. And wake up at what time?
4       A. Wake up, you know, like, 6, 7, 8.
5       Q. And so you would be asleep from 10 or 11
6  to 6, 7 or 8 --
7       A. Yeah.
8       Q. -- is that fair?
9       A. Yeah.
10       Q. And so the only person, then, if we're
11  talking in 27 [sic] to 2019, and you're at the
12  property at night sleeping, there would be one staff
13  member working behind the front window, and there
14  would be a security guard from 10 a.m. to 2 p.m. Is
15  that right?
16       A. Say -- sorry --
17       Q. From 10 p.m. --
18       A. 10 p.m.
19       Q. -- to 2 a.m. Sorry, I got my --
20       A. Yeah, yeah. Yeah, yeah, yeah.
21       Q. Good listening, though. I misstated that.
22  Thank you.
23
24       (Exhibit No. 15 was marked for
25       identification.)

Page 144

1       Q. (By Mr. Bouchard) All right. I'm showing
2  you Plaintiff's Exhibit 15; which is a Google review
3  from a Dante Blackwood. And it says, Way too
4  expensive, loitering all around the building, roaches
5  in the room. I'm never going back to this dump.
6       Do you see that?
7       A. Yes.
8       Q. Do you recall responding to this review?
9       A. I don't recall. It was too long ago, so I
10  don't recall it.
11       Q. The last review I'm going to show you is
12  from -- it's Plaintiff's Exhibit 16. And this is
13  from Yelp.
14       (Exhibit No. 16 was marked for
15       identification.)
16       Q. (By Mr. Bouchard) And I assume, based on
17  what you said before, that you did not look at
18  reviews of the hotel on Yelp; is that correct?
19       A. Yes.
20       Q. So you would not have seen this review
21  before?
22       A. No.
23       Q. Is there a reason why you wouldn't have
24  looked at Yelp reviews?
25       A. No, there's no reason. I just didn't

Page 145

1  looking.
2       Q. I want to read to you. It says, "I think
3  the only thing that was United within this hotel was
4  the cockroaches, rats, and other undescribable
5  vermin. This place is disgusting. Blatant drug
6  sales in front of the rooms, prostitution, and a host
7  of sexual acts taking place on the stairwells. I was
8  there for three days without heat, air conditioning,
9  or fresh air.
10       And it goes on from there. This is a
11  review you're not familiar with?
12       A. No.
13       Q. We've talked about security at the hotel.
14  And if I've understood you correctly, sir, you told
15  me that you would have one security working for years
16  27 [sic] through to 2019, from the hours of 10 p.m.
17  to 2 a.m.?
18       A. Yeah.
19       Q. You had surveillance cameras running on
20  the properties 24/7.
21       A. Yes.
22       Q. Is that correct?
23       And you would call the police if you
24  became aware of criminal activity on the property; is
25  that right?

37 (Pages 142 - 145)

CONF Tahir Shareef                          February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 146

1      A.   Yes.
2      Q.   Were there any other measures that you
3  took to secure the property from 2017 to 2019?
4      A.   No.  Our own staff go and walk around and
5  try to fix if there's something need to be fixed, you
6  know, people putting in the room.  Or, you know, they
7  have loud music, or they have -- you know, they have
8  some, you know, fighting to each other.
9      Q.   Anything else?
10     A.   No.
11     Q.   We've talked at -- a lot about the
12  security guards, so I -- forgive me if I reask you
13  some questions, but I just want to make sure I cover
14  everything I need to since we're not going to have a
15  chance to talk again.
16          From 2017 to 2019, were the only two
17  security guards working at the United Inn and Suites,
18  Officers Webber and McClelland?
19     A.   Yes.
20     Q.   Would there have been any other officers
21  working during that period?
22     A.   No.
23     Q.   And if I understood you correctly, only
24  one of them would be working at a time?
25     A.   Yeah.

Page 147

1      Q.   All right.  So, it would not be true that
2  Webber and McClelland would be working together?
3      A.   No.
4      Q.   They had different days, in other words,
5  that they worked at the property?
6      A.   Yes.
7      Q.   How many -- would they split the week?  So
8  one officer would work maybe three or four days a
9  week, and the other would do the other three or four?
10     A.   Kind of, yes.
11     Q.   Were there any days when there was no
12  security at the property, or were all seven days
13  covered?
14     A.   I -- I can -- I can almost certain that
15  maybe in the whole year, they -- they're not working.
16  Like nobody there for maybe one day or two day.
17     Q.   So this was a regular part-time job for
18  Webber and McClelland?
19     A.   Yeah.
20     Q.   And the only time, from 2017 through 2019,
21  that United Inn and Suites had security on the
22  premises was from 10 p.m. to 2 a.m.?
23     A.   Yes.
24     Q.   The other hours of the day, from 2017 to
25  2019, there was no security guard on the premises?

Page 148

1      A.   No security guard, right.
2      Q.   What would Officers Webber and/or
3  McClelland wear when they were working security?
4      A.   Almost 90 percent of the time, they wear
5  their regular DeKalb County police uniform.
6      Q.   Did they --
7      A.   But --
8      Q.   Sorry, go ahead.
9      A.   But maybe one or two days, you know, they
10  have plain clothes.  And -- but whenever they are
11  there, you know, they have their badge visible, that
12  what I see.  Because the Officer McClelland, he --
13  he's like a sergeant, so sometimes, like, he's not
14  working at the -- at the precinct that day, so he
15  come with the, you know, regular suit and tie,
16  whatever clothing.
17     Q.   What were you paying them?
18     A.   I'm paying them $120.
19     Q.   Per shift?
20     A.   Per shift, yes.
21     Q.   So for a four-hour shift, Webber would be
22  make $120.
23     A.   Yes.
24     Q.   Same thing with McClelland?
25     A.   Yes.

Page 149

1      Q.   And you just paid them directly by check?
2      A.   Yeah.
3      Q.   Would they carry any weapons with them
4  while they were --
5      A.   All --
6      Q.   -- working?
7      A.   All the time.
8      Q.   What did they carry?
9      A.   I don't know, but the gun is there.
10     Q.   Okay.
11     A.   I don't know what they carry all the time.
12     Q.   Where were they situated on the property?
13     A.   90 percent of the time, they are, you
14  know, like walk around or sit in their car.  But, you
15  know, sometime I see them sitting in the office.
16     Q.   So you're saying 90 percent of the time
17  they'd either be in their car or walking around the
18  property?
19     A.   Yeah.
20     Q.   Was their car marked or unmarked?
21     A.   I think I see -- you can say 50/50.
22     Q.   Sometimes it would be a DeKalb patrol
23  vehicle?
24     A.   Yeah.  No, but the -- they have this car
25  -- like I saw him yesterday.  They have a car with --

38 (Pages 146 - 149)

CONF Tahir Shareef                                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 150

1  looks like a regular car, but he has those lights on.
2  So it looks like a private car sometimes.
3      Q.   And remember, I'm talking about 2017 to
4  2019?
5      A.   Yeah, at that time, also.
6      Q.   Okay.
7      A.   Same thing.
8      Q.   Same thing then?
9      A.   Yeah.
10     Q.   So, you've told me that when you were at
11 the property for 15 to 25 days a month, you would
12 typically be sleeping from around 10 or 11 until 6, 7
13 or 8 in the morning.  So how would you know what
14 Webber and McClelland did when they were on their
15 shifts?
16     A.   They -- I mean, we communicate via kind of
17 text message, phone call.  And they come on a very
18 regular basis on the daytime.  But again, many, many
19 nights, I'm up, you know.  Like yesterday, I talked
20 with the officer at almost 1 a.m.  And he was outside
21 and we have, you know, some conversation.  So
22 sometimes I see them, you know, sitting at the car or
23 walking around, so we talk.
24     Q.   So if you are awake, you might see them,
25 but if you are not awake, you're sleeping; you

Page 151

1  obviously don't know what they were doing or not
2  doing?
3      A.   Yeah, that's right.
4      Q.   You're saying you would have text messages
5  between yourself and Officers Webber or McClelland?
6      A.   Yeah.  We text each other.  Yeah...
7      Q.   So when their shift ended at 2 a.m., if
8  I'm understanding correctly, most -- most nights, you
9  would be asleep, then.  So would they write up a
10 report, or how would you learn what had transpired
11 during their shift?
12     A.   When they leave, they inform the front
13 desk, you know, if something happened, or, you know
14 the front desk talk with them or they tell me, you
15 know, in the morning.  Or maybe the officer next
16 morning, they tell me, hey, you know, I have two
17 room, you know, they are, you know, making noise or
18 they are -- you know, they standing outside or loud
19 music.  And we put them in the room.  So next day, I
20 can find out what's going on.
21     Q.   So it was word of mouth?
22     A.   Yeah.
23     Q.   They wouldn't draft an actual document --
24     A.   No, we don't.
25     Q.   -- report?

Page 152

1      A.   We don't.
2      Q.   So they would -- before they left at
3  2 a.m., they would make an oral report to the person
4  working at the front desk telling them what --
5      A.   Not necessarily.
6      Q.   Okay.
7      A.   Not necessarily.
8      Q.   Only if there was something that they
9  thought they needed to report?
10     A.   Yes.
11     Q.   And if there was something they thought
12 they needed to report and they did report it, then
13 the front desk would convey that to you when you
14 started working in the morning?
15     A.   That's right.
16     Q.   Did you ever e-mail with Webber or
17 McClelland, or just text message?
18     A.   Some was text message all that.
19     Q.   I think you've suggested -- and maybe --
20 correct me if I'm wrong.  I understood you to suggest
21 that you decided to have security from 10 p.m. to
22 2 a.m. because that was the period of the 24-hour day
23 when there was the most activity on the property that
24 might be criminal in nature.
25     A.   Yes.

Page 153

1      MS. WARD:  Objection.
2      THE WITNESS:  Yeah.
3      Q.   (By Mr. Bouchard)  Outside of that time
4  period, you agree that there could still be criminal
5  activity of course, right?
6      A.   Yeah, could be.
7      Q.   Just because the security guard leaves at
8  2, doesn't mean there couldn't be crime at 2:15?
9      A.   Uh-huh.
10     Q.   Is that a yes?
11     A.   Yes.
12     Q.   And from 2017 to 2019, you never had a
13 security company that you contracted with to provide
14 security at the hotel; it was just Officers Webber
15 and McClelland; is that right?
16     A.   Right.
17     Q.   Did you ever, at any point in time, sir,
18 have a security assessment done of the property?
19     A.   Security assessment.  No.
20     Q.   Have you ever hired anybody to do an audit
21 of the property to try to determine what could be
22 done to enhance security?
23     A.   No.
24     Q.   Did the security guards, Webber and
25 McClelland, from the years 2017 to 2019, ever make

39 (Pages 150 - 153)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 154

1    recommendations on what you could do to improve
2    security at the hotel?
3        A.   Yes.  We talk about it and they -- they're
4    not objecting it.
5        Q.   What suggestions did they have on how you
6    could improve security at the hotel?
7        A.   When this security person -- hiring a
8    security person coming or security company come up, I
9    ask them if they recommend, you know, some company
10   who is good that can do the job.  And they said, you
11   know, the -- there are so many, I have to look.  But
12   they never recommend anybody, but they, you know --
13   the suggestion is there.
14       Q.   Why didn't you look yourself?
15       A.   In sometime of 2007, '8 and '9, I did hire
16   a security company, but I find out they -- they did
17   not turn out to be good.
18       Q.   I think I've asked you this question a few
19   different ways.  What is the reason why you did not
20   have any security at the hotel outside of 10 p.m. to
21   2 a.m.?
22       MS. WARD:  Objection.
23       THE WITNESS:  I don't know how to
24   answer it.
25       Q.   (By Mr. Bouchard)  Well, you're the manager

Page 155

1    and the owner.
2        A.   Yes.
3        Q.   So, I mean, if this case goes to trial
4    and, for example, Mr. Shareef, you provide testimony
5    at trial, well, the reason why I didn't do that was
6    X, Y, Z, this is my only opportunity to find out why
7    the owner and the manager at the United Inn and
8    Suites didn't hire security guards for the other
9    20 hours of the day.  So what -- is the reason I
10   don't know why, or is there a reason why you did not?
11       A.   No, the only reason is I have, you know,
12   the -- the DeKalb County, I call them and they come
13   and, you know.  I do whatever I need to make a call,
14   so if there is somebody need to be removed the
15   property, they come and do it for me, or some other,
16   you know, things.  So, basically DeKalb County, yeah,
17   I call them and ask for help.  That's the -- that
18   could be the reason.
19       Q.   I think you mentioned that DeKalb County
20   police had recommended to you that you hire more
21   security?
22       A.   Yeah, they suggest it, yes.
23       Q.   When was that?  Was that around 2017 to
24   2019?
25       A.   I don't recall when was that.

Page 156

1        Q.   Do you recall if Webber or McClelland ever
2    suggested hiring more security?
3        A.   No, not really.
4        Q.   You do not recall?
5        A.   No.
6        Q.   Did you ever have any complaints about
7    Webber or McClelland and the services they were
8    providing?
9        A.   Complaint about those officers?
10       Q.   Uh-huh.
11       A.   No.
12       Q.   You were pleased with the work they were
13   doing?
14       A.   Yes.
15       Q.   Was there a curfew from 27 [sic] to 2019
16   at the United Inn and Suites?
17       A.   Curfew mean -- what does that mean,
18   curfew?
19       Q.   People are not allowed to be outside of
20   their rooms.
21       A.   Not the curfew.  We enforce it, they're
22   not allowing to standing long time there.  But
23   there's not a curfew thing.
24       Q.   How would the cur- -- how would the rule
25   on loitering be enforced after 2:00 in the morning

Page 157

1    before the morning shift shows up, because there's
2    only one person working at the hotel?
3        A.   The -- the front desk who is there, they
4    go out and make a round.  And when they see someone
5    standing there or maybe the -- you know, the -- we
6    got a -- you know, like we get complaint like
7    somebody from a certain room call, hey, there are
8    people standing and they have, you know, very loud,
9    and I cannot sleep, so they making noise or they
10   listen to music.  So the front desk go there and tell
11   them to, you know, go in their room and sleep.
12       Q.   Where are the surveillance cameras
13   located?
14       A.   That is at the front desk.
15       Q.   The feed where you could actually see what
16   the surveillance cameras are showing are at the front
17   desk?
18       A.   Yes.
19       Q.   Are they also behind the window?
20       A.   No.
21       Q.   So, you've said that at nighttime, the
22   front desk area is closed, the window is open.
23       A.   Yes.
24       Q.   Is the person -- the one person who's
25   working at the hotel behind the window at nighttime,

40 (Pages 154 - 157)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 158

1  do they have access to surveillance camera feeds?
2      A.  Yes.
3      Q.  Because there are -- there's a feed behind
4  the window?  Is there a screen --
5      A.  No, there's --
6      Q.  -- a video screen they can look at --
7      A.  Yeah, yeah.
8      Q.  -- behind the window?
9      A.  Yeah.  We have monitor right there, so
10  they are standing here, you know.  So then let's say
11  this is a window, and monitor is right here in this
12  wall.
13      Q.  And how many cameras are there throughout
14  the hotel property?
15      A.  I believe 36.
16      Q.  How many rooms are in the hotel?
17      A.  172.
18      Q.  172?
19      A.  Yes.
20      Q.  And what's max capacity at the hotel in
21  terms of guests?
22      A.  Max capacity.  I mean, I have maybe 10, 20
23  rooms empty, you know, in the average day.  Is that
24  the question?
25      Q.  Well, that it -- that's the answer to a

Page 159

1  different question I was going to ask.
2      A.  Okay.
3      Q.  So, on average, would you be renting out
4  about 150 rooms a night?
5      A.  Yes.
6      Q.  And so if you have one or two or more
7  guests, you may have 150 to 300 people staying at the
8  hotel?
9      A.  Yes.
10      Q.  Or more, if there are more quests in a
11  room, correct --
12      A.  Right.  Yes.
13      Q.  What's the max number of guests that
14  should be in a room?
15      A.  Two adults, and two children.
16      Q.  So four?
17      A.  Yes.
18      Q.  Who was responsible for reviewing the
19  surveillance camera footage?  Is it whoever was
20  working at the front desk at that point in time?
21      A.  Yes.
22      Q.  And if they saw something concerning, what
23  were they supposed to do?
24      A.  They go out and, you know, tell the --
25  whoever is doing something, people are just, you

Page 160

1  know, hanging there, loud conversation, or the
2  smoking, they tell them, hey, man, there is no
3  smoking policy in the DeKalb County hotel.  So you
4  cannot smoke.  And then they tell them to go stay in
5  the room.
6      Q.  So they would go out and talk to the
7  guests about whatever it is they'd seen that was
8  concerning?
9      A.  Yes.  Yes.
10      Q.  You've referenced a do-not-rent list.  Is
11  that actually like a document with a list of people's
12  names on it?
13      A.  Yes.
14      Q.  Okay.
15      A.  Big one.
16      Q.  Do you maintain that document?
17      A.  Big one, yes.
18      Q.  I don't know if it's been produced in
19  discovery.  So it's something you have at the hotel?
20      A.  That is -- I don't know how to produce
21  that, but this is like -- can I give example, so this
22  way maybe I explain better?
23          So a person rent a room two years ago, or
24  yesterday, and they misbehave for anything.  We put
25  them on a do-not-rent list.  So when they come back,

Page 161

1  the system already give a red flag, so they cannot
2  get a room at my place.
3      Q.  So, their name would somehow be entered
4  into their reservation system and it -- there would
5  be a flag --
6      A.  Something like that.
7      Q.  -- if that person came back?
8      A.  Yes.
9      Q.  So it's not like you can go back to the
10  office and pull up, like here's my do-not-rent list,
11  it's not a paper document that you have.  Is that
12  what you're saying?
13      A.  I -- I never print it.
14      Q.  Okay.
15      A.  I -- I don't know how to print it.
16      Q.  Okay.
17      A.  But the system make it so easy, so in like
18  a five second, we found out this guy stays in 20 --
19  you know, '15 or '16, do not rent him a room.
20      Q.  Let me ask you about your reser- -- room
21  reservation system.  So, how -- I want to ask about
22  searching your room reservation system.
23      A.  Okay.
24      Q.  Are you able to search your room
25  reservation system for guests for a particular time

41 (Pages 158 - 161)

CONF Tahir Shareef                          February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 162

1  period?
2      A.   When you say "reservation system," meaning
3  you need --
4      Q.   Do you have a record on a computer --
5      A.   A record, yes.
6      Q.   -- of who has stayed at the hotel?
7      A.   Yes.
8      Q.   Can you search that record on your
9  computer of who stayed at the hotel for a particular
10 time period?
11     A.   Yes, I can.
12     Q.   So if you wanted to know everybody who
13 stayed at the hotel in June 2017, could you search
14 that?
15     A.   I believe so, but the system has some
16 stop, I don't know where it stops.  I have to be at
17 the system to find out, but, yes, I -- it may not go
18 now to 2017, it may stop on 2019 or 2020.  But there
19 is some stop.
20     Q.   You mean it only goes a certain distance
21 --
22     A.   Certain, yes.
23     Q.   -- back?
24     A.   Something like that.
25     Q.   Are you able to search within the system

Page 163

1  for people who rented more than one room at a time?
2      A.   The system won't allow to rent room on the
3  same time.
4      Q.   It won't allow one person to rent multiple
5  rooms at the same time?
6      A.   Yes, it won't allow it.
7      Q.   Is this the same system you had in 2017 to
8  2019?
9      A.   Yes.
10     Q.   Are you able to identify through searches
11 in the system people who rented a room for more than
12 30 days?
13     A.   Yes.
14     Q.   How do you do that?
15     A.   If someone is staying -- I cannot explain
16 it, but I can say with the example.
17     Q.   Sure.
18     A.   If someone is saying, let's say, 2019,
19 month of -- month of -- month of March, on like six,
20 March, and then they stayed one week, and then they
21 check out.  They come back in June, three days, they
22 come back again and, you know.  And the -- we have
23 the report, we can pull out the report.
24     Q.   So if you wanted to search for people who
25 had stayed at the hotel for more than 30 days in 2017

Page 164

1  or 2018, could you do that?
2      A.   I don't know about 2017 because it's too
3  far away.
4      Q.   Uh-huh.
5      A.   But I believe -- I remember pulling up a
6  report when was coming out, so I believe I print out.
7  But that was two -- year and a half, two years ago.
8      Q.   I saw some reference in your hotels'
9  policies and procedures to VIP guests, very important
10 person guests.  Are you able to identify guests who
11 have spent the most money at the property in a given
12 year?
13     A.   Our system print out a report, you know.
14 So, the report can tell you that this person stay in
15 2019, how much they paid, how much was the tax
16 collected, how much, you know.  So it was there.
17     Q.   So you think you can search the system for
18 which customer spent the most money at the hotel in a
19 particular year?
20     A.   I don't know when you say spent most of
21 the money, I don't get it.
22     Q.   Well, could you identify, here are the top
23 50 customers at the hotel in 2018, in terms of money
24 spent --
25     A.   No.

Page 165

1      Q.   -- at the hotel?  You could not do that?
2      A.   No.
3      Q.   What were you referring to a minute ago
4  when you said there's some kind of report that would
5  show --
6      A.   No, I can find out like six people stays
7  in 20 -- you know, '19, they stay -- like everyone
8  stays for one month.  And whatever report system
9  generate, because, you know, like some -- some people
10 stays on a daily basis, so they pay every day.  So
11 it's a little bit more rent if you bring the money
12 every day.  But if you pay by the week, it's a little
13 bit less rent.  So someone is staying, like, say, for
14 one month paying a daily price, so he may be paying
15 me, let's say -- I'm just saying put a number there,
16 you know, $50 a day times 30 days.  But the next room
17 is paying on weekly, so they paying only $300 a week,
18 you know, so -- or maybe whatever the weekly rate is,
19 so they pay less than the other person.  So that's
20 the only difference.
21     Q.   But you think if -- if the records go back
22 far enough -- and you're not sure if they do or
23 don't, but if they did, let's say, go back to 2018,
24 could you search the records to find everybody who
25 had rented a room at the hotel in the month of

42 (Pages 162 - 165)

CONF Tahir Shareef                           February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 166

1  October 2018, for example?
2      A.   I never tried it.  I don't know, but if I
3  -- if I know the name and that person stays with us,
4  to search them and print out a report.
5      Q.   Well, I'm saying like in this case, for
6  example, our clients' trafficker -- my client's
7  traffickers went by street names; my client doesn't
8  know their actual legal names.  So -- but she does
9  know when she was at the hotel.  And so if you were
10  asked to search a month of time in 2018,
11  October 2018, could you identify all the guests who
12  were at the hotel who had rented rooms that month?
13     A.   Identify all the guest, I don't think so.
14  I can -- I can -- I can print a report for a guest.
15  If I have a name of the guest, and we're not going
16  too far enough, and the system has the capacity to
17  print out the report, I can print it.  But all the
18  guests, I don't know -- if I know the name, then I
19  can do it.
20     Q.   So you're saying you don't think you can
21  search, based on dates alone, show me the guests for
22  October 1st, 2018 to October 31st, 2018?
23     A.   I don't think so.
24     Q.   You -- in 2017 to 2019, Mr. Shareef, would
25  you and the hotel accept cash to rent rooms?

Page 167

1      A.   Cash, yes, we accept cash.
2      Q.   And how much was it, on average, to rent a
3  room at the United Inn and suites, 2017 to 2019?
4      A.   I don't know on top of my head, but I
5  think our average -- average rent was like $285 a
6  week.
7      Q.   285 per week?
8      A.   Yes.
9      Q.   So, would that mean like 30 to $50 per
10  night?
11     A.   Yes.
12     Q.   Something like that?
13     A.   Uh-huh.
14     Q.   Did you allow hourly rentals?
15     A.   No.
16     Q.   Did you ever rent out the same hotel room
17  more than once in a 24-hour period?
18     A.   What's -- I don't get that question.
19     Q.   Well, the question is: Would you ever rent
20  one hotel room more than one time in a single 24-hour
21  period?
22     A.   It may happen, you know, once a year,
23  twice a year.  Like on Christmastime, you too busy,
24  so if somebody check out and we clean the room and
25  rent it again.

Page 168

1      Q.   What would the hotel do to prevent
2  off-the-books rentals that aren't in the reservation
3  system?
4      A.   Off-the-book reservation system?  I --
5      Q.   Yeah.  So what would the hotel, United Inn
6  and Suites, do to prevent, to stop, people from
7  renting rooms that weren't actually recorded on the
8  reservation system online?
9      A.   I train my staff to rent room and put them
10  properly in the system.  And that's all they do.
11  What prevent them?  The prevent them, that if they do
12  rent room and pocket the money, that they may lose
13  their job.
14     Q.   So if a person shows up at the United Inn
15  and Suites at nighttime to rent a room, it's the
16  nighttime shift, they would go to the window?
17     A.   Yes.
18     Q.   Is that window bullet proof?
19     A.   Not really.  It has a thick glass, but I
20  don't know what kind of bullet break it --
21     Q.   Did you have to -- that glass installed,
22  or did somebody else have that installed?
23     A.   Somebody else install it.
24     Q.   It was there when you got there?
25     A.   No.  We hired, you know, long time ago

Page 169

1  someone to do it.
2      Q.   Did you ask for that glass to be
3  installed?
4      A.   Yes.
5      Q.   Why did you want such thick glass?
6      A.   Because of the -- the safety of the
7  property, and the safety of the, you know, the -- our
8  other front desk staff.  He carry cash, so, you know,
9  that's the reason.
10     Q.   It was for safety of whoever was working
11  at the front desk --
12     A.   Yeah.
13     Q.   -- at nighttime?
14     A.   Yeah.
15     Q.   Have you ever been fearful on the
16  property, Mr. Shareef?
17     A.   Yeah, once or twice.
18     Q.   You've been scared on the property once or
19  twice?
20     A.   Yes.
21     Q.   Has your wife ever been scared on the
22  property?
23     A.   I mean, when I say scared at the property,
24  when we working at the front desk, that's the time,
25  you know, like -- in last, you know, 17 years, the

43 (Pages 166 - 169)

CONF Tahir Shareef                                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 170

1  poor guy Ashar got, you know, robbed once.
2      Q.  Ashar got robbed --
3      A.  Yeah, once.
4      Q.  -- when he was working the front desk?
5      A.  Yeah.  Yeah.
6      Q.  Were you ever fearful of talking with the
7  police because you were worried about what guests at
8  the hotel might do?
9      A.  Never.
10     Q.  You were not afraid?
11     A.  Never.  Fearful to police or fearful to
12  guest?
13     Q.  Fearful of what guests might do --
14     A.  No.
15     Q.  -- to you.
16     A.  No, never.
17     Q.  What are the hotel's rules on minors at
18  the property?
19     A.  The minor has to be accompanied by their,
20  you know -- with their -- the adults.  And we have
21  this policy, you know, that any time the minor is
22  outside, the adult should be accompanied with them.
23     Q.  They should always be with an adult?
24     A.  Yeah.
25     Q.  Is a minor allowed to rent a room at the

Page 171

1  hotel?
2      A.  The -- I don't know what you mean "minor"
3  now, but if you're --
4      Q.  Anybody under --
5      A.  -- not 18 year old, you cannot rent a
6  room.
7      Q.  That's what I'm talking about.
8      A.  Okay.  Okay.
9      Q.  Anybody under the age of 18.
10     A.  Okay.  But then -- then, like a teenager,
11  children, they come with the -- with their parents,
12  you know.  If they're not accompanied with the --
13  when you say "minor," I thought you talking about the
14  small children.  But the children, they are, you
15  know, teen, you know, if they walk around, you know,
16  we don't tell them to, hey, you know, where is your
17  parents.
18     Q.  Is a person who's under the age of 18
19  allowed to rent a room at the hotel?
20     A.  Never.
21     Q.  I'm showing you what's Plaintiff's
22  Exhibit 16.
23     A.  I have a 16 here.
24     Q.  17 --
25         MS. WARD:  Yeah, I was going to say,

Page 172

1  we have 17.
2          MR. BOUCHARD:  Yeah, thank you.  I
3  might need to -- let me write on that
4  again.  Thank you, everybody.
5          (Exhibit No. 17 was marked for
6  identification.)
7      Q.  (By Mr. Bouchard) Mr. Shareef, this is
8  Plaintiff's Exhibit 17.  It's a commercial insurance
9  application dated June 21, 2017.  And it's actually a
10  couple of documents.  The first document is four
11  pages long.  The second document is four pages long,
12  and the third document is three pages long.  There is
13  -- on the first document, which is the fourth page of
14  Plaintiff's Exhibit 17, there's a signature on page 4
15  at the bottom that says Shareef.  Do you see that?
16     A.  Yes.
17     Q.  Is that your signature?
18     A.  No.
19     Q.  It's not your signature?
20     A.  No.
21     Q.  Who -- who signed this; do you have it any
22  idea?
23     A.  Maybe this Bulldog Insurance Company, they
24  -- they sign it.
25     Q.  Did you authorize them to sign it for you?

Page 173

1      A.  When they send me code, I authorize them
2  to get the insurance.
3      Q.  Let's look at the next four-page document
4  that's in Plaintiff's Exhibit 17.  It also has a
5  Shareef signature.  Is that -- are you saying that's
6  not your signature?
7      A.  Page number what?  9.
8      Q.  9 of 9, yeah.
9      A.  9 of 9, yeah.  No, it's not my signature.
10     Q.  And then the last document, page 1 of 3 --
11  go to page 3 of 3, please -- or 4 of 4.
12     A.  4 of 4, yes.
13     Q.  Is that your signature?
14     A.  Where?  Or where it says -- no.
15     Q.  Signature of applicant.
16     A.  No.
17     Q.  Do you know whose signature that is?
18     A.  I don't know.
19     Q.  You do not know?
20     A.  No.
21     Q.  Have you seen this insurance application
22  before?  You see if you look at the first page of
23  Plaintiff's Exhibit 17, that this is for customer ID
24  Northbrook Industries, Inc.  Do you see that?
25     A.  Yes.

44 (Pages 170 - 173)

CONF Tahir Shareef                                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 174

1  Q.  Have you seen this before?
2  A.  I must have seen it because they sent me
3  the e-mail, they said, well, you have the insurance
4  and you're good to go for, you know, whatever year.
5  Q.  Did you help fill this out?
6  A.  No.
7  Q.  You don't remember providing information
8  to somebody to help fill this form out?
9  A.  No.
10  Q.  Look at the second page of the document,
11  Plaintiff's Exhibit 17.  It says that there are three
12  full-time employees and three part-time employees.
13  Do you see that?
14  A.  Yes.
15  Q.  Is that correct, that, as of the date of
16  this document, June 21st, 2017, there were three
17  full-time employees and three part-time employees?
18  A.  No.  There are more, then maybe, a few
19  more employees, part time.
20  Q.  So you think those numbers are just not
21  accurate; is that what you're saying?
22  A.  This three and three, no.
23  Q.  The number should be higher than that?
24  A.  Eight and nine.
25  Q.  On the third page of this Plaintiff's

Page 175

1  Exhibit 17, the third question at the top of the
2  third page is, is a formal safety program in
3  operation.  And there are two boxes checked.  It
4  says, safety manual check, and monthly meetings,
5  check.  Do you see that?
6  A.  Which page is that?
7  Q.  The third page.
8  A.  It's same page, third -- three of four.
9  Oh, okay.  Safety manual, monthly meeting.
10  MR. STORY:  Can you repeat your --
11  MR. BOUCHARD:  And so it said --
12  MR. STORY:  -- question, Ed?  Sorry.
13  MR. BOUCHARD:  -- is that --
14  Q.  (By Mr. Bouchard)  The question at the top
15  of page 3 of Plaintiff's Exhibit 17 says, Is a formal
16  safety program in operation?  And the answer is yes.
17  If you go over to the right-hand column, it says Y
18  for yes.
19  A.  Uh-huh.
20  Q.  And then it checks or has an X in the box
21  of safety manual and monthly meetings.
22  Do you see that?
23  A.  Yes.
24  Q.  You're saying you did not answer that
25  question, somebody else did?

Page 176

1  A.  Somebody else, yeah.  Yeah.
2  Q.  Do you know why the answer is yes there?
3  A.  These people doing my insurance, you know,
4  for the last 17 years.  So, they fill out the
5  application and that's about it.  So, I don't know
6  why it's a yes or no.
7  Q.  Is that accurate, that there was a formal
8  safety program in operation as of June 2017?
9  A.  I mean, we have, you know, talk about it,
10  the -- it may not be something in writing, but we
11  have talk about it.
12  Q.  You have talked about it with your staff,
13  you mean?
14  A.  With the staff, yes.
15  Q.  Who do you think filled out this
16  application that we're looking at, Plaintiff's 17?
17  A.  I don't know.
18  Q.  There's a name on the first page, Azfar
19  Haque --
20  A.  Uh-huh.  Yes.
21  Q.  -- as the contact name?
22  A.  Yes.
23  Q.  Are you familiar with that gentleman?
24  A.  Yeah, I call -- this is the -- this is the
25  owner of the company, so I -- I call them, you know,

Page 177

1  every once in a while.
2  Q.  Is he --
3  A.  Or they call me.
4  Q.  It he your insurance broker?
5  A.  Yeah.
6  Q.  And he has been for a long time?
7  A.  Yeah.  From the day one.
8  Q.  Does he work at the United Inn and Suites?
9  A.  No.
10  Q.  Does he visit the United Inn and Suites to
11  check on the operations of the hotel?
12  A.  Maybe he comes -- check the operation of
13  the hotel?  I don't think so, no.
14  Q.  How would he know how many employees the
15  hotel has?
16  A.  I don't know.
17  Q.  All right.  Now I'm moving to kind of the
18  second document in Plaintiff's Exhibit 17, which it
19  says at the top, Mr. Shareef, commercial general
20  liability section.
21  A.  Uh-huh.
22  Q.  Okay.
23  A.  Yes.
24  Q.  All right.  This has a series of
25  questions.  If you go to page 3 of 4 at the bottom,

45 (Pages 174 - 177)

CONF Tahir Shareef                        February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 178

1    look at the bottom of the document, page 3 of 4.
2        A.   Yes.
3        Q.   I'm sorry, 4 of 4.  My bad.  Question 20.
4            It says, Have any crimes occurred or been
5    attempted on your premises within the last three
6    years, and the answer is no, in the right-hand
7    column.  Did you answer that question or did somebody
8    else answer it?
9        A.   This is the -- Mr. -- Azfar's company, you
10   know, someone on the company answer it.
11       Q.   Do you agree with that answer?
12       A.   Any contact --
13           MR. STORY:  He's asking if you agree
14   to the answer of yes in this question.
15           MR. BOUCHARD:  No.
16       Q.   (By Mr. Bouchard)  I'm asking you if you
17   agree --
18           MR. STORY:  Oh, I'm sorry.
19           MR. BOUCHARD:  It's okay.
20       Q.   (By Mr. Bouchard)  I'm asking if you agree
21   to answer no to question 20 --
22           MR STORY:  Oh, I'm sorry.
23       Q.   (By Mr. Bouchard) -- have any crimes
24   occurred or been attempted on your premises within
25   the last three years?

Page 179

1        A.   Well, the crime -- I don't know if
2    somebody, you know, like, take me to the court or
3    something, you know.  But the -- of course the crime
4    occurred.  I see the reports.
5        Q.   So you don't know why the answer is no?
6        A.   I don't know.
7        Q.   All right.  Let's look at the last
8    document that's part of Exhibit 17, which is the
9    hotel/motel application.  On page 2 of 3, it asks,
10   Question 9, Are your security guards on the premises?
11   And the answer provided is no.
12           Do you see that?
13       A.   Yes.
14       Q.   I think your testimony was when you look
15   at the next page, you don't know who signed this
16   document --
17       A.   Yeah.
18       Q.   -- is that correct?
19       A.   Right.
20       Q.   But you're saying you did not answer
21   Question 9 here?
22       A.   No.
23       Q.   So, do you agree with the answer, no,
24   there were no security guards on the premises as of
25   June 21st, 2017?

Page 180

1        A.   I mean I have those police officer
2    working, so I don't know how to answer this thing.
3        Q.   So I think your answer would have been,
4    yes, there are, based on those officers.  Is that
5    correct?
6        A.   I believe so.
7        Q.   Question 13 is: Any assault and battery
8    incidents in the complex during the past five years?
9    And the answer provided is no.  You're saying you
10   didn't provide that answer; is that correct?
11       A.   That's right.
12       Q.   Do you agree with that answer?
13       A.   Last five year, I mean, this is 17 -- this
14   is --
15           MR. STORY:  Yeah.  Question --
16           THE WITNESS:  This is 2017 --
17           MR. STORY:  Question 13.
18           THE WITNESS:  No, no.  I mean, this
19   -- this insurance is in '17 --
20           MR. STORY:  That's correct, yeah.
21           THE WITNESS:  -- and '18.  2017 --
22       Q.   (By Mr. Bouchard)  So it would have been
23   going back to 2012.
24       A.   So we go back to '12.  So I -- I mean,
25   that -- that's, you know, some -- question number

Page 181

1    which I'm reading?  Number 13?
2        Q.   13.
3        A.   13, assault and battery.  The answer may
4    be yes, because I see the report on 2015.
5        Q.   And then I want to ask you about Question
6    24, which is, Any prior history of bed bugs or other
7    bed infestations?  And the answer provided is no.
8    Did you provide that answer?
9        A.   No.
10       Q.   That's not a correct answer; is that
11   right?
12       A.   Any history of bed bugs.
13       Q.   Or of other bug infestations.
14       A.   Answer yeah.  Answer will be yes, I have
15   roaches problem.
16       Q.   You -- Mr. Shareef, if I'm understanding,
17   as you look at Plaintiff's Exhibit 17, you did not
18   provide any of the answers to the questions included
19   in Plaintiff's Exhibit 17?
20       A.   That is right.
21       Q.   You don't know who answered these
22   questions or where they got the information they used
23   to answer them?
24       A.   That's right.
25       Q.   You don't know who signed the last

46 (Pages 178 - 181)

CONF Tahir Shareef                           February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 182

1  document, but you think the first two were signed by
2  Azfar?
3      A.  No, I don't say it's signed by Azfar.  I
4  don't know.  I said somebody in the office.
5      Q.  You don't know who signed any of these?
6      A.  Right.
7      Q.  You presume it was somebody who works for
8  Bulldog Insurance; is that correct?
9      A.  Yes.
10     Q.  Is that your insurance broker?
11     A.  Yes.
12         THE WITNESS:  I need to go to the
13  bathroom.
14         MR. STORY:  Yeah, let's take a
15  break.
16         MR. BOUCHARD:  Take a break.
17         MS. WARD:  And the food is here.
18         VIDEOGRAPHER:  Off the record 1:22.
19         (Recess was taken.)
20         VIDEOGRAPHER:  Back on the record at
21  2:01.
22     Q.  (By Mr. Bouchard) Mr. Shareef, welcome
23  back.  Did you have a chance to have some lunch?
24     A.  Yes, yes.  Thank you.
25     Q.  Very good.  I want to move on now and talk

Page 183

1  to you a little bit more, Mr. Shareef, about training
2  at the hotel.
3      A.  Okay.
4      Q.  If I've understood your testimony today
5  correctly, it sounds like there were not formal
6  scheduled training sessions with the entire staff all
7  gathering together at one time, but instead there
8  were kind of more casual informal discussions between
9  you or Mr. Islam and individual staff members.  Is
10  that correct?
11     A.  Yes.
12     Q.  So let me -- just to make sure I've got
13  that, let me just ask you: From 2017 to 2019, were
14  there ever training sessions provided at the hotel
15  for all of the staff at the hotel at the same time?
16     A.  No.
17     Q.  Would you train staff at the hotel by
18  talking with them one on one?
19     A.  Yes.
20     Q.  Is that how Mr. Islam would have trained
21  staff at the hotel as well?
22     A.  Yes.
23     Q.  Do you believe that all of the staff who
24  worked at the hotel from 2017 through 2019 received
25  training at some point?

Page 184

1      A.  Yes.
2      Q.  Did that training include signs of
3  criminal activity, including prostitution?
4      A.  Yes.
5      Q.  In other words, would you cover, as part
6  of the training that you would provide to staff,
7  things to look out for that might indicate criminal
8  activity?
9      A.  Yes.
10     Q.  And what types of things would you say to
11  staff when you were training them about what might
12  indicate criminal activity?
13     A.  So, we -- like our observation was that if
14  we have seen evidence of too many people going -- you
15  know any particular room, and they keep going back
16  and forth, or the people are just standing in front
17  -- front of the room, and they are, you know, talking
18  loud, they are smoking, or, you know, they start,
19  yelling at each other, fighting, so all these signs
20  are that, you know, you need to be very careful and
21  try to resolve it, you know.  And tell people that
22  they just go back to their room and stay in their
23  room, or they leave.  So, either case, if they go
24  back to their room and calm down, that's fine.  If
25  they refuse to do it, then we call the DeKalb County

Page 185

1  and seek for their help.  And when they come in,
2  they, you know, kind of observe that -- what is going
3  on.  Sometime they find out the person who is
4  involved in any type of commotion, you know, they
5  have some kind of warning or the warrant against
6  them, so they take them away.  Or sometime we tell
7  them to -- you know, we don't want this person here
8  anymore, remove them from the property.  So they
9  remove it, and we get the trespass warning against
10  them so they never come back.
11         So those are the things we talk to our
12  staff, and they observe it very carefully.
13     Q.  Are there any other things that you would
14  tell your staff to look out for as it relates to
15  trying to identify criminal activity?  You just gave
16  me a list of items.  I'm wondering is there anything
17  else or did you just tell me everything.
18     A.  The -- most of the time is that we just
19  cannot -- I don't go in the room for, you know -- if
20  we think there is something going on -- into the
21  room.  So we call the, you know, police and tell
22  them, you know, that, look, we need help to find out,
23  you know, why these people have so -- so much traffic
24  going to the room.  And they don't listen to us, so
25  they need to be removed from the property.

47 (Pages 182 - 185)

CONF Tahir Shareef                              February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 186

1    Q.   Did all of the housekeepers speak English
2 from 2017 to 2019?
3    A.   Some speaks little bit better, but some,
4 they don't.
5    Q.   And so, if -- I'm assuming would they
6 speak -- based on the names, would they speak
7 Spanish?
8    A.   They did speak Spanish.
9    Q.   Did some of the housekeepers from 2017 to
10 2019 not speak English at all?
11    A.   No.  Everybody speak English.
12    Q.   Did some of the housekeepers speak very
13 limited English?
14    A.   Uh-huh.
15    Q.   And would -- when you say you would train
16 staff at the hotel through one-on-one discussions,
17 either involving you or Mr. Islam, would you talk in
18 Spanish to somebody who speaks very limited English?
19    A.   No.  We have three housekeeper they speak
20 fairly well.  So they involve them stay with us, and
21 then they translated.
22    Q.   How often would you have these discussions
23 about what to look for as it relates to criminal
24 activity on the property?  Was this the kind of
25 thing, Mr. Shareef, where when you hired somebody and

Page 187

1 you were introducing them to the property and they
2 were beginning their work at the property, that you
3 would talk to them about criminal activity and what
4 to look for?  Or is it something that you continued
5 to talk to hotel staff about on an ongoing basis?
6    A.   Of course whenever we hire any new person,
7 that is part of their, you know, detail, work ethics,
8 you know, what to do, besides how to do their job.
9 So we tell them all the -- all the thing which I
10 already explained to you.  And then at least we go,
11 maybe -- if not a monthly basis, maybe bi-monthly
12 basis, we talk to them and just refresh the memory.
13    Q.   Were there ever training materials
14 distributed in writing, or were all of the trainings
15 oral?
16    A.   No.
17    Q.   All of the trainings were oral?
18    A.   Just oral, yes.
19    Q.   So there's no written training materials?
20    A.   No.
21    Q.   And that rhythm or schedule that you just
22 described of, I'd train people when they started
23 working at the hotel, and then maybe on a monthly or
24 every two months basis have a conversation with them,
25 was that true from 2017 to 2019?

Page 188

1    A.   Yes.
2    Q.   Did you, at any point in time,
3 specifically provide a training or discussion
4 focusing on prostitution or sex trafficking or sex
5 for money?
6    A.   Yes, we talk about it.  And we did tell
7 them that, you know, everybody need to have their,
8 you know, eyes keep it open and see what happened.
9 And then the -- the sex trafficking or the
10 prostitution, we just cannot, you know, go and don't
11 know how to you, you know, go for no reason in the room
12 and tell them what you're doing is prostitution and
13 sex trafficking.  So in that case, you know, we
14 always seek help from the DeKalb County Police.
15    Q.   Of course, I assume, and correct me if I'm
16 wrong, the housekeepers at United Inn and Suites
17 would regularly go into hotel rooms to clean --
18    A.   Yes.
19    Q.   -- right?
20    A.   To clean, yes.
21    Q.   And if there were any evidence of
22 commercial sex activities occurring outside of the
23 room, either in the stairwells, in the hallways, in
24 the parking lots, that is visible to staff at the
25 hotel, right?

Page 189

1    A.   Right.
2    Q.   Because it's not in a hotel room?
3    A.   Uh-huh.
4    Q.   Is that correct?
5    A.   That's right.
6    Q.   Mr. Shareef, you gave me -- as I said and
7 as you've said, you gave me a list of things that you
8 told staff to look for that would indicate criminal
9 activity.  When you talk to staff about prostitution
10 or sex for money at the hotel and things to look for,
11 did you give them any additional items to look for,
12 or is it similar to the items that you already
13 described?
14    A.   Basically similar from the item.
15    Q.   Where would these conversations occur when
16 you would train, provide these trainings to staff
17 members?  Where would you be?
18    A.   Next to the front desk, we have just a --
19 we call it back office.  So, with the -- with the
20 front desk staff, we kind of sit there in the back
21 office and have some conversation.  And for the
22 housekeeping, they have their lunchroom, we can call.
23 So the sitting area.  So -- but, you know, about
24 eight chairs there, sometimes they have for -- you
25 know, get together for the lunchtime, or sometime

48 (Pages 186 - 189)

CONF Tahir Shareef                      February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 190

1    when they are finish the day work, and before they
2    clock out, so we talk about it.
3        Q.    And is there a clock-in, clock-out system?
4        A.    Clock-in, clock-out system, yes.
5        Q.    Where is that system?
6        A.    That is in the main office.
7        Q.    Which is by the lobby and the front desk?
8        A.    Yes.
9        Q.    Do -- is it a punch card system or how
10   does -- how --
11       A.    Yes, punch card.
12       Q.    Punch card.  Was that true in 2017 to
13   2019?
14       A.    Yeah.
15       Q.    Is there an electronic record of --
16       A.    No.
17       Q.    No?  Okay.  The information that you would
18   provide in the trainings, Mr. Shareef, what you've
19   described to me, where did you get that information
20   from?
21       A.    This is -- we have, like this observation
22   for last, you know, 17 years, and then we have, you
23   know, something, you know, come up at the -- help
24   with the police officer, you know.  So -- but the
25   basic -- but the basic thing which I emphasize to

Page 191

1    them, that do not enforce anything, you know, call --
2    tell the front desk, tell us.  Just identify the
3    room, all the people, and then we take care of the
4    rest of the thing.
5        Q.    So are you saying the information that you
6    relied upon to provide these trainings to the hotel
7    staff, was that information based on your
8    observations of the property over 17 years?
9        A.    Yeah.
10       Q.    As opposed to saying, no, it was based on
11   this manual that I had from AAHOA, or this manual I
12   got from the American Hospitality and Lodging
13   Association, so was there any training material like
14   that, like a document that you were relying on, or
15   was it your observations of the property?
16       A.    Yeah, but those -- yeah, those document
17   which I read, you know, that time.  So those are
18   basically some common sense.  But, you know, that is
19   maybe a -- like a few papers, you know, in the office
20   file.  But we kind of never provide them any written
21   -- like a material.
22       Q.    And you believe, as you've said, that
23   everybody who would have worked at the property from
24   2017 to '19, would have been trained in the way
25   you've described?

Page 192

1        A.    Yeah.
2        Q.    Do you believe everybody who worked at the
3    hotel in that time period would verify that if they
4    were asked that question?
5        A.    Yeah.
6        Q.    Other than you and Mr. Islam, was anybody
7    else responsible for providing training of hotel
8    staff?
9        A.    No.
10       Q.    In the years 2017 to 2019, nobody else --
11       A.    Nobody else.
12       Q.    -- was responsible?
13       A.    Yeah.
14       Q.    Would you and Mr. Islam, you know, prepare
15   together in terms of what you were going to tell
16   staff about what to look for?  Would you discuss
17   together?
18       A.    We discuss together, yes.  Not -- I don't
19   want to -- but bear -- we discuss together, and then
20   we can, you know, address for if we have, you know,
21   something we call the cops, you know, on -- on
22   someone, on some of the rooms.  So we kind of mention
23   that, hey, you know, this front desk person or the
24   housekeeper mentioned something.  And on their
25   observation, we remove that person from the property.

Page 193

1    And we need to tell the other people to, you know, do
2    the same.
3        Q.    Did you ever ask any outside organizations
4    to provide a training to the hotel staff?
5        A.    No.
6        Q.    On any topic related to crime or any other
7    topic, you did not?
8        A.    No.
9        Q.    Did you post any flyers at the hotel about
10   human trafficking?
11       A.    I don't know.  I don't think so, but I --
12   I can -- I can picture it, I have something, but it's
13   -- it's buried, you know, under the other paperwork
14   on the -- on the wall I'm talking about.
15       Q.    Is this a wall in the lobby or where are
16   you thinking of --
17       A.    Yeah.
18       Q.    In the lobby?
19       A.    Yeah.
20       Q.    I want to look back at Plaintiff's
21   Exhibit 2, which is this Blue Campaign document,
22   Mr. Shareef.
23       A.    Uh-huh.
24       Q.    Do you remember talking very briefly about
25   this --

49 (Pages 190 - 193)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 194

1    A.    Yes.
2    Q.    -- at the beginning?
3    A.    Yes.
4    Q.    And I want to -- looking at Plaintiff's
5  Exhibit 2, I want to take a look first at page 2.  Do
6  you see in the right-hand side in the gray box
7  towards the bottom --
8    A.    Yes.
9    Q.    -- it says, What actions can I take at my
10  business to help stop human trafficking?
11    A.    Uh-huh.
12    Q.    Do you see that?
13    A.    Yes.
14    Q.    And it says, You play a significant role
15  helping to stop this terrible crime by knowing the
16  signs of human trafficking, designing a plan of
17  action to respond to reports of human trafficking in
18  your business, partnering with agencies that provide
19  services to victims of human trafficking in the case
20  of lodging, consider offering vouchers to victims,
21  immediate housing for victims plays a vital role in
22  beginning a victim's -- beginning a victim's healing
23  process, provide employee training to help them
24  understand and identify signs of human trafficking,
25  distributing and posting the fact sheets in this kit

Page 195

1  to your employees.
2        Do you see that?
3    A.    Yes.
4    Q.    As I read the Blue Campaign's materials,
5  Mr. Shareef, excuse me, I read them to basically say,
6  hotels play a significant role in addressing human
7  trafficking, sex trafficking that occurs at hotels.
8    A.    Okay.
9    Q.    Do you agree with that statement?
10    A.    Yeah, on the -- on the material, yes, I
11  agree.
12    Q.    Do you agree that there are specific steps
13  that hotels can take to address sex trafficking on
14  their properties?
15    A.    Yes.
16    Q.    All right.  Let's take a look at the next
17  page, please, page 3 of Plaintiff's Exhibit 2.  Do
18  you see it says, Signs of human trafficking for hotel
19  and motel staff?
20    A.    Yes.
21    Q.    And then underneath that, it says, Hotel
22  and motel employees are often in the best position to
23  see potential signs of human trafficking, especially
24  since your duties give you access to different areas
25  of the properties.  You may also have direct or

Page 196

1  indirect contact with both traffickers or victims.
2        Do you see that?
3    A.    Yes.
4    Q.    Do you agree with that --
5    A.    Yes.
6    Q.    -- statement?
7    A.    Yes.
8    Q.    And do you agree that underneath that
9  paragraph that I just read, there's a list of bullet
10  points under the header General Indicators.  Do you
11  see that?
12    A.    Yes.
13    Q.    And these are basically indicators of sex
14  trafficking it is saying?
15    A.    Right.
16    Q.    And one of the indicators, for example, is
17  individuals appear to be with a significantly older
18  boyfriend or in the company of older males.  That's
19  in the right-hand column towards the bottom.  Do you
20  see that one?
21    A.    Yeah, okay.
22    Q.    One of the indicators is individuals
23  appear to be with a significantly older boyfriend or
24  in the company of older males.  Do you see that?
25    A.    Yes.

Page 197

1    Q.    And then a couple of bullet points above
2  that it says, Individuals dress inappropriately for
3  their age or have lower quality clothing compared to
4  others in their party.
5        Do you see that?
6    A.    Right.
7    Q.    If you go to the first list, the second
8  from the bottom, it says, Individuals lack freedom of
9  movement or are constantly monitored.
10        Do you see that?
11    A.    Yes.
12    Q.    Do you agree, Mr. Shareef, from your
13  experience in the hotel industry for almost two
14  decades that these are indicators of sex trafficking?
15        MS. WARD:  Objection.
16        THE WITNESS:  I -- I don't know,
17    because I think I see like a too many
18    people are wearing, you know, some kind of
19    dress which I don't even approve, but what
20    can I say.  I cannot tell them, hey, you're
21    wearing -- it doesn't matter or because
22    you're doing something illegal.
23    Q.    (By Mr. Bouchard) Let's look at -- take a
24  look at the next page -- page, please.  It says,
25  Signs of human trafficking for housekeeping,

50 (Pages 194 - 197)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 198

1  maintenance, and room service staff. Do you see
2  that?
3      A.  Yes.
4      Q.  And it says, Housekeeping, maintenance,
5  and room service staff typically have the most access
6  to guest rooms where signs of human trafficking may
7  be apparent. By being conscious of human trafficking
8  indicators, you can help identify possible human
9  trafficking activities and victims.
10      Do you see that?
11      A.  Yes.
12      Q.  Do you agree with that?
13      A.  Yes, sir.
14      Q.  And do you see that some of those signs
15  listed here are a Do Not Disturb sign used
16  constantly, request room or housekeeping services,
17  additional towels, new linens, but denies hotel/motel
18  staff entry into room. Refusal of cleaning services
19  for multiple days, excessive amounts of cash in a
20  room, smell of bodily fluids and musk, presence of
21  multiple computers, cell phones, pagers, credit card
22  swipes, or other technology. Individuals leaving
23  room infrequently, not at all, or at odd hours.
24  Individuals loitering in the hallways or appearing to
25  monitor the area, excessive amounts of alcohol or

Page 199

1  illegal drugs in the rooms, evidence of pornography.
2  Minors left alone in room for long periods of time,
3  excessive number of people staying in a room,
4  extended stay with few or no personal possessions,
5  provacative clothing and shoes, constant flow of men
6  into a room at all hours, excessive amounts of sex
7  paraphernalia in rooms, condoms, lubricant, lotion.
8      Do you see that those are some of the
9  items listed?
10      A.  Yes.
11      Q.  Do you agree that those could be signs of
12  sex trafficking?
13      MR. STORY:  Object to form.
14      THE WITNESS:  I -- I cannot, you
15  know, answer it.
16      Q.  (By Mr Bouchard) So you're saying, you
17  agree that they appear on this Blue Campaign list,
18  but you're not sure whether or not they're signs of
19  sex trafficking or not?
20      A.  I mean, Do Not Disturb sign constantly, I
21  have people, good people, you know, they have Do Not
22  Disturb sign because they do not want to get
23  disturbed tomorrow or day after tomorrow. And -- how
24  can you tell someone that, hey, just because you have
25  Do Not Disturb sign -- refusal of cleaning service,

Page 200

1  yeah, people do refuse it. And -- but they refuse it
2  sometime for the good reason, they don't want to be
3  -- get bothered. But, of course, you know, when they
4  -- when they refuse service for -- like for the whole
5  week, then, you know, we tell them, you know, either
6  to -- you know, we not going to renew your contract
7  anymore, or sometime we tell them they have to leave
8  because the room, they make it so dirty.
9      But again, on this -- on these -- most of
10  these observation, I just cannot tell someone that
11  you're doing a human trafficking or prostitution.
12      Q.  Well, I think you're looking, it sounds
13  like, at these indicators as sort of individual
14  items. And I read this as a totality of the
15  circumstances sort of thing. Where if you have a
16  room with minors who are left alone for long periods
17  of time, evidence of pornography, excessive amounts
18  of alcohol, or illegal drugs, individuals loitering
19  in the hallways or appearing to monitor the area,
20  extended stay with few or no personal possessions,
21  provacative clothing, constant flow of men into the
22  room, excessive amounts of sex paraphernalia in the
23  room, at some point the totality of the
24  circumstances, do you agree, Mr. Shareef, could
25  suggest that there is sex trafficking occurring?

Page 201

1      MR. STORY:  Objection.
2      THE WITNESS:  I -- I just cannot,
3  you know, say.
4      Q.  (By Mr. Bouchard) Do you think there's
5  ever a scenario where a hotel owner or manager could
6  know that there's sex trafficking or could have
7  reason to believe that there's sex trafficking
8  occurring on the property?
9      MS. WARD:  Objection.
10      THE WITNESS:  If there is so many
11  people going back and forth in the room,
12  the, you know, we think there is something
13  wrong going on. It may or may not be sex
14  trafficking or any type of activity, but,
15  you know, the -- maybe somebody the druggy
16  came and we kicked them out.
17      Q.  (By Mr. Bouchard) Well, you've talked
18  about how you would -- you would lead trainings at
19  the hotel?
20      A.  Uh-huh.
21      Q.  And you would train staff at the hotel on
22  things to look for that would indicate crime,
23  criminal activity, prostitution. And so I'm taking
24  you through the Department of Homeland Security's
25  document on the Blue Campaign to end human

51 (Pages 198 - 201)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 202

1  trafficking. And I'm trying to understand what
2  indicators would you say, okay, if I saw those, that
3  would give me reason to believe that there is minor
4  sex trafficking happening in that room.
5      A.  Uh-huh.
6      Q.  So what indicators would it be that would
7  cause you to believe that? Is it some of the items
8  on the list that we just read?
9      A.  Yeah, some of the items. Yes.
10     Q.  And again, I -- is it multiple of the
11 items as opposed to just focusing on any one item?
12 Because, of course, you said well, the Do Not Disturb
13 sign used constantly, there could be very good people
14 who have a do not -- I agree with you on that. So, I
15 think the point is, if a certain number of these
16 indicators are present at the same time, do you agree
17 that at some point, it could be the case that these
18 indicators, if there are multiple of them, could give
19 rise to a basis to believe that there's sex
20 trafficking occurring in the room?
21         MR. STORY: Objection.
22         THE WITNESS: I still, you know,
23     don't know how to answer this. I cannot
24     answer this.
25     Q.  (By Mr Bouchard) Why -- why can you not

Page 203

1  answer it?
2      A.  Let's say -- says room -- the last one
3  room stacked with the merchandise, mail package,
4  purses. I mean, I have a business people stay with
5  us, and they have, you know, the -- they bring their
6  merchandise there. They stay for a week, two weeks
7  and they leave. So, I just cannot, you know, tell
8  them, look, you're doing a sex trafficking and
9  they're, you know, husband and wife staying there.
10     Q.  Well, what if you had a room where there
11 were minors in the room or people you believed could
12 be minors, there were drugs visible in the room,
13 there were condoms, lotion, excessive towels, and
14 there was a high volume of visitors to the room, men,
15 specifically, would that cause you to have some
16 concern that there might be commercial sex activity?
17     A.  That's -- that's the -- that's the
18 training we tell them. Look, you know, the -- the
19 minor there with the lot of drugs, of course, you
20 know, we don't want them. And the housekeeper go for
21 cleaning the room and they tell us, hey, this is a
22 child there, minor there, and they have this, you
23 know -- so much, you know, booze there. So we tell
24 them, look, you know, you cannot do this, you got to
25 leave, so we tell them to leave.

Page 204

1      But just because we see some merchandise
2  there, sitting there, we cannot tell them to leave.
3      Q.  Let's take a look at page 5 of Plaintiff's
4  Exhibit 2, which is signs of human trafficking for
5  concierge, bellman, front desk, security, and valet
6  staff. Do you see that?
7      A.  Yes.
8      Q.  It says, Concierge, bellman, front desk,
9  security, and valet staff are typically the first to
10 see guests when they enter the hotel. When checking
11 in or requesting hotel amenities, a guest may exhibit
12 behavior indicating human trafficking.
13         Do you agree with that?
14     A.  Yes.
15     Q.  And then it lists a series of general
16 indicators again. Do you see those?
17     A.  Yes.
18     Q.  Do you agree that these could be
19 indicators of sex trafficking?
20         MR. STORY: You can -- you can
21     review the document.
22         THE WITNESS: Yeah, but I'm reading
23     the first one, checking into room appear to
24     be disturbed or injured. I mean, how can I
25     tell someone this is the -- this goes to be

Page 205

1  the sex trafficking?
2      Q.  (By Mr. Bouchard) Well, again, you're
3  focusing on one indicator.
4      A.  So some of --
5      Q.  If multiple --
6      A.  Some of them, yes.
7      Q.  Yes, right.
8      A.  Some of them, yes. But all of them, I --
9  I just cannot be -- agree with them.
10     Q.  I mean, I don't think anybody's saying,
11 Mr. Shareef, well, if somebody -- if a patron is
12 checking into a room and they appear distressed or
13 injured, that is definitely evidence of sex
14 trafficking and you don't need to know anything else
15 to conclude that there's sex trafficking. Nobody's
16 saying that. The question is, are these indicators
17 of sex trafficking. And if you had multiple
18 indicators present, could that indicate sex
19 trafficking. Do you agree with that or not?
20     A.  Maybe I'm not understanding the question.
21 See, the first one -- again, the patron checking into
22 the room appeared disturbed or injured. They
23 checking with the minor, or without the minor, or
24 just a person checking? So this is confusing, you
25 know, observation. To tell the hotelier that do not

52 (Pages 202 - 205)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 206

1    rent the room when we see a person to be disturbed or
2    injured. So -- but if it says, you know, the child
3    is injured with the person, child is scared, of
4    course, make some sense.
5         Same person is in with the multiple --
6    multiple rooms. We don't rent, you know, the same
7    person multiple rooms. Not because of sex
8    trafficking, just because of fraud. You know, they
9    deny the credit card. They say, look, I was renting
10   one room, why they charge me twice.
11        So -- but, you know, we have landscaping
12   contractor. He rent three rooms for his people. So
13   his name is there, plus the other, you know --
14   two-men crew each room, so six people are staying in
15   three room. His name, landlord -- the boss name is
16   there, he's renting three room for his employees.
17   But here it says, the same person serving --
18   reserving multiple rooms. So, in this case, how you
19   going to rent, you know, your rooms.
20        Q.   Well, again, I think the question is
21   really, Mr. Shareef, if you had multiple indicators,
22   not just one. Like if you had a person checking into
23   a room, appearing distressed or injured, and they
24   were with a minor, okay, or the minor appeared
25   distressed or injured, and the minor was always with

Page 207

1    that patron on the property during school hours,
2    which is a different factor, not -- they weren't on
3    vacation, they appeared to just be living on the
4    property, and there were a col- -- high volume of
5    visitors to and from the room, at some point, I
6    assume you would agree there might be enough
7    indicators that that could suggest sex trafficking or
8    commercial sex activity?
9         A.   Yeah --
10        MR. STORY: Object to form.
11        Q.   (By Mr. Bouchard) Go ahead.
12        A.   I mean, if -- if the -- the whole -- your
13   whole sentence, you know, person come in with the,
14   you know, some injury, staying all the time, the
15   child -- the child is not scare, of course, that's
16   the indicator. But a person come, you know, and they
17   are husband and wife, and sometimes they drive long
18   way and they look, you know, little bit distressed,
19   and they say, look, I need one room for myself and my
20   crew is coming so I need another room, so that's okay
21   with me. I mean, there's nothing to prevent me to
22   not renting a room.
23        And a few or no person items when checking
24   in. Again, if there's a -- you know, renting a room
25   with the child with a few or no item, of course,

Page 208

1    that's a problem. But a person coming with a few
2    items with them, it's okay with me.
3         Q.   Do you agree with me, Mr. Shareef, that if
4    a hotel said, well, we're just not going to pay any
5    attention to these indicators, that that hotel could
6    be responsible if people were sex trafficked at the
7    hotel?
8         MR. STORY: Objection. You can
9    answer.
10        THE WITNESS: I don't know how to
11   answer it.
12        Q.   (By Mr. Bouchard) Well, I mean, do you
13   think a hotel should be paying attention to these
14   indicators?
15        A.   Of course should pay attention to these
16   indicators. But everything is saying it's -- you
17   know, it's like -- it should say, you know, if the
18   person is coming with the child, you know, like the
19   other pages says, the old pers- -- older person come
20   with the lot younger child, and child is a little
21   scared, of course, that is the, you know, reason not
22   even rent a room. But if a person come in and they
23   rent a room and they go to the room, and then they
24   bring a child from somewhere, which we are not even
25   seeing it, then, you know, I don't think I have a

Page 209

1    right to go to the room for no reason.
2         Q.   Obviously housekeeping has an obligation
3    under DeKalb County ordinances to go in the room
4    regularly to clean, right?
5         A.   Yes --
6         MR. STORY: Object to the form.
7         THE WITNESS: We go on a weekly or
8    we go every seven days into the room to
9    clean the rooms.
10        Q.   (By Mr. Bouchard) The window that we've
11   talked about with the thick glass that is where the
12   front desk attendant works at nighttime, is there a
13   little shop behind that with goods that can be
14   purchased?
15        A.   Yes.
16        Q.   Drinks, food?
17        A.   Yes.
18        Q.   Tampons, condoms?
19        A.   Yes.
20        Q.   Other items?
21        A.   Uh-huh.
22        Q.   Are those items purchased by the hotel
23   through the Internet, or how does the hotel get those
24   items?
25        A.   No, we get it from the wholesaler.

53 (Pages 206 - 209)

CONF Tahir Shareef                           February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 210

1    Q.   Okay.
2    A.   There's a few wholesaler in DeKalb County,
3    we get from there.
4    Q.   Do you have guests at the hotel who have
5    traveled across state lines to come stay at the
6    property?  In other words, guests from out of state.
7    A.   Lots of them, yes.
8    Q.   And you accept credit cards at the hotel?
9    A.   Yes.
10        MR. BOUCHARD:  Are we on 18?
11        MR. STORY:  I think we're on 17, but
12   if --
13        MS. WARD:  We've already had 17.
14        MR. BOUCHARD:  Yes.
15        MS. WARD:  18 will be next.
16        MR. STORY:  Okay.  Okay.
17        MR. BOUCHARD:  18 was the -- 17 was
18   the insurance application.
19        MS. WARD:  Yes.
20        MR. STORY:  Yes.  Got you.
21        MR. BOUCHARD:  All right.
22        (Exhibit No. 18 was marked for
23   identification.)
24   Q.   (By Mr. Bouchard) Showing you what's been
25   marked as Plaintiff's Exhibit 18.  I can represent to

Page 211

1    you that this is a picture of J.G. taken when she was
2    16 years old, which is how old she was when she was
3    sex trafficked at the United Inn and Suites.  Do you
4    recognize Ms. J.D.?
5    A.   No.
6    Q.   You don't believe you've ever seen her
7    before?
8    A.   No.
9    Q.   And if she said she recognized you and had
10   seen you before, would you say it's possible you
11   don't remember seeing her, or you are certain you
12   have never seen her before?
13   A.   If she said she saw me, maybe, because I
14   have, you know, more than 300 people at any given
15   time.  So, I may not be -- remember all the faces.
16        (Exhibit No. 19 was marked for
17   identification.)
18   Q.   (By Mr. Bouchard) I'm sending -- sorry,
19   excuse me.  Showing you a photo what I've marked as
20   Plaintiff's Exhibit 19, which is, I'll represent to
21   you, a photo of A.G., G.W. and a sex buyer at the
22   United Inn and Suites in 2017.  Do you recognize, in
23   Plaintiff's Exhibit 19 --
24   A.   No.
25   Q.   -- either of the women photographed there?

Page 212

1    A.   No.
2    Q.   You don't think you've seen them before?
3    A.   No.
4    Q.   Again, if they said that they recognized
5    you, would you say I've definitely never seen them
6    before, or would you just say, I may have, but I
7    don't remember because I see a lot of guests?
8    A.   I think I -- I don't recall.  I'm not
9    remember them.
10   Q.   Showing you a photo that's been marked as
11   Plaintiff's Exhibit 20.
12        (Exhibit No. 20 was marked for
13   identification.)
14   Q.   (By Mr. Bouchard) I'll represent to you
15   this is a photo of G.W.  Is this, from what you can
16   tell, Mr. Shareef, a photo of a room at the United
17   Inn and Suites?
18   A.   I don't know if these two lines represent
19   what here.  So, I don't -- I don't recall these two
20   lines there.  What is this?
21        MR. STORY:  I think that's a mirror.
22        MR. BOUCHARD:  A mirror.
23        THE WITNESS:  Oh, that's a mirror.
24   Okay.
25        MR. STORY:  It's harder because it's

Page 213

1    in black and white, but can you see this is
2    a border of a mirror, I believe --
3        THE WITNESS:  Okay.  Okay.  Yeah.
4    That room seems to be our room.
5    Q.   (By Mr. Bouchard) Does that look to be a
6    United Inn and Suites room?
7    A.   I mean, we have, you know, this kind of
8    carpet.
9    Q.   Well, I mean, you've lived at the
10   property.  I assume you're quite familiar with what
11   --
12   A.   No, I --
13   Q.   -- the rooms look like?
14   A.   Yeah, but I'm -- but there are -- if you
15   go to any hotel in that road, they have the same
16   carpet, same beds.
17   Q.   That's what I'm asking.
18   A.   Yeah, so.
19   Q.   Does this appear to be a room at the
20   United Inn and Suites?
21   A.   Yeah.  I can say yes.
22   Q.   Showing you Plaintiff's Exhibit 21.
23        (Exhibit No. 21 was marked for
24   identification.)
25   Q.   (By Mr. Bouchard) This is a slightly

54 (Pages 210 - 213)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 214

1  closer up version of the photo of the plaintiff A.G.
2  are you saying you still do not recognize Ms. A.G.?
3      A.  No.
4      Q.  You said that there were 36 surveillance
5  cameras at the hotel.  Are any of those surveillance
6  cameras angled towards the parking lot at the hotel?
7      A.  Yeah, a few of them.
8      Q.  Are any of those cameras angled towards
9  the front parking lot, facing Memorial Drive?
10     A.  Yeah, few of them.
11     Q.  I think you said at the beginning of your
12  deposition, Mr. Shareef, that you handled payroll
13  matter -- matters for the company.  Is that right?
14     A.  Yeah.
15     Q.  Are you the one in charge of payroll or is
16  anybody else in charge?
17     A.  I'm the one.
18     Q.  Mr. Islam is not in charge of it?
19     A.  No.
20     Q.  Were you in charge of payroll from 2017 to
21  2019?
22     A.  Yes.
23     Q.  How do you pay the hotel staff?  Is it
24  cash, check, some other way?
25     A.  Pay cash, I pay checks.

Page 215

1      Q.  Cash and checks?
2      A.  Yeah.
3      Q.  How do you decide whether to pay cash or
4  check?
5      A.  If someone says that, you know, it's going
6  to cost them to, you know, go to the bank and cash
7  their check, and so, I pay cash just so they're not,
8  you know, paying any money to the bank.
9      Q.  If someone says they'd prefer to be paid
10  in cash, then you pay them in cash?
11     A.  Yeah.
12     Q.  Are the staff that work at the hotel paid
13  by the hour or by salary?
14     A.  Paid by the hour.
15     Q.  And that was true in 2017 to 2019?
16     A.  Yes.
17     Q.  Is there a company that handles the
18  hotel's accounting?
19     A.  I hired a CPA.
20     Q.  What's the name of the CPA?
21     A.  His name is -- 2017, 2019, Habib.
22  H-A-B-I-B, Habib.  But he died in 2021, I guess.
23     Q.  So he would have been the CPA 2017, 2018?
24     A.  Yeah.
25     Q.  2019?

Page 216

1      A.  Yeah.
2      Q.  And are the people who work at the hotel
3  or who worked there from 2017 to 2019, are they W-2
4  employees or 1099?
5      A.  Yeah, W-2 or 1099.
6      Q.  So would you have a W-2 or a 1099 for
7  everybody who worked at the hotel from 2017 to 2019?
8      A.  I should, or my CPA should have it.
9      Q.  Do you take a salary from the hotel --
10     A.  Yes.
11     Q.  -- or how are you paid?  You take a
12  salary?
13     A.  Yes.
14     Q.  What's your salary?
15     A.  About 5,000 a month.
16     Q.  Does your wife also get paid?
17     A.  Yeah.
18     Q.  Is she salaried as well?
19     A.  Yeah.
20     Q.  Same amount or --
21     A.  Uh-huh, almost same.
22     Q.  Are you a W-2 employee of the hotel?
23     A.  Yes.
24     Q.  And was that true 2017 to 2019?
25     A.  Yes.

Page 217

1      Q.  Has your pay changed since 2017, or has it
2  been about the same?
3      A.  Little bit, maybe.
4      Q.  Fairly similar, though?  I mean, was it
5  about 5,000 a month for you --
6      A.  Maybe that time --
7      Q.  What?
8      A.  4,500 before.
9      Q.  I didn't hear you.
10     A.  4,500 in 2017.
11     Q.  Do you get any bonuses based on the
12  performance of the hotel or for some other reason?
13     A.  No.
14     Q.  So you collect a flat salary?
15     A.  Yes.
16     Q.  Is that right?  And then what about your
17  percentage ownership interest, do you get some
18  additional amount based on the performance of the
19  hotel?
20     A.  Based on perform -- no.
21     Q.  Well, does Mr. Sabharwal get anything for
22  his stake in the -- in the business?
23     A.  Yes.
24     Q.  Okay.  So he does, but you do not, other
25  than your salary?

55 (Pages 214 - 217)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 218

1    A.   No, I -- I pay him monthly some amount.
2    Q.   Does he receive a salary; is that what
3  you're saying?
4    A.   You can say salary receive it, yes.
5    Q.   What -- what would you say it is?
6    A.   1099, we give him.
7    Q.   A 10 -- you consider him a 1099?
8    A.   No, not consider.  The company --
9    Q.   He is?
10   A.   He get the 1099 at the end of the year.
11   Q.   So what does he receive monthly?
12   A.   About 3,500.
13   Q.   And is that because he's a co-owner?
14   A.   Yes.
15   Q.   Not because he's involved in the
16  operations of the property?
17   A.   No, he's not involved.  It's because of
18  the co-owner, you can say.
19   Q.   So if the hotel performs well in a given
20  year, does your compensation increase?
21   A.   Yes.
22   Q.   How?
23   A.   How?  What do you mean how?
24   Q.   Well, how?  Does your salary go up or do
25  you get some draw or distribution as an owner?

Page 219

1    A.   Draw, not really.
2    Q.   Well, I'm asking you to explain -- I'm not
3  -- don't rely on the words that I'm using.  I'm
4  asking you as a general concept, if the hotel has a
5  good year --
6    A.   Uh-huh.
7    Q.   -- and, let's say, it has a hundred
8  percent occupancy from January 1 to December 31 --
9    A.   Right.
10   Q.   -- couldn't be any better --
11   A.   Right.
12   Q.   -- are you still paying yourself 5,000 a
13  month every month, or are you going to get more money
14  because the hotel's doing well?
15   A.   No, the money kind of stays in the -- with
16  the hotel.  But if I need some extra money, then I
17  take a draw.
18   Q.   The hotel, I assume, has an operating
19  account?
20   A.   Yeah.  Yeah.
21   THE WITNESS:  I need to go to the
22  bathroom one second.
23   MR. BOUCHARD:  Yes.  Sure.
24   VIDEOGRAPHER:  Off the record at
25  2:51.

Page 220

1    (Recess was taken.)
2    VIDEOGRAPHER:  Back on the record.
3  The time is 2:59.
4    Q.   (By Mr. Bouchard) Mr. Shareef, just to go
5  back to what we were talking about before the break.
6  If the hotel performs well and is renting out a lot
7  of rooms, do your earnings go up?
8    A.   No.
9    Q.   So the amount you make stays the same and
10  the money in the operating account just grows larger?
11   A.   That's -- yeah, you can say that.
12   Q.   Do you take distributions from the money
13  in the operating account?
14   A.   If I need it.
15   Q.   You have access to it --
16   A.   Yeah.
17   Q.   -- if you want to use it?
18   A.   Yeah.
19   Q.   Do you need Mr. Sabharwal's permission to
20  do that?
21   A.   No.
22   Q.   Is the operating account for the United
23  Inn and Suites only for the United Inn and Suites?
24   A.   Yes.
25   Q.   Have you used it in connection, for

Page 221

1  example, with the United Inn in Macon?
2    A.   No.
3    Q.   Did that have a separate account?
4    A.   Yes.
5    Q.   Let's take a look at the Initial
6  Disclosures, which I've marked as Plaintiff's
7  Exhibit 22.
8    (Exhibit No. 22 was marked for
9    identification.)
10   Q.   (By Mr Bouchard) And these are
11  disclosures, Mr. Shareef, that I received from your
12  lawyers.
13   A.   Okay.
14   Q.   If you go to attachment A, I'll represent
15  to you that --
16   MR. STORY:  There you go.  We're
17  there.
18   MR. BOUCHARD:  Okay.
19   Q.   (By Mr. Bouchard) Attachment A is --
20  there's a question that precedes Attachment A, and
21  I'm going do read it to you right now.  Okay?
22   A.   Okay.
23   Q.   It says, Provide the name, and if known,
24  the address and telephone number of each individual
25  likely to have discoverable information that you may

56 (Pages 218 - 221)

CONF Tahir Shareef                    February 22, 2023

G.W. v. Northbrook Industries, Inc.

Page 222

1  use to support your claims or defenses, unless solely
2  for impeachment identifying the subject of the
3  information.
4      So this is basically asking Northbrook
5  Industries, Inc. to identify people with information
6  that Northbrook may use to support its defenses in
7  this lawsuit. Okay?
8      A.  Okay.
9      Q.  That's the list of people in Attachment A.
10     A.  Okay.
11     Q.  A lot of these names are new to me. I
12 don't know these people, I've never met them, talked
13 to them, or anything else, so I would like some help
14 from you to identify.
15     Obviously, the first three people, those
16 are from a criminal case that I'm not going to ask
17 you about. Number four is you. Number five, we've
18 talked about, Mr. Sabharwal. Number six, I'm going
19 to meet Mr. Islam here shortly. So, let's start with
20 number seven.
21     A.  Uh-huh.
22     Q.  Who is Nazia Islam?
23     A.  That's Ashar's wife.
24     Q.  Does Ashar live on the property?
25     A.  No.

Page 223

1      Q.  Does Nazia live on the property?
2      A.  No.
3      Q.  What does she do at -- or what -- as of
4  2017 through 2019, what did Ms. Islam do at the
5  hotel?
6      A.  She -- maybe sometime she come and help
7  housekeeping.
8      Q.  Was she a full-time employee?
9      A.  No.
10     Q.  Part-time?
11     A.  I mean, she work maybe 10, 15 hours or
12 less in two weeks.
13     Q.  She worked not very much --
14     A.  Yeah.
15     Q.  -- it sounds like? Okay.
16     But she did work during 2017 through 2019
17 at the hotel?
18     A.  Yeah.
19     Q.  The next person on the list, number eight
20 is Raza Shareef. Is that your wife?
21     A.  No, that's my son.
22     Q.  That's your son. Okay.
23     Does he work at the property?
24     A.  Yes.
25     Q.  Did he work there 2017 to 2019?

Page 224

1      A.  I don't know. I have to look. I don't
2  think so. I have to look.
3      Q.  What does he do at the property, or what
4  has he done at the property?
5      A.  Oh, he worked at the front desk.
6      Q.  Front desk.
7      A.  Yes.
8      Q.  Is he a manager?
9      A.  You know, when I'm not here, he -- who is
10 he? He's a -- he's a kind of manager, but he work at
11 the front desk.
12     Q.  What about the next person on this list in
13 Plaintiff's Exhibit 20 --
14     A.  Corita Gram. Yeah, she's -- she's
15 working, still working.
16     Q.  Corita Gram?
17     A.  Yeah.
18     Q.  Did she work 2017 to 2019?
19     A.  Yeah.
20     Q.  And what did she do during that time
21 period --
22     A.  She's a front desk.
23     Q.  Is that what she still does?
24     A.  Yeah.
25     Q.  What about Keten Patel?

Page 225

1      A.  That's a front desk.
2      Q.  Did he work at the front desk from 2017 to
3  2019?
4      A.  Yes.
5      Q.  What about Nabeela Shareef?
6      A.  That's my wife.
7      Q.  That's your wife. Okay. And you've said
8  that when you are at the hotel for 15 to 25 days per
9  month, and you're living at the hotel, you would
10 often be working more than 40 hours per week.
11     A.  Yeah.
12     Q.  Is that true?
13     A.  Yeah.
14     Q.  Is it the same for your wife?
15     A.  I can say yes. Yeah.
16     Q.  And what was your wife doing at the
17 property 2017 through '19?
18     A.  When housekeeping finish the work and --
19 but then when they are working in the rooms, she
20 check the room and make sure they -- she's like a
21 head housekeeper, I can say.
22     Q.  Does your wife speak Spanish?
23     A.  No.
24     Q.  Who is Saad Iqbal?
25     A.  He is one of the nephew -- Ashar's nephew,

57 (Pages 222 - 225)

CONF Tahir Shareef                          February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 226

1  I guess.  He works at a front desk.
2      Q.  Right.
3      A.  Yeah.
4      Q.  Yeah.  He told me -- you told me that he
5  was one of your family members --
6      A.  Yeah.
7      Q.  -- who worked at the hotel?
8      A.  Yeah.
9      Q.  Do you consider him to be your nephew,
10  too?
11     A.  He's my -- Ashar is my sister's son, okay.
12     Q.  Okay.
13     A.  And Saad is Ashar's sister's son.
14     Q.  Okay.
15     A.  So, I -- yeah.  Right.
16     Q.  Okay.
17     A.  You call him my grandson, like maybe.
18     Q.  Right.  Okay.  Understood.  Is Asma
19  Iqbal -- was her --
20     A.  It's Saad Iqbal's mom.
21     Q.  Your sister?
22     A.  Ashar's sister.
23     Q.  Right.  Got it.  And I didn't actually get
24  -- does Saad work at the front desk or...
25     A.  Front desk, yes.

Page 227

1      Q.  Would he have been doing that '17 to '19?
2      A.  Yeah.
3      Q.  What about Asma, what was she doing 2017
4  to 2019?
5      A.  She never work here.
6      Q.  She didn't work at the hotel?
7      A.  No.
8      Q.  All right.  What about number 14, Rossa
9  Mandosa.
10     A.  She's housekeeping.
11     Q.  And that --
12     A.  She's housekeeping girl, yes.
13     Q.  That was true from 2017 to '19?
14     A.  Yeah.
15     Q.  Maria Olivia?
16     A.  Housekeeping.
17     Q.  During that time period that --
18     A.  Yeah.
19     Q.  -- we've been talking about?  Jassie Gram?
20     A.  He is Corita's husband, the Corita Gram
21  here.
22     Q.  Yeah.
23     A.  He's her husband.
24     Q.  Did he work at the property from '17 to
25  '19?

Page 228

1      A.  No.
2      Q.  What about Sheakh Muhammad?
3      A.  He's a grounds man.
4      Q.  Was that true of '17 to '19?
5      A.  Yeah.
6      Q.  Alejandra Leon?
7      A.  Yeah, she's housekeeping.
8      Q.  And she was from '17 to '19?
9      A.  Yeah.
10     Q.  Abdullah Ahmed?
11     A.  Front desk.
12     Q.  Was he in that role from '17 to '19?
13     A.  Yes.
14     Q.  Rafiuzaman Biswas?
15     A.  Front desk.
16     Q.  He was in that role from '17 to '19?
17     A.  Yes.
18     Q.  And Rashid Iqbal?
19     A.  Rashid Iqbal.  He maybe did little bit --
20  some supply, bring some supply stuff for the hotel
21  supply.
22     Q.  That was it?
23     A.  Yeah.
24     Q.  All right.  As we look -- thank you for
25  bearing with me as we went through that list.  I --

Page 229

1  again, I'm trying to identify who these people are.
2      A.  Okay.
3      Q.  So I understand.  Are these the people
4  that you think would likely have information relevant
5  to the issues that we've been talking about and the
6  allegations in these cases about what was going on at
7  the hotel from 2017 to 2019?
8      A.  Yes.  I mean, not all of them.
9      Q.  Right.
10     A.  But Rashid Iqbal may not have any
11  information.  Asma Iqbal have almost no information.
12  Jassie Gram, you know, he just live with the wife and
13  they live at the property.
14     Q.  They do live at the property?
15     A.  Yeah.  Corita Gram.
16     Q.  Is there anybody who worked at the
17  property from 2017 to 2019, at any point during that
18  period, who you think would have knowledge related to
19  the issues in this lawsuit who is not on the list
20  that we just went over?
21     A.  No.
22     Q.  You think that list includes everybody --
23     A.  Yeah.
24     Q.  -- who would have knowledge?
25     A.  Right.

58 (Pages 226 - 229)

CONF Tahir Shareef                        February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 230

1    Q.   How many people who work at the hotel live
2    at the hotel?
3    A.   Corita.
4    Q.   Corita?
5    A.   Yeah.
6    Q.   You, your wife?
7    A.   Right.
8    Q.   Anybody else?
9    A.   Corita's husband.
10   Q.   But he doesn't --
11   A.   Yes, yes.
12   Q.   -- work at the hotel, right?  Okay.  So
13   anybody else other than --
14   A.   No.
15   Q.   Where does Corita live at the hotel?
16   A.   She live one of the room.
17   Q.   In a regular guest room?
18   A.   Yeah.
19   Q.   You're not in a regular guest room,
20   though, if I understand correctly.  You're in --
21   A.   That's a -- like a one bedroom apartment
22   on the third floor.
23   Q.   Does Corita's room have a room number on
24   it?
25   A.   Yes.

Page 231

1    Q.   What is her room number?
2    A.   36.
3    Q.   Room --
4    A.   3-6.
5    Q.   Room 3-6?
6    A.   Yes.
7    Q.   Does your one-bedroom apartment have a
8    room number on it?
9    A.   No.
10   Q.   Do you have any children?  I can't
11   remember if I asked you that at the outset.
12   A.   Yeah.
13   Q.   Are they living with you in Jacksonville
14   or in the hotel?
15   A.   No, they're all grown up.
16   Q.   Grown up?
17   A.   They -- they're out.
18   Q.   All right.  Showing you Plaintiff's
19   Exhibit 23.
20       (Exhibit No. 23 was marked for
21   identification.)
22   Q.   (By Mr. Bouchard) Mr. Shareef, Plaintiff's
23   Exhibit 23 is a State of Georgia corporation annual
24   registration form from 2011 for Northbrook
25   Industries.  Do you see that?

Page 232

1    A.   Yes.
2    Q.   And I'm showing you Plaintiff's
3    Exhibit 24.
4       (Exhibit No. 24 was marked for
5    identification.)
6    Q.   (By Mr. Bouchard) This is a State of
7    Georgia 2012 corporate annual registration form for
8    ASTS -- AS&TS Investments, Inc.  Do you see that?
9    A.   Yes.
10   Q.   What is AS&TS Investments, Inc.?
11   A.   That's a motel in Macon, Georgia.
12   Q.   Called what?
13   A.   United Inn.
14   Q.   Is that the one that you said operated
15   from about 2012 to 2021?
16   A.   Yeah.
17   Q.   And you were an owner during that period?
18   A.   Yes.
19   Q.   With one other gentleman --
20   A.   Yeah.
21   Q.   -- is that what you said?
22   A.   The -- as you see here, Azfar Syed.  He
23   died in 2012.
24   Q.   He died in 2012?
25   A.   Yeah.

Page 233

1    Q.   So after he died, were you the owner of
2    AS&TS Investments Inc. with anybody else, or were you
3    the sole owner?
4    A.   Yeah, sole owner.
5    Q.   Were there any other officers of AS&TS
6    after he died, or were you the sole officer?
7    A.   No other officer.
8    Q.   Did AS&TS Investments own anything other
9    than the United Inn in Macon?
10   A.   No.
11   Q.   Did it operate any businesses other than
12   hotel businesses --
13   A.   Just the hotel.
14   Q.   -- or just the hotel business?
15   A.   Just the hotel.  Yes.
16   Q.   And if I understood correctly, from 2017
17   to 2019, you were the owner of the United Inn in
18   Macon, you were a co-owner of the United Inn in
19   Decatur.
20   A.   Yeah.
21   Q.   And you would split time between the two?
22   A.   Yeah.
23   Q.   Was it a 50/50 split, or how would you
24   estimate how much time you spent in Decatur versus in
25   Macon?

59 (Pages 230 - 233)

CONF Tahir Shareef                                February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 234

1    A.   I -- I split time between these two hotels
2  because they are only about a hundred miles from each
3  other.  So, I go there maybe -- it depend if there's
4  a need for my attention there.  So I go there, stay
5  there for a couple of week.  And then either I go
6  back home or come here.  Sometime I go there for --
7  just for the one week, and then come here or go back
8  home.  So split my time between these, you know,
9  hotel.
10    Q.   Well, I guess, I'm -- what I'm trying to
11  figure out is if you split your time between the
12  hotel in Macon and the hotel in Decatur, how would
13  you spend 15 to 25 days a month in Decatur?  Was it
14  closer to 15 at the time that you had the property in
15  Macon, because you would have also been spending time
16  in Macon, and I assume some time in Jacksonville as
17  well?
18    A.   Yeah, yeah, yeah.  So, I -- I can't
19  calculate the total time, but it's like a -- I -- I
20  go between, you know, the Macon and Jacksonville, and
21  whatever way I can split my time, you know.  And that
22  time my son was also helping me, so he's here, you
23  know, sometime in Decatur.
24    Q.   Okay.
25    A.   So, substituting.

Page 235

1    Q.   So I'm going to ask again, because I want
2  to make sure we're clear on this.  From 2017 to 2019,
3  when you had both the hotel in Macon and the hotel in
4  Decatur, about how many days a month would you
5  estimate that you were at the Decatur hotel, on
6  average?
7    A.   Let's say if any given month I'm here in
8  Decatur and I don't go back to Jacksonville, so I
9  stayed, like, the three weeks, in those three weeks,
10  I maybe go to Macon couple of times.  Sometime for a
11  night, sometime I just don't spend any time there and
12  come back in the same day.  It depend, you know.  So,
13  I -- I spend one day to five days there, so I -- I
14  can't figure it out -- how much time I'm here, over
15  there.  So...
16    Q.   Well, here's the thing, if the case goes
17  to trial, we're entitled to know, were you at the
18  property in Decatur from 2017 through 2019, on
19  average, five nights a month, five days a month, ten
20  days a month.  I mean, 25 days a month.  I'm not
21  going to hold you to a specific number --
22    A.   Right.
23    Q.   -- but I'm trying to understand generally.
24  If there are 30 days in a month --
25    A.   Uh-huh.

Page 236

1    Q.   -- 31 days in a month --
2    A.   Right, right.
3    Q.   -- sometimes, 28 in others, you know --
4    A.   Right.
5    Q.   -- how -- how many days on average would
6  you estimate?  More than half the month, less than
7  half the month?
8    A.   Let's say -- let's say 20 days here, four,
9  five days in Macon.
10    Q.   So you were spending more time in Decatur
11  than in Macon?
12    A.   Yeah, because here it's more, you know,
13  working people and like a this -- this is more busy
14  property and need more attention from me.
15    Q.   It needed more of your attention --
16    A.   Yeah.
17    Q.   -- than the property in Macon?
18    A.   Yeah.
19    Q.   So 15 to 25 days still sounds about right?
20    A.   Yeah.
21    Q.   Even when you had the property in Macon?
22    A.   Yeah.
23    Q.   I was just trying to clarify.
24    A.   That's -- that's -- yeah.
25    Q.   All right.  So, on Plaintiff's Exhibit --

Page 237

1  is this 24, the AS&TS?
2        MR. STORY:  Yes.  Uh-huh.  25.  I'm
3  sorry.
4        MS. WARD:  Well, the new one would
5  be 25.
6        MR. BOUCHARD:  No, I'm not entering
7  a new one.  I'm trying to figure out --
8        MR. STORY:  I'm sorry.  Yes, 24 is
9  the most recent.
10        MR. BOUCHARD:  Got it.  Thank you.
11    Q.   (By Mr. Bouchard) So, looking at 24, which
12  is the AS&TS 2012 corporate registration.  It says,
13  AS&TS Investments, Inc.  And then underneath that it
14  says 4649 Memorial, Decatur, Georgia?
15    A.   Right.
16    Q.   Do you see that?
17    A.   Yes.
18    Q.   Why -- why did you use that address?
19    A.   Because I spent more time here, so it
20  easier for me to open a mail if there is any mail
21  coming.  So, then later on, I change the address back
22  to Macon.  But I believe this is when we make the
23  corporation, we just use this address as a like a --
24  I can say more usable business address for the Macon
25  property.

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 238

1    Q.    Has --
2    A.    Just for the mailing purpose.
3    Q.    Sorry.  My apologies.
4    A.    That's all right.
5    Q.    Are you the one who handles getting the
6    business license for the United Inn and Suites in
7    Decatur?
8    A.    Yes.
9    Q.    Have you always been the one who's
10   responsible for that?
11   A.    Yes.
12   Q.    Has the business license for the United
13   Inn in Decatur ever been in the name of AS&TS
14   Investments?
15   A.    No.
16   Q.    It's always been in Northbrook Industries,
17   Inc.?
18   A.    Yes.
19   Q.    In the hotel in Macon, was that business
20   license always AS&TS Investments?
21   A.    Yes.
22   Q.    I understand that AS&TS Investments, Inc.
23   is no more, it's been closed down?
24   A.    Right.
25   Q.    Is that right?

Page 239

1    A.    Yes.
2    Q.    Dissolved?
3    A.    Yes.
4    Q.    But from 2017 to 2019, it was a business
5    in operation, right?
6    A.    Yes.
7    Q.    Does -- at that time, did AS&TS have
8    corporate bylaws?
9    A.    Yes.
10   Q.    Do you have a copy of those somewhere?
11   A.    Corporate bylaws, I should have it.  Yeah.
12   Q.    Did AS&TS have a board of directors?
13   A.    That's me.
14   Q.    You were the board?
15   A.    Yes.
16   Q.    Did it have any shareholders other than
17   you?
18   A.    No.
19   Q.    And did -- you were not elected to the
20   board of directors, right?  You put yourself on the
21   board as the sole owner of the business, I assume?
22   A.    Yeah.
23   Q.    I assume you didn't have any board
24   meetings with yourself?
25   A.    No.

Page 240

1    Q.    And you wouldn't then have any agenda or
2    minutes from board meetings?
3    A.    No.
4    Q.    Right.  Who were AS&TS's employees?
5    A.    The -- Saad Iqbal; his brother, Saif,
6    S-A-I-F, J-A-M-A-L, Jamal; his mother, Asma Iqbal;
7    and the father is also employed, his name is Rashid
8    Iqbal.
9    Q.    I think you said that you don't regularly
10   provide information to Mr. Sabharwal about the
11   operation of the hotel; is that right?
12   A.    Yes.
13   Q.    Do you have any communications with him of
14   any kind about the operation of the hotel?
15   A.    About the operation?  No, almost zero.
16   Q.    If you did communicate with him about the
17   operations of the hotel, would it be by text message,
18   e-mail, phone call?
19   A.    Phone calls.
20   Q.    No text or e-mails?
21   A.    No.
22   Q.    And you said you thought he visited the
23   property three times in --
24   A.    17 years.
25   Q.    -- the last 17 years?

Page 241

1    A.    Yeah.  And those three times, I don't --
2    in 2006 and '07.
3    Q.    You and Mr. Sabharwal are obviously the
4    sole owners of Northbrook Industries, Inc.; is that
5    correct?
6    A.    Yes.
7    Q.    Are there any other members of the board
8    of directors of Northbrook other than you and
9    Mr. Sabharwal?
10   A.    No.
11   Q.    Were you and Mr. Sabharwal elected to the
12   board, or did you just pick yourselves to be on the
13   board since you're the sole owners?
14   A.    I think this kind of mutual understanding.
15   Q.    Does the board of directors for Northbrook
16   Industries hold meetings?
17   A.    No.
18   Q.    Has it ever held a board of directors
19   meeting, Northbrook?
20   A.    I don't recall.
21   Q.    I think you said no, but did AS&TS in
22   Northbrook ever share bank accounts?
23   A.    No.
24   Q.    Did Northbrook ever loan money to AS&TS?
25   A.    No.

61 (Pages 238 - 241)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 242

1    Q.   Did AS&TS ever loan money to Northbrook?
2    A.   No.
3    Q.   And is there a Northbrook credit card that
4  you use for corporate business to purchase items for
5  the hotel?
6    A.   No.  No.
7    Q.   You use a personal credit card?
8    A.   Yes.
9    Q.   And then get reimbursed?
10   A.   Yes.
11   Q.   Showing you Exhibit 25, which I think may
12 be our last one.
13       (Exhibit No. 25 was marked for
14       identification.)
15   Q.   (By Mr. Bouchard) So, I wanted to just go
16 back before we look at 25.  If you look at 17, which
17 is the insurance application we talked about before.
18   A.   Yeah.
19   Q.   You have them both in front of you?
20   A.   Yeah.
21   Q.   So, if you flip in the document that I've
22 handed you, this Plaintiff's Exhibit 25, which is
23 entitled Consent and Assumption Agreement With
24 Limited Release.  Do you see that?
25   A.   Yes.

Page 243

1    Q.   This one?
2    A.   Yes.
3    Q.   And do you remember this document,
4  Mr. Shareef?
5    A.   Yes.
6    Q.   From 2006?
7    A.   Yes.
8    Q.   Is that on or around the time that you
9  acquired the --
10   A.   Yes.
11   Q.   -- hotel with Mr. Sabharwal?
12   A.   Yes.
13   Q.   And if you flip to the -- what says, page
14 100 in the top right-hand corner.  Do you see that,
15 sir?
16   A.   Yes, I see it.
17   Q.   And do you see there's a line that says,
18 Tahir Shareef, an individual?
19   A.   Right.
20   Q.   And there's a -- what appears to be a
21 signature above that?
22   A.   Yes.
23   Q.   Is that your signature?
24   A.   That is me.
25   Q.   That is you?

Page 244

1    A.   Yes, that's me.
2    Q.   So I'm comparing that signature to the
3  signature that's in Plaintiff's Exhibit 17, which is
4  the commercial insurance application that we talked
5  about, and you said you didn't recognize that
6  signature and it was not yours?
7    A.   Mine is prettier.
8    Q.   You said yours is prettier?
9    A.   I think so.  I think so.
10   Q.   I agree.  So your signature on Plaintiff's
11 Exhibit 25 is not the same as the signature on
12 Plaintiff's Exhibit 17.  Do you agree with that?
13   A.   Oh, yeah.
14   Q.   Those are two different signatures?
15   A.   Uh-huh.  Yes.
16   Q.   What is this Consent and Assumption
17 Agreement With Limited Release that you were signing
18 as an individual?  What was the purposes of this
19 agreement?
20   A.   I really don't know.  But I think -- this
21 is like a 50/50 -- he's 51 person that time, and I
22 was 50.  Something like that.
23   Q.   Was this a document that you had to sign to get
24 the loan --
25   A.   Yeah.

Page 245

1    Q.   -- to the bank to acquire --
2    A.   Yeah.
3    Q.   -- the property?
4    A.   That's right.
5    Q.   Did you and Mr. Sabharwal hire any lawyers
6  or anybody to help you with the acquisition of the
7  property?
8    A.   Yeah, I see his name there a few second
9  ago.  On this document here.  I remembered the name,
10 "McManly," "McManly."  Yeah, William -- William
11 Manly.
12       MR. STORY:  And Mr. Shareef is
13       looking at Exhibit --
14       THE WITNESS:  23 --
15       MR. STORY:  -- 23.
16       THE WITNESS:  His address is
17       somewhere.  I think he's dead, too.
18   Q.   (By Mr. Bouchard) And as part of this
19 consent and assumption agreement, did you understand
20 that the bank was basically saying we need certain
21 assurances from you and Mr. Sabharwal before we agree
22 to give you a loan?
23   A.   Yeah.
24   Q.   About -- you know, you're going to buy
25 insurance for the property, for example, and conduct

62 (Pages 242 - 245)

CONF Tahir Shareef                                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 246

1    --
2    A.    Yes.
3    Q.    -- the property a certain way?
4    A.    Yes.
5         MR. BOUCHARD:  Let's go off the
6    record for a minute.
7         MR. STORY:  Okay.
8         VIDEOGRAPHER:  Off the record at
9    3:32.
10        (Recess was taken.)
11        VIDEOGRAPHER:  We are back on the
12   record at 3:44.
13   Q.   (By Mr. Bouchard) Mr. Shareef, I wanted to
14   bring you back to the Initial Disclosures, that list
15   of people we talked about.  The Initial Disclosures
16   were Plaintiff's Exhibit 22.  Remember we talked
17   about the list of people in Attachment A.  I'm going
18   to let you get that open in front of you, and then
19   I'm going to ask you a question.
20        I know you had told me before that there
21   were certain people who worked at the United Inn and
22   Suites in Decatur who also, at times, worked at the
23   United Inn in Macon.
24   A.    Yes.
25   Q.    Is that true?

Page 247

1    A.    Yes.
2    Q.    Can you tell me --
3    A.    Own -- only Saad Iqbal.
4    Q.    Saad Iqbal was the only one?
5    A.    Yeah.
6    Q.    Okay.
7    A.    He worked two days here -- one day or
8    two days a week and go back to Macon.
9    Q.    He would work at both properties?
10   A.    Yeah.
11   Q.    Tahir did not do that?
12   A.    Who?
13   Q.    Tahir Shareef?
14   A.    No, that's me.
15   Q.    Ashar Islam.  I'm sorry, Mr. Shareef.
16   Mr. Islam did not do that?
17   A.    No.
18   Q.    And so, when he did that, would he get
19   paid by --
20   A.    Different checks.
21   Q.    Two different checks?
22   A.    Yeah.  One from Northbrook.
23   Q.    Okay.
24   A.    One from AS&TS.
25   Q.    Understood.

Page 248

1         MR. BOUCHARD:  Okay.  That's all I
2    have.  Thank you.
3         MR. STORY:  Mr. Shareef, we don't
4    have any questions.  Thank you.
5         THE WITNESS:  Okay.  That's it.
6         VIDEOGRAPHER:  That concludes the
7    deposition.  The time is 3:46.  We're off
8    the record.
9         (Whereupon proceedings concluded at
10   3:45 p.m.)
11        (It was stipulated and agreed by and
12   between counsel for the respective parties
13   and the witness that the signature of the
14   witness to the deposition be reserved.)

Page 249

1         REPORTER DISCLOSURE
2         The following reporter and firm
     disclosures were presented at this
3    proceeding for review by counsel:
4
     Veritext represents that the
5    foregoing transcript as produced by our
     Production Coordinators, Georgia Certified
6    Notaries, is a true, correct and complete
     transcript of the colloquies, questions,
7    and answers as submitted by the certified
     court reporter in this case.  Veritext
8    further represents that the attached
     exhibits, if any, are a true, correct, and
9    complete copy as submitted by the certified
     reporter, attorneys, or witness in this
10   case; and that the exhibits were handled
     and produced exclusively through our
11   Production Coordinators, Georgia Certified
     Notaries.  Copies of notarized production
12   certificates related to this proceeding are
     available upon request to
13   litsup-ga@veritext.com.
14   Veritext is not taking this deposition
     under any relationship that is prohibited
15   by OCGA 15-14-37(a)and(b).  Case-specific
     discounts are automatically applied to all
16   parties, at such time as any
     party receives a discount.  Ancillary
17   services such as calendar and financial
     reports are available to all
18   parties upon request.
19
20
21
22
23
24   Barbara George, CCR 2562
25   February 22, 2023

63 (Pages 246 - 249)

CONF Tahir Shareef                        February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 250

1                    FIRM DISCLOSURE

2       - Veritext was contacted to provide reporting
3       services by the noticing or taking attorney
        in this matter.
4
        - There is no agreement in place that is
5       prohibited by OCGA 15-14-37(a) and (b).  Any
        case-specific discounts are automatically applied
6       to all parties, at such time as any party receives
        a discount.
7
        - Transcripts:  The transcript of this proceeding as
8       produced will be a true, correct, and complete
        record of the colloquies, questions, and
9       answers as submitted by the certified court
        reporter.
10
        - Exhibits:  No changes will be made to the exhibits
11      as submitted by the reporter, attorneys, or
        witnesses.
12
        - Password-Protected Access:  Transcripts and
13      exhibits relating to this proceeding will be
        uploaded to a password-protected repository, to
14      which all ordering parties will have access.
15
16
17
18
19
20
21
22
23
24              Lamarra George, CCR-2582
                February 22, 2023
25

Page 251

1               C E R T I F I C A T E
2
3    STATE OF GEORGIA:
4    COUNTY OF FULTON:
5              I do hereby certify that the
6          aforesaid testimony was taken before me,
7          pursuant to notice, at the time and place
8          indicated; that said deponent was by me
9          duly sworn to tell the truth, the whole
10         truth, and nothing but the truth; that the
11         testimony of said deponent was correctly
12         recorded in machine shorthand by me and
13         thereafter transcribed under my supervision
14         with computer-aided transcription; that the
15         deposition is a true and correct record of
16         the testimony given by the witness; and
17         that I am neither of counsel nor kin to any
18         party in said action, nor interested in the
19         outcome thereof.
20             Witness my hand and official seal
21         this 8th day of March 2023.
22
23
24         Lamarra George, CCR-2582
25         My commission expires on
           the 1st of April 2023.

Page 252

1    William R. Story
2    wstory@hallboothsmith.com
3                 March 14, 2023
4    RE: G.W. v. Northbrook Industries, Inc. D/B/A United Inn And
        Suites
5    2/22/2023, CONF Tahir Shareef (#5661634)
6       The above-referenced transcript is available for
7    review.
8       Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12      The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-southeast@veritext.com.
16
17   Return completed errata within 30 days from
18   receipt of testimony.
19      If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22         Yours,
23         Veritext Legal Solutions
24
25

Page 253

1    G.W. v. Northbrook Industries, Inc. D/B/A United Inn And Suites
2    CONF Tahir Shareef (#5661634)
3          E R R A T A   S H E E T
4    PAGE_____ LINE_____ CHANGE_____
5    _____
6    REASON_____
7    PAGE_____ LINE_____ CHANGE_____
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____    _____
24   CONF Tahir Shareef              Date
25

64 (Pages 250 - 253)

CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

Page 254

1  G.W. v. Northbrook Industries, Inc. D/B/A United Inn And Suites

2  CONF Tahir Shareef (#5661634)

3        ACKNOWLEDGEMENT OF DEPONENT

4    I, CONF Tahir Shareef, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  CONF Tahir Shareef          Date

13  *If notary is required

14        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15        _____ DAY OF _____, 20___.

16

17

18        _____

19        NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions

800.808.4958                                      770.343.9696

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[05231 - 1st]**

Page 1

| **0** |
| --- |

**05231**  1:7 6:14
8:13
**05232**  1:6 6:13
8:11
**05233**  1:7 6:15
8:15
**07**  241:2

| **1** |
| --- |

**1**  3:5 4:23
16:19 17:7,11
30:20 150:20
173:10 219:8
**10**  3:19 78:4,5
78:5 88:2
92:23 93:1,16
96:17,19,21
97:1 98:18
117:3,4 143:1
143:5,14,17,18
145:16 147:22
150:12 152:21
154:20 158:22
218:7 223:11
**100**  243:14
**1000**  2:17
**101**  115:6,9
117:14
**1099**  216:4,5,6
218:6,7,10
**10:00**  92:6,7
98:18
**10:33**  74:9
**10:46**  74:12

**11**  72:18
117:23 118:5
143:5 150:12
**1105**  2:17
**114**  3:17
**115**  3:18
**117**  3:19
**11:00**  143:2
**12**  3:17,20
135:10,12,15
136:21 180:24
**120**  6:13,14,15
8:11,13,15
148:18,22
**12661**  249:23
250:23 251:23
**12:02**  133:24
**12:20**  134:2
**12th**  114:20
119:18,25
120:15
**13**  3:21 47:13
117:21 138:2,3
180:7,17 181:1
181:2,3
**135**  3:20
**1379**  115:20
**138**  3:21
**1382**  116:5
**1383**  115:20
116:7,12
**1398**  117:3
**1399**  117:12
**14**  3:22 47:13
81:5 140:5,6

**227:8 252:3**
**140**  3:22
**1401**  117:3
**14130**  19:12
**143**  3:23
**1432**  117:22
**1433**  117:22
118:12
**144**  3:24
**15**  3:23 20:24
27:4,6 29:12
33:22 63:6
78:4,5 81:5
108:6 143:24
144:2 150:11
161:19 223:11
225:8 234:13
234:14 236:19
**15-14-37**
249:15 250:5
**150**  159:4,7
**16**  3:24 5:3
81:5 107:13
144:12,14
161:19 171:22
171:23 211:2
**17**  3:5 4:1
26:20 34:8
169:25 171:24
172:1,5,8,14
173:4,23
174:11 175:1
175:15 176:4
176:16 177:18
179:8 180:13

180:19 181:17
181:19 190:22
191:8 210:11
210:13,17
227:1,24 228:4
228:8,12,16
240:24,25
242:16 244:3
244:12
**172**  4:1 158:17
158:18
**18**  4:2 17:21
57:10 58:4,12
121:3 124:16
171:5,9,18
180:21 210:10
210:15,17,22
210:25
**19**  4:3 23:24
43:18 61:5
165:7 191:24
211:16,20,23
225:17 227:1
227:13,25
228:4,8,12,16
**191**  1:19 2:11
**194**  114:16
**195**  114:16
**1998**  43:18,25
44:7 45:10
**1:20**  1:6,7,7
**1:22**  182:18
**1st**  166:22
251:25

Case 1:20-cv-05233-SEG     Document 86-28     Filed 10/12/23     Page 68 of 129
CONF Tahir Shareef                                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

[2 - 2019]                                                        Page 2

| **2** | **2002** 46:18,19 | 40:19 48:22,23 | 227:13 229:7 |
|---|---|---|---|
| **2** 3:7,18 55:12 | 47:12 | 50:18 53:15 | 229:17 233:16 |
| 55:14 56:13 | **2005** 44:19 | 59:14,19 60:11 | 235:2,18 239:4 |
| 80:11,14,15 | **2006** 21:17,21 | 62:21 63:5 | **2018** 19:20 |
| 92:7,24 93:1 | 22:16 25:3,8 | 64:3,17 73:11 | 21:4,7,9 27:14 |
| 93:17 94:10 | 27:16 33:21 | 90:14,18 92:12 | 61:4 75:6,22 |
| 95:3 97:7 | 133:13 241:2 | 92:19 97:12,16 | 90:14,18 |
| 98:17,17 115:3 | 243:6 | 98:13 113:19 | 130:22 133:10 |
| 131:20 143:14 | **2007** 154:15 | 115:22 116:23 | 133:13,14 |
| 143:19 145:17 | **2011** 4:8 101:1 | 117:7,18 118:6 | 164:1,23 |
| 147:22 151:7 | 101:4 231:24 | 118:14,23 | 165:23 166:1 |
| 152:3,22 153:8 | **2012** 4:9 36:20 | 123:1 127:8 | 166:10,11,22 |
| 154:21 179:9 | 36:21 180:23 | 131:25 132:11 | 166:22 215:23 |
| 193:21 194:5,5 | 232:7,15,23,24 | 142:14,23 | **2019** 19:20,25 |
| 195:17 204:4 | 237:12 | 146:3,16 | 26:22 27:14 |
| 216:3,5,6,22 | **2014** 18:1 21:2 | 147:20,24 | 33:8,13 35:2 |
| **2,397** 80:5 | 21:3,6 23:22 | 150:3 153:12 | 36:10 38:10 |
| **2/22/2023** | 23:23 | 153:25 155:23 | 39:10,18 40:16 |
| 252:5 | **2015** 3:17 | 162:13,18 | 40:19 43:19 |
| **20** 3:19 4:4 | 65:25 99:12 | 163:7,25 164:2 | 50:18 59:15,20 |
| 19:15 34:8 | 100:1 105:19 | 166:24 167:3 | 60:12 62:21 |
| 68:13 81:5 | 106:10 107:3 | 172:9 174:16 | 63:5 64:3,9,17 |
| 92:14,19 93:19 | 114:20 115:13 | 176:8 179:25 | 73:11 90:14,18 |
| 94:4 102:7 | 119:19 120:1 | 180:16,21 | 92:12,19 97:12 |
| 121:3 155:9 | 120:15 122:5 | 183:13,24 | 97:17 98:13 |
| 158:22 161:18 | 122:16 181:4 | 186:2,9 187:25 | 123:1 127:9 |
| 165:7 178:3,21 | **2016** 71:6 | 190:12 191:24 | 132:1,11 |
| 212:11,12 | 100:24 101:12 | 192:10 211:22 | 142:14,23 |
| 224:13 236:8 | **2017** 3:18,19 | 214:20 215:15 | 143:11 145:16 |
| 254:15 | 4:1 14:12 | 215:21,23 | 146:3,16 |
| **2000** 43:17,17 | 19:20,25 26:22 | 216:3,7,24 | 147:20,25 |
| 44:7,19 47:13 | 27:3,14 33:8 | 217:1,10 223:4 | 150:4 153:12 |
| **2001** 18:21,23 | 33:13 35:1 | 223:16,25 | 153:25 155:24 |
| 19:2 | 36:10 38:10 | 224:18 225:2 | 156:15 162:18 |
| | 39:9,18 40:16 | 225:17 227:3 | 163:8,18 |

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[2019 - 404-815-3575]

Page 3

| | | | |
|---|---|---|---|
| 164:15 166:24 | **213** 4:5 | **2500** 2:5 | **300** 159:7 |
| 167:3 183:13 | **21st** 174:16 | **2582** 1:21 | 165:17 211:14 |
| 183:24 186:2 | 179:25 | 249:23 250:24 | **3020** 18:25 |
| 186:10 187:25 | **22** 1:17 4:6 | 251:24 | **30303** 2:6,12 |
| 190:13 192:10 | 221:7,8 246:16 | **26** 25:2 | **30309** 2:18 |
| 214:21 215:15 | 249:24 250:24 | **27** 143:11 | **31** 219:8 236:1 |
| 215:21,25 | **221** 4:6 | 145:16 156:15 | **31057** 83:8 |
| 216:3,7,24 | **229** 2:5 | **28** 236:3 | **31058** 83:8 |
| 223:4,16,25 | **22nd** 6:2 | **285** 68:13 | **31st** 166:22 |
| 224:18 225:3 | **23** 4:7 231:19 | 167:5,7 | **32225** 19:13 |
| 227:4 229:7,17 | 231:20,23 | **2900** 1:19 2:11 | **32246** 19:1 |
| 233:17 235:2 | 245:14,15 | **2:00** 92:6 | **345** 116:9,22 |
| 235:18 239:4 | **231** 4:7 | 156:25 | **36** 158:15 |
| **2020** 3:14 18:1 | **232** 4:9 | **2:01** 182:21 | 214:4 231:2 |
| 43:18 84:4 | **24** 4:9 31:15 | **2:15** 153:8 | **3:32** 246:9 |
| 99:12 100:2 | 95:23 96:4 | **2:51** 219:25 | **3:44** 246:12 |
| 162:18 | 98:3 152:22 | **2:59** 220:3 | **3:45** 248:10 |
| **2021** 19:7,10 | 167:17,20 | **2nd** 115:22 | **3:46** 248:7 |
| 36:20,21 | 181:6 232:3,4 | | |

| 3 | 4 |
|---|---|
| **3** 3:8 26:20 | **4** 3:10 74:13,16 |
| 65:11,14,19 | 75:2 107:20,20 |
| 69:9 72:19 | 107:24,25 |
| 81:21,24 99:2 | 172:14 173:11 |
| 173:10,11,11 | 173:11,12,12 |
| 175:15 177:25 | 177:25 178:1,3 |
| 178:1 179:9 | 178:3 |
| 195:17 | **4,500** 217:8,10 |
| **3,500** 218:12 | **40** 34:3 63:11 |
| **3-6** 231:4,5 | 225:10 |
| **30** 3:5 6:3 | **400** 77:24 |
| 14:20 17:11,16 | **404-658-9070** |
| 17:22 75:2,3 | 2:6 |
| 163:12,25 | **404-815-3575** |
| 165:16 167:9 | 2:18 |
| 235:24 252:17 | |

Additional index entries (left columns continued):

105:19 106:10
107:3 122:5,16
215:22 232:15
**2023** 1:17 6:3
249:24 250:24
251:21,25
252:3
**20th** 117:7,18
118:14,23
**21** 4:1,5 118:6
172:9 213:22
213:23
**210** 4:2
**211** 4:3
**212** 4:4

237:1,8,11
**24/7** 33:3 91:18
91:20,21
106:18 145:20
**242** 4:11
**247** 28:24
**24763** 55:13
**24768** 55:13
**25** 4:11,23 27:4
27:6 29:12
33:22 63:6
150:11 225:8
234:13 235:20
236:19 237:2,5
242:11,13,16
242:22 244:11

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

**[404-954-5008 - accurate]**                                                    Page 4

| | | | |
|---|---|---|---|
| **404-954-5008** 2:12 | 17:22 33:11,11 33:12 83:7,9 83:10,12 85:11 94:10,12,20 97:7 98:17,18 143:4,6 150:12 | **9** | **abandon** 131:15 133:13 133:14 |
| **440** 77:25 | | **9** 3:18 33:6,10 33:12 94:12,20 96:17,19,21,24 96:25 115:16 115:17,21 154:15 173:7,8 173:8,9,9 179:10,21 | **abandoned** 131:4 133:5,8 |
| **447** 75:8 76:5 77:12,20 78:5 80:20 83:1 130:16 | **60,000** 75:21 **60,345** 75:22 78:7 80:20 | | **abdullah** 228:10 |
| **45** 88:1 108:5,7 109:5 | **6201** 84:12 | **90** 148:4 149:13,16 | **able** 11:9 13:16 161:24 162:25 163:10 164:10 |
| **4649** 10:21 60:9 67:6 84:12 87:17 118:19 237:14 | **65** 3:8 **6:00** 131:19 | **9:20** 1:18 6:2 **9th** 3:14 84:4 | **above** 28:24 197:1 243:21 252:6 254:7 |
| **475** 77:24 | **7** | **a** | **accept** 166:25 167:1 210:8 |
| **5** | **7** 3:15 85:10,14 85:16 98:20 99:8 105:3 107:20 143:4,6 150:12 | **a.g.** 2:3 6:14,21 14:8,13 15:4 58:11 211:21 214:1,2 | **accepted** 6:23 |
| **5** 3:12 79:24,25 80:3 204:3 | | | **access** 68:16 158:1 195:24 198:5 220:15 250:12,14 |
| **5,000** 216:15 217:5 219:12 | **74** 3:10 **78** 75:1,6 **79** 75:21 | **a.g.'s** 8:13 74:20 | **accidentally** 16:11 |
| **50** 23:20 140:2 164:23 165:16 167:9 244:22 | **8** | **a.m.** 1:18 6:2 33:11,12 92:7 92:24 93:1,17 94:10,12,20 95:3 96:19 97:7,7 98:17 98:18 143:14 143:19 145:17 147:22 150:20 151:7 152:3,22 154:21 | **accompanied** 170:19,22 171:12 |
| **50/50** 23:18 24:18 149:21 233:23 244:21 | **8** 3:17 114:15 114:17 119:20 143:4,6 150:13 154:15 | | **account** 219:19 220:10,13,22 221:3 |
| **51** 244:21 **55** 3:7 | **80** 3:12 **81** 23:25 **81/19** 24:18 **82** 116:16 **83** 3:14 116:17 **85** 3:15 **8th** 251:21 | | **accounting** 215:18 |
| **5661634** 252:5 253:2 254:2 | | **aahoa** 43:4,16 45:17 46:4,7 191:11 | **accounts** 241:22 |
| **58** 69:14,17,21 82:1 | | | **accuracy** 252:9 |
| **6** | | | **accurate** 13:17 174:21 176:7 |
| **6** 3:5,14 6:3 14:20 17:11,16 | | | |

**[acknowledgement - agreed]**                                Page 5

acknowledge...
  254:3
acknowledg...
  252:12
acquaintance
  42:17
acquire  245:1
acquired  243:9
acquiring  23:7
acquisition
  245:6
act  9:5
acting  76:11
action  1:6
  101:4 141:2
  194:17 251:18
actions  194:9
activities  62:22
  64:4 70:2,7
  82:5,9,14
  122:2 123:16
  188:22 198:9
activity  58:17
  84:10,23
  105:12,14,17
  107:1 124:18
  131:6 145:24
  152:23 153:5
  184:3,8,12
  185:15 186:24
  187:3 189:9
  201:14,23
  203:16 207:8
acts  56:23
  126:7 145:7

actual  10:1
  151:23 166:8
actually  13:12
  137:20 140:16
  157:15 160:11
  168:7 172:9
  226:23
ad  22:3
addicts  135:24
additional
  189:11 198:17
  217:18
additions  254:6
address  10:20
  18:24 19:2,10
  19:11,14 27:20
  28:4,5,6 66:14
  84:10 112:23
  112:25 113:15
  113:19 120:9
  137:23 139:19
  192:20 195:13
  221:24 237:18
  237:21,23,24
  245:16
addressing
  195:6
admission  75:1
  75:6,21
admissions
  3:11 61:18
  74:18,21
  107:22
admit  75:6,21
  108:7

admitted  62:2
  75:13,25
  108:13 109:10
adult  118:19
  170:22,23
adults  159:15
  170:20
advantage
  46:12
advertise  124:4
  127:10 128:5
advertised
  126:24
advertisements
  123:16 124:15
  124:23 125:9
  125:24 128:18
advertising
  123:21 127:23
advise  84:15
affiliated  36:16
  100:17 101:18
  102:1
affiliation  45:9
aforesaid  251:6
afraid  140:13
  170:10
age  57:10 58:3
  58:12 124:16
  171:9,18 197:3
agencies
  194:18
agenda  240:1
agent  35:18,25

ago  126:21
  144:9 160:23
  164:7 165:3
  168:25 245:9
agree  10:15
  18:4,7 57:2,8
  57:20 58:3,6,7
  58:9 69:12
  75:16 78:10
  82:6 98:25
  99:12 105:24
  106:10 108:16
  109:4 115:12
  115:14 116:23
  117:18 118:23
  131:24 132:10
  133:1,3,4,6,7
  142:6 153:4
  178:11,13,17
  178:20 179:23
  180:12 195:9
  195:11,12
  196:4,8 197:12
  198:12 199:11
  199:17 200:24
  202:14,16
  204:13,18
  205:9,19 207:6
  208:3 244:10
  244:12 245:21
agreeable  8:22
  8:23 9:8,9
agreed  14:15
  15:7 248:11

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 72 of 129
CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

[agreement - appearing]                                        Page 6

| | | | |
|---|---|---|---|
| **agreement** 4:11 | **amended** 3:5 | 105:9,13,16,19 | 103:25 139:9,9 |
| 24:12,20 | 17:11 | 106:2 109:2,6 | 153:20 154:12 |
| 242:23 244:17 | **amenities** | 109:22 110:20 | 171:4,9 192:6 |
| 244:19 245:19 | 204:11 | 120:1 122:3,5 | 214:16 229:16 |
| 250:4 | **american** 43:5 | 122:6,12,15,18 | 230:8,13 233:2 |
| **ahead** 148:8 | 43:10 191:12 | 122:19 123:5,7 | 245:6 |
| 207:11 | **amount** 132:10 | 124:9,13,17,19 | **anybody's** |
| **ahmed** 228:10 | 132:18 216:20 | 125:2 130:23 | 34:11 76:23 |
| **aided** 251:14 | 217:18 218:1 | 130:25 131:10 | 106:24 205:10 |
| **air** 139:13 | 220:9 | 131:12,14 | **anymore** 79:17 |
| 142:1,6 145:8 | **amounts** | 132:23 133:11 | 79:19 185:8 |
| 145:9 | 198:19,25 | 154:24 158:25 | 200:7 |
| **ajc** 80:3 | 199:6 200:17 | 175:16,24 | **anyway** 78:7 |
| **ajube** 20:18,19 | 200:22 | 176:2 178:6,7 | 78:14 120:3 |
| 20:19 | **analysis** 85:25 | 178:8,10,11,14 | **apartment** |
| **alarm** 76:9 | **ancillary** | 178:21 179:5 | 28:16,18 29:2 |
| 82:21 | 249:16 | 179:11,20,23 | 29:3,4,6 |
| **alcohol** 13:21 | **angela** 135:19 | 180:2,3,9,10,12 | 230:21 231:7 |
| 198:25 200:18 | **angled** 214:6,8 | 181:3,7,8,10,14 | **apologies** 238:3 |
| **alejandra** | **annual** 4:7,10 | 181:14,23 | **apologize** |
| 228:6 | 231:23 232:7 | 199:15 202:23 | 136:14 |
| **allegations** | **anonymous** | 202:24 203:1 | **apparent** 198:7 |
| 229:6 | 9:19 | 208:9,11 | **appear** 142:3 |
| **alleged** 51:24 | **answer** 12:22 | **answered** | 196:17,23 |
| 58:16 | 12:23 13:13 | 134:6 181:21 | 199:17 204:23 |
| **alleging** 51:21 | 27:1 51:10,18 | **answering** | 205:12 213:19 |
| 58:18 | 51:19 52:4,21 | 12:12,17 | **appearances** |
| **allotted** 252:20 | 59:4 60:4,14 | **answers** 12:6 | 2:1 |
| **allow** 163:2,4,6 | 62:25 64:10 | 181:18 249:7 | **appeared** |
| 167:14 | 67:19,21 75:13 | 250:9 | 205:22 206:24 |
| **allowed** 156:19 | 75:16,18 76:3 | **anybody** 25:7 | 207:3 |
| 170:25 171:19 | 78:20 87:21 | 34:13,16,20,23 | **appearing** |
| **allowing** | 88:16 89:14 | 34:25 36:6 | 198:24 200:19 |
| 156:22 | 90:1 93:8 | 38:18 40:8 | 206:23 |
| | 99:17 105:5,6 | 50:2 76:17,20 | |

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 73 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.                    February 22, 2023

[appears - attachment]                                                Page 7

**appears** 10:2
68:22 243:20
**appended**
254:7
**applicable**
252:8
**applicant**
173:15
**application** 4:1
172:9 173:21
176:5,16 179:9
210:18 242:17
244:4
**applied** 249:15
250:5
**appreciate** 60:4
**approve** 197:19
**approximate**
27:4
**approximately**
26:21 69:17
**april** 251:25
**area** 42:11,13
60:2,3 84:22
85:6 86:22,23
86:25 87:4,11
87:14,17 88:7
88:9,13,20
89:10 94:2
99:24 105:1
124:24 157:22
189:23 198:25
200:19
**areas** 84:8,9,14
195:24

**arising** 138:21
**armed** 101:25
102:3,5,10
**arrangement**
31:23
**arrest** 102:4
103:14 110:19
111:3,10
128:11
**arrested** 115:4
115:10 116:21
129:1
**arresting**
126:11
**arrests** 84:15
120:5,5 131:7
131:8
**article** 3:13
80:3,4,9,11
**as&ts** 4:10
232:8,10 233:2
233:5,8 237:1
237:12,13
238:13,20,22
239:7,12
241:21,24
242:1 247:24
**as&ts's** 240:4
**ashar** 30:3
31:11,14 35:11
39:2 40:15,19
48:15 50:14
63:25 138:23
139:25 170:1,2
222:24 226:11

247:15
**ashar's** 222:23
225:25 226:13
226:22
**asian** 43:5
**asked** 103:19
104:25 111:20
119:18,22
122:8 124:22
126:8 130:18
134:8 141:8
154:18 166:10
192:4 231:11
**asking** 8:9 12:4
12:17 54:5
60:5,8 63:22
63:23 71:2
88:11 95:21,22
103:25 129:19
130:5 132:7,7
139:15 178:13
178:16,20
213:17 219:2,4
222:4
**asks** 179:9
**asleep** 143:5
151:9
**asma** 226:18
227:3 229:11
240:6
**aspect** 54:15
**aspects** 29:16
**assault** 116:3,8
117:11 180:7
181:3

**assert** 14:9
**assessing** 81:17
**assessment**
54:13 153:18
153:19
**assessments**
78:10
**association**
43:9,11 191:13
**associations**
43:14
**assume** 37:5
50:9 58:23
121:11 142:20
144:16 188:15
207:6 213:10
219:18 234:16
239:21,23
**assuming**
107:10 186:5
**assumption**
4:11 242:23
244:16 245:19
**assurances**
245:21
**asts** 232:8
**atlanta** 1:2,20
2:6,12,18 3:12
42:13 60:6
65:24 80:3
118:16
**attached** 4:23
249:8 252:11
**attachment**
17:19 221:14

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[attachment - bed]**                                                                Page 8

| | | | |
|---|---|---|---|
| 221:19,20 | 133:18 158:23 | 165:21,23 | **basic** 11:12 |
| 222:9 246:17 | 159:3 167:2,5 | 180:23,24 | 56:7 190:25,25 |
| **attempted** | 167:5 235:6,19 | 182:20,23 | **basically** 32:16 |
| 178:5,24 | 236:5 | 184:15,22,24 | 32:18,21 34:7 |
| **attendant** | **awake** 150:24 | 185:10 189:19 | 40:6 155:16 |
| 209:12 | 150:25 | 189:20 193:20 | 189:14 191:18 |
| **attended** 47:8 | **aware** 22:1 | 201:11 220:2,5 | 195:5 196:13 |
| 47:24 53:9 | 64:12,13,15 | 234:6,7 235:8 | 222:4 245:20 |
| **attention** 18:17 | 80:25 84:20 | 235:12 237:21 | **basis** 37:11 |
| 74:25 208:5,13 | 85:4 100:22 | 242:16 246:11 | 95:13 102:24 |
| 208:15 234:4 | 101:9 104:12 | 246:14 247:8 | 103:1,2 131:18 |
| 236:14,15 | 107:11 126:4 | **backpage** | 139:12 141:5 |
| **attorney** 6:17 | 128:4 145:24 | 123:9,12 | 150:18 165:10 |
| 6:24 7:20 | **ay** 20:19 | 124:13,23 | 187:5,11,12,24 |
| 250:3 252:13 | **azfar** 176:18 | 125:22 126:5 | 202:19 |
| **attorneys** 249:9 | 182:2,3 232:22 | 126:22 128:19 | **bates** 55:12 |
| 250:11 | **azfar's** 178:9 | **backpage.com** | 83:7 114:15 |
| **audit** 153:20 | | 120:8 125:4,8 | 115:20 117:3 |
| **august** 3:17 | **b** | **backside** 29:3,9 | 117:22 |
| 114:20 115:13 | | 131:5 | **bathroom** |
| 119:18,25 | **b** 1:7 3:5 6:3,19 | **bad** 72:12 | 182:13 219:22 |
| 120:15 | 7:8,23 14:20 | 178:3 | **battery** 180:7 |
| **authority** 90:24 | 15:20 17:11,16 | **badge** 148:11 | 181:3 |
| **authorize** | 17:22 22:10,13 | **bank** 215:6,8 | **bay** 20:1,4,21 |
| 113:3 172:25 | 38:17 215:22 | 241:22 245:1 | 20:23,25 21:5 |
| 173:1 | 215:22 249:15 | 245:20 | 44:23 |
| **automatically** | 250:5 252:4 | **bar** 6:25 | **bear** 192:19 |
| 135:2 249:15 | 253:1 254:1 | **based** 63:24 | **bearing** 228:25 |
| 250:5 | **back** 61:4 | 64:1 67:25 | **beating** 116:9 |
| **available** 93:10 | 74:11 81:20 | 93:21,22 | 116:22 |
| 124:24,25 | 98:19 115:9 | 130:22 144:16 | **becoming** 82:8 |
| 249:12,17 | 119:13 127:7 | 166:21 180:4 | **bed** 93:24 |
| 252:6 | 133:5 134:1 | 186:6 191:7,10 | 143:1 181:6,7 |
| **average** 27:8 | 140:14,20 | 217:11,18,20 | 181:12 |
| 29:12 33:22 | 144:5 160:25 | | |
| | 161:7,9 162:23 | | |
| | 163:21,22 | | |

**[bedroom - bouchard]**                                        Page 9

**bedroom** 28:16
29:6 230:21
231:7
**beds** 213:16
**beginning** 14:6
140:12 187:2
194:2,22,22
214:11
**behalf** 2:2,8,14
7:7 8:10 14:7
15:19
**behavior** 82:15
82:16 204:12
**believe** 6:25
46:19 47:5
53:10 54:2
60:20 64:3
65:5,7 67:23
69:17 70:5,8
77:24 93:11
100:4,9 101:3
101:10 102:6
105:10 107:16
113:22 120:20
123:22 124:17
128:25 131:23
132:12 158:15
162:15 164:5,6
180:6 183:23
191:22 192:2
201:7 202:3,7
202:19 211:6
213:2 237:22
**believed** 120:25
124:16 203:11

**bellman** 204:5
204:8
**belongs** 103:17
139:4
**best** 12:16
195:22
**better** 34:25
160:22 186:3
219:10
**bi** 187:11
**big** 28:21
160:15,17
**biswas** 228:14
**bit** 28:20 46:24
165:11,13
183:1 186:3
207:18 217:3
228:19
**black** 213:1
**blackwood**
3:23 144:3
**blatant** 145:5
**blue** 3:7 55:20
56:1,6,10
193:21 195:4
199:17 201:25
**blues** 57:5
**board** 239:12
239:14,20,21
239:23 240:2
241:7,12,13,15
241:18
**bodily** 198:20
**body** 101:6,9

**bold** 57:15
**bonuses** 217:11
**book** 168:4
**books** 168:2
**booth** 2:10 6:18
**booze** 203:23
**border** 213:2
**borrero** 3:9
65:15,21 81:22
**boss** 30:9,11
206:15
**bothered** 200:3
**bott** 83:16
**bottom** 55:25
72:20,23,24
80:11,17 83:13
83:16 135:18
172:15 177:25
178:1 194:7
196:19 197:8
**bouchard** 2:4
5:3 6:11,12
7:16,19,20 8:1
8:4,7,25 9:11
10:9,11,20,23
10:25 11:3,7
11:17,21,25
12:4,9,15,25
13:5,8,15,20,24
14:3,23 15:10
15:15,23 16:6
16:8,16,20,23
17:1,3,6,9
26:17 52:7,23
55:16 59:9

61:1,19,21,24
62:1,6,9,12,13
63:3 64:10,20
65:13 67:22
72:11,17,18
74:5,15 77:16
78:23 80:2
83:6,12 85:13
85:16 87:22
88:17 89:15,23
98:1,4,7,13
99:19 106:5
108:3,4 114:19
115:19 116:13
116:17,20
117:6,24 118:4
118:5 123:8
125:15 129:3
131:24 133:1
133:21 134:3
135:14 137:15
138:5 140:8
142:12 144:1
144:16 153:3
154:25 172:2,7
175:11,13,14
178:15,16,19
178:20,23
180:22 182:16
182:22 197:23
199:16 201:4
201:17 202:25
205:2 207:11
208:12 209:10
210:10,14,17

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[bouchard - campaign's]**                                          Page 10

210:21,24
211:18 212:14
212:22 213:5
213:25 219:23
220:4 221:10
221:18,19
231:22 232:6
237:6,10,11
242:15 245:18
246:5,13 248:1
**bought** 22:4
24:5
**boundaries**
89:18
**boundary**
89:17
**box** 175:20
194:6
**boxes** 175:3
**boyfriend**
196:18,23
**break** 72:14
74:6 130:15
133:21 168:20
182:15,16
220:5
**breaking** 98:2
**breath** 141:25
142:6
**briefly** 193:24
**bring** 56:7 94:1
165:11 203:5
208:24 228:20
246:14

**bringing**
102:25 103:1
**broken** 76:7
**broker** 22:4
23:10 37:6
177:4 182:10
**brother** 38:22
38:23 39:2
240:5
**brought** 6:20
7:9
**browse** 18:15
**bryan** 2:22
**bug** 181:13
**bugs** 181:6,12
**building** 75:9
140:11 144:4
**bulldog** 172:23
182:8
**bullet** 56:14
168:18,20
196:9 197:1
**bullets** 48:7
**bunch** 47:20
48:12 49:2
61:13 73:23
79:9,12 82:24
95:14 123:17
126:19,19
**bureau** 118:15
**buried** 193:13
**business** 6:5
23:6 32:12,16
32:24 48:6
79:11 86:11

88:4 113:16
194:10,18
203:4 217:22
233:14 237:24
238:6,12,19
239:4,21 242:4
**businesses**
42:21 233:11
233:12
**busy** 167:23
236:13
**buy** 22:4 33:14
33:17 245:24
**buyer** 211:21
**bylaws** 239:8
239:11

**c**

**c** 2:16 18:25
251:1,1
**calculate**
234:19
**calendar**
249:17
**call** 29:25 47:6
55:1,6 60:20
87:10 88:1,5,6
88:8 90:8 94:7
99:20 100:12
100:13 102:19
103:3,22
110:21,21,22
111:5,21,24
113:25 121:2
130:12 136:8
136:12 137:4,6

137:20 145:23
150:17 155:12
155:13,17
157:7 176:24
176:25 177:3
184:25 185:21
189:19,22
191:1 192:21
226:17 240:18
**called** 20:1
30:20 36:17,22
38:16 44:4,5
44:15 112:24
135:17 139:16
232:12
**calling** 88:10
129:5
**calls** 60:21,21
72:19 240:19
**calm** 94:1
184:24
**camera** 95:13
158:1 159:19
**cameras** 95:14
95:15 121:17
145:19 157:12
157:16 158:13
214:5,6,8
**campaign** 3:7
55:20 56:2,6
56:10 57:5
193:21 199:17
201:25
**campaign's**
195:4

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

[capacity - cited]

Page 11

**capacity** 6:8
14:17,19,19
15:25 158:20
158:22 166:16
**car** 133:17,18
149:14,17,20
149:24,25
150:1,2,22
**card** 79:12
113:6 190:9,11
190:12 198:21
206:9 242:3,7
**cards** 210:8
**care** 29:14,15
31:18 49:11
191:3
**careful** 184:20
**carefully**
185:12
**carpet** 76:8
82:19 213:8,16
**carry** 149:3,8
149:11 169:8
**carrying**
100:10,11,14
**cars** 107:13
133:18
**case** 3:11 6:12
6:14,15 7:8
8:11,13,15
14:13 41:8
59:6 62:16
74:19 101:7,11
101:12 104:13
104:21 134:5,7

155:3 166:5
184:23 188:13
194:19 202:17
206:18 222:16
235:16 249:7
249:10,15
250:5
**cases** 6:20 8:17
9:14,17 14:8
14:15 51:13
58:11 61:5
62:16 74:20
84:14 229:6
**cash** 72:5
166:25 167:1,1
169:8 198:19
214:24,25
215:1,3,6,7,10
215:10
**casual** 183:8
**caught** 100:23
**cause** 202:7
203:15
**caused** 137:24
**ccr** 1:21 249:23
250:24 251:24
**cell** 198:21
**central** 118:17
**certain** 14:25
49:24 90:11
124:24 127:5
147:14 157:7
162:20,22
202:15 211:11
245:20 246:3

246:21
**certainly** 8:3
**certificates**
249:12
**certified** 249:5
249:7,9,11
250:9
**certify** 251:5
**chain** 36:14
83:13,15
**chairs** 189:24
**chance** 146:15
182:23
**change** 23:21
23:23 24:1
97:22 237:21
253:4,7,10,13
253:16,19
**changed** 217:1
**changes** 250:10
252:10 254:6
**changing**
139:23
**charge** 206:10
214:15,16,18
214:20
**check** 31:25,25
32:5 40:25
41:3,9,16,23
42:1,3 55:5
72:6,6 110:2
126:16,18,19
127:2,15
128:13,14
129:15 136:8

149:1 163:21
167:24 175:4,5
177:11,12
214:24 215:4,7
225:20
**checked** 81:8
127:21 175:3
**checking** 126:5
204:10,23
205:12,21,23
205:24 206:22
207:23
**checks** 175:20
214:25 215:1
247:20,21
**chief** 47:20
**child** 118:16,19
203:22 206:2,3
207:15,15,25
208:18,20,20
208:24
**children**
159:15 171:11
171:14,14
231:10
**chipped** 76:7
**christmastime**
167:23
**circumstances**
200:15,24
**citation** 84:15
**citations** 80:6
80:21 83:1
**cited** 75:7

Case 1:20-cv-05233-SEG   Document 86-28   Filed 10/12/23   Page 78 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[citing - company]                                                    Page 12

**citing** 78:18,25
79:3
**city** 65:24
**civil** 1:6 9:4,5
**claims** 222:1
**clarification**
64:7 97:20
**clarify** 98:5
236:23
**clean** 12:10
26:15 131:3,3
131:18 132:5
133:2 138:6
167:24 188:17
188:20 209:4,9
**cleaning** 29:16
49:3,4,10 77:4
198:18 199:25
203:21
**clear** 13:17
15:6 235:2
**clearly** 93:15
**client** 166:7
**client's** 166:6
**clients** 166:6
**clock** 190:2,3,3
190:4,4
**closed** 32:16
94:25 157:22
238:23
**closer** 214:1
234:14
**clothes** 148:10
**clothing** 148:16
197:3 199:5

200:21
**coachman** 3:14
83:16,18,22,24
84:1
**cockroaches**
145:4
**code** 66:14,21
66:25 68:2,23
72:21 73:25
77:12,20 78:9
78:17,24,25
79:13 81:11
99:4 130:15,16
130:19,21
133:9 173:1
**codes** 69:23
73:13,15 75:9
81:12,16 82:4
82:8,13
**col** 207:4
**collect** 82:24,24
217:14
**collected** 68:21
164:16
**colloquies**
249:6 250:8
**column** 175:17
178:7 196:19
**combat** 56:3
**combination**
121:16
**come** 21:18
22:25 32:9
35:10,11 41:12
49:20 53:6

59:7 71:14,21
73:9,24 74:1,2
81:6 82:17
103:12,13
104:1 106:16
108:22,25
110:17 111:10
114:8 130:11
131:19,21
132:2,3 135:2
148:15 150:17
154:8 155:12
155:15 160:25
163:21,22
171:11 185:1
185:10 190:23
207:13,16
208:19,22
210:5 223:6
234:6,7 235:12
**comes** 89:18
177:12
**coming** 54:25
79:16,19 90:9
121:4,19
125:10,24
128:12 135:21
154:8 164:6
207:20 208:1
208:18 237:21
**commercial** 4:1
56:23 57:11
58:4,17 105:12
105:14,17
107:1 115:9

122:2 123:16
123:21 124:4
124:18 125:9
126:7,24
127:10,23
172:8 177:19
188:22 203:16
207:8 244:4
**commission**
75:7 100:1
251:24
**committee**
66:11
**common** 52:6
62:22 64:4
105:15 191:18
**commonly**
120:16
**commotion**
111:22 140:11
185:4
**communicate**
113:13 150:16
240:16
**communication**
13:11
**communicati...**
112:12,13
240:13
**community**
86:11,14
**company** 71:25
72:1 104:11
153:13 154:8,9
154:16 172:23

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[company - conversations]                                                    Page 13

176:25 178:9
178:10 196:18
196:24 214:13
215:17 218:8
**compare**
132:13
**compared**
197:3
**comparing**
244:2
**compensation**
218:20
**compiled**  86:1
**complain**  54:25
81:1,3,7
**complaining**
55:2 141:21
**complaint**  61:8
74:2 102:19
113:11 156:9
157:6
**complaints**
61:7,10 156:6
**complete**  249:6
249:9 250:8
254:8
**completed**
252:17
**complex**  180:8
**complexes**  82:2
**compliance**
66:14 69:23
81:17 82:3,8
**computer**
162:4,9 251:14

**computers**
198:21
**concentration**
68:23,24
**concept**  219:4
**conception**
113:7
**concern**  77:23
103:20 104:7
127:13 129:10
203:16
**concerned**  76:6
104:2 141:25
142:2
**concerning**
77:21,22
159:22 160:8
**concerns**
102:13 129:4
**concierge**
204:5,8
**conclude**
205:15
**concluded**
248:9
**concludes**
248:6
**conclusions**
58:24
**condition**  82:18
**conditioning**
145:8
**conditions**  81:1
**condoms**  33:14
199:7 203:13

209:18
**conduct**  245:25
**conducted**
118:18
**conf**  252:5
253:2,24 254:2
254:4,12
**confidential**
1:13 9:24
**confidentiality**
9:16
**confused**  89:25
126:20
**confusing**
205:24
**connection**
21:12 220:25
**conscious**
198:7
**consent**  4:11
242:23 244:16
245:19
**consider**  52:2
71:15 88:12
105:14,17
107:1 111:15
194:20 218:7,8
226:9
**consideration**
87:24
**considered**
57:11 85:5
86:21 87:11,16
99:23 106:8

**constant**  199:5
200:21
**constantly**
197:9 198:16
199:20 202:13
**constitutional**
3:12,13 80:4
**contact**  176:21
178:12 196:1
**contacted**
250:2
**continued**
187:4
**contract**  71:19
72:7 200:6
**contracted**
153:13
**contractor**
206:12
**convenience**
68:16
**convenient**
70:2,6 82:5
86:1
**convening**
138:18
**conversation**
11:14,19 13:10
26:14 53:24
67:13 114:9
150:21 160:1
187:24 189:21
**conversations**
63:24 110:6
111:12 140:15

[conversations - credit]                                    Page 14

189:15
**convey** 152:13
**cook** 135:20
**coordinators**
249:5,11
**cop** 100:13
121:2
**copies** 17:1
249:11 252:14
**cops** 88:1
100:12 103:3
192:21
**copy** 3:14
16:20 74:17
239:10 249:9
**corita** 224:14
224:16 227:20
229:15 230:3,4
230:15
**corita's** 227:20
230:9,23
**corner** 72:21
72:23,24
243:14
**corporate** 4:9
15:18 16:3
18:4 232:7
237:12 239:8
239:11 242:4
**corporation**
4:7 24:14,15
231:23 237:23
**correct** 8:5
10:9 17:17
41:19,24 44:25

49:25 54:18
58:1 62:7 67:6
72:3 75:18
76:3 89:7 91:4
91:14,16,19,24
92:10,16,20
96:15,18 98:10
119:8 120:22
122:24 124:13
134:11 144:18
145:22 152:20
159:11 174:15
179:18 180:5
180:10,20
181:10 182:8
183:10 188:15
189:4 241:5
249:6,8 250:8
251:15 254:8
**corrections**
254:6
**correctly**
145:14 146:23
151:8 183:5
230:20 233:16
251:11
**corresponden...**
112:15,17
**cost** 215:6
**costs** 135:24
**counsel** 2:1 6:9
7:10 8:16
11:10 248:12
249:3 251:17
252:14

**county** 3:15
42:13,15,23
46:22 47:1,3,5
47:6,10,18
53:5,9,19 54:7
55:1 60:6
65:17 66:1,16
67:25 69:16,22
69:23 70:10
71:11,16 73:13
73:24 75:6,8
75:22 77:20
78:17,24 81:1
81:3,7,11,12,16
81:23 82:2,3,8
82:12 84:22
85:5,18 86:20
86:25 87:3
88:8 90:8,15
90:19 91:6
94:7 99:3
100:1 103:13
104:14 108:8
109:15 110:12
110:16 111:13
112:8,16
113:23,25
118:14 119:14
120:2 121:21
121:24 128:17
130:4,12,21
133:9 148:5
155:12,16,19
160:3 184:25
188:14 209:3

210:2 251:4
**couple** 11:12
47:2 87:10
100:13 102:6,7
141:16 172:10
197:1 234:5
235:10
**course** 35:24
42:19 60:2
87:1 88:21
107:18 109:12
109:20 122:9
127:3 132:14
133:15 153:5
179:3 187:6
188:15 200:3
202:12 203:19
206:4 207:15
207:25 208:15
208:21
**court** 1:1 7:11
9:12 11:4,13
11:22 101:10
179:2 249:7
250:9
**cover** 15:12
146:13 184:5
**covered** 147:13
**covid** 32:12,18
32:25
**cpa** 215:19,20
215:23 216:8
**creating** 26:7
**credit** 113:6
198:21 206:9

[credit - decatur]                                                                    Page 15

210:8 242:3,7
**crew**  206:14
  207:20
**crime**  59:24
  60:2,12 66:14
  68:24 85:6
  86:2,10,22,23
  87:1,4,11,14,17
  88:6,9,13,19,20
  89:9,16 90:2,5
  90:5,5,6 92:22
  99:3,10,13,18
  99:19,23,24
  102:13,14,21
  102:22 103:20
  103:22,23
  104:2,3,7
  105:2,8,11
  106:19 114:1,5
  114:12 129:1
  153:8 179:1,3
  193:6 194:15
  201:22
**crimes**  61:23
  66:21,25 68:2
  86:12 178:4,23
**criminal**  40:25
  41:3,9,15,23
  42:1,3 70:2,6
  82:5,9,13 84:9
  84:23 100:7
  101:4 117:11
  145:24 152:24
  153:4 184:3,7
  184:12 185:15

186:23 187:3
  189:8 201:23
  222:16
**criminals**  142:3
**cross**  8:12,14
  9:2,7
**cs**  252:15
**cur**  156:24
**curfew**  156:15
  156:17,18,21
  156:23
**custom**  113:8
**customer**  31:25
  68:18 82:22
  113:2,10
  164:18 173:23
**customers**  32:1
  32:9 135:8
  164:23
**cut**  76:23
**cv**  1:6,7,7 6:13
  6:14,15 8:11
  8:13,15

### d

**d**  1:7 6:19 7:8
  7:23 15:20
  38:17 252:4
  253:1 254:1
**daily**  84:5,9,16
  86:12 165:10
  165:14
**daly**  2:10 6:22
**dante**  3:23
  144:3

**data**  68:21
**date**  61:5
  108:18 174:15
  253:24 254:12
**dated**  3:14,17
  3:18,19 4:1
  100:2,3 114:20
  115:22 117:7
  118:6 172:9
**dates**  166:21
**david**  2:4,7
  6:11 7:19
  13:25 72:9
  97:19 116:12
  117:23
**day**  10:12
  31:15,15 47:2
  47:9 70:23
  87:10 92:14,19
  93:12 94:4,9
  95:19,23 96:4
  96:5,9 103:4,6
  113:12 141:9
  142:19 147:16
  147:16,24
  148:14 151:19
  152:22 155:9
  158:23 165:10
  165:12,16
  177:7 190:1
  199:23 235:12
  235:13 247:7
  251:21 254:15
**day's**  44:5,9,9
  44:11,25 45:9

45:17,20,23
**days**  26:25 27:4
  27:6 29:12
  33:22 63:6
  71:5 88:1
  101:7,9 145:8
  147:4,8,11,12
  148:9 150:11
  163:12,21,25
  165:16 198:19
  209:8 225:8
  234:13 235:4
  235:13,19,20
  235:20,24
  236:1,5,8,9,19
  247:7,8 252:17
**daytime**  33:5
  49:14,15 77:2
  77:6 142:18
  150:18
**dead**  245:17
**dealers**  135:23
**decades**  197:14
**decatur**  10:23
  22:2 25:14
  37:10 38:7
  39:7 40:10,14
  44:22 48:18
  80:19 118:20
  233:19,24
  234:12,13,23
  235:4,5,8,18
  236:10 237:14
  238:7,13
  246:22

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 82 of 129
CONF Tahir Shareef                    February 22, 2023
G.W. v. Northbrook Industries, Inc.

[december - desk]                                                      Page 16

**december**
  219:8
**decide** 32:8
  90:3 135:1
  215:3
**decided** 23:1
  78:13 112:6
  152:21
**decides** 40:12
**decision** 93:15
  93:21
**declare** 254:4
**dedication**
  84:17
**deemed** 254:6
**defendant** 2:8
  2:14 3:5,10
  17:12 74:17
  108:10
**defendants** 1:9
  8:16
**defenses** 222:1
  222:6
**defer** 58:23
**definitely**
  205:13 212:5
**dekalb** 3:15
  42:13,15,23
  46:22 47:1,3,5
  47:6,9,18 53:5
  53:8,19 54:7
  55:1 60:6
  65:17 66:1,16
  67:25 68:23,25
  69:5,5,16,22

70:10 71:11,16
73:13 75:6,22
77:20 78:17,24
80:4 81:1,3,7
81:10,12,16,23
82:2,12 84:22
85:4,18 86:19
86:25 87:3,7
88:7 90:8,14
90:18 91:6
94:7 99:3
100:1 103:13
104:14 108:8
109:15 110:6
110:12,16
111:13 112:8
112:16 113:23
113:25 118:14
119:14 120:2
121:21,24
128:17 130:4
130:12,21,22
133:9 148:5
149:22 155:12
155:16,19
160:3 184:25
188:14 209:3
210:2
**denies** 198:17
**deny** 206:9
**department**
  3:16 47:7,10
  47:18,19 56:2
  57:4 70:11
  71:12,17 84:22

85:5,18 86:20
90:15,19 91:7
102:20 108:9
108:17 109:15
110:6,12,17
111:13 112:8
112:16 113:24
114:1 119:15
130:4 201:24
**depend** 234:3
  235:12
**deponent** 251:8
  251:11 252:13
  254:3
**deposed** 104:20
**deposing** 38:25
  252:13
**deposition** 1:15
  3:5 6:4,7 8:10
  8:12,19,20,25
  9:2,20,22,23
  10:3 11:1,2
  12:2 14:18
  15:13,17 17:12
  18:10 51:12
  59:14 104:17
  104:23 119:13
  119:23 121:23
  214:12 248:7
  248:14 249:14
  251:15
**depositions**
  104:13
**deputy** 65:16

**describe** 31:20
  42:18
**described**
  94:13 187:22
  189:13 190:19
  191:25
**describing** 29:7
  112:13 142:2
**description** 3:3
**designated**
  17:16,22
**designing**
  194:16
**desk** 29:16,18
  31:17,20,21,22
  32:15,15 39:8
  39:15,24 49:2
  49:10,19,22
  77:2 93:13
  95:25 96:1
  97:16 110:21
  115:8 121:14
  121:18 151:13
  151:14 152:4
  152:13 157:3
  157:10,14,17
  157:22 159:20
  169:8,11,24
  170:4 189:18
  189:20 190:7
  191:2 192:23
  204:5,8 209:12
  224:5,6,11,22
  225:1,2 226:1
  226:24,25

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[desk - dress]**

Page 17

228:11,15
**detail**  104:18
187:7
**determine**
14:17 153:21
**development**
65:17 66:1
69:10 81:23
**died**  215:22
232:23,24
233:1,6
**difference**
52:17 165:20
**different**  7:21
15:3 31:22
44:21 54:5
57:23 61:11,12
129:20 142:4
147:4 154:19
159:1 195:24
207:2 244:14
247:20,21
**differently**  65:8
**dinner**  43:1
**direct**  55:2
74:25 126:25
195:25
**directly**  71:23
71:24 149:1
**directors**
239:12,20
241:8,15,18
**dirty**  200:8
**disagree**  77:12
77:15 81:19

**disclosure**
249:1 250:1
**disclosures**  4:6
221:6,11
246:14,15
249:2
**discount**
249:16 250:6
**discounts**
249:15 250:5
**discoverable**
221:25
**discovered**
23:13
**discovery**
48:10 62:13
104:12 134:4
160:19
**discuss**  23:7
31:8 102:21
192:16,18,19
**discussed**  53:8
54:8 103:21
**discussing**
97:14
**discussion**
188:3
**discussions**
127:1 183:8
186:16,22
**disgusting**
145:5
**dispute**  67:17
**disputing**  57:4

**disrepair**  69:23
82:3
**dissolved**  239:2
**distance**  162:20
**distressed**
205:12 206:23
206:25 207:18
**distributed**
187:14
**distributing**
194:25
**distribution**
218:25
**distributions**
220:12
**district**  1:1,1
**disturb**  198:15
199:20,22,25
202:12
**disturbed**
199:23 204:24
205:22 206:1
**division**  1:2
**document**  3:15
17:20 24:22
61:11,12 85:17
85:20 98:21
100:3 107:23
116:6,8 135:18
151:23 160:11
160:16 161:11
172:10,11,12
172:13 173:3
173:10 174:10
174:16 177:18

178:1 179:8,16
182:1 191:14
191:16 193:21
201:25 204:21
242:21 243:3
244:23 245:9
**documentation**
41:2
**documented**
68:24
**documents**
41:8 47:23
115:4 172:10
**dog**  135:20
**doing**  6:5 29:13
51:25 77:10,11
77:17 103:15
108:23 111:8
121:8 122:2
128:25 139:19
140:19 151:1,2
156:13 159:25
176:3 188:12
197:22 200:11
203:8 219:14
225:16 227:1,3
**dollar**  141:16
**door**  32:15
136:13
**dozens**  107:14
**draft**  151:23
**draw**  218:25
219:1,17
**dress**  197:2,19

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 84 of 129
CONF Tahir Shareef                              February 22, 2023
G.W. v. Northbrook Industries, Inc.

[drink - everybody]                                              Page 18

**drink** 33:14
**drinking** 88:24
**drinks** 209:16
**drive** 10:7,18
10:21 18:25
29:7 60:5,9
67:6 80:22
84:12,13 87:5
87:7,17 89:4
114:12 125:10
207:17 214:9
**drug** 120:3
131:6 135:23
136:13 145:5
**druggy** 201:15
**drugs** 135:19
135:20 136:10
139:18 199:1
200:18 203:12
203:19
**due** 120:4
**duly** 7:14 251:9
**dump** 144:5
**duties** 195:24
**duty** 71:11,13
71:15

**e**

**e** 3:14 18:25
30:25 83:13,15
83:17,21 84:3
112:18,20,23
112:25 113:1
113:15,16,19
152:16 174:3
240:18,20

251:1,1 253:3
253:3,3
**earlier** 51:1
54:4 66:3
94:14 100:25
**earnings** 220:7
**easier** 26:25
237:20
**easy** 161:17
**economic** 69:10
**ed** 175:12
**educating**
124:3
**effectively**
27:19
**efforts** 56:3
**eight** 84:7
85:25 174:24
189:24 223:19
**either** 10:15
25:17 29:2
40:15 63:24
133:17 149:17
184:23 186:17
188:23 200:5
211:25 234:5
**elected** 239:19
241:11
**electronic**
190:15
**elevator** 28:25
**else's** 56:23
**emily** 2:16 7:5
7:6

**emphasize**
190:25
**employed**
240:7
**employee** 45:6
194:23 216:22
223:8
**employees**
37:14 174:12
174:12,17,17
174:19 177:14
195:1,22
206:16 216:4
240:4
**empty** 158:23
**endeavor** 12:15
**ended** 119:24
151:7
**enforce** 156:21
191:1
**enforced**
156:25
**enforcement**
56:4 58:24
78:17,24 79:14
81:17 86:12
108:8 118:18
122:9 130:21
**enforcement's**
133:10
**engage** 56:22
**engaged** 58:16
**engaging** 57:10
58:4

**english** 186:1
186:10,11,13
186:18
**enhance** 153:22
**ensure** 126:6
**enter** 23:1
204:10
**entered** 9:16
84:16 161:3
**entering** 237:6
**entire** 122:4
183:6
**entitled** 66:9
80:4 235:17
242:23
**entry** 198:18
**errata** 252:11
252:13,17
**especially**
195:23
**esq** 2:4,9,10,16
**established**
33:20 50:4
**establishments**
66:15 68:12,25
69:10
**estimate**
101:21 233:24
235:5 236:6
**ethics** 187:7
**events** 14:11
97:22,23
**everybody**
77:16 162:12
165:24 172:4

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 85 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[everybody - family]                                                Page 19

186:11 188:7
191:23 192:2
216:7 229:22
**evidence**
184:14 188:21
199:1 200:17
205:13
**eward** 2:19
**exactly** 30:6
**exam** 6:25
**examination**
5:2,3 9:7 16:15
**examinations**
5:1
**examined** 7:14
**example** 17:25
48:22 84:12
136:20 155:4
160:21 163:16
166:1,6 196:16
221:1 245:25
**exceptions**
57:16
**excessive**
198:19,25
199:3,6 200:17
200:22 203:13
**exclusively**
249:10
**excuse** 107:20
195:5 211:19
**exhibit** 3:3,5,7
3:8,10,12,14,15
3:17,18,19,20
3:21,22,23,24

4:1,2,3,4,5,6,7
4:9,11 16:19
17:7,11,20
55:12,14 56:13
65:11,14,19
69:9 72:19
74:13,16 75:2
79:24,25 80:3
81:21,24 83:7
83:10,12 85:10
85:14,16 98:20
99:2,8 105:3
107:20,20,24
114:15,17
115:16,17,21
117:4,21
119:20 135:10
135:12,15
136:21 138:3
140:5,6 143:24
144:2,12,14
171:22 172:5,8
172:14 173:4
173:23 174:11
175:1,15
177:18 179:8
181:17,19
193:21 194:5
195:17 204:4
204:11 210:22
210:25 211:16
211:20,23
212:11,12
213:22,23
221:7,8 224:13

231:19,20,23
232:3,4 236:25
242:11,13,22
244:3,11,12
245:13 246:16
**exhibits** 3:1
4:23 249:8,10
250:10,10,13
**exist** 113:19
123:15,20
**existence**
127:11
**expedia** 134:22
**expensive**
144:4
**experience**
122:1 130:23
197:13
**expert** 81:16,18
**expires** 251:24
**explain** 140:1
160:22 163:15
219:2
**explained**
11:10 187:10
**explanation**
78:16 128:16
**exploit** 56:8
**exploitation**
118:16
**express** 102:12
**expressed**
103:20
**extended** 66:9
66:15 80:5

199:4 200:20
**exterior** 73:1
**extra** 81:6
113:13 219:16
**eye** 141:22
**eyes** 54:11,21
188:8

**f**

**f** 20:20 240:6
251:1
**face** 29:7
**faces** 211:15
**facilitates**
68:18
**facing** 214:9
**fact** 91:9 120:4
130:20 194:25
**factor** 207:2
**factual** 16:1
**fails** 252:19
**fair** 89:9
121:25 143:8
**fairly** 186:20
217:4
**false** 59:22
**familiar** 42:14
52:10 56:10
91:9 101:12
122:8,11,13,17
123:8 126:22
127:8,11
138:13 145:11
176:23 213:10
**family** 35:12,13
35:15 38:6,10

CONF Tahir Shareef                February 22, 2023
G.W. v. Northbrook Industries, Inc.

[family - form]                                                    Page 20

| | | | |
|---|---|---|---|
| 38:13 41:22 | filed  7:21 | firmly  6:25 | floor  28:19 |
| 48:16 50:13,15 | fill  174:5,8 | first  7:14 22:12 | 230:22 |
| 63:16 135:22 | 176:4 | 39:1 43:23 | floors  28:24 |
| 226:5 | filled  176:15 | 45:8 52:23 | florida  18:19 |
| far  28:3 112:7 | filter  124:23 | 55:19,22 56:1 | 19:1,13 25:13 |
| 127:13 164:3 | 125:8,22 | 65:18 83:14,15 | 27:21 28:5 |
| 165:22 166:16 | financial | 83:17 84:25 | 44:3 |
| fasil  20:20,20 | 249:17 | 85:24 115:1 | flow  199:5 |
| father  240:7 | finch  2:4 | 118:13,13 | 200:21 |
| faucet  81:9 | finchmccrani... | 119:19 172:10 | fluids  198:20 |
| favors  116:10 | 2:7 | 172:13 173:22 | flyers  193:9 |
| 116:23 | find  58:20 | 176:18 182:1 | focus  59:16 |
| faxes  112:18 | 59:25,25 71:20 | 194:5 197:7 | 84:9 |
| fbi  101:10 | 79:16,21 82:17 | 204:9,23 | focused  73:10 |
| fearful  169:15 | 102:3 111:8 | 205:21 222:15 | focusing  50:19 |
| 170:6,11,11,13 | 128:14,18,24 | fit  64:11 | 59:14 188:4 |
| february  1:17 | 136:6,7,11 | five  49:9 72:14 | 202:11 205:3 |
| 6:2 22:16 | 151:20 154:16 | 77:3 101:23 | following  249:2 |
| 249:24 250:24 | 155:6 162:17 | 110:8 126:21 | follows  7:15 |
| federal  9:4 | 165:6,24 185:3 | 141:10 161:18 | food  33:14 |
| 118:15 | 185:22 | 180:8,13 | 182:17 209:16 |
| feed  157:15 | finding  104:10 | 222:17 235:13 | footage  159:19 |
| 158:3 | fine  36:1 77:19 | 235:19,19 | force  118:16 |
| feedback  135:8 | 78:13 118:3 | 236:9 | forced  56:22 |
| feeds  158:1 | 184:24 | fix  135:6 | forcement |
| feel  85:8 104:3 | fines  80:20 | 136:16,18 | 133:9 |
| female  120:8 | finish  12:23 | 146:5 | foregoing |
| fifth  116:7 | 13:6 190:1 | fixed  146:5 | 75:23 249:5 |
| fight  117:14,16 | 225:18 | flag  161:1,5 | 254:5 |
| fighting  146:8 | finished  129:2 | flags  53:20 | forgive  146:12 |
| 184:19 | fire  75:8 | 54:1 | form  4:8,10 |
| figure  234:11 | fired  76:18 | flat  133:9,16 | 8:20 52:3,20 |
| 235:14 237:7 | 79:12,15,20 | 217:14 | 57:24 59:3 |
| file  1:6 41:5 | firm  6:24 249:2 | flip  17:19 | 60:13 62:24 |
| 191:20 | 250:1 | 242:21 243:13 | 67:18 105:25 |

**[form - given]**                                                    Page 21

125:12 128:20
131:11 174:8
199:13 207:10
209:6 231:24
232:7
**formal** 175:2
175:15 176:7
183:5
**forth** 140:14
184:16 201:11
**found** 60:16
102:11 161:18
**four** 67:3 80:21
93:2 135:17
140:2 141:11
147:8,9 148:21
159:16 172:10
172:11 173:3
175:8 222:17
236:8
**fourth** 67:25
99:3 116:6
172:13
**frame** 98:6
**fraud** 206:8
**freedom** 56:7
197:8
**fresh** 139:13
142:1,6 145:9
**friend** 22:18,19
23:3 42:5
**friendly** 138:6
**friends** 42:19
**friendship**
42:18

**front** 11:22
29:16,18 31:17
31:20,21,22
32:15,15 39:8
39:15,24 49:1
49:10,19,22
77:2 90:12
93:13 95:25
96:1 97:16
110:21 115:8
121:13,18
138:7 140:11
140:14 143:13
145:6 151:12
151:14 152:4
152:13 157:3
157:10,14,16
157:22 159:20
169:8,11,24
170:4 184:16
184:17 189:18
189:20 190:7
191:2 192:23
204:5,8 209:12
214:9 224:5,6
224:11,22
225:1,2 226:1
226:24,25
228:11,15
242:19 246:18
**full** 9:21 10:1
78:13 135:18
135:23 136:10
174:12,17
223:8

**fulton** 251:4
**functioning**
31:11
**further** 84:6
249:8
**furthermore**
14:14
**future** 129:8,10
130:2,8

**g**

**g.j.** 7:9
**g.w.** 1:4 2:3
6:12,21 8:11
14:8,13 15:4
58:11 211:21
212:15 252:4
253:1 254:1
**g.w.'s** 3:11
74:19
**ga** 249:13
**gain** 56:23
**gambrell** 2:16
**gangs** 100:5,7,7
**gas** 85:21,25
**gate** 88:25
91:12
**gates** 91:10
**gathering**
183:7
**general** 125:1,2
177:19 196:10
204:15 219:4
**generally** 51:2
60:5 94:21
141:20 235:23

**generate** 165:9
**gentleman**
38:16 71:20
138:9 140:9
176:23 232:19
**gentlemen** 72:3
**george** 1:21
249:23 250:24
251:24
**georgia** 1:1,20
2:6,12,18 4:7,9
6:24 7:1 9:5
10:23 22:2
25:14 36:18,22
38:3,8 39:21
40:14 118:20
231:23 232:7
232:11 237:14
249:5,11 251:3
**getting** 139:17
140:17 238:5
**girl** 107:13
227:12
**girls** 51:14
**give** 7:1 47:25
101:20 136:17
160:21 161:1
189:11 195:24
202:3,18 218:6
245:22
**given** 48:25
49:9,12 140:1
164:11 211:14
218:19 235:7
251:16 254:9

**[glass - guest]**                                                      Page 22

**glass** 168:19,21
  169:2,5 209:11
**gmail.com.**
  112:24
**go** 14:15 19:23
  20:7,7,10
  25:18,19 33:15
  40:1,22 54:25
  80:10 83:20,22
  86:5 88:7
  93:24 101:10
  110:25 116:5
  117:16 119:13
  124:12 126:13
  126:15 130:25
  131:20 132:12
  132:16,24
  139:4,6,14
  141:22,22,23
  142:5,9 143:1
  146:4 148:8
  157:4,10,11
  159:24 160:4,6
  161:9 162:17
  165:21,23
  168:16 173:11
  174:4 175:17
  177:25 180:24
  182:12 184:22
  184:23 185:19
  187:10 188:10
  188:11,17
  197:7 203:20
  207:11 208:23
  209:1,3,7,8

213:15 215:6
  218:24 219:21
  220:4,7 221:14
  221:16 234:3,4
  234:5,6,7,20
  235:8,10
  242:15 246:5
  247:8
**goal** 12:9
**goes** 94:11 95:2
  145:10 155:3
  162:20 204:25
  235:16
**going** 9:11,20
  10:5 12:25
  26:11 32:8
  33:13 38:25
  55:4 67:10
  72:13 104:22
  106:22 107:8
  110:4,24,25
  111:3 114:14
  115:15 117:25
  119:3,13 121:5
  121:9,14
  123:25 124:8
  127:16 129:16
  131:1,6 135:5
  139:24 140:11
  142:5 144:5,11
  146:14 151:20
  159:1 166:15
  171:25 180:23
  184:14,15
  185:2,20,24

192:15 200:6
  201:11,13
  206:19 208:4
  215:5 219:13
  221:21 222:16
  222:18 229:6
  235:1,21
  245:24 246:17
  246:19
**good** 6:11,16
  7:6,16,18
  72:17 77:25
  82:20 104:10
  137:13 141:8
  141:12 143:21
  154:10,17
  174:4 182:25
  199:21 200:2
  202:13 219:5
**goods** 209:13
**google** 3:20,21
  3:22,23 134:19
  134:24 135:1
  135:11,11
  137:2 138:5
  140:8 144:2
**gotten** 65:24
**government**
  56:5 116:4
**gram** 224:14,16
  227:19,20
  229:12,15
**grandson**
  226:17

**gray** 194:6
**ground** 11:8
  49:4 140:12
**grounds** 228:3
**groundskeeper**
  77:4
**group** 113:7
**group's** 113:9
**grown** 231:15
  231:16
**grows** 220:10
**guard** 91:20,21
  92:1,4,15,18
  93:16 94:3,22
  95:2 96:18,20
  96:21 97:1,8
  97:15 103:6,10
  112:3 143:14
  147:25 148:1
  153:7
**guard's** 96:13
**guards** 90:3,7
  91:18 93:12
  112:1 113:24
  126:1,5 127:1
  146:12,17
  153:24 155:8
  179:10,24
**guess** 18:15
  21:2 51:10
  52:6 102:24
  215:22 226:1
  234:10
**guest** 29:1 81:3
  81:7 95:17

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

**[guest - hire]**

Page 23

99:21 103:17
104:5 136:6
166:13,14,15
170:12 198:6
204:11 230:17
230:19
**guests** 32:9
35:4 80:25
136:5 158:21
159:7,13 160:7
161:25 164:9
164:10,10
166:11,18,21
170:7,13
204:10 210:4,6
212:7
**guidelines** 48:8
48:13
**gun** 149:9
**guy** 20:18,20
100:14,23
141:16 161:18
170:1
**guy's** 142:10

**h**

**h** 215:22 253:3
**habib** 215:21
215:22
**half** 47:1,9
56:14 135:18
164:7 236:6,7
**halfway** 118:13
**hall** 2:10 6:17
**hallboothsmi...**
2:13,13 252:2

**hallways** 132:9
188:23 198:24
200:19
**hambrick** 3:21
138:10,15
**hand** 72:21,24
175:17 178:6
194:6 196:19
243:14 251:20
**handed** 17:10
55:17 85:17
242:22
**handing** 74:15
83:8
**handled** 214:12
249:10
**handles** 215:17
238:5
**handout** 47:25
**handouts** 48:12
**hang** 93:24
**hanging** 82:22
142:3 160:1
**happen** 107:5
114:13 167:22
**happened**
35:24 51:21,24
60:23,24 61:4
61:5,6 90:17
100:13 109:12
129:9,15 135:3
151:13 188:8
**happening**
106:22 107:8
109:24 111:16

129:7 130:3,8
202:4
**happy** 129:17
141:18
**haque** 176:19
**hard** 26:6
84:17
**harder** 212:25
**haven** 70:2,6
82:5,8,13
**head** 31:11
167:4 225:21
**header** 196:10
**healing** 194:22
**health** 66:14,21
67:1 68:2
73:15 75:9
99:4
**hear** 52:24
217:9
**heard** 52:23
53:2 54:4
84:25
**heat** 145:8
**heavily** 129:12
**held** 241:18
**help** 23:10 40:2
40:7 60:20
88:5 90:2 94:7
102:20 103:13
111:1 117:25
118:17 121:6
121:20 155:17
174:5,8 185:1
185:22 188:14

190:23 194:10
194:23 198:8
222:13 223:6
245:6
**helping** 194:15
234:22
**hereto** 254:7
**hesitate** 117:25
**hey** 108:22
139:16 141:20
142:5 151:16
157:7 160:2
171:16 192:23
197:20 199:24
203:21
**high** 59:23 60:2
60:12 85:6
86:2,21,23
87:1,4,14,17
88:9,12,19,20
89:9,16 90:2,5
99:19,23,24
105:2 132:10
132:20 140:18
203:14 207:4
**higher** 68:24
174:23
**highest** 66:20
66:25 68:22
86:10 105:8
**highways** 68:17
**hinder** 69:10
**hire** 40:12
71:21 90:3,7
111:25 112:3

CONF Tahir Shareef                February 22, 2023
G.W. v. Northbrook Industries, Inc.

**[hire - hotel]**                                                Page 24

| | | | |
|---|---|---|---|
| 154:15 155:8 | **hotel**   10:14,17 | 102:12,23 | 167:16,20 |
| 155:20 187:6 | 10:21 16:1 | 103:19,21 | 168:1,5 170:8 |
| 245:5 | 19:22 20:1 | 104:1,2,3,4 | 171:1,19 |
| **hired**   23:10 | 25:14,18,19,20 | 105:5 107:3 | 177:11,13,15 |
| 41:25 72:1 | 25:21 27:10 | 111:15 113:17 | 179:9 183:2,14 |
| 153:20 168:25 | 28:15,21,23 | 115:5,7 116:9 | 183:15,17,21 |
| 186:25 215:19 | 29:1,9,13,17,23 | 117:17 120:4,7 | 183:24 186:16 |
| **hiring**   40:20,23 | 30:1,16,19 | 120:10 121:1 | 187:5,23 |
| 103:5 113:24 | 31:2,8,8,12 | 121:15,17 | 188:17,25 |
| 154:7 156:2 | 32:6 35:1 | 122:11,12,24 | 189:2,10 191:6 |
| **history**   40:25 | 36:17,24 38:1 | 123:2,3 124:1 | 192:3,7 193:4 |
| 41:3,9,15,23 | 39:16 40:5,20 | 126:6 127:1 | 193:9 195:18 |
| 42:3 181:6,12 | 42:5,10,11,23 | 128:12 129:4 | 195:21 197:13 |
| **hold**   235:21 | 43:3,7,10,14 | 129:11,21,21 | 198:17 201:5 |
| 241:16 | 44:1,2,12,23 | 129:25 130:1,3 | 201:19,21 |
| **holiday**   132:13 | 45:8,13,21 | 130:5,9,22,23 | 204:10,11 |
| **home**   95:2 | 46:3,6,17 48:5 | 130:25 131:1,2 | 208:4,5,7,13 |
| 96:13 131:20 | 49:21 50:2,5 | 131:25 132:11 | 209:22,23 |
| 234:6,8 | 51:2 53:13,22 | 132:14,19 | 210:4,8 213:15 |
| **homeland**   56:3 | 54:10 58:17 | 133:2,4,10 | 214:5,6,23 |
| 57:5 201:24 | 59:10 60:11 | 134:9,14 | 215:12 216:2,7 |
| **homeless**   88:22 | 63:6,11,14,17 | 136:22 138:8 | 216:9,22 |
| 90:11 | 65:2,8 67:25 | 138:22 139:18 | 217:12,19 |
| **homelessness** | 70:11 71:8 | 141:13 142:13 | 218:19 219:4 |
| 87:9 | 73:6,12 76:21 | 144:18 145:3 | 219:16,18 |
| **homicide** | 78:18,25 79:3 | 145:13 153:14 | 220:6 223:5,17 |
| 100:19,19,20 | 80:5 81:2 | 154:2,6,20 | 225:8,9 226:7 |
| **homicides** | 82:13 86:24 | 157:2,25 | 227:6 228:20 |
| 100:18 | 87:8,16 88:12 | 158:14,16,20 | 229:7 230:1,2 |
| **horrific**   135:22 | 88:12,20 90:5 | 159:8 160:3,19 | 230:12,15 |
| **hospitality**   3:7 | 90:25 91:11,13 | 162:6,9,13 | 231:14 233:12 |
| 43:5,13 55:23 | 91:18 92:2,5 | 163:25 164:18 | 233:13,14,15 |
| 191:12 | 97:5,8,11 99:3 | 164:23 165:1 | 234:9,12,12 |
| **host**   145:6 | 99:9 100:5,18 | 165:25 166:9 | 235:3,3,5 |
| | 101:18 102:1 | 166:12,25 | 238:19 240:11 |

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[hotel - impeachment]**                                          Page 25

240:14,17
242:5 243:11
**hotel's** 170:17
215:18 219:14
**hotelier** 205:25
**hotels** 19:24
21:9 23:8
36:16 37:16,18
37:20 42:15,21
43:24 44:8
45:2,5 46:20
46:25 53:15
66:10,15,20,25
68:22 69:14,16
69:21 80:21
82:1 84:8
91:10 105:1,9
120:2 124:5
127:10 128:6
164:8 195:6,7
195:13 234:1
**hotspot** 138:8
138:16 139:8
**hour** 34:3
72:14 93:2
95:23 96:4
98:3 148:21
152:22 167:17
167:20 215:13
215:14
**hourly** 167:14
**hours** 31:15
63:11 92:4,14
92:19 93:12,19
94:4,9 95:19

95:22 98:16
142:22,24
145:16 147:24
155:9 198:23
199:6 207:1
223:11 225:10
**house** 48:4
**housekeeper**
186:19 192:24
203:20 225:21
**housekeepers**
49:2,10 77:3
186:1,9,12
188:16
**housekeeping**
189:22 197:25
198:4,16 209:2
223:7 225:18
227:10,12,16
228:7
**housing** 194:21
**huh** 13:4 15:14
17:18 54:6,17
55:21 56:9,15
56:17 57:19,25
59:21 60:7,10
66:17 67:7
68:8 80:18
83:25 91:3
94:17 95:4
105:4,10
114:22 130:17
136:23 153:9
156:10 164:4
167:13 175:19

176:20 177:21
186:14 189:3
193:23 194:11
201:20 202:5
209:21 216:21
219:6 222:21
235:25 237:2
244:15
**human** 56:3,8
57:11 58:4
95:5 193:10
194:10,16,17
194:19,24
195:6,18,23
197:25 198:6,7
198:8 200:11
201:25 204:4
204:12
**hundred** 219:7
234:2
**husband** 203:9
207:17 227:20
227:23 230:9
**hustler** 140:15
**hustlers** 138:7
**hypothetical**
129:22

**i**

**idea** 69:19
172:22
**identical** 51:6
74:22
**identification**
17:8 55:15
65:12 74:14

80:1 83:11
85:15 114:18
115:18 117:5
135:13 138:4
140:7 143:25
144:15 172:6
210:23 211:17
212:13 213:24
221:9 231:21
232:5 242:14
**identified** 37:5
84:8 116:3
**identifies** 9:19
99:9
**identify** 6:10
23:11 86:2
124:23 163:10
164:10,22
166:11,13
185:15 191:2
194:24 198:8
222:5,14 229:1
**identifying**
222:2
**identities** 9:18
**illegal** 197:22
199:1 200:18
**immediate**
194:21
**immediately**
120:9
**impact** 69:11
**impeachment**
222:2

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 92 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[implied - inn]                                                        Page 26

| | | | |
|---|---|---|---|
| **implied**  15:3 | **indicated**  251:8 | 253:1 254:1 | 20:4,21,23 |
| **important** | **indicating** | **industry** | 21:1,6,12,16,19 |
| 164:9 | 204:12 | 197:13 | 22:2 23:14,17 |
| **improperly** | **indication** | **infestation**  73:4 | 25:2 27:20,23 |
| 78:18,25 79:3 | 54:22 | 73:7 | 28:2,11,14 |
| **improve**  154:1 | **indicator**  205:3 | **infestations** | 29:11 31:10 |
| 154:6 | 207:16 | 181:7,13 | 33:21 34:8,16 |
| **inappropriately** | **indicators**  54:1 | **influence**  13:21 | 36:11,14,18,22 |
| 197:2 | 196:10,13,16 | **inform**  151:12 | 37:9,9,22 38:4 |
| **inc.'s**  3:10 | 196:22 197:14 | **informal**  183:8 | 38:7,14 39:7 |
| 74:17 | 198:8 200:13 | **information** | 39:13,21,25 |
| **incident**  61:6 | 202:2,6,16,18 | 30:18 113:6,8 | 40:10,10,13 |
| 115:2 116:3 | 204:16,19 | 113:9 129:14 | 44:5,9,9,11,15 |
| 117:10 118:9 | 205:16,18 | 174:7 181:22 | 44:22,22,24,25 |
| **incidents**  14:10 | 206:21 207:7 | 190:17,19 | 45:9,17,20,23 |
| 60:25 180:8 | 208:5,14,16 | 191:5,7 221:25 | 48:17 50:9,21 |
| **include**  105:12 | **indirect**  196:1 | 222:3,5 229:4 | 58:13 59:23 |
| 184:2 | **individual** | 229:11,11 | 60:9 62:23 |
| **included**  51:3 | 15:17,24 183:9 | 240:10 | 64:5,16 67:3 |
| 181:18 | 200:13 221:24 | **infrequently** | 67:24 69:3 |
| **includes**  17:20 | 243:18 244:18 | 198:23 | 70:5 72:20 |
| 229:22 | **individuals** | **initial**  4:6 | 73:12 75:8 |
| **including**  9:5 | 196:17,22 | 221:5 246:14 | 76:12,17 77:7 |
| 29:17 184:3 | 197:2,8 198:22 | 246:15 | 77:19 80:10,19 |
| **income**  30:22 | 198:24 200:18 | **initials**  9:25 | 82:11 84:13,21 |
| **incoming** | **industries**  1:7 | **initiative**  66:13 | 85:5 86:7,21 |
| 139:25 | 2:8,15 3:6 4:8 | 84:5 | 87:13 88:25 |
| **incorporated** | 6:5,19 7:7,22 | **injured**  204:24 | 89:6,10,11,16 |
| 2:8,15 6:5,19 | 14:8,21 15:20 | 205:13,22 | 89:17,18 90:15 |
| **increase**  86:12 | 17:12,17,23 | 206:2,3,23,25 | 90:19 92:15,23 |
| 86:13 218:20 | 24:15 35:18 | **injury**  207:14 | 95:20,24 97:25 |
| **index**  3:1 5:1 | 36:4 134:5 | **inn**  1:7 6:6,19 | 98:21 99:2,9 |
| **indicate**  53:21 | 173:24 222:5 | 7:8,23 10:6,13 | 99:13 100:17 |
| 184:7,12 189:8 | 231:25 238:16 | 10:16,16 15:21 | 101:5,13 105:6 |
| 201:22 205:18 | 241:4,16 252:4 | 16:3 18:1 20:1 | 105:8,12,16,19 |

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

[inn - j.g.'s]

Page 27

| | | | |
|---|---|---|---|
| 106:9 107:14 | **inspections** | **introducing** | 40:19 48:15 |
| 107:21 109:16 | 80:5 | 187:1 | 50:23 63:25 |
| 112:21 115:13 | **inspector**  81:6 | **introduction** | 134:10 183:9 |
| 116:24 117:15 | **inspectors** | 7:5 | 183:20 186:17 |
| 117:19 118:20 | 82:16 | **investigating** | 192:6,14 |
| 118:24 119:25 | **install**  168:23 | 119:24 | 214:18 222:19 |
| 120:1,10,17,20 | **installed** | **investigation** | 222:22 223:4 |
| 122:2,10,14,17 | 168:21,22 | 118:15 | 247:15,16 |
| 124:5,19 | 169:3 | **investments** | **islam's**  30:3 |
| 125:11 127:11 | **insurance**  4:1 | 4:10 232:8,10 | 51:5 |
| 127:23 128:6 | 172:8,23 173:2 | 233:2,8 237:13 | **issue**  8:21 |
| 128:19 130:6 | 173:21 174:3 | 238:14,20,22 | 87:23 |
| 130:20 132:13 | 176:3 177:4 | **involve**  111:22 | **issues**  66:14 |
| 146:17 147:21 | 180:19 182:8 | 186:20 | 134:7,8 138:21 |
| 155:7 156:16 | 182:10 210:18 | **involved**  19:24 | 229:5,19 |
| 167:3 168:5,14 | 242:17 244:4 | 25:8 65:23 | **item**  189:14 |
| 177:8,10 | 245:25 | 101:11 116:8 | 202:11 207:25 |
| 188:16 211:3 | **interest**  21:7 | 185:4 218:15 | **items**  51:4 |
| 211:22 212:17 | 23:7 217:17 | 218:17 | 185:16 189:11 |
| 213:6,20 | **interested** | **involvement** | 189:12 199:9 |
| 220:23,23 | 251:18 | 45:9 | 200:14 202:7,9 |
| 221:1 232:13 | **interference** | **involving** | 202:11 207:23 |
| 233:9,17,18 | 116:4 | 186:17 | 208:2 209:20 |
| 238:6,13 | **interior**  73:1 | **iqbal**  38:16,20 | 209:22,24 |
| 246:21,23 | **interject**  14:1 | 39:12,20 40:9 | 242:4 |
| 252:4 253:1 | **internet**  123:15 | 48:16 63:25 | |
| 254:1 | 209:23 | 225:24 226:19 | **j** |
| **insert**  9:24 | **interrupt**  12:20 | 228:18,19 | **j**  240:6 |
| **inside**  131:4 | 13:1 72:12 | 229:10,11 | **j.d.**  211:4 |
| 132:25 133:2 | **interstate** | 240:5,6,8 | **j.g**  58:11 |
| 139:5,14,14 | 68:17 | 247:3,4 | **j.g.**  2:3 6:15 |
| **inspect**  73:25 | **intervention** | **iqbal's**  226:20 | 15:1 107:12 |
| **inspection** | 66:10 | **islam**  31:11,14 | 211:1 |
| 73:20,22 74:3 | **interview**  40:23 | 35:11 37:20 | **j.g.'s**  8:16 |
| | | 38:25 39:2 | 74:20 |

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[jacksonville - know]**                                                Page 28

**jacksonville**
18:19,24 19:1
19:4,12,17,19
19:21,25 20:4
21:10,23 25:12
27:21 28:5,10
28:12 38:1
44:2,16,24,24
44:25 231:13
234:16,20
235:8
**jail**  129:16,18
**jamal**  240:6
**january**  219:8
**jassie**  227:19
229:12
**jeez**  129:25
**jeopardize**
111:23
**job**  39:6,23
77:11,17
147:17 154:10
168:13 187:8
**jobs**  77:10
**journal**  3:12
80:3
**judge**  11:23
58:24
**july**  14:11 61:5
118:6,14,23
**jumped**  116:14
**june**  3:18,19
4:1 14:11 61:4
115:22 116:23
117:7,18

162:13 163:21
172:9 174:16
176:8 179:25
**justice**  56:8

**k**

**k**  30:20
**k11**  30:20
**keep**  38:24 41:5
88:10,21
128:12 129:5
132:16,23
139:7 140:19
141:21,22
142:13,17
184:15 188:8
**keeping**  9:18
140:15
**keten**  224:25
**key**  115:7
**kick**  87:9 88:24
**kicked**  201:16
**killed**  101:5
**kin**  251:17
**kind**  10:12 24:4
41:2 43:17
48:7,8,13
55:10 69:4
79:21 108:19
108:20 141:5
141:19 147:10
150:16 165:4
168:20 177:17
183:8 185:2,5
186:24 189:20
191:20 192:22

197:18 213:7
219:15 224:10
240:14 241:14
**kit**  194:25
**knew**  101:11
120:4
**knock**  106:21
106:23 136:13
**know**  12:21
13:3 18:14
19:22 20:11,12
21:20 24:4
26:5,10,10
29:15 31:4,5
31:17 32:1
33:6 34:13,25
35:10,11,23,24
35:25 36:2
39:25 40:5
41:10 42:20,22
46:23,24 48:7
48:11 51:15,18
51:19 52:5,15
52:25 53:1,6
53:13,23 54:3
54:24,25 55:4
55:6 58:20,21
58:21 59:5,7,9
60:1,15,16,17
60:18,18,23,24
61:3,13,16
63:2 65:9,9,21
66:6,7 67:20
69:15,18 70:8
70:13 71:1,14

73:8,8 75:3
77:1,25 79:6
79:15 81:4,4,5
81:8 84:1 85:7
87:1,6,7,9,20
88:4,7,9,10,15
88:21,21,23,23
88:23 89:13
90:6 92:25
93:8,8,13,14,24
93:25 94:6
95:13,17,17,18
99:16,23,24
100:12,13,14
101:8,10,19,24
101:25 102:4
102:19 103:12
103:13,15,15
103:16,18
104:6,7,15
106:1,3,4,11,17
106:19,20,20
106:24 107:5,7
107:7,7,8,24
108:18,19,19
108:25 109:6
109:12,21,21
109:24 110:1
110:23 111:2,2
111:6,7,7,14,21
111:22,23
112:2,5 113:1
113:2,3,4,5,6
113:11,12,12
113:13 114:8,9

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

**[know - law]**

Page 29

| | | | |
|---|---|---|---|
| 114:11,11,12 | 146:6,6,7,8 | 181:21,25 | 236:3,12 |
| 114:12 119:3,8 | 148:9,11,15 | 182:4,5 184:15 | 244:20 245:24 |
| 120:9 121:2,3 | 149:9,11,14,15 | 184:17,18,20 | 246:20 |
| 121:4,7,18,19 | 150:13,19,21 | 184:21 185:2,4 | **knowing** |
| 121:20,20 | 150:22 151:1 | 185:7,19,21,22 | 194:15 |
| 123:6,14,17,18 | 151:13,13,15 | 185:23 187:7,8 | **knowledge** |
| 123:19,19,23 | 151:16,17,17 | 188:7,8,10,11 | 16:1 26:18 |
| 123:23,23,24 | 151:18 154:9 | 188:11,13 | 59:8 64:8,8,9 |
| 124:7,22 125:3 | 154:11,12,23 | 189:23,25 | 65:1 86:19 |
| 125:5,7,15,21 | 155:10,11,13 | 190:22,23,23 | 122:22,25 |
| 125:22 126:9,9 | 155:16 157:5,6 | 190:24 191:1 | 123:1,11 |
| 126:10,12,12 | 157:8,11 | 191:17,18,19 | 128:11 229:18 |
| 126:13,13,14 | 158:10,23 | 192:14,20,20 | 229:24 |
| 126:15,15,21 | 159:24 160:1 | 192:21,23 | **knowledgeable** |
| 127:4,5,13,14 | 160:18,20 | 193:1,11,13 | 34:19 |
| 128:9,10,21,23 | 161:15,19 | 197:16,18 | **known** 221:23 |
| 128:25 129:13 | 162:12,16 | 199:15,21 | **kudos** 7:2 |
| 129:17 131:15 | 163:22 164:2 | 200:3,5,5,6 | |
| 131:17,19 | 164:13,16,20 | 201:3,6,12,15 | **l** |
| 132:2,3,4,4,12 | 165:7,9,16,18 | 202:22,23 | **l** 20:20 22:10 |
| 132:13,14,14 | 166:2,3,8,9,18 | 203:5,7,9,18,20 | 38:17 240:6 |
| 132:14,16,22 | 166:18 167:4 | 203:23,23,24 | **lack** 69:23 82:3 |
| 132:23,24 | 167:22 168:20 | 205:14,25 | 197:8 |
| 133:15,16,19 | 168:25 169:7,8 | 206:2,6,8,11,13 | **lamarra** 1:21 |
| 135:5 136:4,6 | 169:25,25 | 206:19 207:13 | 249:23 250:24 |
| 136:7,9,10,12 | 170:1,20,21 | 207:14,16,18 | 251:24 |
| 136:12,15 | 171:2,12,15,15 | 207:24 208:10 | **landlord** |
| 138:24 139:4,7 | 171:15,16 | 208:17,17,18 | 206:15 |
| 139:8,10,11,11 | 173:17,18,19 | 208:21,25 | **landscaping** |
| 139:12,12,13 | 174:4 176:2,3 | 211:14 212:18 | 206:11 |
| 139:23 141:8,9 | 176:5,9,17,25 | 213:7 215:5,6 | **lane** 19:12 |
| 141:9,10,12,14 | 177:14,16 | 215:8 222:12 | **larger** 220:10 |
| 141:16,16,19 | 178:10 179:1,2 | 224:1,9 229:12 | **late** 49:20 |
| 141:22,25 | 179:3,5,6,15 | 234:8,20,21,23 | 94:11 |
| 142:11 143:4 | 180:2,25 | 235:12,17 | **law** 11:22 56:4 |
| | | | 58:24 108:7 |

Case 1:20-cv-05233-SEG     Document 86-28     Filed 10/12/23     Page 96 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[law - loitering]                                                                Page 30

122:9
lawsuit 8:14,16
53:3 58:21
222:7 229:19
lawsuits 7:22
51:13 61:9,10
lawyers 221:12
245:5
lead 80:5 131:8
201:18
leaky 81:9
learn 151:10
leave 90:12
95:18 151:12
184:23 200:7
203:7,25,25
204:2
leaves 153:7
leaving 198:22
led 47:15,18
left 55:25 79:11
115:1 116:2
117:10,15
137:7 152:2
199:2 200:16
legal 166:8
252:23
legitimate 78:2
leon 228:6
letter 30:25
letters 112:18
level 59:23
60:12 140:12
liability 177:20

license 238:6
238:12,20
lieu 9:25
life 69:11
lights 150:1
likely 221:25
229:4
limited 4:12 9:6
108:11 186:13
186:18 242:24
244:17
line 243:17
253:4,7,10,13
253:16,19
linens 198:17
lines 210:5
212:18,20
list 17:21 18:7
18:12 60:22
61:1,2,3,12,15
61:22 62:3,17
63:22 66:24
67:3 80:22
84:10 86:7
98:22 103:17
105:1,6 108:24
136:6 160:10
160:11,25
161:10 185:16
189:7 196:9
197:7 199:17
202:8 222:9
223:19 224:12
228:25 229:19
229:22 246:14

246:17
listcrawler
124:13 126:23
listed 51:4
98:21 99:2
198:15 199:9
listen 93:25
139:5 157:10
185:24
listening
143:21
lists 204:15
literally 87:25
litsup 249:13
littering 132:7
little 28:20
46:24 72:13
86:9 97:21
142:4 165:11
165:12 183:1
186:3 207:18
208:20 209:13
217:3 228:19
live 18:18,19
19:4,14 22:7
25:21 28:10,12
86:14 87:24,25
87:25 106:17
142:9 222:24
223:1 229:12
229:13,14
230:1,15,16
lived 18:20
19:2,10 23:2
213:9

lives 22:23
25:12,13 56:8
living 21:23
27:12,19 33:25
34:5 51:15
63:11 104:5
136:18 207:3
225:9 231:13
llp 2:4
loan 24:3,4,5,6
24:9 241:24
242:1 244:24
245:22
lobby 31:21,24
32:10,19,22
33:1,6 190:7
193:15,18
lobby's 50:5
94:25
locate 125:23
located 28:18
68:13,25 120:8
157:13
location 19:3
84:11,11
locations 86:2
86:10,15
lodging 43:11
43:14 191:12
194:20
loitering 131:2
131:2,25 132:8
132:11,19
139:18 144:4
156:25 198:24

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

**[loitering - make]**

Page 31

200:18

**long** 18:20 44:6
44:18 142:4
144:9 156:22
168:25 172:11
172:11,12
177:6 199:2
200:16 207:17

**longer** 24:3
34:17 39:9
70:17 71:5
79:13

**look** 53:21 54:9
54:21 56:12
72:18 81:20
83:6,13 95:16
98:19 106:22
107:19 108:4
109:19 110:2
110:23 111:1,7
111:21 114:10
118:12 126:14
126:17 129:14
135:4 140:4,13
141:17 144:17
154:11,14
158:6 173:3,22
174:10 178:1
179:7,14
181:17 184:7
185:14,22
186:23 187:4
189:8,10,11
192:16 193:20
194:5 195:16

197:23,24
201:22 203:8
203:18,24
204:3 206:9
207:18,19
213:5,13 221:5
224:1,2 228:24
242:16,16

**looked** 81:22
81:24 107:23
119:20 144:24

**looking** 50:18
63:1,4 107:24
115:14 117:1
117:20 145:1
176:16 194:4
200:12 237:11
245:13

**looks** 150:1,2

**loose** 10:12

**lose** 168:12

**lot** 34:9 49:5
89:4 91:11
104:3 107:14
115:6 120:5
130:1 131:1,1
131:4,5,5,25
133:4,5 139:17
146:11 203:19
208:20 212:7
214:6,9 220:6
222:11

**lotion** 199:7
203:13

**lots** 132:10
138:7 188:24
210:7

**loud** 140:15
146:7 151:18
157:8 160:1
184:18

**louise** 129:25

**low** 90:5

**lower** 197:3

**lubricant** 199:7

**lunch** 42:25
182:23

**lunchroom**
189:22

**lunchtime**
189:25

**luz** 3:8 65:15
81:22

**lying** 107:17
109:13

**m**

**m** 240:6

**machine**
251:12

**macon** 36:18
36:22 37:9
38:3 39:21
40:10 44:23
221:1 232:11
233:9,18,25
234:12,15,16
234:20 235:3
235:10 236:9
236:11,17,21

237:22,24
238:19 246:23
247:8

**madam** 9:12

**made** 80:22
93:15 120:5,5
131:6 250:10
254:5

**mail** 3:14 27:23
28:1,3 30:25
83:13,15,17,21
84:3 112:20,23
112:25 113:1
113:15,19
152:16 174:3
203:3 237:20
237:20 240:18

**mailing** 28:4,5
238:2

**mails** 112:18
113:16 240:20

**main** 190:6

**maintain**
112:20 160:16

**maintenance**
29:15 49:3
77:3 198:1,4

**make** 12:13
54:13 84:14
88:6 93:25
127:22 137:20
146:13 148:22
152:3 153:25
155:13 157:4
161:17 183:12

**[make - member]**                                                                              Page 32

200:8 206:4
220:9 225:20
235:2 237:22
**makes** 14:23
**making** 15:5
88:23 151:17
157:9
**males** 196:18
196:24
**man** 101:5
116:8,21 160:2
228:3
**manage** 29:14
130:3,5
**manager** 29:25
31:12,16 45:23
45:25 46:2
76:11 88:11
110:22 111:14
124:1 129:3,10
129:25 130:6
138:23 154:25
155:7 201:5
224:8,10
**managers**
86:14
**managing**
20:12 29:17
**mandosa** 227:9
**manipulated**
56:22
**manly** 245:11
**manual** 3:7
175:4,9,21
191:11,11

**map** 69:3
**march** 3:14
84:4 163:19,20
251:21 252:3
**margaret** 2:10
**maria** 227:15
**mark** 9:23
**marked** 16:18
17:7,10 55:11
55:14 65:11,14
74:13,16 79:23
79:25 83:10
85:9,14 114:14
114:17 115:15
115:17 117:2,4
135:12 138:1,3
140:4,6 143:24
144:14 149:20
172:5 210:22
210:25 211:16
211:19 212:10
212:12 213:23
221:6,8 231:20
232:4 242:13
**married** 28:8
**marta** 65:23
**material**
191:13,21
195:10
**materials** 124:3
187:13,19
195:4
**matter** 15:1,12
197:21 214:13
250:3

**matters** 15:4
214:13
**maurice** 3:21
138:10
**max** 158:20,22
159:13
**mcclelland**
70:20 71:7
127:19 146:18
147:2,18 148:3
148:12,24
150:14 151:5
152:17 153:15
153:25 156:1,7
**mccranie** 2:4
**mcmanly**
245:10,10
**mdaly** 2:13
**meadow** 44:23
**meadows** 20:1
20:4,21,23
21:1,6
**mean** 12:10
30:21 42:9
51:18 52:7,14
67:22 70:14
77:10 79:19
81:15 86:24,25
87:24 90:2
93:6 99:18
101:20 104:5
105:7 106:16
107:4 109:11
117:1 121:8,11
131:13,21

132:2 142:25
150:16 153:8
155:3 156:17
156:17 158:22
162:20 167:9
169:23 171:2
176:9,13 180:1
180:13,18,24
199:20 203:4
204:24 205:10
207:12,21
208:12 213:7,9
217:4 218:23
223:11 229:8
235:20
**meaning** 52:15
70:16 87:11
112:17,18
162:2
**measures** 146:2
**meet** 8:1 22:17
42:25 222:19
**meeting** 42:24
46:22 115:5
138:19 139:16
139:22,22
175:9 241:19
**meetings** 47:1
53:5 175:4,21
239:24 240:2
241:16
**meg** 6:22
**member** 35:12
35:13 41:22
43:2,10,13,16

CONF Tahir Shareef                          February 22, 2023
G.W. v. Northbrook Industries, Inc.

[member - move]                                            Page 33

49:22 64:1
121:15 122:4
143:13
**members**  38:6
38:11,13 48:16
50:13,15 63:16
65:8 86:14
183:9 189:17
226:5 241:7
**memorial**  10:6
10:18,21 29:7
60:5,9 67:6
80:22 84:12,12
87:5,7,17 89:4
114:12 118:20
125:9 214:9
237:14
**memory**  187:12
**men**  107:15
199:5 200:21
203:14 206:14
**mention**  9:11
45:3 138:8
192:22
**mentioned**  9:13
155:19 192:24
**merchandise**
203:3,6 204:1
**mess**  135:19
**message**  150:17
152:17,18
240:17
**messages**  151:4
**met**  8:4 22:19
23:2 39:2

222:12
**methodology**
66:19
**metro**  60:6
118:16
**middle**  55:22
69:4
**miles**  234:2
**miller**  3:22
140:10,24
**mind**  38:25
78:22
**mine**  118:2
244:7
**minor**  51:25
170:19,21,25
171:2,13 202:3
203:19,22
205:23,23
206:24,24,25
**minors**  9:15
124:16 170:17
199:2 200:16
203:11,12
**minute**  72:14
165:3 246:6
**minutes**  126:21
131:16 240:2
**mirror**  212:21
212:22,23
213:2
**misbehave**
160:24
**mischaracteri...**
98:9

**misstated**
143:21
**mobility**  68:18
**moderate**  90:6
**mom**  226:20
**mond**  3:22
140:9
**monday**  129:22
**money**  52:9
82:24 103:9
164:11,18,21
164:23 165:11
168:12 188:5
189:10 215:8
219:13,15,16
220:10,12
241:24 242:1
**monies**  116:9
116:22
**monitor**  29:21
89:24 134:10
134:13,17
158:9,11
198:25 200:19
**monitored**
197:9
**monitoring**
51:3
**monitors**  134:8
**monroe**  135:19
**month**  27:7,8
29:12 33:22
63:8 107:15
133:18 150:11
163:19,19,19

165:8,14,25
166:10,12
216:15 217:5
219:13,13
225:9 234:13
235:4,7,19,19
235:20,20,24
236:1,6,7
**monthly**  175:4
175:9,21
187:11,11,23
218:1,11
**months**  25:20
25:20 26:21,23
26:24 46:10
135:21 187:24
**morning**  6:11
6:16 7:6,16,18
8:2 92:8,24
131:20 150:13
151:15,16
152:14 156:25
157:1
**motel**  82:1
85:21 179:9
195:19,22
198:17 232:11
**motels**  66:10,15
66:20 68:22
69:16,21 86:1
86:6 98:22
**mother**  240:6
**mouth**  151:21
**move**  19:3
90:10 182:25

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 100 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.    February 22, 2023

[moved - nighttime]                                                    Page 34

**moved** 19:7
**movement**
  197:9
**movie** 31:4
**moving** 177:17
**muhammad**
  228:2
**multiple** 63:16
  122:15,18,23
  123:2,3 138:20
  163:4 198:19
  198:21 202:10
  202:18 205:5
  205:17 206:5,6
  206:7,18,21
**murder** 100:21
  100:22 101:13
  129:21,23,23
**murders** 130:1
  130:3
**music** 93:25
  146:7 151:19
  157:10
**musk** 198:20
**mutual** 22:18
  22:19 23:2,4,5
  241:14

**n**

**nabeela** 225:5
**name** 6:16 7:19
  10:1 20:15,18
  22:9,10,12
  24:3,4,5,7,10
  35:25 37:12
  38:16 79:9

161:3 163:3
166:3,15,18
176:18,21
206:13,15,15
215:20,21
221:23 238:13
240:7 245:8,9
**named** 20:20
  138:9 140:9
**names** 9:21,25
  70:19 79:6,7,8
  119:21 160:12
  166:7,8 186:6
  222:11
**narcotics** 120:6
  131:7
**narrative** 115:3
  117:12
**nature** 152:24
**navigate** 125:3
**nazia** 222:22
  223:1
**ne** 1:19 2:5,11
  2:17
**near** 68:13
**necessarily**
  79:19 152:5,7
**necessary** 55:6
  254:6
**need** 19:23 20:6
  20:9,13,15
  35:25 60:19
  88:5 93:3,6,9
  93:16 94:6
  99:21 100:15

102:19 106:19
110:1 111:15
111:21 113:2,3
113:12,13
117:25 121:6
129:15 132:24
138:20 146:5
146:14 155:13
155:14 162:3
172:3 182:12
184:20 185:22
185:25 188:7
193:1 205:14
207:19,20
219:16,21
220:14,19
234:4 236:14
245:20
**needed** 40:2
  93:11 95:13
  152:9,12
  236:15
**needing** 127:2
**negative** 137:7
  137:24
**negatively**
  69:11
**neighborhood**
  87:13 88:20
  104:8 114:11
  118:17 133:15
**neither** 251:17
**nephew** 35:16
  35:17,22 38:21
  39:3 225:25,25

226:9
**nephews** 50:8
**never** 30:24,25
  31:3 59:7
  87:16 91:13,16
  91:17,21 103:5
  120:24 123:24
  144:5 153:12
  154:12 161:13
  166:2 170:9,11
  170:16 171:20
  185:10 191:20
  211:12 212:5
  222:12 227:5
**new** 12:18 19:3
  22:7,23 23:2
  25:13 141:14
  187:6 198:17
  222:11 237:4,7
**news** 52:25
  80:4
**nice** 8:1
**night** 32:11
  49:20,25 70:23
  92:7,23 94:11
  94:12 95:21
  96:5,12 138:8
  140:19 142:4,9
  142:20 143:12
  159:4 167:10
  235:11
**nights** 150:19
  151:8 235:19
**nighttime**
  32:21 49:17,18

[nighttime - occurring]                                                Page 35

49:21 50:5
70:25 142:23
157:21,25
168:15,16
169:13 209:12
**nine** 125:10
135:21 174:24
**nobody's**
205:15
**nod** 13:12
**noise** 88:23
93:25 151:17
157:9
**noncompliance**
82:12
**nongovernm...**
56:5
**normal** 26:13
26:14 67:13
132:19
**north** 68:23
69:5 118:17
**northbrook** 1:7
2:8,15 3:5,10
4:8 6:4,4,18
7:7,22 14:7,20
15:20 17:12,17
17:23 24:15
35:18 36:3
74:17 134:5
173:24 222:4,6
231:24 238:16
241:4,8,15,19
241:22,24
242:1,3 247:22

252:4 253:1
254:1
**northbrook's**
18:3
**northern** 1:1
**notaries** 249:6
249:11
**notarized**
249:11
**notary** 254:13
254:19
**note** 14:25
252:10
**noted** 254:7
**notes** 72:22
**notice** 3:5 8:18
15:16,18 17:11
18:9 84:6
251:7
**noticed** 8:12,15
51:12 136:20
**notices** 9:2,2
**noticing** 250:3
**notification**
108:20 109:21
**notified** 108:9
108:17
**notify** 109:15
109:18 112:9
**number** 66:20
66:25 67:3
68:2,12 69:19
80:13 120:9
122:1 136:7
159:13 165:15

173:7 174:23
180:25 181:1
199:3 202:15
221:24 222:17
222:17,18,20
223:19 227:8
230:23 231:1,8
235:21
**numbers**
174:20

**o**

**oath** 11:18
64:24 107:12
128:1
**object** 52:3,20
59:3 60:13
62:24 67:18
78:9 105:25
125:12 128:20
131:11 199:13
207:10 209:6
**objected** 78:12
109:6
**objecting** 154:4
**objection** 14:2
14:9,24 15:8,8
36:1 64:18
77:14 78:19
83:4 87:19
88:14 89:12,20
89:21 99:15
108:12 109:10
123:4 132:21
142:7 153:1
154:22 197:15

201:1,9 202:21
208:8
**objections** 8:19
**objects** 108:10
**obligation**
209:2
**observation**
93:23 184:13
190:21 192:25
200:10 205:25
**observations**
63:23 191:8,15
**observe** 54:10
55:3 94:6
121:10 185:2
185:12
**observed** 64:2
**obviously** 11:9
11:13 151:1
209:2 222:15
241:3
**occasionally**
124:15
**occupancy**
219:8
**occur** 82:11
92:23 189:15
**occurred** 14:11
76:15 105:11
178:4,24 179:4
**occurring**
118:24 120:17
188:22 200:25
201:8 202:20

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 102 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[occurs - operations]

Page 36

occurs 89:16
92:22 195:7
ocga 249:15
250:5
october 166:1
166:11,22,22
odd 198:23
offender 80:17
offer 46:8,11
118:1
offering 194:20
office 66:1,2,4
79:11 81:22
93:5 127:15
140:14 149:15
161:10 182:4
189:19,21
190:6 191:19
officer 36:8
47:21 49:20,25
60:19 65:17
70:12,14,16,20
70:21 71:4,7,8
104:14,17
109:11 110:2
110:22 119:15
119:22 124:10
124:25 125:7
126:11,12,19
127:14 128:10
128:17,23
130:11,18
147:8 148:12
150:20 151:15
180:1 190:24

233:6,7
officer's 121:23
officers 35:7
36:3,11 71:12
93:10 103:12
104:10 115:5
115:10 119:21
129:12 146:18
146:20 148:2
151:5 153:14
156:9 180:4
233:5
official 251:20
officials 108:8
oftentimes
63:13
oh 16:13 22:3
61:19 71:3,3
72:25 136:12
137:12 139:13
175:9 178:18
178:22 212:23
224:5 244:13
okay 12:18,19
12:23,24 13:6
13:24 16:8,13
16:22,22 17:6
18:16 19:5
20:18,18 23:19
26:9,12 42:12
43:9 59:18
61:19,21 62:1
62:6,19 68:9
72:25 74:4,5,7
80:15 83:19

96:3 98:1,7
104:21,24
108:3 116:15
116:19 128:12
133:20 134:7
149:10 150:6
152:6 159:2
160:14 161:14
161:16,23
171:8,8,10
175:9 177:22
178:19 183:3
190:17 195:8
196:21 202:2
206:24 207:20
208:2 210:1,16
210:16 212:24
213:3,3 217:24
221:13,18,21
221:22 222:7,8
222:10 223:15
223:22 225:7
226:11,12,14
226:16,18
229:2 230:12
234:24 246:7
247:6,23 248:1
248:5
old 107:13
171:5 208:19
211:2,2
older 196:17,18
196:23,24
208:19

olivia 227:15
once 72:15
73:22 74:2
81:6 113:14
167:17,22
169:17,18
170:1,3 177:1
ongoing 187:5
online 46:13,14
134:8,13 135:4
138:19,20,22
139:18,19
168:8
open 32:11
33:5 85:19
157:22 188:8
237:20 246:18
operate 233:11
operated
232:14
operating
65:17 100:5,6
219:18 220:10
220:13,22
operation 31:1
84:4 85:21
98:20 100:3
118:18 175:3
175:16 176:8
177:12 239:5
240:11,14,15
operations 18:1
30:15 46:4,7
63:20 113:16
131:8 177:11

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 103 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[operations - paragraph]                                                        Page 37

218:16 240:17

**opinion** 60:11
62:22 73:11
88:11,17 90:4
106:11 131:14
142:10,10

**opportunity**
106:12 155:6

**opposed** 191:10
202:11

**oral** 24:13
112:13 152:3
187:15,17,18

**orbitz** 134:22

**ordering**
250:14

**orders** 9:16

**ordinances**
209:3

**organization**
45:15

**organizations**
43:2,14 45:16
56:6 193:3

**original** 4:24

**ourself** 134:16

**outcome**
251:19

**outlined** 51:1

**outset** 231:11

**outside** 88:24
95:16 131:3
132:8 133:2
139:2,3,12
141:21,23

142:1,3,5
150:20 151:18
153:3 154:20
156:19 170:22
188:22 193:3

**oversee** 29:19
89:24

**overseeing**
122:14,18,23
123:2

**owed** 44:21
116:10,22

**own** 25:14 44:7
44:8,18 48:8
48:13 90:15,19
90:21 111:10
146:4 233:8
247:3

**owned** 44:9,21
45:3 46:1

**owner** 20:21,22
20:25 21:3,5
21:14,15,19,21
25:12,13 36:24
37:3 42:6,10
42:11 45:6,25
54:10 111:14
113:5 124:1
155:1,7 176:25
201:5 218:13
218:18,25
232:17 233:1,3
233:4,17,18
239:21

**owners** 25:2
42:14,23 43:3
43:7 86:13
241:4,13

**ownership** 21:6
23:16,20,24,25
24:17 25:8
90:24 217:17

**owning** 42:20

**p**

**p** 18:25

**p.c.** 2:10

**p.m.** 33:6,10,12
92:7,23 93:1
93:16 94:10,12
94:20 96:17,17
96:19,21,24,25
97:1 98:17,17
98:18,18
131:20 143:14
143:17,18
145:16 147:22
152:21 154:20
248:10

**pacing** 140:14
140:19

**package** 203:3

**page** 3:3 5:2
55:19,23 56:1
56:12,14 65:18
66:18 75:2,3
80:11,13,14,17
83:14,17,21,22
86:5 108:6
115:1,3 116:5

116:6,7,7,11,12
117:12 118:12
172:13,14
173:3,7,10,11
173:22 174:10
174:25 175:2,6
175:7,8,15
176:18 177:25
178:1 179:9,15
194:5 195:17
195:17 197:24
197:24 204:3
243:13 253:4,7
253:10,13,16
253:19

**pagers** 198:21

**pages** 17:20
172:11,11,12
208:19

**paid** 71:23,24
72:3 75:21
78:7 80:20
149:1 164:15
215:9,12,14
216:11,16
247:19

**paint** 76:8,8

**paper** 161:11

**papers** 52:12
191:19

**paperwork**
193:13

**paragraph**
75:23 80:16
118:13,14

**[paragraph - period]**                                                        Page 38

196:9
**paraphernalia**
199:7 200:22
**parents**  171:11
171:17
**parked**  107:13
**parking**  89:4
107:14 115:6
131:5 132:9
133:5 188:24
214:6,9
**part**  20:22
25:25 53:23
104:12 134:4
147:17 174:12
174:17,19
179:8 184:5
187:7 223:10
245:18
**participate**
46:21 124:2,6
**participated**
45:13 46:17,20
47:17
**particular**  55:3
161:25 162:9
164:19 184:15
**parties**  14:14
14:16 248:12
249:16,18
250:6,14
**partner**  20:19
22:7
**partnering**
194:18

**partners**  22:14
25:1
**partnership**
23:1 24:12,18
30:22,23
**party**  197:4
249:16 250:6
251:18
**pass**  129:14
**passed**  6:25
**passing**  131:22
**password**
250:12,13
**past**  180:8
**patel**  224:25
**patrol**  84:11
149:22
**patron**  205:11
205:21 206:22
207:1
**pats**  84:11
**pay**  18:17 72:5
72:6 76:23
78:13 103:9
165:10,12,19
208:4,15
214:23,25,25
215:3,7,10
217:1 218:1
**paying**  148:17
148:18 165:14
165:14,17,17
208:13 215:8
219:12

**payroll**  29:14
214:12,15,20
**peachtree**  1:19
2:5,11,17
**peop**  31:24
**people**  20:11,14
20:16 32:2,5
40:19 41:11,25
42:24 48:24
49:5,8,13
53:13 55:4
59:6 76:8 77:6
79:6 87:9
88:22 90:10
93:14,23 100:9
106:25 109:25
110:3 111:3,6
111:11 121:4,5
121:7,19 126:9
128:9,11 131:2
132:2,3,8,15,24
133:19 136:6
137:4 139:2,3
139:5,11,24
140:2,16
141:18,20,21
141:22,23,25
142:3 146:6
156:19 157:8
159:7,25 163:1
163:11,24
165:6,9 168:6
176:3 184:14
184:16,21
185:23 187:22

191:3 193:1
197:18 199:3
199:21,21
200:1 201:11
202:13 203:4
203:11 206:12
206:14 208:6
211:14 216:2
222:5,9,12,15
229:1,3 230:1
236:13 246:15
246:17,21
**people's**  106:23
160:11
**percent**  20:24
23:20,24,25
140:2 148:4
149:13,16
219:8
**percentage**
217:17
**perfect**  82:19
**perform**  217:20
**performance**
217:12,18
**performs**
218:19 220:6
**period**  14:13
19:20 34:12
35:5,8 38:15
40:18 50:19
59:13,19 70:17
70:24 73:21
98:3 99:25
100:4 110:9

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[period - please]                                                    Page 39

122:4,16
142:14 146:21
152:22 153:4
162:1,10
167:17,21
192:3 224:21
227:17 229:18
232:17
**periods** 59:16
199:2 200:16
**permission**
220:19
**permitted** 9:3
46:9
**pers** 208:19
**person** 23:1
31:16 34:15,15
46:13,15 49:1
49:3,10,18
50:6 55:2 77:2
77:4 90:11
94:21,24 95:20
95:21,23,25
96:10,13 97:11
97:16 99:21
101:9 102:4,5
108:22 109:19
131:17,21
143:10 152:3
154:7,8 157:2
157:24,24
160:23 161:7
163:4 164:10
164:14 165:19
166:3 168:14

171:18 185:3,7
187:6 192:23
192:25 205:24
206:1,3,5,7,17
207:13,16,23
208:1,18,19,22
223:19 224:12
244:21
**personal** 6:7
14:19 24:7,9
28:1,3,4 42:18
42:19 199:4
200:20 242:7
**personally**
137:21 142:15
**persons** 77:3
**perspectives**
71:8
**pervasive**
99:13,17
**pescara** 18:25
**phone** 16:10
30:25 126:16
128:14 137:20
150:17 240:18
240:19
**phones** 198:21
**photo** 211:19
211:21 212:10
212:15,16
214:1
**photograph** 4:2
4:3,4,5
**photographed**
211:25

**photographs**
133:8
**pick** 16:11 93:1
241:12
**picture** 193:12
211:1
**pimp** 117:14,15
**pimps** 122:11
122:13,17,23
123:2
**place** 10:18
107:11 131:9
145:5,7 161:2
250:4 251:7
**places** 53:16
**plain** 148:10
**plaintiff** 1:5
3:11 6:12,13
6:15 8:11 10:2
55:13 74:19
83:8,9 107:12
114:16 115:20
117:22,23
214:1
**plaintiff's** 3:10
16:18 17:10
55:12 56:13
65:14,18 69:9
72:19 74:16,18
75:2 80:2
81:20,24 83:7
83:12 85:10,16
98:19 99:1,8
105:3 107:19
107:20,22,23

107:25 114:15
115:16,21
117:3,21 118:5
119:20 135:10
135:15 136:21
138:2 140:5
144:2,12
171:21 172:8
172:14 173:4
173:23 174:11
174:25 175:15
176:16 177:18
181:17,19
193:20 194:4
195:17 204:3
210:25 211:20
211:23 212:11
213:22 221:6
224:13 231:18
231:22 232:2
236:25 242:22
244:3,10,12
246:16
**plaintiffs** 2:2
6:21 7:21 9:14
9:21,25 58:10
**plan** 84:5
194:16
**play** 194:14
195:6
**plays** 194:21
**pleasant** 19:12
**please** 6:9 7:11
12:11,20 39:11
67:14 84:10,15

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

**[please - prior]**

Page 40

98:9,10 173:11
195:17 197:24
**pleased** 156:12
**plus** 206:13
**pocket** 16:10
141:17 168:12
**point** 19:12
35:17 45:3,12
48:8 49:12
84:20 85:3
86:20 97:20,22
120:19,24
129:24 153:17
159:20 183:25
188:2 200:23
202:15,17
207:5 229:17
**points** 44:21
56:14 196:10
197:1
**police** 3:16,17
3:18,19 35:7
47:18,19,20,21
49:19,25 55:1
55:1,7 60:19
61:14 70:10,12
70:14,16 71:4
71:11,16 84:22
85:5,18 86:20
87:10 88:8
90:15,19 91:6
93:5,10 94:7
99:20,22 102:4
103:22 104:13
104:17 108:8

108:17 109:11
109:15 110:2,6
110:12,17,22
111:13 112:8
112:16 113:23
114:1,19
115:21 117:6
117:13 118:6
119:15,19
121:21,23
124:9,25 125:7
126:10 128:10
129:5 130:4,11
130:18 145:23
148:5 155:20
170:7,11 180:1
185:21 188:14
190:24
**policies** 164:9
**policy** 160:3
170:21
**politely** 67:10
139:6
**poor** 133:15
170:1
**popularity**
124:3
**pornography**
199:1 200:17
**portion** 49:24
80:9 104:19
121:22 124:9
**portions**
119:16

**position** 111:24
195:22
**possessions**
199:4 200:20
**possible** 66:2
198:8 211:10
**post** 97:22
141:15 193:9
**posting** 194:25
**posts** 125:10
**potential** 32:9
195:23
**powerpoint** 3:8
65:15 81:21
100:1
**practice** 6:23
9:5 137:1
**precedes**
221:20
**precinct** 86:6
86:11 98:22
105:1,8,9
118:17 148:14
**prefer** 215:9
**preliminary**
15:11
**premises**
147:22,25
178:5,24
179:10,24
**prepare** 192:14
**prepared** 13:9
**preparing** 9:22
**prepresentation**
3:8 65:15

**presence**
198:20
**present** 2:21
6:9 8:17 27:17
33:21 202:16
205:18
**presentation**
81:21 82:6
98:25 100:2
**presented**
46:23 249:2
**preservation**
9:6
**preserved** 8:22
**president** 36:9
**presume** 18:10
182:7
**prettier** 244:7,8
**pretty** 60:2
114:8
**prevent** 111:16
129:7,9,11
130:2,8 168:1
168:6,11,11
207:21
**previously**
39:13 107:23
**price** 165:14
**priceline**
134:22
**print** 161:13,15
164:6,13 166:4
166:14,17,17
**prior** 8:4 18:12
53:2 61:23

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 107 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[prior - provide]                                                    Page 41

81:5 84:20
85:3 86:19
120:6,19,24
136:3 181:6
**privacy** 106:23
**private** 56:5
150:2
**privilege** 8:21
**probably** 43:18
**problem** 73:9
87:8 105:18
106:9,17 107:2
107:4 120:2,21
120:25 136:19
181:15 208:1
**problems** 73:2
**procedure** 9:4
46:25
**procedures**
164:9
**proceed** 11:11
**proceeding**
11:4 249:3,12
250:7,13
**proceedings**
248:9
**process** 134:5
194:23
**produce** 160:20
**produced** 41:8
66:19 160:18
249:5,10 250:8
**production**
249:5,11,11

**professional**
42:17,20
**program** 175:2
175:16 176:8
**prohibited**
249:14 250:5
**promotions**
65:24
**proof** 79:22
168:18
**properly** 9:1
77:11,17
168:10
**properties**
23:11 70:1
82:4 145:20
195:14,25
247:9
**property** 21:4
26:19,22 27:5
29:19,21 33:25
34:12,17,20
35:4,8 36:21
37:5 48:23
51:3,16,21,24
53:22 63:20
71:9 75:7 89:6
89:24,25 90:1
94:22 95:6,10
95:12,18 99:22
100:10 101:14
101:17 103:18
106:16,18
108:10 109:1
110:19 111:17

112:10 114:2,5
116:4,24
126:18 131:17
131:18 143:12
145:24 146:3
147:5,12
149:12,18
150:11 152:23
153:18,21
155:15 158:14
164:11 169:7
169:16,18,22
169:23 170:18
185:8,25
186:24 187:1,2
191:8,15,23
192:25 201:8
207:1,4 210:6
213:10 218:16
222:24 223:1
223:23 224:3,4
225:17 227:24
229:13,14,17
234:14 235:18
236:14,17,21
237:25 240:23
245:3,7,25
246:3
**prostitute**
117:14 126:11
**prostitute's**
117:15
**prostitutes**
122:12,15,18
122:23 123:3

**prostitution**
52:1,2,6,9,15
52:18 53:7,14
53:16 54:3
56:24 58:8
62:22 64:4,16
65:1 105:13,15
105:18 106:8
107:2 108:9,18
108:23 109:16
110:7,18,19
111:8,13
112:10 114:6
115:2,4,12
116:24 117:19
118:9,19,24
119:3,25 120:3
120:6,16,21,25
121:9 129:6,7
129:8,9,11,17
130:8 131:8
138:9,16 139:9
139:17 145:6
184:3 188:4,10
188:12 189:9
200:11 201:23
**protect** 56:6
**protected**
250:12,13
**protecting** 9:18
**protective** 9:16
**provacative**
199:5 200:21
**provide** 13:12
13:17 53:20

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 108 of 129

CONF Tahir Shareef

G.W. v. Northbrook Industries, Inc.

February 22, 2023

[provide - reason]

Page 42

97:20 153:13
155:4 180:10
181:8,18 184:6
188:3 189:16
190:18 191:6
191:20 193:4
194:18,23
221:23 240:10
250:2
**provided** 47:3
48:9 66:2
68:17 75:13
104:20 134:6,9
179:11 180:9
181:7 183:14
**providing** 12:6
15:24 16:2
156:8 174:7
192:7
**provisionally**
6:22
**proximity**
68:17
**public** 125:1,2
254:19
**pull** 161:10
163:23
**pulled** 140:13
**pulling** 164:5
**punch** 190:9,11
190:12
**purchase** 44:12
242:4
**purchased**
209:14,22

**purpose** 238:2
**purposes** 9:3
9:19 123:15,20
244:18
**purses** 203:4
**pursuant** 9:1
15:16 251:7
**pursued** 22:4
**pushing** 132:16
**put** 14:1 15:7
16:10 24:5
88:6,9 108:24
111:23 129:16
129:18 141:17
151:19 160:24
165:15 168:9
239:20
**putting** 146:6

**q**

**quality** 69:11
197:3
**question** 8:21
9:15 12:7,12
12:13,17 13:2
13:6 26:7 54:5
87:23 104:25
105:5,7,11,14
105:16 109:3
109:22 119:23
121:25 122:3,8
122:13,16
124:9,11,14,17
124:22 125:14
129:20 130:24
137:11 154:18

158:24 159:1
167:18,19
175:1,12,14,25
178:3,7,14,21
179:10,21
180:7,15,17,25
181:5 192:4
205:16,20
206:20 221:20
246:19
**questions** 8:9
8:19 12:5
14:10 51:10
59:15 104:22
134:6 146:13
177:25 181:18
181:22 248:4
249:6 250:8
**quests** 159:10
**quick** 14:1
**quite** 213:10
**quoting** 119:22

**r**

**r** 2:9 18:25
22:10 251:1
252:1 253:3,3
**radar** 120:4
**rafiuzaman**
228:14
**ran** 19:22
**random** 31:7
**ranked** 66:20
**rashid** 228:18
228:19 229:10
240:7

**rat** 73:4,6,9
**rate** 86:10
105:2,8 165:18
**rats** 145:4
**raza** 223:20
**react** 129:8
**reactions**
119:16
**read** 52:12
56:20 104:19
104:22 105:21
105:24 106:6
119:15 120:11
121:22 124:8
141:24 145:2
191:17 195:4,5
196:9 200:14
202:8 221:21
252:9 254:5
**reading** 138:19
181:1 204:22
**real** 14:1
**realize** 67:11
**really** 59:16
116:6,7 126:23
141:8,12 156:3
168:19 206:21
219:1 244:20
**reask** 146:12
**reason** 13:15
13:18,19 41:13
82:23 83:2
106:24,25
135:7 144:23
144:25 154:19

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[reason - rely]**                                                                                      Page 43

155:5,9,10,11
155:18 169:9
188:11 200:2
201:7 202:3
208:21 209:1
217:12 252:11
253:6,9,12,15
253:18,21
**reasonable**
8:18
**recall**  47:15
55:8 108:21
138:15,18
141:1 144:8,9
144:10 155:25
156:1,4 212:8
212:19 241:20
**receipt**  252:18
**receive**  27:23
28:1 30:18
46:6 113:16
124:2 130:20
218:2,4,11
**received**  45:20
46:3 85:19
183:24 221:11
**receives**  30:20
249:16 250:6
**receiving**  8:18
77:20 80:20
**recent**  237:9
**recess**  74:10
133:25 182:19
220:1 246:10

**recognize**
79:18 87:12
211:4,22 214:2
244:5
**recognized**
211:9 212:4
**recollection**
101:17 116:1
**recommend**
114:4 154:9,12
**recommendat...**
154:1
**recommended**
113:24 114:7
155:20
**record**  6:1,10
8:8 9:13 12:10
13:9 15:1,6,7
16:17 26:7,15
67:14 74:8,11
111:9 133:23
134:1 136:8
162:4,5,8
182:18,20
190:15 219:24
220:2 246:6,8
246:12 248:8
250:8 251:15
**recorded**  168:7
251:12
**recording**  12:2
**records**  41:9
85:19 165:21
165:24

**red**  53:20 54:1
161:1
**reduce**  84:9,23
86:12 114:5,5
**refer**  9:20
10:13,14
**reference**  41:12
41:15 118:18
164:8
**referenced**  15:2
75:23 160:10
252:6
**referred**  41:19
42:2,4 130:19
**referring**  10:15
61:2,17 62:3
66:3 165:3
**refinance**  24:2
**reflect**  16:17
**refresh**  187:12
**refusal**  198:18
199:25
**refuse**  184:25
200:1,1,4
**registered**
35:18
**registration**  4:8
4:10 231:24
232:7 237:12
**regular**  29:1,4
74:3 131:18
139:11 141:5
142:24 147:17
148:5,15 150:1
150:18 230:17

230:19
**regularly**  25:17
25:19 73:12,21
103:22 128:18
138:25 139:1
188:17 209:4
240:9
**regulation**
46:24
**reimbursed**
242:9
**reiterate**  11:12
**related**  22:21
39:4 113:16
193:6 229:18
249:12
**relates**  185:14
186:23
**relating**  16:1
110:19 250:13
**relation**  23:6
37:11
**relationship**
35:15 37:8
82:7 249:14
**release**  4:12
242:24 244:17
**relevance**
14:24
**relevant**  14:13
229:4
**relied**  129:12
191:6
**rely**  219:3

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

[relying - response]

Page 44

| | | | |
|---|---|---|---|
| **relying** 191:14 | 171:19 206:1,6 | 250:9,11 | 249:12,18 |
| **remained** 21:3 | 206:12,19 | **reporting** | **requesting** |
| **remarks** | 208:22,23 | 250:2 | 204:11 |
| 131:22 139:10 | **rentals** 167:14 | **reports** 60:17 | **requests** 61:18 |
| **remember** | 168:2 | 61:13,14 | **required** |
| 53:11 99:6 | **rented** 127:5 | 120:23 138:24 | 254:13 |
| 140:23,25 | 163:1,11 | 139:17 179:4 | **reser** 161:20 |
| 150:3 164:5 | 165:25 166:12 | 194:17 249:17 | **reservation** |
| 174:7 193:24 | **renting** 159:3 | **repository** | 161:4,21,22,25 |
| 211:11,15 | 168:7 206:9,16 | 250:13 | 162:2 168:2,4 |
| 212:7,9 231:11 | 207:22,24 | **represent** 6:18 | 168:8 |
| 243:3 246:16 | 220:6 | 41:7 65:16 | **reserved** |
| **remembered** | **repeat** 175:10 | 74:19 114:25 | 248:14 |
| 245:9 | **repeatedly** | 115:2 116:5 | **reserving** |
| **remind** 67:10 | 138:21 | 117:13 134:4 | 206:18 |
| **remove** 90:10 | **report** 3:17,18 | 210:25 211:20 | **residence** 28:14 |
| 103:17 106:25 | 3:19 30:7,13 | 212:14,18 | **residential** |
| 108:22 111:2 | 60:1 63:2,4 | 221:14 | 27:20 |
| 131:16 185:8,9 | 85:8 99:23 | **representative** | **resolution** |
| 192:25 | 114:19,23 | 14:20 16:3 | 24:16 |
| **removed** 99:22 | 115:3,8,14,21 | 17:16,22 18:4 | **resolve** 184:21 |
| 100:15 121:7 | 115:24 116:20 | **representative's** | **resort** 88:8 |
| 155:14 185:25 | 117:1,7,20 | 15:19 | 90:9 |
| **renew** 200:6 | 118:6 119:1,19 | **represented** | **respect** 86:13 |
| **rent** 33:13 | 119:19,21 | 11:9 | **respective** 9:17 |
| 53:14 107:6 | 151:10,25 | **represents** | 10:1 248:12 |
| 108:24 160:10 | 152:3,9,12,12 | 249:4,8 | **respond** 194:17 |
| 160:23,25 | 163:23,23 | **reprimanded** | **responded** |
| 161:10,19 | 164:6,13,14 | 76:20 | 117:13 |
| 163:2,4 165:11 | 165:4,8 166:4 | **request** 3:10 | **responding** |
| 165:13 166:25 | 166:14,17 | 62:13 74:18,20 | 144:8 |
| 167:2,5,16,19 | 181:4 | 75:1,5,20 | **response** 75:25 |
| 167:25 168:9 | **reporter** 7:11 | 85:19 107:22 | 85:19 108:10 |
| 168:12,15 | 9:12 11:5,13 | 108:5,7,11,20 | 108:16 109:4,9 |
| 170:25 171:5 | 249:1,2,7,9 | 109:4,7 198:16 | 114:10 134:9 |

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 111 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[response - room]**

Page 45

136:21 137:2
141:2
**responses** 3:10
74:18 107:21
**responsibilities**
51:2,5
**responsibility**
40:20 50:20,23
**responsible**
78:11 79:2
159:18 192:7
192:12 208:6
238:10
**rest** 18:6 103:6
140:16 191:4
**return** 252:13
252:17
**revenues** 30:19
**review** 3:21,22
3:23,24 135:23
136:17,24
137:24 138:5,9
138:13,19
139:18,19
140:9,23 141:2
141:4,6,15,20
144:2,8,11,20
145:11 204:21
249:3 252:7
**reviewed**
104:16
**reviewing**
159:18
**reviews** 3:20
134:9,10,14,17

135:4,11,17
136:3,5 137:7
138:20,22
141:10 144:18
144:24
**rhythm** 187:21
**right** 8:5 10:24
11:24 12:3
18:2 19:18
20:8 21:25
23:12 24:11,23
24:25 25:6,11
25:15,16 26:2
26:4 27:11,13
27:15,18,22
28:21 29:20
31:13 32:7,20
32:23 33:2,4
33:17,18,23,24
34:2 35:19
37:13 38:9
39:15,17 43:8
44:17,20 45:11
48:21 49:23
50:7,10,16
54:12 55:24
56:7 57:7,24
62:15 63:7,17
63:20 64:8
67:4,5 68:1,4
69:4 71:10,10
72:21,24,25
73:2,17 76:16
76:16 77:5,8,9
77:18 83:3,5

85:2,12 88:3
90:12,22 91:2
91:7,22,25
94:18,19,23
95:1,7,8,11
96:7,9,12,14,20
97:8,9 98:12
105:3 109:8
112:14 114:3
116:19 122:21
126:18 127:25
128:8 129:19
136:19,25
137:1 139:15
143:15 144:1
145:25 147:1
148:1 151:3
152:15 153:5
153:15,16
158:9,11
159:12 175:17
177:17,24
178:6 179:7,19
180:11 181:11
181:20,24
182:6 188:19
188:25 189:1,5
194:6 195:16
196:15,19
197:6 205:7
209:1,4 210:21
214:13 217:16
219:9,11
221:21 226:2
226:15,18,23

227:8 228:24
229:9,25 230:7
230:12 231:18
235:22 236:2,2
236:4,19,25
237:15 238:4
238:24,25
239:5,20 240:4
240:11 243:14
243:19 245:4
**rise** 202:19
**roach** 73:4,6,8
**roaches** 73:9
76:8 81:9
135:24 144:4
181:15
**road** 90:12
213:15
**rob** 102:5
**robbed** 170:1,2
**robberies**
101:25 102:3
102:10
**robinson** 2:22
**role** 194:14,21
195:6 228:12
228:16
**room** 28:24
33:13 53:14
55:4 76:9 81:8
106:21,21,24
107:6,6,9,11
108:23 109:23
110:3,25 115:6
115:7,9 116:9

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 112 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[room - saying]                                                        Page 46

116:22 117:14
117:16,17
121:5,11,14,18
127:5 132:17
132:25 139:4,6
139:14 140:17
141:23 144:5
146:6 151:17
151:19 157:7
157:11 159:11
159:14 160:5
160:23 161:2
161:19,20,22
161:24 163:1,2
163:11 165:16
165:25 167:3
167:16,20,24
168:9,12,15
170:25 171:6
171:19 184:15
184:17,22,23
184:24 185:19
185:21,24
188:11,23
189:2 191:3
198:1,5,16,18
198:20,23
199:2,3,6
200:8,16,22,23
201:11 202:4
202:20 203:2,3
203:10,11,12
203:14,21
204:23 205:12
205:22 206:1

206:10,14,15
206:16,23
207:5,19,20,22
207:24 208:22
208:23,23
209:1,3,8
212:16 213:4,4
213:6,19
225:20 230:16
230:17,19,23
230:23 231:1,3
231:5,8
**rooms**   29:1,4
132:8 138:6
145:6 156:20
158:16,23
159:4 163:5
166:12,25
168:7 188:17
192:22 198:6
199:1,7 206:6
206:7,12,18,19
209:9 213:13
220:7 225:19
**rossa**   227:8
**round**   157:4
**rule**   156:24
**rules**   9:4 11:8
11:12 46:23
170:17
**run**   32:16
45:13,21 88:4
**running**   46:17
46:20 65:23
129:21 145:19

**russell**   2:16

**s**

**s**   18:25 20:20
22:10,13 38:17
240:6 253:3
**saab**   22:13
**saad**   38:16,20
39:12,20 40:9
48:15 63:25
225:24 226:13
226:20,24
240:5 247:3,4
**saad's**   39:6
**sabarwal**   22:10
22:11,15 24:13
**sabharwal**   25:5
25:10,17,23
26:3,18 30:13
31:1,8 36:5,12
37:1 42:7
90:22 217:21
222:18 240:10
241:3,9,11
243:11 245:5
245:21
**sabharwal's**
220:19
**safe**   104:3
**safeguard**   84:5
85:21 98:20
100:3
**safety**   46:25
169:6,7,10
175:2,4,9,16,21
176:8

**saif**   240:5
**sake**   26:6
**salaried**   216:18
**salary**   215:13
216:9,12,14
217:14,25
218:2,4,24
**sales**   145:6
**sat**   11:3
**save**   103:8
**saw**   22:3 91:11
103:23 114:1
149:25 159:22
164:8 202:2
211:13
**saying**   19:8
24:7 41:14,19
47:8 57:22
58:19 59:11
63:3 67:23
68:5 78:23
81:15 87:3,12
87:18 89:25
110:16 119:2
127:17 132:18
137:4,15
138:20 141:12
141:24 142:5
149:16 151:4
161:12 163:18
165:15 166:5
166:20 173:5
174:21 175:24
179:20 180:9
191:5,10

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 113 of 129

CONF Tahir Shareef    February 22, 2023
G.W. v. Northbrook Industries, Inc.

[saying - see]    Page 47

| | | | |
|---|---|---|---|
| 196:14 199:16 | 237:14 243:13 | 177:20 | 66:11,16,18,21 |
| 205:10,16 | 243:17 | **secure** 146:3 | 66:24 68:11,14 |
| 208:16 214:2 | **scare** 207:15 | **security** 57:5 | 68:19 69:1,5 |
| 218:3 245:20 | **scared** 169:18 | 71:25 89:24 | 69:14,24 70:3 |
| **says** 17:25 | 169:21,23 | 90:3,6 93:11 | 72:22 75:5,11 |
| 24:22 51:25 | 206:3 208:21 | 93:16 94:3,22 | 75:14,20,25 |
| 52:13 55:20,23 | **scenario** 201:5 | 95:2 96:13,18 | 80:7,23 83:14 |
| 56:1,16,20,21 | **schedule** | 96:20,21 97:1 | 83:16,21,24 |
| 57:5,10,15 | 142:13,14 | 97:7,15 103:6 | 84:3,18 85:7 |
| 58:9 61:15 | 187:21 | 103:10 104:11 | 85:20 86:3,6 |
| 66:13,19 68:11 | **scheduled** | 111:25 112:3 | 86:16 88:22,22 |
| 68:16,21 69:9 | 183:6 | 113:24 126:1,5 | 93:23 95:15 |
| 69:14,21 70:1 | **schofield** | 127:1 143:14 | 98:22 99:7,8 |
| 73:1,4 75:5,20 | 119:22,24 | 145:13,15 | 99:10 100:11 |
| 82:1 85:20,24 | **school** 207:1 | 146:12,17 | 104:7 106:19 |
| 85:25 86:5,9 | **scope** 108:11 | 147:12,21,25 | 108:14 114:20 |
| 106:22 108:7 | **screen** 158:4,6 | 148:1,3 152:21 | 114:25 115:22 |
| 109:9,11 115:1 | **seal** 251:20 | 153:7,13,14,18 | 116:2 117:8 |
| 115:8 116:20 | **search** 161:24 | 153:19,22,24 | 118:6,10,21 |
| 118:12 127:5 | 162:8,13,25 | 154:2,6,7,8,8 | 119:1,21 |
| 128:23 135:18 | 163:24 164:17 | 154:16,20 | 121:14,15,16 |
| 135:20,23 | 165:24 166:4 | 155:8,21 156:2 | 123:24 124:15 |
| 138:6 139:8 | 166:10,21 | 179:10,24 | 131:15 135:5 |
| 140:10 144:3 | **searches** | 204:5,9 | 135:14 136:1,3 |
| 145:2 172:15 | 163:10 | **security's** 56:3 | 136:15 138:11 |
| 173:14 174:11 | **searching** | 201:24 | 140:21 141:5 |
| 175:4,15,17 | 161:22 | **see** 17:13,23 | 144:6 148:12 |
| 177:19 178:4 | **second** 56:12 | 52:25 55:16,19 | 149:15,21 |
| 194:9,14 | 80:11,16 83:20 | 55:22,25 56:8 | 150:22,24 |
| 195:18,21 | 83:22 161:18 | 56:13,18,25 | 157:4,15 |
| 197:2,8,24 | 172:11 174:10 | 57:9,13,15,18 | 172:15 173:22 |
| 198:4 203:2 | 177:18 197:7 | 58:21 60:1,17 | 173:24 174:13 |
| 204:8 206:2,17 | 219:22 245:8 | 60:22 61:3,12 | 175:5,22 179:4 |
| 208:19 215:5,9 | **section** 57:9 | 61:16 64:11 | 179:12 181:4 |
| 221:23 237:12 | 85:24 117:12 | 65:14,18 66:9 | 188:8 194:6,12 |

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[see - shareef]**

Page 48

| | | | |
|---|---|---|---|
| 195:2,18,23 | **sense** 12:13 | **several** 120:5,6 | **sexual** 116:10 |
| 196:2,11,20,24 | 14:23 191:18 | 131:7,7 | 116:23 145:7 |
| 197:5,10,17 | 206:4 | **sex** 52:9,10,13 | **sgrlaw.com** |
| 198:1,10,14 | **sent** 61:20 | 52:18,24 53:1 | 2:19 |
| 199:8 204:1,6 | 62:14 174:2 | 53:6,16,21 | **share** 37:14 |
| 204:10,16 | 252:14 | 54:1,3,14,22 | 241:22 |
| 205:21 206:1 | **sentence** 109:9 | 56:16,21,21,23 | **shareef** 1:16 |
| 212:7 213:1 | 207:13 | 56:23 57:11,23 | 6:7 7:13,17 |
| 231:25 232:8 | **separate** 15:18 | 58:4,7,17 59:1 | 10:4 13:16 |
| 232:22 237:16 | 221:3 | 59:10 101:6,8 | 15:10,25 16:9 |
| 242:24 243:14 | **sergeant** 83:21 | 105:12,13,14 | 16:18 17:9 |
| 243:16,17 | 83:24 84:1 | 105:15,17,18 | 18:18 26:5,18 |
| 245:8 | 127:17 148:13 | 106:8 107:1,2 | 33:20 37:18 |
| **seeing** 120:23 | **series** 12:5 | 107:13 109:20 | 41:7 43:24 |
| 208:25 211:11 | 177:24 204:15 | 110:12,14 | 45:12 48:17,23 |
| **seek** 185:1 | **seriously** 7:3 | 115:9 122:2 | 50:19 51:9 |
| 188:14 | **served** 9:1 | 123:16,21 | 55:17 59:13 |
| **seem** 130:1 | 74:20 | 124:4,18 125:9 | 63:5 65:16 |
| **seems** 82:6 | **service** 93:5,9 | 126:7,24 | 72:19 74:15 |
| 104:2 213:4 | 113:12,13 | 127:10,23 | 83:14 85:4,17 |
| **seen** 17:3 18:12 | 198:1,5 199:25 | 128:5 140:18 | 90:2 98:8 |
| 41:9 74:23 | 200:4 | 188:4,4,9,13,22 | 103:9 104:1,21 |
| 105:3 114:23 | **services** 156:7 | 189:10 195:7 | 109:3,16 |
| 115:24,25 | 194:19 198:16 | 195:13 196:13 | 114:20 115:20 |
| 144:20 160:7 | 198:18 249:17 | 197:14 199:6 | 116:21 117:7 |
| 173:21 174:1,2 | 250:3 | 199:12,19 | 118:7 122:20 |
| 184:14 211:6 | **serving** 206:17 | 200:22,25 | 126:20 129:20 |
| 211:10,12 | **session** 46:12 | 201:6,7,13 | 130:16 133:7 |
| 212:2,5 | **sessions** 183:6 | 202:4,19 203:8 | 134:3 135:15 |
| **sell** 136:13 | 183:14 | 203:16 204:19 | 137:21 138:18 |
| **send** 18:15 | **seven** 49:13 | 205:1,13,15,17 | 155:4 166:24 |
| 113:6,8,8,11,15 | 69:8 77:6 | 205:18 206:7 | 169:16 172:7 |
| 173:1 | 81:23 82:18 | 207:7,8 208:6 | 172:15 173:5 |
| **sending** 113:1 | 147:12 209:8 | 211:3,21 | 177:19 181:16 |
| 113:7 211:18 | 222:20 | | 182:22 183:1 |

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 115 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[shareef - slide]

Page 49

186:25 189:6
190:18 193:22
195:5 197:12
200:24 205:11
206:21 208:3
212:16 214:12
220:4 221:11
223:20 225:5
231:22 243:4
243:18 245:12
246:13 247:13
247:15 248:3
252:5 253:2,24
254:2,4,12
**shareef's** 14:17
**shareholders**
239:16
**shares** 24:5
**sharif** 8:8
**sheakh** 228:2
**sheet** 252:11
**sheets** 194:25
**sheriff** 102:19
**shift** 48:25 49:1
49:6,9,13,15,17
49:21 77:2,7
94:9,13 95:21
96:5,5,9,12
97:21 138:24
139:23,24,25
148:19,20,21
151:7,11 157:1
168:16
**shifts** 84:6
97:24,25 98:14

98:15,16
150:15
**shoes** 199:5
**shootings**
101:16,19
**shop** 86:14
209:13
**short** 141:16
**shorthand**
251:12
**shortly** 222:19
**show** 114:14
115:15 135:10
138:1 144:11
165:5 166:21
**showing** 16:17
55:11 65:13
79:23 85:9
117:2,21 144:1
157:16 171:21
210:24 211:19
212:10 213:22
231:18 232:2
242:11
**shown** 18:9
**shows** 53:4
157:1 168:14
**shut** 32:18,21
32:25 50:5
**sic** 143:11
145:16 156:15
**side** 29:2
140:11 194:6
**sign** 172:24,25
198:15 199:20

199:22,25
202:13 244:23
252:12
**signature**
172:14,17,19
173:5,6,9,13,15
173:17 243:21
243:23 244:2,3
244:6,10,11
248:13 249:23
250:23 251:23
**signatures**
244:14
**signed** 24:24,24
83:24 172:21
179:15 181:25
182:1,3,5
252:20
**significant**
68:12 194:14
195:6
**significantly**
196:17,23
**signing** 244:17
**signs** 53:20,25
83:21 184:2,19
194:16,24
195:18,23
197:25 198:6
198:14 199:11
199:18 204:4
**similar** 74:21
189:12,14
217:4

**simple** 116:3
117:11
**single** 167:20
**sir** 7:24 8:2,5
10:4 11:1 12:5
12:11,23 15:15
17:19 20:17
66:18 67:8,10
79:1 94:9
116:5 121:23
145:14 153:17
198:13 243:15
**sister** 226:21,22
**sister's** 226:11
226:13
**sit** 149:14
189:20
**sitting** 67:22
127:14 141:7
149:15 150:22
189:23 204:2
**situated** 87:14
149:12
**situation** 85:25
**six** 82:17 84:7
110:8 133:14
163:19 165:6
206:14 222:18
**sleep** 142:20,22
157:9,11
**sleeping** 143:12
150:12,25
**slide** 68:11 69:8
69:8 72:18
81:23

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 116 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

Page 50

[slightly - standing]

slightly   54:5
  129:19 213:25
small   171:14
smell   198:20
smith   2:10,16
  6:18
smoke   76:9
  82:21 160:4
smoking   76:9
  160:2,3 184:18
sold   21:4,6
  44:11
sole   37:3 233:3
  233:4,6 239:21
  241:4,13
solely   222:1
solutions
  252:23
somebody
  33:13 40:13
  41:14,18 42:2
  42:4 50:12
  54:14,22,24
  77:11 95:15
  107:6 110:19
  129:16,18
  131:22 133:16
  134:13 136:13
  141:12 155:14
  157:7 167:24
  168:22,23
  174:8 175:25
  176:1 178:7
  179:2 182:4,7
  186:18,25

201:15 205:11
somebody's
  79:18 106:3,21
son   223:21,22
  226:11,13
  234:22
soon   130:15
sorry   14:5
  18:22 35:11
  38:24,24 62:10
  116:7,14
  137:12 143:16
  143:19 148:8
  175:12 178:3
  178:18,22
  211:18 237:3,8
  238:3 247:15
sort   11:7 15:11
  94:13 200:13
  200:15
sounds   49:5
  72:17 183:5
  200:12 223:15
  236:19
south   68:25
  69:5
southeast
  252:15
spanish   186:7,8
  186:18 225:22
speak   67:13
  186:1,6,6,8,10
  186:11,12,19
  225:22

speaks   186:3
  186:18
specific   108:18
  108:19 123:23
  141:4 195:12
  235:21 249:15
  250:5
specifically
  60:8 75:1
  188:3 203:15
spend   234:13
  235:11,13
spending   63:5
  234:15 236:10
spent   34:22
  164:11,18,20
  164:24 233:24
  237:19
spill   89:11
split   147:7
  233:21,23
  234:1,8,11,21
spoken   13:13
stacked   203:3
staff   29:16,16
  29:23 35:1
  40:20,23 46:25
  49:3,4,11,22
  50:21 51:4
  63:19,25 65:7
  76:20 93:14
  102:12,22
  103:20 121:15
  121:17 132:5
  138:6,19,21,25

139:16,21
  140:3 141:1,7
  143:12 146:4
  168:9 169:8
  176:12,14
  183:6,9,15,17
  183:21,23
  184:6,11
  185:12,14
  186:16 187:5
  188:24 189:8,9
  189:16,20
  191:7 192:8,16
  193:4 195:19
  198:1,5,18
  201:21 204:6,9
  214:23 215:12
staffing   97:10
stairwells
  132:9 145:7
  188:23
stake   20:23
  23:16 24:17
  217:22
stamped   55:12
  83:7 114:15
  115:20 117:3
  117:22
stand   138:7
  139:12
standing   14:2,9
  95:16 132:8,15
  139:2,3,7
  151:18 156:22
  157:5,8 158:10

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

**[standing - suites]**

Page 51

| | | | |
|---|---|---|---|
| 184:16 | 206:14 207:14 | 61:17,20,22,25 | 228:20 |
| **star** 141:10,11 | **stays** 25:20 | 62:2,7,10,24 | **subject** 84:4 |
| **start** 8:9 12:12 | 27:4 161:18 | 64:6 67:18 | 108:12 109:9 |
| 12:17 43:23 | 165:6,8,10 | 72:9,12 74:7 | 222:2 |
| 184:18 222:19 | 166:3 219:15 | 78:19 85:11 | **submitted** |
| **started** 14:5 | 220:9 | 89:12,21 97:19 | 249:7,9 250:9 |
| 152:14 187:22 | **steering** 66:10 | 98:2,5,8 99:15 | 250:11 |
| **starts** 80:17 | **step** 127:7 | 105:25 108:1 | **subscribed** |
| **state** 4:7,9 6:23 | **steps** 111:15,19 | 116:11,15,18 | 254:14 |
| 8:7 69:22 82:3 | 114:5 129:6 | 117:23 118:2 | **substances** |
| 210:5,6 231:23 | 130:2,10,12 | 123:4 125:12 | 13:21 |
| 232:6 251:3 | 195:12 | 128:20 131:11 | **substantially** |
| **stated** 57:23 | **steven** 3:14 | 137:10,13 | 74:21 |
| **statement** | 83:15,17 | 175:10,12 | **substituting** |
| 30:22 57:7 | **stipulated** | 178:13,18,22 | 234:25 |
| 195:9 196:6 | 248:11 | 180:15,17,20 | **sudden** 133:14 |
| **states** 1:1 | **stop** 12:22 13:5 | 182:14 199:13 | **sue** 51:15 |
| **station** 85:21 | 69:15 89:22 | 201:1 202:21 | **sued** 51:17 |
| **stations** 86:1 | 132:6 162:16 | 204:20 207:10 | **suggest** 82:7 |
| **stay** 28:15 | 162:18,19 | 208:8 209:6 | 152:20 155:22 |
| 66:10,15 80:5 | 168:6 194:10 | 210:11,16,20 | 200:25 207:7 |
| 117:16 132:17 | 194:15 | 212:21,25 | **suggested** |
| 132:24 135:22 | **stops** 89:17 | 221:16 237:2,8 | 152:19 156:2 |
| 139:5,14 160:4 | 162:16 | 245:12,15 | **suggestion** |
| 164:14 165:7 | **store** 32:3 | 246:7 248:3 | 154:13 |
| 184:22 186:20 | 85:21 | 252:1 | **suggestions** |
| 199:4 200:20 | **stores** 84:7 86:1 | **strategy** 66:10 | 154:5 |
| 203:4,6 210:5 | **story** 2:9 6:16 | **street** 1:19 2:5 | **suit** 148:15 |
| 234:4 | 6:17 7:4 8:23 | 2:11,17 166:7 | **suite** 1:19 2:5 |
| **stayed** 162:6,9 | 9:9 13:25 14:4 | **strictly** 32:12 | 2:11,17 |
| 162:13 163:20 | 15:2 16:9,14 | **strives** 56:6 | **suites** 1:8 6:6 |
| 163:25 235:9 | 16:22,25 17:2 | **stroll** 142:1 | 6:20 7:8,23 |
| **staying** 159:7 | 17:5 26:5,10 | **structure** 73:2 | 10:6,16 15:21 |
| 163:15 165:13 | 26:13 52:3,20 | **stuff** 79:12 | 16:4 18:1 |
| 199:3 203:9 | 59:3 60:13 | 110:25 132:4 | 21:13,14,16,19 |

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 118 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[suites - take]                                                  Page 52

22:2 23:14,17
25:2 27:20,24
28:2,11,15
29:12 31:11
33:21 34:9,16
36:11,14,18,22
37:9,10,23
38:4,7,14 39:7
39:13 40:13
44:22,23 48:18
50:9,21 58:13
59:23 60:9
62:23 64:5,17
67:4,24 69:4
70:6 72:20
73:12 75:8
76:12,17 77:7
77:19 80:10,19
82:11 84:21
85:6 86:21
87:13 89:1,7
89:10,11,16,17
89:19 90:16,20
92:15,23 95:20
95:24 99:2,14
100:17 101:6
101:13 105:12
105:16,19
107:14,21
109:17 112:21
115:13 116:25
117:19 118:20
118:25 120:17
120:21 122:10
122:14 124:5

124:19 125:11
127:5,11,24
128:19 130:7
130:20 146:17
147:21 155:8
156:16 167:3
168:6,15 177:8
177:10 188:16
211:3,22
212:17 213:6
213:20 220:23
220:23 238:6
246:22 252:4
253:1 254:1
**summary**  84:16
116:21
**sun**  140:20
**supervise**  29:23
50:14
**supervised**
63:19
**supervises**
50:12
**supervising**
50:10 51:4
**supervision**
251:13
**supervisor**
84:15
**supply**  228:20
228:20,21
**support**  222:1
222:6
**supposed**  40:1
55:5 159:23

**suppression**
85:22
**sure**  11:10
12:14 15:5
17:3 73:19
126:23 127:22
146:13 163:17
165:22 183:12
199:18 219:23
225:20 235:2
**surprise**  120:13
124:20,21
130:22,24
131:10
**surprises**  122:6
122:19
**surrounds**
89:10
**surveillance**
130:11 145:19
157:12,16
158:1 159:19
214:4,5
**suspicious**
110:24
**swear**  7:11
**swipes**  198:22
**sworn**  7:14
251:9 254:14
**syed**  232:22
**system**  95:13
136:8 161:1,4
161:17,21,22
161:25 162:2
162:15,17,25

163:2,7,11
164:13,17
165:8 166:16
168:3,4,8,10
190:3,4,5,9

**t**

**t**  251:1,1 253:3
253:3
**table**  86:9
**tahir**  1:16 6:7
7:13 15:25
35:10 38:22
48:17 109:16
243:18 247:11
247:13 252:5
253:2,24 254:2
254:4,12
**take**  27:3 29:14
29:15 31:18
35:1 48:7,22
52:9 53:3
56:12 63:22
72:14 74:5
83:6 90:12
107:19 108:4
111:4,6,11,16
111:19 114:4
121:9 122:19
127:7 129:6
130:2,14
133:21 134:14
141:2 179:2
182:14,16
185:6 191:3
194:5,9 195:13

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 119 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[take - testimony]                                                    Page 53

| | | | |
|---|---|---|---|
| 195:16 197:23 | 176:12 201:17 | **technical** 10:13 | **telling** 88:21 |
| 204:3 216:9,11 | 209:11 222:12 | **technology** | 111:2 119:14 |
| 219:17 220:12 | 222:18 242:17 | 198:22 | 125:17,18 |
| 221:5 | 244:4 246:15 | **teen** 171:15 | 126:25 128:23 |
| **taken** 8:10 9:1 | 246:16 | **teenager** | 132:23 141:22 |
| 9:3 11:1,2 | **talking** 10:5,17 | 171:10 | 152:4 |
| 74:10 104:13 | 12:22 26:23 | **telephone** | **ten** 66:19,25 |
| 133:25 182:19 | 31:6,7,7 34:7 | 221:24 | 84:7 125:10 |
| 211:1 220:1 | 34:14 61:7,11 | **tell** 20:9,13 | 131:16 235:19 |
| 246:10 251:6 | 62:17 64:7 | 28:20 40:1,22 | **tendency** |
| **takes** 107:11 | 82:15 87:6 | 54:20 76:5 | 132:16 |
| **talk** 30:24 31:1 | 97:10 100:24 | 82:19,19 95:18 | **term** 52:10,14 |
| 31:3,4 46:24 | 101:1,7 102:22 | 99:20 100:12 | 52:24 53:2 |
| 47:21 102:14 | 104:9 105:2 | 100:14 108:22 | **terms** 24:17 |
| 102:15,17,18 | 138:15 139:7 | 109:23,25 | 99:3 158:21 |
| 104:9 106:14 | 141:1 142:13 | 110:2,23 111:1 | 164:23 192:15 |
| 110:3,11,17 | 143:11 150:3 | 111:7 121:8,18 | **terrible** 194:15 |
| 113:10 128:7 | 170:6 171:7,13 | 126:1 127:3,21 | **testified** 7:15 |
| 138:20 139:1,1 | 183:18 184:17 | 128:2 139:3,13 | 106:5 107:12 |
| 139:10,25 | 193:14,24 | 141:23 151:14 | 125:8,16,17,18 |
| 141:5,19,20 | 220:5 227:19 | 151:16 157:10 | **testify** 65:8 |
| 146:15 150:23 | 229:5 | 159:24 160:2,4 | **testifying** |
| 151:14 154:3 | **talks** 72:21 | 164:14 171:16 | 120:20 128:17 |
| 160:6 176:9,11 | 80:10 | 184:21 185:6 | **testimony** 9:7 |
| 182:25 185:11 | **tampons** | 185:14,17,21 | 13:17 14:18 |
| 186:17 187:3,5 | 209:18 | 187:9 188:6,12 | 15:19,24 16:2 |
| 187:12 188:6 | **target** 84:8,10 | 191:2,2 192:15 | 64:15,22 65:4 |
| 189:9 190:2 | 84:14,21 | 193:1 197:20 | 68:7 86:18 |
| **talked** 63:19 | **targeted** 86:24 | 199:24 200:5,7 | 104:20,23 |
| 99:1 103:21 | **task** 118:16 | 200:10 203:7 | 106:3 128:1,22 |
| 110:15 119:6 | **tat** 109:19 | 203:18,21,23 | 155:4 179:14 |
| 127:14 130:14 | **tax** 164:15 | 203:25 204:2 | 183:4 251:6,11 |
| 130:15 138:23 | **team** 78:24 | 204:25 205:25 | 251:16 252:9 |
| 138:25 145:13 | 81:17 118:18 | 212:16 247:2 | 252:18 254:8 |
| 146:11 150:19 | | 251:9 | |

| | | | |
|---|---|---|---|
| **texaco** 84:12 | **think** 15:10 | 241:14,21 | **tickets** 73:23 |
| **text** 30:25 | 16:23 18:14 | 242:11 244:9,9 | **tie** 148:15 |
| 150:17 151:4,6 | 33:19,19 47:6 | 244:20 245:17 | **time** 6:2 9:15 |
| 152:17,18 | 47:8 52:17,22 | **thinking** | 14:12,21,24 |
| 240:17,20 | 54:7 71:5,13 | 193:16 | 19:20 21:24 |
| **thank** 7:10 | 77:1,16 78:2 | **third** 28:19,24 | 23:18 25:7 |
| 16:14 26:16 | 78:24 79:2 | 172:12 174:25 | 32:12 34:12,22 |
| 84:16 143:22 | 83:1 89:15,18 | 175:1,2,7,8 | 35:23 38:14 |
| 172:2,4 182:24 | 90:1 93:22 | 230:22 | 39:1 40:18 |
| 228:24 237:10 | 95:17 96:4 | **thought** 39:12 | 44:9,21 45:3 |
| 248:2,4 | 97:21 101:16 | 54:15 66:4 | 45:24 46:9,14 |
| **thanks** 14:22 | 101:20 102:8 | 94:13 103:5 | 46:16 49:12 |
| 62:9 117:24 | 103:7,16 | 126:21 152:9 | 50:19,20 58:12 |
| **thereof** 251:19 | 107:17 109:2 | 152:11 171:13 | 58:22 59:6,13 |
| **thick** 168:19 | 110:5,14,23 | 240:22 | 59:15,19 63:24 |
| 169:5 209:11 | 126:25 130:7 | **three** 7:20 8:17 | 64:19,20 70:13 |
| **thing** 30:6 40:4 | 132:18 135:2 | 9:17 48:20 | 70:18,24 72:13 |
| 52:16 53:6 | 141:15 145:2 | 51:14 56:14 | 73:10,22 76:14 |
| 73:18 107:5 | 149:21 152:19 | 58:16 60:21 | 84:20,25 85:3 |
| 108:21 109:25 | 154:18 155:19 | 97:24 98:14,15 | 86:20 87:25 |
| 114:9 126:10 | 164:17 165:21 | 145:8 147:8,9 | 92:2 93:3,4,6,9 |
| 127:6 128:10 | 166:13,20,23 | 163:21 172:12 | 93:10 94:1 |
| 132:4 141:12 | 167:5 174:20 | 174:11,12,16 | 98:3,5 99:25 |
| 145:3 148:24 | 176:15 177:13 | 174:17,22,22 | 100:4,13,16 |
| 150:7,8 156:23 | 179:14 180:3 | 175:8 178:5,25 | 106:18 108:11 |
| 180:2 186:25 | 182:1 185:20 | 186:19 206:12 | 108:19 110:9 |
| 187:9 190:25 | 193:11 197:17 | 206:15,16 | 113:21 114:1 |
| 191:4 200:15 | 200:12 201:4 | 222:15 235:9,9 | 119:2 120:7,19 |
| 235:16 | 201:12 202:15 | 240:23 241:1 | 120:25 122:4,9 |
| **things** 8:8 31:7 | 205:10 206:20 | **throw** 132:3 | 122:15 125:4 |
| 53:20 54:8,9 | 208:13,25 | **thugs** 140:15 | 126:19,19 |
| 155:16 184:7 | 210:11 212:2,8 | **thumbs** 13:11 | 129:24 130:23 |
| 184:10 185:11 | 212:21 214:11 | **ticket** 82:20,23 | 130:25 137:16 |
| 185:13 189:7 | 224:2 229:4,18 | 82:23 | 139:22 140:2 |
| 189:10 201:22 | 229:22 240:9 | | 140:12 142:9 |

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

**[time - trafficking]**                                                    Page 55

| | | | |
|---|---|---|---|
| 142:14 143:3 | 102:6,7 110:5 | **tomorrow** | 196:19 214:6,8 |
| 146:24 147:17 | 110:8,11,21 | 133:17 199:23 | **towels** 198:17 |
| 147:20 148:4 | 113:5 121:2 | 199:23 | 203:13 |
| 149:7,11,13,16 | 126:8 165:16 | **took** 46:12 | **traffic** 110:24 |
| 150:5 153:3,17 | 235:10 240:23 | 134:16 146:3 | 121:11,14 |
| 156:22 159:20 | 241:1 246:22 | **toolkit** 3:7 | 185:23 |
| 161:25 162:10 | **timing** 15:1,3 | 55:23 | **trafficked** 59:2 |
| 163:1,5 166:10 | **tire** 133:16 | **top** 55:19 56:14 | 59:10 208:6 |
| 167:20 168:25 | **tires** 133:9 | 66:24 83:20 | 211:3 |
| 169:24 170:21 | **title** 30:3 36:8 | 85:20,25 86:6 | **trafficker** |
| 174:12,12,17 | **today** 6:22 8:5 | 86:7 98:21,22 | 166:6 |
| 174:17,19 | 8:10 10:5,12 | 99:9 105:6 | **traffickers** |
| 177:6 183:7,15 | 11:11,19 12:2 | 115:1 116:2 | 166:7 196:1 |
| 185:18 188:2 | 12:5,9 13:16 | 117:10 164:22 | **trafficking** |
| 191:17 192:3 | 13:22 15:23 | 167:4 175:1,14 | 52:11,13,18,24 |
| 199:2 200:17 | 18:13 51:9,12 | 177:19 243:14 | 53:1,6,17,22 |
| 202:16 207:14 | 84:21 85:3 | **topic** 18:3 | 54:1,3,14,23 |
| 211:15 217:6 | 86:19 120:19 | 193:6,7 | 56:4,16,21,22 |
| 220:3 223:8,10 | 120:24 129:15 | **topics** 17:21 | 56:24 57:12,23 |
| 224:20 227:17 | 133:17 136:3 | 18:7,12 53:8 | 58:5,7 105:13 |
| 233:21,24 | 141:6,6 183:4 | 53:12 | 105:15,18 |
| 234:1,8,11,14 | **today's** 8:20 | **total** 26:24 | 106:9 107:2 |
| 234:15,16,19 | 9:20 18:9 | 66:19 234:19 | 109:20 110:13 |
| 234:21,22 | 59:14 | **totality** 200:14 | 110:14 188:4,9 |
| 235:11,14 | **together** 14:16 | 200:23 | 188:13 193:10 |
| 236:10 237:19 | 42:25 43:1,1 | **totally** 79:5,5 | 194:10,16,17 |
| 239:7 243:8 | 147:2 183:7 | 81:18 | 194:19,24 |
| 244:21 248:7 | 189:25 192:15 | **touch** 82:22 | 195:7,7,13,18 |
| 249:16 250:6 | 192:17,18,19 | **tough** 104:8 | 195:23 196:14 |
| 251:7 252:19 | **told** 54:24 63:4 | **tourism** 47:6 | 197:14,25 |
| **timeframe** | 77:1 94:8,20 | 47:10 66:5 | 198:6,7,9 |
| 252:8 | 126:22 145:14 | **tow** 133:17,17 | 199:12,19 |
| **times** 14:25 | 150:10 189:8 | 133:18 | 200:11,25 |
| 26:20 47:2 | 226:4,4 246:20 | **towards** 80:11 | 201:6,7,14 |
| 87:10 88:2 | | 80:16 194:7 | 202:1,4,20 |

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 122 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[trafficking - uh]                                                           Page 56

203:8 204:4,12
204:19 205:1
205:14,15,17
205:19 206:8
207:7
**train** 168:9
183:17 186:15
187:22 189:16
201:21
**trained** 45:16
81:10,12
183:20 191:24
**training** 45:13
45:20 46:3,6,9
46:10,11,17,21
46:25 47:9,20
50:21 54:16
183:1,6,14,25
184:2,6,11
187:13,19
188:3 191:13
192:7 193:4
194:23 203:18
**trainings** 46:20
47:4,15,18,24
53:9,19 54:8,9
55:9 66:3
124:2 187:14
187:17 189:16
190:18 191:6
201:18
**transcribed**
251:13
**transcribing**
11:14

**transcript** 4:24
9:24 104:17
119:23 249:5,6
250:7 252:6,20
254:5,8
**transcription**
251:14
**transcripts**
250:7,12
**translated**
186:21
**transpired**
151:10
**trash** 132:3
**travel** 40:6
44:15,24
**traveled** 210:5
**travels** 28:13
37:25
**trespass** 117:11
185:9
**trial** 14:16,21
106:14 155:3,5
235:17
**tried** 166:2
**troubled** 69:9
**true** 18:6 27:14
27:16 36:10
40:16 58:19
59:22 67:1,23
77:4 92:12
94:16 95:8
97:12,16 122:3
147:1 187:25
190:12 215:15

216:24 225:12
227:13 228:4
246:25 249:6,8
250:8 251:15
254:8
**trust** 86:13
115:24
**truth** 251:9,10
251:10
**try** 111:16,22
114:5 125:23
126:5 129:6
130:2 135:8
136:13 137:10
137:13,23
141:2 146:5
153:21 184:21
**trying** 21:20
48:10 62:11
102:5 109:3
185:15 202:1
229:1 234:10
235:23 236:23
237:7
**tucker** 85:21
86:6,11 98:22
99:9 100:3
105:1,8,9
**tuesday** 129:23
**turn** 117:12
140:18 154:17
**twice** 81:6
167:23 169:17
169:19 206:10

**two** 17:20 19:6
60:21 70:16
71:5 97:25
101:6,9 104:10
115:5 133:18
139:23 141:9
146:16 147:16
148:9 151:16
159:6,15,15
160:23 164:7,7
175:3 182:1
187:24 197:13
203:6 206:14
212:18,19
223:12 233:21
234:1 244:14
247:7,8,21
**type** 24:3 60:20
112:16 115:2
116:3 117:10
118:9 125:2
127:6 185:4
201:14
**types** 184:10
**typical** 77:7
**typically** 94:8
150:12 198:5
204:9

**u**

**u.s.** 56:2
**uh** 13:4 15:14
17:18 54:6,17
55:21 56:9,15
56:17 57:19,25
59:21 60:7,10

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 123 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[uh - unmarked]                                                    Page 57

66:17 67:7
68:8 80:18
83:25 91:3
94:17 95:4
105:4,10
114:22 130:17
136:23 153:9
156:10 164:4
167:13 175:19
176:20 177:21
186:14 189:3
193:23 194:11
201:20 202:5
209:21 216:21
219:6 222:21
235:25 237:2
244:15
**under** 9:3
11:18 13:20
56:21 57:10
58:3,11 64:24
107:12 124:16
128:1 171:4,9
171:18 193:13
196:10 209:3
249:14 251:13
**undercover**
115:5,10
**underneath**
66:13 86:9
195:21 196:8
237:13
**understand**
7:24,25 10:4
11:15,16,17,20

11:25 12:7
13:7 15:15,21
16:4 17:15
48:10 51:17,22
51:23 52:14
53:15,25 58:10
58:14,15 87:23
105:7,21
106:15,15
120:11,16
194:24 202:1
229:3 230:20
235:23 238:22
245:19
**understanding**
23:4,5 25:25
51:8,11,20
97:23 98:11
151:8 181:16
205:20 241:14
**understood**
61:24 145:14
146:23 152:20
183:4 226:18
233:16 247:25
**undescribable**
145:4
**unfair** 79:5,5
**unified** 56:2
**uniform** 71:14
148:5
**unincorporated**
69:22 82:2
**unit** 118:15
122:5 124:12

**united** 1:1,7 6:6
6:19 7:8,23
10:6,13,16,16
15:20 16:3
18:1 21:12,14
21:15,19 22:2
23:13,17 25:2
27:19,23 28:1
28:11,14 29:11
31:10 33:21
34:8,16 36:11
36:14,17,22
37:9,9,22 38:3
38:7,14 39:7
39:13,21,25
40:9,10,13
44:22,22 48:17
50:9,21 58:13
59:23 60:8
62:23 64:5,16
67:3,24 69:3
70:5 72:20
73:12 75:7
76:11,17 77:7
77:19 80:10,19
82:11 84:13,21
85:5 86:7,21
87:13 88:25
89:6,10,11,16
89:17,18 90:15
90:19,21 92:15
92:23 95:20,23
97:25 98:21
99:2,9,13
100:17 101:5

101:13 105:6,7
105:11,16,19
106:9 107:14
107:21 109:16
112:21 115:13
116:24 117:15
117:19 118:20
118:24 119:25
120:1,10,17,20
122:2,10,14,17
124:5,19
125:11 127:5
127:10,23
128:6,19 130:6
130:20 145:3
146:17 147:21
155:7 156:16
167:3 168:5,14
177:8,10
188:16 211:3
211:22 212:16
213:6,20
220:22,23
221:1 232:13
233:9,17,18
238:6,12
246:21,23
252:4 253:1
254:1
**unitedinn4649**
112:24
**units** 84:6
**unmarked**
149:20

Case 1:20-cv-05233-SEG    Document 86-28    Filed 10/12/23    Page 124 of 129
CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

[unnecessary - want]                                                    Page 58

**unnecessary** 133:12

**unusually** 132:20

**update** 30:15

**uploaded** 250:13

**usable** 237:24

**use** 13:10 32:5 53:13 67:14 104:11 112:25 113:1,15,21 125:23 129:22 220:17 222:1,6 237:18,23 242:4,7

**used** 36:17 43:4 53:16 124:4 126:6 127:9 128:5 181:22 198:15 202:13 220:25 252:20

**using** 48:14 125:1 219:3

**usually** 71:14 142:16,18

**utilize** 125:4

**utilized** 66:19

**v**

**v** 252:4 253:1 254:1

**vacation** 207:3

**valet** 204:5,9

**various** 42:22 134:7

**vehicle** 131:16 133:13 149:23

**vehicles** 131:4 133:5,8,14

**verbal** 13:10,12

**verify** 192:3 252:9

**veritext** 249:4,7 249:14 250:2 252:14,23

**veritext.com.** 249:13 252:15

**vermin** 145:5

**version** 214:1

**versus** 32:10 233:24

**vice** 118:15 122:4 124:12

**victim** 54:14,22 57:11 58:4

**victim's** 194:22 194:22

**victims** 53:21 56:21 194:19 194:20,21 196:1 198:9

**video** 6:3 16:12 158:6

**videographer** 2:22 6:1 7:10 11:5 12:1 74:8 74:11 133:23 134:1 182:18 182:20 219:24 220:2 246:8,11

248:6

**videotape** 12:1

**videotaped** 1:15

**view** 57:23 70:11

**violated** 73:13

**violation** 72:21 78:9,14 81:9 133:12

**violations** 66:21 67:1 68:3,23 73:25 75:8,23 76:5 76:10,14,18,21 76:24 77:12,20 78:1,3,25 82:18,18 99:4 130:16,16,19 130:21

**vip** 164:9

**visibility** 68:18

**visible** 148:11 188:24 203:12

**visit** 133:10 135:22 177:10

**visited** 240:22

**visitors** 203:14 207:5

**vital** 194:21

**voice** 56:2

**volume** 203:14 207:4

**vouchers** 194:20

**vs** 1:6

**w**

**w** 22:10 216:3,5 216:6,22

**wait** 12:11,16

**waiving** 108:12 109:10

**wake** 143:3,4

**walk** 11:7 31:21,25 32:3 86:25 87:7 89:3 95:12 146:4 149:14 171:15

**walked** 115:8

**walking** 87:2 95:10 106:18 115:6 149:17 150:23

**wall** 76:7,7,8 158:12 193:14 193:15

**want** 14:9 16:11 24:6 31:3 56:20 72:9 81:20 97:19 104:19 104:21 107:4 110:25 119:15 135:10 145:2 146:13 161:21 169:5 181:5 182:25 185:7 192:19 193:20 194:4,5 199:22

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.
February 22, 2023

200:2 203:20
220:17 235:1
**wanted**  15:6
24:3 74:25
98:3 121:22
162:12 163:24
242:15 246:13
**ward**  2:16 7:3,6
7:6 8:24 9:10
15:5 64:18
77:14 83:4
87:19 88:14
89:20 132:21
142:7 153:1
154:22 171:25
182:17 197:15
201:9 210:13
210:15,19
237:4
**warning**  185:5
185:9
**warrant**  111:4
185:5
**watch**  95:14
109:23 110:1
**watching**  31:4
**way**  30:25 39:3
59:9 65:25
66:7 67:13,24
93:16 94:13
100:25 109:14
140:10 141:19
144:3 160:22
191:24 207:18
214:24 234:21

246:3
**ways**  154:19
**we've**  39:1 50:4
72:13 97:10,14
99:1 104:13
139:16 145:13
146:11 209:10
210:13 222:17
227:19 229:5
**weapon**  100:11
100:15
**weapons**
100:10 149:3
**wear**  148:3,4
**wearing**  197:18
197:21
**webber**  70:21
71:8 127:17,18
146:18 147:2
147:18 148:2
148:21 150:14
151:5 152:16
153:14,24
156:1,7
**website**  123:9
123:11,24
125:1 126:13
128:13
**websites**
123:14,20
124:4,12,14
126:24 127:2,9
127:12,22
128:5,19
134:17,20

**wednesday**
129:24
**week**  60:21,21
63:11 135:25
147:7,9 163:20
165:12,17
167:6,7 200:5
203:6 225:10
234:5,7 247:8
**weekly**  102:24
103:1,2 165:17
165:18 209:7
**weeks**  34:3
46:11 84:7
104:6,6 203:6
223:12 235:9,9
**welcome**
182:22
**went**  9:13
115:9 124:14
166:7 228:25
229:20
**west**  2:17
**white**  213:1
**wholesaler**
209:25 210:2
**wife**  28:10
37:22 40:4,9
48:15 50:8
63:13,25
169:21 203:9
207:17 216:16
222:23 223:20
225:6,7,14,16
225:22 229:12

230:6
**wife's**  65:4
**william**  2:9
245:10,10
252:1
**wind**  140:16
**window**  32:2,3
32:5,10,11,13
32:17,24 33:7
33:15 50:6,20
93:2 94:25
95:6 143:13
157:19,22,25
158:4,8,11
168:16,18
209:10
**witness**  7:12,18
7:25 8:3,6 10:8
10:10,19,22,24
11:2,6,16,20,24
12:3,8,14,19,24
13:4,7,14,18,23
15:14,22 16:5
16:7,13 26:9
26:12 52:5,22
59:5 60:15
62:4 63:1
64:19 67:20
77:15 78:21
83:5 87:20
88:15 89:13,22
98:12 99:16
106:1 108:2
116:16 123:6
125:13 128:21

CONF Tahir Shareef
G.W. v. Northbrook Industries, Inc.

February 22, 2023

**[witness - yeah]**                                                                 Page 60

| | | | |
|---|---|---|---|
| 131:13 132:22 | **work**  14:16 | 40:5 43:23 | **writing**  112:9 |
| 137:12 142:8 | 19:17,18 31:15 | 48:24 49:5,13 | 176:10 187:14 |
| 153:2 154:23 | 31:19 33:7 | 50:2,6,6 51:6 | **written**  24:12 |
| 180:16,18,21 | 37:16,18,20,22 | 56:4 63:10,14 | 24:18 72:7 |
| 182:12 197:16 | 38:1,3,7 39:20 | 63:17 65:25 | 83:2 112:15 |
| 199:14 201:2 | 40:1,13 44:6 | 70:17 71:4 | 136:21 187:19 |
| 201:10 202:22 | 49:11,19 70:22 | 76:10 77:6 | 191:20 |
| 204:22 208:10 | 70:23 71:16,21 | 79:13 82:21 | **wrong**  62:7 |
| 209:7 212:23 | 84:17 92:4 | 90:7 92:2 | 67:24 68:5 |
| 213:3 219:21 | 103:6 122:10 | 94:21,24 95:5 | 121:6 152:20 |
| 245:14,16 | 142:19 147:8 | 95:20,23,25 | 188:16 201:13 |
| 248:5,13,14 | 156:12 177:8 | 109:25 121:13 | **wrote**  73:23 |
| 249:9 251:16 | 187:2,7 190:1 | 122:1,12 | 82:20,22,23 |
| 251:20 252:8 | 215:12 216:2 | 124:11 129:13 | 84:3 |
| 252:10,12,19 | 223:11,16,23 | 143:13 145:15 | **wstory**  2:13 |
| **witnesses** | 223:25 224:10 | 146:17,21,24 | 252:2 |
| 250:11 | 224:18 225:2 | 147:2,15 148:3 | **x** |
| **woman**  101:5 | 225:18 226:24 | 148:14 149:6 | **x**  155:6 175:20 |
| 115:4,7 116:9 | 227:5,6,24 | 152:4,14 157:2 | **y** |
| 116:22 121:8 | 230:1,12 247:9 | 157:25 159:20 | **y**  155:6 175:17 |
| **woman's** | **worked**  21:9 | 169:10,24 | **yard**  49:11 |
| 117:16 | 38:14 39:13,15 | 170:4 180:2 | **yeah**  14:3 |
| **women**  58:16 | 40:9 45:5 | 187:23 224:15 | 16:25,25 17:5 |
| 111:8 122:1 | 48:17 50:9 | 224:15 225:10 | 19:16 20:5 |
| 124:15,18 | 94:8 97:15 | 225:19 236:13 | 21:8 22:20 |
| 128:18 211:25 | 103:25 124:18 | **works**  34:16 | 23:9 24:8,19 |
| **wondering** | 147:5 183:24 | 39:8,9 182:7 | 24:21 25:22 |
| 185:16 | 191:23 192:2 | 209:12 226:1 | 27:9,22 28:16 |
| **wood**  135:19 | 216:3,7 223:13 | **worried**  170:7 | 30:23 34:6 |
| **word**  52:6 | 224:5 226:7 | **worry**  141:18 | 47:13 48:3 |
| 151:21 | 229:16 246:21 | **worst**  67:25 | 50:17 53:4,4 |
| **words**  40:18 | 246:22 247:7 | 80:17 99:3 | 54:19,24 58:6 |
| 75:18 147:4 | **working**  19:21 | **write**  78:1 | 58:9,18 62:4,5 |
| 184:5 210:6 | 29:11,18 34:3 | 137:1 151:9 | 62:9 64:14,21 |
| 219:3 | 34:4,6 39:24 | 172:3 | |

**[yeah - zero]**                                                      Page 61

| | | | |
|---|---|---|---|
| 64:23,25 70:24 | 181:14 182:14 | 247:5,10,22 | **young**  58:16 |
| 71:13 72:6,17 | 190:14 191:9 | **year**  26:21,24 | **younger**  208:20 |
| 72:25 73:16 | 191:16,16 | 27:6 71:3,3 | **z** |
| 75:17 78:6 | 192:1,5,13 | 73:22 74:2 | |
| 81:13 83:23 | 193:17,19 | 79:4,4 80:21 | **z**  155:6 |
| 87:15 91:11 | 195:10 196:21 | 81:5,6 82:16 | **zero**  133:13 |
| 93:15 94:15 | 200:1 202:9 | 107:13 147:15 | 240:15 |
| 97:2,4,6 | 203:17 204:22 | 164:7,12,19 | |
| 102:11,11 | 207:9 213:3,14 | 167:22,23 | |
| 103:7,24 106:7 | 213:18,21 | 171:5 174:4 | |
| 106:13,15 | 214:7,10,14 | 180:13 218:10 | |
| 112:5,7 115:14 | 215:2,11,24 | 218:20 219:5 | |
| 116:18 119:1 | 216:1,5,17,19 | **years**  17:25 | |
| 120:23 127:20 | 219:20,20 | 19:6,15 26:20 | |
| 128:3 129:12 | 220:11,16,18 | 33:12 34:8,8 | |
| 134:16,25 | 223:14,18 | 59:17 71:2 | |
| 135:9 139:21 | 224:14,17,19 | 91:2 102:7 | |
| 142:21 143:7,9 | 224:24 225:11 | 110:10 120:7 | |
| 143:20,20,20 | 225:13,15 | 121:3,3 145:15 | |
| 143:20,20 | 226:3,4,6,8,15 | 153:25 160:23 | |
| 145:18 146:25 | 227:2,14,18,22 | 164:7 169:25 | |
| 147:19 149:2 | 228:5,7,9,23 | 176:4 178:6,25 | |
| 149:19,24 | 229:15,23 | 180:8 190:22 | |
| 150:5,9 151:3 | 230:5,18 | 191:8 192:10 | |
| 151:6,6,22 | 231:12 232:16 | 211:2 240:24 | |
| 153:2,6 155:16 | 232:20,25 | 240:25 | |
| 155:22 158:7,7 | 233:4,20,22 | **yelling**  184:19 | |
| 158:9 168:5 | 234:18,18,18 | **yelp**  3:24 | |
| 169:12,14,17 | 236:12,16,18 | 144:13,18,24 | |
| 170:3,5,5,24 | 236:20,22,24 | **yesterday**  7:1 | |
| 171:25 172:2 | 239:11,22 | 87:11 141:7 | |
| 173:8,9 176:1 | 241:1 242:18 | 149:25 150:19 | |
| 176:1,24 177:5 | 242:20 244:13 | 160:24 | |
| 177:7 179:17 | 244:25 245:2,8 | **york**  22:8,23 | |
| 180:15,20 | 245:10,23 | 23:2 25:13 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.