UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

J.G.,

               Plaintiff,

      v.

NORTHBROOK     INDUSTRIES,
INC. D/B/A UNITED INN AND
SUITES,

               Defendant.

CIVIL ACTION NO.

1:20-CV-05233-SEG

## <u>O R D E R</u>

      This case is before the Court on Defendant Northbrook Industries, Inc.'s motion for summary judgment (Doc. 103) and Plaintiff J.G.'s motion for sanctions (Doc. 86).

      At age 16, Plaintiff J.G. was trafficked for sex for over one month at the United Inn, a hotel owned and operated by Northbrook Industries, Inc. ("Northbrook"). In this lawsuit, J.G. brings claims against Northbrook for violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595, and for negligence under Georgia law. J.G. argues that Northbrook participated in a common undertaking with her traffickers and that Northbrook knew or should have known that she was being trafficked at its hotel. In its motion for summary judgment, Northbrook denies that it

participated in such an undertaking and that it had such knowledge. As for the negligence claim, Northbrook argues that J.G. was not an invitee on its property to whom a duty of ordinary care was owed. For the following reasons, the Court finds that Northbrook's motion for summary judgment should be denied as to the TVPRA claim but granted as to the negligence claim. The Court further finds that Northbrook engaged in discovery misconduct in this case for which it is appropriate to award a monetary sanction.

## I.   Background[1]

In August or September of 2018, J.G., age 16, met a man who went by "Shaq." (Doc. 105-1, J.G. Dep. at 22:9–12.) Shaq began trafficking J.G. for sex. (*Id.* at 25:22–26:1.) As of October 2018, Shaq was incarcerated. (*Id.* at 27:5–7.) But under Shaq's direction, Kevy, a woman J.G. met through Shaq, brought J.G. to the United Inn to "make money for Shaq[.]" (*Id.* at 26:2–9, 27:5–7, 29:15–21.) Kevy left J.G. at the hotel. (*Id.* at 28:20–29:9.)

---

[1] The facts in this section are drawn from the parties' statements of material fact, *see* LR 56.1(B), NDGa., and, as necessary, from the underlying record. The Court has viewed the evidence and drawn all factual inferences in the light most favorable to Plaintiff. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Where a party has objected to the materiality of an asserted statement of fact, it can be assumed that the Court has overruled such objection by including the fact herein. Where a party has objected to an asserted fact as not supported by the cited evidence, the Court cites directly to the relevant record evidence as opposed to the opposing party's characterization of it.

The next day, J.G. was alone outside the United Inn with "nowhere to go" when a man named King approached her and invited her to his room.  (Doc. 115-1, Pl. SOMF ¶ 7; Doc. 105-1, J.G. Dep. at 29:4–11, 47:7–19.)  King was renting multiple rooms at the hotel and appeared to live there.  (Doc. 115-1, Pl. SOMF ¶ 8.)  King began posting "ads" online for J.G. and trafficking her for sex.  (Doc. 115-1, Pl. SOMF ¶ 11; Doc. 105-1, J.G. Dep. at 50:8–51:21.)  King also carried a gun and was violent toward J.G.  (Doc. 115-1, Pl. SOMF ¶ 10; Doc. 105-1, J.G. Dep. at 76:9–77:11.)  J.G was trafficked by King at the United Inn for approximately one week before King "kicked [her] out of the room" for trying to keep some of the money earned through commercial sex work.  (Doc. 115-1, Pl. SOMF ¶ 13; Doc. 105-1, J.G. Dep. at 60:1–6.)

After being "kicked [ ] out" by King, J.G. was alone in a hotel hallway when she met a man who went by "Cash," who invited J.G. to his hotel room.  (Doc. 105-1, J.G. Dep. at 60:1–21.)  Cash then trafficked J.G. at the United Inn for the next four weeks.  (Doc. 115-1, Pl. SOMF ¶¶ 16, 18.)  Cash had "associates" who carried guns and threatened J.G.  (Doc. 115-1, Pl. SOMF ¶ 17; Doc. 105-1, J.G. Dep. at 76:9–77:5.)  Cash also sold drugs from his hotel rooms.  (Doc. 105-1, J.G. Dep. at 74:21–22.)  J.G. was trafficked by Cash until November 2018, when Cash was arrested.  (Doc. 115-1, Pl. SOMF ¶ 1; Doc. 105-1, J.G. Dep. at 61:5–13.)

3

In January 2019, J.G. was again trafficked for sex at the United Inn for approximately two to three days.[2]  (Doc. 115-1, Pl. SOMF ¶ 1; Doc. 105-1, J.G. Dep. at 37:13–20.)  During this period, she was trafficked along with three other minors.  (Doc. 115-2, N.S. Aff. ¶¶ 3–5.)

In total, J.G. was trafficked for sex as a minor at the United Inn for approximately six weeks, during which time she engaged in commercial sex with approximately 12 men per day.  (Doc. 115-1, Pl. SOMF ¶ 38.)

The record shows that some of the members of United Inn's staff had interactions with J.G., her traffickers, and other trafficking victims.  For example, J.G. would go to the front desk almost every day to purchase goods, including condoms, and to trade out towels.  (Doc. 105, J.G. Dep. at 95:20–97:24.)  She sometimes went to the front desk with her traffickers, and other times she went alone or with other trafficking victims.  (*Id.*)  Housekeeping staff often cleaned the traffickers' rooms when J.G. was present, and there were guns, condoms, and drugs left out in the room.  (Doc. 105-1, J.G. Dep. at 90–94.)  J.G.'s traffickers were "cool with everybody" who worked at the United Inn.  (Doc. 115-1, Pl. SOMF ¶ 51; Doc. 105-1, J.G. Dep. at 93:8–17.)  And a person who appeared to be a manager came to a room in which J.G. was

---

[2] The record is unclear as to who trafficked J.G. during this period.

trafficked with three other minor girls "multiple times" to request money for the room.  (Doc. 115-3, N.S. Aff. ¶¶ 4, 10–11.)

One United Inn employee in particular had multiple, notable interactions with Cash.  This employee – to whom J.G. refers in her deposition as a "front desk lady" (Doc. 105-1, J.G. Dep. at 94:17–20) – would allegedly warn Cash when there was "too much traffic coming in and out" of Cash's room (*Id.* at 102:22–103:9.)  On multiple occasions, the employee told Cash that, "We are watching you and there's too much traffic," and she would suggest that Cash switch rooms.  (*Id.* at 102–104.)  When the employee suggested that Cash switch rooms, he did so.  (*Id.* at 103:6–9.)  The same employee would buy drugs from Cash in his hotel room (with J.G. in the room).  (*Id.* at 99:23-100:2.)

J.G. deposed that it was "blatant" and obvious through "common sense" that her traffickers were using hotel rooms for sex trafficking.  (*Id.* at 93:9, 94:3.)  For example, the traffickers "didn't bother to hide" guns, condoms, and drugs from housekeeping staff (*id.* at 93:3–94:13); Plaintiff and other minors would "stroll" through the hotel each day looking for customers while "barely wearing clothes," even when it was cold outside (*id.* at 84:6–86:15, 113:6–10); Plaintiff's traffickers were "always switching sheets" and towels – "more than . . . a regular person would" (*id.* at 113:20–114:2); and there would be daily, heavy foot traffic around the traffickers' rooms, in which there were multiple

girls and women.  (Doc. 115-1, Pl. SOMF ¶ 49; Doc. 105-1, J.G. Dep. at 102:24–103:9.)

J.G. contends that additional evidence tends to show that Northbrook knew or should have known that she specifically was being trafficked for sex at its hotel.  For example, in October 2018, while J.G. was being trafficked at the United Inn, a Rockdale County Sheriff's Office investigator, Tim Wade, sent multiple emails to the United Inn advising that J.G. was a "[m]issing person" believed to be at the hotel.  (Doc. 115-1, Pl. SOMF ¶ 20; Doc. 115-5; Doc. 115-6; Doc. 115-7.)  Investigator Wade attached to at least two emails a "Be on the Lookout" ("BOLO") notice containing J.G.'s name, picture, age, race, height, and weight.  (Doc. 115-5; Doc. 115-6.)  One of Investigator Wade's emails stated: "Ashar [United Inn's manager], [I] [w]as advised by [J.G.'s] guardian that she was staying at [the] United Inn . . . .  Thank you for your help."  (Doc. 115-5.)  Another email – with a subject line of "MISSING JUVENILE MAYBE AT UNITED INN HOTEL ON MEMORIAL DRIVE" – stated that Investigator Wade was "contacted by the guardian of [J.G.] who stated that her niece was at this hotel[.]"  (Doc. 115-7.)  United Inn's owner, Tahir Shareef, acknowledges that the hotel received Investigator Wade's emails.  (Doc. 106-2, Northbrook 30(b)(6) Dep. at 310:5–311:13; 312:14–24; 321:20–323:9.)  United Inn's practice was to post notices of missing persons on

6

an office wall, though Mr. Shareef is not sure if it followed that practice with the BOLO notices relating to J.G. (Doc. 115-1, Pl. SOMF ¶ 25.)

There is also evidence that commercial sex activity was common at the United Inn since at least 2015. The DeKalb County Police Department identified the United Inn as a "problem hotel," known to have prostitution occurring on site. (Doc. 115-1, Pl. SOMF ¶¶ 98–99.) DeKalb County Police detective C.D. King testified that, from 2015 to 2021, there were multiple men at the United Inn overseeing commercial sex workers. (*Id.* ¶ 101.) The record in this case contains evidence that at least three other persons trafficked underage girls for sex at the United Inn roughly a year before J.G. was trafficked there.[3] (*Id.* ¶¶ 65–68.) In addition, in 2017, the DeKalb County Vice Unit conducted a joint operation with the FBI "in reference to child and adult prostitution" at the United Inn. (Doc. 115-16, King Dep. at 29–33.) And numerous police reports from 2012 to 2018 document arrests made in connection with commercial sex and sex-related crime at the United Inn. (Doc. 115-17, Doc. 115-18.) Despite the prevalence of commercial sex and sex-related crime on its premises, the United Inn had only one security guard on the

---

[3] The persons involved in commercial sex work with those traffickers have also sued Northbrook for TVPRA violations. *A.G. v. Northbrook Industries, Inc. d/b/a United Inn and Suites*, No. 1:20-cv-05232-JPB; *G.W. v. Northbrook Industries, Inc. d/b/a United Inn and Suites*, No. 1:20-cv-05232-JPB.

property between 10 pm and 2 am and did not have security outside of those hours.  (Doc. 106-1, Northbrook 30(b)(6) Dep. at 143:10–22; Doc. 115-1, Pl. SOMF ¶ 122.)  Northbrook also failed to post legally mandated anti-trafficking notices on its property.  (Doc. 115-1, Pl. SOMF ¶ 118.)

J.G. filed this lawsuit against Northbrook on December 28, 2020.  (Doc. 1.)  Northbrook filed a motion to dismiss, which the Court denied.  (Doc. 44.) Discovery in this case was, at times, fraught.   By its own admission, Northbrook failed to timely search obvious sources of relevant and discoverable information – such as the United Inn's own computer and email account – in response to Plaintiff's discovery requests.  (Doc. 88 at 8.)  Northbrook's failure in this regard led to discovery disputes and an extended discovery period that culminated in Plaintiff filing a motion for sanctions against Northbrook.[4]  (Doc. 86.)  On December 21, 2023, Northbrook filed a motion for summary judgment.[5] (Doc. 103.)

---

[4] The circumstances of the discovery dispute are discussed in Section IV, *infra*.

[5] Northbrook has also filed motions to exclude the testimony of Plaintiff's expert witnesses, Naeshia McDowell and Darrell Chaneyfield.  (Doc. 99, 100.) Plaintiff has filed a motion to exclude the testimony of Northbrook's expert witness, Karim Vellani.  (Doc. 109.)  The parties do not rely on expert testimony for purposes of the instant motion for summary judgment.  The motions to exclude will be adjudicated on a later date by separate order.

8

## II.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the   district   court   in   considering   whether   to   grant   summary judgment.  *Anderson  v.  Liberty  Lobby,  Inc.*, 477  U.S.  242,  255  (1986); *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence demonstrating a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that opposing party.  *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1246 (11th Cir. 1999).  A fact is "material" only

if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson*, 477 U.S. at 248. A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.* "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog*, 193 F.3d at 1246.

### III. Defendant's Motion for Summary Judgment

J.G. brings claims for violation of the TVPRA, 18 U.S.C. § 1591, *et seq.*, and negligence. Northbrook seeks summary judgment on both claims.

### A. TVPRA Claim

"The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, prohibits the sex trafficking of children or adults by force, fraud, or coercion." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021); 18 U.S.C. § 1591(a). In addition to its criminal prohibition, the TVPRA provides a civil remedy to people who have experienced certain kinds of human trafficking, including sex trafficking in violation of Section 1591(a). 18 U.S.C. § 1595(a). The statute states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

*Id.* Under Section 1595, a plaintiff may bring either (a) a direct civil claim against the perpetrator of her trafficking or (b) a civil "beneficiary" claim against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]." *Id.* In this case, Plaintiff has sued Northbrook, a company that allegedly knowingly benefited from sex trafficking in general and from Plaintiff's victimization in particular.

Section 1595(a) requires a plaintiff bringing a TVPRA civil beneficiary claim to satisfy four elements. The plaintiff must demonstrate that the defendant:

> (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff.

*Red Roof*, 21 F.4th at 726. Northbrook does not dispute that it "knowingly benefited" during the relevant periods by receiving revenue from hotel rooms paid for by J.G.'s traffickers, and it further does not dispute that J.G.'s traffickers violated the TVPRA as to her. Northbrook argues that (1) it did not take part in a "common undertaking or enterprise involving risk and potential

profit," and (2) it did not have "constructive or actual knowledge" that the alleged undertaking violated the TVPRA as to J.G.

## 1. Element Two: Participation in a Venture

Civil beneficiary liability under the TVPRA arises when the defendant "*participat*[*es*] *in a venture* which that person knew or should have known has engaged in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a) (emphasis added). The Eleventh Circuit defines the phrase "participation in a venture" as taking part "in a common undertaking or enterprise involving risk and potential profit." *Red Roof*, 21 F.4th at 725.

Here, Northbrook argues that it is entitled to summary judgment on the TVPRA claim because "Plaintiff cannot prove that Northbrook took part with other participants in a *common undertaking of sex trafficking* as required under the standard established in *Red Roof Inns*." (Doc. 104 at 5 (emphasis added).) In response, J.G. argues that under *Red Roof*, she need only show that Northbrook took part in a common undertaking involving risk and potential profit, not a common undertaking *of sex trafficking*, and that, with the venture so framed, she has presented evidence of Northbrook's participation in it. (Doc. 115 at 14–15, Doc. 132 at 1–2, 8.)

12

  a. **Plaintiff Must Show that Defendant Participated in a Common Undertaking Involving Risk and Potential Profit, But Not That Defendant Directly Participated in Sex Trafficking.**

The Court begins with Northbrook's argument that to satisfy the TVPRA's second element, J.G. must allege facts demonstrating that "Northbrook was '*in on*' Plaintiff's sex trafficking" and/or that Northbrook took part with others in a "common undertaking of sex trafficking." (Doc. 126 at 5 (emphasis added); Doc. 104 at 5.)  For the following reasons, the Court concurs with Plaintiff that she need not make such a showing.

First, the plain language of the statutory scheme does not impose a duty on Plaintiff to show that Northbrook participated directly in sex trafficking. Section 1591 of the TVPRA criminalizes the sex trafficking of children.  18 U.S.C. § 1591.  A person commits the crime of sex trafficking when, as relevant here, he "benefits, financially or by receiving anything of value, from *participation in a venture* which has engaged in an act" described in violation of § 1591(a)(1), while "knowing, or . . . in reckless disregard of the fact . . . that the [trafficking victim] has not attained the age of 18 years and will be caused to engage in a commercial sex act[.]"  *Id.* (emphasis added).[6]  In the context of

---

[6] The relevant statutory provision states in full:

 (a) Whoever knowingly--

Section 1591's *criminal* prohibition, "participation in a venture" is defined as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." 18 U.S.C. § 1591(e)(4).  In interpreting "participation in a venture" for purposes of *civil liability* under Section 1595, by contrast, the Eleventh Circuit declined to "transpos[e] the statutory definition from [the] criminal section to the civil cause of action."  *Red Roof*, 21 F.4th at 724.  Instead, the phrase "participation in a venture" is to be understood according to its "plain meaning," as taking part in a "common undertaking or enterprise involving

---

> (1) in or affecting interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),
>
> knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b)[.]

18 U.S.C. § 1591(a).

risk and potential profit." *Id.* at 725.  The result here for Plaintiff is that she need not show, for purposes of proving "participation in a venture," that Northbrook "knowingly assist[ed], support[ed], or facilitate[ed]" an act of sex trafficking, as would be required under the criminal code provision.  *See* 18 U.S.C. § 1591(e)(4); *Red Roof*, 21 F.4th at 724–25.  Put another way, J.G. need not show that Northbrook participated directly in sex trafficking.[7]

So much for what Plaintiff does *not* have to show under the second TVPRA element.  The Court next discusses the Eleventh Circuit's guidance on what evidence might suffice to show participation in a venture under § 1595.

In *Red Roof*, plaintiffs asserted TVPRA beneficiary claims against the franchisors of hotels at which they were allegedly trafficked.  The plaintiffs alleged that the franchisors participated in "sex trafficking ventures" with sex traffickers and hotel employees.  *Red Roof*, 21 F.4th at 720–21.  As for the franchisors' specific roles in the ventures, the plaintiffs alleged that the

---

[7] *See, e.g., Red Roof*, 21 F.4th at 730 (Jordan, J., concurring) (writing separately to emphasize that "the participation element of a 'beneficiary' claim under § 1595(a) does not require that the defendant in question have participated in the sex trafficking act itself."); *Does 1-4 v. Red Roof Inns, Inc.*, 688 F. Supp. 3d 1247, 1254 (N.D. Ga. 2023) ("As the Eleventh Circuit established in [*Red Roof*], a person can be liable without participating in the sex trafficking act itself."); *see also G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 553 n.6 (7th Cir. 2023) ("Courts unanimously agree that a civil defendant under Section 1595 need not have violated Section 1591." (collecting cases)).

franchisors received revenue from renting rooms to the sex traffickers, oversaw operations and hotel policies, controlled the training of managers, "sent inspectors to the hotels who would have seen signs of sex trafficking," and received reviews mentioning sex work occurring at the hotels. *Id.* at 726–27.

In considering whether these allegations satisfied the second TVPRA element, the Eleventh Circuit underscored that the *Red Roof* plaintiffs chose to frame the ventures at issue as "*sex trafficking* ventures." *Id.* at 726 (emphasis added) ("Over and over, [plaintiffs] repeated this phrase: sex trafficking venture.  In fact, every single reference to a 'venture' in the complaints refers to a 'sex trafficking venture.'"); *id.* at 727 ("[Plaintiffs] chose to frame the ventures at issue as sex trafficking ventures").  The court then deemed the plaintiffs' allegations insufficient to show the defendant-franchisors' participation in the alleged "sex trafficking ventures" and held that the plaintiffs "provided no plausible allegations that the franchisors took part in the common undertaking of sex trafficking." *Id.* at 726–27.  While the *Red Roof* plaintiffs attempted to show participation in a venture, in part, through allegations that the franchisors saw "signs of sex trafficking," the Eleventh Circuit stated that "observing something is not the same as participating in it." *Id.*  *Red Roof* further held that a hotel franchisor does not participate in a "sex trafficking venture" by merely "financially benefit[ting]

16

from renting hotel rooms to the [plaintiff's] sex traffickers" and seeing signs of sex trafficking.  *See id.* at 727.

While the plaintiffs in *Red Roof* failed to show the defendant hotel *franchisors'* participation in "sex trafficking ventures," the Eleventh Circuit provided guidance as to the "kinds of allegations [that] would establish a hotel *operator's* participation in a venture with a sex trafficker."  *Id.* at 726 (emphasis added).  Specifically, the court cited with approval *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) (Souter, J.), explaining as follows:

> In *Ricchio*, the plaintiff sued the owner and live-in operators of a hotel where she was held hostage and sexually abused. *Id.* at 556. The First Circuit held that the plaintiff had plausibly alleged that the operators' association with the plaintiff's sex trafficker was a "venture" because her abuser "had prior commercial dealings with the [operators], which the parties wished to reinstate for profit." *Id.* at 555. Considering these dealings, the plaintiff also plausibly alleged that, by renting a room to the abuser, the operators were "associating with him in an effort to force [the plaintiff] to serve their business objective." *Id.* We agree that these kinds of allegations would establish a hotel operator's participation in a venture with a sex trafficker.

*Red Roof*, 21 F.4th at 725–26.

The plaintiffs in *Red Roof* brought their TVPRA claims against a hotel franchisor.  The Eleventh Circuit recently considered how the "participation in a venture" element applies in a case, such as J.G.'s, against a hotel franchisee. In *K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024)

(per curiam), a plaintiff sought to establish a hotel franchisee's participation in a venture through allegations that: "(1) [defendant] knew or should have known that sex trafficking was occurring at its hotel—based on online reviews, police reports, and visible indicators—yet (2) [defendant] continued to engage in a hotel business relationship with and collect room rental revenue from [plaintiff's trafficker] for approximately four years." *Id.* at *3. These allegations were deemed insufficient to show that the hotel "took part in a common sex trafficking undertaking or enterprise" with the plaintiff's trafficker. *Id.* The *Riti* court reasoned that plaintiff's allegations "amount[ed] to contentions that [defendant] financially benefitted from renting hotel rooms to K.H.'s trafficker and that [defendant] observed signs of sex trafficking at the hotel." *Id.* at *4. It stated that under *Red Roof*, "allegations of financial benefit alone are not sufficient to establish that the defendant participated in a sex trafficking venture[,]" and it reiterated that "observing signs of sex trafficking 'is not the same as participating in it.'" *Id.* (quoting *Red Roof Inns*, 21 F.4th at 726). The court further noted that the allegations in *Ricchio* were "far stronger than just an operator renting rooms to a trafficker." *Id.* at *3.

To summarize, for the second TVPRA element, Plaintiff need not show that Northbrook directly participated in sex trafficking, but neither will it suffice merely to show that sex trafficking occurred on the premises and the

18

defendant-operator saw signs of it. "The common thread in the Eleventh Circuit's opinions is a requirement that the plaintiff (i) show at least some connection between the hotel operator's and the trafficker's actions (the *common* venture) and (ii) identify what actions the operator took to advance the object of the joint undertaking (*participation* in the common venture)." *G.W. v. Northbrook Indus., Inc.*, No. 1:20-CV-05232-JPB, 2024 WL 3166083, at *4 (N.D. Ga. June 14, 2024).

> **b.  A Jury Could Find from the Evidence of Record that Northbrook "Participated in a Venture" within the Meaning of § 1595.**

With the foregoing principles in mind, the Court turns to the facts of this case. Plaintiff contends that Northbrook participated in a venture with her traffickers. Whether framed as a "sex trafficking venture," like the one considered in *Red Roof*, or more generally, as a common undertaking involving risk and profit, a reasonable jury could find that Plaintiff's evidence is in accord with the "kinds of allegations" that the Eleventh Circuit has suggested might establish "a hotel operator's participation in a venture with a sex trafficker." *Red Roof*, 21 F.4th at 725.

First, Plaintiff has introduced "lookout" evidence of the variety that courts generally have deemed sufficient to show a hotel operator's participation

in a venture.[8]   Specifically, J.G. testified that a United Inn employee who

worked at the front desk would "watch[ ]" Cash's rooms and "warn" him when

there was "too much traffic coming in and out of [his] room."  (Doc. 105-1, J.G.

Dep. at 103:2–104:19.)   This employee provided warnings to Cash on multiple

occasions and would suggest that Cash switch rooms when there was too much

foot traffic from customers seeking to purchase commercial sex.   When the

employee suggested that Cash switch rooms, he did so.

A jury may or may not believe that the employee was acting as a lookout

for Cash.   On the one hand, a jury could find an innocent explanation for the

employee's conduct; it could conclude that she merely advised Cash to "keep it

down," a task that a front desk employee might be called upon to perform at

any hotel.   On the other, given the full context here, a jury could also

reasonably infer that the employee's warnings were intended to further the

---

[8] *See, e.g., Does 1–4*, 688 F. Supp. 3d at 1254 (denying summary judgment as
to TVPRA claim where there was evidence that "some employees acted as
lookouts and notified the pimps when police were nearby or on the premises");
*W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1371 (N.D. Ga. 2023) (same);
*H.B. v. Red Roof Inns, Inc.*, No. 1:22-cv-1181-JPB, Doc. 158 at 18 (N.D. Ga.
June 17, 2024) (denying hotel operator's motion for summary judgment where
"Plaintiff has offered evidence that Red Roof Inn employees directly facilitated
the illicit activities of Plaintiff's traffickers by providing lookout services."); *cf.*
*K. H. v. Riti, Inc.*, 2024 WL 505063, at *4 n.6 (affirming dismissal of TVPRA
claim and noting the absence of allegations that hotel employees worked
directly with traffickers by providing lookouts in exchange for cash or drugs).

success of Cash's sex trafficking enterprise which, in turn, boosted hotel revenue. This is a question for the fact finder. *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1334 (11th Cir. 2022) ("Where reasonable minds might differ on the inferences arising from undisputed facts, summary judgment should not be granted, and a fact finder should be permitted to determine which inferences to accept.") (internal quotation marks omitted).[9]

Second, the record in this case contains evidence of "commercial dealings" that Northbrook and J.G.'s traffickers reinstated for profit over an extended period. *Red Roof*, 21 F.4th at 725–26 (citing *Ricchio*, 853 F.3d at 555). J.G. was trafficked at the United Inn by two men who concurrently operated bustling, multi-room commercial sex enterprises that were patronized by hundreds of men. Plaintiff's trafficker, "Cash," operated a trafficking business out of this relatively small hotel for at least a month, during which time he rented at least four rooms, and more than 300 men came to purchase sex with J.G. alone. Plaintiff's other trafficker, "King," was

---

[9] The existence of lookout evidence distinguishes this case from two other cases brought against Northbrook in which Northbrook obtained summary judgment as to the plaintiffs' TVPRA claims. *See G.W. v. Northbrook Indus., Inc.*, No. 1:20-CV-05232-JPB, 2024 WL 3166083 (N.D. Ga. June 14, 2024); *A.G. v. Northbrook Indus., Inc.*, No. 1:20-CV-05231, Doc. 151 (N.D. Ga. June 14, 2024).

trafficking women out of multiple rooms at the same time and apparently lived at the hotel.

The trier of fact will view the foregoing evidence along with additional, contextual evidence of a booming prostitution industry at the United Inn more generally.   The record contains evidence that at least three other men trafficked underage girls for sex at the United Inn roughly a year before J.G. was there.   And Detective King testified that there were multiple men overseeing commercial sex workers at the United Inn from 2015 to 2021.   A reasonable jury could find that the ubiquitous presence of sex trafficking at the United Inn during the relevant periods supports Plaintiff's claim of Northbrook's "ongoing business relationship" with sex traffickers, and with J.G.'s traffickers in particular.  *Does 1–4*, 688 F. Supp. 3d at 1254.

Third, a jury could infer from the evidence of record that the undertaking between Northbrook and J.G.'s traffickers involved "risk and potential profit" for Northbrook and the traffickers alike.  As for risk, there is evidence that Northbrook exposed itself to risk by harboring commercial sex enterprises that operated overtly on its premises, including those of Plaintiff's traffickers.  Such evidence includes testimony that: (1) Plaintiff's trafficker, King, lived at the hotel and simultaneously operated his trafficking business out of multiple rooms; (2) hundreds of adult men passed in and out of Cash's and King's hotel

rooms, which were occupied by underage girls; (3) a hotel employee would "watch" Cash's rooms, warn him when there was too much traffic, and suggest that he switch rooms when the traffic was excessive; (4) J.G., a 16-year-old girl who "looked [her] age," "stroll[ed]" the hotel common areas every day for four weeks, often with "barely [any] clothes on[,]" to find customers (Doc. 105-1, J.G. Dep. at 83:9–23, 86:5–15, 113:3–19); (5) housekeeping employees interacted with traffickers and victims and saw guns, drugs, and condoms on open display in their rooms; (6) the hotel manager came to J.G.'s hotel room to collect money and saw her with three other underage girls in the room; (7) J.G. would go to the hotel front desk almost every day to purchase condoms and other items – sometimes with Cash and other times with other trafficking victims; and (8) Cash and King were "cool with everybody" who worked at the United Inn (*id.* at 93:8–17).[10]

Despite the facts that sex trafficking at the hotel was "blatant" (*id.* at 114:3–8), and that the DeKalb County Police Department recommended that

---

[10] It bears emphasizing that Plaintiff is not limited to direct evidence in proving her claims. *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1329 (11th Cir. 2022) ("We treat circumstantial evidence the same as direct evidence."); *Ricchio*, 853 F.3d at 557 ("The factual allegations in the complaint are 'circumstantial,' to be sure, but there is no requirement for direct evidence.") (quoting *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 88 (1st Cir. 2015)) (alteration adopted).

Northbrook hire additional security guards (Doc. 106-1, Northbrook 30(b)(6) Dep. at 155:19–22), Northbrook had only one security guard on the property between 10 pm and 2 am and did not have security outside of those hours. Northbrook also failed to post legally mandated anti-trafficking notices on its property. A jury could find from the foregoing evidence that Northbrook had an ongoing interest in the success of a venture with Plaintiff's traffickers, and that it took on risk to further the ends of that venture.

As for profit, the common venture generated revenue for both Northbrook and the traffickers. The traffickers profited from their commercial sex enterprises at the United Inn, and Northbrook "acknowledges that it would have received revenues from the rental of any hotel rooms in which sex trafficking is alleged to have occurred." (Doc. 104 at 5.)

The evidence described above could lead a reasonable jury to decide that Northbrook had "an ongoing interest in the success of a specific venture and elect[ed] to further the ends of the venture beyond what would reasonably be expected in an ordinary commercial transaction." *Doe (S.M.A.) v. Salesforce, Inc.*, No. 3:23-CV-0915-B, 2024 WL 1337370, at * 13 (N.D. Tex. Mar. 28, 2024) (discussing "participation in a venture" as interpreted by the Eleventh Circuit).

### c.      Vicarious Liability

As discussed above, in furtherance of element two of her TVPRA claim, Plaintiff points to evidence that the United Inn's front desk employee arguably acted as a lookout for J.G.'s trafficker.  Northbrook says that even if the front desk employee did function as a lookout for Cash's operation, Northbrook cannot be held vicariously liable for the employee's conduct because it was outside the scope of her employment.  As this Court has stated in analyzing a vicarious liability theory in a TVPRA case:

> The Supreme Court has routinely assumed that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules" and, in that context, has held that "traditional vicarious liability rules ordinarily make principals . . . vicariously liable for the acts of their agents." *Meyer v. Holley*, 537 U.S. 280, 285 (2003).

*J.K. v. Ramada Worldwide, Inc.*, No. 1:23-CV-108-TWT, 2023 WL 5621913, at *4 (N.D. Ga. Aug. 30, 2023).

Under Georgia law,[11] an employer is vicariously liable for its employee's conduct when the employee was "acting in furtherance of and within the scope

---

[11] The parties cite to Georgia caselaw addressing vicarious liability.  Although "many courts apply state law when determining vicarious liability in TVPRA claims," *Doe (K.B.) v. G6 Hosp., LLC*, No. 1:23-CV-2597-TWT, 2023 WL 8650785, at *7 (N.D. Ga. Dec. 14, 2023) (collecting cases), "federal statutes are generally intended to have uniform nationwide application," *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (citation omitted).  Thus,

of [the employer's] business," even if the employer had not "commanded . . . or assented to" the act. *Duvall v. Cronic*, 820 S.E.2d 780, 789 (Ga. Ct. App. 2018) (citing *Piedmont Cotton Mills v. Gen. Warehouse No. Two*, 149 S.E.2d 72, 76 (Ga. 1966)). The fact that an unlawful act was intentional does not preclude a finding that it was done within the scope of employment, *id.*, but an employer is not liable for unlawful acts committed "for *purely personal reasons* disconnected from the [employer's] authorized business." *Carter v. Riggins*, 748 S.E.2d 117, 120 (Ga. Ct. App. 2013) (emphasis in original) (citation omitted) (finding no vicarious liability where a restaurant employee physically attacked a customer).

Federal common law applies a similar, though arguably less exacting, standard for vicarious liability. "The Restatement defines conduct, including an intentional tort, to be within the scope of employment when 'actuated, at

---

"[w]hen applying agency principles to federal statutes," federal courts often look to "general agency principles" as set forth in the Restatement of Agency. *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1245 (11th Cir. 2002) ("When applying agency principles to federal statutes, 'the Restatement (Second) of Agency . . . is a useful beginning point for a discussion of general agency principles.'") (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755 (1998)); *see also Reid*, 490 U.S. at 740 ("In past cases of statutory interpretation, when we have concluded that Congress intended terms such as . . . 'scope of employment' to be understood in light of agency law, we have relied on the general common law of agency, rather than on the law of any particular State, to give meaning to these terms.").

least in part, by a purpose to serve the [employer],' even if it is forbidden by the employer." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) (quoting Restatement §§ 228(1)(c), 230). "For example, when a salesperson lies to a customer to make a sale, the tortious conduct is within the scope of employment because it benefits the employer by increasing sales, even though it may violate the employer's policies." *Id.* (citing Prosser and Keeton on Torts § 70, at 505–06). Under both Georgia and federal common law, the scope of an employer's vicarious liability is generally a question of fact. *Johnson St. Properties, LLC v. Clure*, 805 S.E.2d 60, 66 (Ga. 2017); *Commodity Futures Trading Comm'n v. Gibraltar Monetary Corp.*, 575 F.3d 1180, 1186 (11th Cir. 2009).

Whether the vicarious liability inquiry is governed by state or federal common law, the result for Defendant here is the same – questions of material fact preclude summary judgment on the TVPRA claim. Per Plaintiff, the "front desk lady" at the United Inn warned Cash about the traffic coming in and out of his hotel rooms while she was on the job and working at the hotel front desk. The "front desk lady" would sometimes warn Cash using the hotel phone; other times she called Cash to the hotel lobby and warned him there. The employee also used her authority to suggest and facilitate room changes for Cash when there was too much foot traffic in the vicinity of his rooms. It is reasonably

27

inferable that these acts – communicating with hotel guests and facilitating room changes – were not "disconnected from [Northbrook's] authorized business" of renting hotel rooms. *Carter*, 748 S.E.2d at 120. It will be for the jury to determine the scope of this employee's conduct and whether it could be seen as "benefit[ing] the employer by increasing sales[.]" *Ellerth*, 524 U.S. at 756. Genuine issues of material fact remain as to whether the employee's alleged actions fell within the scope of her employment.[12]

### d.   Conclusion as to "Participation in a Venture"

The evidence in this case is "stronger than just an operator renting rooms to a trafficker." *Riti*, 2024 WL 505063, at *3. Plaintiff has presented evidence from which a jury could find that Defendant did not merely observe signs of sex trafficking but took part in a common undertaking involving risk and potential profit. "[U]nder these circumstances . . . it [i]s reasonably inferable

---

[12] The Court further notes that several courts have rejected the idea that the TVPRA does not permit agency liability. *See, e.g.*, *Doe v. Hotels*, No. 6:23-CV-1012-JSS-LHP, 2024 WL 2955728, at *5 (M.D. Fla. June 12, 2024) (stating that "[w]hile the TVPRA is silent on the issue of indirect liability, numerous district courts have rejected the argument that the TVPRA does not permit agency liability.") (internal quotations omitted); *J.K. v. Ramada Worldwide, Inc.*, No. 1:23-CV-108-TWT, 2023 WL 5621913, at *4 (N.D. Ga. Aug. 30, 2023) (franchisor defendant "cites no authority definitively establishing a prohibition of TVPRA beneficiary claims under a vicarious liability theory rooted in agency principles."); *H.B.*, No. 1:22-cv-1181-JPB, Doc. 158 at 25 (hotel operators "could be held vicariously liable" under the TVPRA for employees' alleged provision of lookout services).

that the [h]otel operator and trafficker were working together 'to force [plaintiff] to serve their business objective.'" *Id.* (quoting *Ricchio*, 853 F.3d at 555). Plaintiff has offered sufficient evidence as to the second element of her TVPRA claim, as other judges in this district have found on similar facts.[13]

## 2. Element Four: Actual or Constructive Knowledge of the Undertaking's Violation of the TVPRA as to Plaintiff

The fourth element of a TVPRA beneficiary claim is that the defendant "knew or should have known [that the venture] has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a). The Eleventh Circuit has said that this element requires the plaintiff to show that the defendant had "either actual or constructive knowledge that the venture in which [it] participated and from which [it] benefited violated the TVPRA" *as to the plaintiff*. *Red Roof*, 21 F.4th at 725. Knowledge is "awareness or understanding of a fact or

---

[13] *See W.K.*, 692 F. Supp. 3d at 1380 (finding that plaintiff had presented sufficient evidence of participation in a venture at summary judgment, where, *inter alia*, defendants had an ongoing relationship with known pimps and sex workers at the hotel, defendants and their employees were aware that they were profiting from renting rooms to those persons, and employees had sex with a trafficking victim); *Does 1-4*, 688 F. Supp. 3d at 1255 (finding sufficient evidence of a venture on summary judgment where, *inter alia*, the defendants regularly saw pimps and sex workers using hotel rooms, booked suspected sex workers in rooms at the back of the hotel, acted as lookouts and notified pimps when police were nearby, and were aware that some sex workers appeared to be underage and physically emaciated); *H.B.*, No. 1:22-cv-1181-JPB, Doc. 158 at 19 (denying hotel's motion for summary judgment where there was evidence of hotel employees providing lookout services).

circumstance." *Id.* (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)).    Constructive knowledge is "that knowledge which 'one using reasonable care or diligence should have.'" *Id.* (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Northbrook had at least constructive if not actual knowledge that the undertaking in which it participated violated the TVPRA as to Plaintiff.  This is so for several reasons. First, Plaintiff has produced evidence that Northbrook received actual notice while J.G. was at the United Inn that J.G. was a missing teen believed to be at the hotel. Specifically, on October 29, 2018, while J.G. was being trafficked by Cash, Northbrook received multiple BOLO notices from the Rockdale County Sheriff's Office advising Northbrook that J.G. was a "missing" 16-year-old believed to be at the United Inn since October 9, 2018.  (Doc. 115-1, Pl. SOMF ¶ 20; Doc. 115-5–7.)  The BOLO notices contained J.G.'s picture, age, race, height, and weight.  (Doc. 115-5.)  They were emailed directly to Northbrook by a Rockdale County police investigator, and Northbrook's owner acknowledges receiving the emails containing the notices.

The Court considers too the fact that J.G. was – at the very time the emails were received by Northbrook – engaging at the United Inn in overt acts

suggestive of commercial sex work.  Specifically, J.G., a 16-year-old girl who "looked [her] age," "strolled" the hotel common areas every day for a month while wearing "barely [any] clothes."  (Doc. 105-1, J.G. Dep. at 83:9–23, 86:5–15, 113:3–19.)  She walked around the property "with, like, no clothes on" even when it was cold outside and when most others her age would be in school.  (*Id.* at 113:3–10.)  Plaintiff interacted with hotel employees every day, including when she went to the hotel front desk to purchase condoms and when housekeeping employees came into the traffickers' rooms containing guns, condoms, and drugs in plain sight.  Plaintiff had visible marks on her body from being beaten and burned with cigarettes by King.  (*Id.* at 145–46.)  J.G. testified that hotel employees knew that she was engaging in commercial sex work at the hotel, describing the circumstances of her trafficking as "blatant" and apparent through "common sense." (*Id.* at 112:20–113:10, 114:3–8.)  A jury may find this testimony credible, given evidence that hundreds of men filed in and out of the hotel rooms that J.G. occupied over a period of six weeks.

Finally, there is evidence to show that J.G. accompanied Cash to the hotel lobby when United Inn's front desk employee warned Cash about the excessive foot traffic coming in and out of his rooms.  (*Id.* at 105:13–25.)  Given that a jury could reasonably infer that the hotel employee knew about and was

indeed assisting Cash's trafficking operation, a jury could also infer that the employee understood J.G. to be a victim of sex trafficking.[14]

For the reasons stated above, there is a triable issue of fact as to whether Northbrook had actual or constructive knowledge that the venture in which it participated violated the TVPRA as to J.G.  Other judges of this Court have found the same on similar facts.  *See, e.g., Does 1–4*, 688 F. Supp. 3d at 1254 (denying summary judgment as to TVPRA claim where, *inter alia*, hotel employees acted as lookouts, employees "regularly observed pimps and prostitutes using [hotel] rooms," "some of the prostitutes appeared to be young or underage," and some of the victims exhibited signs of physical abuse); *W.K.*, 692 F. Supp. 3d at 1371 (finding sufficient evidence of defendants' knowledge of a TVPRA violation where, *inter alia*, commercial sex at the hotel was "obvious" to employees, hotel employees had commercial sex with a plaintiff,

---

[14] The hotel employee's knowledge can be imputed to Northbrook.  *See Cadet v. Fla. Dep't of Corr.*, 853 F.3d 1216, 1229–30 (11th Cir. 2017) (stating that under the Third Restatement of Agency, a principal is charged with the agent's knowledge unless the agent acts "adversely to the principal in a transaction or matter, intending to act *solely* for the agent's own purposes or those of another person."); *Roylston v. Bank of Am., N.A.*, 660 S.E.2d 412, 417 (Ga. Ct. App. 2008) (stating that Georgia law "imputes to the principal, and charges him with, all notice or knowledge relating to the subject-matter of the agency which the agent acquires or obtains while acting as such agent and within the scope of his authority[.]").

and the defendants had an ongoing relationship with plaintiffs' traffickers); *H.B. v. Red Roof Inns, Inc.*, No. 1:22-cv-1181-JPB, Doc. 158 at 18 (N.D. Ga. June 17, 2024) (finding sufficient evidence as to the fourth TVPRA element where hotel employees provided lookout services and assisted in facilitating the trafficking operation).

In sum, J.G. has shown that there are genuine disputes of material fact that preclude summary judgment on the TVPRA claim.  Northbrook's request for summary judgment on J.G.'s TVPRA claim is **DENIED**.

### B. Negligence Claim

J.G. asserts a negligence claim, arguing that she was an invitee who sustained reasonably foreseeable injuries on Northbrook's premises.  The elements of a negligence claim are (1) "the existence of a duty on the part of the defendant," (2) "a breach of such duty," (3) "causation of the injury alleged," and (4) "damages as a result of the alleged breach of duty."  *Wells Fargo Bank, N.A. v. Jenkins*, 744 S.E.2d 686, 687 (Ga. 2013).  "The threshold issue . . . is whether and to what extent the defendant owes a legal duty to the plaintiff." *McGarity v. Hart Elec. Membership Corp.*, 706 S.E.2d 676, 679 (Ga. Ct. App. 2011).  "A landowner owes the highest duty — the duty of ordinary care — to an invitee[,]" whereas "[a] landowner owes a lesser duty — to avoid causing

willful or wanton injury — to a licensee." *Cham v. ECI Mgmt. Corp.*, 836 S.E.2d 555, 559 (Ga. Ct. App. 2019) (citation omitted).

J.G. argues that "United Inn owed J.G. a duty of ordinary care because she was an invitee of United Inn." (Doc. 115 at 20 (capitalizations omitted).)[15] Determination of whether a person is an invitee is governed by O.C.G.A. § 51-3-1, which provides:

> Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for

---

[15] From the start of this case, Plaintiff has consistently asserted that Northbrook owed a duty to exercise ordinary care because of Plaintiff's status as an *invitee* at the United Inn. At oral argument on the instant motion, Plaintiff argued for the first time that Plaintiff was a *known licensee or trespasser*. Plaintiff later filed a notice memorializing and supplementing the new argument. (Doc. 136.) The general rule is that "an argument raised for the first time during oral argument comes too late[.]" *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1338 n.6 (11th Cir. 2009) (citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned."); *Willis v. Blunt*, No. 1:21-CV-03334-ELR, 2022 WL 1714857, at *2 n.4 (N.D. Ga. May 4, 2022) ("[T]he Court is not obligated to consider an argument raised for the first time at oral argument."). Application of the general rule is appropriate here. Northbrook has had no meaningful opportunity to respond to Plaintiff's "known licensee" theory, for it was not noted in the complaint, raised at the motion-to-dismiss stage, or raised in the summary judgment briefing. Looking back to the complaint, it does not contain the term "licensee," repeatedly speaks of Northbrook's duties to "invitees," and characterizes Plaintiff as an "invitee" no less than eight times. (Compl. ¶¶ 12, 15, 17, 86, 92, 94, 100–102, 104, 106–07.) The Court declines to consider Plaintiff's new argument, raised for the first time after full summary judgment briefing, and more than three-and-one-half years into this litigation.

injuries caused by his failure to exercise ordinary care in keeping
the premises and approaches safe.

A person is generally deemed an invitee if he "has been induced or led to come
upon [the] premises for any lawful purpose" and "his presence on the property
is of mutual benefit to both him and the landowner." *Matlack v. Cobb Elec.
Mbrshp. Corp.*, 658 S.E.2d 137, 138 (Ga. Ct. App. 2008). A licensee, by
contrast, "is one who is permitted, either expressly or impliedly, to go on the
premises of another, but merely for his own interest, convenience, or
gratification." *Id.* (citing O.C.G.A. § 51-3-2).

Plaintiff argues that Northbrook induced her to come onto its property
for the lawful purposes of obtaining lodging and purchasing goods in the hotel
lobby. (Doc. 115 at 21–22.) Even viewing the evidence in the light most
favorable to Plaintiff, no jury could find for Plaintiff on this theory. First, on
the specific facts of this case, the evidence shows that Plaintiff was brought to
the United Inn by sex traffickers and/or their associates not to obtain lodging,
but for the purpose of engaging her in unlawful sex work. Plaintiff then
remained in residence at the United Inn, in rooms paid for by traffickers (Doc.
105-1, J.G. Dep. at 59, 96), for the purpose of engaging in unlawful sex work.[16]

---

[16] Plaintiff's briefing cites to the affidavit of N.S. as evidence that, on one
occasion, "J.G. and other minors paid the United Inn manager directly" for the
hotel room in which they were trafficked. (Doc. 115 at 22.) The N.S. affidavit

Second, while Plaintiff purchased goods in the United Inn lobby, no reasonable jury could find on this record that Plaintiff was induced or led to come upon the premises for the lawful purpose of buying sundries in the lobby. To the contrary, J.G. testified that she was on the hotel's premises solely because she was being trafficked there. (Doc. 105-1, J.G. Dep. at 27 ("Q: Were you ever at the United Inn for anything other than trafficking? A: No, ma'am."); *id.* at 29 ("Q: But did you understand that's why you would be going there? A. Yeah, to work for Shaq. I knew we were about to make money for Shaq, yes, ma'am.").) Even "[a]ccepting that Plaintiff was coerced to stay at the Hotel does not change the reality that commercial sex was her purpose for being there." *G.W. v. Northbrook Indus., Inc.*, No. 1:20-CV-05232-JPB, 2024 WL 3166083, at *8 (N.D. Ga. June 14, 2024) (granting summary judgment to Northbrook on negligence claim and stating that "[t]he Court is not aware of any support for the proposition that Plaintiff's patronage of the lobby store during her unlawful visit transformed that visit into one induced by United for a lawful purpose."). Plaintiff has not shown that Northbrook, by express or

---

says that "one or more of the girls in our group" paid cash for the room on that occasion (Doc. 115-3 ¶ 12) but does not specify that J.G. paid for the room. Even if J.G. did pay, there is no reasonable dispute that her purpose for being on the premises was to engage sex work.

implied invitation, induced or led her to come on the premises for a lawful purpose.  *Id.* at *8.

For the reasons stated above, J.G. was not an invitee on Northbrook's premises at the time of her injury.  She was likely instead a licensee to whom Northbrook owed a duty to avoid causing willful or wanton injury.  J.G.'s summary judgment briefing does not identify evidence or make argument that Northbrook inflicted such willful or wanton injury.  Northbrook's request for summary judgment on J.G.'s negligence claim is therefore **GRANTED**.[17]

## IV.    Plaintiff's Motion for Sanctions

J.G. seeks sanctions against Northbrook for alleged violations of Federal Rules of Civil Procedure 26(g) and 37(c) in the discovery phase of this case.

---

[17] Plaintiff states in a footnote in her summary judgment response brief that her negligence claim is also asserted under distinct theories of "negligent hiring, supervision, and retention."  (Doc. 115 at 18 n.8.)  But Plaintiff makes no argument as to how the evidence of record supports these theories. Defendant moved for summary judgment on the negligence claim.  Plaintiff's inclusion in briefing of one sentence stating that "J.G.'s negligence claim includes negligent hiring, supervision, and retention" does not preclude the entry of summary judgment here.  *See Anderson*, 477 U.S. at 256 ("[A] party opposing a properly submitted motion for summary judgment may not rest upon mere allegation . . . , but must set forth specific facts showing that there is a genuine issue for trial."); *see also Monroe Cnty. Emples. Ret. Sys. v. S. Co.*, 333 F. Supp. 3d 1315, 1322 (N.D. Ga. 2018) (noting that a court's role is not "to make arguments for the parties" but to "consider and decide the specific arguments made by the parties").

## A. Background

On September 22, 2022, Plaintiff served Defendant with requests for production of documents, to include documents showing communications relating to sex trafficking at the United Inn, the hotel's security measures, employee training, and the identities of employees.  (Doc. 86-1.)  On November 2, 2022, Defendant responded to the discovery request and produced 623 pages of documents.  (Doc. 86-2.)

On February 22, 2023, Plaintiff took the depositions of Northbrook's owner and Rule 30(b)(6) representative, Tahir Shareef, and the United Inn's manager, Ashar Islam.  Shareef admitted during his deposition that certain sources of electronically stored information ("ESI") had not been searched prior to Northbrook's November 2022 document production.  Such sources included the hotel's Gmail account, the hotel's computer, and the hotel's text messages. Defendant acknowledges that "[d]uring the depositions, it became apparent that Northbrook had not completed an exhaustive search for potentially responsive documents." (Doc. 88 at 4.)

On February 24, 2023, Plaintiff served Northbrook with supplemental discovery requests.   (Doc. 86-5.)   Northbrook failed to respond to the supplemental discovery requests within 30 days, as required under Fed. R. Civ. P. 34(b)(2)(A).  On March 30, the parties agreed that Northbrook would make

a supplemental production by April 21.  (Doc. 86-12.)  Because fact discovery was set to conclude on March 31, the parties agreed to a discovery extension. Plaintiff filed a motion to that effect, which the Court granted.  (Doc. 61.)

On April 20, 2023, Northbrook made a supplemental production of approximately 3,500 pages.  Plaintiff contends that the production included "smoking-gun documents" that should have been produced in response to Plaintiff's September 2022 discovery request.  The production included, for example, the highly relevant, J.G.-related BOLO notices discussed above, a list of employees working at the United Inn during the relevant period, communications between Northbrook and the DeKalb County Police Department, and communications with the FBI regarding a sex trafficking investigation.  Due to the late production, Plaintiff had to re-depose witnesses. On May 12, 2023, Plaintiff served additional discovery requests based on Northbrook's April 20, 2023, production, to which Northbrook responded.

Plaintiff subsequently sought, pursuant to this Court's Standing Order, a telephone conference with the Court to discuss Defendant's discovery conduct and to seek permission to file a motion for sanctions.  A telephone conference occurred on May 26, 2023.  (Doc. 72.)  The Court directed the parties to confer on an appropriate measure to address Northbrook's admitted discovery

violations, but the Court also authorized the filing of Plaintiff's motion for sanctions if no agreement could be reached.  (*Id.*)

The parties conferred but could not reach agreement.  Plaintiff filed the instant motion for sanctions on October 12, 2023.  (Doc. 86.)[18]  The Court held a show-cause hearing on the motion.

### B. Legal Standard

Plaintiff seeks sanctions pursuant to Rule 26(g), Rule 37(c), and the Court's inherent power to sanction.

#### 1. Rule 26(g)

Under Rule 26(g)(1), a discovery response must be signed by an attorney or party, and "[b]y signing," the attorney or party "certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" that a disclosure is "complete and correct as of the time it is made" and that the response is consistent with the rules, not interposed for the purpose of causing delay, and not unreasonable.  Fed. R. Civ. P. 26(g)(1)(A).

---

[18] Plaintiff contends that the motion could not have been filed sooner because she did not obtain responses to all outstanding discovery requests until July 2023, the parties engaged in subsequent "back-and-forth communications" regarding the responses, and "it was not until September 6, 2023 that Plaintiff's counsel received information from Defendant's counsel about certain documents requested in May 2023 that relate to the instant sanctions briefing." (Doc. 91 at 10–11.)

Rule 26(g) "imposes an affirmative duty to engage in pretrial discovery in a responsible manner[.]" *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012) (quoting Fed. R. Civ. P. 26(g) advisory comm. note).   "This broad duty is satisfied when an attorney makes 'a reasonable inquiry into the factual basis of his response, request, or objection.'" *Id.*

If a discovery certification violates Rule 26(g)(1) "without substantial justification," the court "must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both."   Fed. R. Civ. P. 26(g)(3).   In the absence of substantial justification, "Rule 26(g) sanctions are not discretionary[.]" *Annapolis Citizens Class Overcharged for Water-Sewer, by Loudon Operations, LLC v. Stantec, Inc.*, No. CV 20-2603 (BAH), 2021 WL 75766, at *9 (D.D.C. Jan. 8, 2021).   "The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." Fed. R. Civ. P. 26(g)(3).

### 2. Rule 37(c)(1)

Rule 37(c)(1) permits courts to impose certain sanctions for a party's failure to disclose or supplement prior responses.   The rule provides:

> If a party fails to provide information or identify a witness as
> required by Rule 26(a) or (e),[19] the party is not allowed to use that
> information or witness to supply evidence on a motion, at a
> hearing, or at a trial, unless the failure was substantially justified
> or is harmless. In addition to or instead of this sanction, the court,
> on motion and after giving an opportunity to be heard:
>
>> (A)  may order payment of the reasonable expenses,
>>      including attorney's fees, caused by the failure;
>> (B)  may inform the jury of the party's failure; and
>> (C)  may impose other appropriate sanctions, including any
>>      of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

Fed. R. Civ. P. 37(c)(1).  "Rule 37(c) does not require the moving party to show

that the non-producing party acted in bad faith."  *Neville v. Lanier Parking*

*Sols. VI, LLC*, No. 1:19-CV-02151-TWT-JFK, 2019 WL 12876073, at *2 (N.D.

Ga. Oct. 18, 2019), *R&R adopted*, 2020 WL 10619150 (N.D. Ga. Jan. 17, 2020)

(alterations adopted and citation omitted). But "[t]he burden rests upon the

non-producing party to show that its actions were substantially justified or

harmless."  *Stallworth v. E-Z Serve Convenience Stores*, 199 F.R.D. 366, 368

(M.D. Ala. 2001).

---

[19] Relevant here, Rule 26(e) provides that a party "who has responded to [a]
. . . request for production . . . must supplement or correct" the response "in a
timely manner if the party learns that in some material respect the disclosure
or response is incomplete or incorrect[.]"  Fed. R. Civ. P. 26(e)(1)(A).

### 3. The Court's Inherent Power to Sanction

A court may "impose sanctions for litigation misconduct under its inherent power," which derives from "the court's need to manage its own affairs so as to achieve the orderly . . . disposition" of a case. *Eagle Hospital Physicians v. SRG Consulting, Inc.,* 561 F.3d 1298, 1306 (11th Cir. 2009). "The key to unlocking a court's inherent power is a finding of bad faith." *Id.* (quotation marks and citation omitted). "[I]n the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th Cir. 2017) (citation omitted). "Bad faith" does not mean mere recklessness or negligence; there must be "something more to constitute bad faith." *Id.* The Court's inherent power "must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764 (1980).

### C. Discussion

Plaintiff seeks sanctions for Northbrook's failure to conduct a reasonable inquiry for relevant documents in response to Plaintiff's discovery requests and Northbrook's failure to timely supplement its November 2022 discovery responses. The Court will address whether Plaintiff is entitled to sanctions and, if so, what an appropriate sanction is in this case.

### 1. Entitlement to Sanctions

Sanctions under Rule 26(g) are appropriate. Northbrook failed to conduct a reasonable inquiry in response to Plaintiff's September 2022 discovery requests. Northbrook acknowledges that this is so. (Doc. 88 at 1 ("Northbrook readily acknowledges, and regrets, the deficiency in its initial production in response to Plaintiff's requests."); *id.* at 8 ("Northbrook has never contested the general premise that its first production of documents was incomplete, and thus does not argue here that the certification was proper.").) Northbrook's owner admitted during Northbrook's Rule 30(b)(6) deposition that prior to Defendant's November 2022 production, the hotel failed to search obvious sources of potentially relevant documents, such as the hotel's computer and email account. When Northbrook searched those sources after the original discovery period had ended, it produced 3,500 pages of relevant documents.

By signing its November 2022 discovery response, Northbrook certified that the response was consistent with the Federal Rules, to the best of the signer's knowledge and belief, formed after a reasonable inquiry. Fed. R. Civ. P. 26(g)(1). But it was not, and Northbrook does not argue that it was substantially justified in failing to conduct a reasonable inquiry. The fact that Northbrook eventually complied with its obligations under Rule 26(g) "does not erase" the violation "for failing to conduct a reasonable search in the first

place." *Venator v. Interstate Res., Inc.*, No. CV415-086, 2016 WL 1574090, at *9 (S.D. Ga. Apr. 15, 2016).

Sanctions are not, however, warranted under Rule 37(c). Accepting that Northbrook failed to timely supplement its discovery responses in accordance with Rule 26(e), Northbrook has adequately shown that this failure was "harmless." *See Hearn v. McKay*, 603 F.3d 897, 903 (11th Cir. 2010) (stating that, under Rule 37(c), undisclosed information "may still be used at trial if the disclosure failure was substantially justified or if it was harmless."). Courts have applied the following factors in evaluating whether a failure to disclose discovery information was harmless: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence." *L.A. v. Riverside Mil. Acad. Found., Inc.*, No. 2:18-CV-00215-RWS, 2021 WL 8998914, at *3 (N.D. Ga. Sept. 30, 2021). "[F]ailure to disclose is considered 'harmless' where there is no substantial prejudice to the party entitled to receive the disclosure." *Andrews v. Autoliv Japan, Ltd.*, No. 1:14-CV-3432-SCJ, 2021 WL 4079112, at *2 (N.D. Ga. Jan. 20, 2021). A party is considered prejudiced when the "late disclosure deprives the opposing party of a meaningful opportunity to

perform discovery and depositions related to the documents or witnesses in question." *Paul v. Aramark Healthcare Support Servs., LLC*, No. 1:15-cv-189-MHC, 2016 WL 7888045, at *4 (N.D. Ga. June 2, 2016).

Here, the Court recognizes that many of the documents that Northbrook failed initially to produce – including J.G.'s BOLO notice – were highly relevant and important to Plaintiff's case. The Court further recognizes that Northbrook has offered no good reason for failing to timely supplement its November 2022 production and indeed does not dispute that it should have produced the documents earlier than it did. Despite all that, it cannot be said that Plaintiff was deprived of a "meaningful opportunity to perform discovery and depositions related to the documents . . . in question." *Paul*, 2016 WL 7888045, at *4. The extended discovery period granted to Plaintiff enabled Plaintiff to review the untimely-produced documents, serve supplemental discovery requests based on those documents, serve third-party subpoenas, and re-open depositions. Plaintiff also was able to incorporate evidence from the untimely production into her response to Northbrook's motion for summary judgment. *Cf. Go Med. Indus. Pty, Ltd. v. Inmed Corp.*, 300 F. Supp. 2d 1297, 1308 (N.D. Ga. 2003), *aff'd sub nom. Go Med. Indus. Pty., Ltd. v. Inmed Corp.*, 471 F.3d 1264 (Fed. Cir. 2006) (failure to disclose was not harmless where the disclosure was not made until after the opposing party filed a motion for

46

summary judgment). Any prejudice that Plaintiff may have suffered because of Northbrook's violation of Rule 26(e) was cured by the discovery extension that the Court granted at Plaintiff's request. *See Negrete v. Nat'l Unity Ins. Co.*, No. 1:20-CV-02205-SCJ, 2021 U.S. Dist. LEXIS 269425, at *14–15 (N.D. Ga. Dec. 14, 2021) (noting that the opportunity to conduct discovery may "render the non-disclosure harmless"). For the foregoing reasons, the Court declines to award sanctions pursuant to Rule 37(c).[20]

## 2. An Appropriate Sanction

The Court "must" impose "an appropriate sanction" in the event of a violation of Rule 26(g)(1). Fed. R. Civ. P. 26(g)(3). "The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation." *Id.* "[T]he decision of what sanction is appropriate . . . is committed to the district court's discretion." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1372 (11th Cir. 1997). In fashioning the appropriate

---

[20] Neither are sanctions warranted pursuant to the Court's inherent power to sanction. The Court may exercise this inherent power only upon a finding of subjective bad faith. *Purchasing Power*, 851 F.3d at 1225. Plaintiff does not argue that Northbrook's failure to timely produce relevant documents was motivated by bad faith; to the contrary, Plaintiff refers to Northbrook's conduct as "discovery negligence." (*See, e.g.,* Doc. 86 at 1, 4, 6, 10, 12, 15, 19, 21.) A showing of negligence is insufficient to warrant the exercise of the Court's inherent power to sanction. *Purchasing Power*, 851 F.3d at 1225.

sanction, "the Court considers the nature of the sanction 'in light of the particular circumstances.'" *Carter v. Butts Cnty., Georgia*, No. 5:12-CV-209 (LJA), 2016 WL 1274557, at *15 (M.D. Ga. Mar. 31, 2016) (quoting Fed. R. Civ. P. 26, Advisory Committee Notes (1983 Amendment)).

Plaintiff seeks attorneys' fees and costs incurred because of Northbrook's violation of Rule 26(g).  Northbrook does not dispute that Plaintiff has incurred attorneys' fees and costs that she would not have incurred had Northbrook conducted a timely, reasonable inquiry for responsive documents.  The Court finds that an award of fees, which is expressly contemplated by Rule 26(g)(3), is appropriate here.  Fed. R. Civ. P. 26(g)(3); *Fanelli v. BMC Software, Inc.*, No. 1:11-CV-436-LMM, 2015 U.S. Dist. LEXIS 188632, at *11 (N.D. Ga. Apr. 29, 2015) (imposing costs and fees, including those associated with a reopened deposition, caused by the defendant's belated production of documents).[21]

Plaintiff also seeks non-monetary sanctions such as the exclusion of certain arguments at trial related to the belatedly produced documents.  Considering the Court's determination that extended discovery and related

---

[21] The Court is not persuaded by Northbrook's argument that no "further" sanctions are warranted because Northbrook was "already [ ] sanctioned" by the two-month discovery extension.  (Doc. 88 at 16.)  None of Northbrook's cited authorities suggests that a consented-to discovery extension constitutes a "sanction" under Rule 26.

measures cured any prejudice to Plaintiff's ability to make her case, the Court finds the requested non-monetary sanctions to be disproportionate.

Having found that Plaintiff is entitled to monetary sanctions under Rule 26(g)(3), the Court must determine a reasonable fee award. To do so, the Court applies the "lodestar" formula, which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Norman v. Housing Auth.*, 836 F.2d 1292, 1299 (11th Cir. 1988). Plaintiff, as the party seeking a fee award, "bears the burden of . . . documenting appropriate hours and hourly rates" and must "supply[ ] the court with specific and detailed evidence" to allow it to determine a reasonable award. *Norman*, 836 F.2d at 1303.

Here, Plaintiff seeks $49,075 for 75.5 hours of work at an hourly rate of $650. (Doc. 86-33, 98.) Plaintiff also seeks $1,025.16 in expenses. (Doc. 98.) Northbrook does not dispute the reasonableness of Plaintiff's rate, but it does dispute the reasonableness of the number of hours claimed.

Attorneys' fees and expenses awarded pursuant to Rule 26(g)(3) "should be for the reasonable expenses incurred as a result of, or *caused by*, the offending conduct." *Taika Blaier v. Amps Staffing, Inc.*, No. 1:20-cv-2324-AT, 2022 U.S. Dist. LEXIS 151150, at *7-8 (N.D. Ga. July 26, 2022) (emphasis in original). In determining whether the claimed fee amount is causally related

to the Rule 26(g) violation, courts apply the but-for test articulated in *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017). *See, e.g., Taika Blaier*, 2022 U.S. Dist. LEXIS 151150, at *8 (applying *Goodyear* in determining Rule 26(g) sanction); *In re Scrap King LLC*, No. 8:18-cv-733-MSS-AEP, 2023 U.S. Dist. LEXIS 97365, at *14 (M.D. Fla. May 8, 2023) (same). In *Goodyear*, the Supreme Court provided the following guidance for how the but-for test is to be applied in practice:

> This but-for causation standard generally demands that a district court assess and allocate specific litigation expenses—yet still allows it to exercise discretion and judgment. The court's fundamental job is to determine whether a given legal fee—say, for taking a deposition or drafting a motion—would or would not have been incurred in the absence of the sanctioned conduct. The award is then the sum total of the fees that, except for the misbehavior, would not have accrued. . . . The court may decide, for example, that all (or a set percentage) of a particular category of expenses—say, for expert discovery—were incurred solely because of a litigant's bad-faith conduct. And such judgments, in light of the trial court's superior understanding of the litigation, are entitled to substantial deference on appeal.

581 U.S. at 109–10 (internal quotation marks and citations omitted). *Goodyear* also makes clear that "[t]he essential goal in shifting fees is to do rough justice, not to achieve auditing perfection." *Id.* at 110 (internal quotation marks omitted); *see also id.* ("[T]rial courts undertaking that task need not, and indeed should not, become green-eyeshade accountants (or whatever the contemporary equivalent is)."). To that end, "a district court may take into

account its overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."   *Id.* (internal quotation marks omitted and alteration adopted).

Plaintiff seeks attorneys' fees for the following tasks:

| Task | Amount of Time | Rate ($650/hour) |
|---|---|---|
| Drafted and sent emails to Defendant's counsel re Defendant's discovery negligence; reviewed and responded to Defendant's counsel emails re the same. *[Exhibits 3 - 20]* | 4.0* | |
| Drafted and served supplemental discovery requests in February 2023 necessitated by Defendant's negligence in responding to Plaintiff's September 2022 requests. *[Exhibits 4, 4a, 4b]* | 1.5* | |
| Drafted motion for discovery extension and corresponding proposed order resulting from Defendant's discovery negligence. *[Doc. 50, Doc. 50-1]* | 1.5 | |
| Prepared for and re-opened depositions of Defendant's 30(b)(6) representative, owner, and manager on May 2, 2023, following Defendant's April 20, 2023 production of 3,500 pages, including the hottest in the case. *[Deposition preparation included re-reviewing Defendant's earlier depositions, document production, and discovery responses, which, on some key issues, materially conflicted with Defendant's late production and responses.]* | 5.0* | |
| Prepared for and participated in phone calls with Defendant's counsel re Defendant's discovery negligence.   *[Phone calls on 3/30/23; 5/9/23; 5/30/23]* | 3.0 | |
| Drafted and sent communications to Court regarding discovery dispute.  Drafted and submitted discovery dispute statement to Court. *[Exhibit 16]* | 3.0* | |
| Prepared for and participated in telephonic conference with Court re discovery dispute statement. *[Doc. 72]* | 2.5* | |
| Drafted and filed motion for sanctions and memorandum in support. *[Doc. 86]* | 35.0 | |
| Reviewed and analyzed Defendant's response in opposition to Plaintiff's motion for sanctions *[Doc. 88]*; drafted and filed reply brief in support of motion for sanctions *[Doc. 91]*. | 15.0 | |
| Prepared for and participated in show cause hearing with Judge Geraghty on December 12, 2023. | 5.0 | |
| | 75.5** | $49,075 |

(Doc. 98-1 at 3.)[22]   Plaintiff also seeks $1,025.16 in expenses for "[h]iring [a] court reporter and videographer for re-opened depositions on May 2, 2023[.]" (Doc. 98-1 at 4.)  Counsel for Plaintiff, David Bouchard of Finch McCranie LLP,

---

[22] Plaintiff submitted a fee petition with her motion (Doc. 86-33) and later submitted an amended fee petition (Doc. 98-1) to account for time spent reviewing Northbrook's response brief, drafting a reply brief, and preparing for the show-cause hearing.

submitted an affidavit in support of Plaintiff's fee request.  (Doc. 86-33.)  Mr. Bouchard avers that he represents the plaintiffs in two other cases against Northbrook, both of which involved discovery disputes like the one at issue here.  (*Id.* ¶ 6.)  Counsel states that, "[t]o avoid recovering attorneys' fees for the same work multiple times, [he] ha[s] identified certain tasks that applied to all three cases" and divided the total hours expended by three.  (*Id.* ¶ 7.)[23] He states that the claimed fees "do[ ] not account for significant time devoted by another Firm lawyer and a Firm administrative support person[.]" (*Id.* ¶ 9 (emphasis omitted).)

Northbrook objects to the number of hours claimed for the preparation of the sanctions motion, arguing that the attorney time expended was not "caused by" the sanctioned conduct.  It also contends that "Plaintiff's counsel spent far more on the pending motion for sanctions than on any supposed extra work directly associated with the discovery deficiency."  (Doc. 88.)

The Court overrules Northbrook's objection in part and sustains it in part.  Northbrook's Rule 26(g) violation set in motion a chain of events that resulted in Plaintiff spending significant, additional time on discovery matters, including the instant motion.  *See Taika Blaier*, 2022 U.S. Dist. LEXIS 151150,

---

[23] These tasks are designated by asterisks in the chart above.  (Doc. 98.)

at *18 ("Put another way, 'but-for' Defendants' [sanctioned conduct], Plaintiff's counsel would not have incurred the cost of briefing the motion for contempt and sanctions for Defendants' failure to pay.") (citing *Goodyear*, 581 U.S. at 108).   Northbrook has offered no persuasive reason to reject Plaintiff's fee request in its entirety.   And *Goodyear* contemplates that a fee for "drafting a motion" may be recoverable as a sanction.  581 U.S. at 110.

The Court, however, agrees with Northbrook that the 50 hours Plaintiff claims for drafting her motion (35 hours) and reply brief (15 hours) are excessive.  To achieve "rough justice," *Goodyear*, 581 U.S. at 110, the Court will reduce the number of compensable hours by 20.   Plaintiff's remaining fee requests are reasonable, particularly considering her exclusion of fees for other attorneys and paralegals and the application of a discount for tasks performed in the three companion cases against Northbrook.

Plaintiff's claimed expenses are also reasonable.  Northbrook argues that Plaintiff's court reporter and videographer fees for the reopened depositions were not "caused by" the Rule 26(g) violation because "if the supplemental documents had instead been produced in the first instance, the result would have been longer first depositions for the Northbrook representatives[.]"  (Doc. 88 at 15.)  But that is speculative; we can't know how long depositions might have taken if the documents in question had been timely produced.  We do

know that Northbrook's missteps necessitated a second round of depositions and much discovery-related conferral and negotiation that would not have occurred otherwise.  Northbrook's objection is overruled.

In sum, Plaintiff has shown that 55.5 of the claimed 75.5 hours are reasonable and were caused by Northbrook's Rule 26(g) violation.  Plaintiff is entitled to $36,075 in fees and $1,025.16 in costs ($37,100.16 in total).

### V.   Conclusion

Defendant's motion for summary judgment (Doc. 103) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted as to Plaintiff's negligence claim but denied as to Plaintiff's TVPRA claim.

Plaintiff's motion for sanctions (Doc. 86) is **GRANTED IN PART**.  **IT IS HEREBY ORDERED** that Plaintiff is awarded $37,100.16 in attorneys' fees and costs, which sum shall be paid within 30 days of the entry of this order.

Northbrook's motions to exclude (Doc. 99, 100) and Plaintiff's motion to exclude (Doc. 109) are **STAYED** and will be considered in advance of the pretrial conference.   The parties are **DIRECTED** to submit a proposed consolidated pretrial order within 30 days of the entry of this order.

The parties are reminded that this Court offers litigants a dispute resolution program by which parties may request mediation with a United States Magistrate Judge.  If the parties are interested in availing themselves

of this procedure, they may file a joint motion requesting that the case be referred for mediation.

**SO ORDERED** this 15th day of August, 2024.

SARAH E. GERAGHTY
United States District Judge