Exhibit 5

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3              CASE NO. 1:20-cv-05232-JPB
                         1:20-cv-05231-JPB
 4                       1:20-cv-05233-SEG

 5   G.W., J.G. and A.G.,

 6                    Plaintiffs,
     vs.
 7
     NORTHBROOK INDUSTRIES, INC. d/b/a UNITED INN AND
 8   SUITES,

 9                    Defendant.

10   _____/

11          ZOOM VIDEO-RECORDED DEPOSITION OF

12                    KARIM VELLANI

13
              Tuesday, November 28th, 2023
14               9:32 a.m. - 4:07 p.m.

15

16          Stenographically Reported By:
                   Edward F. Kidd
17          Registered Professional Reporter

18

19

20

21

22

23

24

25
```

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 2..5

Page 2

```
 1   APPEARANCES:
 2   (All appearances remotely via Zoom)
 3
     On behalf of Plaintiffs:
 4
 5        FINCH McCRANIE, LLP
          229 Peachtree Street Northeast
 6        Suite 2500
          Atlanta, Georgia 30303
 7        (404)658-9070
          BY: DAVID H. BOUCHARD, ESQ.
 8        david@finchmccranie.com
 9
     On behalf of Defendant Northbrook Industries d/b/a
10   United Inn & Suites in the A.G. and G.W. Matters:
11
          LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
12        600 Peachtree Street Northeast
          Suite 4700
13        Atlanta, Georgia 30308
          (404)348-8585
14        BY: ADI ALLUSHI, ESQ.
             CAMERON MOBLEY, ESQ.
15        adi.allushi@lewisbrisbois.com
          cameron.mobley@lewisbrisbois.com
16
17   On behalf of Defendant Northbrook Industries d/b/a
     United Inn & Suites in J.G. Matter:
18
19        SMITH, GAMBRELL & RUSSELL, LLP
          1105 West Peachtree Street Northeast
20        Suite 1000
          Atlanta, Georgia 30309
21        (404)815-3500
          BY: DANA M. RICHENS, ESQ.
22        drichens@sgrlaw.com
23
24   ALSO PRESENT:  ROCCO FRANCO, Videographer
25
```

Page 3

```
 1              I N D E X
 2
 3   Examination                          Page
 4   Direct          By Mr. Bouchard         5
     Cross           By Ms. Richens        232
 5   Redirect        By Mr. Bouchard       233
 6   Certificate of Oath                   236
     Certificate of Reporter               237
 7   Errata Sheet (forwarded upon execution) 238
 8           PLAINTIFF EXHIBITS
 9
     No.                                   Page
10
     1    TAG Threat Analysis Report J.G. vs. 37
11        Northbrook
12   2    TAG Threat Analysis Report A.G. vs. 38
          Northbrook
13
     3    TAG Threat Analysis Report G.W. vs. 38
14        Northbrook
15   4    10/29/18 Email from Tim Wade to    96
          United Inn, Subject: Missing Person -
16        Attachments: Bolo Jhordyn Grimes.docx
17   5    Comprehensive Human trafficking  126
          Assessment
18
     6    Vellani Invoices Pertaining to A.G. 235
19
     7    Vellani Invoices Pertaining to G.W. 235
20
     8    Vellani Invoices Pertaining to J.G. 235
21
22
23   (Stenographer's Note:  All documents were sent
     electronically.  A digital sticker was placed on the
24   documents which were marked during the proceeding.)
25
```

Page 4

```
 1   The following proceedings began at 9:32 a.m.:
 2        THE VIDEOGRAPHER:  This is the beginning
 3   of the deposition of Karim Vellani in the
 4   matter of G.W. versus Northbrook Industries,
 5   Inc., et al.  Today's date is November 28th,
 6   2023, and the time on the monitor is 9:32 a.m.
 7        My name is Rocco Franco and I'm the
 8   videographer.  The court reporter is Ed Kidd.
 9   And we are here with Huseby Global Litigation.
10        Counsel, please introduce yourselves after
11   which the court reporter will swear in the
12   witness.
13        MR. BOUCHARD:  Good morning.  David
14   Bouchard for the law firm Finch McCranie on
15   behalf of plaintiffs A.G., G.W. and J.G.
16        MR. ALLUSHI:  Good morning.  Adi Allushi
17   and Cameron Mobley is here as well from Lewis,
18   Brisbois, Bisgaard & Smith on behalf of United
19   Inn for the A.G. and G.W. cases.
20        MS. RICHENS:  And I'm Dana Richens with
21   Smith, Gambrell & Russell on behalf of
22   Defendant Northbrook Industries, Inc. d/b/a
23   United Inn & Suites in the J.G. matter.
24        THE STENOGRAPHER:  All right.
25   Mr. Vellani, would you kindly raise your right
```

Page 5

```
 1   hand.
 2        Do you solemnly swear that the testimony
 3   you are about to give will be the truth, the
 4   whole truth, and nothing but the truth?
 5        THE WITNESS:  Yes, sir, I do.
 6   Thereupon:
 7              KARIM VELLANI
 8   having been first duly sworn, was examined and
 9   testified as follows:
10              DIRECT EXAMINATION
11   BY MR. BOUCHARD:
12   Q.   Good morning, Mr. Vellani.  My name is
13   David Bouchard.  We met briefly off the record.
14   It's nice to see you this morning, sir.
15   A.   You too, sir.  Nice to meet you.
16   Q.   And, sir, you understand that I represent
17   the plaintiffs A.G., G.W. and J.G. in three separate
18   cases filed against United Inn and Suites.  You
19   understand that?
20   A.   Yes, I do.
21   Q.   And you and I have not spoken prior to
22   today, is that correct, sir?
23   A.   That is correct.
24   Q.   You have never spoken to anybody from my
25   law firm.  Is that also correct?
```

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                          **Pages 6..9**

---

Page 6

1   A.   I don't know.  I don't think so.
2        MR. BOUCHARD:  All right.  For the record,
3   just a few preliminary items.  This deposition
4   is taken on behalf of plaintiff [A.G.] in case
5   number 120-cv-05231.  It has been cross-noticed
6   in case number 120-cv-05232 which is [J.W.]'s
7   lawsuit and in case number 120-cv-05233 which
8   is [J.G.]'s lawsuit.
9        And I will say for the record for the
10  purposes of the court reporter, there is a
11  confidentiality order in effect in all three
12  cases.  So while I will be referring to the
13  plaintiffs at times by their full names, I
14  would ask that all references to the plaintiffs
15  be modified in the record to their first
16  initials which is how the cases are captioned.
17  Counsel for the defendants in all three cases
18  are present after receiving reasonable notice
19  of the deposition.
20       Counsel, is it agreeable that all
21  objections other than to the form of the
22  question or to an issue of privilege are
23  preserved?
24       MS. RICHENS:  Yes, and I would also like
25  to confirm our agreement before we got on the

---

Page 7

1   record to stipulate that any objection by
2   counsel in one case would be deemed an
3   objection similarly stated by counsel in the
4   other case or cases so that we're not bogging
5   down the stenographer.
6        MR. BOUCHARD:  That's confirmed, Dana.
7        MR. ALLUSHI:  Agreed on behalf of Lewis
8   Brisbois, too.
9        MR. BOUCHARD:  This deposition is taken
10  pursuant to properly served deposition notices
11  and cross-notices and is taken for all purposes
12  permitted under the Federal Rules of Civil
13  Procedure and the Georgia Civil Practice Act
14  including but not limited to preservation of
15  testimony and cross-examination.
16       Is that agreed, Counsel?
17       MS. RICHENS:  Why are you referencing the
18  Georgia Civil Practice Act?
19       MR. BOUCHARD:  Because we have a
20  negligence claim under Georgia law.
21       MS. RICHENS:  Okay.  Fine.
22  BY MR. BOUCHARD:
23       Q.   Mr. Vellani, today I'm going to be
24  referring to "the United Inn and Suites," "the
25  United Inn," "the hotel" at various points.  I'll be

---

Page 8

1   referring to the United Inn and Suites at 4649
2   Memorial Drive in Decatur, Georgia, in slightly
3   different ways.  But, sir, I would like you to agree
4   with me that our understanding today will be that
5   when we're talking with a break or the United Inn
6   or 4649 Memorial, we're talking about the same
7   place, the United Inn and Suites.  Is that
8   agreeable, sir?
9        A.   Yes, sir.
10       Q.   I understand, Mr. Vellani, that you have
11  been deposed before.  Is that correct?
12       A.   Yes, sir.
13       Q.   I'm going to bypass the typical ground
14  rules of the deposition because I'm comfortable and
15  trusting that you understand them, sir, based on
16  your experience in prior depositions.  Just two
17  points I did want to cover with you.  One, if
18  anybody needs to take a break but most importantly,
19  you, Mr. Vellani, at any point in time, please let
20  me know.  I would just ask that you wait to ask for
21  a break until after any pending questions have been
22  answered in full.  Is that fair?
23       A.   Yes, sir.
24       MR. BOUCHARD:  And I will note for the
25  record, Dana, and Adi and Mr. Videographer, and

---

Page 9

1   the court reporter, I have a brief call that I
2   need to make at 11:00 a.m.  So I am planning to
3   take a break from probably 10:55 to
4   approximately 11:05 or 11:10.  Just for
5   planning purposes, I'm letting everybody know
6   that.
7   BY MR. BOUCHARD:
8        Q.   Mr. Vellani, is there any reason that you
9   are not in a position today to offer clear and
10  correct testimony?
11       A.   No, sir, I'm able to do that.
12       Q.   You're in a position to provide reliable
13  and trustworthy testimony today?
14       A.   Yes, sir.
15       Q.   Thank you, sir.
16       Mr. Vellani, do you have a law degree?
17       A.   I do not.
18       Q.   Have you attended law school?
19       A.   No, sir.
20       Q.   Have you taken the bar exam in any of the
21  50 states?
22       A.   No, sir.
23       Q.   Have you ever filed a lawsuit?
24       A.   No, sir.
25       Q.   I take it you've never stood up in court

---

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                                        Pages 10..13

Page 10

1  on behalf of a client as a lawyer representing a
2  client?
3      A.  Let me back up.  You say have I ever filed
4  a lawsuit.  My company filed a lawsuit which I'm the
5  sole owner of.  And I have stood up in court in
6  front of a judge and dealt with that lawsuit.
7      Q.  Does that relate to business matters
8  before your company?
9      A.  Yes, sir.
10     Q.  Other than that, any other lawsuits you've
11 been involved with?
12     A.  No, sir.
13     Q.  Does the lawsuit pertain to your work as a
14 security consultant?
15     A.  It was a small claim regarding unpaid
16 bills.
17     Q.  Have you ever stood up in court on behalf
18 of a client as an advocate for a client?
19     A.  No, sir.
20     Q.  Have you ever worked for the judiciary?
21     A.  No, sir.
22     Q.  For a judge?
23     A.  No, sir.
24     Q.  Or a court?
25     A.  Other than as an expert witness, no, sir.

Page 11

1      Q.  Do you consider yourself or hold yourself
2  out to be an expert in the law?
3      A.  No.
4      Q.  Have you worked in the hospitality
5  industry?
6      A.  I have provided consulting services in the
7  hospitality industry.  I've never been employed by a
8  hotel.
9      Q.  And we'll talk about consulting services
10 you provided to the hospitality industry later.  But
11 for now, you've never been employed by a hospitality
12 services provider like a hotel, motel, or anything
13 else?
14     A.  Correct.
15     Q.  Do you have experience in hotel
16 operations?
17     A.  Through my consulting practice, yes, sir.
18     Q.  Do you consider yourself an expert in
19 hotel operations?
20     A.  Well, the security operations, yes.
21     Q.  What about nonsecurity operations?
22     A.  I'm going to generally say no.
23     Q.  Are you a member of any hospitality trade
24 groups or organizations?
25     A.  No, sir.

Page 12

1      Q.  Are you a member of the American
2  Hospitality and Lodging Association?
3      A.  No, sir.
4      Q.  The Asian American Hotel Owners
5  Association?
6      A.  No, sir.
7      Q.  The Georgia Hospitality and Lodging
8  Association?
9      A.  No, sir.
10     Q.  Have you ever attended any of the
11 conferences put on by any of those hospitality trade
12 groups or organizations that I just named?
13     A.  Not that I can recall, sir.
14     Q.  Do you have a medical degree?
15     A.  No, sir.
16     Q.  Have you attended medical school?
17     A.  No, sir.
18     Q.  Do you consider yourself an expert in
19 medicine?
20     A.  No, sir.
21     Q.  Are you a psychiatrist?
22     A.  No, sir.
23     Q.  Are you a psychologist?
24     A.  No, sir.
25     Q.  Have you ever worked as a law enforcement

Page 13

1  officer?
2      A.  No, sir.
3      Q.  Do you have law enforcement training?
4      A.  Yes, sir.
5      Q.  What training do you have?
6      A.  So my undergrad bachelor's degree is
7  criminal justice with a specialization in law
8  enforcement.  I've also been trained by the Texas
9  Commission on -- well, now it's called TCOLE --
10 Texas Commission on Law Enforcement standards with
11 respect to firearms training.
12     Q.  Any other law enforcement training?
13     A.  I've attended various trainings with
14 respect to criminal profiling, gang crimes.  And
15 there might be some other ones listed on my CV.
16     Q.  That's all that's coming to mind right
17 now, though?
18     A.  Yes, sir.
19     Q.  Have you ever investigated a crime
20 personally?
21     A.  Yes.
22     Q.  Which crimes?  Can you tell me about that?
23     A.  Well, there are times in my consulting
24 practice where I've had to do, you know, what I
25 would consider to be HR-related investigations.  I

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 14..17

Page 14

1  also worked as a private investigator before working
2  for a consulting firm.  So there were various
3  different types of crimes.
4      Q.    Let me ask it this way:  Have you ever
5  investigated a crime as a law enforcement officer?
6      A.    No, sir.
7      Q.    Have you ever made an arrest?
8      A.    No, sir.
9      Q.    Do you consider yourself an expert in law
10  enforcement?
11      A.    No, sir.
12      Q.    Have you ever worked as a service provider
13  for sex trafficking victims or survivors?
14      A.    No, sir.
15      Q.    Have you ever worked for a sex trafficking
16  survivors or victims organization?
17      A.    No, sir.
18      Q.    Have you ever interviewed a sex
19  trafficking victim or survivor?
20      A.    I don't know that we were using those
21  terms back in 2009.  So given we weren't using those
22  terms specifically, the answer would be no.
23      Q.    Who were you thinking of in 2009?
24      A.    So in 2009 I was hired by a law firm who
25  was working for the mayor's office of Houston to

Page 15

1  evaluate specific hotels where there was a lot of
2  vice activity and potential sex trafficking going
3  on.  That was -- so that was 2009.  It was on the
4  heels of the Wilberforce TVPRA 2008 law.  So during
5  that time I did interview prostitutes.  Whether they
6  were trafficking victims or not, I don't know.
7  That's not my call.
8      Q.    How many did you interview during that
9  time in connection with that project that you're
10  describing?
11      A.    Probably around half a dozen.  Half a
12  dozen to a dozen.
13      Q.    Have you interviewed any sex trafficking
14  victims or survivors since that project that you're
15  describing in 2009?
16      A.    No, sir.
17      Q.    You mentioned that it wasn't your call to
18  determine whether they were prostitutes or sex
19  trafficking victims.  What did you mean by that?
20      A.    Well, obviously, we're dealing with -- in
21  this situation we're dealing with the Texas penal
22  code.  So is not up to me to make that
23  determination.  Ultimately, I think that's the DA's
24  decision as to whether to charge someone with, you
25  know, being a prostitute or being a victim of sex

Page 16

1  trafficking.
2          So I think, you know, like law
3  enforcement, they make an initial assumption on
4  whether the person is a criminal or victim.  But
5  ultimately, it's the DA that makes that decision.
6  Then I assume at some point it's the judge's
7  decision.
8      Q.    Have you ever interviewed an individual
9  who was engaged in commercial sex activity as a
10  minor?
11      A.    Well, I don't know the ages of those
12  people I was mentioning.  So I don't know.
13      Q.    Have you ever worked on a sex trafficking
14  case as a law enforcement officer?
15      A.    No, I've never been a law enforcement
16  officer.
17      Q.    I understand that you worked for the
18  Department of Homeland Security for 11 years.  Can
19  you tell me what your role there entailed, sir?
20      A.    Yeah, I didn't work directly for DHS.
21  This actually was a project that started pre-9/11.
22  It's an entity called Federal Protective Service
23  which is now under Homeland Security.  Previously it
24  was under the General Services Administration.  So
25  what I did is -- this was, you know, early in my

Page 17

1  company's history.  So I took a job working for a
2  company called, SEG, Inc., as a quality control
3  monitor wherein I would go to federal buildings
4  across Texas initially and inspect the security
5  officers that were assigned to those federal
6  buildings that was everything from a federal
7  building like the Murrah Federal Building in
8  Oklahoma, that kind of building and everything down
9  to a small little social security office that was
10  next to a Walmart in some small town.  So I
11  inspected the security officers, ensuring they were
12  in compliance with the contract and ensuring they
13  were in compliance with the policies and procedures
14  of the company.  And inspected their morale,
15  inspected their uniform.  That kind of stuff.  That
16  eventually grew into a contract for my company where
17  I believe we were in 23 states and on a monthly
18  basis we were inspecting about 11- -- 1,000 to 1100
19  officers every month across 700 federal buildings in
20  23 states, and that varied over time.
21      Q.    Did your job consist of any other duties
22  or responsibilities other than what you just
23  described or is what you just provided a fair
24  summary?
25      A.    No.  That was the bulk of it.  There were

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                                    Pages 18..21

Page 18

1  times I had to go out and do an HR investigation.
2  In fact, that is what I was doing on 9/11 for work.
3  I was conducting an investigation that was related
4  to, you know, kind of a human resources type of an
5  issue.  I was also assisted that company with
6  hiring security officers at the start of new
7  contracts.  So there were some ancillary stuff that
8  happened during that 11 years, but the bulk of it
9  was what I mentioned.
10     Q.   Do you hold yourself out as an expert in
11 sex trafficking?
12     A.   I hold myself as an expert in crime
13 analysis and crime prevention wherein I look at
14 different types of crime.  Sex trafficking being one
15 of them.  But would I hold myself out as an expert
16 in sex trafficking exclusively?  No.  It would be
17 all within the confines of security and crime
18 prevention.
19     Q.   Do I understand correctly, Mr. Vellani,
20 that you are a CPP and a CSC?
21     A.   Yes, sir.
22     Q.   I just want to ask you about those.  What
23 is CPP?
24     A.   So a CPP stands for Certified Protection
25 Professional.  It's kind of a gold standard in the

Page 19

1  security industry.  It is a certification that is
2  hosted by the -- by what's now called ASIS
3  International which used to be called American
4  Society for Industrial Security.  It's the largest
5  security association in the world.  Basically, it's
6  a self-study program where you can attend classes,
7  either hosted at the local chapter or at, you know,
8  headquarters, I guess, during the annual conference.
9  It took me about a year to study for it because I
10 did not want to fail the test.  Took the test,
11 passed the test.  And there's a recertification, I
12 think, every three years.
13     Q.   Did you find it to be a fairly rigorous
14 process?
15     A.   Very much.
16     Q.   What does the CPP credential signify in
17 terms of what you're able to do?
18     A.   Well, like I said, it's kind of the gold
19 standard for the security industry.  I don't know
20 that it necessarily qualifies me to do anything.  It
21 basically says I have this baseline of knowledge.
22          There are times when I'm bidding on
23 projects where they require a CPP.  So, you know,
24 there are some clients that require it in order to
25 hire you or in order for you to be qualified to bid

Page 20

1  on a project and win a project.  So it comes in
2  handy in that situation.  I don't know anything, you
3  know, beyond that what it does.
4      Q.   Does it enable you to conduct risk
5  assessments?
6      A.   Well, risk assessments can be done without
7  a CPP.  But, again, it depends on what the client's
8  requirements are.  If they have a requirement for a
9  CPP to do a risk assessment at the property, then it
10 does.  But most clients don't require that.
11     Q.   Most clients, you're saying, interested in
12 a risk assessment do not require a CPP, is that
13 fair?
14     A.   Yeah.  I think probably 70 percent.  Just
15 looking back on my consulting practice, probably
16 70 percent have no preference to the CPP whatsoever.
17 Probably about 25 percent have it as a preference
18 and maybe 5 percent require it.
19     Q.   If a client came to you and said, "Hey,
20 we're looking at you considering you or we're also
21 considering somebody else who doesn't have a CPP to
22 conduct a risk assessment that we want done," what
23 would your opinion be about whether they would get
24 just as good a job from somebody who didn't have a
25 CPP as if they got it done from you?

Page 21

1          MR. ALLUSHI:  Objection.
2      A.   I don't -- I don't think the CPP has that
3  kind of power.  I think the -- I think the quality
4  of the risk assessment is based on the quality of
5  the individual conducting the risk assessment.  So
6  I've written extensively.  Researched extensively.
7  I published a book and two editions and a third one
8  on the way regarding risk assessments.  I think that
9  makes me far more qualified than a CPP would grant
10 me.  I'm not trying to diminish the certification,
11 but I don't think it has the kind of power you're
12 suggesting it might have.
13     Q.   Do you believe that the CPP qualifies you
14 to serve as a forensic security consultant?
15     A.   No.  It's not a requirement.
16     Q.   What qualifies you to serve as a forensic
17 security consultant?
18          MS. RICHENS:  Objection.
19     A.   Ultimately, I think that's the judge's
20 decision, right?  That's not my decision, it's not
21 your decision, that's not defense counsel's
22 decision.  That's the judge's decision.  The CPP
23 might play into the qualifications but I don't think
24 that's the end-all be-all.
25

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                         Pages 22..25

Page 22

1   BY MR. BOUCHARD:
2       Q.   And I'm not suggesting that it is.  I'm
3   just asking what do you believe qualifies you to
4   serve as a forensic security consultant?
5       A.   So, again, if you look at my CV, number
6   one, starting with the education, you know, I've got
7   a bachelor's degree in criminal justice with a
8   specialization in law enforcement.  I have a
9   master's degree in criminal justice management.
10  I've got extensive experience including working for
11  another expert witness when I first got into this
12  business.  You know, while an undergrad during an
13  internship, I have published extensively in the area
14  of security.  I have written extensively, researched
15  extensively in the field of crime prevention, crime
16  analysis and security risk assessments.  So that's
17  probably the core of it.
18           On top of that, I have the certifications.
19  You know, on top of that I've been, you know,
20  allowed to testify in court in I think 9 or 10
21  trials.
22      Q.   Do you think research or publications
23  aren't necessary to establish somebody as a forensic
24  security consultant?
25      A.   So are you asking that in the eyes of the

Page 23

1   courts?  Because, I mean --
2       Q.   No, I'm not.  I'm asking that of
3   Karim Vellani.  I'm not asking you to speak as the
4   court.
5       A.   So it is my belief that research and
6   publishing is a critical requirement to show or to
7   demonstrate that one is up to speed in their field
8   of study.  And can then, you know, testify as an
9   expert witness.  Is it a necessity?  Not that I'm
10  aware of.  Because, obviously, at some point we all
11  start off as an expert without those publications
12  sometimes.
13      Q.   Do you agree that the CPP certification
14  means that the applicant has demonstrated knowledge
15  and competency in seven key domains of security?
16      A.   Yes, sir.
17      Q.   Do you agree that the CPP certification is
18  globally recognized as the standard of excellence
19  for security management professionals?
20      A.   It's certainly the marketing pitch for the
21  ASIS.
22      Q.   Do you quibble with that or disagree with
23  it?
24      A.   No, I don't disagree with it.
25      Q.   You also are a CSC.  Can you tell me about

Page 24

1   what that means and what it entails?
2       A.   Sure, so the CSC is a Certified Security
3   Consultant.  It is a certification that is hosted by
4   the International Association of Professional
5   Security Consultants.  It basically demonstrates
6   that you have the knowledge within the security
7   consulting field and it looks at -- I don't know
8   about today, but when it started it looked at three
9   different domains.  Physical security, security
10  management and forensic security.
11      Q.   Have you been evaluated on all three of
12  those domains or one but not the other?  Can you
13  explain that, please?
14      A.   Yes.  I mean, you're taxing my brain here.
15  I'm trying to remember the history of this.  So as I
16  recall, you're tested on all three domains plus
17  ethics.  So you certainly have to have a baseline
18  knowledge in all three areas.  But you most
19  certainly had to excel at one or two of the areas in
20  order to pass the test.  I mean, in other words, you
21  couldn't just have knowledge in one area and pass
22  the test.
23      Q.   I understand.  Which of those areas are
24  you the strongest in?  Which of those three are you
25  the strongest in and which are you comparatively

Page 25

1   weaker in?
2       A.   So I would say --
3           (Zoom distortion.)
4       A.   -- security management -- well, at the
5   time that I took the exam, I would say security
6   management would be my strongest suit followed by
7   forensic security followed by physical security and
8   I think that's still true today.
9       Q.   Does the CSC, in your opinion,
10  Mr. Vellani, qualify you to do things that the CPP
11  that you also have does not qualify you to do?
12      A.   Well, again, you say "qualify."  I mean,
13  as independent security consultants, which I am, you
14  know, it's in the eye of the buyer, right?  So
15  ultimately you are selling your services and if the
16  client deems it necessary or preferential, then,
17  yes.  If they don't, then, no.
18      Q.   As a security professional, somebody who
19  works in the security industry, in your opinion,
20  does the CSC qualify you to do things that somebody
21  without a CSC is not qualified to do?
22      A.   Again, I'm not the buyer, right?  So if
23  somebody is trying to hire me as a security
24  consultant, they place value on the CSC.  I don't
25  get to make that decision.  That's in the eye of the

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                                    Pages 26..29

Page 26

1  buyer.
2      Q.   Is it fair to say you don't have an
3  opinion on that or you don't hold an opinion on
4  that?
5          MR. ALLUSHI:  Objection.
6      A.   So I think the CSC is good.  I think it's
7  great.  But, you know, I'm not the one that's doing
8  the hiring, right?  That is up to -- in the case of
9  my consulting practice, that is up to my client to
10  make that decision whether they hold value in that
11  or, you know, in the case of litigation, whether the
12  judge sees value in that.
13      Q.   I understand what you're saying.  But I'm
14  not asking for, you know, what your client might
15  think or believe.  I'm asking for what you think or
16  believe.  Do you have anything further to add or
17  have you answered the question?
18          MR. ALLUSHI:  Objection.
19      A.   Well, like I mentioned, I think the CSC is
20  a very good certification.  I think the -- the fact
21  that it requires, you know, much like the CPP, the
22  CSC also requires recertification demonstrating, you
23  know, experience, education, training, you know,
24  presentations that you have given, participation in
25  the industry.  I think all of those things are a

Page 27

1  good thing.
2  BY MR. BOUCHARD:
3      Q.   Have you spoken to Plaintiff G.W. before?
4      A.   No, sir.
5      Q.   Have you ever asked to do so?
6      A.   No, sir.
7      Q.   Have you ever spoken to Plaintiff A.G.
8  before?
9      A.   No, sir.
10      Q.   Have you asked to do so?
11      A.   No, sir.
12      Q.   Have you spoken to Zaccheus Obie.
13      A.   No, sir.
14      Q.   Have you asked to do so?
15      A.   No, sir.
16      Q.   Have you asked Zaccheus Obie how often he
17  trafficked minors at the United Inn?
18      A.   No, sir.
19          MR. ALLUSHI:  Objection.
20  BY MR. BOUCHARD:
21      Q.   Have you asked him why he chose the
22  United Inn?
23          MR. ALLUSHI:  Objection.
24      A.   No, sir.
25  BY MR. BOUCHARD:

Page 28

1      Q.   Have you spoken to Kikia Anderson?
2      A.   I don't know who that is, sir.
3      Q.   I take it then you have not asked to speak
4  to her since you don't know who that is, is that
5  fair?
6          MR. ALLUSHI:  Objection.
7      A.   Correct.
8  BY MR. BOUCHARD:
9      Q.   Have you asked Kikia Anderson how often
10  she trafficked minors at United Inn?
11          MR. ALLUSHI:  Again, I'm going to object
12      to this.  He said he doesn't know who that is.
13      What's the point of asking the questions,
14      David?
15          MR. BOUCHARD:  Adi, you can have a
16      standing form objection to this line of
17      questioning.  That's fine.
18  BY MR. BOUCHARD:
19      Q.   Have you asked Kikia Anderson how often
20  she trafficked minors at the United Inn,
21  Mr. Vellani?
22      A.   No, sir.
23      Q.   Have you asked her why she chose the
24  United Inn?
25      A.   No, sir.

Page 29

1      Q.   Have you spoken to Plaintiff J.G.?
2      A.   No, sir.
3      Q.   Have you asked to do so?
4      A.   No, sir.
5      Q.   Have you spoken to any of her alleged
6  traffickers: Shaq, Shay, Cash or King?
7      A.   No, sir.
8      Q.   Have you asked to do so?
9      A.   No, sir.
10      Q.   Have you asked any of J.G.'s traffickers
11  how often they trafficked minors at the United Inn?
12          MS. RICHENS:  Objection.
13      A.   No, sir.
14  BY MR. BOUCHARD:
15      Q.   Have you asked any of J.G.'s traffickers
16  why they chose the United Inn?
17          MR. ALLUSHI:  Objection.
18      A.   No, sir.
19  BY MR. BOUCHARD:
20      Q.   Have you spoken to Ashar Islam?
21      A.   No, sir.
22      Q.   Have you asked to do so?
23      A.   I don't know.  I don't think so.
24      Q.   I understand that you have spoken to
25  Tahir Shareef?

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                                    Pages 30..33

Page 30

1    A.    Yes, sir.
2    Q.    How many times have you spoken to
3    Tahir Shareef?
4    A.    I believe it was just one time.
5    Q.    Have you personally visited the United
6    Inn?
7    A.    Yes, sir.
8    Q.    I'm going to ask you about that a little
9    bit later but just for now I wanted to ask have you
10   stayed at the United Inn?
11   A.    No, sir.
12   Q.    Have you asked to stay at the United Inn?
13   A.    No, sir.
14   Q.    When did you first visit the United Inn?
15   A.    January 17, 2023.
16   Q.    So you never went to the United Inn in the
17   years 2017, 2018, or 2019, is that correct?
18   A.    Correct.
19   Q.    Where did you stay when you came to
20   Atlanta in January 2023?
21   A.    I don't know, sir.  You know, I mean, I
22   stayed in various hotels in Atlanta, depending where
23   I got to be.  I don't know where I stayed that
24   particular trip.
25   Q.    But you know you did not stay at the

Page 31

1    United Inn?
2    A.    Correct.
3    Q.    Is that correct?
4    Are you familiar or are you aware with
5    internet websites that existed in 2017, 2018, and
6    2019 to advertise sex for money?
7    A.    Some of them, yes.
8    Q.    Which of the websites are you familiar
9    with, sir?
10   A.    Well, Backpage is the obvious answer.  You
11   know, there were some other ones.  USA Sex Guide.  I
12   don't believe Craig's List was doing advertisements
13   back then.  But they might have been.  You know,
14   there's other ones.  Rubmaps comes to mind.
15   Q.    Did you do any research as part of your
16   engagement in this case about the United Inn on any
17   of the websites you just mentioned?
18   A.    Well, Backpage didn't exist when I was
19   engaged with this, when I was initially engaged with
20   this lawsuit and I did not look at any of the other
21   ones.  It wouldn't do me any good, obviously, I'm
22   four, five years removed from the time of the
23   incident.
24   Q.    Mr. Vellani, you're, obviously, not
25   claiming to be an eyewitness to any of the events

Page 32

1    alleged in the complaints, is that fair?
2    A.    That's fair.
3    Q.    Are you going to provide an opinion at
4    trial about whether Plaintiff G.W. is credible?
5    A.    No, sir.
6    Q.    What about whether Plaintiff J.G. is
7    credible?
8    A.    No, sir.
9    Q.    Or whether Plaintiff A.G. is credible?
10   A.    No, sir.
11   Q.    Are you going to provide an opinion at
12   trial about whether Tahir Shareef is credible?
13   A.    No, sir, I don't make credibility
14   judgments.
15   Q.    I take it it's the same answer as to
16   Ashar Islam?
17   A.    Correct.
18   Q.    We're going to talk about your expert
19   reports here shortly, sir.  But just at the outset
20   before we get into them, I wanted to ask you are all
21   of the opinions that you hold in the A.G., G.W., and
22   J.G. cases set forth in your expert reports?
23   A.    Yes, sir.
24   Q.    Are there any opinions you're going to
25   offer at trial that are not set forth in the expert

Page 33

1    reports?
2    A.    I assume that you will be eliciting
3    further opinions from me or sub-opinions to my
4    primary opinion and certainly defense counsel may do
5    the same.  So I can't answer that definitively.
6    What I can tell you is that whatever opinions you
7    guys elicit, I would assume they would fall under
8    the general opinion I've given already.
9    Q.    And as you're sitting here right now,
10   you're not aware of any other new or different
11   opinions that aren't already contained in your
12   reports that you prepared in this case?
13   A.    That's correct.
14   Q.    Do you plan to provide an opinion at trial
15   about whether plaintiffs were or were not trafficked
16   at United Inn?
17   A.    I already stated that as a fact in the
18   reports.
19   Q.    Do you plan to provide an opinion at trial
20   about whether plaintiffs were minors engaging in sex
21   for money at United Inn?
22   A.    I don't remember exactly how I worded it
23   in the reports but I think I already acknowledged
24   that factually they're victims of sex trafficking by
25   virtue of their age.

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 34..37

Page 34

1    Q.   Will you provide an opinion at trial,
2  Mr. Vellani, about whether sex trafficking was
3  foreseeable at United Inn?
4    A.   So I don't -- you know, my opinion is
5  contained in here in this -- these reports.  And I
6  don't use the word foreseeability in these reports.
7  So the answer would be no.  But, you know, again, if
8  the judge asked me the question, I would certainly
9  answer it.
10    Q.   Will you provide an opinion at trial about
11  whether United Inn knew or should have known that
12  plaintiffs were sex trafficking victims?
13    A.   I think I addressed that in my report as
14  well.  They certainly didn't have knowledge of it.
15    Q.   When you say that "they certainly didn't
16  have knowledge of it," are you saying that, in fact,
17  the defendant, United Inn and Suites, did not have
18  knowledge of it, or are you saying based on your
19  review of the discovery materials, you've concluded
20  that they did not have knowledge of it?
21    MR. ALLUSHI:  Object to the form.
22    A.   The latter, but also the interview that I
23  conducted.  So based on the discovery materials that
24  I reviewed, I see no evidence that they were aware
25  of it.  And also, I spoke to Mr. Shareef and I don't

Page 35

1  see any -- he didn't know about any of this.
2  BY MR. BOUCHARD:
3    Q.   I asked you previously if you're planning
4  to offer credibility determinations at trial.  Do
5  you recognize that if there's a divergence between
6  what the plaintiffs say and what Tahir Shareef or
7  Ashar Islam say on behalf of United Inn and Suites,
8  the fact finder in the case, that is the jury, may
9  have to make a credibility determination?
10    A.   Yes, I understand that.
11    Q.   Are you intending to come into the
12  courtroom as an expert and say I vouch for the
13  credibility of Tahir Shareef and what he told me?
14    MR. ALLUSHI:  Objection.
15    A.   No, sir.
16  BY MR. BOUCHARD:
17    Q.   I didn't hear your answer.
18    A.   No, sir.
19    Q.   Do you intend to provide an opinion at
20  trial about whether United Inn had certain duties
21  under the law?
22    A.   I mean, that sounds like a legal analysis
23  that I would have to do.  So I would say generally
24  no.  What my opinions would be -- would be regarding
25  the standard of care.

Page 36

1    Q.   Is that what your opinions, in your mind,
2  Mr. Vellani, concern, that is, the standard of care?
3    A.   That would be the primary opinion, yes,
4  would be the standard of care.  But like I said,
5  there may be -- there are certainly sub-opinions
6  under that that I'm sure you'll elicit or defense
7  counsel will elicit.
8    Q.   Will you provide an opinion at trial about
9  whether defendant should or should not be found
10  liable for the causes of action set forth in the
11  complaints?
12    A.   Seems like a jury decision to me.
13    MR. ALLUSHI:  Object to the form.
14  BY MR. BOUCHARD:
15    Q.   Will you provide an opinion at trial about
16  whether plaintiffs have suffered damages?
17    A.   No, sir.
18    Q.   Will you provide an opinion at trial about
19  the adequacy of plaintiffs' allegations?
20    A.   I'm going to say no, but I don't know what
21  you're saying.  Adequacy of their allegations?
22    Q.   The suspicion -- let me try to rephrase
23  that.
24    Will you provide an opinion at trial,
25  Mr. Vellani, about whether plaintiffs have

Page 37

1  sufficiently alleged their causes of action in order
2  to -- for United Inn to be found liable?
3    MR. ALLUSHI:  Objection.
4    A.   I'm going to say no.  I don't fully
5  understand what you're saying but...
6  BY MR. BOUCHARD:
7    Q.   Mr. Vellani, do you have your expert
8  reports printed out in front of you or do you have
9  them otherwise available?
10    A.   Yes, sir.
11    Q.   Okay.  Are you going to be referring to
12  the electronic copies or paper copies?
13    A.   The electronic copies.
14    Q.   And you're comfortable with the
15  electronic, sir?
16    A.   Certainly more so than paper.
17    Q.   I am, too, but not everybody is of that
18  stripe.  So I just wanted to confirm.
19    A.   Yes, sir.
20    Q.   I'm going to identify your expert report
21  in the J.G. matter as Exhibit 1.
22    (Thereupon, marked as Plaintiff
23    Exhibit 1.)
24    MR. BOUCHARD:  Your expert report in the
25  A.G. matter as Exhibit 2.

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 38..41

Page 38

1       (Thereupon, marked as Plaintiff
2    Exhibit 2.)
3       MR. BOUCHARD:  And your expert report in
4    the G.W. matter as Exhibit 3.
5       (Thereupon, marked as Plaintiff
6    Exhibit 3.)
7    BY MR. BOUCHARD:
8       Q.   Mr. Vellani, I'll represent that the
9    reports I have seen that I have copies of are dated
10   June 14, 2023.
11      A.   Yes, sir.
12      Q.   Are those the most up-to-date reports that
13   you have prepared?
14      A.   Yes, sir.
15      Q.   Have you made any changes to your reports
16   since June 14th, 2023?
17      A.   No, sir.
18      Q.   Do you agree that the opinions provided in
19   Exhibits 1, 2, and 3, that is, the J.G. report, the
20   A.G. report, and the G.W. report are identical
21   opinions?
22      A.   The opinions are identical.  The actual
23   reports are not entirely identical.
24      Q.   What are the differences between the
25   reports in the three cases?

Page 39

1       A.   Well, I'm going to go from mostly memory
2    here.  But I'll also flip through them.  Obviously,
3    the material reviewed is different in each case.  Or
4    at least the difference between A.G., G.W., and then
5    separately, J.G.'s got, you know, different
6    documents.  The background section for each incident
7    is different.  Each is, you know, specific to each
8    of the plaintiffs.  There was the issue with J.G.
9    when the police were on-site that is specifically
10   addressed.  There is the incident with respect to
11   the period -- the period for the crime analysis that
12   I looked at would be different based on the period
13   of trafficking.  Because each -- all three were
14   different.  The crime history on the property which
15   would be within the scope of my crime analysis are
16   different because the trafficking periods are
17   different.  A.G. and G.W. have that specific
18   incident and the people knocking on their door.  You
19   know, that didn't apply to the J.G. report.  So
20   that's different.  There's also that situation where
21   A.G. and G.W. lost the key, their guest room key.
22   So that would be different and wouldn't apply to
23   J.G.  So those are -- I think I've hit all the
24   differences.
25      Q.   So I can represent to you, Mr. Vellani,

Page 40

1    that I set the three reports down and went through
2    them and my list is very similar to yours.  Let me
3    just kind of compare and confirm here, if I can.
4       A.   Sure.
5       Q.   Looking at the table of contents for
6    Plaintiffs' Exhibit 1 which is the J.G. report, I
7    believe that the following sections have some
8    differences across the three reports.  The materials
9    received section?
10      A.   Yes, sir.
11      Q.   The subject incident background section?
12      A.   Yes, sir.
13      Q.   The analysis of crime at the United Inn
14   and Suites section?
15      A.   Yes, sir.
16      Q.   The awareness section?
17      A.   I don't know if there was a difference
18   there.  Was there?  Let me take a quick look at
19   that, if you don't mind.  Give me one second, sir.
20      Q.   No problem.
21      A.   Yeah, I mean, there's a difference there
22   because that's referring to that knocking loudly on
23   the door.  Yeah.  There is a difference there.
24      Q.   And the last section, referring back to
25   the table of contents, where I saw a difference

Page 41

1    between the three reports, was the guest management
2    section.  Do you agree with that?
3       A.   Is that regarding the -- yeah, that's the
4    difference with the lost room key, yes, sir.
5       Q.   I'm not aware based on my review of the
6    reports of any other sections that are different
7    between the three reports.  Does my summary there
8    seem reasonable to you, Mr. Vellani?
9       A.   Yes, sir.  Well.  Let me back up.  The
10   Appendix C is different.
11      Q.   Yes, sir.  That's correct.  I missed that.
12   And I appreciate the clarification.  Any other
13   sections other than the ones I've listed and what
14   you just flagged that you're aware of?
15      A.   I don't think so.
16      Q.   Looking at page 1 and, again, because the
17   majority of the sections across the three reports
18   are similar, or identical, rather, Mr. Vellani, I'm
19   going to generally be referring to Exhibit 1 which
20   is Plaintiff J.G.'s report, okay?
21      A.   Okay.
22      Q.   Where there are differences between the
23   three reports, I will perhaps ask you specific
24   questions about those differences.  And if you're
25   aware of differences that are relevant to the

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 42..45

---

Page 42

1   questions I'm asking, I would like you to raise
2   those differences with me.  Is that fair?
3          A.   That's fair.
4          Q.   Just a quick question on page 1 of
5   Exhibit 1, sir, you say "This report may be
6   supplemented as additional discovery is made
7   available and other case activity is completed."
8          You've mentioned that the reports dated
9   June 14th are the most up to date and they have not
10  been updated since then.  As you sit here today, do
11  you intend to supplement the June 14th reports?
12         A.   Only if there's additional discovery that
13  I got access to.  As of right now, there is nothing
14  else.
15         Q.   Are there any materials you needed to
16  prepare your reports that you did not receive?
17         A.   No, sir.
18         Q.   And I take it --
19         A.   Let me be clear about one thing.  There is
20  no other discovery.  There is other research that
21  I've looked at since these reports were published.
22  So those other studies I think you were provided a
23  list of the human trafficking references.  There is
24  a couple studies in there that I may address.  But
25  that's certainly not part of the discovery in this

Page 43

1   case.
2          Q.   And I take it your answer as to your
3   intent to supplement your report and any materials
4   you needed that you have not received would be the
5   same for the A.G. and G.W. reports, is that correct?
6          A.   Correct.
7          Q.   Mr. Vellani, let's take a look at page 3,
8   the second paragraph of page 3, and we're looking at
9   Plaintiffs' Exhibit 1 which is the J.G. report.
10  Page 3, paragraph 2.  Which starts, "Karim's
11  practical experience in mitigating sex
12  trafficking..."  Do you see that, sir?
13         A.   Yes, sir.
14         Q.   You're familiar with that paragraph, of
15  course?
16         A.   Yes, sir.
17         Q.   What sex trafficking stress and
18  vulnerabilities, to use the language from paragraph
19  two here did you identify at specific hotels in
20  Houston?
21         A.   I'm sorry.  What specific threats and
22  vulnerabilities?
23         Q.   What sex trafficking threats and
24  vulnerabilities did you identify at specific hotels
25  in Houston?

Page 44

1          A.   So, I mean, let me kind of back up and
2   give you my recollection of that project.  So a law
3   firm called -- that was retained by the mayor's
4   office, I went downtown, met with them.  They
5   explained what the concerns were, what the project
6   was, what they wanted me to ultimately do.  So as I
7   recall, I treated it no different than I do any of
8   my other security risk assessment projects which
9   means that I started with evaluating the crime
10  statistics for the individual hotels that I was
11  looking at.  So I pulled the -- requested the
12  current data from Houston Police Department for the
13  specific hotels, did a deep dive on -- I can't
14  remember in 2009 if that was, like, offense data or
15  call for service data, but regardless, it was some
16  kind of raw data.  Pulled that data, analyzed that
17  data.  And then I went back and requested police
18  reports on specific incidents.  I recall at some
19  point going to the property, spending a lot of time
20  at these different hotels.  And then as I mentioned,
21  I also interviewed some of the, you know, the
22  prostitutes that were working that area.
23         I also interviewed some of the hotel
24  managers and hotel staff that were working there.  I
25  went back at night, did an assessment.

Page 45

1          So ultimately -- because this was for a
2   number of different hotels.  There were several
3   different crime analyses that were done.  One for
4   each one.  And then one generally for the area that
5   we were looking at.  So that was the threat
6   assessment part.
7          The vulnerability assessment was unique to
8   each individual hotel.  Some of these were motels,
9   some of them were hotels.  Some of them had, like,
10  a -- I want to say like a motor court.  The one that
11  I'm thinking of, you drove into, you know, you drove
12  in off the street into an enclosed parking area and
13  it was enclosed by the structural buildings.  The
14  actual buildings of the motel.  So some of them had
15  night windows only.  Some of them had different
16  signage.  Some of them had a front desk that was
17  accessible by guests, some of them were not.  So the
18  vulnerabilities were unique to each one.  The threat
19  assessment was also unique to each one.
20         Q.   How do you distinguish between a threat
21  assessment and vulnerability assessment?
22         A.   So there is -- basically, if you you've
23  ever looked at my books, Strategic Security
24  Management, there is a five-step process for
25  evaluating risks.  Step number one is to identify

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                   Pages 46..49

Page 46

1  what we're trying to protect.  That's the asset
2  identification.  The second thing is the threat
3  assessment.  That means what are we protecting
4  against.  So threat assessment, what are we
5  protecting against?
6          The third part is an evaluation of the
7  security measures in place.
8          And the fourth part is the vulnerability
9  assessment which is where you're looking for the
10  gaps in the security program.
11          And then ultimately it culminates in the
12  fifth step which is the risk assessment itself.  So
13  threats are, you know, what we're protecting against
14  and vulnerabilities are the gaps or weaknesses in
15  the security program.
16      Q.   In looking back at Exhibit 1, your report,
17  in the J.G. matter, it says that you, quote -- I'm
18  changing the verb tense here -- "identified threats
19  and vulnerabilities at specific hotels..."
20          Do you see that?
21      A.   Yes, sir.
22      Q.   What do you mean, like, what did you
23  identify?
24      A.   So like I said, I pulled -- for the threat
25  assessment part, you know, obviously, I listened to

Page 47

1  the client about what their concerns were.  I
2  listened to the hotels about what their concerns
3  were.  Whether it was, you know, clerks, hotel staff
4  or management.  I pulled the crime data for the
5  property.  And then secondly, the vulnerability
6  assessment is where I actually went on-site,
7  conducted interviews, reviewed the security measures
8  in place at each hotel.  And then further refined
9  the threat assessment based on specific concerns I
10  heard from staff and management on-site.
11      Q.   So I appreciate -- as I understand your
12  answer, you're sort of walking me through the
13  process and procedure you followed to prepare your
14  analysis?
15      A.   Yes, sir.
16      Q.   My question is intended to get more at
17  what the conclusions were as it relates to threats
18  and vulnerabilities.  And I understand they were
19  hotel specific.  But can you give me some examples,
20  please, of your conclusions as to the threats and
21  vulnerabilities at the hotels you were involved with
22  looking at.
23          MR. ALLUSHI:  Objection.
24      A.   We're talking 15 years ago.  I don't
25  recall the specific threats.  I can imagine they

Page 48

1  entailed, you know, various types of vice crimes.
2  I'm sure there were some of those hotels that
3  actually had prostitution or arrests.  And in the --
4  specifically, I mean, with respect to the
5  vulnerabilities, all I can recall is that I came up
6  with a list of evidence-based measures that would
7  work to try to thwart -- like, for example, some of
8  those hotels were renting by the hour.  So that was
9  something that ultimately was in my report that they
10  needed to change.
11          But as far as what the specific
12  vulnerabilities were, you know, I don't recall a
13  whole lot of them other than that one that keeps
14  coming to mind where I can envision, you know, the
15  driving in from the street and having only that one
16  access point which was a good thing.  But,
17  unfortunately, it was being used in a nefarious way.
18      BY MR. BOUCHARD:
19      Q.   Did you prepare and submit a report with
20  your findings to the City of Houston?
21      A.   I don't know if I submitted a report in
22  writing.  I recall going back down to the -- going
23  back downtown and meeting with the attorneys and
24  giving them some documentation regarding
25  evidence-based practices.  But I don't know if I

Page 49

1  actually wrote a report or they wrote the report.  I
2  don't recall that.
3      Q.   You say in the same paragraph here that
4  you developed methods for mitigating the risk of sex
5  trafficking and vice crimes.  Can you tell me what
6  methods you developed for mitigating the risk of sex
7  trafficking and vice crimes?
8      A.   Well, the one that comes to mind is the
9  hourly rentals.  That was probably the -- that's the
10  thing that's sticking in my mind.  You know, what
11  the other ones were, I don't recall off the top of
12  my head.  I mean, that was -- you know, there's --
13  unfortunately, there's a dearth of research with
14  respect to what works and what doesn't.  So it's
15  possible I gave them some recommendations regarding,
16  you know, crime prevention meetings, working with
17  the police.  I think I recall -- again, this is 15
18  years ago -- so I think I recall giving them
19  information about working with the police not
20  requiring warrants in order to give the guest
21  registry access to the rooms and video surveillance
22  for those hotels that had video surveillance.  Not
23  all of them did.
24      Q.   And I understand we're talking about
25  events 15 years ago and you're doing your best to

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                     Pages 50..53

Page 50

1  recall and I appreciate that.
2          Are there any other methods that as you're
3  sitting here right now you can recall or have you
4  exhausted your memory?
5      A.  Yeah, I've exhausted my memory, sir.  If
6  anything else come to mind, I'll let you know.
7      Q.  Other than the work you did for the City
8  of Houston in 2009, what other practical experience,
9  to use the language here that you used in
10 paragraph 2, do you have mitigating sex trafficking
11 at lodging facilities?
12     A.  Well, so, you know, most of my work is
13 consulting.  Not litigation.  So litigation stuff
14 only started a couple years ago with respect to sex
15 trafficking specifically.  So a lot of my clients
16 have hotels on their properties.  So when I conduct
17 a security risk assessment, these are one of the
18 conceptual threats that I look at.  So with respect,
19 you know, what is the risk of your hotel being used
20 for prostitution or sex trafficking.  So that would
21 have been throughout the course of my, you know,
22 practice.  Most of the work that I've done recently,
23 probably the most notable work is in the healthcare
24 field.  Not so much in the hotels.  But with respect
25 to hotels, it would just be on an ongoing basis as I

Page 51

1  evaluate different properties.
2          You know, one of the things that I'm
3  looking for in hotels or even residential
4  environments, you know, because most trafficking
5  actually, according to the data, occurs in
6  residential environments, not in hotels.  So even in
7  the apartment complexes that I evaluate, that is
8  something I'm looking for, you know, to see if it's
9  a concern.
10         So when I review the crime history, you
11 know, primarily what I'm doing is I'm driving --
12 using the crime history of the property and the
13 concerns expressed by stakeholders to drive the
14 analysis that I'm conducting.  So if a hotel is
15 telling me that they've got a concern about this,
16 then that's one of the issues I'll look at.  If they
17 tell me they're only concerned about burglaries in
18 motor vehicles, that's what I'm looking at.  I'm not
19 necessarily looking at prostitution or sex
20 trafficking.
21         But I don't know if I've answered your
22 question.
23     Q.  I think you have.  Do you consider the
24 police to be stakeholders?  Or who counts as a
25 stakeholder?

Page 52

1      A.  Well, the stakeholder would be ultimately
2  the people that are, you know, responsible for
3  managing the place.  So the police are not
4  necessarily my client.  They're not the stakeholders
5  as I'm using the term.
6      Q.  Tell me if I'm misstating or
7  misunderstanding.  As I understand your testimony a
8  moment ago, Mr. Vellani, you're saying that you have
9  conducted a number of risk assessments for hotel
10 properties that include consideration of the risk of
11 sex trafficking or commercial sex activity on the
12 property?
13     A.  Yes, sir.  It's -- yes.
14     Q.  So my next question is, approximately how
15 many of those types of risk assessments have you
16 performed?
17     A.  Specifically for hotels?
18     Q.  Yeah, of that specific type of risk
19 assessments for hotels that include consideration of
20 sex trafficking risks?
21     A.  I don't know that I can break it down by
22 hotel over the years.  But, you know, this is
23 something that has -- you know, obviously, working
24 with the city was somewhat -- well, it was very
25 informative for me that this was a concern.  And

Page 53

1  then, obviously, understanding what the FBI or what
2  the Department of Justice did in 2008 with the
3  Wilberforce TVPRA.  It has always been an ongoing
4  concern for me throughout the years as I conduct
5  these assessments.  But, you know, every year is a
6  little different for me.  I mean, some years I'm
7  doing more consulting with hospitals.  Some years
8  I'm doing more consulting with shopping centers,
9  retail stores.  Some years are more heavy on, you
10 know, multi- -- with -- with mixed-use properties
11 which include hotels.
12         So, you know, is it something I'm working
13 on every single year in terms of actual consulting?
14 No.  Is it something that I'm researching, you know,
15 every year?  Yes.  But I can't tell you, like, the
16 number of hotels that I've looked at over the years.
17 I mean, in it's been 15 years.  You know, I don't
18 know the answer.
19     Q.  Are you able to provide me with an
20 approximate range of how many?  In other words, is
21 it more than 10?  Is it more than 25?  Is it more
22 than 50?  Is it more than 100?  Can you give me an
23 approximate range?
24     A.  I don't know.  I mean, I'd have to go back
25 and look at the different projects because a lot of

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 54..57

Page 54

1  these projects are for large property owners that
2  own multiple different types of properties within a,
3  you know, single plot of land so to speak.  So the
4  ones that's coming to mind, they have a mall.
5  They've got commercial office buildings.  They have
6  residential buildings.  They have hotels.  You know,
7  so I don't know the number.  I'd have to go back and
8  think about that.
9       Q.   Well, because this is the only opportunity
10  I have to depose you in advance of trial,
11  Mr. Vellani, I'm trying to get, as best I can, an
12  understanding of your expertise, experience,
13  education, and so forth.
14       A.   Yes, sir.
15       Q.   And I know you understand that because
16  you've been through discovery before.
17            Can you tell me, have you conducted more
18  than 10 risk assessments for hotels that include
19  consideration of sex trafficking risks?
20       A.   Yes, sir.  I answered yes.  More than 10,
21  yes.  Somewhere between 10 and 100.  I'd have to go
22  back and look, like I said.
23       Q.   And is that something that you've done in
24  recent years or is that something that you were
25  doing in 2009 in that period but you've stopped

Page 55

1  doing?
2       A.   No.  It's been an ongoing thing.  I still
3  got clients with those kinds of properties.
4       Q.   On page 3, looking at the same paragraph
5  of Exhibit 1, it says that you've researched and
6  published on sex trafficking mitigation and
7  developed programs for identifying responding to sex
8  trafficking victims in various environments, notably
9  in the healthcare environment.  Do you see that?
10       A.   Yes, sir.
11       Q.   There's two footnotes on the bottom of the
12  page and both appear to be references to
13  publications that are for healthcare environments.
14  Is that fair?
15       A.   Correct.
16       Q.   Have you researched and published on sex
17  trafficking mitigation and environments other than
18  the healthcare environment?
19       A.   Researched, yes.  Published, those are my
20  only two articles with respect to sex trafficking.
21  One of them addresses -- I think actually both of
22  them may address hotels as well, but they're focused
23  on healthcare.
24       Q.   Using the language that you're using here
25  in paragraph 2 of Plaintiffs' Exhibit 1, have you

Page 56

1  developed programs for identifying and responding to
2  sex trafficking victims in the hospitality
3  environment?
4       A.   Not specifically in the hospitality.  I
5  have researched on hospitality in order to establish
6  a standard of care.  I have written and published on
7  healthcare.
8       Q.   In paragraph 3 towards the bottom, the
9  last sentence of paragraph 3 says that you've worked
10  on projects, and you list different customers or
11  clients, as I understand it, that you've worked on
12  projects with as a consultant.  Is that correct?
13       A.   Yes, sir.
14       Q.   And you list hotels and motels towards the
15  end.
16       A.   Yes, sir.
17       Q.   Have you told me about the projects, to
18  use your language, that you have worked on for
19  hotels and motels?  Or are there other projects that
20  we haven't discussed that you're referring to there?
21       A.   I think we've covered it.
22       Q.   I was interested that it said you've
23  worked on projects for financial institutions, too.
24  What are those projects?
25       A.   Banks.  Looking at the -- primarily the --

Page 57

1  so sometime back we had written an article I believe
2  I coauthored with someone else on ATM security.  So
3  because of that article I've gotten calls and been
4  retained by banks to evaluate their crime on their
5  property.  There's a law in Texas that requires
6  every operator of an ATM to review their crime on an
7  annual basis at the properties.  So I've done that.
8  I've also done vulnerability assessments of banks.
9       Q.   Take a look at page 5 of Exhibit 1 which
10  is the materials received section, Mr. Vellani.
11       A.   Yes, sir.
12       Q.   And I take it that all the materials that
13  you received and reviewed are listed here on page 5?
14       A.   I believe so.  I don't think there's any
15  that's come in after this.
16       Q.   Is that the same for Exhibits 2 and 3,
17  A.G. and G.W.'s reports?
18       A.   Yes, sir.
19       Q.   Is it your testimony that you have
20  received and reviewed all of the documents produced
21  in discovery in this case, whether by the plaintiffs
22  or by United Inn or a third party?
23       A.   Listen, I think all experts are hamstrung
24  by what the attorneys give them and don't give them.
25  So it is my understanding that I have everything.

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                                    Pages 58..61

Page 58

1   But I don't know that anything was withheld from me.
2       Q.    I wanted to ask you just a few questions
3   about the materials that you considered that are
4   listed here on page 5, Mr. Vellani.  In the course
5   of your review of materials that you received for
6   preparation of your reports, Exhibits 1, 2, and 3,
7   did you seek background check documentation on
8   United Inn employees?
9       A.    No, sir.
10      Q.    When you work as a consultant with hotels,
11  do you recommend that they conduct background checks
12  on the staff that they hire?
13      A.    Yes, sir.  The short answer is yes.
14      Q.    Do you consider that to be a security
15  industry standard?
16          MR. ALLUSHI:  Objection.
17      A.    To conduct a background check on
18  employees?  Yes.
19  BY MR. BOUCHARD:
20      Q.    Why is that?
21      A.    Again, let me be clear about this.  I'm
22  not aware of any written standard that requires it
23  unless you adopt such a standard.  It's certainly a
24  good practice to do a background check on your
25  employees or if you're, you know, an apartment

Page 59

1   complex, your residents.  So it's certainly good
2   practices but I'm not aware of any standard which
3   requires it.
4       Q.    Why do you recommend to your hospitality
5   clients that they conduct background checks on their
6   staff?
7       A.    Primarily because you're concerned about,
8   you know, fiduciary responsibilities, right?  I
9   mean, if you got somebody that's got, you know, a
10  history of theft of money or credit card fraud and
11  things like that, you know, you want to try to keep
12  those people out of it -- out of the, you know, out
13  of your employment.
14          In the situation with respect to
15  trafficking, or prostitution, you know, one of the
16  concerns would be that they've got a background in
17  vice crimes.  So conducting a criminal background
18  check is certainly a good idea.
19      Q.    Did you -- as part of the materials
20  received in preparation for your expert reports, did
21  you interview hotel staff or review interview notes
22  of hotel staff interviews?
23      A.    I'm not aware of any hotel staff interview
24  notes.  The only person that I've interviewed in
25  this case is Mr. Shareef.

Page 60

1       Q.    Did you ask to interview hotel staff?
2       A.    I did not.  We were five years removed
3   from the incident.  So I did not.
4       Q.    Do you personally know that hotel staff
5   working at the hotel in 2017 through 2019 spoke
6   English?
7           MR. ALLUSHI:  Objection.
8       A.    I think I had asked Mr. Shareef about
9   that.  And either that -- or the deposition -- it
10  was either the deposition or during the interview
11  that I -- that question came up.  Whether it was by
12  you or by me.  My understanding, or my recollection
13  was that, you know, the staff spoke a sufficient
14  amount of English to get by to do their job.
15  BY MR. BOUCHARD:
16      Q.    That's your understanding based on what
17  Mr. Shareef told you?
18      A.    Yes.  As I recall, again, whether he told
19  me or said in a deposition, I don't recall where
20  that came up.
21      Q.    Do you know how many people were on staff
22  at the hotel in 2017?
23      A.    Yeah, he talked about that.  I asked
24  specifically about, you know, the day shift.  So on
25  page 15 they were five housekeepers, one front desk

Page 61

1   person, a groundskeeper.  So that's seven.  And then
2   at night there was two, the police officer when the
3   police officer was there.  Otherwise, it was just
4   the night shift clerk.
5       Q.    And you're -- as I understand it, your
6   answer is about how many people were working at a
7   given time of day at the hotel.  I'm asking do you
8   know how many people were on staff generally at the
9   hotel in 2017?
10      A.    Well, I mean, I think that would -- this
11  would give us nine plus the owner.
12      Q.    Well, do you think that those people were
13  working seven days a week?
14          MR. ALLUSHI:  Objection.
15      A.    No.  What I'm saying is what -- either in
16  the deposition or in the interview, he gave me a
17  list of all the staff members by title and the count
18  by title.  So, no, I don't think they were working
19  seven days a week.  They might have been.  I have no
20  idea.  What I was trying to get from him -- I think
21  these came from the interview notes -- was where I
22  got these numbers from.
23  BY MR. BOUCHARD:
24      Q.    When you say interview notes, are you
25  saying of your interview of Mr. Shareef?

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                                    Pages 62..65

Page 62

1    A.   Yes, sir.
2    Q.   Did you personally ask Mr. Shareef
3  questions?
4    A.   Yes, sir.
5    Q.   And you recorded notes of the interview?
6    A.   I put notes into the report which
7  ultimately became part of my report.
8    Q.   Do you have notes independent of your
9  report from the interview?
10   A.   No, sir.  Everything was incorporated.  So
11 I had a working document that ultimately turned into
12 the report.
13   Q.   Okay.  So other than the nine people
14 referenced on page 15 of your expert reports, you're
15 not aware of whether there were any other staff
16 members at United Inn in 2017?
17   A.   No, and I should say 10.  10, 10 people
18 including the second police officer.  I mean, again,
19 if we're trying to get a total number, I think 10.
20 10 would be about the right number.  If we're not
21 including Mr. Shareef himself who was there
22 sometimes.
23   Q.   What I would like to do is include
24 Mr. Shareef but I would not like to include the
25 police officers who worked off duty.  I'm talking

Page 63

1  about hotel staff.  Not those who contracted with
2  the hotel.
3    A.   Sure.
4    Q.   How many did you understand, based on your
5  interview of Mr. Shareef, were on hotel staff in
6  2017?
7    A.   So based on your guidance with that
8  question, you've got one in terms of the owner.
9  You've got the manager.  You've got five
10 housekeepers.  You've got the front desk person who
11 may or may not be the same as the owner or manager.
12 And then you got the groundskeepers.  So that's
13 five, six, seven, eight, nine?
14   Q.   And is your understanding that the
15 staffing was the same in 2018 and 2019?
16   A.   You know, I don't -- I certainly didn't
17 ask them to break it down by year.  So I don't know
18 the answer.  I think when I asked the question, you
19 know, we didn't narrow it down for each year.  So I
20 don't know the answer to that.  I don't know if he
21 had the years where he had less staffing or years
22 where he had more staff.
23   Q.   Have you reviewed lists of who worked at
24 the hotel from 2017 to 2019 in the course of your
25 review of discovery materials in this case?

Page 64

1    A.   So I don't have a specific recollection of
2  any list.  I guess it might have shown up in some of
3  the discovery responses.  But I don't recall
4  specifically seeing that.
5    Q.   So you do not recall seeing lists of who
6  worked at the hotel, is that correct?
7         MR. ALLUSHI:  Objection.
8    A.   Again, it's possible that a list existed
9  in one of the discovery responses but I don't have a
10 specific recollection of the list right now.
11   Q.   Have you -- and I take it the answer is no
12 based on your answer there but tell me if I'm wrong.
13 Have you compared lists of staff produced by
14 United Inn in discovery in this case?
15   A.   Compared it to what?
16   Q.   To each other, the different lists of
17 hotel staff?
18   A.   Yes, again, I don't have any specific
19 recollection.  So I don't know if there are
20 different lists or whether there is even a list.  I
21 don't know.
22   Q.   When you are working as a security
23 consultant with a hotel that's hired you to provide,
24 for example, a risk assessment, Mr. Vellani, is it
25 important for you to understand who works at the

Page 65

1  hotel?
2         MR. ALLUSHI:  Objection.
3    A.   What do you mean by who works, like by
4  name?
5  BY MR. BOUCHARD:
6    Q.   Is it important for you to know how many
7  people work at the hotel?
8    A.   Well, some of those people play greater
9  importance, right?  Like, I'm not really that
10 concerned with the groundskeeper.  I'm more
11 concerned with the staff working in the hotel.  You
12 know, the staff, the housekeepers, the number of
13 housekeepers, the number of people working at the
14 front desk.  But I don't really get bogged down by,
15 you know, the number of groundskeepers, for example,
16 or maintenance people.  So yes, I do ask the
17 question.  I do have that information but I can't
18 think of a place where it actually has a lot of
19 relevance like the number of housekeepers or the
20 number of groundskeepers.
21   Q.   But the number of housekeepers or the
22 number of people working at the front desk or in a
23 security-related function, is that important to you
24 in connection with a risk assessment?
25   A.   It can be.  I mean, it depends on the

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**

Pages 66..69

Page 66

1  nature of the engagement.  If they're concerned
2  about burglaries of motor vehicles or auto thefts in
3  the parking lot, I'm far less concerned about the
4  staff members in the office.  I'm more concerned
5  about the number of people that are engaged in the
6  parking lot.  Whether it's a security officer or,
7  you know, front desk staff that's working out into
8  the parking lot.  So it depends on the nature of the
9  assessment.
10      Q.  If you were working for a hotel that asked
11  you to do a risk assessment and as part of that
12  assessment you were considering the risk of sex
13  trafficking, would it concern you if the hotel gave
14  you different lists of staff with different numbers
15  of staff members on it?
16          MR. ALLUSHI:  Objection.
17  BY MR. BOUCHARD:
18      Q.  Go ahead, Mr. Vellani.
19      A.  I'm sorry.  Would it concern me if they
20  gave me different lists?  I've not experienced that.
21      Q.  Okay.  So have you ever been in a
22  situation as a consultant advising a hotel on risks
23  related to sex trafficking where you've had
24  difficulty getting information from the hotel about
25  who worked at the hotel?

Page 67

1          MR. ALLUSHI:  Objection.
2      A.  Well, I mean, keep in mind that you're
3  asking me about something that I'm doing in the
4  moment.  I don't think I have ever experienced where
5  someone has given me -- having difficulty telling me
6  who is in their employ right now at the time of the
7  assessment because it's realtime.  You know, they
8  may have forgotten someone, I suppose.  But -- and
9  they may have clarified later on or when I go
10  on-site, you know, I find an extra staff member
11  there they hadn't mentioned during the telephone
12  interview that occurred before I went on-site.  But,
13  you know, we're talking about in the moment when I'm
14  doing a risk assessment.  I'm not doing this five
15  years in the past.
16  BY MR. BOUCHARD:
17      Q.  But if the hotel that you were working
18  with had been doing background checks, they should
19  have records of that, you agree, of who they had
20  conducted background checks on in order to gain
21  employment at their hotel?
22          MR. ALLUSHI:  Objection.
23      A.  You mean they should have had records of
24  it?  Are you asking me if they should have had
25  records?

Page 68

1  BY MR. BOUCHARD:
2      Q.  If a hotel had done background checks, you
3  would expect them to maintain records of them?
4      A.  Yes.  It depends on how they're doing it,
5  right?  Because they're a lot of portals that are
6  used now.  You know, the example I'm thinking of is
7  where they have already got an established criteria
8  set up with the background check company and they
9  simply get a pass or fail and that's sometimes
10  through an online portal.  So is it ideal that they
11  would print off a copy of that or somehow save the
12  report and put it in the personnel file, yes.  But I
13  certainly have come across circumstances where the
14  criminal background check would be through the
15  portal and they didn't save a record of it.  They
16  just have to go back into the portal if they still
17  have access.
18      Q.  Did you interview Detective Weber?
19      A.  Did I interview him?  I don't think I
20  interviewed the police officers.  I don't know.  I
21  don't think I did.
22      Q.  Did you ask to?
23      A.  No.  I think they -- I think, because I
24  got the affidavits, that kind of satisfied my needs.
25      Q.  Have you seen in the course of your review

Page 69

1  of the discovery materials and materials in this
2  case, have you seen a do not rent list?
3      A.  I don't know that I've seen one.  I mean,
4  I certainly asked about it but I don't know that
5  I've actually seen it.  I don't recall seeing it.  I
6  don't know if it was, you know, an exhibit to one of
7  the depositions.  I don't recall seeing one.
8      Q.  In the course of your review of discovery
9  materials, did you see nightly security
10  documentation or reports from the hotel security
11  that worked from 10:00 p.m. to 2:00 a.m.?
12      A.  No, sir.
13      Q.  Did you see any sign-in/sign-out sheets
14  for trainings of hotel staff?
15      A.  No, sir.
16      Q.  Did you see any documents showing which
17  hotel staff received trainings?
18      A.  No, sir.
19      Q.  Did you review United Inn's guilty plea to
20  the DeKalb County code enforcement violations?
21      A.  I'm aware of it.  I don't know that I've
22  seen documentation regarding it.
23      Q.  Did you review a missing person notice
24  relating to Plaintiff J.G.?
25      A.  Again, I can go back through my file and

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                              Pages 70..73

Page 70

1  see if I've actually seen it.  I want to say that I
2  have but I don't recall specifically.
3          MR. BOUCHARD:  This is probably a good
4      time to take a break and go off the record.
5          THE VIDEOGRAPHER:  Okay.  The time on the
6      monitor is 10:54 a.m. and we're off the record.
7          (Recess 10:54 a.m. until 11:14 a.m.)
8          THE VIDEOGRAPHER:  The time on the monitor
9      is 11:14 a.m.  We are back on the record.
10  BY MR. BOUCHARD:
11      Q.  Mr. Vellani, I wanted to ask, have you
12  seen an affidavit from a young woman named Nova who
13  says that she was at the United Inn and Suites with
14  J.G.?
15      A.  That does not sound familiar.
16      Q.  If you can take a look at page 6 of
17  Plaintiffs' Exhibit 1, sir, which I'll represent to
18  you the language I'm going to point you to from
19  page 6 of Exhibit 1 is also contained in Exhibits 2
20  and 3 where you talk about on January 17th
21  conducting a day and night inspection and on
22  May 25th interviewing Tahir Shareef.  Do you see
23  that, sir?
24      A.  Yes, sir.
25      Q.  I would like to start with the day and

Page 71

1  night inspection.  Can you tell me what that
2  consisted of?
3      A.  Yes.  So I think the day inspection I went
4  out there at about 1:00 p.m., spent some time at the
5  property.  Went and looked around the entirety of
6  the property.  Walked it, drove it, looked for
7  concealment opportunities.  I think at that point I
8  had known that J.G. said she had sex in a car in the
9  parking lot.  So I was looking for concealment
10  opportunities.  I was looking at the breezeways
11  where the front door -- I'm sorry -- where the front
12  office was.  The number of access points to the
13  property.  And then I went and drove the area to get
14  an understanding of, you know, what else was in the
15  area.  I may have known about the other hotels in
16  the area.  Stone Mountain Inn and that kind of
17  thing.  And the gas stations.  But, you know, that's
18  kind of my routine is to go look at the area.  And
19  then I went back to the hotel that afternoon and
20  then I went back at night to go and just see what it
21  looked like at night.  I mean, I didn't go out there
22  and try to look at lighting and try to assume what
23  I'm seeing today or that day was the same I would
24  have seen, you know, back in '17, '18.
25      Q.  What time of night did you go back?

Page 72

1      A.  I don't know, sir.  It was after dark.
2  That's all I recall.
3      Q.  Was it before midnight?
4      A.  I'm sure it was before midnight, yes.
5      Q.  Okay.  And what was the purpose of going
6  back at night?
7      A.  Sometimes I just like to get a feel for an
8  area at night.  Not necessarily the property, but
9  the area.
10      Q.  You said you're sure it was before
11  midnight.  Do you think it was before 9:00 p.m.?
12      A.  I couldn't tell you, sir.  You know, I
13  couldn't tell you what time it was.
14      Q.  Okay.  You described what you did when you
15  went at 1:00 p.m.  And I wanted to just kind of
16  start there and we'll talk about night and then
17  at -- is there anything else that you did when you
18  went to the property that afternoon around 1:00 p.m.
19  that you haven't told me?
20      A.  No, sir.
21      Q.  Okay.  When you went back at night -- you
22  said you can't remember exactly when you went back
23  but it was before midnight -- what did you do when
24  you went back at night?
25      A.  Just get a feel for the area.  The traffic

Page 73

1  in the area.  You know, look at the lights.  The
2  problem with doing the lighting inspection five
3  years later just doesn't make a lot of sense, right?
4  Especially nowadays people doing LED upgrades.  What
5  I see in place today is not the same thing I would
6  necessarily see back five years ago because of the
7  LED upgrades that people are typically engaging in
8  nowadays.
9      Q.  Is there anything else you did when you
10  went back at night?
11      A.  No, sir.
12      Q.  Where were you physically positioned when
13  you went back at night?
14      A.  Well, I drove the property again.  So I
15  drove by the property, drove onto the property.  I
16  don't recall sitting there and, you know.  I do
17  recall sitting there during the day and just
18  observing the property.  You know, from the front
19  parking lot pretty much directly in front of the
20  office.  I didn't do that at night.  The lighting,
21  you know, the night thing was mostly about the
22  lighting.
23      Q.  How long were you on the property in the
24  afternoon when you arrived about 1 o'clock?  When
25  did you leave the property?

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                  Pages 74..77

Page 74

1    A.   Well, like I said, I was at the property.
2  Then I drove the area.  Then I went back to the
3  property.  So I would say the totality of that was
4  probably a couple of hours.
5    Q.   Does that mean two hours, approximately,
6  or what does that mean to you?
7    A.   I don't know.  You can look at my invoice
8  and possibly figure it out.  I don't --
9    Q.   What about -- sorry.  Go ahead.
10    A.   I don't know the answer, I guess is the
11  short answer.  Well, I've got -- yeah.  It was
12  probably at least a couple hours.  At night, I don't
13  remember it being very long.  Maybe 15 minutes.
14    Q.   Did you take any notes from your visits to
15  the property that afternoon or that night?
16    A.   I would have probably taken, like, a keep
17  note like a Google Keep note.  I don't know.  The
18  short answer is I don't know.  If I did, I would
19  have taken them in a Google Keep app and then
20  transferred them to, you know, what ultimately
21  became my report.
22    Q.   You're saying any notes that you took
23  during your site inspection at the United Inn would
24  be incorporated in your report?
25    A.   Yes.  If I had taken any notes, yes, sir.

Page 75

1    Q.   Did you take any photos or videos?
2    A.   I did take photos.  I don't think I took
3  any videos.  The photos are more -- mostly, like,
4  they're not necessarily security features.  They're
5  mostly documentation that I was there.
6    Q.   And I take it that photos and/or videos
7  that you took are not incorporated in your report?
8    A.   No, sir.
9    Q.   How many did you take, do you think?
10    A.   Probably, like, five or six.  Usually the
11  first thing I do is take a picture of some signage
12  indicating where I'm at so when I go back and review
13  the photos, you know, I've got kind of that
14  benchmark.
15    Q.   Okay.  So going back to your reports
16  referenced to "I conducted a day and night
17  inspection of the United Inn and Suites."  Have you
18  described for me what that consisted of or are there
19  any other things that you did as part of that
20  inspection that you have not told me about?
21    A.   No.  I gave you kind of the broad brush of
22  what I did that day.
23    Q.   Well, is there anything specific you
24  haven't mentioned that you did that day?
25    A.   Well, like I said, I mean, I looked at the

Page 76

1  opportunities for concealment in the parking lot.  I
2  looked at the layout of the structure.  Like I told
3  you, you know, with that 2009 project, one of the
4  things that stood out was you drive in off a public
5  street and you drive into kind of a motor court and
6  park your car there and go to a registration window.
7  And, you know, so similar to this, I'm just looking
8  for how is this thing laid out, where the cameras
9  are.  Opportunities for concealment.  Where, you
10  know, light fixture are.  Where the front desk is
11  relative to, you know, the entrance.  What
12  visibility they have from just the front desk alone.
13  So there was nothing specific.  I didn't go look at
14  door locks or anything on the units or anything like
15  that.
16    Q.   Did you go in any of the rooms?
17    A.   I did not go in any of the rooms, no.
18    Q.   Did you go into the office?
19    A.   I went by the window.  I'm not sure if the
20  office was open back then.  You know, it was kind
21  of, I guess, the tail end of COVID.  Maybe we're
22  still at the tail end.  I don't know where we're at.
23  But I did not go into the office.  I went to the
24  front desk.  I walked the breezeways.  I walked the
25  stairs.  I walked around to the back.  That kind of

Page 77

1  thing.
2    Q.   Fair to say that you tried to walk around
3  the common areas of the hotel?
4    A.   That would be fair.  It's a better way of
5  saying it than what I said.
6    Q.   And you've told me you can't remember
7  where you stayed that night, is that correct?
8    A.   Yeah, I don't recall where I stayed.  I
9  mean, I typically stay at, you know, I stay --
10  typically, most of the time I stay at a hotel near
11  the airport.  It all depends on where I've got to
12  be, you know, during the course of that trip.  You
13  know, so I'll be out there again in a couple weeks
14  and I'm staying at a completely different hotel than
15  where I normally stay.  So...
16    Q.   And I believe you said this.  My memory is
17  not perfect so forgive me if I'm repeating myself.
18  Other than the January 17th visit that we've talked
19  about, have you ever visited the United Inn and
20  Suites?
21    A.   No, sir.
22    Q.   You also say here on page 6 that on
23  May 25th you interviewed Tahir Shareef to learn more
24  about the security program in place at United Inn
25  and Suites.  Do you see that?

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 78..81

Page 78

1    A.   Yes, sir.
2       Q.   And I believe we've touched on that a bit.
3    And my understanding is, correct me if I'm wrong,
4    that you did take notes during that interview but
5    your notes are incorporated into the reports that
6    you prepared in the three matters, is that correct?
7       A.   Yes, sir.
8       Q.   Where did that interview occur?  I take it
9    you were not at the United Inn for that interview?
10      A.   No.  It was by Zoom or Teams or some video
11   chat program.
12      Q.   What time of day was it?  Do you recall?
13      A.   No.
14      Q.   Do you recall how long it was?
15      A.   It was at least a couple of hours.  You
16   know, that kind of interview takes at least a couple
17   of hours.
18      Q.   Who participated?
19      A.   That is an excellent question.  It --
20   certainly one or more of the attorneys was on the
21   call as well.  Who it was, it might have been Will
22   Story, it may have been Don Brown.  Dana may have
23   been on it.  I don't recall who was on it
24   specifically.  I was not alone with them, I guess,
25   is my point.

Page 79

1       Q.   What I'm trying to understand is, is the
2    entirety of what you learned from Mr. Shareef in
3    that interview recorded in Exhibits 1 through 3?
4       A.   Yes, sir.
5       Q.   So in other words, it's not like you're
6    going to come into trial and say, well, Mr. Shareef
7    told me X, Y, Z, it's not in my reports but I
8    remember that he also told me that.  Is that fair?
9       A.   That's fair.
10      Q.   All right.  Okay.  And so what you learned
11   about the security program at the United Inn as
12   you've said is incorporated in your report already
13   through that call?
14      A.   Yes, sir.
15      Q.   Based on that interview that you had on
16   May 25th and your review of certain discovery
17   materials in the case, Mr. Vellani, I want to ask
18   you just some questions about your understanding of
19   United Inn's security measures in effect from 2017
20   to 2019.  Okay?
21      A.   Okay.
22      Q.   During that time period and -- again, I'm
23   going to be asking about the time period 2017 to
24   2019 -- did United Inn have a gate to the property?
25      A.   No, sir.

Page 80

1       Q.   During that time period, did United Inn
2    have security guards on the property 24 hours a day?
3       A.   No, sir.
4       Q.   During that time period, did United Inn
5    have security guards on the property outside of
6    10:00 p.m. to 2:00 a.m.?
7       A.   No, sir.
8       Q.   During that time period --
9       A.   Well, let me be clear.  Let me be clear.
10   I believe the officers in their affidavits stated
11   they would adjust those times.  Either the officers
12   in their affidavits said that or Mr. Shareef told me
13   this, that they wouldn't necessarily -- it wasn't
14   always 10:00 p.m. to 2:00 a.m.  It would fluctuate
15   based on the needs of the property.  If I'm not
16   mistaken, that should be in my reports.
17      Q.   But I take it if Mr. Shareef's testimony
18   or the affidavits differ on that point, you would
19   defer to what the affidavits and Mr. Shareef's
20   testimony say?
21      A.   Yes, sir.
22      Q.   During that time period, did United Inn
23   require security guards to submit daily reports
24   about their security patrols?
25      A.   So let's be clear here, these are not

Page 81

1    security guards.  These are off-duty police
2    officers, just for clarity.  The typical things that
3    off-duty police officers do is different than what
4    security officers do.  So the answer to your
5    question is no, the police officers did not do
6    reports on a daily basis like a security officer
7    would.  My understanding is they communicated via
8    phone and text directly with Mr. Shareef about any
9    issues or the manager that was on duty if there was
10   an immediate issue.
11      Q.   Have you reviewed the phone logs and the
12   text logs to determine the frequency of the
13   communications?
14      A.   No, sir.
15      Q.   You said there's a difference between
16   having security guards and having off-duty cops.
17   What did you mean by that?
18      A.   Number one, I used the term security
19   officer.  Not security guard.  There are things that
20   are common practices amongst security officers that
21   are different from the way off-duty police officers
22   approach things.  Off-duty police officers typically
23   are focused on, you know, crime prevention and
24   responding to crimes.  They don't typically have
25   written post orders.  Security companies oftentimes

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 82..85

Page 82

1  do.  You know, security officers will often times
2  have what's called a patrol audit system or a guard
3  tour system.  That is not something police officers
4  typically do.  So there are differences in the way
5  they approach, you know, whatever the problem is, or
6  whatever their role is.  So I wouldn't expect the
7  police officers as a matter of good practice to, you
8  know, do written daily activity reports, for
9  example.
10      Q.   And your point there about patrol audits
11  actually ties in with a question I was about to ask
12  you.  Which is during that time period, did
13  United Inn require or receive patrol audit
14  information from the off-duty police officers who
15  worked from 10:00 p.m. to 2:00 a.m. at the hotel?
16      A.   Let's make sure we're talking about the
17  same thing.  A patrol audit system is basically
18  where you've got sensors all over the property that
19  you scan.  Either QR codes, bar codes, something
20  like that.  Or you've got some kind of GPS tracking
21  that they use to track where the officers are.  I'm
22  not aware of any such system existing in United Inn.
23  It is possible there may have been a system on the
24  police officers' patrol cars that allowed for GPS
25  tracking.  It is also possible they had some kind of

Page 83

1  GPS tracking on their cell phones.  But I'm not
2  aware of anything that United Inn required or
3  provided in that regard.
4      Q.   During that time period, did United Inn
5  have one United Inn employee working at the property
6  from 9:00 p.m. to 6:00 a.m.?
7      A.   That's my understanding, yes, sir.
8      Q.   During that time period, did United Inn
9  have one United Inn employee working on the property
10  for five hours during the night without any off-duty
11  police officers also working?
12      A.   Going to make me do my math.  9:00 to
13  6:00 is what we're talking about.  9:00 p.m. to
14  6:00 a.m. is what we're talking about minus the four
15  hours, right?  So six, seven, eight, nine, minus
16  four, that's five hours, yes, sir.
17      Q.   During the time period, 2017 to 2019, did
18  United Inn conduct a formal assessment, formal
19  risk -- assessment, excuse me, of the property?
20      A.   My understanding is they only did an
21  informal risk assessment of the property.
22      Q.   And I think you've answered this, but to
23  be clear, during that time period, based on your
24  interview of Mr. Shareef and your review of the
25  documents, did United Inn conduct background checks

Page 84

1  on their employees?
2          MR. ALLUSHI:  Objection.  Go ahead.
3      A.   So my understanding was that most of his
4  employees were either known to him or came to him by
5  way of referrals from other hotel operators.  So
6  from those folks, he told me that they did not
7  conduct criminal background checks.  What he told me
8  on the other folks is that he would do criminal
9  background investigations.
10  BY MR. BOUCHARD:
11      Q.   Your testimony is that he told you that he
12  would conduct background checks on certain of his
13  employees?
14      A.   On people that were not known to him or
15  directly referred to him by another hotel operator
16  or calling someone from one of the associations.
17      Q.   But you did not see any proof or
18  documentation of such background checks, is that
19  correct?
20          MR. ALLUSHI:  Objection.
21      A.   No, sir, I did not.  As I explained, you
22  know, the way background checks are done nowadays,
23  you can either get a formal report from the
24  background check company or you can -- in some
25  instances you can log in to a portal and get access

Page 85

1  to the reports without necessarily printing or
2  saving the report.  Or in some cases you can just go
3  into a county website and go do the background check
4  yourself.
5  BY MR. BOUCHARD:
6      Q.   During that time period, did United Inn
7  pay some of their employees in cash and not retain
8  records of the payments?
9      A.   I don't know the answer to that, sir.  I
10  think he testified about that in his deposition.
11  But I don't recall exactly what he said.
12      Q.   During that time period, did United Inn
13  monitor online reviews about the hotel?
14      A.   I think he was asked about that as well.
15  I don't think they did.  I don't have a specific
16  recollection of it.
17      Q.   During that time period, did United Inn
18  monitor websites advertising sex for money?
19      A.   I don't think so.
20      Q.   During that time period, did United Inn
21  hold regular crime prevention meetings?
22          MR. ALLUSHI:  Objection.  Go ahead, Karim.
23      A.   I'm going to say no.  That's not something
24  that I'm aware of being a practice in the hotel-type
25  facilities.  That's something that's a practice

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                                    Pages 86..89

Page 86

1  that's typically held in, you know, big corporate
2  type, you know, one of the gas companies, for
3  example, or apartments do it sometimes. But I'm not
4  aware of that being a practice in hotels.
5      BY MR. BOUCHARD:
6      Q.   Mr. Vellani, let's look at page 8 of
7  Plaintiffs' Exhibit 1, which I can represent to you
8  is identical to page 8 in Plaintiffs' Exhibits 2 and
9  3 as well.  On page 8 of Plaintiffs' Exhibit 1,
10 there's a paragraph in the middle of the page that
11 starts, "The exploitation phase."
12      Do you see that?
13     A.   Yes, sir.
14     Q.   What do you mean by exploitation phase?
15     A.   Well, you have to go back to the previous
16 paragraph that starts on page 7.  So it talks about
17 trafficking being a process crime, not a singular
18 offense.  So that process phase starts with, you
19 know, either the deception -- I'm sorry -- the first
20 phase of the four distinct phases is deception,
21 abduction or recruitment.  You know, in this case I
22 think we've got probably -- we don't have abduction.
23 You know, I think I can either characterize these
24 three incidents as either starting with deception or
25 recruitment.  A.G. and G.W. may be a little

Page 87

1  different on that one.  I guess recruitment would be
2  the right word.
3      And then transportation.  So I think
4  they -- at least with A.G. and G.W., I believe they
5  transported themselves to the hotel, if I recall
6  correctly.  And then you have that exploitation
7  phase which is usually where the incident occurs.
8  Where the actual, you know, the actual sexual part
9  of the incident occurs.  Keep in mind we're talking
10 about human trafficking here.  We're not necessarily
11 talking about sex trafficking with these four
12 phases.  So the exploitation can also be labor
13 trafficking.
14      And then you have the fourth phase which
15 is victim disposal.
16      So what I'm talking about with respect to
17 the exploitation phase, it can occur and often
18 occurs in different locations.  If you're
19 trafficking for labor, sometimes it may be only in
20 one location, like, you know, basically you got a
21 domestic slave for lack of a better word.  That may
22 only happen in one location.
23      With sex trafficking, it's typically a
24 transient crime where it's moving around from place
25 to place, hotel to hotel, you know, residential

Page 88

1  locations.  So I don't know if I answered your
2  question, but I hope I did.
3      Q.   Well, help me out with that paragraph
4  where you say the exploitation phase occurs in
5  different types of places.  Are you talking there
6  generally about human trafficking or are you talking
7  about sex trafficking?
8      A.   Human trafficking consists of two
9  different forms of trafficking.  It consist of labor
10 trafficking and sex trafficking or sex trafficking.
11 So because we're talking about sex trafficking here,
12 we can talk specifically about how that occurs with
13 respect to sex trafficking.
14      So the exploitation phase usually involves
15 the moving the victims around to different
16 locations.  In other words, you're not just
17 hunkering down at one hotel and everything is
18 occurring there.  You're usually moving around to
19 different places.  You can also be moved into the
20 strip clubs.  You can be moved into the massage
21 parlors, you can be moved into residential
22 environments which I think I mentioned to you is the
23 most common location is a personal residence.  Not
24 in a hotel.
25      Q.   Is this paragraph saying -- or is it your

Page 89

1  opinion that the exploitation phase as it relates to
2  sex trafficking specifically can occur in public
3  places?
4      A.   Yes.
5      Q.   How so?
6      A.   Well, if you've got somebody that's forced
7  into commercial sex acts and are told to, for
8  example, walk the street to solicit customers, the
9  trafficking -- the actual exploitation can occur in
10 a back alley, for example.  It can occur in a car on
11 the side of the street.  It can occur in a public
12 park, for example.  So there are numerous places
13 where the exploitation can occur.
14      Q.   Can exploitation as it relates to sex
15 trafficking exploitation occur in hotel common
16 areas?
17      A.   Yes.
18      Q.   How so?
19      A.   Well, again, I think in J.G.'s case she
20 mentioned having sex in a car in the parking lots.
21 So that would be in the common area.  The parking
22 lot would be the common area.
23      Q.   And to make sure that we're speaking the
24 same language here, when we talk about hotel common
25 areas, we're talking about parking lots, hallways,

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 90..93

1   stairwells, breezeways, sidewalks that are on the
2   property.  Do you agree with that?
3       A.  Yes, or in the bushes.
4       Q.  Any other ways you can think of that the
5   exploitation phase as it relates to sex trafficking
6   can occur in a hotel common area?
7       A.  Yes, rooftop pools, or rooftops, period.
8   Accessible rooftops.
9       Q.  Do you consider online ads a public place?
10      MS. RICHENS:  Objection.
11      A.  I would consider them to be a public
12  place.  But I think the online ads are typically for
13  advertising of the exploitation.
14  BY MR. BOUCHARD:
15      Q.  The next paragraph, Mr. Vellani, on page 8
16  talks about sex trafficking being a transient
17  clandestine crime, which I think you mentioned a few
18  moments ago.  Do you see where I'm referring?
19      A.  Yes, sir.
20      Q.  And you say "unlike robbery which often
21  occurs in the open with victims willing to report
22  the crime, the clandestine nature of the
23  exploitation phase of sex trafficking makes it
24  difficult to protect and prevent."  Do you see that?
25      A.  Yes, sir.

1       Q.  Is that your opinion about sex trafficking
2   in general or is that your opinion about the sex
3   trafficking allegations in these three cases?
4       A.  Well, probably both.  Because I'm only
5   aware of one of the -- I'm only aware of J.G. who
6   claims that on United property she had sex in the
7   common areas.  My understanding of all the rest of
8   the incidents they were inside the guest room where
9   it would be difficult to understand what's happening
10  inside the guestroom, you know, without installing
11  cameras or something in a guest room which would be
12  ludicrous, obviously.
13      Q.  So do you make a distinction between
14  J.G.'s allegations and A.G. or G.W.'s allegations
15  because of what you just noted, or do you still say
16  in all three cases that sex trafficking is a
17  transient and clandestine crime that is difficult to
18  detect and prevent?
19      MR. ALLUSHI:  Objection.
20      A.  So I would still hold the same opinion on
21  all three cases.  All I'm pointing out factually is
22  that J.G. stated she had sex in the parking lot.
23  The problem with that is you still have -- you know,
24  that would be a concealment opportunity, right?
25  Because, I mean, you could have sex in a car between

1   two other parked cars or between a parked car and
2   another structural barrier and you would still, you
3   know, have concealment.  That way and because of
4   that, it would be difficult to detect and prevent.
5   We're not talking about necessarily acts that are
6   lasting all night long.  So it could be something
7   that happens very quickly in a parking lot.  But
8   she's the only one that factually stated that there
9   was something going on outside.
10  BY MR. BOUCHARD:
11      Q.  Have you reviewed as part of your review
12  of certain discovery materials text messages between
13  A.G. or G.W. their traffickers?
14      A.  You know, I'd have to go back and look at
15  their exhibits.  That all sounds familiar.  Give me
16  one second.  If I'm not mistaken, that stuff was in
17  their -- in the deposition exhibits.  There's a lot
18  of files here.  So just give me one minute.
19      Q.  I can represent to you, Mr. Vellani, there
20  were certain text messages used in A.G. and G.W.'s
21  depositions.  It wasn't the full scope of these.  So
22  are you familiar with the text messages that were
23  used as exhibits in their depositions, but if there
24  were --
25      MR. ALLUSHI:  Objection.

1   BY MR. BOUCHARD:
2       Q.  -- you're not familiar with them?
3       MR. ALLUSHI:  I'm going to object.  If you
4   need to review the record before you answer
5   that, you can do so, Karim.
6       THE WITNESS:  Yeah.  Thank you.
7       A.  I'm looking at some of the text messages
8   now.  So, yes, I do see this.  In a Number A.G. 9,
9   for example.
10  BY MR. BOUCHARD:
11      Q.  Are you familiar with text messages
12  outside of those that were used as exhibits in A.G.
13  and G.W.'s depositions?
14      A.  Unless they were part of my file, I don't
15  have a specific recollection of others.  There may
16  have been but I don't know.
17      Q.  Is it your opinion, Mr. Vellani, that sex
18  trafficking of minors in hotels is always difficult
19  to detect and prevent?
20      A.  Always?  No.  I mean, I think what's
21  difficult is to know what's going on inside a room.
22      Q.  Why is that difficult?
23      A.  Because the guest room is a private space.
24  You know, you're ultimately, you know, renting the
25  room with a certain expectation of privacy.  So, you

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 94..97

Page 94

1  know, you don't have staff that just comes in and
2  unlocks the door and walks in.  You may have staff
3  that comes in upon request or at the guest's
4  request.  But you very rarely will see the hotel
5  just going and unlock a door except by police
6  request.
7      Q.   Are you not familiar with routine
8  housekeeping services whereby hotel staff would
9  regularly come into and out of rooms for cleaning
10 purposes?
11     A.   Yes, that's what I meant.  That's either
12 at staff request because the housekeepers want to
13 get in and clean or somebody wants to do an
14 inspection or in the case of United Inn they had a
15 policy to inspect a room every seven days.  Or at a
16 guest request where they request housekeeping or
17 maintenance or something like that.  So I did
18 mention that.
19     Q.   When you talk about that United Inn
20 policy, are you familiar with the DeKalb County
21 motel/hotel ordinance in effect in 2017?
22     A.   Yes.
23          MR. ALLUSHI:  Objection.
24          MS. RICHENS:  Yeah, objection.
25     A.   I am familiar with it, yeah, I've actually

Page 95

1  got it pulled up.  I think it required, like, you
2  know, 120 days or something before they have to
3  check out or they can't stay longer than 120 days,
4  something to that effect.  It's actually been a
5  while since I reviewed this 14-page ordinance.  So I
6  don't remember all the requirements in it.
7  BY MR. BOUCHARD:
8      Q.   You said that sex trafficking of minors is
9  not always difficult to detect and prevent in a
10 hotel if I understood you correctly.  Can you
11 explain to me when it would not be difficult to
12 detect and prevent in your opinion?
13     A.   Well, I can probably give you an extreme
14 example, you know, if, for example, there was kind
15 of a ubiquitous site like Backpage that existed and
16 you had the ads that specify specific hotels or
17 hotel room numbers, and there was a practice of
18 monitoring those sites.  You know, one of the
19 technologies we're looking at today is the use of
20 facial recognition cameras to identify the number of
21 unique people entering into a, you know, a hotel
22 room.  And then after a certain threshold is met
23 that would send an alert that, hey, there have been
24 three unique people entering this room over the
25 course of an hour and that happened the last hour as

Page 96

1  well.  You know, that might give you some impetus to
2  go and knock on the door and find out what's going
3  on.  We're not there yet for facial recognition
4  cameras for sure.  But I think we'll get there at
5  some point.  That would be a circumstance where I
6  think it might be easier to detect.  Barring
7  something -- some, you know, technological
8  advancement and a reduction in the cost of such
9  technology, you know, I think it's -- it's
10 challenging.  If you were to go stand outside and
11 just monitor, you know, every room, you know, have
12 visibility to every room and sat there and count the
13 number of unique people entering in over the course
14 of an hour, that might be an indicator.  But barring
15 something like that, I don't know from an
16 operational practice perspective, what would work
17 today.  Like, I think I have an understanding what's
18 going to work in the future.  Less so what is going
19 to happen -- you know, what would work today.
20     Q.   I'm going to show you what I'm marking as
21 Plaintiffs' Exhibit 4.  I'm going to do a screen
22 share here, Mr. Vellani.
23          (Thereupon, marked as Plaintiff
24     Exhibit 4.)
25

Page 97

1  BY MR. BOUCHARD:
2      Q.   And Plaintiffs' Exhibit 4 is an email and
3  an attachment to it.  Do you see that Plaintiffs'
4  Exhibit 4 is Bates-stamped NBI003097 which I can
5  represent to you is a document produced by
6  United Inn?
7      A.   Yes, sir.
8      Q.   It's an email from investigator T. Wade
9  whose signature block identifies him as being with
10 the Rockdale County Sheriff's Office?
11     A.   Yes, sir.
12     Q.   Do you see the subject line says "missing
13 person"?
14     A.   Yes, sir.
15     Q.   And it says, "Ashar, was advised by her
16 guardian that she was staying at United Inn located
17 at 4649 Memorial Drive.  Thank you for your help."
18          Do you see that?
19     A.   Yes.
20     Q.   Are you familiar with this email?
21     A.   Yes, sir.
22     Q.   And you see there's an attachment to it,
23 that says bolo [J.G.]?
24     A.   Yes, sir.
25     Q.   You understand [J.G.] is Plaintiff J.G.?

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                                    Pages 98..101

Page 98

1    A.   Yes, sir.
2    Q.   What's a bolo?
3    A.   Be on the lookout.
4    Q.   Are you familiar with be on the lookout
5    notices?
6    A.   Yes, sir.
7    Q.   Okay.  And this is the attachment to, and
8    you can see, it's the next consecutive Bates number
9    of 003098 in that email.  Have you seen this
10   document before?  That is the bolo missing person
11   report for [J.G.]?
12   A.   Yes, sir.
13   Q.   Do you understand that the hotel received
14   this email and the corresponding notice?
15   A.   Yes.
16   Q.   And do you understand that the email that
17   we were just looking at was dated October 29th?  Do
18   you agree?  I can go back to it.
19   A.   Yes, sir.
20   Q.   And the notice here is dated October 9th.
21   It says that she's been missing since October 9th.
22   Do you see that?
23   A.   I think I saw it on the other page.
24   Q.   Yes, sir.
25   A.   Yes.

Page 99

1    Q.   In your opinion as somebody who works in
2    the security industry and has provided
3    recommendations to hotels about mitigating the risk
4    of sex trafficking, what do you think United Inn and
5    Suites should have done in response to receiving
6    this notice?
7         MS. RICHENS:  Objection.
8    A.   Well --
9         MR. ALLUSHI:  Objection.
10   A.   -- somehow shared it with the staff.  And
11   my understanding from either the deposition or my
12   interview with Mr. Shareef is they posted these
13   missing persons flyers in the office so the staff
14   could see them.
15   BY MR. BOUCHARD:
16   Q.   Do you know if the staff had an
17   opportunity to see this notice outside of walking
18   into the office?
19   A.   I don't know where else they could post
20   it.  You know, it would have to go in the office.  I
21   mean, that whole kind of, you know, trespassing
22   list, do not rent list, missing person list, all of
23   that, you know, bad check list, you know, thinking
24   about the way a bodega is run in New York City.
25   They have the list of bad check writers right at the

Page 100

1    front desk.  Same thing with DNRs, do not rent list,
2    trespass list, all these kind of things would be
3    typically posted in the office, typically in the
4    private area.  You know, not in the common area.
5    So, no, I'm not aware of anywhere they would see
6    this without going into the office.
7    Q.   Do you know if each of the members of the
8    housekeeping staff saw a copy of this notice?
9    A.   I can't say specifically with respect to
10   this notice, sir.
11   Q.   Anything else that you think in your
12   opinion the hotel should have done in response to
13   receipt of this notice?
14   A.   Well, again, everybody's got different
15   ways of communicating, right?  I mean, every
16   organization communicates in different ways.  So in
17   this situation, the way he -- the way Mr. Shareef
18   shared information was by posting it in the office.
19   I mean, I've seen other organizations which would be
20   an email blast if everybody had email or a text
21   blast or a Slack chat or something like that.  So,
22   you know, as long as they're communicating it
23   somehow, I'm comfortable with that.  The mechanism
24   by which they communicate would be up to the
25   individual culture or the organization that we're

Page 101

1    dealing with.
2    Q.   When a hotel receives a notice like this
3    that specifically says there's a missing 16-year-old
4    who is suspected of being at that particular hotel,
5    would you recommend to the hotel that they convene a
6    staff meeting to ask staff whether they had seen the
7    missing minor identified in the missing minor
8    notice?
9         MS. RICHENS:  Objection.
10   A.   It's a lovely idea.  But I don't know
11   that -- you know, I don't know the frequency at
12   which they deal with this kind of issue.  You know,
13   if it was a unique one-off circumstance, you know,
14   perhaps.  If this was, like, an ongoing thing where
15   the police were leaving missing persons flyers, you
16   know, I can't imagine that you would have a meeting
17   every time something like this happened.
18        So I think it was reasonable to post this
19   in the office for the staff to be able to see it.
20   You know, I also wouldn't recommend that somebody go
21   door to door looking for her.  So, again, I'm
22   comfortable with what they did which is to post it
23   in the office.
24        Let me know when we get to a two-minute
25   stopping point.  I apologize.  I didn't take a

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 102..105

Page 102

1  restroom break.
2  BY MR. BOUCHARD:
3      Q.   Let me just ask a couple more questions.
4  I won't take long.
5      A.   Sure.
6      Q.   Is a hotel's receipt of missing minor
7  notices like this relevant to your assessment of the
8  risk of sex trafficking at a hotel?
9          MR. ALLUSHI:  Objection.
10         MS. RICHENS:  Objection.
11     A.   Well, it's a missing -- I mean, based on
12 what I'm looking at up on the screen, it's a missing
13 person.  It's not a notice of sex trafficking.
14         Now, I think if you go back to the email
15 for one second, I think he did reference that, if
16 I'm not mistaken.
17         Okay, so that even references it there.  I
18 mean, you know, no, it wouldn't -- I don't see the
19 connection from a missing person to -- unless I'm
20 not seeing something on the screen.  I'm not seeing
21 the connection to sex trafficking.  I'm simply
22 seeing a missing person flyer.
23 BY MR. BOUCHARD:
24     Q.   So an unaccompanied missing 16-year-old
25 law enforcement notice regarding an unaccompanied

Page 103

1  minor being at the hotel for weeks, is not relevant
2  in your opinion to a hotel's assessment of the risk
3  of sex trafficking at the hotel?
4          MS. RICHENS:  Objection.
5      A.   Again, I'm not -- I'm not -- perhaps I'm
6  not following your question.  But I'm not seeing the
7  connection between a missing person and sex
8  trafficking.
9  BY MR. BOUCHARD:
10     Q.   Well, I'm not talking specifically about
11 just a missing person report.  I'm talking about a
12 missing 16-year-old report that specifically regards
13 that 16-year-old being at the property for weeks on
14 end when it's the middle of the school year.
15         MS. RICHENS:  Objection.
16     A.   I --
17         MR. ALLUSHI:  Objection.
18     A.   I would look at that as a concern for a
19 missing person.  I wouldn't correlate that with sex
20 trafficking.
21         MR. BOUCHARD:  Okay.  This is a good time
22     for us to take a break if it's a quick one.  Or
23     if we need a long one.  We can go off the
24     record here.
25         THE VIDEOGRAPHER:  Okay.  The time on the

Page 104

1  monitor is 11:58 a.m.  And we are off the
2  record.
3          (Lunch recess 11:58 a.m. until 12:48 p.m.)
4          THE VIDEOGRAPHER:  The time on the monitor
5  is 12:48 p.m. and we are back on the record.
6  BY MR. BOUCHARD:
7      Q.   Good afternoon, Mr. Vellani.  Did you have
8  a good lunch?
9      A.   Yes.  Thank you.
10     Q.   Thank you.  We were -- before we took the
11 break, we were talking about Plaintiffs' Exhibit 4
12 which was a notice regarding Plaintiff J.G.  Do you
13 remember Plaintiffs' Exhibit 4?
14     A.   Yes, sir.
15     Q.   And I wanted to ask you, sir, whether in
16 your opinion is the number of missing minor notices
17 that a hotel receives about minors suspected of
18 being at the hotel relevant to the risk of sex
19 trafficking at the hotel?
20         MS. RICHENS:  Objection.
21     A.   The answer is no, because I'm not certain
22 of what the correlation is between missing persons
23 and sex trafficking.  A lot of missing persons are
24 simply just runaways.
25

Page 105

1  BY MR. BOUCHARD:
2      Q.   And, sir, are you not aware of a
3  correlation between runaway minors and sex
4  trafficking?
5      A.   Well, if you look at the number of -- if
6  you look at the FBI's Uniform Crime Report which
7  documents runaways, you're talking about, you know,
8  tens if not hundreds of thousands of incidents on an
9  annual basis.  And you look at the number of sex
10 trafficking incidents and you're talking about, you
11 know, hundreds of incidents.  So I'm not sure where
12 that correlation would be.
13     Q.   Is your testimony that the prevalence of
14 sex trafficking nationwide is hundreds of incidents
15 per year?
16     A.   So --
17         MR. ALLUSHI:  Objection.
18     A.   -- I'm talking about the number of sex
19 trafficking incidents -- I think we'll have to
20 acknowledge the obvious, which is nobody's got great
21 number on this issue.  You know, we don't have --
22 nobody collects statistics that have been found to
23 be reliable.  I think the FBI data is probably
24 underreported and the national trafficking hotline
25 is probably overreported.  I don't think we've got a

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                    Pages 106..109

Page 106

1    great handle on this. Having said that, you know,
2    the prevalence data is just not any kind of a --
3    it's not in a reliable place right now. But if you
4    look at the FBI stats -- forgive me, I'm trying to
5    pull it up. And I'm happy to share this with you
6    since I did not provide this previously. I'm only
7    looking this up in response to the question you're
8    asking me.
9        BY MR. BOUCHARD:
10       Q.   Sir, Mr. Vellani, I'm going to ask you,
11   don't conduct internet searches --
12       A.   I'm not.
13       Q.   -- to try to answer --
14       A.   I'm not.
15       Q.   -- my question.
16       A.   I'm not. I'm looking at the FBI files
17   that I actually have on my computer. And like I
18   said, this was a file that I'm happy to provide you.
19   You know, I did give you the DeKalb County incident.
20   But if you look at 2022, for example, you know, they
21   were not -- there's barely -- I don't have a total
22   here, but there's barely a thousand incidents versus
23   the tens of thousands or hundreds of thousands of
24   calls the National Trafficking Hotline receives.
25   The number is 2135, by the way, nationwide, in 2022.

Page 107

1    You know, that's not a lot of data. If you go back
2    to 2019, you know, we can look at those numbers and
3    I can assure you I'm not doing it right now, but I
4    can assure you it's going to be far less.
5        Q.   And my specific question was whether you
6    were aware of the relationship between runaway
7    minors and sex trafficking risks.
8             Are you aware of the relationship or not
9    aware?
10       A.   I'm aware of a relationship between
11   vulnerable populations of which runaways would be
12   part of that vulnerable population. So -- but as
13   far as a direct correlation between missing minors
14   and sex trafficking, no, I'm not aware of the
15   correlation.
16       Q.   If we can take a look at page 9 of
17   Plaintiffs' Exhibit 1. It's the J.G. report.
18   Page 9 is identical in Exhibits 2 and 3 as well.
19   Let me know when you're there, sir.
20       A.   Yes, sir. I'm there.
21       Q.   Do you agree, sir, that pages 9 through 11
22   of your report concern identifying sex trafficking
23   victims in the healthcare setting?
24       A.   Yes, sir.
25       Q.   And you're not of the opinion that the

Page 108

1    United Inn and Suites is a healthcare setting, is
2    that correct?
3        A.   No, sir. The purpose of this section was
4    to illustrate the challenges in identifying victims
5    in an environment where you're able to ask a lot of
6    invasive questions and conduct physical examinations
7    and also separate the victim from the trafficker.
8    That was the purpose of this section. These are not
9    things that a hotel can reasonably do.
10       Q.   Your first paragraph cites to four
11   different footnotes, 10, 11, 12, 13, looking at
12   page 9 of your first paragraph?
13       A.   Yes, sir.
14       Q.   Do you agree that those four footnotes
15   pertain to sex trafficking identification in the
16   healthcare setting?
17       A.   Yes, sir. Well, yes. 11 and 12 I know
18   specifically address hotels as well and the
19   challenges of identifying victims in other
20   environments other than healthcare.
21       Q.   So your opinion in that first paragraph as
22   I am going to read it is, "Without self-reporting,
23   sex trafficking victims are difficult to identify
24   and are frequently misidentified."
25            Do you see that?

Page 109

1        A.   Yes, sir.
2        Q.   Focusing on the hospitality setting in the
3    hospitality environment. Is it your opinion that
4    unless minor victims of sex trafficking self-report,
5    they are difficult to identify in a hospitality
6    setting?
7        A.   Yes.
8        Q.   What is your basis for that opinion?
9        A.   So, again, it's easier to think about
10   this -- I hope it's easier to think about this if
11   you look at the challenges in environments where
12   it's easier to identify them. Challenging but still
13   easier, okay? So we have difficulties in
14   identifying victims in environments where
15   theoretically it's easier to identify them. So
16   anything short of those environments makes it
17   significantly harder. So that's kind of the basis
18   for it. The other thing is when I think about how
19   to solve this problem, and that's what I do, I mean,
20   that's what I do for a living is try to solve crime
21   problems. I look at all the various solutions to
22   try and solve a crime problem and there's very few
23   things that are in existence today, either
24   technology-wise or, you know, are reasonable to
25   deploy that could be, you know, used to, you know,

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                      Pages 110..113

Page 110

1  determine whether something bad is going on, right?
2  I mean, all you can do is provide all the things
3  that you can provide, like phones, for example, in
4  rooms or making staff available so people can
5  self-report.  I don't know if I answered your
6  question.  I hope I did.
7      Q.   Do you think that the act of sex
8  trafficking minors is as likely to happen in a
9  healthcare environment as it is in a hospitality
10  environment?
11      A.   Okay.  So we have to go back to the
12  process notion, right?  It's not -- sex trafficking
13  is not an act, okay?  The sex, the exploitation, the
14  sex is an act but there's a whole process involved
15  with this.  So do I think that the exploitation, the
16  abduction, as the case may be in some instances, not
17  our instances, but in other instances that can occur
18  elsewhere besides at a hotel.
19      Q.   And I appreciate the clarification and
20  understand the point.  Let me clarify my question
21  and say, do you agree that it's more likely that the
22  exploitation phase of sex trafficking will occur in
23  a hospitality environment than in a healthcare
24  environment?
25      A.   Not the exploitation.  If you go within

Page 111

1  the umbrella of the exploitation, there are many
2  acts involved.  Okay.  This is the reason why they
3  have, for example, I don't know about other states,
4  but here in Texas, if you go get a haircut, you're
5  going to see the sex trafficking sign.  Okay?
6  Because the exploitation can occur at the barbershop
7  as well.  So exploitation is a broader concept than
8  just a sex act.  I do agree with you that the sex
9  act is most likely to occur in a private space.
10  Whether that's a personal residence, a car that's
11  concealed, you know, a park where there's nobody at
12  or in a guest room of a hotel.
13      Q.   As opposed to a healthcare environment?
14      A.   Yeah.  God, I hope not, but, yeah, I
15  guess.
16      Q.   I want to look at page 12.  You say in the
17  middle paragraph, you start by saying, "Healthcare
18  facilities can also implement methods to encourage
19  victims to give nonverbal signals."
20          Are you familiar with this paragraph?
21      A.   Yes, sir.
22      Q.   And part of -- at least part of what you
23  discuss in this paragraph, if you agree with me,
24  sir, relates to signage.  Do you agree with me?
25      A.   Yes, sir.

Page 112

1      Q.   Is it your opinion that signage can
2  encourage victims of sex trafficking to report their
3  victimization, whether it's verbal reporting or
4  nonverbal reporting?
5          MR. ALLUSHI:  Objection.
6      A.   So the signage here is basically very
7  explicit instructions on how to report that you need
8  help.  So, for example, it's not just a sign like
9  the one that's, you know, in OGCA that requires just
10  the National Trafficking Hotline.  This is very
11  explicit signage that says flip over this sign to
12  let us know you need help.  Or, you know, put this
13  colored sticker on the urine cup so we know you're
14  trying to tell us something.  Right?  It's very
15  explicit signage.  But it's also signage that comes
16  on the heels of this very invasive questioning that
17  medical providers can ask that hotel folks cannot
18  ask or shouldn't ask.  You know, so it's -- it's if
19  they have -- what I'm laying out here is how we do
20  it in healthcare.  It is basically a start to finish
21  process that involves all steps.  Not just some.
22  BY MR. BOUCHARD:
23      Q.   Understood.  And I want to go back to the
24  question and just understand.  Do you believe that
25  signage can encourage victims of sex trafficking to

Page 113

1  report their victimization?
2      A.   Okay.  But -- yes, yes.  But based on the
3  way the sign is that I'm referring to here which is
4  very explicit, right?  A sign that says, you know,
5  flip this sign over -- number one, you're creating
6  this trustworthy, safe space followed by separation
7  of the trafficking victim from the trafficker,
8  followed by this very thorough medical examination
9  followed by these invasive questions culminating in,
10  hey, we need to get a urine sample.  Go to this
11  private bathroom which is only accessible to
12  patients and then you'll find this very explicit
13  sign with instructions on it.  This is not the same
14  thing as throwing up a sign in a hotel lobby.
15  That's all I'm trying to illustrate.
16      Q.   Just underneath that paragraph still
17  looking at page 12 of Plaintiffs' Exhibit 1, there's
18  a paragraph that begins, "I am unaware of any
19  evidence-based research."
20          Do you see that?
21      A.   Yes, sir.
22      Q.   And you're familiar with that paragraph,
23  sir?
24      A.   Yes, sir.
25      Q.   What is the definition, or what is your

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 114..117

Page 114

1 definition of evidence-based research?
2    A.   So glad you asked me that question.  I
3 just did a great presentation on this.  I think it
4 was a great presentation for the -- for the American
5 Society for Industrial Security.  And I would rather
6 just read it to you if you don't mind, because I
7 think this is an important part of this.
8    Q.   Well, sir, every witness --
9        MR. ALLUSHI:  Let him.  Hang on, David,
10 let him finish.
11        MR. BOUCHARD:  Well, he was starting to
12 pull it up, I believe, and I was just going to
13 ask him not to do that.
14    A.   Well, I explore the benefit of not having
15 to try and memorize this.  Basically evidence-based
16 is an approach.  It started in medicine.  It has in
17 essence expanded into law enforcement education and
18 the security industry that emphasizes the practical
19 application of findings based on the best available
20 current research.
21        So in the security industry we talk about
22 a systematic approach to reviewing evidence,
23 criminology evidence in our case, or
24 security-related research in our case to identify
25 those best practices that work.  And ultimately what

Page 115

1 we're trying to do is find out what works, what
2 doesn't and what is -- (Zoom distortion).
3        THE STENOGRAPHER:  Your audio cut out
4 there, sir.  "What doesn't and what is..."
5    A.   What works, what doesn't and what is
6 promising.
7        THE STENOGRAPHER:  Thank you.
8 BY MR. BOUCHARD:
9    Q.   And so what needs to serve as the basis
10 for the evidence-based research?  Is it
11 peer-reviewed studies?  Is it randomized controlled
12 trials what constitutes, quote/unquote, evidence?
13    A.   Sure, that's a great question.  So there's
14 something called the evidence hierarchy.  And at the
15 top of the evidence hierarchy are systematic
16 reviews.  A systematic review is basically a
17 summary, a synthesis of all prior research that's
18 been done on a certain topic.  Typically, those
19 prior studies are going to be randomized control
20 trials.  So where systematic reviews exist, that's
21 what we're looking for.  Systematic reviews are
22 pretty rare in my field.  They do exist in some
23 areas like lighting and video surveillance, things
24 like that.
25        Barring that, we're looking for randomized

Page 116

1 control trials, right?  We're looking for more than
2 a bunch of yahoos sitting in a room making up
3 indicators and saying, yeah, these are indicators of
4 sex trafficking.  Because that is not evidence
5 based, and to your point, hasn't been peer-reviewed.
6    Q.   Okay.  So did you just give me the full
7 evidence hierarchy as you're calling it or is there
8 more to that hierarchy?
9    A.   No, there's more to it.  Do you want me to
10 pull that up?
11    Q.   So just as a general rule I don't want you
12 to be pulling up documents.
13    A.   Okay.
14    Q.   Referring to files or anything else unless
15 I'm asking you or referring you to the document.
16 Because if we were sitting here in person,
17 Mr. Vellani, obviously, you wouldn't have the
18 ability to do that.  And it's not the typical or
19 accepted practice in depositions for witnesses to
20 just be referring to their own documents.
21        So I'm asking as you're sitting here and
22 as you recall, is there more to that evidence
23 hierarchy that you can tell me about?
24    A.   Yes.  As I recall, so like I said,
25 systematic reviews are considered a level 5.

Page 117

1 Randomized control trials are also considered a
2 level 5.  Other studies like pretest/post-test,
3 meaning what's the crime before we implement
4 measures?  What's the crime after we implement
5 measures?  Those are typically, if I recall, like a
6 level 3 or 4.  Below that is survey research.  Below
7 that is, you know, like case studies, like corporate
8 case studies and just opinions.
9    Q.   So would those be levels 1 and 2?
10    A.   I think, believe it or not, I actually
11 think it starts at level 0.  I think it goes from
12 level 0 to 5.
13    Q.   Is it your opinion, Mr. Vellani, that
14 anti-trafficking intervention should not be used at
15 hotels unless there's evidence-based research
16 showing they are effective?
17        MR. ALLUSHI:  Objection.
18    A.   I wouldn't say that.  What I would say is
19 that, you know, there are some organizations that
20 will implement things that they have seen work at
21 other locations.  And they can try and see if it
22 will work at, you know, a potential other location.
23 In which case they've got anecdotal information,
24 anecdotal evidence that something works.  So it
25 doesn't have to be only, you know, evidence-based

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 118..121

---

Page 118

1  research. We can still try things that work in one
2  location and see if it works in another location.
3  That's, obviously, not always the case but, you
4  know, ideally it would work at another location.
5  But there's no way to know until you try it.
6      Q.  I take it based on that answer that your
7  answer here will be no, but let me know if I'm
8  wrong. Is it your opinion that anti-trafficking
9  interventions cannot be effective at hotels unless
10  there's evidence-based research of their
11  effectiveness?
12          MR. ALLUSHI:  Objection.
13      A.  Well, again, it's hard for me to answer on
14  such a broad question, right? It depends on what
15  you're talking about. I mean, what we've seen with
16  respect to this -- there's no criminology studies
17  that I'm aware of, for example, with respect to
18  signage, right? Does the mere presence of a traffic
19  hotline sign change any outcomes? I don't know that
20  because we don't have research that supports that.
21  So it depends on what measures you're talking about.
22  What I'm saying with that paragraph in that report,
23  in that section of the report, is that those red
24  flags so to speak, that Polaris and Homeland
25  Security put out, there is no evidence backing those

Page 119

1  up. They just sound like good ideas. And I know
2  there's a pending FOIA request out there to DHS on
3  this and Polaris trying to get support, like, how
4  did they come up with that list? I have not seen
5  the results of that yet, by the way.
6      BY MR. BOUCHARD:
7      Q.  Are you aware of evidence-based research
8  showing, for example, that DHS indicia are
9  unreliable?
10      A.  No, not unreliable.
11      Q.  Are you aware of evidence-based research
12  showing that the Polaris indicia are unreliable?
13      A.  No, not unreliable. Because I think
14  that's the problem, is nobody is testing this stuff
15  right? There was a great article in Police Chief
16  Magazine which is the International Association of
17  Chiefs of Police Magazine that talks about some of
18  what they thought was indicia on Backpage that turns
19  out that it was no correlation with sex trafficking.
20  So they, you know, get a bunch of yahoos sitting
21  around a room, develop a bunch of red flags or
22  indicators and then at some point they go out and
23  test this stuff and see if it actually does
24  correlate or doesn't correlate. At least in that
25  one police chief article it did not correlate.

Page 120

1      Q.  Is it your opinion that only academics and
2  researchers are qualified to implement
3  anti-trafficking interventions?
4      A.  No. I mean, I don't consider myself a
5  researcher. I just happen to be a security
6  consultant who engages with the research. So I
7  would say the answer to that is no.
8      Q.  What about operation of hotels? Are folks
9  who are not academics or researchers qualified to
10  operate hotels, in your opinion?
11      A.  Qualified to operate hotels? Sure.
12          MR. ALLUSHI:  Objection.
13      A.  I would say that's fairly common in the
14  standard, the norm.
15      BY MR. BOUCHARD:
16      Q.  Have you personally evaluated the
17  effectiveness of anti-trafficking interventions in
18  the hospitality industry?
19      A.  No. What I do is I engage with the
20  research. So I'm not personally a researcher myself
21  most of the time. I mean, I've done research in the
22  past on my own on different topics, you know,
23  security staffing in hospitals which you may have
24  seen on my CV. But, no, I don't personally conduct
25  the research. What I do is spend 20 percent of my

Page 121

1  time reviewing research. Whether it's on
2  trafficking or workplace violence or mass shooters
3  or what have you.
4      BY MR. BOUCHARD:
5      Q.  Have you talked to anybody at the
6  Department of Homeland Security about the campaign
7  signs and indicators?
8      A.  No. What I mentioned is that we've got a
9  pending -- I've got a colleague that's got a pending
10  request that I helped write. A FOIA request to
11  identify if there was any evidence associated with
12  those indicators. And I believe, if I'm not
13  mistaken, I'm not directly involved, but I believe
14  that FOIA request went to Polaris because they've
15  got federal funding. So they would be subjected to
16  FOIA. And one to DHS, obviously, which would have
17  to respond to that request.
18      Q.  Do you consider DHS to be an expert on our
19  nation's criminal laws?
20          MR. ALLUSHI:  Objection.
21      A.  I wouldn't know how to handle that. I
22  mean, I would say that their primary objective is to
23  protect the homeland from terrorism. Again, I think
24  that's a better question for them, not me.
25

---

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                    Pages 122..125

Page 122

BY MR. BOUCHARD:

1 BY MR. BOUCHARD:
2     Q.   Do you believe there are sex trafficking
3 experts working at the Department of Homeland
4 Security?
5     A.   I don't know, sir.
6     Q.   Are you aware of whether the Department of
7 Homeland Security trains the nation's federal law
8 enforcement officers on sex trafficking using the
9 Blue Campaign?
10    A.   That I understand might be a role, sir, of
11 other police departments.
12    Q.   Is it your opinion that the Department of
13 Homeland Security should not be training the
14 nation's federal law enforcement officers on sex
15 trafficking using the Blue Campaign?
16         MR. ALLUSHI:  Objection.
17    A.   Just to be clear, you're saying Blue
18 Campaign.  I didn't know the Blue Campaign applied
19 to the training of law enforcement, whether it's
20 federal, state, or local.  So -- but taking the Blue
21 Campaign part of it out, I do think it's appropriate
22 for DHS to be training federal law enforcement as
23 well as state and local.
24 BY MR. BOUCHARD:
25    Q.   So what's the distinction you're making

Page 123

1 between the Blue Campaign and DHS training federal,
2 state and local law enforcement on sex trafficking?
3     A.   I don't know that the Blue Campaign is
4 all-encompassing the way you're proposing it is.  I
5 understood the Blue Campaign to be primarily focused
6 on the business sector.  Not necessarily, I mean,
7 they may refer to it as Blue Campaign, I guess, in
8 the training.  But I've never heard it referred to
9 that way.
10    Q.   Have you talked to anyone in the American
11 Hospitality and Lodging Association about the
12 effectiveness of sex trafficking signs and
13 indicators?
14    A.   No.
15    Q.   Anybody at any other hospitality and
16 lodging associations that you've spoken about
17 that topic?
18    A.   No, because what I -- I wouldn't ask them
19 about the findings.  What I would be asking them for
20 would be the underlying support for anything that
21 they told me.  So I would still be looking for that,
22 you know, internal association case study or I would
23 be looking for the published peer-reviewed journal
24 articles which looked at that issue.  And I looked
25 for those and they don't exist.

Page 124

1     Q.   Have you ever given talks or presentations
2 to a hospitality organization or association about
3 use of sex trafficking red flags and indicators?
4     A.   No.
5     Q.   Are there any sex trafficking red flags or
6 indicators that you believe are reliable?
7     A.   Yes.  I think there's a lot of evidence.
8 If you look at pages 10, 11, 12 of my reports, there
9 is a lot of -- I won't say a lot.  There is
10 evidence-based support for some of those questions.
11 There are also various screening tools out there
12 that could be used to, you know, question potential
13 victims to identify whether they're, you know, in
14 fact, a victim or not.  So there are a number of
15 tools out there.  It was like there was a recent
16 systematic review which looked at 41 different
17 screening tools.  Each of those screening tools had
18 evidence-based indicators within them.  That's one
19 of the articles I gave you that are cited, that I
20 sent you.
21    Q.   Let me focus that question on the
22 hospitality industry specifically.  Are there any
23 sex trafficking red flags or indicators that you
24 believe are reliable specifically for the
25 hospitality setting?

Page 125

1     A.   There are none that are evidence-based.
2 There are some that just make practical sense to me,
3 like not renting by the hour, right?  Hourly rentals
4 to me don't make a lot of sense unless you're on a
5 major thoroughfare and you're catering specifically
6 to truckers, for example, who need to shower and get
7 back on the road.  But even then, you've got truck
8 stops that handle that kind of traffic.  So the
9 short answer is no, I'm not aware of any, you know,
10 that are reliable in the sense that they're
11 evidence-based.
12    Q.   You said you do believe there are some
13 that made common sense or at least that's what I
14 understood you to say?
15    A.   I said the hourly rentals doesn't make a
16 lot of sense to me.  I mean, I don't see where
17 there's a market need for that except in the case
18 where there's no truck stops and you're on a major
19 thoroughfare and you're catering to truckers, you
20 know, long-haul drivers.
21    Q.   Any other red flags or indicators that you
22 think make sense for the hospitality industry other
23 than hourly rentals?
24    A.   No, because as I've gone through the
25 various lists of indicators that have kind of

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                              Pages 126..129

Page 126

1  changed a little bit over time and are a little bit
2  different between the organization that you're
3  looking at.  None of them -- all of them have -- all
4  of them have reasons why you may do something that
5  would otherwise be an indicator.  Like, for example,
6  accepting cash, right?  I mean, that is one of the
7  purported indicators, but there are plenty of
8  reasons why people would use cash.  You know, so
9  that in and of itself to me is not any kind of
10  indicator.  There is certainly no research to
11  support the notion that only criminals use cash or
12  only sex traffickers use cash.  I occasionally use
13  it for some reason.
14     Q.   I'm going to show you what I'm marking at
15  Plaintiffs' Exhibit 5.
16          (Thereupon, marked as Plaintiff
17          Exhibit 5.)
18  BY MR. BOUCHARD:
19     Q.   And I just direct you to Plaintiff's
20  Exhibit 1.  You can look at page 12 where you cite
21  to the Polaris project --
22     A.   Yes.
23     Q.   -- that suggests certain questions to ask
24  sex trafficking victims.  So I'm going to show you
25  Plaintiffs' Exhibit 5 here.

Page 127

1          (Clarification requested by stenographer.)
2  BY MR. BOUCHARD:
3     Q.   Do you see that I've put Plaintiffs'
4  Exhibit 5 in front of you, Mr. Vellani, which is the
5  National Human Traffic Resource Center/Polaris
6  Project Comprehensive Human Trafficking Assessment?
7     A.   Yes, sir.
8     Q.   And I'll represent to you that when I was
9  looking at the bottom of page 12 of Plaintiffs'
10  Exhibit 1, where you have the list of questions, I
11  didn't know exactly where they came from.  And I did
12  some research and it appears they came from this
13  assessment.  Is this the source of the questions
14  that appear on pages 12 to 13 of your expert
15  reports?
16     A.   I don't know.  You'd have to go to page 4
17  so I can see that.  I don't know if it's the same
18  version or not.  Well, that's general trafficking.
19  Can you go down to the one that says sex trafficking
20  questions?  I apologize, I don't see numbers on this
21  document.  But I saw a table of contents with
22  numbers unless I was mistaken.
23     Q.   I think it's --
24     A.   There you go.  Yes.  Thank you.  Those are
25  the questions.

Page 128

1     Q.   Okay.  Is this the source for what you
2  have on the bottom of page 12 and 13 of your expert
3  reports?
4     A.   It appears to be, yes, sir.
5     Q.   And you see the copyright on this document
6  is 2011?
7     A.   Yes, sir.
8     Q.   Is your understanding that these were
9  questions that were for hospitality participants to
10  ask or law enforcement and other professionals to
11  ask?
12     A.   Well, it certainly wasn't hospitality.  I
13  actually could never figure out who the audience was
14  for this.  But it wasn't hospitality.  I can almost
15  assure you that.  These would be crazy questions to
16  ask a guest.
17     Q.   You do see here that it says, for example,
18  on page 1 of Plaintiffs' Exhibit 5 under assessment
19  environment and tone, "Conduct the assessment in a
20  comfortable, safe environment.  If you are in a
21  police station or in a place where the physical
22  space/conditions are limiting, attempt to create an
23  environment that is as calming and positive as
24  possible."
25          Do you see that?

Page 129

1     A.   Yes, that's kind of what I was looking to.
2  We do the same thing in hospitals.
3     Q.   And just to clarify, are you saying that
4  the questions that are on pages 10 and 11, you
5  agree -- of your report, Plaintiffs' Exhibit 1, do
6  you agree that the questions on pages 10 and 11 are
7  not questions that you would expect somebody in the
8  hospitality industry to ask?
9     A.   Yes, that's correct.  The section was not
10  on hospitality specifically.  It was about how to
11  identify a victim.  What are the different methods
12  for identifying a victim.
13     Q.   I want you to look, if you can, sir, back
14  at Plaintiffs' Exhibit 1 page 13, please.
15     A.   Okay.
16     Q.   Your last sentence on that page starts
17  "Unlike healthcare environments."  Do you see that?
18     A.   Yes, sir.
19     Q.   When you say hotels like the United Inn
20  and Suites are not well situated to identify victims
21  of sex trafficking, what do you mean by the term
22  "well situated"?
23     A.   Well, again, if you think about what is
24  necessary, okay, and even in -- let me be clear
25  about this, because even when you do the things that

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 130..133

---

Page 130

1  I'm about to list, you can still get it wrong.
2  Okay.  You can still make mistakes.  So what I
3  recommend and I think ultimately what even Polaris
4  is recommending in that is that you go through these
5  invasive screening tools, right?  You ask a lot of
6  invasive questions.  So in the healthcare
7  environment you go further than that.  You also
8  conduct a physical examination.  You also do a
9  medical records review.  And then you create that
10 safe environment which Polaris talks about, right?
11 And then at least in the environments that I'm
12 talking about, you would give them that further step
13 of creating, you know, the signage that with
14 exclusive directions on how we want you to
15 communicate to us nonverbally that you're a
16 trafficking victim.
17        So, no, these are not things that a hotel
18 can do.  But these are not necessarily only things
19 that law enforcement can do.  The point of it is
20 that it is very difficult to identify a victim even
21 in environments where you can do a medical records
22 review, a physical examination, ask a lot of
23 invasive questions.  Separate the trafficker from
24 victim.  These are not things a hotel can do.  So
25 They're not well situated to actually do much in

Page 131

1  terms of identifying an actual victim of
2  trafficking.
3        Q.   Do you agree with me that a victim of
4  trafficking can be identified through observable
5  behaviors, not just through questions that you pose
6  to the victim?
7        A.   No.
8        Q.   Do you agree that identifying victims of
9  sex trafficking is different than identifying red
10 flags of sex trafficking?
11        MR. ALLUSHI:  Objection.
12        A.   Well, define what you mean by red flags.
13 Because there's behavioral red flags that are
14 associated with, you know, an environment, I think
15 the way they are presented by DHS or Polaris.  And
16 there's also acts that people do, right, that are
17 specific.  So I guess I need your help in
18 understanding what you mean by red flags, because,
19 obviously, that's not a -- you know, that's not a
20 normal word, right?  That's implying something.
21        BY MR. BOUCHARD:
22        Q.   Well, when you say they're not well
23 situated to identify victims of sex trafficking,
24 what I'm trying to understand is, is there a
25 difference between saying hotels are not well

Page 132

1  situated to identify victims of sex trafficking
2  versus saying hotels are not well situated to
3  identify red flags and indicators promulgated by the
4  Department of Homeland Security or Polaris or ECPAT
5  or BEST or any of the other organizations that
6  promulgate sex trafficking red flags and indicators?
7        MR. ALLUSHI:  Objection.
8        A.   We're kind of at a crossroads.  You either
9  got to pull up the red flags for me or I'm happy to
10 do it on my end.  We can do it either way.  I need
11 to look at those indicators so I can answer your
12 question properly.
13        BY MR. BOUCHARD:
14        Q.   Okay.  Well, take away the words "red
15 flags," because we've been talking about indicators
16 of sex trafficking already.  So do you agree there's
17 a difference between identifying a victim of
18 trafficking and identifying indicators of
19 trafficking?
20        MR. ALLUSHI:  Objection.
21        A.   We're still in the same place though.
22 Because, you know, again, the indicators that I talk
23 about and the indicators that I recommend to my
24 clients to look out for are not the same as what
25 Polaris and Blue Campaign look at.  I would just

Page 133

1  like to be just a little bit more specific so I can
2  give you a proper answer.
3        BY MR. BOUCHARD:
4        Q.   When you say that indicators that you rely
5  upon or that you recommend your clients implement,
6  I'm not sure I got your wording exactly right, but
7  what do you mean?  What indicators do you rely upon?
8  What do you recommend your clients implement?
9        A.   Well, the biggest thing is a screening
10 tool right?  The evidence-based screening tool are
11 the best indicators to me.  You can look at somebody
12 with a history of STIs, you can look at -- you know,
13 there's dental indicators you can look at.  There
14 are all kinds of indicators out there but they're
15 primarily medical based, right?  Barring a medical
16 evaluation, then you're looking at the
17 evidence-based screening tools of which I think I
18 mentioned there were recent systematic review which
19 identified 41 different screening tools.  The
20 indicators in there are the ones that I'm talking
21 about.  Not the indicators that someone paying cash
22 or renting by the hour, right?  I'm talking about
23 the real indicators.  Not ones that are a bunch of
24 yahoos sitting in a room going ah, that sounds like
25 a good idea.

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 134..137

Page 134

1    Q.  Do those indicators that you're referring
2    to in your opinion apply to the hospitality setting?
3        A.  They don't.  But that's kind of my point,
4    right?  That's what I'm trying to draw your
5    attention to is that there are indicators that are
6    evidence-based.  But there is no reasonable
7    practical way to implement that same stuff in a
8    hospitality environment, right?
9            And then I went further than that, I said
10   there are some things that just don't make a lot of
11   sense to me, like I can't think of a good reason to
12   rent a hotel by the hour other than the very small
13   rare exception that I gave you.
14       Q.  So if you were engaged by a hotel in the
15   years 2017 to 2019 to provide consulting services
16   regarding mitigating a risk of sex trafficking at
17   the hotel, are there any indicators, red flags,
18   signs that you would have proposed that the hotel
19   rely upon or use?
20           MR. ALLUSHI:  Objection.
21       A.  To identify trafficking?
22   BY MR. BOUCHARD:
23       Q.  To mitigate the risk of sex trafficking?
24       A.  It's a phenomenal question.  I -- again,
25   the only thing that come to mind is the hourly

Page 135

1    rentals.  But even that's not specifically about
2    trafficking, right?  That's broader to include other
3    kind of nefarious activities that people want that
4    private space for.  So I can't think of any -- like,
5    again, you're just asking me, you know, without
6    supporting evidence or anything.  The only thing I
7    think would be disconcerting would be the hourly
8    rentals.
9        Q.  So if the hotel client -- assuming you
10   consider them clients or customers, whatever -- if
11   the hotel client that had engaged you to act as a
12   consultant said, "Mr. Vellani, we're really intent
13   on addressing the risk of sex trafficking.  Can you
14   please provide us with some materials that we can
15   rely upon to train our staff?  If you can't, what
16   should we tell our staff?"
17           MR. ALLUSHI:  Objection.
18       A.  Again, good question.  So I think what I
19   would explain -- and this is what I continually do
20   with my consulting clients -- is I try to educate
21   them on both the actual threat, you know, about this
22   particular incident, the actual threat specifically
23   at their property.  And then, obviously, you're
24   telling me they have already got these concerns.  So
25   I probably don't need to spend a lot of time

Page 136

1    educating them on what they already think they are
2    concerned about.  But I think the biggest problem --
3    and, look, I'm not trying to be flip about this.
4    Sex trafficking is a big problem.  I think the
5    biggest problem right now is that people
6    misunderstand the prevalence of it, right?  I mean,
7    in 2022 there's only 2,000 documented incidents
8    throughout the entire country.  In 2019 there's
9    only, like, 1600 incidents throughout the entire
10   country, right?  So people are -- people have been
11   told that this is a bigger problem than what it
12   perhaps is whether by way, you know, of that movie
13   that just came out a few months ago or whether
14   they're seeing the signs every time they go to the
15   barber or hair salon, right?  There's a belief it's
16   a bigger problem than what it actually is.  In fact,
17   one of the references I gave you is Ella Cockbain's
18   book which talks about all these myths that exist
19   about sex trafficking or human trafficking in
20   general.  So what would I -- I would first try to
21   get them to understand reality.  That's the first
22   thing that I would do.  And then they said, "Well,
23   we don't care about reality.  We still want to do
24   something," I might talk about what does the future
25   hold for being able to actually identify nefarious

Page 137

1    activity in a room, whether it's people fencing
2    stolen goods or selling drugs, prostituting or sex
3    trafficking and then I would talk to them about the
4    facial recognition cameras that I mentioned to you
5    earlier.
6            There's also some potential technology
7    that exists today where you can count the number of
8    times the guest room is open.  The problem is most
9    of that is when you open the guest room from the
10   outside, right?  Because you got typically
11   electronic locks on the door and you can interrogate
12   that lock to find out how many times that guest room
13   is opened from the outside but you're not counting
14   the number of times it's been open from the inside.
15   So if you're a prostitute, you're typically opening
16   the guest room from the inside and therefore you're
17   not able to count the number of times that door is
18   opened.
19           But, you know, beyond that what would I
20   advise them?  Probably not a whole lot.  I mean, if
21   they still said we still want something, then, yes,
22   sure.  I would refer back to everything else that's
23   out there in the industry.  But I'm going to say --
24   I'm going to give them -- I'm going to temper their
25   expectations on what those things can do.  That's

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                      Pages 138..141

Page 138

1  part of my job is to educate my client. As a
2  consultant, my job is to educate my client on what
3  works and what doesn't, and what's promising. Sorry
4  for the long, rambling answer.
5      BY MR. BOUCHARD:
6      Q.   No, I appreciate the thoughtful response.
7           I wanted to ask on page 14 and 15 of
8  Plaintiffs' Exhibit 1, really looking more at
9  page 15 of Plaintiffs' Exhibit 1 which is identical
10 on Exhibits 2 and 3. You talk about staffing at the
11 hotel and, obviously, we've already discussed
12 staffing-related issues. I wanted to ask you a
13 slightly different question which is do you have an
14 opinion about what an appropriate guest to staff
15 ratio is for a hotel like United Inn and Suites?
16     A.   No, I don't have an opinion on that. You
17 know, I think, you know, that's more of a functional
18 question for an individual hotel as to what their
19 appropriate level of staffing is. I've come across
20 some of these extended stay hotels that don't even
21 have staff at night. Odd, but, you know, it is a
22 practice for some hotels.
23     Q.   I take it you would not recommend that
24 practice?
25     A.   I mean, I haven't looked at it enough to

Page 139

1  be able to say one way or the other. Again, I found
2  it odd because it was the first time I had ever seen
3  that. You know, I would typically imagine that
4  there would be some staff -- at least a staff member
5  available to handle after hours check-ins but
6  apparently this particular extended stay doesn't
7  even allow after hours check-in. So...
8      Q.   On page 14 at the very bottom of
9  Plaintiffs' Exhibit 1, page 14, you say that "The
10 owner of United Inn has been an intermittent member
11 of the Asian American Hotel Owners Association since
12 1998."
13          Do you see that?
14     A.   Yes, sir.
15     Q.   Do you know if he was a member from 2017,
16 2018 or 2019, in any of those years?
17     A.   As I recall, he wasn't able to pinpoint a
18 specific year, the specific years where he was a
19 member or not a member. So I don't have any
20 understanding of that.
21     Q.   On page 16 of Plaintiffs' Exhibit 1 your
22 first sentence talks about Plaintiff J.G. knowing
23 her traffickers sufficiently to meet with him in
24 person and you say kidnapping was not involved. Do
25 you see that?

Page 140

1      A.   Yes, sir.
2      Q.   And you have virtually identical sentences
3  on pages 16 of Exhibits 2 and 3 about plaintiffs
4  A.G. and G.W. respectively. What is your definition
5  of kidnapping?
6      A.   So, you know, again, I would have to refer
7  back to, you know, I typically use FBI UCR
8  definitions, Uniform Crime Report definitions. I'm
9  basically -- it's a physical abduction of someone.
10 So against their will.
11     Q.   Are you planning or intending to testify
12 at trial that any of the plaintiffs were not being
13 held against their will?
14     A.   I think there's other experts involved in
15 this case that will talk about this. I don't think
16 that's going to be an opinion that I need to give.
17 What I'm saying is there was not a physical
18 abduction. That's the extent of what I'm saying.
19     Q.   And I assume your answers would be the
20 same as to A.G. and G.W.'s cases?
21     A.   Yes, sir.
22     Q.   Where at the bottom of page 16 off
23 Plaintiffs' Exhibit 1, you say, "During the early
24 part of her trafficking on November 14th, J.G. was
25 detained by a De Kalb County Police Department

Page 141

1  police officer at United Inn." Do you see that?
2      A.   Yes, sir.
3      Q.   What do you say that quote was "the early
4  part of her trafficking"?
5      A.   Well, that's a wonderful question. I
6  think her period of trafficking was October 7th of
7  2018 to January of 2019. So if I recall what you
8  just said, November, so that would be early part of
9  her trafficking at United Inn. Let me be clear.
10 That's at United Inn. So October, November,
11 December, January. November would be, you know,
12 within the first month.
13     Q.   Well, it would be about five, five and a
14 half weeks later?
15     A.   Right. Yes.
16     Q.   No?
17     A.   Yes.
18     Q.   You say in the next sentence, that "J.G.
19 did not ask the police officers for assistance."
20          Do you see that?
21     A.   Yes, sir.
22     Q.   How do you know that?
23     A.   Because I watched the body camera footage
24 and read a report regarding this incident.
25     Q.   Did you watch the entirety of the body

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 142..145

Page 142

1  camera footage?
2      A.  Well, again, I'll give you the same answer
3  I gave you before.  I'm always hamstrung by what
4  attorneys give me, right?  So based on what I have,
5  I see no evidence of that.
6      Q.  Well, did the footage that you reviewed
7  only include J.G. talking to the police or did it
8  also include other people who you didn't know
9  talking to the police?
10         MR. ALLUSHI:  I'm going to object to that.
11     You can show him the video.  I mean, you don't
12     have to remember everything, Karim.
13         THE WITNESS:  Thank you.
14     A.  Listen, it's body camera footage.  So it's
15  typical body camera footage.  There is typically
16  more people there.  In this instance I do remember
17  there were multiple people there.  I don't know what
18  I don't have as far as what's on that video.
19  BY MR. BOUCHARD:
20     Q.  I take it that you would defer to the
21  evidence and testimony at trial since you were not
22  there yourself on November 14th?
23     A.  Yes, of course.
24     Q.  What is your recollection of what the
25  videos show?

Page 143

1      A.  It showed -- let me -- the part of the
2  video that's coming to mind is the part where the
3  police car is sitting there, and there's a bunch of
4  people gathered around the police officer.  He's
5  talking to multiple ones of them.  I might be
6  confusing this also with the report.  Because in the
7  report she gives her name as Chameeka Grimes which I
8  believe was her cousin.  So I don't know if that
9  came from the police department or that came from
10  the cameras, from the body cameras.  You know, it
11  was multiple people involved in this.
12     Q.  Based on the -- your recollection of the
13  videos, is your recollection that the video footage
14  that you reviewed was at the United Inn and Suites?
15     A.  Yes, sir.
16     Q.  It wasn't at the police department or some
17  other location?
18     A.  No.  I believed it was at the location.
19     Q.  Which is, as you know, one of the hotels
20  where Plaintiff J.G. alleges she was trafficked, is
21  that right?
22     A.  Yes.
23     Q.  And to your knowledge, sir, were some of
24  Plaintiff J.G. traffickers in her immediate vicinity
25  when she was talking to the police officer in the

Page 144

1  parking lot at United Inn and Suites?
2      A.  I don't know that I know that.  That is
3  what I suspect, but I don't know that I know that.
4  I don't think those people were necessarily
5  identified by their street names which were, you
6  know, Shaq, Cash, and King.
7      Q.  Do you know why the police officers had
8  gone to the United Inn on November 14th?  Was it for
9  a sex trafficking-related call or was it for
10  something else?
11     A.  If I'm not mistaken, I believe it was a
12  robbery.
13         MS. RICHENS:  Let me object to the
14     question about traffickers, quote, being in the
15     vicinity when J.G. was speaking to the police.
16     I think that's a vague terminology.
17  BY MR. BOUCHARD:
18     Q.  On the bottom of page 16, Plaintiffs'
19  Exhibit 1, you say, Mr. Vellani, that "United Inn
20  and Suites was not aware of any incidents involving
21  J.G. contemporaneously.  J.G. never reported the
22  incidents to United Inn and Suites."
23         What does that mean, "not aware of any
24  incidents involving J.G. contemporaneously"?
25     A.  So based on the November incident I don't

Page 145

1  know that they knew that that was the missing
2  person.  That's number one.  Number two, again, she
3  didn't ask for help from United Inn using, you know,
4  one of the several different communication methods
5  she had with them.  There was a number three there
6  but I can't remember what it is.
7         The bottom line is, I mean, they didn't
8  know about it at the time she was there.
9      Q.  Are you testifying that is, in fact, true?
10  Is that your opinion, or are you saying based on the
11  discovery materials you've reviewed and the
12  deposition testimony you've reviewed, that's your
13  conclusion?
14     A.  Yes, the latter.
15     Q.  But I take it you will defer to whatever
16  the evidence and the testimony at trial will show?
17     A.  Yes, that's exactly what I'm saying here.
18  I mean, that's based on my review of the case.  So
19  whatever comes out at trial, I'm happy to defer to
20  that.
21     Q.  And there are different points in your
22  report where you use language like there is evidence
23  or there is no evidence of certain actions taken by
24  United Inn or certain knowledge possessed by
25  United Inn.  Are you familiar with those terms that

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 146..149

Page 146

1  you used in your report, either there being evidence
2  or there being no evidence?
3         MR. ALLUSHI:  Objection.
4     A.  Yes.
5  BY MR. BOUCHARD:
6     Q.  And kind of similar to the question I just
7  asked you, Mr. Vellani.  Do you intend to testify at
8  trial as to what, in fact, United Inn knew or what,
9  in fact, United Inn did or will you defer to the
10  evidence and testimony at trial?
11        MR. ALLUSHI:  Objection.
12     A.  So, I mean, what I can tell you is that my
13  report is, obviously, based on the record as it
14  exists at the time of the report.  If something
15  different happens in trial, I will defer to that.
16  And I'll certainly be asking for dailies, you know,
17  to review that if anything is different.
18  BY MR. SIR.
19     Q.  Right.  But what I'm trying to understand
20  is are you planning to offer testimony at trial
21  about what, in fact, United Inn knew or did?
22     A.  I don't know exactly how to answer your
23  question.  If I'm asked what is my understanding of
24  the facts, I will recite those facts at trial.  If
25  something is different that's in the record at

Page 147

1  trial, then, obviously, I would defer to that.  So
2  hopefully I'm answering your question.
3     Q.  And, obviously, your knowledge of the case
4  is limited by the access you've been given or not
5  given to the materials from the case.  Is that fair?
6     A.  Well, that, and my own independent
7  investigation by way of the crime stats and my
8  interview of Mr. Shareef and my site inspection to
9  the extent that provides anything.
10     Q.  On page 18 of Plaintiffs' Exhibit 1 you
11  say that -- in that third bullet point, and this is
12  language that also appears in Plaintiffs' Exhibits 2
13  and 3, you said the DeKalb Police Department did not
14  report any human trafficking incidents to the FBI in
15  2017 or 2018.  Do you see that?
16     A.  Yes, sir.
17     Q.  What does that mean to you?
18     A.  Well, again, it goes back to this notion
19  that we're very early on in the development of
20  trying -- of law enforcement trying to solve these
21  crimes.  Like I told you when I gave you the 2022
22  statistics, nationwide there were only 2,000
23  incidents that are documented in the FBI files.  And
24  I told you that unequivocally there would be fewer
25  incidents in earlier years because I think we are

Page 148

1  just geared -- for better or worse, the law
2  enforcement realm is only now gearing up to deal
3  with this even though it was in the 20- -- in the
4  2018 TVPRA.  So bottom line on this is if you look
5  at the Uniform Crime Report, specifically the
6  national incident-based reporting system data for
7  DeKalb County, they don't report any incidents of
8  human trafficking.  My guess is that we'll continue
9  to see that number go up and up and up as law
10  enforcement is trained to separate prostitution from
11  trafficking.  And then hopefully we'll get better at
12  reporting and then we'll get better at crime
13  prevention and we'll start to solve this problem and
14  you'll see that number come back down.  That would
15  be my big picture, you know, guesstimate about that.
16     Q.  Sorry.  I didn't mean to speak over you.
17  Were you finished?
18     A.  Yes, sir.
19     Q.  Okay.  You're, obviously, aware that the
20  FBI investigated and the Department of Justice
21  prosecuted Zaccheus Obie and Kikia Anderson for
22  trafficking A.G. and G.W. in 2017 at the United Inn.
23  Are you aware?
24     A.  The Obie brothers, yes.  I don't know who
25  this other third person is that you're referring to.

Page 149

1  I may have come across this name but it's not coming
2  to me right now.
3     Q.  Is it your opinion that there was no minor
4  sex trafficking in DeKalb County in 2017 or 2018?
5         MR. ALLUSHI:  Objection.
6     A.  No.  I think we've got a record here of
7  such activity, right?  What I'm saying is that there
8  was nothing reported to DeKalb County, from DeKalb
9  County to the FBI of any incidents.  And think I
10  that goes back to incorrectly identifying victims as
11  criminals sometimes.
12  BY MR. BOUCHARD:
13     Q.  Just -- sorry.  Go ahead.
14     A.  No.  I'm sorry.  My bad.
15     Q.  Just under that bullet point, page 18,
16  Plaintiffs' Exhibit 1.
17     A.  Yes, sir.
18     Q.  You say that you applied a methodology
19  called the Uniform Crime Reporting methodology.  Do
20  you see that?
21     A.  Yes, sir.
22     Q.  Is that methodology referenced in the
23  IAPSC Forensic Methodology?
24     A.  I believe it is.  I'm not opening another
25  file.  I'm just simply opening the methodology.  I

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                    Pages 150..153

Page 150

1  don't want to make it into something else.
2      Q.   That's what I was going to ask you to do
3  anyway, if you could.  Appendix B to Plaintiffs'
4  Exhibit 1.
5      A.   So, yeah, it's on -- it's in the
6  references section on page 7 of the methodology.
7      Q.   Can you point me to it?
8      A.   If you look at the forensic methodology,
9  page 7, it's numbered in the bottom right corner.
10     Q.   Yes, sir.
11     A.   I lost it now.  Bear with me.
12     Q.   Okay.
13     A.   U.S. Department of Justice.
14     Q.   Yes.  Okay.  Thank you.  On page 22 of
15 Plaintiffs' Exhibit 1, you have this tri- -- and
16 I'll represent again this is identical to page 22 of
17 Plaintiffs' Exhibits 2 and 3.  You have this
18 triangle that shows offender, place, target, victim
19 and then on an exterior triangle, handler, manager,
20 guardian.  Do you see that triangle?
21     A.   Yes, sir.
22     Q.   And, obviously, in the middle of it all is
23 crime?
24     A.   Correct.
25     Q.   Okay.  So what I would like to understand

Page 151

1  is can you sort of apply that analysis and that
2  triangle, if you will, to these cases and sort of
3  explain to me who are the offenders, who are the
4  targets, victims, what was the place, who was the
5  handler, handlers, who is the manager, who is the
6  guardian?
7      A.   Yes, sir.  So in order for a crime --
8  number one, this has its genesis in what is called
9  routine activities theory.  Routine activities
10 theory is one of the three preeminent theories that
11 come under the category of environmental
12 criminology.  So the routine activity theory was
13 developed by a guy named Marcus Felson who just
14 retired from --
15          (Clarification requested by stenographer.)
16     A.   Marcus Felson.  He just retired from a
17 university here in Texas.  He was the -- when I
18 first got to know him he was the dean -- when I say
19 got to know him, I mean from afar.  When I first got
20 to know him from afar, he was the dean at Rutgers
21 School of Criminal Justice in New Jersey.  He was
22 primarily with the home office in England.
23          So Dr. Felson came up with routine
24 activities theory.  And basically what that talks
25 about is how people throughout the course of their

Page 152

1  everyday life come across crime opportunities.  And
2  people in the course of their everyday life come
3  across, you know, activities that they do.  And some
4  of those people are criminals.
5          So that resulted in this triangle which is
6  originally just the inner circle.  Today it sits
7  with the inner and outer triangle -- not circle,
8  excuse me, triangle -- and then there's now a third
9  triangle around it.  So this is called the problem
10 analysis triangle or the new crime triangle.  And
11 what it basically says is in order for a crime to
12 occur, there has to be a target or victim.  So if
13 we're talking about property, it would be the
14 target.  So that would be jewelry, the purse, the
15 wallet, whatever.  If it's a person-on-person crime
16 it could be a victim.  Or the victim that owns the
17 target.
18          And then the third -- the second element
19 that has to be in place is that there has to be an
20 offender.  And then that offender typically comes
21 across, you know, the opportunity for a crime
22 through his routine activities.
23          And then the third element is for there to
24 be a place for them to converge in time and space
25 for the crime to occur.

Page 153

1          So if you remove one of those elements,
2  the crime doesn't occur.  That's the theory.  Okay.
3          Now, the outside triangle is called the
4  controller triangle.  Okay.  So the three elements
5  there are the three controllers.  Handler, manager,
6  and guardian.  There is a third triangle that I
7  mentioned that is not shown on here that is still a
8  theory that's in development that are called super
9  controllers.  And I do think super controllers come
10 into play here as well.  So guardians are protective
11 of a target or a victim.  Most guardians are
12 self-guardians.  In other words, if I'm going to do
13 a site inspection and a, you know, high crime --
14 very high crime property, I'm probably not wearing a
15 fancy watch or driving a fancy car because I don't
16 want to become victimized, right?
17          So the idea is I'm engaging in
18 self-guardianship.  Ms. Richens, I'm assuming is not
19 driving to the gas station with her windows down
20 pumping gas with her Louis Vuitton sitting on the
21 passenger's side seat.  Okay, because she's engaging
22 in self-guardianship.  So most guardianship is
23 self-guardians.
24          If you're talking about a parking lot of a
25 grocery store, the bystanders in the area are

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 154..157

Page 154

1  guardians as well.  They're bystanders, they're
2  serving to some extent as a deterrent.  They're the
3  ones that can call the police.  They're the ones
4  that can alert management.
5         On the offender's side of things, the
6  handler is a person that controls the offender.  So
7  historically that's been church.  That's been
8  school.  You could also say a handler would be a
9  corrections officer.  It could be, you know, a
10 community intervention specialist.  It's somebody
11 that affects the behavior of the offender.
12        On the place side, you have a manager who
13 is responsible for the activities of that place.  It
14 probably helps to identify place which I think is
15 also defined in the report.  A place is a very
16 small, has a known geographic location, contained
17 within defined property boundaries, serves one
18 general function and has a legal authority to
19 control the use of the place.  So in this situation
20 the place is, obviously, United Inn.  You could say
21 that there's an interior element and an exterior
22 element to the place.  But generally speaking,
23 United Inn is the place.  Though we can acknowledge
24 there is interior private space and exterior common
25 areas.

Page 155

1         So a manager is basically responsible for
2  the smooth functioning of the place.  In this case,
3  it's a hotel.  The place is a hotel.  So the smooth
4  functioning of the place is that people are coming
5  to rent rooms.  They're getting access to the rooms.
6  They're getting the amenities they need.  They have
7  a smooth checkout process.  They leave the property,
8  housekeeping comes in, cleans the room and makes it
9  available for the next tenant, the next guest.  That
10 is in essence what a place manager does.
11        There is a new theory that is in
12 development called place management theory that has
13 some documentation thus far, okay, that talks about
14 how a place manager can affect the security posture
15 of a place.  Again, that's in development.  Good
16 stuff.  Hopefully gets better as we move forward in
17 time.
18        But ultimately, what the problem analysis
19 triangle says is that in order for a crime to
20 occur -- to not occur you have to remove one of the
21 three elements.  And you can remove one of the three
22 elements by using that controller triangle, or what
23 I mentioned was the super controller triangle.
24        So let's just talk about that for one
25 second.  If you talk about the manager which is

Page 156

1  probably the best place to talk about it.  The
2  manager has super control over it.  He's got funding
3  from ostensibly a bank.  If you think about -- I
4  don't know enough about the Epstein issue, but I
5  know, like, the banks were sued because they enabled
6  his trafficking.  That's why they were sued.  They
7  were super controllers.  I've had situations with
8  apartments where a bank will call me and want me to
9  do an assessment of on an apartment complex that
10 they are going to fund.  The bank is acting as a
11 super controller.  If the crime can't get under
12 control, maybe they don't fund that apartment
13 complex rehabilitation.  So we've taken the manager
14 out of it.  We've taken the place out of it.  The
15 super controller is not providing the funding.
16        In this situation you've got DeKalb County
17 who identifies this as a high crime property.  I
18 don't really understand how they did that.  I'm not
19 disputing it but I have no understanding what that
20 methodology was.  But what I do not see, I do not
21 see DeKalb County engaging with United Inn and
22 acting as a super controller and saying, "Hey if you
23 don't get the crime problem under control we're
24 going to file a nuisance abatement lawsuit on you."
25 Okay.  And what I don't see is the police officers

Page 157

1  going and talking to the bad guys, the traffickers
2  and saying, "Hey, you know, you guys need to get
3  this guy under control.  He needs to stop engaging
4  in whatever bad activities he's engaging in."
5         And then and the guardianship side, the
6  super controller would basically typically be the
7  parents, right?  The parents, the foster homes, you
8  know, the schools, what have you.
9         So in order -- and your question is great.
10 Because this problem analysis triangle I use as a
11 framework for assessing any kind of crime.  Okay?
12 So where do I see opportunities here is that -- I
13 use the problem analysis triangle to identify
14 opportunities for intervention.  Okay.  And to stop
15 the crime.  I hope I answered your question.
16    Q.   I think you did.  Can you just -- thank
17 you for that walk-through.  Can you just sort of
18 directly, if it's possible, tell me who each of
19 these people are in this case or in these cases?  In
20 other words the place is, obviously, United Inn and
21 Suites.  I think that's obvious.  The offender, I
22 believe, are the traffickers or the alleged
23 traffickers.  Can you sort of continue down that
24 path for me and just identify directly who fits in
25 each of those buckets in these cases?

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 158..161

Page 158

1    A.  Sure.  So J.G. -- I'm sorry -- yes, J.G.,
2  A.G. and G.W. would be the victims.  The guardians
3  would have been ostensibly the parents because
4  they're minors.  The offenders would be the Obie
5  brothers and this other Anderson person you're
6  talking about.  And then Cash, King and Shaq would
7  be the offenders.  The handlers for those folks, I
8  don't know who those folks are.  I don't know if
9  they were on probation.  I don't know who these guys
10  were or whether they had handlers.  Certainly not
11  effective handlers.  The place would be the
12  United Inn.  But like I mentioned earlier, the place
13  could also be -- there's an inside component and an
14  outside component, right?  It's kind of like if you
15  were running a mall that -- or your office, for
16  example, I'm assuming you're sitting in a law office
17  somewhere.  You are responsible for the interior of
18  your leased space.  The renter, the guest, is
19  responsible for the interior of their space, right?
20  So if she choose to let in a bad person that's kind
21  of on them, right?  I provided you as the hotel
22  owner I provided you with locks on the doors and
23  maybe a peephole but ultimately you're responsible
24  for what is going inside your room.
25         So there is an inside/outside component.

Page 159

1  Your point earlier about the common areas, that's on
2  the management that's on United Inn's owner, period,
3  right?  So the owner -- the place is United Inn
4  inside/outside.  And then the manager would be, you
5  know, for the common areas it's definitely
6  United Inn.
7         For the interior of the leased guest room
8  right, or rented guest room, that would be the
9  person that is, you know, renting the room.
10    Q.  You said, and your report says this, too,
11  that most guardianship is self-guardianship, that is
12  people taking action to protect themselves?
13    A.  Yes, sir.
14    Q.  Does that apply to minors as well?  In
15  other words as a security expert who gives advice to
16  hotels on mitigating sex trafficking risks, do you
17  expect minors to exercise self-guardianship?
18    A.  So I've actually been thinking about this
19  question a lot.  You know, I don't know if I
20  anticipated your question, but I've been thinking
21  about this a lot.  I think the law -- and I'm not a
22  lawyer -- but the law seems to be very clear on the
23  actual consent part of the sex act.  That is not
24  within the purview of the minor.  However, I think
25  any of us with children, you know, I've got a

Page 160

1  15-year-old and she's clamoring for social media and
2  I refuse to let her have it.  So -- because I -- you
3  know, I don't want her to do it.  She's also
4  cognizant of the dangers of some parts of social
5  media.  So she herself engages in self-guardianship.
6  So just by the fact that that she's a minor does not
7  mean that she can't be engaged in self-guardianship.
8         So I think my answer is that, yes, a minor
9  can engage in self-guardianship.  They do it all the
10  time.  They don't just leave their phones laying
11  around on a public bus, for example.  They engage in
12  guardianship over that phone, right?
13    Q.  On page 23 of Plaintiffs' Exhibit 1, the
14  first full paragraph says, "Furthermore, criminology
15  has shown," and then it goes on from there.  Let me
16  know when you see that?
17    A.  Yes, sir.  I'm there.
18    Q.  Okay.  I wanted to ask you, and, again,
19  this paragraph from page 23 is also in Plaintiffs'
20  Exhibits 2 and 3 in the A.G. and G.W. cases.  And
21  you talk about area crime can be used for
22  comparative purposes, and specifically a place could
23  be compared to other places with similar
24  characteristics in the area.  Did you compare
25  United Inn to other places with similar

Page 161

1  characteristics in its area?
2    A.  No.  The whole purpose of this section is
3  to basically say this notion of a high crime area is
4  a misnomer.  Like, you know, the example that I
5  typically give and you're not from Houston.  I know
6  you're not familiar with Houston.  There is an area
7  north of Houston in the Intercontinental Airport
8  that -- it's called Greenspoint, and people for
9  years called it Gunspoint.  And HPD, the Houston
10  Police Department went out from and did -- the crime
11  analysts did a deep dive on the crime stats and
12  identified really there was only three properties,
13  three specific places that had high crime.  Those
14  three places contributed entirely to the reputation
15  of Gunspoint.  So they sent HPD officers out there
16  to go get the crime problem under control at those
17  three properties.  And once they did, Gunspoint lost
18  its reputation and people started referring to it as
19  Greenspoint.  Post-COVID it's back to being called
20  Gunspoint again.  Though I'm not sure how many bad
21  places there are that are contributing to that
22  reputation.
23         So the purpose of this section is really
24  to say that, you know, calling something a high
25  crime area is somewhat of a misnomer.  What I did do

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 162..165

Page 162

1  in this case is I did the deep dive on the crime
2  statistics for United Inn and I also reviewed the
3  DeKalb County data which identified United Inn in
4  that top five hot spot analysis.  Though I don't
5  fully understand what they predicated that analysis
6  on.
7      Q.  So you did not, if I'm understanding you
8  correctly, compare United Inn to other hotels with
9  similar characteristics in its area.  Is that fair?
10     A.  I didn't personally do it.  It was already
11  done as part of the analysis.  As part of DeKalb
12  County's analysis.
13     Q.  Page 25 of Plaintiffs' Exhibit 1, which,
14  again, is identical to page 25 of Plaintiffs'
15  Exhibits 2 and 3.  Talks of nonstranger crimes being
16  difficult or more difficult to prevent than stranger
17  crimes?
18     A.  Correct.
19     Q.  Is it your opinion that minor sex
20  trafficking cannot be prevented when it is a
21  nonstranger crime?
22        MR. ALLUSHI:  Objection.
23     A.  I'm not saying it can't be prevented.  I'm
24  saying that you've got to look at that -- you know,
25  if you're looking at the stuff through the frame of

Page 163

1  that problem analysis triangle, there are multiple
2  places where it can be mitigated, right?  There are
3  certain things a place manager can do.  There are
4  probably a whole lot more things that the
5  guardianships can do.  In other words, the parents,
6  society, church whatever.  And there are probably
7  things that can impact that offender.  So, no, I'm
8  not saying that.  I think this is a nonstranger
9  crime by virtue of the fact this wasn't, like, a
10  forced abduction, a physical abduction, you know, of
11  these three individuals.  This was somebody that
12  they became familiar with through, you know, social
13  media or through word of mouth in the case of A.G.
14  and G.W.  So they're nonstranger by that virtue but
15  I think in general, nonstranger crimes are harder to
16  prevent.  They're not crimes of opportunity for the
17  most part.
18  BY MR. BOUCHARD:
19     Q.  What do you mean when you say intervention
20  once the crime is under way is possible?
21     A.  Well, I hate to say it, I mean, this
22  paragraph really goes to more the -- to -- to, you
23  know, like, the carjackings in a parking lot, right?
24  In other words, that deterring and preventing the
25  crime are really challenging.  And the example I can

Page 164

1  give you just sort of explain that so the
2  intervention part makes sense.  If you've got a
3  domestic violence incident, you're not likely to
4  deter or prevent that kind of crime.  If you think
5  about -- I don't know if you used to watch cops back
6  in the days, I think it's back on TV again.  You
7  would always see the police officer wait for backup
8  when responding to a domestic violence incident.
9  The reason for that is those are very volatile
10  situations that are not going to be prevented by the
11  mere fact that a police officer is standing there.
12  Okay?  So preventing is not really the objective.
13        The goal then turns to intervention.  So
14  once the officer has backup, you know, then they
15  will intervene, separate the parties and, you know,
16  under some state laws take one party to prison --
17  excuse me -- to jail.  So intervention basically
18  means that you could possibly intervene though it is
19  dangerous.  If there is a security officer, a
20  bouncer in a club and you have a bar brawl, two guys
21  fighting over politics or sports, you know, you're
22  probably not going to prevent that thing but you
23  could intervene though it's probably dangerous.  So
24  intervention simply means you can stop the crime as
25  it's going on.  You cannot prevent it.

Page 165

1      Q.  On page 26 of Plaintiffs' Exhibit 1, you
2  talk about calls for service.  For instance,
3  crimes -- and this also appears in Plaintiffs'
4  Exhibit 2 and 3.  I wanted to ask you about the
5  specific language that appears at the top of page 27
6  where you say "When assessing crime risk, calls for
7  service should not be used alone and when better
8  information (offense incident data and offense
9  incident reports) is available, calls for service
10  have little value."
11        Do you see that?
12     A.  Yes, sir.
13     Q.  There's language about using calls for
14  service data in Appendix B to your reports.  Which
15  is the IAPSC safe forensic methodology as I'm sure
16  you're aware.  That particular language when
17  assessing crime risk calls for service should not be
18  used alone and when better information is available,
19  calls for service have little value.  Do you agree
20  that language is not in the IAPSC Forensic
21  Methodology that appears in Appendix B?  And if you
22  need to take a look at Appendix B, obviously, feel
23  free.
24     A.  Wait a minute.  Let me see if I
25  understand.  You're saying on the top of page 27

**Page 166**

1    that when assessing crime risk calls for service
2    should not be used alone when better information is
3    available. And calls for service have little value
4    and you want me to compare that to what's in the
5    forensic methodology?
6         Q.  That's correct. And if it's helpful, I
7    mean, obviously, feel free to look at the entirety
8    of Appendix B, the forensic methodology. I thought
9    you were referring to footnote 1 on page 4 of
10   Appendix B which has virtually identical language to
11   what's on pages 26 and 27 except for that part that
12   I just read about calls for service having little
13   value. So that's what I'm trying to understand. Is
14   that language in the forensic methodology document
15   or is it not?
16        A.  The little value part is not. So keep in
17   mind that I'm on the committee that writes this
18   forensic methodology. And the language -- that
19   whole language in footnote number 1 is language that
20   I wrote and got approved by the forensic committee
21   and ultimately the membership.
22        So, I mean, obviously, I've iterated on
23   that since the time of the report. I've written
24   extensively. I've written two books on this. So
25   you're looking at -- I think 2014 language if I

**Page 167**

1    remember correctly. In the forensic methodology
2    then you're looking at 2023 language, you know, that
3    I've iterated on. I'm not trying to quote the
4    forensic methodology, in other words.
5         Q.  Understood. And that's what I just wanted
6    to clarify. Because a lot of footnote 1 in the
7    forensic methodology that's Appendix B appears on
8    pages 26 and 27 of your report.
9         A.  Yes, in the report. I authored both, yes.
10        Q.  But the little value language about calls
11   for service does not appear in the forensic
12   methodology document in Appendix B and I just wanted
13   to confirm with you that you agree?
14        A.  Yes. Yes. That language is not in the
15   forensic methodology.
16        Q.  Is it your opinion that calls for service
17   are not relevant to conducting a risk assessment of
18   a hotel?
19        MS. RICHENS:  Objection.
20        A.  You have to go back and think about what
21   calls for service are, right? They are literally
22   someone calling -- it depends on the jurisdiction.
23   Every jurisdiction is different. You can think
24   about it in this case. When I requested the calls
25   for service from DeKalb County, what they sent me

**Page 168**

1    was an actual list of offenses, which is great.
2    Which is exactly what I would prefer. But calls for
3    service depends on the jurisdiction. And in some
4    jurisdictions there is a direct correlation between
5    a call for service and the crime. In some
6    jurisdictions you'll have an initial call type and
7    then you'll have a final call type. So what I'm
8    primarily concerned about is the final call type.
9    If you look at Las Vegas, for example, their calls
10   for service are utter garbage and then basically
11   unusable but they don't give you anything else. So
12   you got to rely on that as a stepping stone to a
13   second request which is for the police reports.
14   Which is what I think you guys did in this case as
15   well as what I did to backfill some of the missing
16   reports.
17        So the calls for service for the most part
18   are a stepping stone to get to the police reports,
19   okay. Because I don't know how to request the
20   police reports for a property. I need to give the
21   police department specific numbers. I get those
22   case numbers from the calls for service. So calls
23   for service are nothing more than somebody called
24   the police. Could be an emergency number. Could be
25   a nonemergency number as well, could be a police

**Page 169**

1    officer happening upon a crime, okay, or happening
2    upon something suspicious and then later identifying
3    it's not a crime. But the problem with calls for
4    service, again, depending on the jurisdiction, you
5    may get everything. You may get fire calls. You
6    may get ambulance calls. You may get police calls.
7    You may get cats stuck up in trees. You may get the
8    vicious pit bull calls. The calls for service are
9    not the meaningful data. They are only meaningful
10   in that they get you to the second set of data which
11   is the police reports.
12        I got to be honest, I don't know if any of
13   this stuff is relevant for this case because I don't
14   know what you got when you made your request, but
15   when I made my request, they gave me actual
16   offenses.
17        MR. BOUCHARD:  If everybody is okay, let's
18   go about maybe five more minutes and then we
19   can take a break. I realize we've been on for
20   a while. Is that okay with everybody?
21        MS. RICHENS:  Yes.
22        THE WITNESS:  Okay.
23   BY MR. BOUCHARD:
24        Q.  On page 27, Mr. Vellani, Plaintiffs'
25   Exhibit 1, you have a paragraph in the middle of the

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 170..173

Page 170

1  page that starts "in this matter."  You see that?
2      A.   On 27?
3      Q.   Page 27 of Plaintiffs' Exhibit 1, in the
4  middle of the --
5      A.   Oh, yes, yes.
6      Q.   Okay.  And you're familiar with that
7  paragraph?
8      A.   Yes.
9      Q.   I can represent it also appears in
10 Plaintiffs' Exhibits 2 and 3.  There's a sentence
11 there towards the end of the paragraph that says,
12 "Further, there is no evidence that," do you see
13 that?
14     A.   Yes, that's that super controller part
15 that I was talking about earlier.  That is, you
16 know, what I'm looking for is for the city, the
17 authority having jurisdiction, the police department
18 to engage with the property to help them get the
19 crime problem under control.  You'll see that in
20 some cases or some projects.  You know, I can't find
21 any evidence here where the police department was
22 engaging with the property to help them get the
23 crime problem under control as DeKalb County saw it.
24     Q.   Have you seen a letter from April 2017
25 from the De Kalb County Police Department to the

Page 171

1  United Inn and Suites?
2      A.   What year was that, sir?
3      Q.   April 2017.
4      A.   Oh, I'm sorry.  I thought that was the
5  date. April 2017.  I don't know, sir.  You'd have
6  to show it to me and see I've seen it before.  I
7  don't know.
8      Q.   Have you reviewed deposition testimony
9  about the De Kalb Police Department visiting the
10 hotel two to three times per week?
11     A.   Yes.  But are you talking about police
12 officers responding there?  Or going there to
13 investigate vice crimes?  Are we talking about C.D.
14 King's deposition?  I'm trying to understand what
15 we're referring to.
16     Q.   I'm talking about Tahir Shareef and
17 Ashar Islam's depositions about the volume of DeKalb
18 County Police Department visits and response to
19 calls for service?
20     A.   Yes.  I mean, I certainly read their
21 depositions and their exhibits to those depositions.
22 But I don't know exactly what this April 27 letter
23 is off the top of my head.  I'm sorry.  April 2017
24 letter.
25     Q.   Well, and I actually moved on from that

Page 172

1  and was talking about the DeKalb County Police
2  Department responding to calls for service at the
3  United Inn and Suites approximately two to three
4  times per week.  Is that deposition testimony that
5  you're familiar with or no?
6      A.   Well, not specifically.  I mean, I vaguely
7  remember something about this, but I don't remember
8  the context.
9      Q.   Are you aware of evidence of the
10 United Inn asking the De Kalb Police Department for
11 recommendations on security at the property?
12     MR. ALLUSHI:  Objection.
13     A.   You mean the police department or the guys
14 that work there?
15 BY MR. BOUCHARD:
16     Q.   The police department.
17     A.   No, I don't.
18     Q.   Okay.  Are you aware of evidence of the
19 United Inn asking the De Kalb Police Department to
20 train hotel staff on sex trafficking?
21     A.   No, sir.
22          No.
23     Q.   Sorry.  What did you say, sir?
24     A.   No.
25     Q.   Okay. all right.  The last question before

Page 173

1  we take a brief break.  So on page 27 you -- of the
2  respective expert reports, you talk about the
3  operative time period.  So page 27 of Exhibit 1, you
4  say the operative time period for the crime analysis
5  is January 1, 2014 to January 31, 2019.  And then if
6  you look at Plaintiffs' Exhibit 2, for example, at
7  page 27, it says the operative time period for the
8  crime analysis is January 1, 2014 to July 21, 2017.
9  So it looks like you used over five years for J.G.
10 but about three and a half years for A.G. and G.W.
11 Is that correct?
12     A.   Yes.  The forensic methodology reports we
13 can look at three to five years of data.  My normal
14 practice is look at three calendar years and then up
15 until the date of the incident in the subject year.
16 So my normal practice would be what I did in A.G.
17 and G.W.  But I didn't want to cut short the
18 analysis in J.G.  So I went ahead and used more than
19 five years.
20     MR. BOUCHARD:  Okay.  All right.  Let's go
21 off the record, please.
22     THE VIDEOGRAPHER:  Okay.  Time on the
23 monitor is 2:19 p.m. and we are off the record.
24     (Recess 2:19 p.m. until 2:35 p.m.)
25     THE VIDEOGRAPHER:  Time on the monitor is

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 174..177

Page 174

1    2:35 p.m. and we are back on the record.
2    BY MR. BOUCHARD:
3        Q.   Mr. Vellani looking at page 27 of
4    Plaintiffs' Exhibit 1.  You -- at the bottom of
5    page 27 you list certain crimes that you call,
6    "noteworthy."
7            Do you see that on the bottom of page 27
8    of Plaintiffs' Exhibit 1?
9        A.   Yes, sir.
10       Q.   And I'll represent to you that there is
11   similar language and a similar list on Plaintiffs'
12   Exhibits 2 and 3.  Looking at page 27 at that
13   language of Plaintiffs' Exhibit 1, what makes those
14   crimes that you have listed there noteworthy crimes,
15   to use your language?
16       A.   So this is, you know, you've got a good
17   question there.  I mean, I think the problem that we
18   have with this is really what I say on 28.  There is
19   no evidence.  There is no evidence that -- the
20   problem I'm having is I'm trying to find correlation
21   between sex trafficking and other crimes and I'm not
22   finding it.  If you, for example, look at instances
23   of rape in an apartment unit, you will oftentimes
24   also look at burglaries, right?  If somebody can
25   break in to steal, they can break in to rape

Page 175

1    ostensibly is the argument.  I can't find
2    correlation between trafficking and other crimes.
3    I'm going to give you just a quick example and then
4    I'll go on and explain this.  I have some very
5    high-end clients with, you know, six-star hotels, or
6    $10,000 a month for a one-bedroom apartment unit.
7    And they have had trafficking.  But they don't have
8    violent crimes on the property.  They don't have
9    rapes on the property.  They don't have prostitution
10   on the property but they have had trafficking.  So I
11   actually can't find correlation between other crimes
12   beginning trafficking.  Okay.  So in the absence of
13   that, the only thing I can do was look at this
14   through the typical premises filter which is, you
15   know, here are the violent crimes that have occurred
16   and here are the prostitution crimes which is, you
17   know, we sometimes try to talk about -- when we talk
18   about trafficking you need to know the 2008
19   Wilberforce TVPRA tells us to distinguish between
20   trafficking and prostitution.
21           So all I'm saying is these are the more
22   serious crimes.  I didn't look at -- thefts and all
23   that other stuff are summarized in Appendix C.  But,
24   you know, that's the best explanation of why I'm
25   saying noteworthy.  I felt compelled to include some

Page 176

1    of the crimes in the actual body of the report and I
2    chose those crimes.
3        Q.   And just to repeat what I think you said,
4    correct me if I'm wrong, you decided to include
5    certain crimes that you thought were more serious.
6    Is that the distinction, or how did you decide what
7    to include?
8        A.   Yeah.  So, again, absence of correlation
9    between other crimes and trafficking, right?  That's
10   the biggest issue.  So what I did is I included all
11   of Appendix C which is all the crimes at United and
12   the, you know, the other -- the crimes against
13   persons.  The crimes against property.  The crimes
14   against society.  I've included all that in
15   Appendix C.  I felt compelled to include something
16   in the body of the report.  So using the typical
17   premises security lens, I included the violent
18   crimes.  The crimes against persons, and then I went
19   one step further and included, you know, the
20   prostitution events, even though, you know, they're
21   supposed to be distinguished from trafficking.  So
22   that's the short answer.  What I did not include is
23   property crimes.
24       Q.   Is it your testimony that there was only
25   one death at the United Inn in the five years

Page 177

1    preceding January 2019?
2        A.   Well, that's a good question.  Only one
3    death or only one murder?
4        Q.   Well, either.  Only one murder?
5        A.   Well, I don't know about deaths.  I mean,
6    people can die of natural causes at hotels.  You
7    know, there's only one murder that is listed in the
8    record.  There are several people dead.  Those could
9    have suicide or natural causes.
10       Q.   On page 28 of Plaintiffs' Exhibit 1.
11       A.   I'm sorry, what page?
12       Q.   Page 28 of Plaintiffs' Exhibit 1.
13       A.   Yes, sir.
14       Q.   There is language in a section called
15   inherent threats and this also is language in
16   Plaintiffs' Exhibits 2 and 3.  Tell me when you're
17   at that section.
18       A.   I'm there.
19       Q.   It says, the last sentence of that
20   section, "To the extent that," and then it says,
21   "Sex trafficking could be considered inherent threat
22   though the dearth of prevalent data described above
23   temperate concern."
24           What do you mean sex trafficking could be
25   considered an inherent threat?

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                    Pages 178..181

Page 178

1    A.   Well, I mean that it's the private space,
2  right?  So somebody could use the private rented
3  space for a number of, you know, elicit behaviors.
4  It could be, you know, extramarital affairs.  It
5  could be drug use.  It could be building a bomb.  It
6  could be collecting, you know, weapons like they did
7  at the MGM Grand and they did the mass shooting.
8  You know, the privacy of the guest room is really
9  what's at issue here.  So within the confines of a
10  myriad of other crimes that could occur, you could
11  build a meth lab in a private guest room, right?  It
12  has happened before.  That's what I mean that sex
13  trafficking could be one of those crimes that occur
14  just by virtue of the privacy of the guest room.
15    Q.   The first sentence on page 28, Plaintiffs'
16  Exhibit 1, underneath the section entitled
17  Awareness.
18    A.   Yes.
19    Q.   That's there being no evidence of United
20  Inn and Suites financially benefiting.  Do you see
21  that?
22    A.   Yes, sir.
23    Q.   I've asked you sort of a similar style of
24  question at different points of the deposition to
25  the one that I'm about to ask you, which is I take

Page 179

1  it that you will defer to what the evidence and
2  testimony at trial show and leave it to the fact
3  finder to make decisions about United Inn and
4  Suites' liability or no liability.  Is that correct?
5    A.   Yes.
6    Q.   Page 28 of Plaintiffs' Exhibit 1, the
7  second paragraph in the awareness section talks
8  about United Inn not being aware of pimps overseeing
9  prostitutes.  Similar type of question there.  I
10  assume you'll defer to the evidence and testimony at
11  trial?
12    A.   Yes, sir.
13    Q.   And two sentences later you say, "There is
14  no evidence in this matter that a pattern of
15  prostitution," and you go on from there "was
16  observable to United Inn and Suites staff."
17         Again, will you defer to the evidence and
18  testimony at trial?
19    A.   Yes, sir.
20         MR. ALLUSHI:  I'm going to object to the
21      questions about evidence testimony at trial,
22      all of those.
23  BY MR. BOUCHARD:
24    Q.   On page 26, Mr. Vellani, of Plaintiffs'
25  Exhibit 1 and the same on Plaintiffs' Exhibits 2 and

Page 180

1  3, you define crime pattern at the top of page 26.
2  Do you see that?
3    A.   Yes, sir.
4    Q.   And is that -- as we sit here today, is
5  that still your definition of crime pattern or do
6  you have any changes to it?  I assume you don't but
7  just confirming.
8    A.   Yes.  It's not my definition.  It's the
9  one promulgated by the International Association of
10  Crime Analysts.
11    Q.   On page 28, going back to page 28, the
12  last paragraph says, "Staff that entered guestrooms
13  e.g. housekeeping," and then it goes on to talk
14  about what they're required to report.  Do you see
15  that?
16    A.   Yes, sir.
17    Q.   And you talk about you use the phrase
18  suspicious items or activities in a guest room.  Do
19  you see that?
20    A.   Yes, sir.
21    Q.   And I'll represent to you that same
22  paragraph is in Plaintiffs' Exhibits 2 and 3 as
23  well.  Do you know what United Inn and its staff
24  considered, quote, suspicious items or activity in a
25  guest room?

Page 181

1    A.   No, that wasn't explicit.  But when
2  talking to Mr. Shareef, you know, I don't think he
3  gave me an explicit example.  But he -- I think the
4  term either in his deposition or in the interview
5  was anything unusual.  That would be not in keeping
6  with, you know, a typical guest room.  Like, if
7  somebody walked into that room in the MGM Grand and
8  found 40 assault weapons.  You know, obviously,
9  unusual.  Somebody building a meth lab, you know,
10  unusual, right?  So that type of thing.  But I don't
11  think we got into, you know, what specific things
12  that they would be looking for other than anything
13  unusual.
14    Q.   Do you know if they would have considered
15  drug paraphernalia in a room anything unusual?
16    A.   I don't know.  I mean, you'd have to ask
17  them.  But I would imagine that they would consider
18  it suspicious given that it's, you know, drug
19  paraphernalia, right?  It's illegal.
20    Q.   What about guns?
21    A.   What about guns?  Is that what you said?
22         MR. ALLUSHI:  Objection.
23    A.   I mean, I don't know if they would
24  consider that unusual or not.  I mean, you know, I
25  sometimes have my gun with me when I go to a bad

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                          Pages 182..185

Page 182

1  area and keep it in the hotel. So I don't know what
2  they would consider unusual. I think probably that
3  would be unusual because people don't typically want
4  their gun just laying around. But I don't know.
5  That's a question for them.
6  BY MR. BOUCHARD:
7     Q.   Do you know if they would have considered
8  video cameras in the room unusual?
9     A.   I don't know if they would or not.
10    Q.   Large amounts of cash in the room?
11    MS. RICHENS: Objection.
12    A.   I would imagine they would consider that.
13 Again, these are questions for them. He said, you
14 know, basically it was the testimony or the
15 interview was anything unusual.
16 BY MR. BOUCHARD:
17    Q.   Okay. So is that the extent of your
18 knowledge about what suspicious items or activity in
19 a guest room were anything unusual or can you
20 provide any more detail on that?
21    A.   Well, I think the example that he gave
22 perhaps -- I don't know if it was in both the
23 interview -- I think it was in both -- you know, was
24 a large number of people would also be considered
25 unusual and suspicious and they would try to

Page 183

1  investigate that further or ask the person to, you
2  know, reduce the number of people or leave the
3  property. I think that was the specific example
4  that he used.
5     Q.   Do you know if minors loitering in a
6  parking lot late at night, meeting with different
7  adult men for short periods of time would have been
8  considered suspicious activity?
9     MS. RICHENS: Objection.
10    MR. ALLUSHI: Objection.
11    A.   I don't know. Do they know they're
12 minors? That's the biggest problem, right? We
13 don't know if they're minors or not. But, you know,
14 I would suspect that would raise some suspicion. It
15 might be part of the reason why they had police
16 officers there.
17 BY MR. BOUCHARD:
18    Q.   Do you know how United Inn staff was to
19 know what qualified as suspicious items or activity?
20    A.   I don't know if in the deposition that was
21 explored beyond anything unusual. And I don't
22 recall, I mean, if I would have asked him, I would
23 have written it up. But I probably didn't ask him
24 either specifically, you know, how they determined
25 what would be suspicious other than, you know, it's

Page 184

1  just not the norm.
2     Q.   On page 29 you say that, Plaintiffs'
3  Exhibit 1, the last sentence of that top most
4  paragraph on page 29 starts with "there is no
5  evidence." Do you see that?
6     A.   Yes, sir.
7     Q.   And there's a similar sentence in
8  Plaintiffs' Exhibits 2 and 3 on pages 29 in those
9  reports. Similar question what I've asked, will you
10 defer at trial to the evidence and testimony of the
11 witnesses?
12    A.   Yes, sir.
13    Q.   On page 29 in your reports, you talk about
14 code violations. Do you agree -- based on my
15 understanding of what you've written here, it
16 appears that a 1 percent increase in code
17 enforcement in LA, New York and Seattle was
18 associated with a .1 to .6 percent decrease in
19 violent crime.
20       So in LA, New York and Seattle, was it
21 true that an increase in code enforcement was
22 associated with a decrease in violent crime, is that
23 correct?
24    MR. ALLUSHI: Objection.
25    A.   Yes. I mean, that's what it shows. I

Page 185

1  think we're talking about miniscule numbers at this
2  point, right? I mean, I think that's the issue
3  there. I mean, it was fascinating because I think
4  your question to Mr. Shareef was -- I mean, you had
5  a similar question. That's what prompted me to go
6  and look this up to see if there's any relationship
7  there. And this is the only study that I could find
8  on this topic. But you're talking about itty-bitty
9  numbers.
10 BY MR. BOUCHARD:
11    Q.   On page 30 you say that United Inn
12 conducted informal security risk assessments of the
13 property. Do you see that?
14    A.   Yes, sir.
15    Q.   What do you mean by informal security risk
16 assessments?
17    A.   So Mr. Shareef would talk to Weber and
18 McClelland about any problems on the property.
19 There was this whole notion of him going to these
20 various trainings put on by the tourism board in the
21 county themselves with respect to at least
22 trafficking in prostitution were discussed. So if
23 you think about the security measures that are in
24 place, you can see evidence of the informal risk
25 assessments being conducted. And then when I talked

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                    Pages 186..189

Page 186

1  to him, that is one of the questions I asked him, is
2  if they had ever done something informal as opposed
3  to hiring, you know, somebody like me to come out
4  and evaluate what the security needs are.  And the
5  way he explained to me how he arrived at his
6  decisions indicated there was an informal security
7  risk assessment process that he was implementing, I
8  don't want to say realtime, but it was something
9  more than that, you know, every five years, we're
10 going to hire a security consultant, right?  It was
11 something more than that.  It was something
12 occurring not realtime but not irregular, like,
13 every five years.
14     Q.   I take it it's not your testimony that
15 Mr. Shareef or Mr. Islam have expertise in
16 conducting risk assessments?
17     A.   No.  But I think it is pretty common for
18 property managers, place managers to, you know,
19 assess security needs.  Do they have the
20 qualifications that I have?  No.  But I don't want
21 to diminish, you know, that they can do some things
22 on their own or at least make a determination that,
23 hey, I need to talk to the police officers about
24 this or, hey, I need to go hire a security
25 consultant if it's a deeper problem.  I mean, I'm

Page 187

1  sure we all live at homes with door locks and window
2  locks and maybe secondary locks.  And perhaps some
3  of those decisions were decisions we made.  Not the
4  builder.  You know, some of us are putting LED
5  lighting up around our homes or cameras up around
6  our homes, Ring doorbells.  You know, those are part
7  of the informal security risk assessment process
8  that results in something tangible and visible
9  indicating that informal assessment.
10     Q.   If United Inn had called you in 2017,
11 2018, or 2019 and asked you whether you recommended
12 they conduct a formal security risk assessment, what
13 would you have said?
14          MR. ALLUSHI:  Objection.
15     A.   The answer would be -- that's my cell.  So
16 I would recommend they do that.  You know, we
17 would -- most of us security consultants that exist
18 that are independent would be extraordinarily busy
19 if every property did that.  Yeah, if they called
20 and wanted an assessment, I would send them a
21 proposal and may or may not get the gig.  They may
22 not like the fact that I have a CPP, who knows.
23     BY MR. BOUCHARD:
24     Q.   Have you in the course of your work in
25 this case made any recommendations to the United Inn

Page 188

1  and Suites about enhancing or modifying or improving
2  or refining or what have you security at the hotel?
3          MR. ALLUSHI:  Objection.
4     A.   No, they're not my client.
5     BY MR. BOUCHARD:
6     Q.   They have not asked you to do a security
7  risk assessment?
8     A.   No.
9     Q.   On pages 30 and 31 of your reports you
10 talk about certain rules of the hotel.  For example,
11 the top of page 31 you talk about rules of conduct
12 applicable to guests.  Are you familiar with what
13 I'm describing?
14     A.   Yes, sir.
15     Q.   Do you know whether the hotel rules at the
16 United Inn were enforced?
17     A.   We have evidence that they were being
18 enforced because he gave examples of -- he gave
19 examples of when there were too many people going in
20 and out of a room, he would ask them to leave or
21 then he also gave examples of people that didn't
22 follow the rules, he would trespass them from the
23 property.  He also gave examples of situations where
24 people were not allowing access to the room and
25 didn't renew their -- their folio -- their --

Page 189

1  their -- their -- he didn't renew their stay.  I
2  think if I'm recalling correctly, Weber and/or
3  McClelland also talked about when they saw
4  suspicious activity, management would go in and ask
5  the people to leave or trespass them from the
6  property.  So I do see evidence that they were
7  enforcing the rules, including ones that were not
8  specifically explicitly listed.
9     Q.   Forgive me if I've asked you this question
10 already.  I don't think I have.  I know I asked you
11 some questions related to training that you might
12 provide to a hotel.  But I wanted to ask you
13 directly.  Do you think that in 2017 to 2019 hotels
14 should have offered staff trainings on sex
15 trafficking?
16          MR. ALLUSHI:  Objection.
17     A.   I struggle with this, Mr. Bouchard,
18 because the research on training does not to date
19 show that it's effective at changing outcomes.
20 Okay.  The studies that have been done thus far
21 primarily talk about whether people can simply
22 recall what they learned.  You know, I sat through a
23 National Center for Missing Exploited Children
24 training as I was working on something on the
25 consulting side.  I'll be the first to admit I

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                      Pages 190..193

1  wasn't fully engaged in it. I was doing two
2  different windows on my monitor. You know, and do I
3  recall parts of it? Sure. Do I think there's
4  anything that was in that training that was going to
5  help me change any outcomes for it? I don't think
6  so. There's no studies that show that training is
7  effective at changing the outcomes. And I'm going
8  to give you one example and, you know, again, I'm
9  assuming that counsel has provided you with the a
10 list of the references that I sent. There is a
11 paper by Caitlin, Caitlin Wings (phonetic). It was
12 published in 2022. That study found that if you go
13 so far as to tell the person, a layperson, that
14 there was sex between a minor and an adult, that
15 only 61 percent of those folks could even
16 acknowledge that that's a crime. 21 percent of
17 those people, 21 percent of the 61 percent identify
18 the crime as prostitution. And only 5 percent
19 identified it as trafficking, right? So we got this
20 very -- we've got a problem with this issue. Like,
21 I love the idea of training. I think training has a
22 place. I recommend training to my clients in
23 various areas. But on this trafficking front, I'm
24 not seeing where any current training is effective
25 at changing outcomes here. And that to me is

1  really, really concerning. Especially in light of
2  this '22 study, this 2022 study that's showing that,
3  you know, you're explicitly stating that sex
4  occurred between a minor and adult and only
5  61 percent of the people are saying it's a crime,
6  and only 5 percent of that subset are saying it's
7  trafficking. I mean, that's a real problem. So I
8  don't know that I'm recommending training other
9  than, you know, check the box, say you did it. But
10 I'm not sure that we're changing outcomes here.
11 That what I'm struggling with.
12     BY MR. BOUCHARD:
13     Q.   I think you said that as part of your work
14 as a consultant for the hospitality industry you
15 have been engaged to conduct risk assessments for
16 hotels, and as part of that, you have considered the
17 risks of sex trafficking, is that correct?
18     A.   Yes, sir.
19     Q.   And did you engage in that work from the
20 years 2017 to 2019?
21     A.   I think I've been engaging in that kind of
22 work since, you know -- I've been engaging in hotel
23 work since I started or shortly after I started my
24 company. The actual topic of sex trafficking didn't
25 really start for me until 2009.

1      Q.   Okay. And did it start for you in 2009 as
2  a result of the passage of the William Wilberforce
3  law that you discussed?
4      A.   Indirectly. I wasn't aware of its passage
5  in 2008. I became aware of it in 2009 when the City
6  of Houston engaged me.
7      Q.   Trying to focus on the 2017 to 2019 time
8  period because, obviously, that's when the incidents
9  at issue occurred. And I'd like to focus on
10 hospitality environments specifically. During that
11 time period, what were you advising hospitality
12 companies that engaged you, hotels that engaged you
13 on what steps to take to mitigate the risk of sex
14 trafficking?
15     MR. ALLUSHI:  Objection.
16     A.   I don't know that I have an answer for
17 that. Because I don't know how to search my memory
18 and narrow this down to those three years. I mean,
19 what I can tell you is I didn't have any hotels that
20 were doing hourly rentals. So I wouldn't have made
21 a recommendation to not do something that they
22 weren't already doing. I don't have an answer, sir.
23 That's kind of a -- you know, I don't know how to
24 answer that. I don't know -- you know, that's just
25 a hard question to answer.

1  BY MR. BOUCHARD:
2      Q.   On page 32 of Plaintiffs' Exhibit 1 as
3  well as Plaintiffs' Exhibits 2 and 3, you have a
4  section called Guest Management.
5      A.   Yes, sir.
6      Q.   That talks about a two-factor
7  authentication process?
8      A.   Yes, sir.
9      Q.   You know the paragraph I'm talking about?
10     A.   Yes, sir.
11     Q.   Are you going to testify at trial that
12 United Inn, in fact, followed that authentication
13 process or are you going to defer to what the trial
14 evidence and testimony shows?
15     A.   I think both, right? I mean, if somebody
16 testifies to the contrary, that's fine. But I
17 still, you know, this is -- I'm told this is what
18 the process was. It's an extreme -- it's an extreme
19 thing. Just give you an example. I rented four
20 hotel rooms in Normal, Illinois back in May for me
21 and my other -- my subcontractors consultants on the
22 project. All the rooms were listed in my name. And
23 one of my guys lost his key and went to the front
24 desk and was able to get a key using his name. So
25 that's the norm, unfortunately, is that people are

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 194..197

Page 194

1  able to go get hotel room keys with relative ease at
2  hotels.  It's a little bit disconcerting.  If
3  somebody asked for who is on the registry, that's at
4  least one form of authentication.  In this
5  situation, and I would say that probably would be
6  the better norm than what I've seen.  But in this
7  case, you know, this is at least what they explained
8  to me how they did it, they would go out and do this
9  two-step process.  They get the phone number from
10 the registry.  Then they get the person that they
11 call because they don't know who is on the other end
12 of the line to give them the, you know, the last
13 four digits of their driver's license to confirm
14 that person.  It's a pretty interesting process.
15     Q.    On page 33 of Plaintiffs' Exhibits 1, 2,
16 and 3, you talk about vehicle gates, if installed --
17 this is in the middle of the page, the middle of the
18 physical security paragraph.  Vehicle gates if
19 installed would cause traffic or reduce the number
20 of parking spots available.  Do you see that?
21     A.    Yes, sir.
22     Q.    Is it your testimony that United Inn was
23 prohibited from installing gates?
24     A.    I don't know if they were prohibited.
25 There have been times in my career where I've made

Page 195

1  recommendations where they installed gates and they
2  have been prohibited.  I don't know that they ever
3  asked the question to determine if they were
4  prohibited or not.  The issue ultimately becomes one
5  of space.  So in this situation if you look at the
6  distance between the street entry point to the
7  building sidewalk, the sidewalk around the building,
8  you'd have a really challenging time putting a
9  vehicle access gate.  I'm not saying it's not
10 possible.  You could put up a rollup gate.  Your
11 typical swing gate you wouldn't have enough room, I
12 don't believe, to put in a gate without either doing
13 one of two things.  Either, A, backing traffic up on
14 the street or you'd have to have a setback on that
15 gate so people can pull into the driveway to be able
16 to, you know, use the telephone entry system or call
17 the front desk or enter a code, you have to push
18 that gate in and then you'd have even less room to
19 open that gate.  So I don't know if it was
20 physically possible to do it with a typical swing
21 gate.  Now, again, a rollup gate would be a totally
22 different story.  It would be extremely expensive.
23 And if you did -- if you did set the gate back into
24 the property, you'd be losing parking spaces if you
25 were able to physically do it.

Page 196

1     Q.    The bottom of page 33 of Plaintiffs'
2  Exhibits 1, 2, and 3 talks about United Inn's video
3  surveillance system.
4     A.    Yes, sir.
5     Q.    Do you know what was the hotel's policy
6  and practice on reviewing security camera footage?
7     A.    Like, you mean reviewing in realtime?
8     Q.    Or after the fact.  Either way.
9     A.    So a couple things.  Number one, he told
10 me they would provide the video to the police upon
11 request.  They didn't require a warrant.  That after
12 incidents they would review the videos if necessary.
13 And then as far as proactive monitoring, the only
14 things I heard was that it could be monitored from
15 the office in realtime.  But, you know, primarily
16 that was a night function because, obviously,
17 they're too busy, not obviously, but they were busy
18 during the day.
19     Q.    Would you have recommended as a security
20 consultant proactive monitoring of the surveillance
21 footage?
22     A.    So this is a question I get asked a lot by
23 my clients nowadays because there's a lot of
24 companies that are out there selling or leasing
25 cameras and then offering as a subscription service

Page 197

1  to be able to monitor in realtime.  There have been
2  only a small handful of studies on that.  Mostly by
3  a guy named Eric Piza out of Northwestern
4  University.  Those studies show limited
5  effectiveness in terms of monitoring the cameras.
6  The question is for what, right?  Are we monitoring
7  for suspicious activity?  In this situation are we
8  monitoring for too many people going in and out of a
9  room?  Are we monitoring for loitering?  The
10 question is what are we monitoring for.  But in
11 those studies -- and there's a study you can look
12 up; I'd happy to send it to you -- called Project
13 Green Light.  It was implemented in Detroit.  What
14 they did is install the cost of the -- they
15 installed cameras at specific hot spots.  They also
16 installed some other security measures at certain
17 properties with the cameras.  And then they put the
18 camera monitors at the 911 dispatch center, provided
19 law enforcement-type training to the dispatchers.
20 And then they had police officers driving around
21 these hot spot areas and when the dispatcher saw
22 something suspicious, they would dispatch the police
23 officers who were already nearby to respond
24 proactively.  And that showed some effectiveness.
25 It's an extreme example of how they, you know, get

Page 198

1 to solve crime or prevent crime. But I think it's
2 showing some effectiveness. There have not been
3 enough studies on this in the private sector for me
4 to say that it's going to make a whole lot of
5 difference.
6          Now, what I alluded to earlier with
7 respect to the facial recognition cameras, if the --
8 if you have facial recognition cameras, you don't
9 really need monitoring. You can just set a
10 threshold, hey, if there are three unique faces
11 entering into a hotel room, send an alarm when this
12 happens and I'll dispatch the manager or the
13 off-duty police officer to that room to find out
14 what's going on. That would make sense. That
15 conceptually makes sense to me. But to just sit
16 there and monitor these 36 cameras, you know, I
17 don't know. I don't know how effective that would
18 be.
19     Q.  Bottom of page 34, Plaintiffs' Exhibit 1
20 and 2 and 3, you say that "The police officers
21 schedule is based on time."
22          This is in the last paragraph on paragraph
23 34, kind of in the middle -- page 34, kind of in the
24 middle, "The schedule was based on times of reduced
25 hotel staffing at night."

Page 199

1          Do you see that, sir?
2     A.  Yes, sir.
3     Q.  And what -- in your experience, what time
4 of day do you believe crime is most likely to occur
5 at a hotel?
6     A.  So there's --
7          MS. RICHENS:  Objection.
8     A.  There's no single answer to that. I mean,
9 you have to analyze the crime at a specific place to
10 identify what the temporal trends are. I mean, you
11 know, there are typical patterns and trends for
12 specific properties. But those temporal patterns
13 and trends are not consistent among all facilities
14 of the same type.
15          So, for example, you know, some shopping
16 centers around where I live have more crime between,
17 like, 3:30 to 6:30. And then, you know, for me,
18 it's obvious because I'm looking for this stuff.
19 Like, what's causing that. It's all those burglars
20 and motor vehicles and shoplifting incidents are a
21 result of the high school that's nearby. They get
22 out of school at 3:30. They all head over, and you
23 can see them heading over to the shopping center,
24 right? So that trend at that particular shopping
25 center is different from the trend at the shopping

Page 200

1 center another half mile away because the kids are
2 all walking that far. So there is no single answer
3 to this. That's why you have to do the deep dive on
4 the crime statistics to look for those patterns and
5 trends.
6          The only thing I can tell you specifically
7 about this case is what the trends do show. And
8 then you also have to take into account that
9 informal security risk assessment process that
10 Mr. Shareef was engaged in, that, hey, we have less
11 staff. We got more people making noise hanging out
12 and listening to loud music, that's why we're going
13 to put the security, the police officers between
14 10:00 p.m. and 2:00 a.m. and then at 2:00 a.m.
15 things start to quiet down.
16     BY MR. BOUCHARD:
17     Q.  And if I changed my question there to say
18 what time of day do you believe commercial sex
19 activity is most likely to occur at a hotel, would
20 the answer that you just gave be the same?
21     A.  Yes, but it would be much harder, right?
22 Because the original question was about all crime.
23 And your question now is about, you know, CSA
24 specifically -- commercial sexual activity
25 specifically, you know, I don't know that there is a

Page 201

1 pattern or trend to that. We don't have enough
2 datapoints to be able to show any kind of trend with
3 that.
4     Q.  On page 35 you say -- the last sentence on
5 page 35 of Plaintiffs' Exhibits 1, 2, and 3, that
6 "Even with a very high relative risk of crime, it is
7 possible for security measures to be adequate and
8 reasonable."
9          I couldn't really figure out how that
10 statement connected to the rest of the report. Can
11 you explain why that's there and -- can you explain
12 why that's there?
13     A.  Yes. I mean, there's three things. I
14 mean, number one, Warren Sherman who I'm quoting
15 there is probably one of the most preeminent
16 criminologists of our time. He is the author of
17 that whole thing I keep talking about what works,
18 what doesn't, and what's promising, that's his
19 phrase as well.
20          In 1995 he was retained or commissioned by
21 Congress to write report on crime prevention, what
22 works, what doesn't and what's promising. So
23 Warren Sherman in 1989 published this study called
24 Violent Stranger Crime at a Large Hotel. That was a
25 quote from there. And ultimately what he was

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 202..205

1  talking about is that security measures while -- you
2  know, should meet the standard of care, even when
3  those exist, crime can still happen.  So my point is
4  that even though the city had designated this as a
5  high crime property, that even Mr. Shareef testified
6  that it was a high crime area, you know, crime can
7  still happen even when you put reasonable security
8  measures in place.
9          And in this situation, if you go back to
10  my opinion, which is that they met the standard of
11  care, even though they were meeting the standard of
12  care, crime can still happen.
13      Q.   That ties in directly to what I was going
14  to ask you next, which is looking at page 36 of
15  Plaintiffs' Exhibit 1, 2, and 3, where you say
16  "defendants met the applicable standard of care
17  relating to security," what do you consider the
18  applicable standard of care relating to security?
19      A.   So I think -- you haven't done in this
20  case and I appreciate this.  You haven't focused on
21  gates, guns and guards so much, right?  You're
22  focusing on those operational security measures to
23  find out, you know, what they're doing with respect
24  to guest management, visitor management, you know,
25  monitoring for nefarious activities, that kind of

1  stuff.
2          So when I say the standard of care, it's
3  not necessarily gates, guns and guards because the
4  research on that doesn't show that to be all that
5  effective.  Where most properties meet the standard
6  of care and what most facilities of a similar type,
7  i.e., in other hotels, what they do are those
8  operational measures, which, again, I applaud you
9  because that's what you're focusing on.
10          So when I see them doing good from an
11  operational security perspective, is that they have
12  a staff that's reported -- that's required to report
13  suspicious items and activity.  There was evidence
14  that they were assisting domestic violence victims.
15  They were conducting criminal background
16  investigations to varying degrees depending on
17  whether it was somebody the owner knew or was
18  referred to or somebody outside -- outside that
19  realm.  They were conducting the informal risk
20  assessments.  They had the written management
21  policies.  They had the guest rules of conduct.
22  They were posting the missing persons flyers in the
23  office.  He was attending training.  I don't know
24  whether he was a member of AA -- AHOA at that time
25  or not.  But he was attending various training as

1  early as 2013 and 2014 which included sex
2  trafficking and prostitution topics.  He was also
3  trained by the police department.  I believe that
4  was 2017.  He attended that extended stay ordinance
5  in either late 2017 or late 2016 or early 2017.
6  That also addressed human trafficking.  Of his own
7  volition, he developed this four-page packet on
8  human trafficking prevention which he made available
9  in paper and electronically to staff.  He, you know,
10  also told me that he spoke with staff about this in
11  2018.  You know, the two-factor authentication I
12  liked.  I thought that was a good practice.  Again,
13  you know, even if they were using one factor, it's
14  better than what the norm is which is, like, here,
15  everybody gets a key, right?  Like I experienced in
16  May and was upset about.
17          You know, they didn't have hourly rentals
18  which I think is really, like, one thing that kind
19  of stands out.  Inspecting the rooms every seven
20  days or they wouldn't renew the stay.  They had
21  loitering signs which goes into the physical
22  security.  They had communication methods.  Front
23  desk.  Phones in the rooms.  Obviously, people have
24  cell phones, but they had somebody on staff there
25  that could be available to the guests 24/7.

1          As far as physical security, they had the
2  off-duty police officers; they had, you know,
3  limited concealment opportunities outside the
4  facility; they had staff that walked the property at
5  night.  They had police officers.  They called the
6  police department for too many people being in a
7  room.  And that ultimately led to at least one
8  prostitution arrest which means they're actually
9  doing the right things.  Right, specifically on this
10  issue.
11          They didn't require a warrant.  C.D. King
12  testified to this.  They didn't require a warrant
13  for the video registry or even room access.  I would
14  expect hotels as far as meeting the standard of care
15  to provide video in the guest registry.  But to
16  actually provide room access I think is above and
17  beyond the standard of care.
18          The off-duty police officers when they
19  informed the manager or the clerk about high traffic
20  in a room, the hotel would deal with it right away.
21  They would ask the person to leave or be trespassed
22  and then they maintained that do not rent list.
23      Q.   I want to take a look at Appendix B to
24  Plaintiffs' Exhibits 1, 2, and 3.  We've, obviously,
25  talked a little bit about Appendix B already.  It's

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 206..209

Page 206

1   the IAPSC Forensic Methodology?
2       A.   Yes, sir.
3       Q.   Let me know when you're there.
4       A.   I'm there.
5       Q.   I received yesterday from your counsel
6   a -- or from United Inn and Suites' counsel, excuse
7   me, a revised version of this forensic methodology
8   dated September 27, 2023.  Which, obviously, is
9   dated after your June 14th, 2023 reports in this
10  case or these cases.  I assume that the forensic
11  methodology that's in Appendix B, which is on the
12  front page, it says, "Updated January 29th, 2021,"
13  that was the effective forensic methodology document
14  at the time that you prepared and wrote your
15  June 14th reports?
16      A.   Yes.  But in fairness, there's no sub --
17  there's no major difference with the actual
18  methodology.  The only thing that was changed on
19  there was the format because I hated the two-column
20  stuff.  So I pushed for them to make that a
21  one-column deal.
22           And then we also added in -- we added in
23  some additional references and we cited some other
24  cases that cited the methodology.
25      Q.   On page 8 of Appendix B, I'm going to be

Page 207

1   referring to Appendix B which, again, is the
2   January 2021 version.
3       A.   Yes, sir.
4       Q.   Just to be clear, was this effective at
5   the time that you prepared your report?
6       A.   Yes, sir.
7       Q.   Okay.  On page 8, there's italicized
8   language that says founded in 1984.  And then it
9   goes on from there.  Do you see that?
10      A.   Yes, sir.
11      Q.   Are you familiar with that language?
12      A.   Yes.
13      Q.   Do you agree with that language?
14      A.   Yes, sir.
15      Q.   Is IAPSC a widely recognized and respected
16  association committed to establishing and
17  maintaining the highest standards for security
18  consultants in the industry?
19      A.   Yes, sir.
20      Q.   Has it, in fact, established and
21  maintained the highest standards for security
22  consultants in the industry?
23      A.   Yes, sir.
24      Q.   What is the significance of your being a
25  member in IAPSC?  What does that credential qualify

Page 208

1   you to do?
2       A.   The only real thing it does is validate
3   two things.  A, that I'm a security consultant.
4   And, B, and, most importantly, that I am an
5   independent security consultant.  In other words,
6   I'm not a security consultant that also does private
7   investigations or, worse, that I'm a security
8   consultant that only recommends one product or one
9   service.  In other words, I don't work for, you
10  know, a guard company that's doing security
11  consulting work and only recommending security
12  officers, right?  I'm not a camera -- I don't work
13  for a camera company.  Meaning, that I only
14  recommend cameras or one brand of cameras.
15           So the independence means that I'm product
16  agnostic.  I only look at what the needs of the
17  client are.  And that is the only way that I'm
18  allowed to make money.  I'm not allowed to recommend
19  specific products or services.
20      Q.   What do you mean when you say that it
21  validates you as a security consultant?
22      A.   Well, I mean, because they're looking at
23  the education and training.  You know, and what your
24  role is in your day-to-day worklife, right?  They're
25  verifying that you are, in fact, a security

Page 209

1   consultant.  Not somebody that does primarily -- you
2   know, keep in mind that IAPSC was really a response
3   to guys that did 99 percent private investigations
4   and occasionally they would advise someone on their
5   security needs.  So that's what the IAPSC was the
6   result of and, you know, obviously, I wasn't around,
7   back in -- I mean, I was physically around in '84, I
8   wasn't in the business in '84.  So it was a direct
9   response to guys that were primarily private
10  vendors.
11           Today it stands more today for being
12  product agnostic.  Meaning, I don't work for a
13  camera manufacturer.  I don't only recommend ADT as
14  your central monitoring center, right?  So it's
15  product agnostic, that independent part is the core
16  of the association.
17      Q.   In layman's terms, how would you describe
18  what is the IAPSC Forensic Methodology?
19      A.   So the forensic methodology is a framework
20  for assessing matters in litigation to provide
21  consistency with approach between cases and amongst
22  members for developing the opinions.
23      Q.   On page 2 of Appendix B -- and I think
24  this is related to what you were just saying -- it
25  says underneath position statement that "The

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                    Pages 210..213

Page 210

1  International Association of Professional Security
2  Consultants does hereby recognize that its members
3  will be called upon to perform as 'forensic
4  consultants' and serve as expert witnesses in a
5  court of law or other legal proceeding."
6         Do you see that?
7     A.  Yes, sir.
8     Q.  And then it says, "The purpose of these
9  guidelines is to meet the need for a standardized
10  methodology using the evaluation of premises
11  security cases."
12     A.  Yes, sir.
13     Q.  Do you agree with that?
14     A.  Yes, sir.
15     Q.  Are members of the IAPSC authorized by
16  IAPSC to serve as forensic consultants in premises
17  security cases?
18     A.  So I want to draw a distinction between
19  the words forensic security consultant and an expert
20  witness.  A forensic security consultant is
21  basically a security consultant who says that they
22  provide that service.  It's not up to the IAPSC to
23  deem you an expert.  That's the role of the judge.
24  I mean, you know, these two defense attorneys can
25  hire me all day long but I don't get anywhere unless

Page 211

1  the judge approves me, right?
2         So to say you're an expert witness implies
3  that the judge has approved you, not the IAPSC.
4  Forensic security consultant basically means that
5  that's what you're primarily engaged in and perhaps
6  you have been approved by a judge somewhere along
7  the way.
8     Q.  I guess my question was a little bit -- I
9  think it's a little different.  Maybe you've
10  answered it.  But does IAPSC authorize its members
11  to serve as, quote, forensic consultants and serve
12  as expert witnesses in a court of law or other legal
13  proceeding?  I'm not asking if a judge designates
14  them.  I'm asking does IAPSC authorize its members
15  to do that?
16     A.  No.  I mean, authorize.  I mean, I don't
17  know if it authorizes anyone to do anything.  The
18  membership is primarily broken out into four
19  categories.  Guys that focus on the -- we talked
20  about this with respect to the CSC designation.  The
21  membership is broken down primarily into three
22  components.  It really should be four because we
23  should be including information security consultants
24  as well.  But number one is a security management
25  consultant which is really the beginning of this

Page 212

1  association.  And then at some point people started
2  doing physical security stuff and they had a lot
3  more architectural engineering background.  So those
4  are the physical security guys.
5         And then there were guys that also, also
6  in addition to one of those two things started doing
7  forensic consultants, you know, serving as --
8  holding themselves out as forensic consultants.
9         So, no.  They're not authorizing you to do
10  anything.  They're basically saying you are a
11  security consultant.  You are an independent
12  security consultant.
13     Q.  Who do you believe is qualified to apply
14  the IAPSC Forensic Methodology?  Only members of
15  IAPSC or other --
16     A.  Fortunately, it's widely used by most
17  experts that I come across that are not members.  So
18  it is fortunately widely accepted by nonmembers as
19  well as members.
20     Q.  Do you agree that at various points in
21  Appendix B the forensic methodology asks forensic
22  security consultants to use their judgment,
23  experience, and expertise?
24     A.  Yes.
25     Q.  And that the IAPSC Forensic Methodology,

Page 213

1  in other words, is not a mathematical formula, but
2  instead it requires the security consultant to use
3  their discretion, experience, and expertise in
4  performing an assessment?
5     A.  Yes.
6     Q.  Do you agree that forensic security
7  consultants applying the IAPSC Forensic Methodology
8  may analyze information differently based on their
9  different experiences in the security field?
10     A.  Yes.
11     Q.  Is it your opinion that this methodology
12  in Appendix B is the correct methodology to use in
13  A.G., G.W. and J.G. cases for a premises security
14  expert?
15     A.  I'm sorry.  What was the last phrase?
16     Q.  For a premises --
17         MR. ALLUSHI:  Objection.
18  BY MR. BOUCHARD:
19     Q.  -- security expert?
20     A.  Yes.
21     Q.  And your testimony, if I understood it, is
22  that you applied this methodology in coming to your
23  opinions in your expert reports, is that correct?
24     A.  Yes, sir.
25     Q.  Did you conduct both a threat assessment

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                   **Pages 214..217**

Page 214
1  and a vulnerability assessment?
2      A.  Yes, sir.
3      Q.  Okay.  And can you walk me through the
4  threat assessment first and then walk me through the
5  vulnerability assessment?
6      A.  Sure.  So as I mentioned earlier, when we
7  were talking about that five-step process, the
8  threat assessment in this case really starts on
9  page 17, I'm assuming of all three reports, but
10 certainly the J.G. report, which is what we've been
11 talking about.  So the threat assessment component
12 starting on page 17 talks about the general nature
13 of sex trafficking, the prevalence data, right?
14 What do we know nationwide?
15         And then I go through and explain the
16 methodology in greater detail.  Obviously, the
17 forensic methodology doesn't give you the
18 granularity.  So what I'm providing in the first few
19 pages, 17, 18, 19, 20, 21, 22, 23, 24, 25, you know,
20 basically, all the way to 27, so 17 to 27, is, you
21 know, a deeper look at a methodology.  It's not the
22 methodology.  It's a methodology for evaluating the
23 crime.  The actual crime history on the property.
24 And then in 27 -- on page 27 I start the analysis of
25 actual crimes as required by the forensic

Page 215
1  methodology, you know, along with the prior ten
2  pages.
3          And then on page 28 because the forensic
4  methodology also requires me to look at, you know,
5  something more than just prior similars, it requires
6  me to look at the inherent threats which in your
7  world I think would encompass the totality of the
8  circumstances.  You know, the inherent threat
9  assessment is on page 28.
10         And then because we are in a matter
11 involving litigation, obviously, we've got to look
12 at kind of that -- you know, I'm not using a legal
13 term, but notice, right?  We have to look at that
14 awareness crime.  So that's why I start on page 28.
15         And then 29 was just a bonus, because that
16 code violation discussion.
17         And then the vulnerability assessment
18 really comes into its own on page 30 and then goes
19 all the way down to page 35.  So that is the
20 evaluation -- like I told you, in order to
21 understand the vulnerabilities, you have to
22 understand what existing security measures are.  You
23 have to understand what you're trying to protect,
24 what you're protecting against and where your
25 weaknesses are.  And you understand your weaknesses

Page 216
1  by looking at the existing security measures.  So 30
2  to 35 provides with you the vulnerability
3  assessment.
4      Q.  And thank you for that overview, sir.
5  Appendix B, pages 4 and 5 talk about several areas
6  that are numbered 1 through 5 that can be part of a
7  vulnerability assessment/security survey.  And on
8  page 4 before number 1 in that list it says, "The
9  following areas in review are not meant to be
10 all-inclusive nor all exclusive.  The decision to
11 review the material is at the judgment/discretion of
12 the expert."
13         Do you see that?
14     A.  Yes, sir.
15     Q.  Did you go through and follow all five of
16 these items listed on pages 4 and 5, incident
17 review, site inspections, security personnel,
18 security management programs, security equipment?
19     A.  Yes, sir.
20     Q.  In other words, your findings on those
21 issues are on pages 30 to 35?
22     A.  Yes, sir.
23     Q.  Did you deviate from the IAPSC Forensic
24 Methodology in any way in your analysis in these
25 cases?

Page 217
1      A.  No.
2      Q.  Yesterday, I'll represent to you I
3  received from United Inn's counsel several
4  documents.  One of which was a copy of your CV.  I
5  received some documents in the latter half of the
6  day and did not have time to compare your CV to the
7  CV that's in your June 14th reports.  Are there any
8  changes that have been made to your CV since the
9  June 14th reports?
10     A.  Yes, I'm sure there are.  The thing that
11 comes to mind is I taught a class earlier this month
12 to ASIS International on evidence-based security
13 practices.  So you'll see a November 8th entry on my
14 publications and presentations list.
15         I also was asked to author The Guideline
16 on Human Trafficking Victim Identification and
17 Response for the International Association of
18 Healthcare Security and Safety.  I may have also
19 added in the NCMEC training, the National Center for
20 Missing & Exploited Children sex trafficking
21 training that I took.  There may be a couple other
22 changes but those are the three that come to mind.
23     MR. BOUCHARD:  And just as an aside, I
24 think I have probably 10 to 15 minutes left.
25     Is everybody okay with my finishing out or do

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                    Pages 218..221

Page 218

1    we need to take a break?
2        MS. RICHENS:  I'm fine with you
3    proceeding.
4        (Overtalking.)
5        MR. ALLUSHI:  -- a break.
6    BY MR. BOUCHARD:
7        Q.  Mr. Vellani, in what areas have you been
8    qualified as an expert witness previously?
9        A.  You mean by a judge?
10       Q.  That's correct, yes, sir.
11       A.  So I think all of my prior trial testimony
12   would have been just on the general concept of crime
13   analysis, crime prevention, and security.  But,
14   obviously, there's a whole bunch of stuff that falls
15   underneath that.
16       Q.  Have you ever been qualified by a judge as
17   an expert witness in sex trafficking?
18       A.  No.  I'm not holding myself out as an
19   expert on sex trafficking.
20       Q.  Understood.  I'm just clarifying.
21           Has your testimony ever been excluded by a
22   court or a judge, to your knowledge, sir?
23       A.  No, sir.
24       Q.  Has your testimony ever been limited by a
25   court or a judge, to your knowledge?

Page 219

1        A.  That I'm going to hedge and say I don't
2    know.  Because I have walked in a court in Georgia
3    and been told by counsel that the judge is only
4    letting in certain data.  So I don't know if that
5    was a limitation on me or a limitation on the data.
6    I took it as a limitation on the data but I don't
7    know to say one way or the other because I don't
8    know.  I don't see those orders or whatever,
9    whatever results from that, you know.
10       Q.  Do you know what kind of case that was in
11   Georgia?
12       A.  Yeah.  I want to say it was an apartment
13   robbery shooting.  And I remember being prepared to
14   walk in and talk about 30 prior violent crimes on
15   the property and the judge -- I guess, the judge had
16   limited it to, like, only 13 being admissible.  I
17   don't know if I have my numbers right but that's
18   generally the premise.
19       Q.  Approximately how many times in total --
20   and emphasis on approximately unless you know the
21   exact answer -- have you been designated as an
22   expert witness?
23       A.  Designated?
24       Q.  Yes, sir.
25       A.  I have no idea.  It's been a lot.

Page 220

1        Q.  Okay.  Do you have any working
2    understanding of how many times you've been
3    designated as an expert for a plaintiff versus for a
4    defendant?
5        A.  Designations would probably be -- at this
6    point in my career probably 60 percent defense,
7    40 percent plaintiff, if I had to guess.  I hate to
8    say this but there are cases where I've learned that
9    I was designated by an attorney without my approval,
10   without even knowing about the case.  So I welcome
11   reports and designations.  So there are maybe more
12   that have occurred that I'm just not aware of.
13           And then, you know, if you want to go
14   further than that, depositions, and trials, I
15   mean...
16       Q.  Have you been qualified as an expert on
17   behalf of a hotel defendant in a civil sex
18   trafficking case before?
19       A.  Sex trafficking?  No.  I'm not even aware
20   of any sex trafficking cases that have gone to trial
21   yet.
22       Q.  Okay.  Well, even before trial, when
23   there's pretrial motions on experts, are you
24   aware -- I don't know, have you been involved in any
25   cases as an expert involving sex trafficking

Page 221

1    lawsuits against hotels?
2        A.  Yes.
3        Q.  And have you been involved in those cases
4    as an expert for the hotel defendant or the
5    trafficking plaintiff?
6        A.  The only -- the only one that I'm aware of
7    right now is actually on behalf of neither of those
8    parties.  It's on behalf of the security company.
9    You know what, let me take that back.  So I've been
10   designated as a security expert on behalf of the
11   security company defendant in two cases.  I think I
12   was just designated on a case involving a hotel for
13   the hotel defendant.  Again, these are so early on
14   that it's hard for me to know where they're at in
15   every case.  This is certainly one that's the
16   furthest along.
17       Q.  Have you ever been retained as an expert
18   on behalf of a plaintiff in a civil sex trafficking
19   case?
20       A.  No, I haven't.
21       Q.  Have you been asked to provide any
22   opinions rebutting either Naeshia McDowell or
23   Darrell Chaneyfield?
24       A.  I don't know that I was explicitly asked
25   to provide opinions regarding Mr. Chaneyfield.

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    Pages 222..225

Page 222

1   Though I do have opinions.  And the other guy, I
2   think is who, the trafficking expert.
3        Q.   Naeshia McDowell?
4        A.   Is that the trafficking expert?
5        Q.   Yes.
6        A.   I was not asked to rebut any testimony
7   regarding the trafficking experts.
8        Q.   And I take it based on our prior question
9   and answer, you have not prepared a rebuttal expert
10  report?
11       A.   For Chaneyfield?  No.
12       Q.   Okay.  And you, obviously, don't mention
13  him in your June 14th report, is that correct?
14       A.   I don't think I knew about him at the
15  time.
16       Q.   In the finals that I got from your counsel
17  yesterday, there was an excerpt from his deposition.
18  Are you familiar with that or do you need to review
19  it?  I can bring it up on the screen if you're not
20  familiar with it.
21       A.   I'm intimately familiar with it.
22       Q.   Why is that in your file?
23       A.   Because Mr. Chaneyfield does not
24  understand what allowed him to be a member.  He said
25  two things, quite frankly, that were very offensive

Page 223

1   to me in my professional capacity.  Number one, he
2   stated that the IAPSC deemed him an expert.  And
3   that is simply factually not true.  He outlined a
4   process by which he obtained membership which is not
5   accurate.  And then on page 100 he claims that I was
6   part of that process.  I've not -- never met
7   Mr. Chaneyfield.  I don't know who he is.  I've
8   never seen Mr. Chaneyfield.  I certainly was not
9   involved in deeming him an expert.  That is the most
10  ludicrous proposition I've ever heard.
11       Q.   Are those the reasons why -- I mean, I
12  still guess I don't understand why that excerpt from
13  his transcript was in your file.
14            MR. ALLUSHI:  Objection.
15       A.   Yeah, I provided it for those reasons,
16  because none of what he said on those three pages is
17  true.
18       BY MR. BOUCHARD:
19       Q.   Okay.  There were also some documents that
20  I received from your counsel yesterday, three IAPSC
21  documents as being part of your file.  One of which
22  was IAPSC qualifications.  One of which was IAPSC
23  membership classifications.  And one of which was
24  the updated IAPSC Forensic Methodology.  Why were
25  those documents in your file?

Page 224

1        A.   Well, I provided the methodology because
2   that's the most updated methodology.  I always
3   provide the forensic methodology in response.  I
4   provide an updated CV and updated methodology, and I
5   provide the references.  That's kind of just routine
6   course for me.  The classifications of membership
7   and the qualifications for membership were provided
8   in context for the Chaneyfield excerpt.  I mean,
9   there's nothing in there that shows that IAPSC is
10  deeming anyone an expert.  They certainly didn't
11  deem him an expert, and I certainly had nothing to
12  do with this purported deeming of an expert.
13       Q.   Is Threat Analysis Group the company that
14  you work for in your capacity as an expert?
15       A.   Threat Analysis Group, LLC is my company
16  that does everything, right?  So it's publications,
17  research, security risk assessments, crime analysis,
18  and the expert work.
19       Q.   Okay.  And from what you've said, my
20  understanding is that your expert work is a fraction
21  of the revenue of Threat Analysis Group, is that
22  correct?
23       A.   Yes, sir.
24       Q.   It's less than 50 percent, is that what
25  you're saying?

Page 225

1        A.   Yes, far less.
2        Q.   Okay.  Do you have a ballpark estimate of
3   how much revenue Threat Analysis Group generates
4   annually from your expert work?
5        A.   No, sir.  That's not something I've ever
6   looked at.
7        Q.   Is it more than a hundred thousand
8   dollars?
9        A.   I don't know the answers to these
10  questions regarding revenue.  I can tell you where I
11  spend my time.  But I don't -- you know, that's not
12  something I look at.  I don't even have the
13  capability to look at that.  I should.
14       Q.   What percentage of your time do you spend
15  on expert work?
16       A.   So pre-COVID it was 5 percent.  During
17  COVID when everything else shut down it rose to
18  about 10 percent and unfortunately it's still
19  sitting at 10 percent today, roughly.  Obviously, I
20  don't know account for every hour of every day.  But
21  it's about 10 percent on expert work.  20 percent on
22  research.  70 percent on consulting work.
23       Q.   Something I didn't ask you earlier about
24  your site inspection at United Inn and Suites.  Were
25  there any parameters put up on your site inspection

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                                    Pages 226..229

Page 226

1  in terms of how much time to spend?  What you could
2  look at, who you could talk to, or were you free to
3  conduct any and all investigations that you wanted
4  to?
5      A.   So I would probably fire a client that put
6  in parameters on me with that.  No, nobody put any
7  parameters on me.
8      MR. BOUCHARD:  Okay.  So I'm going to go
9      off the record here for a few minutes to look
10     at my notes.  I think I've completed my
11     examination of you.  I wanted to just make a
12     quick note for the record that we, obviously,
13     don't have a rebuttal expert report from
14     Mr. Vellani.  The deadline for rebuttal expert
15     report disclosures has come and gone.  I
16     understand it sounds like he has opinions about
17     Mr. Chaneyfield's testimony or report, or I'm
18     not sure.  I would oppose and will oppose
19     rebuttal expert testimony from Mr. Vellani
20     because the deadline's passed and there hasn't
21     been a rebuttal expert report provided.  And so
22     I'm reserving my right to come back and ask him
23     questions about his rebuttal opinions.  But I'm
24     not even going to attempt to do that today
25     because I don't have the benefit of a report

Page 227

1      from him on that.  So I'm just saying that for
2      the record.
3      MR. ALLUSHI:  I certainly, for the record,
4      disagree with that to the extent the
5      information that he would rebut is new
6      information and information that was derived
7      from Mr. Chaneyfield's deposition, just for the
8      record.
9      You need five minutes to go off the
10     record?
11     MR. BOUCHARD:  Yes.  Let's go off the
12     record for about five minutes.  Thank you.
13     THE VIDEOGRAPHER:  Okay.  Time on the
14     monitor is 3:48 p.m. and we're off the record.
15     (Recess 3:48 p.m. until 3:57 p.m.)
16     THE VIDEOGRAPHER:  The time on the monitor
17     is 3:57 p.m. and we are back on the record.
18  BY MR. BOUCHARD:
19     Q.   Mr. Vellani, just briefly, notwithstanding
20  what I said a moment ago before we went off the
21  record, again, I haven't received a rebuttal report
22  and so forth, but you mentioned that you have
23  opinions about Mr. Chaneyfield's testimony.  I would
24  like to hear what those opinions are.
25     A.   Well, I mean, I think in fairness, I need

Page 228

1  his second deposition in order to fully flesh this
2  out.  But to the extent that I'm just looking at his
3  report, you know, I mean, I would like the benefit
4  of the second -- of the rest of his deposition.  But
5  looking at his report, you know, he talked about --
6  I disagree with his really first opinion which is
7  that inadequate anti-trafficking materials.  I think
8  given that what we talked about with respect to
9  training, what the hotel was doing, they had
10 adequate and reasonable measures in place already.
11 He also gives a second opinion which is inadequate
12 security measures and coverage.  I disagree with
13 that for the reasons that I outline in my report and
14 in this deposition.  His -- I guess these are
15 specifics about his second opinion.  Third, well --
16 bear with me because I'm having a hard time
17 understanding the layout of his report.  He's really
18 just giving reasons.
19     Okay.  So let me back up.  I see the way
20 that he's got this laid out now.  So opinion number
21 one, he's got widely available and free
22 anti-trafficking materials and trainings, educate
23 hotel owners and staff about the observable signs of
24 sex trafficking.
25     So I think the problem is what we talked

Page 229

1  about already.  Which is that that's not
2  evidence-based stuff.  You know, he didn't cite to
3  any evidence basis for what he's saying.
4      Opinion number two, fell far short -- fell
5  far below the industry standard by failing to
6  provide anti-trafficking training materials.  So I
7  think they were actually on par with where the
8  industry was at, specifically during the period 2017
9  to 2019.
10     Then he goes on to say failed to follow
11 hotel safety and security industry standards during
12 the relevant period pertaining to guest security and
13 safety.  I think I've adequately outlined why I
14 disagree with that, but I disagree with that.
15     Number four, he gives the opinion adequate
16 training and security measures in effect more likely
17 than not that the subject incidents described in the
18 complaints would have prevented or avoided.  I mean,
19 I think even if you were to apply what he says, that
20 it would be really speculative to say that they
21 would have been prevented or avoided.
22     And then -- that's it.  He's only got
23 those four opinions.  So I disagree with three of
24 them and one of them I think is just speculative
25 that even I couldn't say.  I couldn't even say the

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                                    Pages 230..233

Page 230

1  opposite.

2      Q.   So when you said, you know, I do have an
3  opinion -- I haven't been asked to provide any
4  opinions rebutting him, but I do have opinions.  I
5  think you said that just before we took the break.
6  I'm just trying to make sure I understand what those
7  opinions are.  Did you just give me them, or are
8  there any others?

9      A.   Well, that's the big takeaways, try to do
10  this in short order just looking at his four
11  opinions.  But, you know, like with me, you would
12  have elicited additional opinions, very specific
13  opinions that I've been happy to give to you.  I
14  would like the benefit, and I understand that
15  there's, you know, deadlines that can't be thwarted,
16  you know, I would like the benefit of hearing the
17  full scope of his specific opinions by way of his
18  deposition.  And, obviously, we have not seen his
19  second deposition yet or the continuation of his
20  deposition.  But based on his report, that's what I
21  can give you.

22      Q.   Okay.  Have you read his deposition
23  transcript from the first part of his deposition?

24      A.   Yeah.  That's how I ended up giving you
25  those excerpts.  Yes, sir, I have.

Page 231

1      Q.   Okay.  And any other opinions based on
2  that part that you've reviewed that you're not
3  sharing with me right now?  I'm trying to understand
4  what opinions you have as you sit here right now.

5      A.   I don't know that -- I don't know that I
6  can lay them all out for you without spending some
7  time with that deposition.  Again, I didn't intend
8  to do that until I had the benefit of the
9  continuation of the deposition.  So, you know,
10  beyond what I've given you thus far with respect to
11  his written opinions, I don't think I can dig deeper
12  at this point without having some more time to be
13  able to spend with the first deposition and in the
14  continuation just in regard to anything specific
15  that he says.

16      Q.   And these questions that I'm asking you
17  are not a waiver or intended to be a waiver of my
18  prior point on the rebuttal deadline having passed.

19           But while I have you here and I have
20  United Inn's counsel here, I wanted to ask you,
21  since you said you had opinions, I wanted to ask you
22  what those were.  And I understand you have shared
23  to the extent you can today what your opinions are.
24  Is that a fair summary?

25      A.   Yes, sir.

Page 232

1      MR. BOUCHARD:  Okay.  That concludes my
2  questioning for you today, Mr. Vellani.  I very
3  much appreciate your time.  Obviously, Adi or
4  Dana may have questions for you.

5      THE WITNESS:  Thank you, sir.

6      MR. ALLUSHI:  No questions.

7           CROSS-EXAMINATION

8  BY MS. RICHENS:

9      Q.   I just have one question.  Mr. Vellani,
10  when you were being questioned earlier today about
11  Exhibit 4 which is the bolo pertaining to [J.G.],
12  you remember that line of questioning?

13      A.   Yes, sir -- yes, ma'am.  Sorry.

14      Q.   And you indicated that you were -- we
15  talked about posting the notice in the office and
16  you said you would not recommend that they go door
17  to door looking for [J.G.].

18           Do you remember that testimony?

19      A.   Yes.

20      Q.   Why do you say that?  In other words, why
21  would you not recommend that someone go door to door
22  looking for a missing person who there's reason to
23  believe is on the property?

24      A.   Well, A, I'm not connecting the dots that
25  a missing persons is what led them to believe she

Page 233

1  was on the property when they got that flyer.
2  That's number one.  Number two, I don't think that
3  would be the normal process.  That would not be
4  standard practice in a hotel that I have ever heard
5  of that would sit there and go door to door
6  inspecting every room.  I mean, if you had reason to
7  believe there was a person in a specific room, sure,
8  you might go and fake an inspection that needed to
9  be done or sent housekeepers over there.  But to
10  literally go there and inspect every hotel room
11  seems unreasonable.

12      Q.   Any other reason or it's just simply
13  unreasonable?

14      A.   Yes.  It's just not the normal practice.

15      MS. RICHENS:  Thank you.

16      MR. BOUCHARD:  I'm sorry.  There's one
17  thing I meant to introduce.  I apologize.

18           REDIRECT EXAMINATION

19  BY MR. BOUCHARD:

20      Q.   Mr. Vellani, we received yesterday your
21  invoices in the A.G., G.W. and J.G. matters.  And I
22  can show them to you if you would like me to.  But
23  I'll represent to you that Adi and Dana provided
24  them to me.  I would like to introduce those
25  respectively as Plaintiffs' Exhibits 5, 6, and 7,

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
**Karim Vellani on 11/28/2023**                    **Pages 234..237**

Page 234

1    A.G. would be 6 -- I'm sorry --A.G.'s invoices would
2    be 5, G.W.'s would be 6 and J.G.'s would be 7.
3            THE STENOGRAPHER:  I think I already have
4    a 5, sir.
5            MR. BOUCHARD:  Okay.  Let's make A.G. 6,
6    G.W. 7 and J.G. 8.
7            MR. ALLUSHI:  Are you going to ask
8    questions about them?
9            MR. BOUCHARD:  Am I going to ask him
10   questions about them?
11           MR. ALLUSHI:  Right.
12           MR. BOUCHARD:  I was going to ask him if
13   he would like to see them or if he's familiar
14   with the invoices that you guys sent me
15   yesterday.
16           MR. ALLUSHI:  Okay.  I don't have an
17   objection, obviously, at trial you would have
18   to -- you know, I'm not stipulating these are
19   admissible at trial.  I'm saying if you want to
20   ask him questions or you want to submit them at
21   this deposition, I have no objection to that.
22           MR. BOUCHARD:  Yeah.  I don't have any
23   questions about them at this point.  I'm not
24   expecting you to stipulate to them.
25   BY MR. BOUCHARD:

Page 235

1        Q.  But, Mr. Vellani, you do know the invoices
2    that your counsel provided to me yesterday for those
3    three cases?
4        A.  Yes, sir.
5            MR. BOUCHARD:  Okay.  I'm admitting those
6    at least for purposes of this deposition as
7    Plaintiffs' Exhibit 6, 7, and 8.
8            (Thereupon, marked Plaintiff Exhibits 6
9    through 8.)
10           MR. BOUCHARD:  Okay.  All right.  Thank
11   you, Mr. Vellani, for your time.
12           MR. ALLUSHI:  We'll read and sign and I'll
13   take a PDF package, thank you.
14           THE STENOGRAPHER:  Mr. Bouchard, are you
15   ordering?
16           MR. BOUCHARD:  Yes, a PDF package, please.
17           MS. RICHENS:  Same here.
18           THE VIDEOGRAPHER:  The time is 4:07 p.m.
19   and we're off the record.
20           THE STENOGRAPHER:  Would you like a copy,
21   Mr. Mobley?
22           MR. MOBLEY:  No.
23           MR. ALLUSHI:  We're the same firm.
24           THE STENOGRAPHER:  Oh, right.  Sorry.
25           (The proceedings concluded at 4:07 p.m.)

Page 236

1            CERTIFICATE OF OATH
2
3            I, the undersigned authority, certify
4    that KARIM VELLANI remotely appeared before me
5    and was duly sworn on the 28th day of November,
6    2023.
7
8
9
10           _____
             EDWARD F. KIDD, RPR
11           Notary Public, State of Florida
             My Commission No. HH126175
12           Expires: 6/25/25
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 237

1            CERTIFICATE OF REPORTER
2
3
4            I, EDWARD F. KIDD, Registered
5    Professional Reporter, do hereby certify that I
6    was authorized to and did stenographically report
7    the foregoing remote Zoom video-recorded
8    deposition of KARIM VELLANI; that a review of the
9    transcript was requested; and that the transcript
10   is a true record of my stenographic notes.
11           I FURTHER CERTIFY that I am not a
12   relative, employee, attorney, or counsel of any
13   of the parties, nor am I a relative or employee
14   of any of the parties' attorneys or counsel
15   connected with the action, nor am I financially
16   interested in the action.
17           Dated this 30th day of November, 2023.
18
19
20           _____
             EDWARD F. KIDD, RPR
21
22
23
24
25

**G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.**
Karim Vellani on 11/28/2023                                    Page 238

```
                              Page 238
 1                    ERRATA SHEET
 2              DO NOT WRITE ON TRANSCRIPT
                ENTER CHANGES ON THIS PAGE
 3
             In Re:  G.W. V NORTHBROOK
 4           Case No.:  1:20-CV-05232-JPB
                    KARIM VELLANI
 5               November 28th, 2023
 6  PAGE   LINE         CHANGE              REASON
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  Under penalties of perjury, I declare that I have
    read the foregoing transcript of the above
17  proceeding and I hereby swear that my testimony
    therein was true at the time it was given and is now
18  true and correct, including any corrections and/or
    amendments listed above.
19
    Signature of Witness _____
20
    Dated this _____ day of _____, _____.
21
22
23
24
25
```

www.huseby.com        Huseby Global Litigation        800-333-2082

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                Index: $10,000..10:54

Exhibits
────────────

VellaniK-1
3:10
37:21,23
40:6 41:19
42:5 43:9
46:16
55:5,25
57:9
70:17,19
86:7,9
107:17
113:17
126:20
127:10
129:5,14
138:8,9
139:9,21
140:23
144:19
147:10
149:16
150:4,15
160:13
162:13
165:1
169:25
170:3
173:3
174:4,8,13
177:10,12
178:16
179:6,25
184:3
193:2
198:19

202:15

VellaniK-2
3:12 37:25
38:2 165:4
173:6

VellaniK-3
3:13 38:4,
6

VellaniK-4
3:15
96:21,24
97:2,4
104:11,13
232:11

VellaniK-5
3:17
126:15,17,
25 127:4
128:18

VellaniK-6
3:18 235:7

VellaniK-7
3:19
235:8,9

VellaniK-8
3:20
235:8,9

──────────
$
──────────

$10,000
175:6

──────────
-
──────────

--a.g.'s

234:1

──────────
0
──────────

0  117:11,12

003098  98:9

──────────
1
──────────

1  37:21,23
38:19 40:6
41:16,19
42:4,5
43:9 46:16
55:5,25
57:9 58:6
70:17,19
73:24 79:3
86:7,9
107:17
113:17
117:9
126:20
127:10
128:18
129:5,14
138:8,9
139:9,21
140:23
144:19
147:10
149:16
150:4,15
160:13
162:13
165:1
166:9,19
167:6

169:25
170:3
173:3,5,8
174:4,8,13
177:10,12
178:16
179:6,25
184:3,16,
18 193:2
194:15
196:2
198:19
201:5
202:15
205:24
216:6,8

1,000  17:18

10  22:20
53:21
54:18,20,
21 62:17,
19,20
108:11
124:8
129:4,6
217:24
225:18,19,
21

100  53:22
54:21
223:5

10:00  69:11
80:6,14
82:15
200:14

10:54  70:6,7

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: 10:55..2014

**10:55**  9:3

**11**  16:18
 18:8
 107:21
 108:11,17
 124:8
 129:4,6

**11-**  17:18

**1100**  17:18

**11:00**  9:2

**11:05**  9:4

**11:10**  9:4

**11:14**  70:7,9

**11:58**  104:1,
 3

**12**  108:11,
 17 111:16
 113:17
 124:8
 126:20
 127:9,14
 128:2

**120**  95:2,3

**120-cv-05231**
 6:5

**120-cv-05232**
 6:6

**120-cv-05233**
 6:7

**12:48**  104:3,
 5

**13**  108:11
 127:14

128:2
129:14
219:16

**14**  38:10
 138:7
 139:8,9

**14-page**  95:5

**14th**  38:16
 42:9,11
 140:24
 142:22
 144:8
 206:9,15
 217:7,9
 222:13

**15**  47:24
 49:17,25
 53:17
 60:25
 62:14
 74:13
 138:7,9
 217:24

**15-year-old**
 160:1

**16**  139:21
 140:3,22
 144:18

**16-year-old**
 101:3
 102:24
 103:12,13

**1600**  136:9

**17**  30:15
 71:24

214:9,12,
19,20

**17th**  70:20
 77:18

**18**  71:24
 147:10
 149:15
 214:19

**19**  214:19

**1984**  207:8

**1989**  201:23

**1995**  201:20

**1998**  139:12

**1:00**  71:4
 72:15,18

─────────────

**2**

─────────────

**2**  37:25
 38:2,19
 43:10
 50:10
 55:25
 57:16 58:6
 70:19 86:8
 107:18
 117:9
 138:10
 140:3
 147:12
 150:17
 160:20
 162:15
 165:4
 170:10

173:6
174:12
177:16
179:25
180:22
184:8
193:3
194:15
196:2
198:20
201:5
202:15
205:24
209:23

**2,000**  136:7
 147:22

**20**  120:25
 214:19
 225:21

**20-**  148:3

**2008**  15:4
 53:2
 175:18
 192:5

**2009**  14:21,
 23,24
 15:3,15
 44:14 50:8
 54:25 76:3
 191:25
 192:1,5

**2011**  128:6

**2013**  204:1

**2014**  166:25
 173:5,8

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                Index: 2016..3

204:1

**2016** 204:5

**2017** 30:17
31:5 60:5,
22 61:9
62:16
63:6,24
79:19,23
83:17
94:21
134:15
139:15
147:15
148:22
149:4
170:24
171:3,5,23
173:8
187:10
189:13
191:20
192:7
204:4,5
229:8

**2018** 30:17
31:5 63:15
139:16
141:7
147:15
148:4
149:4
187:11
204:11

**2019** 30:17
31:6 60:5
63:15,24
79:20,24

83:17
107:2
134:15
136:8
139:16
141:7
173:5
177:1
187:11
189:13
191:20
192:7
229:9

**2021** 206:12
207:2

**2022**
106:20,25
136:7
147:21
190:12
191:2

**2023** 4:6
30:15,20
38:10,16
167:2
206:8,9

**21** 173:8
190:16,17
214:19

**2135** 106:25

**22** 150:14,
16 191:2
214:19

**23** 17:17,20
160:13,19
214:19

**24** 80:2
214:19

**24/7** 204:25

**25** 20:17
53:21
162:13,14
214:19

**25th** 70:22
77:23
79:16

**26** 165:1
166:11
167:8
179:24
180:1

**27** 165:5,25
166:11
167:8
169:24
170:2,3
171:22
173:1,3,7
174:3,5,7,
12 206:8
214:20,24

**28** 174:18
177:10,12
178:15
179:6
180:11
215:3,9,14

**28th** 4:5

**29** 184:2,4,
8,13
215:15

**29th** 98:17
206:12

**2:00** 69:11
80:6,14
82:15
200:14

**2:19**
173:23,24

**2:35** 173:24
174:1

---

**3**

**3** 38:4,6,19
43:7,8,10
55:4 56:8,
9 57:16
58:6 70:20
79:3 86:9
107:18
117:6
138:10
140:3
147:13
150:17
160:20
162:15
165:4
170:10
174:12
177:16
180:1,22
184:8
193:3
194:16
196:2
198:20

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: 30..A.G.

201:5
202:15
205:24

**30**   185:11
188:9
215:18
216:1,21
219:14

**31**   173:5
188:9,11

**32**   193:2

**33**   194:15
196:1

**34**   198:19,
23

**35**   201:4,5
215:19
216:2,21

**36**   198:16
202:14

**3:30**
199:17,22

**3:48**
227:14,15

**3:57**
227:15,17

_____

**4**

**4**   96:21,24
97:2,4
104:11,13
117:6
127:16
166:9

216:5,8,16
232:11

**40**   181:8
220:7

**41**   124:16
133:19

**4649**   8:1,6
97:17

**4:07**
235:18,25

_____

**5**

**5**   20:18
57:9,13
58:4
116:25
117:2,12
126:15,17,
25  127:4
128:18
190:18
191:6
216:5,6,16
225:16
233:25
234:2,4

**50**   9:21
53:22
224:24

_____

**6**

**6**   70:16,19
77:22
184:18

233:25
234:1,2,5
235:7,8

**60**   220:6

**61**   190:15,
17  191:5

**6:00**   83:6,
13,14

**6:30**   199:17

_____

**7**

**7**   86:16
150:6,9
233:25
234:2,6
235:7

**70**   20:14,16
225:22

**700**   17:19

**7th**   141:6

_____

**8**

**8**   86:6,8,9
90:15
206:25
207:7
234:6
235:7,9

**84**   209:7,8

**8th**   217:13

_____

**9**

**9**   22:20
93:8
107:16,18,
21  108:12

**9/11**   18:2

**911**   197:18

**99**   209:3

**9:00**   72:11
83:6,12,13

**9:32**   4:1,6

**9th**   98:20,
21

_____

**A**

**A.G.**   4:15,
19  5:17
6:4  27:7
32:9,21
37:25
38:20
39:4,17,21
43:5  57:17
86:25  87:4
91:14
92:13,20
93:8,12
140:4,20
148:22
158:2
160:20
163:13
173:10,16

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: a.m...Adi

213:13
233:21
234:1,5

a.m.   4:1,6
9:2 69:11
70:6,7,9
80:6,14
82:15
83:6,14
104:1,3
200:14

AA   203:24

abatement
156:24

abduction
86:21,22
110:16
140:9,18
163:10

ability
116:18

absence
175:12
176:8

academics
120:1,9

accepted
116:19
212:18

accepting
126:6

access   42:13
48:16
49:21

68:17
71:12
84:25
147:4
155:5
188:24
195:9
205:13,16

accessible
45:17 90:8
113:11

account
200:8
225:20

accurate
223:5

acknowledge
105:20
154:23
190:16

acknowledged
33:23

act   7:13,18
110:7,13,
14 111:8,9
135:11
159:23

acting
156:10,22

action   36:10
37:1
159:12

actions
145:23

activities
135:3
151:9,24
152:3,22
154:13
157:4
180:18
202:25

activity
15:2 16:9
42:7 52:11
82:8 137:1
149:7
151:12
180:24
182:18
183:8,19
189:4
197:7
200:19,24
203:13

acts   89:7
92:5 111:2
131:16

actual   38:22
45:14
53:13 87:8
89:9 131:1
135:21,22
159:23
168:1
169:15
176:1
191:24
206:17
214:23,25

add   26:16

added   206:22
217:19

addition
212:6

additional
42:6,12
206:23
230:12

address
42:24
55:22
108:18

addressed
34:13
39:10
204:6

addresses
55:21

addressing
135:13

adequacy
36:19,21

adequate
201:7
228:10
229:15

adequately
229:13

Adi   4:16
8:25 28:15
232:3
233:23

adjust  80:11

Administration
16:24

admissible
219:16
234:19

admit  189:25

admitting
235:5

adopt  58:23

ads  90:9,12
95:16

ADT  209:13

adult  183:7
190:14
191:4

advance
54:10

advancement
96:8

advertise
31:6

advertisements
31:12

advertising
85:18
90:13

advice
159:15

advise
137:20
209:4

advised
97:15

advising
66:22
192:11

advocate
10:18

afar
151:19,20

affairs
178:4

affect
155:14

affects
154:11

affidavit
70:12

affidavits
68:24
80:10,12,
18,19

afternoon
71:19
72:18
73:24
74:15
104:7

age  33:25

ages  16:11

agnostic
208:16
209:12,15

agree  8:3

23:13,17
38:18 41:2
67:19 90:2
98:18
107:21
108:14
110:21
111:8,23,
24 129:5,6
131:3,8
132:16
165:19
167:13
184:14
207:13
210:13
212:20
213:6

agreeable
6:20 8:8

agreed  7:7,
16

agreement
6:25

ahead  66:18
74:9 84:2
85:22
149:13
173:18

AHOA  203:24

airport
77:11
161:7

alarm  198:11

alert  95:23

154:4

all-
encompassing
123:4

all-inclusive
216:10

allegations
36:19,21
91:3,14

alleged  29:5
32:1 37:1
157:22

alleges
143:20

alley  89:10

allowed
22:20
82:24
208:18
222:24

allowing
188:24

alluded
198:6

Allushi  4:16
7:7 21:1
26:5,18
27:19,23
28:6,11
29:17
34:21
35:14
36:13 37:3
47:23
58:16 60:7

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023    Index: ambulance..Appendix

61:14 64:7
65:2 66:16
67:1,22
84:2,20
85:22
91:19
92:25 93:3
94:23 99:9
102:9
103:17
105:17
112:5
114:9
117:17
118:12
120:12
121:20
122:16
131:11
132:7,20
134:20
135:17
142:10
146:3,11
149:5
162:22
172:12
179:20
181:22
183:10
184:24
187:14
188:3
189:16
192:15
213:17
218:5
223:14

227:3
232:6
234:7,11,
16 235:12,
23

ambulance
169:6

amenities
155:6

American
12:1,4
19:3 114:4
123:10
139:11

amount  60:14

amounts
182:10

analyses
45:3

analysis
18:13
22:16
35:22
39:11,15
40:13
47:14
51:14
151:1
152:10
155:18
157:10,13
162:4,5,
11,12
163:1
173:4,8,18

214:24
216:24
218:13
224:13,15,
17,21
225:3

analysts
161:11
180:10

analyze
199:9
213:8

analyzed
44:16

ancillary
18:7

and/or  75:6
189:2

Anderson
28:1,9,19
148:21
158:5

anecdotal
117:23,24

annual  19:8
57:7 105:9

annually
225:4

answering
147:2

answers
140:19
225:9

anti-
trafficking
117:14
118:8
120:3,17
228:7,22
229:6

anticipated
159:20

apartment
51:7 58:25
156:9,12
174:23
175:6
219:12

apartments
86:3 156:8

apologize
101:25
127:20
233:17

app  74:19

apparently
139:6

appears
127:12
128:4
147:12
165:3,5,21
167:7
170:9
184:16

Appendix
41:10
150:3

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023          Index: applaud..assessment

165:14,21,
22 166:8,
10 167:7,
12 175:23
176:11,15
205:23,25
206:11,25
207:1
209:23
212:21
213:12
216:5

applaud
203:8

applicable
188:12
202:16,18

applicant
23:14

application
114:19

applied
122:18
149:18
213:22

apply  39:19,
22 134:2
151:1
159:14
212:13
229:19

applying
213:7

approach
81:22 82:5

114:16,22
209:21

approval
220:9

approved
166:20
211:3,6

approves
211:1

approximate
53:20,23

approximately
9:4 52:14
74:5 172:3
219:19,20

April  170:24
171:3,5,
22,23

architectural
212:3

area  22:13
24:21
44:22
45:4,12
71:13,15,
16,18
72:8,9,25
73:1 74:2
89:21,22
90:6 100:4
153:25
160:21,24
161:1,3,6,
25 162:9
182:1

202:6

areas  24:18,
19,23 77:3
89:16,25
91:7
115:23
154:25
159:1,5
190:23
197:21
216:5,9
218:7

argument
175:1

arrest  14:7
205:8

arrests  48:3

arrived
73:24
186:5

article
57:1,3
119:15,25

articles
55:20
123:24
124:19

Ashar  29:20
32:16 35:7
97:15
171:17

Asian  12:4
139:11

ASIS  19:2

23:21
217:12

asks  212:21

assault
181:8

assess
186:19

assessing
157:11
165:6,17
166:1
209:20

assessment
20:9,12,22
21:4,5
44:8,25
45:6,7,19,
21 46:3,4,
9,12,25
47:6,9
50:17
64:24
65:24
66:9,11,12
67:7,14
83:18,19,
21 102:7
103:2
127:6,13
128:18,19
156:9
167:17
186:7
187:7,9,
12,20
188:7

200:9
213:4,25
214:1,4,5,
8,11
215:9,17
216:3

assessment/
security
216:7

assessments
20:5,6
21:8 22:16
52:9,15,19
53:5 54:18
57:8
185:12,16,
25 186:16
191:15
203:20
224:17

asset  46:1

assigned
17:5

assistance
141:19

assisted
18:5

assisting
203:14

association
12:2,5,8
19:5 24:4
119:16
123:11,22
124:2

139:11
180:9
207:16
209:16
210:1
212:1
217:17

associations
84:16
123:16

assume  16:6
33:2,7
71:22
140:19
179:10
180:6
206:10

assuming
135:9
153:18
158:16
190:9
214:9

assumption
16:3

assure
107:3,4
128:15

Atlanta
30:20,22

ATM  57:2,6

attachment
97:3,22
98:7

attempt

128:22
226:24

attend  19:6

attended
9:18
12:10,16
13:13
204:4

attending
203:23,25

attention
134:5

attorney
220:9

attorneys
48:23
57:24
78:20
142:4
210:24

audience
128:13

audio  115:3

audit  82:2,
13,17

audits  82:10

authentication
193:7,12
194:4
204:11

author
201:16
217:15

authored
167:9

authority
154:18
170:17

authorize
211:10,14,
16

authorized
210:15

authorizes
211:17

authorizing
212:9

auto  66:2

avoided
229:18,21

aware  23:10
31:4 33:10
34:24
41:5,14,25
58:22
59:2,23
62:15
69:21
82:22 83:2
85:24 86:4
91:5 100:5
105:2
107:6,8,9,
10,14
118:17
119:7,11
122:6
125:9

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.

144:20,23
148:19,23
165:16
172:9,18
179:8
192:4,5
220:12,19,
24 221:6

awareness
40:16
178:17
179:7
215:14

―――――――

**B**

―――――――

bachelor's
13:6 22:7

back 10:3
14:21
20:15
31:13
40:24 41:9
44:1,17,25
46:16
48:22,23
53:24
54:7,22
57:1 68:16
69:25 70:9
71:19,20,
24,25
72:6,21,
22,24
73:6,10,13
74:2
75:12,15

76:20,25
86:15
89:10
92:14
98:18
102:14
104:5
107:1
110:11
112:23
125:7
129:13
137:22
140:7
147:18
148:14
149:10
161:19
164:5,6
167:20
174:1
180:11
193:20
195:23
202:9
209:7
221:9
226:22
227:17
228:19

backfill
168:15

background
39:6 40:11
58:7,11,
17,24
59:5,16,17

67:18,20
68:2,8,14
83:25
84:7,9,12,
18,22,24
85:3
203:15
212:3

backing
118:25
195:13

Backpage
31:10,18
95:15
119:18

backup
164:7,14

bad 99:23,
25 110:1
149:14
157:1,4
158:20
161:20
181:25

ballpark
225:2

bank 156:3,
8,10

banks 56:25
57:4,8
156:5

bar 9:20
82:19
164:20

barber

136:15

barbershop
111:6

barely
106:21,22

barrier 92:2

barring
96:6,14
115:25
133:15

based 8:15
21:4
34:18,23
39:12 41:5
47:9 60:16
63:4,7
64:12
79:15
80:15
83:23
102:11
113:2
114:19
116:5
118:6
133:15
142:4
143:12
144:25
145:10,18
146:13
184:14
198:21,24
213:8
222:8
230:20

231:1

**baseline**
19:21
24:17

**basically**
19:5,21
24:5 45:22
82:17
87:20
112:6,20
114:15
115:16
140:9
151:24
152:11
155:1
157:6
161:3
164:17
168:10
182:14
210:21
211:4
212:10
214:20

**basis**  17:18
50:25 57:7
81:6 105:9
109:8,17
115:9
229:3

**Bates**  98:8

**Bates-stamped**
97:4

**bathroom**
113:11

**be-all**  21:24

**bear**  150:11
228:16

**began**  4:1

**beginning**
4:2 175:12
211:25

**begins**
113:18

**behalf**  4:15,
18,21 6:4
7:7 10:1,
17 35:7
220:17
221:7,8,
10,18

**behavior**
154:11

**behavioral**
131:13

**behaviors**
131:5
178:3

**belief**  23:5
136:15

**believed**
143:18

**benchmark**
75:14

**benefit**
114:14
226:25
228:3
230:14,16

231:8

**benefiting**
178:20

**bid**  19:25

**bidding**
19:22

**big**  86:1
136:4
148:15
230:9

**bigger**
136:11,16

**biggest**
133:9
136:2,5
176:10
183:12

**bills**  10:16

**Bisgaard**
4:18

**bit**  30:9
78:2 126:1
133:1
194:2
205:25
211:8

**blast**
100:20,21

**block**  97:9

**Blue**  122:9,
15,17,18,
20 123:1,
3,5,7
132:25

**board**  185:20

**bodega**  99:24

**body**
141:23,25
142:14,15
143:10
176:1,16

**bogged**  65:14

**bogging**  7:4

**bolo**  97:23
98:2,10
232:11

**bomb**  178:5

**bonus**  215:15

**book**  21:7
136:18

**books**  45:23
166:24

**bottom**  55:11
56:8 127:9
128:2
139:8
140:22
144:18
145:7
148:4
150:9
174:4,7
196:1
198:19

**Bouchard**
4:13,14
5:11,13
6:2 7:6,9,

19,22 8:24
9:7 22:1
27:2,20,25
28:8,15,18
29:14,19
35:2,16
36:14
37:6,24
38:3,7
48:18
58:19
60:15
61:23 65:5
66:17
67:16 68:1
70:3,10
84:10 85:5
86:5 90:14
92:10
93:1,10
95:7 97:1
99:15
102:2,23
103:9,21
104:6
105:1
106:9
112:22
114:11
115:8
119:6
120:15
121:4
122:1,24
126:18
127:2
131:21
132:13

133:3
134:22
138:5
142:19
144:17
146:5,18
149:12
163:18
169:17,23
172:15
173:20
174:2
179:23
182:6,16
183:17
185:10
187:23
188:5
189:17
191:12
193:1
200:16
213:18
217:23
218:6
223:18
226:8
227:11,18
232:1
233:16,19
234:5,9,
12,22,25
235:5,10,
14,16

**bouncer**
164:20

**boundaries**

154:17

**box** 191:9

**brain** 24:14

**brand** 208:14

**brawl** 164:20

**break** 8:18,
21 9:3
52:21
63:17 70:4
102:1
103:22
104:11
169:19
173:1
174:25
218:1,5
230:5

**breezeways**
71:10
76:24 90:1

**briefly** 5:13
227:19

**bring** 222:19

**Brisbois**
4:18 7:8

**broad** 75:21
118:14

**broader**
111:7
135:2

**broken**
211:18,21

**brothers**

148:24
158:5

**Brown** 78:22

**brush** 75:21

**buckets**
157:25

**build** 178:11

**builder**
187:4

**building**
17:7,8
178:5
181:9
195:7

**buildings**
17:3,6,19
45:13,14
54:5,6

**bulk** 17:25
18:8

**bull** 169:8

**bullet**
147:11
149:15

**bunch** 116:2
119:20,21
133:23
143:3
218:14

**burglaries**
51:17 66:2
174:24

**burglars**

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                                Index: bus..case

199:19

**bus**  160:11

**bushes**  90:3

**business**
10:7 22:12
123:6
209:8

**busy**  187:18
196:17

**buyer**  25:14,
22 26:1

**bypass**  8:13

**bystanders**
153:25
154:1

———————
C
———————

**C.D.**  171:13
205:11

**Caitlin**
190:11

**calendar**
173:14

**call**  9:1
15:7,17
44:15
78:21
79:13
144:9
154:3
156:8
168:5,6,7,
8 174:5
194:11

195:16

**called**  13:9
16:22 17:2
19:2,3
44:3 82:2
115:14
149:19
151:8
152:9
153:3,8
155:12
161:8,9,19
168:23
177:14
187:10,19
193:4
197:12
201:23
205:5
210:3

**calling**
84:16
116:7
161:24
167:22

**calls**  57:3
106:24
165:2,6,9,
13,17,19
166:1,3,12
167:10,16,
21,24
168:2,9,
17,22
169:3,5,6,
8 171:19
172:2

**calming**
128:23

**camera**
141:23
142:1,14,
15 196:6
197:18
208:12,13
209:13

**cameras**  76:8
91:11
95:20 96:4
137:4
143:10
182:8
187:5
196:25
197:5,15,
17 198:7,
8,16
208:14

**Cameron**  4:17

**campaign**
121:6
122:9,15,
18,21
123:1,3,5,
7 132:25

**capability**
225:13

**capacity**
223:1
224:14

**captioned**
6:16

**car**  71:8
76:6
89:10,20
91:25 92:1
111:10
143:3
153:15

**card**  59:10

**care**  35:25
36:2,4
56:6
136:23
202:2,11,
12,16,18
203:2,6
205:14,17

**career**
194:25
220:6

**carjackings**
163:23

**cars**  82:24
92:1

**case**  6:4,6,
7 7:2,4
16:14
26:8,11
31:16
33:12 35:8
39:3 42:7
43:1 57:21
59:25
63:25
64:14 69:2
79:17
86:21

89:19
94:14
110:16
114:23,24
117:7,8,23
118:3
123:22
125:17
140:15
145:18
147:3,5
155:2
157:19
162:1
163:13
167:24
168:14,22
169:13
187:25
194:7
200:7
202:20
206:10
214:8
219:10
220:10,18
221:12,15,
19

cases  4:19
5:18 6:12,
16,17 7:4
32:22
38:25 85:2
91:3,16,21
140:20
151:2
157:19,25
160:20

170:20
206:10,24
209:21
210:11,17
213:13
216:25
220:8,20,
25 221:3,
11 235:3

cash  29:6
85:7
126:6,8,
11,12
133:21
144:6
158:6
182:10

categories
211:19

category
151:11

catering
125:5,19

cats  169:7

causing
199:19

cell  83:1
187:15
204:24

center
189:23
197:18
199:23,25
200:1
209:14

217:19

Center/polaris
127:5

centers  53:8
199:16

central
209:14

certification
19:1 21:10
23:13,17
24:3 26:20

certifications
22:18

Certified
18:24 24:2

challenges
108:4,19
109:11

challenging
96:10
109:12
163:25
195:8

Chameeka
143:7

Chaneyfield
221:23,25
222:11,23
223:7,8
224:8

Chaneyfield's
226:17
227:7,23

change  48:10
118:19
190:5

changed
126:1
200:17
206:18

changing
46:18
189:19
190:7,25
191:10

chapter  19:7

characteristic
s  160:24
161:1
162:9

characterize
86:23

charge  15:24

chat  78:11
100:21

check  58:7,
17,24
59:18
68:8,14
84:24 85:3
95:3
99:23,25
191:9

check-in
139:7

check-ins
139:5

checkout
  155:7

checks  58:11
  59:5
  67:18,20
  68:2 83:25
  84:7,12,
  18,22

chief
  119:15,25

Chiefs
  119:17

children
  159:25
  189:23
  217:20

choose
  158:20

chose  27:21
  28:23
  29:16
  176:2

church  154:7
  163:6

circle
  152:6,7

circumstance
  96:5
  101:13

circumstances
  68:13
  215:8

cite  126:20
  229:2

cited  124:19
  206:23,24

cites  108:10

city  48:20
  50:7 52:24
  99:24
  170:16
  192:5
  202:4

civil  7:12,
  13,18
  220:17
  221:18

claim  7:20
  10:15

claiming
  31:25

claims  91:6
  223:5

clamoring
  160:1

clandestine
  90:17,22
  91:17

clarification
  41:12
  110:19
  127:1
  151:15

clarified
  67:9

clarify
  110:20
  129:3

167:6

clarifying
  218:20

clarity  81:2

class  217:11

classes  19:6

classification
s  223:23
  224:6

clean  94:13

cleaning
  94:9

cleans  155:8

clear  9:9
  42:19
  58:21
  80:9,25
  83:23
  122:17
  129:24
  141:9
  159:22
  207:4

clerk  61:4
  205:19

clerks  47:3

client  10:1,
  2,18 20:19
  25:16
  26:9,14
  47:1 52:4
  135:9,11
  138:1,2
  188:4

208:17
  226:5

client's
  20:7

clients
  19:24
  20:10,11
  50:15 55:3
  56:11 59:5
  132:24
  133:5,8
  135:10,20
  175:5
  190:22
  196:23

club  164:20

clubs  88:20

coauthored
  57:2

Cockbain's
  136:17

code  15:22
  69:20
  184:14,16,
  21 195:17
  215:16

codes  82:19

cognizant
  160:4

colleague
  121:9

collecting
  178:6

collects
  105:22

colored
  112:13

comfortable
  8:14 37:14
  100:23
  101:22
  128:20

commercial
  16:9 52:11
  54:5 89:7
  200:18,24

Commission
  13:9,10

commissioned
  201:20

committed
  207:16

committee
  166:17,20

common   77:3
  81:20
  88:23
  89:15,21,
  22,24 90:6
  91:7 100:4
  120:13
  125:13
  154:24
  159:1,5
  186:17

communicate
  100:24
  130:15

communicated
  81:7

communicates
  100:16

communicating
  100:15,22

communication
  145:4
  204:22

communications
  81:13

community
  154:10

companies
  81:25 86:2
  192:12
  196:24

company
  10:4,8
  17:2,14,16
  18:5 68:8
  84:24
  191:24
  208:10,13
  221:8,11
  224:13,15

company's
  17:1

comparative
  160:22

comparatively
  24:25

compare   40:3
  160:24

162:8
166:4
217:6

compared
  64:13,15
  160:23

compelled
  175:25
  176:15

competency
  23:15

complaints
  32:1 36:11
  229:18

completed
  42:7
  226:10

completely
  77:14

complex   59:1
  156:9,13

complexes
  51:7

compliance
  17:12,13

component
  158:13,14,
  25 214:11

components
  211:22

Comprehensive
  127:6

computer

106:17

concealed
  111:11

concealment
  71:7,9
  76:1,9
  91:24 92:3
  205:3

concept
  111:7
  218:12

conceptual
  50:18

conceptually
  198:15

concern   36:2
  51:9,15
  52:25 53:4
  66:13,19
  103:18
  107:22
  177:23

concerned
  51:17 59:7
  65:10,11
  66:1,3,4
  136:2
  168:8

concerns
  44:5 47:1,
  2,9 51:13
  59:16
  135:24

concluded
  34:19

235:25

concludes
 232:1

conclusion
 145:13

conclusions
 47:17,20

conduct
 20:4,22
 50:16 53:4
 58:11,17
 59:5
 83:18,25
 84:7,12
 106:11
 108:6
 120:24
 128:19
 130:8
 187:12
 188:11
 191:15
 203:21
 213:25
 226:3

conducted
 34:23 47:7
 52:9 54:17
 67:20
 75:16
 185:12,25

conducting
 18:3 21:5
 51:14
 59:17
 70:21

167:17
186:16
203:15,19

conference
 19:8

conferences
 12:11

confidentialit
y  6:11

confines
 18:17
 178:9

confirm  6:25
 37:18 40:3
 167:13
 194:13

confirmed
 7:6

confirming
 180:7

confusing
 143:6

Congress
 201:21

connected
 201:10

connecting
 232:24

connection
 15:9 65:24
 102:19,21
 103:7

consecutive

98:8

consent
 159:23

consideration
 52:10,19
 54:19

considered
 58:3
 116:25
 117:1
 177:21,25
 180:24
 181:14
 182:7,24
 183:8
 191:16

consist
 17:21 88:9

consisted
 71:2 75:18

consistency
 209:21

consistent
 199:13

consists
 88:8

constitutes
 115:12

consultant
 10:14
 21:14,17
 22:4,24
 24:3 25:24
 56:12

58:10
64:23
66:22
120:6
135:12
138:2
186:10,25
191:14
196:20
208:3,5,6,
8,21 209:1
210:19,20,
21 211:4,
25 212:11,
12 213:2

consultants
 24:5 25:13
 187:17
 193:21
 207:18,22
 210:2,16
 211:11,23
 212:7,8,22
 213:7

consultants'
 210:4

consulting
 11:6,9,17
 13:23 14:2
 20:15 24:7
 26:9 50:13
 53:7,8,13
 134:15
 135:20
 189:25
 208:11
 225:22

contained
  33:11 34:5
  70:19
  154:16

contemporaneou
sly  144:21,
  24

contents
  40:5,25
  127:21

context
  172:8
  224:8

continually
  135:19

continuation
  230:19
  231:9,14

continue
  148:8
  157:23

contract
  17:12,16

contracted
  63:1

contracts
  18:7

contrary
  193:16

contributed
  161:14

contributing
  161:21

control  17:2
  115:19
  116:1
  117:1
  154:19
  156:2,12,
  23 157:3
  161:16
  170:19,23

controlled
  115:11

controller
  153:4
  155:22,23
  156:11,15,
  22 157:6
  170:14

controllers
  153:5,9
  156:7

controls
  154:6

convene
  101:5

converge
  152:24

copies
  37:12,13
  38:9

cops  81:16
  164:5

copy  68:11
  100:8
  217:4
  235:20

copyright
  128:5

core  22:17
  209:15

corner  150:9

corporate
  86:1 117:7

correct
  5:22,23,25
  8:11 9:10
  11:14 28:7
  30:17,18
  31:2,3
  32:17
  33:13
  41:11
  43:5,6
  55:15
  56:12 64:6
  77:7 78:3,
  6 84:19
  108:2
  129:9
  150:24
  162:18
  166:6
  173:11
  176:4
  179:4
  184:23
  191:17
  213:12,23
  218:10
  222:13
  224:22

corrections

154:9

correctly
  18:19 87:6
  95:10
  162:8
  167:1
  189:2

correlate
  103:19
  119:24,25

correlation
  104:22
  105:3,12
  107:13,15
  119:19
  168:4
  174:20
  175:2,11
  176:8

cost  96:8
  197:14

counsel  4:10
  6:17,20
  7:2,3,16
  33:4 36:7
  190:9
  206:5,6
  217:3
  219:3
  222:16
  223:20
  231:20
  235:2

counsel's
  21:21

count   61:17
  96:12
  137:7,17

counting
  137:13

country
  136:8,10

counts   51:24

county   69:20
  85:3  94:20
  97:10
  106:19
  140:25
  148:7
  149:4,8,9
  156:16,21
  162:3
  167:25
  170:23,25
  171:18
  172:1
  185:21

County's
  162:12

couple   42:24
  50:14
  74:4,12
  77:13
  78:15,16
  102:3
  196:9
  217:21

court   4:8,11
  6:10  9:1,
  25  10:5,
  17,24

22:20  23:4
  45:10  76:5
  210:5
  211:12
  218:22,25
  219:2

courtroom
  35:12

courts   23:1

cousin   143:8

cover   8:17

coverage
  228:12

covered
  56:21

COVID   76:21
  225:17

CPP   18:20,
  23,24
  19:16,23
  20:7,9,12,
  16,21,25
  21:2,9,13,
  22  23:13,
  17  25:10
  26:21
  187:22

Craig's
  31:12

crazy   128:15

create
  128:22
  130:9

creating
  113:5
  130:13

credential
  19:16
  207:25

credibility
  32:13
  35:4,9,13

credible
  32:4,7,9,
  12

credit   59:10

crime   13:19
  14:5
  18:12,13,
  14,17
  22:15
  39:11,14,
  15  40:13
  44:9  45:3
  47:4  49:16
  51:10,12
  57:4,6
  81:23
  85:21
  86:17
  87:24
  90:17,22
  91:17
  105:6
  109:20,22
  117:3,4
  140:8
  147:7
  148:5,12

149:19
  150:23
  151:7
  152:1,10,
  11,15,21,
  25  153:2,
  13,14
  155:19
  156:11,17,
  23  157:11,
  15  160:21
  161:3,10,
  11,13,16,
  25  162:1,
  21  163:9,
  20,25
  164:4,24
  165:6,17
  166:1
  168:5
  169:1,3
  170:19,23
  173:4,8
  180:1,5,10
  184:19,22
  190:16,18
  191:5
  198:1
  199:4,9,16
  200:4,22
  201:6,21,
  24  202:3,
  5,6,12
  214:23
  215:14
  218:12,13
  224:17

crimes
   13:14,22
   14:3  48:1
   49:5,7
   59:17
   81:24
   147:21
   162:15,17
   163:15,16
   165:3
   171:13
   174:5,14,
   21  175:2,
   8,11,15,
   16,22
   176:1,2,5,
   9,11,12,
   13,18,23
   178:10,13
   214:25
   219:14

criminal
   13:7,14
   16:4  22:7,
   9  59:17
   68:14
   84:7,8
   121:19
   151:21
   203:15

criminals
   126:11
   149:11
   152:4

criminologists
   201:16

criminology
   114:23
   118:16
   151:12
   160:14

criteria
   68:7

critical
   23:6

cross-
examination
   7:15  232:7

cross-noticed
   6:5

cross-notices
   7:11

crossroads
   132:8

CSA   200:23

CSC   18:20
   23:25  24:2
   25:9,20,
   21,24
   26:6,19,22
   211:20

culminates
   46:11

culminating
   113:9

culture
   100:25

cup   112:13

current

44:12
   114:20
   190:24

customers
   56:10  89:8
   135:10

cut   115:3
   173:17

CV   13:15
   22:5
   120:24
   217:4,6,7,
   8  224:4

_____

D

d/b/a   4:22

DA   16:5

DA's   15:23

dailies
   146:16

daily   80:23
   81:6  82:8

damages
   36:16

Dana   4:20
   7:6  8:25
   78:22
   232:4
   233:23

dangerous
   164:19,23

dangers
   160:4

dark   72:1

Darrell
   221:23

data   44:12,
   14,15,16,
   17  47:4
   51:5
   105:23
   106:2
   107:1
   148:6
   162:3
   165:8,14
   169:9,10
   173:13
   177:22
   214:13
   219:4,5,6

datapoints
   201:2

date   4:5
   42:9  171:5
   173:15
   189:18

dated   38:9
   42:8
   98:17,20
   206:8,9

David   4:13
   5:13  28:14
   114:9

day   60:24
   61:7
   70:21,25
   71:3,23
   73:17

75:16,22,
24 78:12
80:2
196:18
199:4
200:18
210:25
217:6
225:20

**day-to-day**
208:24

**days** 61:13,
19 94:15
95:2,3
164:6
204:20

**De** 140:25
170:25
171:9
172:10,19

**dead** 177:8

**deadline**
226:14
231:18

**deadline's**
226:20

**deadlines**
230:15

**deal** 101:12
148:2
205:20
206:21

**dealing**
15:20,21
101:1

**dealt** 10:6

**dean**
151:18,20

**dearth** 49:13
177:22

**death** 176:25
177:3

**deaths** 177:5

**Decatur** 8:2

**December**
141:11

**deception**
86:19,20,
24

**decide** 176:6

**decided**
176:4

**decision**
15:24
16:5,7
21:20,21,
22 25:25
26:10
36:12
216:10

**decisions**
179:3
186:6
187:3

**decrease**
184:18,22

**deem** 210:23
224:11

**deemed** 7:2
223:2

**deeming**
223:9
224:10,12

**deems** 25:16

**deep** 44:13
161:11
162:1
200:3

**deeper**
186:25
214:21
231:11

**defendant**
4:22 34:17
36:9
220:4,17
221:4,11,
13

**defendants**
6:17
202:16

**defense**
21:21 33:4
36:6
210:24
220:6

**defer** 80:19
142:20
145:15,19
146:9,15
147:1
179:1,10,
17 184:10

193:13

**define**
131:12
180:1

**defined**
154:15,17

**definition**
113:25
114:1
140:4
180:5,8

**definitions**
140:8

**definitively**
33:5

**degree** 9:16
12:14 13:6
22:7,9

**degrees**
203:16

**Dekalb** 69:20
94:20
106:19
147:13
148:7
149:4,8
156:16,21
162:3,11
167:25
170:23
171:17
172:1

**demonstrate**
23:7

demonstrated
  23:14

demonstrates
  24:5

demonstrating
  26:22

dental
  133:13

department
  16:18
  44:12 53:2
  121:6
  122:3,6,12
  132:4
  140:25
  143:9,16
  147:13
  148:20
  150:13
  161:10
  168:21
  170:17,21,
  25 171:9,
  18 172:2,
  10,13,16,
  19 204:3
  205:6

departments
  122:11

depending
  30:22
  169:4
  203:16

depends  20:7
  65:25 66:8
  68:4 77:11

118:14,21
167:22
168:3

deploy
  109:25

depose  54:10

deposed  8:11

deposition
  4:3 6:3,19
  7:9,10
  8:14 60:9,
  10,19
  61:16
  85:10
  92:17
  99:11
  145:12
  171:8,14
  172:4
  178:24
  181:4
  183:20
  222:17
  227:7
  228:1,4,14
  230:18,19,
  20,22,23
  231:7,9,13
  234:21
  235:6

depositions
  8:16 69:7
  92:21,23
  93:13
  116:19
  171:17,21

220:14

derived
  227:6

describe
  209:17

describing
  15:10,15
  188:13

designated
  202:4
  219:21,23
  220:3,9
  221:10,12

designates
  211:13

designation
  211:20

designations
  220:5,11

desk  45:16
  60:25
  63:10
  65:14,22
  66:7
  76:10,12,
  24 100:1
  193:24
  195:17
  204:23

detail
  182:20
  214:16

detained
  140:25

detect  91:18
  92:4 93:19
  95:9,12
  96:6

Detective
  68:18

deter  164:4

determination
  15:23 35:9
  186:22

determinations
  35:4

determine
  15:18
  81:12
  110:1
  195:3

determined
  183:24

deterrent
  154:2

deterring
  163:24

Detroit
  197:13

develop
  119:21

developed
  49:4,6
  55:7 56:1
  151:13
  204:7

developing
  209:22

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023    Index: development..document

development
 147:19
 153:8
 155:12,15

deviate
 216:23

DHS  16:20
 119:2,8
 121:16,18
 122:22
 123:1
 131:15

die  177:6

differ  80:18

difference
 39:4
 40:17,21,
 23,25 41:4
 81:15
 131:25
 132:17
 198:5
 206:17

differences
 38:24
 39:24 40:8
 41:22,24,
 25 42:2
 82:4

differently
 213:8

difficult
 90:24
 91:9,17
 92:4

93:18,21,
22 95:9,11
108:23
109:5
130:20
162:16

difficulties
 109:13

difficulty
 66:24 67:5

dig  231:11

digits
 194:13

diminish
 21:10
 186:21

direct  5:10
 107:13
 126:19
 168:4
 209:8

directions
 130:14

directly
 16:20
 73:19 81:8
 84:15
 121:13
 157:18,24
 189:13
 202:13

disagree
 23:22,24
 227:4
 228:6,12

229:14,23

disclosures
 226:15

disconcerting
 135:7
 194:2

discovery
 34:19,23
 42:6,12,
 20,25
 54:16
 57:21
 63:25
 64:3,9,14
 69:1,8
 79:16
 92:12
 145:11

discretion
 213:3

discuss
 111:23

discussed
 56:20
 138:11
 185:22
 192:3

discussion
 215:16

dispatch
 197:18,22
 198:12

dispatcher
 197:21

dispatchers
 197:19

disposal
 87:15

disputing
 156:19

distance
 195:6

distinct
 86:20

distinction
 91:13
 122:25
 176:6
 210:18

distinguish
 45:20
 175:19

distinguished
 176:21

distortion
 25:3 115:2

dive  44:13
 161:11
 162:1
 200:3

divergence
 35:5

DNRS  100:1

document
 62:11 97:5
 98:10
 116:15
 127:21

128:5
166:14
167:12
206:13

**documentation**
48:24 58:7
69:10,22
75:5 84:18
155:13

**documented**
136:7
147:23

**documents**
39:6 57:20
69:16
83:25
105:7
116:12,20
217:4,5
223:19,21,
25

**dollars**
225:8

**domains**
23:15
24:9,12,16

**domestic**
87:21
164:3,8
203:14

**Don** 78:22

**door** 39:18
40:23
71:11
76:14

94:2,5
96:2
101:21
137:11,17
187:1
232:16,17,
21 233:5

**doorbells**
187:6

**doors** 158:22

**dots** 232:24

**downtown**
44:4 48:23

**dozen** 15:11,
12

**draw** 134:4
210:18

**drive** 8:2
51:13
76:4,5
97:17

**driver's**
194:13

**drivers**
125:20

**driveway**
195:15

**driving**
48:15
51:11
153:15,19
197:20

**drove** 45:11
71:6,13

73:14,15
74:2

**drug** 178:5
181:15,18

**drugs** 137:2

**duly** 5:8

**duties** 17:21
35:20

**duty** 62:25
81:9

---

**E**

---

**e.g.** 180:13

**earlier**
137:5
147:25
158:12
159:1
170:15
198:6
214:6
217:11
225:23
232:10

**early** 16:25
140:23
141:3,8
147:19
204:1,5
221:13

**ease** 194:1

**easier** 96:6
109:9,10,
12,13,15

**ECPAT** 132:4

**Ed** 4:8

**editions**
21:7

**educate**
135:20
138:1,2
228:22

**educating**
136:1

**education**
22:6 26:23
54:13
114:17
208:23

**effect** 6:11
79:19
94:21 95:4
229:16

**effective**
117:16
118:9
158:11
189:19
190:7,24
198:17
203:5
206:13
207:4

**effectiveness**
118:11
120:17
123:12
197:5,24
198:2

electronic
37:12,13,
15 137:11

electronically
204:9

element
152:18,23
154:21,22

elements
153:1,4
155:21,22

elicit 33:7
36:6,7
178:3

elicited
230:12

eliciting
33:2

Ella 136:17

email 97:2,
8,20 98:9,
14,16
100:20
102:14

emergency
168:24

emphasis
219:20

emphasizes
114:18

employ 67:6

employed
11:7,11

employee
83:5,9

employees
58:8,18,25
84:1,4,13
85:7

employment
59:13
67:21

enable 20:4

enabled
156:5

enclosed
45:12,13

encompass
215:7

encourage
111:18
112:2,25

end 56:15
76:21,22
103:14
132:10
170:11
194:11

end-all
21:24

ended 230:24

enforced
188:16,18

enforcement
12:25
13:3,8,10,
12 14:5,10

16:3,14,15
22:8 69:20
102:25
114:17
122:8,14,
19,22
123:2
128:10
130:19
147:20
148:2,10
184:17,21

enforcement-
type 197:19

enforcing
189:7

engage
120:19
160:9,11
170:18
191:19

engaged 16:9
31:19 66:5
134:14
135:11
160:7
190:1
191:15
192:6,12
200:10
211:5

engagement
31:16 66:1

engages
120:6
160:5

engaging
33:20 73:7
153:17,21
156:21
157:3,4
170:22
191:21,22

engineering
212:3

England
151:22

English
60:6,14

enhancing
188:1

ensuring
17:11,12

entailed
16:19 48:1

entails 24:1

enter 195:17

entered
180:12

entering
95:21,24
96:13
198:11

entire
136:8,9

entirety
71:5 79:2
141:25
166:7

entitled
  178:16

entity  16:22

entrance
  76:11

entry  195:6,
  16 217:13

environment
  55:9,18
  56:3 108:5
  109:3
  110:9,10,
  23,24
  111:13
  128:19,20,
  23 130:7,
  10 131:14
  134:8

environmental
  151:11

environments
  51:4,6
  55:8,13,17
  88:22
  108:20
  109:11,14,
  16 129:17
  130:11,21
  192:10

envision
  48:14

Epstein
  156:4

equipment
  216:18

Eric  197:3

essence
  114:17
  155:10

establish
  22:23 56:5

established
  68:7
  207:20

establishing
  207:16

estimate
  225:2

et al  4:5

ethics  24:17

evaluate
  15:1 51:1,
  7 57:4
  186:4

evaluated
  24:11
  120:16

evaluating
  44:9 45:25
  214:22

evaluation
  46:6
  133:16
  210:10
  215:20

events  31:25
  49:25
  176:20

eventually
  17:16

everybody's
  100:14

everyday
  152:1,2

evidence
  34:24
  114:22,23
  115:12,14,
  15 116:4,
  7,22
  117:24
  118:25
  121:11
  124:7
  135:6
  142:5,21
  145:16,22,
  23 146:1,
  2,10
  170:12,21
  172:9,18
  174:19
  178:19
  179:1,10,
  14,17,21
  184:5,10
  185:24
  188:17
  189:6
  193:14
  203:13
  229:3

evidence-based
  48:6,25
  113:19

114:1,15
  115:10
  117:15,25
  118:10
  119:7,11
  124:10,18
  125:1,11
  133:10,17
  134:6
  217:12
  229:2

exact  219:21

exam  9:20
  25:5

examination
  5:10 113:8
  130:8,22
  226:11
  233:18

examinations
  108:6

examined  5:8

examples
  47:19
  188:18,19,
  21,23

excel  24:19

excellence
  23:18

excellent
  78:19

exception
  134:13

excerpt

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023    Index: excerpts..expert

222:17
223:12
224:8

excerpts
230:25

excluded
218:21

exclusive
130:14
216:10

exclusively
18:16

excuse  83:19
152:8
164:17
206:6

exercise
159:17

exhausted
50:4,5

exhibit
37:21,23,
25 38:2,4,
6 40:6
41:19 42:5
43:9 46:16
55:5,25
57:9 69:6
70:17,19
86:7,9
96:21,24
97:2,4
104:11,13
107:17
113:17

126:15,17,
20,25
127:4,10
128:18
129:5,14
138:8,9
139:9,21
140:23
144:19
147:10
149:16
150:4,15
160:13
162:13
165:1,4
169:25
170:3
173:3,6
174:4,8,13
177:10,12
178:16
179:6,25
184:3
193:2
198:19
202:15
232:11
235:7

exhibits
38:19
57:16 58:6
70:19 79:3
86:8
92:15,17,
23 93:12
107:18
138:10
140:3

147:12
150:17
160:20
162:15
170:10
171:21
174:12
177:16
179:25
180:22
184:8
193:3
194:15
196:2
201:5
205:24
233:25
235:8

exist  31:18
115:20,22
123:25
136:18
187:17
202:3

existed  31:5
64:8 95:15

existence
109:23

existing
82:22
215:22
216:1

exists  137:7
146:14

expanded
114:17

expect  68:3
82:6 129:7
159:17
205:14

expectation
93:25

expectations
137:25

expecting
234:24

expensive
195:22

experience
8:16 11:15
22:10
26:23
43:11 50:8
54:12
199:3
212:23
213:3

experienced
66:20 67:4
204:15

experiences
213:9

expert  10:25
11:2,18
12:18 14:9
18:10,12,
15 22:11
23:9,11
32:18,22,
25 35:12
37:7,20,24

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: expertise..fact

38:3 59:20
62:14
121:18
127:14
128:2
159:15
173:2
210:4,19,
23 211:2,
12 213:14,
19,23
216:12
218:8,17,
19 219:22
220:3,16,
25 221:4,
10,17
222:2,4,9
223:2,9
224:10,11,
12,14,18,
20 225:4,
15,21
226:13,14,
19,21

**expertise**
54:12
186:15
212:23
213:3

**experts**
57:23
122:3
140:14
212:17
220:23
222:7

**explain**
24:13
95:11
135:19
151:3
164:1
175:4
201:11
214:15

**explained**
44:5 84:21
186:5
194:7

**explanation**
175:24

**explicit**
112:7,11,
15 113:4,
12 181:1,3

**explicitly**
189:8
191:3
221:24

**exploitation**
86:11,14
87:6,12,17
88:4,14
89:1,9,13,
14,15
90:5,13,23
110:13,15,
22,25
111:1,6,7

**Exploited**
189:23
217:20

**explore**
114:14

**explored**
183:21

**expressed**
51:13

**extended**
138:20
139:6
204:4

**extensive**
22:10

**extensively**
21:6
22:13,14,
15 166:24

**extent**
140:18
147:9
154:2
177:20
182:17
227:4
228:2
231:23

**exterior**
150:19
154:21,24

**extra**  67:10

**extramarital**
178:4

**extraordinaril
y**  187:18

**extreme**

95:13
193:18
197:25

**extremely**
195:22

**eye**  25:14,
25

**eyes**  22:25

**eyewitness**
31:25

_____
F
_____

**faces**  198:10

**facial**  95:20
96:3 137:4
198:7,8

**facilities**
50:11
85:25
111:18
199:13
203:6

**facility**
205:4

**fact**  18:2
26:20
33:17
34:16 35:8
124:14
136:16
145:9
146:8,9,21
160:6
163:9

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023          Index: factor..find

164:11
179:2
187:22
193:12
196:8
207:20
208:25

factor
204:13

facts 146:24

factually
33:24
91:21 92:8
223:3

fail 19:10
68:9

failed
229:10

failing
229:5

fair 8:22
17:23
20:13 26:2
28:5 32:1,
2 42:2,3
55:14
77:2,4
79:8,9
147:5
162:9
231:24

fairly 19:13
120:13

fairness
206:16

227:25

fake 233:8

fall 33:7

falls 218:14

familiar
31:4,8
43:14
70:15
92:15,22
93:2,11
94:7,20,25
97:20 98:4
111:20
113:22
145:25
161:6
163:12
170:6
172:5
188:12
207:11
222:18,20,
21 234:13

fancy 153:15

fascinating
185:3

FBI 53:1
105:23
106:4,16
140:7
147:14,23
148:20
149:9

FBI's 105:6

features

75:4

federal 7:12
16:22
17:3,5,6,
7,19
121:15
122:7,14,
20,22
123:1

feel 72:7,
25 165:22
166:7

fell 229:4

Felson
151:13,16,
23

felt 175:25
176:15

fencing
137:1

fewer 147:24

fiduciary
59:8

field 22:15
23:7 24:7
50:24
115:22
213:9

fighting
164:21

figure 74:8
128:13
201:9

file 68:12
69:25
93:14
106:18
149:25
156:24
222:22
223:13,21,
25

filed 5:18
9:23 10:3,
4

files 92:18
106:16
116:14
147:23

filter
175:14

final 168:7,
8

finals
222:16

financial
56:23

financially
178:20

Finch 4:14

find 19:13
67:10 96:2
113:12
115:1
137:12
170:20
174:20
175:1,11

185:7
198:13
202:23

finder   35:8
179:3

finding
174:22

findings
48:20
114:19
123:19
216:20

fine   7:21
28:17
193:16
218:2

finish
112:20
114:10

finished
148:17

finishing
217:25

fire   169:5
226:5

firearms
13:11

firm   4:14
5:25 14:2,
24 44:3
235:23

fits   157:24

five-step
45:24

214:7

fixture
76:10

flagged
41:14

flags   118:24
119:21
124:3,5,23
125:21
131:10,12,
13,18
132:3,6,9,
15 134:17

flesh   228:1

flip   39:2
112:11
113:5
136:3

fluctuate
80:14

flyer   102:22
233:1

flyers   99:13
101:15
203:22

focus   124:21
192:7,9
211:19

focused
55:22
81:23
123:5
202:20

focusing

109:2
202:22
203:9

FOIA   119:2
121:10,14,
16

folio   188:25

folks   84:6,8
112:17
120:8
158:7,8
190:15

follow
188:22
216:15
229:10

footage
141:23
142:1,6,
14,15
143:13
196:6,21

footnote
166:9,19
167:6

footnotes
55:11
108:11,14

forced   89:6
163:10

forensic
21:14,16
22:4,23
24:10 25:7
149:23

150:8
165:15,20
166:5,8,
14,18,20
167:1,4,7,
11,15
173:12
206:1,7,
10,13
209:18,19
210:3,16,
19,20
211:4,11
212:7,8,
14,21,25
213:6,7
214:17,25
215:3
216:23
223:24
224:3

foreseeability
34:6

foreseeable
34:3

forgive
77:17
106:4
189:9

forgotten
67:8

form   6:21
28:16
34:21
36:13
194:4

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: formal..gave

formal  83:18
  84:23
  187:12

format
  206:19

forms  88:9

formula
  213:1

fortunately
  212:16,18

forward
  155:16

foster  157:7

found  36:9
  37:2
  105:22
  139:1
  181:8
  190:12

founded
  207:8

four-page
  204:7

fourth  46:8
  87:14

fraction
  224:20

frame  162:25

framework
  157:11
  209:19

Franco  4:7

frankly
  222:25

fraud  59:10

free  165:23
  166:7
  226:2
  228:21

frequency
  81:12
  101:11

frequently
  108:24

front  10:6
  37:8 45:16
  60:25
  63:10
  65:14,22
  66:7 71:11
  73:18,19
  76:10,12,
  24 100:1
  127:4
  190:23
  193:23
  195:17
  204:22
  206:12

full  6:13
  8:22 92:21
  116:6
  160:14
  230:17

fully  37:4
  162:5
  190:1
  228:1

function
  65:23
  154:18
  196:16

functional
  138:17

functioning
  155:2,4

fund
  156:10,12

funding
  121:15
  156:2,15

furthest
  221:16

future  96:18
  136:24

─────────────
        G
─────────────

G.W.  4:4,
  15,19 5:17
  27:3 32:4,
  21 38:4,20
  39:4,17,21
  43:5 86:25
  87:4 92:13
  140:4
  148:22
  158:2
  160:20
  163:14
  173:10,17
  213:13
  233:21
  234:6

G.w.'s  57:17
  91:14
  92:20
  93:13
  140:20
  234:2

gain  67:20

Gambrell
  4:21

gang  13:14

gaps  46:10,
  14

garbage
  168:10

gas  71:17
  86:2
  153:19,20

gate  79:24
  195:9,10,
  11,12,15,
  18,19,21,
  23

gates
  194:16,18,
  23 195:1
  202:21
  203:3

gathered
  143:4

gave  49:15
  61:16
  66:13,20
  75:21
  124:19

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: geared..groups

| | | | |
|---|---|---|---|
| 134:13 | **Georgia** | **glad** 114:2 | 181:7 |
| 136:17 | 7:13,18,20 | **Global** 4:9 | **grant** 21:9 |
| 142:3 | 8:2 12:7 | **globally** | **granularity** |
| 147:21 | 219:2,11 | 23:18 | 214:18 |
| 169:15 | **gig** 187:21 | **goal** 164:13 | **great** 26:7 |
| 181:3 | **give** 5:3 | **God** 111:14 | 105:20 |
| 182:21 | 40:19 44:2 | **gold** 18:25 | 106:1 |
| 188:18,21, | 47:19 | 19:18 | 114:3,4 |
| 23 200:20 | 49:20 | **good** 4:13, | 115:13 |
| **geared** 148:1 | 53:22 | 16 5:12 | 119:15 |
| **gearing** | 57:24 | 20:24 | 157:9 |
| 148:2 | 61:11 | 26:6,20 | 168:1 |
| **general** | 92:15,18 | 27:1 31:21 | **greater** 65:8 |
| 16:24 33:8 | 95:13 96:1 | 48:16 | 214:16 |
| 91:2 | 106:19 | 58:24 | **Green** 197:13 |
| 116:11 | 111:19 | 59:1,18 | **Greenspoint** |
| 127:18 | 116:6 | 70:3 82:7 | 161:8,19 |
| 136:20 | 130:12 | 103:21 | **grew** 17:16 |
| 154:18 | 133:2 | 104:7,8 | **Grimes** 143:7 |
| 163:15 | 137:24 | 119:1 | **grocery** |
| 214:12 | 140:16 | 133:25 | 153:25 |
| 218:12 | 142:2,4 | 134:11 | **ground** 8:13 |
| **generally** | 161:5 | 135:18 | **groundskeeper** |
| 11:22 | 164:1 | 155:15 | 61:1 65:10 |
| 35:23 | 168:11,20 | 174:16 | **groundskeepers** |
| 41:19 45:4 | 175:3 | 177:2 | 63:12 |
| 61:8 88:6 | 190:8 | 203:10 | 65:15,20 |
| 154:22 | 193:19 | 204:12 | **Group** |
| 219:18 | 194:12 | **goods** 137:2 | 224:13,15, |
| **generates** | 214:17 | **Google** | 21 225:3 |
| 225:3 | 230:7,13, | 74:17,19 | **groups** 11:24 |
| **genesis** | 21 | **GPS** 82:20, | 12:12 |
| 151:8 | **giving** 48:24 | 24 83:1 | |
| **geographic** | 49:18 | **Grand** 178:7 | |
| 154:16 | 228:18 | | |
| | 230:24 | | |

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                                    Index: guard..happen

| | | | |
|---|---|---|---|
| guard 81:19 | guesstimate | Guideline | half 15:11 |
| 82:2 | 148:15 | 217:15 | 141:14 |
| 208:10 | | | 173:10 |
| | guest 39:21 | guidelines | 200:1 |
| guardian | 41:1 49:20 | 210:9 | 217:5 |
| 97:16 | 91:8,11 | | |
| 150:20 | 93:23 | guilty 69:19 | hallways |
| 151:6 | 94:16 | gun 181:25 | 89:25 |
| 153:6 | 111:12 | 182:4 | hamstrung |
| | 128:16 | | 57:23 |
| guardians | 137:8,9, | guns | 142:3 |
| 153:10,11 | 12,16 | 181:20,21 | |
| 154:1 | 138:14 | 202:21 | hand 5:1 |
| 158:2 | 155:9 | 203:3 | handful |
| | 158:18 | | 197:2 |
| guardianship | 159:7,8 | Gunspoint | |
| 153:22 | 178:8,11, | 161:9,15, | handle 106:1 |
| 157:5 | 14 180:18, | 17,20 | 121:21 |
| 159:11 | 25 181:6 | | 125:8 |
| 160:12 | 182:19 | guy 151:13 | 139:5 |
| | 193:4 | 157:3 | |
| guardianships | 202:24 | 197:3 | handler |
| 163:5 | 203:21 | 222:1 | 150:19 |
| | 205:15 | | 151:5 |
| guards 80:2, | 229:12 | guys 33:7 | 153:5 |
| 5,23 81:1, | | 157:1,2 | 154:6,8 |
| 16 202:21 | guest's 94:3 | 158:9 | |
| 203:3 | | 164:20 | handlers |
| | guestroom | 168:14 | 151:5 |
| guess 19:8 | 91:10 | 172:13 | 158:7,10, |
| 64:2 74:10 | | 193:23 | 11 |
| 76:21 | guestrooms | 209:3,9 | |
| 78:24 87:1 | 180:12 | 211:19 | handy 20:2 |
| 111:15 | | 212:4,5 | Hang 114:9 |
| 123:7 | guests 45:17 | 234:14 | |
| 131:17 | 188:12 | | hanging |
| 148:8 | 204:25 | ———————— | 200:11 |
| 211:8 | | H | |
| 219:15 | guidance | ———————— | happen 87:22 |
| 220:7 | 63:7 | | 96:19 |
| 223:12 | | hair 136:15 | 110:8 |
| 228:14 | Guide 31:11 | haircut | 120:5 |
| | | 111:4 | |

202:3,7,12

**happened**
18:8 95:25
101:17
178:12

**happening**
91:9 169:1

**happy** 106:5,
18 132:9
145:19
197:12
230:13

**hard** 118:13
192:25
221:14
228:16

**harder**
109:17
163:15
200:21

**hate** 163:21
220:7

**hated** 206:19

**head** 49:12
171:23
199:22

**heading**
199:23

**headquarters**
19:8

**healthcare**
50:23
55:9,13,
18,23 56:7

107:23
108:1,16,
20 110:9,
23 111:13,
17 112:20
129:17
130:6
217:18

**hear** 35:17
227:24

**heard** 47:10
123:8
196:14
223:10
233:4

**hearing**
230:16

**heavy** 53:9

**hedge** 219:1

**heels** 15:4
112:16

**held** 86:1
140:13

**helped**
121:10

**helpful**
166:6

**helps** 154:14

**hey** 20:19
95:23
113:10
156:22
157:2
186:23,24

198:10
200:10

**hierarchy**
115:14,15
116:7,8,23

**high**
153:13,14
156:17
161:3,13,
24 199:21
201:6
202:5,6
205:19

**high-end**
175:5

**highest**
207:17,21

**hire** 19:25
25:23
58:12
186:10,24
210:25

**hired** 14:24
64:23

**hiring** 18:6
26:8 186:3

**historically**
154:7

**history** 17:1
24:15
39:14
51:10,12
59:10
133:12
214:23

**hit** 39:23

**hold** 11:1
18:10,12,
15 26:3,10
32:21
85:21
91:20
136:25

**holding**
212:8
218:18

**home** 151:22

**homeland**
16:18,23
118:24
121:6,23
122:3,7,13
132:4

**homes** 157:7
187:1,5,6

**honest**
169:12

**hope** 88:2
109:10
110:6
111:14
157:15

**hospitality**
11:4,7,10,
11,23
12:2,7,11
56:2,4,5
59:4
109:2,3,5
110:9,23

120:18
123:11,15
124:2,22,
25 125:22
128:9,12,
14 129:8,
10 134:2,8
191:14
192:10,11

**hospitals**
53:7
120:23
129:2

**hosted** 19:2,
7 24:3

**hot** 162:4
197:15,21

**hotel** 7:25
8:5 11:8,
12,15,19
12:4
44:23,24
45:8 47:3,
8,19 50:19
51:14
52:9,22
59:21,22,
23 60:1,4,
5,22 61:7,
9 63:1,2,
5,24 64:6,
17,23
65:1,7,11
66:10,13,
22,24,25
67:17,21
68:2

69:10,14,
17 71:19
77:3,10,14
82:15
84:5,15
85:13
87:5,25
88:17,24
89:15,24
90:6 94:4,
8 95:10,
17,21
98:13
100:12
101:2,4,5
102:8
103:1,3
104:17,18,
19 108:9
110:18
111:12
112:17
113:14
130:17,24
134:12,14,
17,18
135:9,11
138:11,15,
18 139:11
155:3
158:21
167:18
171:10
172:20
182:1
188:2,10,
15 189:12
191:22

193:20
194:1
198:11,25
199:5
200:19
201:24
205:20
220:17
221:4,12,
13 228:9,
23 229:11
233:4,10

**hotel's**
102:6
103:2
196:5

**hotel-type**
85:24

**hotels** 15:1
30:22
43:19,24
44:10,13,
20 45:2,9
46:19
47:2,21
48:2,8
49:22
50:16,24,
25 51:3,6
52:17,19
53:11,16
54:6,18
55:22
56:14,19
58:10
71:15 86:4
93:18

95:16 99:3
108:18
117:15
118:9
120:8,10,
11 129:19
131:25
132:2
138:20,22
143:19
159:16
162:8
175:5
177:6
189:13
191:16
192:12,19
194:2
203:7
205:14
221:1

**hotline**
105:24
106:24
112:10
118:19

**hour** 48:8
95:25
96:14
125:3
133:22
134:12
225:20

**hourly** 49:9
125:3,15,
23 134:25
135:7

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: hours..illustrate

192:20
204:17

**hours**  74:4,
5,12
78:15,17
80:2
83:10,15,
16 139:5,7

**housekeepers**
60:25
63:10
65:12,13,
19,21
94:12
233:9

**housekeeping**
94:8,16
100:8
155:8
180:13

**Houston**
14:25
43:20,25
44:12
48:20 50:8
161:5,6,7,
9 192:6

**HPD**  161:9,
15

**HR**  18:1

**HR-RELATED**
13:25

**human**  18:4
42:23
87:10

88:6,8
127:5,6
136:19
147:14
148:8
204:6,8
217:16

**hundred**
225:7

**hundreds**
105:8,11,
14 106:23

**hunkering**
88:17

**Huseby**  4:9

---

**I**

---

**i.e.**  203:7

**IAPSC**  149:23
165:15,20
206:1
207:15,25
209:2,5,18
210:15,16,
22 211:3,
10,14
212:14,15,
25 213:7
216:23
223:2,20,
22,24
224:9

**idea**  59:18
61:20
101:10

133:25
153:17
190:21
219:25

**ideal**  68:10

**ideally**
118:4

**ideas**  119:1

**identical**
38:20,22,
23 41:18
86:8
107:18
138:9
140:2
150:16
162:14
166:10

**identification**
46:2
108:15
217:16

**identified**
46:18
101:7
131:4
133:19
144:5
161:12
162:3
190:19

**identifies**
97:9
156:17

**identify**

37:20
43:19,24
45:25
46:23
95:20
108:23
109:5,12,
15 114:24
121:11
124:13
129:11,20
130:20
131:23
132:1,3
134:21
136:25
154:14
157:13,24
190:17
199:10

**identifying**
55:7 56:1
107:22
108:4,19
109:14
129:12
131:1,8,9
132:17,18
149:10
169:2

**illegal**
181:19

**Illinois**
193:20

**illustrate**
108:4
113:15

imagine
 47:25
 101:16
 139:3
 181:17
 182:12

impact 163:7

impetus 96:1

implement
 111:18
 117:3,4,20
 120:2
 133:5,8
 134:7

implemented
 197:13

implementing
 186:7

implies
 211:2

implying
 131:20

importance
 65:9

important
 64:25
 65:6,23
 114:7

importantly
 8:18 208:4

improving
 188:1

inadequate
 228:7,11

incident
 31:23
 39:6,10,18
 40:11 60:3
 87:7,9
 106:19
 135:22
 141:24
 144:25
 164:3,8
 165:8,9
 173:15
 216:16

incident-based
 148:6

incidents
 44:18
 86:24 91:8
 105:8,10,
 11,14,19
 106:22
 136:7,9
 144:20,22,
 24 147:14,
 23,25
 148:7
 149:9
 192:8
 196:12
 199:20
 229:17

include
 52:10,19
 53:11
 54:18
 62:23,24
 135:2

142:7,8
 175:25
 176:4,7,
 15,22

included
 176:10,14,
 17,19
 204:1

including
 7:14 22:10
 62:18,21
 189:7
 211:23

incorporated
 62:10
 74:24 75:7
 78:5 79:12

incorrectly
 149:10

increase
 184:16,21

independence
 208:15

independent
 25:13 62:8
 147:6
 187:18
 208:5
 209:15
 212:11

indicating
 75:12
 187:9

indicator
 96:14

126:5,10

indicators
 116:3
 119:22
 121:7,12
 123:13
 124:3,6,
 18,23
 125:21,25
 126:7
 132:3,6,
 11,15,18,
 22,23
 133:4,7,
 11,13,14,
 20,21,23
 134:1,5,17

indicia
 119:8,12,
 18

Indirectly
 192:4

individual
 16:8 21:5
 44:10 45:8
 100:25
 138:18

individuals
 163:11

Industrial
 19:4 114:5

Industries
 4:4,22

industry
 11:5,7,10

19:1,19
25:19
26:25
58:15 99:2
114:18,21
120:18
124:22
125:22
129:8
137:23
191:14
207:18,22
229:5,8,11

informal
83:21
185:12,15,
24 186:2,6
187:7,9
200:9
203:19

information
49:19
65:17
66:24
82:14
100:18
117:23
165:8,18
166:2
211:23
213:8
227:5,6

informative
52:25

informed
205:19

inherent
177:15,21,
25 215:6,8

initial  16:3
168:6

initially
17:4 31:19

initials
6:16

Inn  4:19,23
5:18 7:24,
25 8:1,5,7
27:17,22
28:10,20,
24 29:11,
16 30:6,
10,12,14,
16 31:1,16
33:16,21
34:3,11,17
35:7,20
37:2 40:13
57:22 58:8
62:16
64:14
70:13
71:16
74:23
75:17
77:19,24
78:9
79:11,24
80:1,4,22
82:13,22
83:2,4,5,
8,9,18,25
85:6,12,

17,20
94:14,19
97:6,16
99:4 108:1
129:19
138:15
139:10
141:1,9,10
143:14
144:1,8,
19,22
145:3,24,
25 146:8,
9,21
148:22
154:20,23
156:21
157:20
158:12
159:3,6
160:25
162:2,3,8
171:1
172:3,10,
19 176:25
178:20
179:3,8,16
180:23
183:18
185:11
187:10,25
188:16
193:12
194:22
206:6
225:24

Inn's  69:19
79:19

159:2
196:2
217:3
231:20

inside  91:8,
10 93:21
137:14,16
158:13,24

inside/outside
158:25
159:4

inspect  17:4
94:15
233:10

inspected
17:11,14,
15

inspecting
17:18
204:19
233:6

inspection
70:21
71:1,3
73:2 74:23
75:17,20
94:14
147:8
153:13
225:24,25
233:8

inspections
216:17

install
197:14

installed
  194:16,19
  195:1
  197:15,16

installing
  91:10
  194:23

instance
  142:16
  165:2

instances
  84:25
  110:16,17
  174:22

institutions
  56:23

instructions
  112:7
  113:13

intend  35:19
  42:11
  146:7
  231:7

intended
  47:16
  231:17

intending
  35:11
  140:11

intent  43:3
  135:12

Intercontinent
al  161:7

interested

20:11
56:22

interesting
  194:14

interior
  154:21,24
  158:17,19
  159:7

intermittent
  139:10

internal
  123:22

International
  19:3 24:4
  119:16
  180:9
  210:1
  217:12,17

internet
  31:5
  106:11

internship
  22:13

interrogate
  137:11

intervene
  164:15,18,
  23

intervention
  117:14
  154:10
  157:14
  163:19
  164:2,13,

17,24

interventions
  118:9
  120:3,17

interview
  15:5,8
  34:22
  59:21,23
  60:1,10
  61:16,21,
  24,25
  62:5,9
  63:5 67:12
  68:18,19
  78:4,8,9,
  16  79:3,15
  83:24
  99:12
  147:8
  181:4
  182:15,23

interviewed
  14:18
  15:13 16:8
  44:21,23
  59:24
  68:20
  77:23

interviewing
  70:22

interviews
  47:7 59:22

intimately
  222:21

introduce
  4:10

233:17,24

invasive
  108:6
  112:16
  113:9
  130:5,6,23

investigate
  171:13
  183:1

investigated
  13:19 14:5
  148:20

investigation
  18:1,3
  147:7

investigations
  13:25 84:9
  203:16
  208:7
  209:3
  226:3

investigator
  14:1 97:8

invoice  74:7

invoices
  233:21
  234:1,14
  235:1

involved
  10:11
  47:21
  110:14
  111:2
  121:13
  139:24

140:14
143:11
220:24
221:3
223:9

**involves**
88:14
112:21

**involving**
144:20,24
215:11
220:25
221:12

**irregular**
186:12

**Islam**  29:20
32:16 35:7
186:15

**Islam's**
171:17

**issue**  6:22
18:5 39:8
81:10
101:12
105:21
123:24
156:4
176:10
178:9
185:2
190:20
192:9
195:4
205:10

**issues**  51:16

81:9
138:12
216:21

**italicized**
207:7

**items**  6:3
180:18,24
182:18
183:19
203:13
216:16

**iterated**
166:22
167:3

**itty-bitty**
185:8

———————

———————
J
———————

**J.G.**  4:15,
23 5:17
29:1 32:6,
22 37:21
38:19
39:8,19,23
40:6 43:9
46:17
69:24
70:14 71:8
91:5,22
97:23,25
98:11
104:12
107:17
139:22
140:24
141:18

142:7
143:20,24
144:15,21,
24 158:1
173:9,18
213:13
214:10
232:11
233:21
234:6

**J.g.'s**
29:10,15
39:5 41:20
89:19
91:14
234:2

**J.g.]'s**  6:8

**J.G.].**
232:17

**J.w.]'s**  6:6

**jail**  164:17

**January**
30:15,20
70:20
77:18
141:7,11
173:5,8
177:1
206:12
207:2

**Jersey**
151:21

**jewelry**
152:14

**job**  17:1,21

20:24
60:14
138:1,2

**journal**
123:23

**judge**  10:6,
22 26:12
34:8
210:23
211:1,3,6,
13 218:9,
16,22,25
219:3,15

**judge's**  16:6
21:19,22

**judgment**
212:22

**judgment/
discretion**
216:11

**judgments**
32:14

**judiciary**
10:20

**July**  173:8

**June**  38:10,
16 42:9,11
206:9,15
217:7,9
222:13

**jurisdiction**
167:22,23
168:3
169:4
170:17

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: jurisdictions..large

jurisdictions
  168:4,6

jury  35:8
  36:12

justice  13:7
  22:7,9
  53:2
  148:20
  150:13
  151:21

———————

K

Kalb  140:25
  170:25
  171:9
  172:10,19

Karim  4:3
  5:7 23:3
  85:22 93:5
  142:12

Karim's
  43:10

keeping
  181:5

key  23:15
  39:21 41:4
  193:23,24
  204:15

keys  194:1

Kidd  4:8

kidnapping
  139:24
  140:5

kids  200:1

Kikia  28:1,
  9,19
  148:21

kind  17:8,
  15 18:4,25
  19:18
  21:3,11
  40:3 44:1,
  16 68:24
  71:16,18
  72:15
  75:13,21
  76:5,20,25
  78:16
  82:20,25
  95:14
  99:21
  100:2
  101:12
  106:2
  109:17
  125:8,25
  126:9
  129:1
  132:8
  134:3
  135:3
  146:6
  157:11
  158:14,20
  164:4
  191:21
  192:23
  198:23
  201:2
  202:25

  204:18
  215:12
  219:10
  224:5

kindly  4:25

kinds  55:3
  133:14

King  29:6
  144:6
  158:6
  205:11

King's
  171:14

knew  34:11
  145:1
  146:8,21
  203:17
  222:14

knock  96:2

knocking
  39:18
  40:22

knowing
  139:22
  220:10

knowledge
  19:21
  23:14
  24:6,18,21
  34:14,16,
  18,20
  143:23
  145:24
  147:3
  182:18

  218:22,25

———————

L

LA  184:17,
  20

lab  178:11
  181:9

labor  87:12,
  19 88:9

lack  87:21

laid  76:8
  228:20

land  54:3

language
  43:18 50:9
  55:24
  56:18
  70:18
  89:24
  145:22
  147:12
  165:5,13,
  16,20
  166:10,14,
  18,19,25
  167:2,10,
  14 174:11,
  13,15
  177:14,15
  207:8,11,
  13

large  54:1
  182:10,24
  201:24

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: largest..list

largest  19:4
156:24

Las  168:9

lasting  92:6

late  183:6
  204:5

law  4:14
  5:25  7:20
  9:16,18
  11:2  12:25
  13:3,7,10,
  12  14:5,9,
  24  15:4
  16:2,14,15
  22:8  35:21
  44:2  57:5
  102:25
  114:17
  122:7,14,
  19,22
  123:2
  128:10
  130:19
  147:20
  148:1,9
  158:16
  159:21,22
  192:3
  197:19
  210:5
  211:12

laws  121:19
  164:16

lawsuit  6:7,
  8  9:23
  10:4,6,13
  31:20

lawsuits
  10:10
  221:1

lawyer  10:1
  159:22

lay  231:6

laying
  112:19
  160:10
  182:4

layman's
  209:17

layout  76:2
  228:17

layperson
  190:13

learn  77:23

learned
  79:2,10
  189:22
  220:8

leased
  158:18
  159:7

leasing
  196:24

leave  73:25
  155:7
  160:10
  179:2
  183:2
  188:20
  189:5

205:21

leaving
  101:15

led  73:4,7
  187:4
  205:7
  232:25

left  217:24

legal  35:22
  154:18
  210:5
  211:12
  215:12

lens  176:17

letter
  170:24
  171:22,24

letting  9:5
  219:4

level  116:25
  117:2,6,
  11,12
  138:19

levels  117:9

Lewis  4:17
  7:7

liability
  179:4

liable  36:10
  37:2

license
  194:13

life  152:1,

2

light  76:10
  191:1
  197:13

lighting
  71:22
  73:2,20,22
  115:23
  187:5

lights  73:1

limitation
  219:5,6

limited  7:14
  147:4
  197:4
  205:3
  218:24
  219:16

limiting
  128:22

list  31:12
  40:2  42:23
  48:6
  56:10,14
  61:17
  64:2,8,10,
  20  69:2
  99:22,23,
  25  100:1,2
  119:4
  127:10
  130:1
  168:1
  174:5,11
  190:10

205:22
216:8
217:14

listed 13:15
41:13
57:13 58:4
174:14
177:7
189:8
193:22
216:16

Listen 57:23
142:14

listened
46:25 47:2

listening
200:12

lists 63:23
64:5,13,
16,20
66:14,20
125:25

literally
167:21
233:10

litigation
4:9 26:11
50:13
209:20
215:11

live 187:1
199:16

living
109:20

LLC 224:15

lobby 113:14

local 19:7
122:20,23
123:2

located
97:16

location
87:20,22
88:23
117:22
118:2,4
143:17,18
154:16

locations
87:18
88:1,16
117:21

lock 137:12

locks 76:14
137:11
158:22
187:1,2

lodging
12:2,7
50:11
123:11,16

log 84:25

logs 81:11,
12

loitering
183:5
197:9
204:21

long 73:23
74:13
78:14 92:6
100:22
102:4
103:23
138:4
210:25

long-haul
125:20

longer 95:3

looked 24:8
39:12
42:21
45:23
53:16
71:5,6,21
75:25 76:2
123:24
124:16
138:25
225:6

lookout
98:3,4

losing
195:24

lost 39:21
41:4
150:11
161:17
193:23

lot 15:1
44:19
48:13
50:15
53:25

65:18
66:3,6,8
68:5 71:9
73:3,19
76:1 89:22
91:22
92:7,17
104:23
107:1
108:5
124:7,9
125:4,16
130:5,22
134:10
135:25
137:20
144:1
153:24
159:19,21
163:4,23
167:6
183:6
196:22,23
198:4
212:2
219:25

lots 89:20,
25

loud 200:12

loudly 40:22

Louis 153:20

love 190:21

lovely
101:10

ludicrous
91:12

223:10

lunch   104:3,
8

—————————
          M
—————————

made   14:7
  38:15 42:6
  125:13
  169:14,15
  187:3,25
  192:20
  194:25
  204:8
  217:8

Magazine
  119:16,17

maintain
  68:3

maintained
  205:22
  207:21

maintaining
  207:17

maintenance
  65:16
  94:17

major   125:5,
  18 206:17

majority
  41:17

make   9:2
  15:22 16:3
  25:25
  26:10

32:13 35:9
73:3 82:16
83:12
89:23
91:13
125:2,4,
15,22
130:2
134:10
150:1
179:3
186:22
198:4,14
206:20
208:18
226:11
230:6
234:5

makes   16:5
  21:9 90:23
  109:16
  155:8
  164:2
  174:13
  198:15

making   110:4
  116:2
  122:25
  200:11

mall   54:4
  158:15

management
  22:9 23:19
  24:10
  25:4,6
  41:1 45:24
  47:4,10

154:4
155:12
159:2
189:4
193:4
202:24
203:20
211:24
216:18

manager
  63:9,11
  81:9
  150:19
  151:5
  153:5
  154:12
  155:1,10,
  14,25
  156:2,13
  159:4
  163:3
  198:12
  205:19

managers
  44:24
  186:18

managing
  52:3

manufacturer
  209:13

Marcus
  151:13,16

marked   37:22
  38:1,5
  96:23
  126:16

235:8

market
  125:17

marketing
  23:20

marking
  96:20
  126:14

mass   121:2
  178:7

massage
  88:20

master's
  22:9

material
  39:3
  216:11

materials
  34:19,23
  40:8 42:15
  43:3
  57:10,12
  58:3,5
  59:19
  63:25
  69:1,9
  79:17
  92:12
  135:14
  145:11
  147:5
  228:7,22
  229:6

math   83:12

mathematical
  213:1

matter   4:4,
  23 37:21,
  25 38:4
  46:17 82:7
  170:1
  179:14
  215:10

matters   10:7
  78:6
  209:20
  233:21

mayor's
  14:25 44:3

Mcclelland
  185:18
  189:3

Mccranie
  4:14

Mcdowell
  221:22
  222:3

meaning
  117:3
  208:13
  209:12

meaningful
  169:9

means   23:14
  24:1 44:9
  46:3
  164:18,24
  205:8
  208:15

  211:4

meant   94:11
  216:9
  233:17

measures
  46:7 47:7
  48:6 79:19
  117:4,5
  118:21
  185:23
  197:16
  201:7
  202:1,8,22
  203:8
  215:22
  216:1
  228:10,12
  229:16

mechanism
  100:23

media   160:1,
  5 163:13

medical
  12:14,16
  112:17
  113:8
  130:9,21
  133:15

medicine
  12:19
  114:16

meet   5:15
  139:23
  202:2
  203:5
  210:9

meeting
  48:23
  101:6,16
  183:6
  202:11
  205:14

meetings
  49:16
  85:21

member   11:23
  12:1 67:10
  139:4,10,
  15,19
  203:24
  207:25
  222:24

members
  61:17
  62:16
  66:4,15
  100:7
  209:22
  210:2,15
  211:10,14
  212:14,17,
  19

membership
  166:21
  211:18,21
  223:4,23
  224:6,7

Memorial
  8:2,6
  97:17

memorize
  114:15

memory   39:1
  50:4,5
  77:16
  192:17

men   183:7

mention
  94:18
  222:12

mentioned
  15:17 18:9
  26:19
  31:17 42:8
  44:20
  67:11
  75:24
  88:22
  89:20
  90:17
  121:8
  133:18
  137:4
  153:7
  155:23
  158:12
  214:6
  227:22

mentioning
  16:12

mere   118:18
  164:11

messages
  92:12,20,
  22 93:7,11

met   5:13
  44:4 95:22
  202:10,16

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: meth..mitigating

223:6

**meth** 178:11
181:9

**methodology**
149:18,19,
22,23,25
150:6,8
156:20
165:15,21
166:5,8,
14,18
167:1,4,7,
12,15
173:12
206:1,7,
11,13,18,
24 209:18,
19 210:10
212:14,21,
25 213:7,
11,12,22
214:16,17,
21,22
215:1,4
216:24
223:24
224:1,2,3,
4

**methods**
49:4,6
50:2
111:18
129:11
145:4
204:22

**MGM** 178:7
181:7

**middle** 86:10
103:14
111:17
150:22
169:25
170:4
194:17
198:23,24

**midnight**
72:3,4,11,
23

**mile** 200:1

**mind** 13:16
31:14 36:1
40:19
48:14
49:8,10
50:6 54:4
67:2 87:9
114:6
134:25
143:2
166:17
209:2
217:11,22

**miniscule**
185:1

**minor** 16:10
101:7
102:6
103:1
104:16
109:4
149:3
159:24
160:6,8

162:19
190:14
191:4

**minors** 27:17
28:10,20
29:11
33:20
93:18 95:8
104:17
105:3
107:7,13
110:8
158:4
159:14,17
183:5,12,
13

**minus** 83:14,
15

**minute** 92:18
165:24

**minutes**
74:13
169:18
217:24
226:9
227:9,12

**misidentified**
108:24

**misnomer**
161:4,25

**missed** 41:11

**missing**
69:23
97:12
98:10,21

99:13,22
101:3,7,15
102:6,11,
12,19,22,
24 103:7,
11,12,19
104:16,22,
23 107:13
145:1
168:15
189:23
203:22
217:20
232:22,25

**misstating**
52:6

**mistaken**
80:16
92:16
102:16
121:13
127:22
144:11

**mistakes**
130:2

**misunderstand**
136:6

**misunderstandi**
**ng** 52:7

**mitigate**
134:23
192:13

**mitigated**
163:2

**mitigating**

43:11
49:4,6
50:10 99:3
134:16
159:16

mitigation
55:6,17

mixed-use
53:10

Mobley  4:17
235:21,22

modified
6:15

modifying
188:1

moment  52:8
67:4,13
227:20

moments
90:18

money  31:6
33:21
59:10
85:18
208:18

monitor  4:6
17:3 70:6,
8 85:13,18
96:11
104:1,4
173:23,25
190:2
197:1
198:16
227:14,16

monitored
196:14

monitoring
95:18
196:13,20
197:5,6,8,
9,10 198:9
202:25
209:14

monitors
197:18

month  17:19
141:12
175:6
217:11

monthly
17:17

months
136:13

morale  17:14

morning
4:13,16
5:12,14

motel  11:12
45:14

motel/hotel
94:21

motels  45:8
56:14,19

motions
220:23

motor  45:10
51:18 66:2
76:5

199:20

Mountain
71:16

mouth  163:13

move  155:16

moved  88:19,
20,21
171:25

movie  136:12

moving  87:24
88:15,18

multi-  53:10

multiple
54:2
142:17
143:5,11
163:1

murder
177:3,4,7

Murrah  17:7

music  200:12

myriad
178:10

myths  136:18

─────────────
        N
─────────────

Naeshia
221:22
222:3

named  12:12
70:12
151:13

197:3

names  6:13
144:5

narrow  63:19
192:18

nation's
121:19
122:7,14

national
105:24
106:24
112:10
127:5
148:6
189:23
217:19

nationwide
105:14
106:25
147:22
214:14

natural
177:6,9

nature  66:1,
8 90:22
214:12

NBI003097
97:4

NCMEC  217:19

nearby
197:23
199:21

necessarily
19:20

51:19 52:4
72:8 73:6
75:4 80:13
85:1 87:10
92:5 123:6
130:18
144:4
203:3

necessity
23:9

needed 42:15
43:4 48:10
233:8

nefarious
48:17
135:3
136:25
202:25

negligence
7:20

nice 5:14,
15

night 44:25
45:15
61:2,4
70:21
71:1,20,
21,25
72:6,8,16,
21,24
73:10,13,
20,21
74:12,15
75:16 77:7
83:10 92:6
138:21

183:6
196:16
198:25
205:5

nightly 69:9

nobody's
105:20

noise 200:11

nonemergency
168:25

nonmembers
212:18

nonsecurity
11:21

nonstranger
162:15,21
163:8,14,
15

nonverbal
111:19
112:4

nonverbally
130:15

norm 120:14
184:1
193:25
194:6
204:14

normal
131:20
173:13,16
193:20
233:3,14

north 161:7

Northbrook
4:4,22

Northwestern
197:3

notable
50:23

notably 55:8

note 8:24
74:17
226:12

noted 91:15

notes 59:21,
24 61:21,
24 62:5,6,
8 74:14,
22,25
78:4,5
226:10

noteworthy
174:6,14
175:25

notice 6:18
69:23
98:14,20
99:6,17
100:8,10,
13 101:2,8
102:13,25
104:12
215:13
232:15

notices 7:10
98:5 102:7

104:16

notion
110:12
126:11
147:18
161:3
185:19

notwithstandin
g 227:19

Nova 70:12

November 4:5
140:24
141:8,10,
11 142:22
144:8,25
217:13

nowadays
73:4,8
84:22
196:23

nuisance
156:24

number 6:5,
6,7 22:5
45:2,25
52:9 53:16
54:7
62:19,20
65:12,13,
15,19,20,
21,22 66:5
71:12
81:18 93:8
95:20
96:13 98:8
104:16

105:5,9,
18,21
106:25
113:5
124:14
137:7,14,
17 145:2,5
148:9,14
151:8
166:19
168:24,25
178:3
182:24
183:2
194:9,19
196:9
201:14
211:24
216:8
223:1
228:20
229:4,15
233:2

**numbered**
150:9
216:6

**numbers**
61:22
66:14
95:17
107:2
127:20,22
168:21,22
185:1,9
219:17

**numerous**
89:12

— O —

**Obie**  27:12,
16 148:21,
24 158:4

**object**  28:11
34:21
36:13 93:3
142:10
144:13
179:20

**objection**
7:1,3
21:1,18
26:5,18
27:19,23
28:6,16
29:12,17
35:14 37:3
47:23
58:16 60:7
61:14 64:7
65:2 66:16
67:1,22
84:2,20
85:22
90:10
91:19
92:25
94:23,24
99:7,9
101:9
102:9,10
103:4,15,
17 104:20
105:17
112:5

117:17
118:12
120:12
121:20
122:16
131:11
132:7,20
134:20
135:17
146:3,11
149:5
162:22
167:19
172:12
181:22
182:11
183:9,10
184:24
187:14
188:3
189:16
192:15
199:7
213:17
223:14
234:17,21

**objections**
6:21

**objective**
121:22
164:12

**observable**
131:4
179:16
228:23

**observing**
73:18

**obtained**
223:4

**obvious**
31:10
105:20
157:21
199:18

**occasionally**
126:12
209:4

**occur**  78:8
87:17
89:2,9,10,
11,13,15
90:6
110:17,22
111:6,9
152:12,25
153:2
155:20
178:10,13
199:4
200:19

**occurred**
67:12
175:15
191:4
192:9
220:12

**occurring**
88:18
186:12

**occurs**  51:5
87:7,9,18
88:4,12
90:21

October
  98:17,20,
  21 141:6,
  10

odd  138:21
  139:2

off-duty
  81:1,3,16,
  21,22
  82:14
  83:10
  198:13
  205:2,18

offender
  150:18
  152:20
  154:6,11
  157:21
  163:7

offender's
  154:5

offenders
  151:3
  158:4,7

offense
  44:14
  86:18
  165:8

offenses
  168:1
  169:16

offensive
  222:25

offer  9:9
  32:25 35:4

146:20

offered
  189:14

offering
  196:25

office  14:25
  17:9 44:4
  54:5 66:4
  71:12
  73:20
  76:18,20,
  23 97:10
  99:13,18,
  20 100:3,
  6,18
  101:19,23
  151:22
  158:15,16
  196:15
  203:23
  232:15

officer  13:1
  14:5
  16:14,16
  61:2,3
  62:18 66:6
  81:6,19
  141:1
  143:4,25
  154:9
  164:7,11,
  14,19
  169:1
  198:13

officers
  17:5,11,19

18:6 62:25
  68:20
  80:10,11
  81:2,3,4,
  5,20,21,22
  82:1,3,7,
  14,21
  83:11
  122:8,14
  141:19
  144:7
  156:25
  161:15
  171:12
  183:16
  186:23
  197:20,23
  198:20
  200:13
  205:2,5,18
  208:12

officers'
  82:24

oftentimes
  81:25
  174:23

OGCA  112:9

Oklahoma
  17:8

on-site  39:9
  47:6,10
  67:10,12

one-bedroom
  175:6

one-column
  206:21

one-off
  101:13

ongoing
  50:25 53:3
  55:2
  101:14

online  68:10
  85:13
  90:9,12

open  76:20
  90:21
  137:8,9,14
  195:19

opened
  137:13,18

opening
  137:15
  149:24,25

operate
  120:10,11

operation
  120:8

operational
  96:16
  202:22
  203:8,11

operations
  11:16,19,
  20,21

operative
  173:3,4,7

operator
  57:6 84:15

operators
  84:5

opinion
  20:23
  25:9,19
  26:3 32:3,
  11 33:4,8,
  14,19
  34:1,4,10
  35:19
  36:3,8,15,
  18,24 89:1
  91:1,2,20
  93:17
  95:12 99:1
  100:12
  103:2
  104:16
  107:25
  108:21
  109:3,8
  112:1
  117:13
  118:8
  120:1,10
  122:12
  134:2
  138:14,16
  140:16
  145:10
  149:3
  162:19
  167:16
  202:10
  213:11
  228:6,11,
  15,20
  229:4,15

  230:3

opinions
  32:21,24
  33:3,6,11
  35:24 36:1
  38:18,21,
  22 117:8
  209:22
  213:23
  221:22,25
  222:1
  226:16,23
  227:23,24
  229:23
  230:4,7,
  11,12,13,
  17 231:1,
  4,11,21,23

opportunities
  71:7,10
  76:1,9
  152:1
  157:12,14
  205:3

opportunity
  54:9 91:24
  99:17
  152:21
  163:16

oppose
  226:18

opposed
  111:13
  186:2

opposite
  230:1

order   6:11
  19:24,25
  24:20 37:1
  49:20 56:5
  67:20
  151:7
  152:11
  155:19
  157:9
  215:20
  228:1
  230:10

ordering
  235:15

orders   81:25
  219:8

ordinance
  94:21 95:5
  204:4

organization
  14:16
  100:16,25
  124:2
  126:2

organizations
  11:24
  12:12
  100:19
  117:19
  132:5

original
  200:22

originally
  152:6

ostensibly

  156:3
  158:3
  175:1

outcomes
  118:19
  189:19
  190:5,7,25
  191:10

outer   152:7

outline
  228:13

outlined
  223:3
  229:13

outset   32:19

overreported
  105:25

overseeing
  179:8

Overtalking
  218:4

overview
  216:4

owner   10:5
  61:11
  63:8,11
  139:10
  158:22
  159:2,3
  203:17

owners   12:4
  54:1
  139:11
  228:23

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023
Index: owns..past

owns  152:16

---

**P**

---

p.m.  69:11
71:4
72:11,15,
18 80:6,14
82:15
83:6,13
104:3,5
173:23,24
174:1
200:14
227:14,15,
17 235:18,
25

package
235:13,16

packet  204:7

pages  107:21
124:8
127:14
129:4,6
140:3
166:11
167:8
184:8
188:9
214:19
215:2
216:5,16,
21 223:16

paper  37:12,
16 190:11
204:9

par  229:7

paragraph
43:8,10,
14,18 49:3
50:10
55:4,25
56:8,9
86:10,16
88:3,25
90:15
108:10,12,
21 111:17,
20,23
113:16,18,
22 118:22
160:14,19
163:22
169:25
170:7,11
179:7
180:12,22
184:4
193:9
194:18
198:22

parameters
225:25
226:6,7

paraphernalia
181:15,19

parents
157:7
158:3
163:5

park  76:6
89:12

111:11

parked  92:1

parking
45:12
66:3,6,8
71:9 73:19
76:1
89:20,21,
25 91:22
92:7 144:1
153:24
163:23
183:6
194:20
195:24

parlors
88:21

part  31:15
42:25 45:6
46:6,8,25
59:19 62:7
66:11
75:19 87:8
92:11
93:14
107:12
111:22
114:7
122:21
138:1
140:24
141:4,8
143:1,2
159:23
162:11
163:17
164:2

166:11,16
168:17
170:14
183:15
187:6
191:13,16
209:15
216:6
223:6,21
230:23
231:2

participants
128:9

participated
78:18

participation
26:24

parties
164:15
221:8

parts  160:4
190:3

party  57:22
164:16

pass  24:20,
21 68:9

passage
192:2,4

passed  19:11
226:20
231:18

passenger's
153:21

past  67:15

120:22

path  157:24

patients
  113:12

patrol  82:2,
  10,13,17,
  24

patrols
  80:24

pattern
  179:14
  180:1,5
  201:1

patterns
  199:11,12
  200:4

pay  85:7

paying
  133:21

payments
  85:8

PDF  235:13,
  16

peephole
  158:23

peer-reviewed
  115:11
  116:5
  123:23

penal  15:21

pending  8:21
  119:2
  121:9

people  16:12
  39:18 52:2
  59:12
  60:21
  61:6,8,12
  62:13,17
  65:7,8,13,
  16,22 66:5
  73:4,7
  84:14
  95:21,24
  96:13
  110:4
  126:8
  131:16
  135:3
  136:5,10
  137:1
  142:8,16,
  17 143:4,
  11 144:4
  151:25
  152:2,4
  155:4
  157:19
  159:12
  161:8,18
  177:6,8
  182:3,24
  183:2
  188:19,21,
  24 189:5,
  21 190:17
  191:5
  193:25
  195:15
  197:8
  200:11

204:23
  205:6
  212:1

percent
  20:14,16,
  17,18
  120:25
  184:16,18
  190:15,16,
  17,18
  191:5,6
  209:3
  220:6,7
  224:24
  225:16,18,
  19,21,22

percentage
  225:14

perfect
  77:17

perform
  210:3

performed
  52:16

performing
  213:4

period
  39:11,12
  54:25
  79:22,23
  80:1,4,8,
  22 82:12
  83:4,8,17,
  23 85:6,
  12,17,20

90:7 141:6
  159:2
  173:3,4,7
  192:8,11
  229:8,12

periods
  39:16
  183:7

permitted
  7:12

person  16:4
  59:24 61:1
  63:10
  69:23
  97:13
  98:10
  99:22
  102:13,19,
  22 103:7,
  11,19
  116:16
  139:24
  145:2
  148:25
  154:6
  158:5,20
  159:9
  183:1
  190:13
  194:10,14
  205:21
  232:22
  233:7

person-on-
person
  152:15

personal
  88:23
  111:10

personally
  13:20 30:5
  60:4 62:2
  120:16,20,
  24 162:10

personnel
  68:12
  216:17

persons
  99:13
  101:15
  104:22,23
  176:13,18
  203:22
  232:25

perspective
  96:16
  203:11

pertain
  10:13
  108:15

pertaining
  229:12
  232:11

phase  86:11,
  14,18,20
  87:7,14,17
  88:4,14
  89:1 90:5,
  23 110:22

phases  86:20
  87:12

phenomenal
  134:24

phone  81:8,
  11 160:12
  194:9

phones  83:1
  110:3
  160:10
  204:23,24

phonetic
  190:11

photos  75:1,
  2,3,6,13

phrase
  180:17
  201:19
  213:15

physical
  24:9 25:7
  108:6
  128:21
  130:8,22
  140:9,17
  163:10
  194:18
  204:21
  205:1
  212:2,4

physically
  73:12
  195:20,25
  209:7

picture
  75:11
  148:15

pimps  179:8

pinpoint
  139:17

pit  169:8

pitch  23:20

Piza  197:3

place  8:7
  25:24 46:7
  47:8 52:3
  65:18 73:5
  77:24
  87:24,25
  90:9,12
  106:3
  128:21
  132:21
  150:18
  151:4
  152:19,24
  154:12,13,
  14,15,19,
  20,22,23
  155:2,3,4,
  10,12,14,
  15 156:1,
  14 157:20
  158:11,12
  159:3
  160:22
  163:3
  185:24
  186:18
  190:22
  199:9
  202:8
  228:10

places  88:5,
  19 89:3,12
  160:23,25
  161:13,14,
  21 163:2

plaintiff
  6:4 27:3,7
  29:1 32:4,
  6,9 37:22
  38:1,5
  41:20
  69:24
  96:23
  97:25
  104:12
  126:16
  139:22
  143:20,24
  220:3,7
  221:5,18
  235:8

Plaintiff's
  126:19

plaintiffs
  4:15 5:17
  6:13,14
  33:15,20
  34:12 35:6
  36:16,25
  39:8 57:21
  140:3,12

plaintiffs'
  36:19 40:6
  43:9 55:25
  70:17
  86:7,8,9
  96:21

97:2,3
104:11,13
107:17
113:17
126:15,25
127:3,9
128:18
129:5,14
138:8,9
139:9,21
140:23
144:18
147:10,12
149:16
150:3,15,
17 160:13,
19 162:13,
14 165:1,3
169:24
170:3,10
173:6
174:4,8,
11,13
177:10,12,
16 178:15
179:6,24,
25 180:22
184:2,8
193:2,3
194:15
196:1
198:19
201:5
202:15
205:24
233:25
235:7

**plan** 33:14,
19

**planning**
9:2,5 35:3
140:11
146:20

**play** 21:23
65:8
153:10

**plea** 69:19

**plenty** 126:7

**plot** 54:3

**point** 8:19
16:6 23:10
28:13
44:19
48:16
70:18 71:7
78:25
80:18
82:10 96:5
101:25
110:20
116:5
119:22
130:19
134:3
147:11
149:15
150:7
159:1
185:2
195:6
202:3
212:1
220:6

231:12,18
234:23

**pointing**
91:21

**points** 7:25
8:17 71:12
145:21
178:24
212:20

**Polaris**
118:24
119:3,12
121:14
126:21
130:3,10
131:15
132:4,25

**police** 39:9
44:12,17
49:17,19
51:24 52:3
61:2,3
62:18,25
68:20
81:1,3,5,
21,22
82:3,7,14,
24 83:11
94:5
101:15
119:15,17,
25 122:11
128:21
140:25
141:1,19
142:7,9
143:3,4,9,

16,25
144:7,15
147:13
154:3
156:25
161:10
164:7,11
168:13,18,
20,21,24,
25 169:6,
11 170:17,
21,25
171:9,11,
18 172:1,
10,13,16,
19 183:15
186:23
196:10
197:20,22
198:13,20
200:13
204:3
205:2,5,6,
18

**policies**
17:13
203:21

**policy**
94:15,20
196:5

**politics**
164:21

**pools** 90:7

**population**
107:12

**populations**

107:11

portal
  68:10,15,
  16  84:25

portals  68:5

pose  131:5

position
  9:9,12
  209:25

positioned
  73:12

positive
  128:23

possessed
  145:24

possibly
  74:8
  164:18

post  81:25
  99:19
  101:18,22

Post-covid
  161:19

posted  99:12
  100:3

posting
  100:18
  203:22
  232:15

posture
  155:14

potential
  15:2

117:22
124:12
137:6

power  21:3,
  11

practical
  43:11 50:8
  114:18
  125:2
  134:7

practice
  7:13,18
  11:17
  13:24
  20:15 26:9
  50:22
  58:24 82:7
  85:24,25
  86:4 95:17
  96:16
  116:19
  138:22,24
  173:14,16
  196:6
  204:12
  233:4,14

practices
  48:25 59:2
  81:20
  114:25
  217:13

pre-9/11
  16:21

pre-covid
  225:16

preceding
  177:1

predicated
  162:5

preeminent
  151:10
  201:15

prefer  168:2

preference
  20:16,17

preferential
  25:16

preliminary
  6:3

premise
  219:18

premises
  175:14
  176:17
  210:10,16
  213:13,16

preparation
  58:6 59:20

prepare
  42:16
  47:13
  48:19

prepared
  33:12
  38:13 78:6
  206:14
  207:5
  219:13
  222:9

presence
  118:18

present  6:18

presentation
  114:3,4

presentations
  26:24
  124:1
  217:14

presented
  131:15

preservation
  7:14

preserved
  6:23

pretest/post-
  test  117:2

pretrial
  220:23

pretty  73:19
  115:22
  186:17
  194:14

prevalence
  105:13
  106:2
  136:6
  214:13

prevalent
  177:22

prevent
  90:24
  91:18 92:4
  93:19

95:9,12
162:16
163:16
164:4,22,
25 198:1

prevented
162:20,23
164:10
229:18,21

preventing
163:24
164:12

prevention
18:13,18
22:15
49:16
81:23
85:21
148:13
201:21
204:8
218:13

previous
86:15

previously
16:23 35:3
106:6
218:8

primarily
51:11
56:25 59:7
123:5
133:15
151:22
168:8
189:21

196:15
209:1,9
211:5,18,
21

primary  33:4
36:3
121:22

print  68:11

printed  37:8

printing
85:1

prior  5:21
8:16
115:17,19
215:1,5
218:11
219:14
222:8
231:18

prison
164:16

privacy
93:25
178:8,14

private  14:1
93:23
100:4
111:9
113:11
135:4
154:24
178:1,2,11
198:3
208:6
209:3,9

privilege
6:22

proactive
196:13,20

proactively
197:24

probation
158:9

problem
40:20 73:2
82:5 91:23
109:19,22
119:14
136:2,4,5,
11,16
137:8
148:13
152:9
155:18
156:23
157:10,13
161:16
163:1
169:3
170:19,23
174:17,20
183:12
186:25
190:20
191:7
228:25

problems
109:21
185:18

procedure
7:13 47:13

procedures
17:13

proceeding
210:5
211:13
218:3

proceedings
4:1 235:25

process
19:14
45:24
47:13
86:17,18
110:12,14
112:21
155:7
186:7
187:7
193:7,13,
18 194:9,
14 200:9
214:7
223:4,6
233:3

produced
57:20
64:13 97:5

product
208:8,15
209:12,15

products
208:19

professional
18:25 24:4
25:18
210:1

223:1

**professionals**
23:19
128:10

**profiling**
13:14

**program**  19:6
46:10,15
77:24
78:11
79:11

**programs**
55:7  56:1
216:18

**prohibited**
194:23,24
195:2,4

**project**
15:9,14
16:21  20:1
44:2,5
76:3
126:21
127:6
193:22
197:12

**projects**
19:23  44:8
53:25  54:1
56:10,12,
17,19,23,
24  170:20

**promising**
115:6
138:3

201:18,22

**prompted**
185:5

**promulgate**
132:6

**promulgated**
132:3
180:9

**proof**  84:17

**proper**  133:2

**properly**
7:10
132:12

**properties**
50:16  51:1
52:10
53:10  54:2
55:3  57:7
161:12,17
197:17
199:12
203:5

**property**
20:9  39:14
44:19  47:5
51:12
52:12  54:1
57:5  71:5,
6,13  72:8,
18  73:14,
15,18,23,
25  74:1,3,
15  79:24
80:2,5,15
82:18

83:5,9,19,
21  90:2
91:6
103:13
135:23
152:13
153:14
154:17
155:7
156:17
168:20
170:18,22
172:11
175:8,9,10
176:13,23
183:3
185:13,18
186:18
187:19
188:23
189:6
195:24
202:5
205:4
214:23
219:15
232:23
233:1

**proposal**
187:21

**proposed**
134:18

**proposing**
123:4

**proposition**
223:10

**prosecuted**
148:21

**prostitute**
15:25
137:15

**prostitutes**
15:5,18
44:22
179:9

**prostituting**
137:2

**prostitution**
48:3  50:20
51:19
59:15
148:10
175:9,16,
20  176:20
179:15
185:22
190:18
204:2
205:8

**protect**  46:1
90:24
121:23
159:12
215:23

**protecting**
46:3,5,13
215:24

**Protection**
18:24

**protective**
16:22

153:10

**provide**  9:12
32:3,11
33:14,19
34:1,10
35:19
36:8,15,
18,24
53:19
64:23
106:6,18
110:2,3
134:15
135:14
182:20
189:12
196:10
205:15,16
209:20
210:22
221:21,25
224:3,4,5
229:6
230:3

**provided**
11:6,10
17:23
38:18
42:22 83:3
99:2
158:21,22
190:9
197:18
223:15
224:1,7
226:21
233:23

235:2

**provider**
11:12
14:12

**providers**
112:17

**providing**
156:15
214:18

**psychiatrist**
12:21

**psychologist**
12:23

**public**  76:4
89:2,11
90:9,11
160:11

**publications**
22:22
23:11
55:13
217:14
224:16

**published**
21:7 22:13
42:21
55:6,16,19
56:6
123:23
190:12
201:23

**publishing**
23:6

**pull**  106:5

114:12
116:10
132:9
195:15

**pulled**
44:11,16
46:24 47:4
95:1

**pulling**
116:12

**pumping**
153:20

**purported**
126:7
224:12

**purpose**  72:5
108:3,8
161:2,23
210:8

**purposes**
6:10 7:11
9:5 94:10
160:22
235:6

**purse**  152:14

**pursuant**
7:10

**purview**
159:24

**push**  195:17

**pushed**
206:20

**put**  12:11
62:6 68:12

112:12
118:25
127:3
185:20
195:10,12
197:17
200:13
202:7
225:25
226:5,6

**putting**
187:4
195:8

---

**Q**

**QR**  82:19

**qualifications**
21:23
186:20
223:22
224:7

**qualified**
19:25 21:9
25:21
120:2,9,11
183:19
212:13
218:8,16
220:16

**qualifies**
19:20
21:13,16
22:3

**qualify**
25:10,11,

12,20
207:25

quality 17:2
  21:3,4

question
  6:22 26:17
  34:8 42:4
  47:16
  51:22
  52:14
  60:11
  63:8,18
  65:17
  78:19 81:5
  82:11 88:2
  103:6
  106:7,15
  107:5
  110:6,20
  112:24
  114:2
  115:13
  118:14
  121:24
  124:12,21
  132:12
  134:24
  135:18
  138:13,18
  141:5
  144:14
  146:6,23
  147:2
  157:9,15
  159:19,20
  172:25
  174:17

177:2
178:24
179:9
182:5
184:9
185:4,5
189:9
192:25
195:3
196:22
197:6,10
200:17,22,
23 211:8
222:8
232:9

questioned
  232:10

questioning
  28:17
  112:16
  232:2,12

questions
  8:21 28:13
  41:24 42:1
  58:2 62:3
  79:18
  102:3
  108:6
  113:9
  124:10
  126:23
  127:10,13,
  20,25
  128:9,15
  129:4,6,7
  130:6,23
  131:5

179:21
182:13
186:1
189:11
225:10
226:23
231:16
232:4,6
234:8,10,
20,23

quibble
  23:22

quick 40:18
  42:4
  103:22
  175:3
  226:12

quickly 92:7

quiet 200:15

quote 46:17
  141:3
  144:14
  167:3
  180:24
  201:25
  211:11

quote/unquote
  115:12

quoting
  201:14

_____

_____
    R

raise 4:25
  42:1
  183:14

rambling
  138:4

randomized
  115:11,19,
  25 117:1

range 53:20,
  23

rape
  174:23,25

rapes 175:9

rare 115:22
  134:13

rarely 94:4

ratio 138:15

raw 44:16

read 108:22
  114:6
  141:24
  166:12
  171:20
  230:22
  235:12

real 133:23
  191:7
  208:2

reality
  136:21,23

realize
  169:19

realm 148:2
  203:19

realtime
  67:7

186:8,12
196:7,15
197:1

**reason** 9:8
111:2
126:13
134:11
164:9
183:15
232:22
233:6,12

**reasonable**
6:18 41:8
101:18
109:24
134:6
201:8
202:7
228:10

**reasons**
126:4,8
223:11,15
228:13,18

**rebut** 222:6
227:5

**rebuttal**
222:9
226:13,14,
19,21,23
227:21
231:18

**rebutting**
221:22
230:4

**recall** 12:13

24:16
44:7,18
47:25
48:5,12,22
49:2,11,
17,18
50:1,3
60:18,19
64:3,5
69:5,7
70:2 72:2
73:16,17
77:8
78:12,14,
23 85:11
87:5
116:22,24
117:5
139:17
141:7
183:22
189:22
190:3

**recalling**
189:2

**receipt**
100:13
102:6

**receive**
42:16
82:13

**received**
40:9 43:4
57:10,13,
20 58:5
59:20
69:17

98:13
206:5
217:3,5
223:20
227:21
233:20

**receives**
101:2
104:17
106:24

**receiving**
6:18 99:5

**recent** 54:24
124:15
133:18

**recently**
50:22

**recertificatio
n** 19:11
26:22

**recess** 70:7
104:3
173:24
227:15

**recite**
146:24

**recognition**
95:20 96:3
137:4
198:7,8

**recognize**
35:5 210:2

**recognized**
23:18
207:15

**recollection**
44:2 60:12
64:1,10,19
85:16
93:15
142:24
143:12,13

**recommend**
58:11 59:4
101:5,20
130:3
132:23
133:5,8
138:23
187:16
190:22
208:14,18
209:13
232:16,21

**recommendation**
192:21

**recommendation
s** 49:15
99:3
172:11
187:25
195:1

**recommended**
187:11
196:19

**recommending**
130:4
191:8
208:11

**recommends**
208:8

record   5:13
  6:2,9,15
  7:1 8:25
  68:15
  70:4,6,9
  93:4
  103:24
  104:2,5
  146:13,25
  149:6
  173:21,23
  174:1
  177:8
  226:9,12
  227:2,3,8,
  10,12,14,
  17,21
  235:19

recorded
  62:5 79:3

records
  67:19,23,
  25 68:3
  85:8
  130:9,21

recruitment
  86:21,25
  87:1

red   118:23
  119:21
  124:3,5,23
  125:21
  131:9,12,
  13,18
  132:3,6,9,
  14 134:17

REDIRECT
  233:18

reduce   183:2
  194:19

reduced
  198:24

reduction
  96:8

refer   123:7
  137:22
  140:6

reference
  102:15

referenced
  62:14
  75:16
  149:22

references
  6:14 42:23
  55:12
  102:17
  136:17
  150:6
  190:10
  206:23
  224:5

referencing
  7:17

referrals
  84:5

referred
  84:15
  123:8
  203:18

referring
  6:12 7:24
  8:1 37:11
  40:22,24
  41:19
  56:20
  90:18
  113:3
  116:14,15,
  20 134:1
  148:25
  161:18
  166:9
  171:15
  207:1

refined   47:8

refining
  188:2

refuse   160:2

regard   83:3
  231:14

registration
  76:6

registry
  49:21
  194:3,10
  205:13,15

regular
  85:21

regularly
  94:9

rehabilitation
  156:13

relate   10:7

related   18:3
  66:23
  189:11
  209:24

relates
  47:17
  89:1,14
  90:5
  111:24

relating
  69:24
  202:17,18

relationship
  107:6,8,10
  185:6

relative
  76:11
  194:1
  201:6

relevance
  65:19

relevant
  41:25
  102:7
  103:1
  104:18
  167:17
  169:13
  229:12

reliable
  9:12
  105:23
  106:3
  124:6,24
  125:10

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023          Index: rely..represent

rely 133:4,
7 134:19
135:15
168:12

remember
24:15
33:22
44:14
72:22
74:13 77:6
79:8 95:6
104:13
142:12,16
145:6
167:1
172:7
219:13
232:12,18

remove 153:1
155:20,21

removed
31:22 60:2

renew 188:25
189:1
204:20

rent 69:2
99:22
100:1
134:12
155:5
205:22

rentals 49:9
125:3,15,
23 135:1,8
192:20
204:17

rented 159:8
178:2
193:19

renter
158:18

renting 48:8
93:24
125:3
133:22
159:9

repeat 176:3

repeating
77:17

rephrase
36:22

report 34:13
37:20,24
38:3,19,20
39:19 40:6
41:20 42:5
43:3,9
46:16
48:9,19,21
49:1 62:6,
7,9,12
68:12
74:21,24
75:7 79:12
84:23 85:2
90:21
98:11
103:11,12
105:6
107:17,22
112:2,7
113:1

118:22,23
129:5
140:8
141:24
143:6,7
145:22
146:1,13,
14 147:14
148:5,7
154:15
159:10
166:23
167:8,9
176:1,16
180:14
201:10,21
203:12
207:5
214:10
222:10,13
226:13,15,
17,21,25
227:21
228:3,5,
13,17
230:20

reported
144:21
149:8
203:12

reporter
4:8,11
6:10 9:1

reporting
112:3,4
148:6,12
149:19

reports
32:19,22
33:1,12,
18,23
34:5,6
37:8 38:9,
12,15,23,
25 40:1,8
41:1,6,7,
17,23
42:8,11,
16,21 43:5
44:18
57:17 58:6
59:20
62:14
69:10
75:15 78:5
79:7
80:16,23
81:6 82:8
85:1 124:8
127:15
128:3
165:9,14
168:13,16,
18,20
169:11
173:2,12
184:9,13
188:9
206:9,15
213:23
214:9
217:7,9
220:11

represent
5:16 38:8

39:25
70:17 86:7
92:19 97:5
127:8
150:16
170:9
174:10
180:21
217:2
233:23

**representing**
10:1

**reputation**
161:14,18,
22

**request**
94:3,4,6,
12,16
119:2
121:10,14,
17 168:13,
19 169:14,
15 196:11

**requested**
44:11,17
127:1
151:15
167:24

**require**
19:23,24
20:10,12,
18 80:23
82:13
196:11
205:11,12

**required**

83:2 95:1
180:14
203:12
214:25

**requirement**
20:8 21:15
23:6

**requirements**
20:8 95:6

**requires**
26:21,22
57:5 58:22
59:3 112:9
213:2
215:4,5

**requiring**
49:20

**research**
22:22 23:5
31:15
42:20
49:13
113:19
114:1,20,
24 115:10,
17 117:6,
15 118:1,
10,20
119:7,11
120:6,20,
21,25
121:1
126:10
127:12
189:18
203:4

224:17
225:22

**researched**
21:6 22:14
55:5,16,19
56:5

**researcher**
120:5,20

**researchers**
120:2,9

**researching**
53:14

**reserving**
226:22

**residence**
88:23
111:10

**residential**
51:3,6
54:6 87:25
88:21

**residents**
59:1

**Resource**
127:5

**resources**
18:4

**respect**
13:11,14
39:10 48:4
49:14
50:14,24
55:20
59:14

87:16
88:13
100:9
118:16,17
185:21
198:7
202:23
211:20
228:8
231:10

**respected**
207:15

**respective**
173:2

**respond**
121:17
197:23

**responding**
55:7 56:1
81:24
164:8
171:12
172:2

**response**
99:5
100:12
106:7
138:6
171:18
209:2,9
217:17
224:3

**responses**
64:3,9

responsibiliti
es  17:22
 59:8

responsible
 52:2
 154:13
 155:1
 158:17,19,
 23

rest  91:7
 201:10
 228:4

restroom
 102:1

result  192:2
 199:21
 209:6

resulted
 152:5

results
 119:5
 187:8
 219:9

retail  53:9

retain  85:7

retained
 44:3 57:4
 201:20
 221:17

retired
 151:14,16

revenue
 224:21
 225:3,10

review  34:19
 41:5 51:10
 57:6 58:5
 59:21
 63:25
 68:25
 69:8,19,23
 75:12
 79:16
 83:24
 92:11 93:4
 115:16
 124:16
 130:9,22
 133:18
 145:18
 146:17
 196:12
 216:9,11,
 17 222:18

reviewed
 34:24 39:3
 47:7
 57:13,20
 63:23
 81:11
 92:11 95:5
 142:6
 143:14
 145:11,12
 162:2
 171:8
 231:1

reviewing
 114:22
 121:1
 196:6,7

reviews
 85:13
 115:16,20,
 21 116:25

revised
 206:7

Richens  4:20
 6:24 7:17,
 21 21:18
 29:12
 90:10
 94:24 99:7
 101:9
 102:10
 103:4,15
 104:20
 144:13
 153:18
 167:19
 169:21
 182:11
 183:9
 199:7
 218:2
 232:8
 233:15
 235:17

rigorous
 19:13

Ring  187:6

risk  20:4,
 6,9,12,22
 21:4,5,8
 22:16 44:8
 46:12
 49:4,6

50:17,19
 52:9,10,
 15,18
 54:18
 64:24
 65:24
 66:11,12
 67:14
 83:19,21
 99:3 102:8
 103:2
 104:18
 134:16,23
 135:13
 165:6,17
 166:1
 167:17
 185:12,15,
 24 186:7,
 16 187:7,
 12 188:7
 191:15
 192:13
 200:9
 201:6
 203:19
 224:17

risks  45:25
 52:20
 54:19
 66:22
 107:7
 159:16
 191:17

road  125:7

robbery
 90:20

144:12
219:13

Rocco   4:7

Rockdale
97:10

role   16:19
82:6
122:10
208:24
210:23

rollup
195:10,21

rooftop   90:7

rooftops
90:7,8

room   39:21
41:4 91:8,
11 93:21,
23,25
94:15
95:17,22,
24 96:11,
12 111:12
116:2
119:21
133:24
137:1,8,9,
12,16
155:8
158:24
159:7,8,9
178:8,11,
14 180:18,
25 181:6,
7,15

182:8,10,
19 188:20,
24 194:1
195:11,18
197:9
198:11,13
205:7,13,
16,20
233:6,7,10

rooms   49:21
76:16,17
94:9 110:4
155:5
193:20,22
204:19,23

rose   225:17

roughly
225:19

routine
71:18 94:7
151:9,12,
23 152:22
224:5

Rubmaps
31:14

rule   116:11

rules   7:12
8:14
188:10,11,
15,22
189:7
203:21

run   99:24

runaway
105:3

107:6

runaways
104:24
105:7
107:11

running
158:15

Russell   4:21

Rutgers
151:20

—————————

S

—————————

safe   113:6
128:20
130:10
165:15

safety
217:18
229:11,13

salon   136:15

sample
113:10

sat   96:12
189:22

satisfied
68:24

save   68:11,
15

saving   85:2

scan   82:19

schedule
198:21,24

school   9:18
12:16
103:14
151:21
154:8
199:21,22

schools
157:8

scope   39:15
92:21
230:17

screen   96:21
102:12,20
222:19

screening
124:11,17
130:5
133:9,10,
17,19

search
192:17

searches
106:11

seat   153:21

Seattle
184:17,20

secondary
187:2

section   39:6
40:9,11,
14,16,24
41:2 57:10
108:3,8
118:23

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023        Index: sections..separately

129:9
150:6
161:2,23
177:14,17,
20 178:16
179:7
193:4

**sections**
40:7 41:6,
13,17

**sector** 123:6
198:3

**security**
10:14
11:20
16:18,23
17:4,9,11
18:6,17
19:1,4,5,
19 21:14,
17 22:4,
14,16,24
23:15,19
24:2,5,6,
9,10 25:4,
5,7,13,18,
19,23 44:8
45:23
46:7,10,15
47:7 50:17
57:2 58:14
64:22 66:6
69:9,10
75:4 77:24
79:11,19
80:2,5,23,
24 81:1,4,

6,16,18,
19,20,25
82:1 99:2
114:5,18,
21 118:25
120:5,23
121:6
122:4,7,13
132:4
155:14
159:15
164:19
172:11
176:17
185:12,15,
23 186:4,
6,10,19,24
187:7,12,
17 188:2,6
194:18
196:6,19
197:16
200:9,13
201:7
202:1,7,
17,18,22
203:11
204:22
205:1
207:17,21
208:3,5,6,
7,10,11,
21,25
209:5
210:1,11,
17,19,20,
21 211:4,
23,24

212:2,4,
11,12,22
213:2,6,9,
13,19
215:22
216:1,17,
18 217:12,
18 218:13
221:8,10,
11 224:17
228:12
229:11,12,
16

**security-related**
65:23
114:24

**seek** 58:7

**sees** 26:12

**SEG** 17:2

**self-guardians**
153:12,23

**self-guardianship**
153:18,22
159:11,17
160:5,7,9

**self-report**
109:4
110:5

**self-reporting**
108:22

**self-study**
19:6

**selling**
25:15
137:2
196:24

**send** 95:23
187:20
197:12
198:11

**sense** 73:3
125:2,4,
10,13,16,
22 134:11
164:2
198:14,15

**sensors**
82:18

**sentence**
56:9
129:16
139:22
141:18
170:10
177:19
178:15
184:3,7
201:4

**sentences**
140:2
179:13

**separate**
5:17 108:7
130:23
148:10
164:15

**separately**
39:5

separation
  113:6

September
  206:8

serve  21:14,
  16 22:4
  115:9
  210:4,16
  211:11

served  7:10

serves
  154:17

service
  14:12
  16:22
  44:15
  165:2,7,9,
  14,17,19
  166:1,3,12
  167:11,16,
  21,25
  168:3,5,
  10,17,22,
  23 169:4,8
  171:19
  172:2
  196:25
  208:9
  210:22

services
  11:6,9,12
  16:24
  25:15 94:8
  134:15
  208:19

serving
  154:2
  212:7

set  32:22,
  25 36:10
  40:1 68:8
  169:10
  195:23
  198:9

setback
  195:14

setting
  107:23
  108:1,16
  109:2,6
  124:25
  134:2

sex  14:13,
  15,18
  15:2,13,
  18,25
  16:9,13
  18:11,14,
  16 31:6,11
  33:20,24
  34:2,12
  43:11,17,
  23 49:4,6
  50:10,14,
  20 51:19
  52:11,20
  54:19
  55:6,7,16,
  20 56:2
  66:12,23
  71:8 85:18
  87:11,23

88:7,10,
  11,13
89:2,7,14,
  20 90:5,
  16,23
91:1,2,6,
  16,22,25
93:17 95:8
99:4
102:8,13,
  21 103:3,
  7,19
104:18,23
105:3,9,
  14,18
107:7,14,
  22 108:15,
  23 109:4
110:7,12,
  13,14,22
111:5,8
112:2,25
116:4
119:19
122:2,8,14
123:2,12
124:3,5,23
126:12,24
127:19
129:21
131:9,10,
  23 132:1,
  6,16
134:16,23
135:13
136:4,19
137:2
144:9

149:4
159:16,23
162:19
172:20
174:21
177:21,24
178:12
189:14
190:14
191:3,17,
  24 192:13
200:18
204:1
214:13
217:20
218:17,19
220:17,19,
  20,25
221:18
228:24

sexual  87:8
  200:24

Shaq  29:6
  144:6
  158:6

share  96:22
  106:5

shared  99:10
  100:18
  231:22

Shareef
  29:25 30:3
  32:12
  34:25
  35:6,13
  59:25

60:8,17
61:25
62:2,21,24
63:5 70:22
77:23
79:2,6
80:12 81:8
83:24
99:12
100:17
147:8
171:16
181:2
185:4,17
186:15
200:10
202:5

**Shareef's**
80:17,19

**sharing**
231:3

**Shay** 29:6

**sheets** 69:13

**Sheriff's**
97:10

**Sherman**
201:14,23

**shift** 60:24
61:4

**shooters**
121:2

**shooting**
178:7
219:13

**shoplifting**
199:20

**shopping**
53:8
199:15,23,
24,25

**short** 58:13
74:11,18
109:16
125:9
173:17
176:22
183:7
229:4
230:10

**shortly**
32:19
191:23

**show** 23:6
96:20
126:14,24
142:11,25
145:16
171:6
179:2
189:19
190:6
197:4
200:7
201:2
203:4
233:22

**showed** 143:1
197:24

**shower** 125:6

**showing**
69:16
117:16
119:8,12
191:2
198:2

**shown** 64:2
153:7
160:15

**shows** 150:18
184:25
193:14
224:9

**shut** 225:17

**side** 89:11
153:21
154:5,12
157:5
189:25

**sidewalk**
195:7

**sidewalks**
90:1

**sign** 111:5
112:8,11
113:3,4,5,
13,14
118:19
235:12

**sign-in/sign-
out** 69:13

**signage**
45:16
75:11
111:24

112:1,6,
11,15,25
118:18
130:13

**signals**
111:19

**signature**
97:9

**significance**
207:24

**significantly**
109:17

**signify**
19:16

**signs** 121:7
123:12
134:18
136:14
204:21
228:23

**similar** 40:2
41:18 76:7
146:6
160:23,25
162:9
174:11
178:23
179:9
184:7,9
185:5
203:6

**similarly**
7:3

**similars**
215:5

| | | | |
|---|---|---|---|
| **simply** 68:9 | 29:2,4,7, | 86:13 | 177:13 |
| 102:21 | 9,13,18,21 | 90:19,25 | 178:22 |
| 104:24 | 30:1,7,11, | 97:7,11, | 179:12,19 |
| 149:25 | 13,21 31:9 | 14,21,24 | 180:3,16, |
| 164:24 | 32:5,8,10, | 98:1,6,12, | 20 184:6, |
| 189:21 | 13,19,23 | 19,24 | 12 185:14 |
| 223:3 | 35:15,18 | 100:10 | 188:14 |
| 233:12 | 36:17 | 104:14,15 | 191:18 |
| **single** 53:13 | 37:10,15, | 105:2 | 192:22 |
| 54:3 199:8 | 19 38:11, | 106:10 | 193:5,8,10 |
| 200:2 | 14,17 | 107:19,20, | 194:21 |
| **singular** | 40:10,12, | 21,24 | 196:4 |
| 86:17 | 15,19 | 108:3,13, | 199:1,2 |
| | 41:4,9,11 | 17 109:1 | 206:2 |
| **sir** 5:5,14, | 42:5,17 | 111:21,24, | 207:3,6, |
| 15,16,22 | 43:12,13, | 25 113:21, | 10,14,19, |
| 8:3,8,9, | 16 46:21 | 23,24 | 23 210:7, |
| 12,15,23 | 47:15 50:5 | 114:8 | 12,14 |
| 9:11,14, | 52:13 | 115:4 | 213:24 |
| 15,19,22, | 54:14,20 | 122:5,10 | 214:2 |
| 24 10:9, | 55:10 | 127:7 | 216:4,14, |
| 12,19,21, | 56:13,16 | 128:4,7 | 19,22 |
| 23,25 | 57:11,18 | 129:13,18 | 218:10,22, |
| 11:17,25 | 58:9,13 | 139:14 | 23 219:24 |
| 12:3,6,9, | 62:1,4,10 | 140:1,21 | 224:23 |
| 13,15,17, | 69:12,15, | 141:2,21 | 225:5 |
| 20,22,24 | 18 70:17, | 143:15,23 | 230:25 |
| 13:2,4,18 | 23,24 | 147:16 | 231:25 |
| 14:6,8,11, | 72:1,12,20 | 148:18 | 232:5,13 |
| 14,17 | 73:11 | 149:17,21 | 234:4 |
| 15:16 | 74:25 75:8 | 150:10,21 | 235:4 |
| 16:19 | 77:21 | 151:7 | |
| 18:21 | 78:1,7 | 159:13 | **sit** 42:10 |
| 23:16 | 79:4,14,25 | 160:17 | 180:4 |
| 27:4,6,9, | 80:3,7,21 | 165:12 | 198:15 |
| 11,13,15, | 81:14 | 171:2,5 | 231:4 |
| 18,24 | 83:7,16 | 172:21,23 | 233:5 |
| 28:2,22,25 | 84:21 85:9 | 174:9 | **site** 74:23 |

95:15
147:8
153:13
216:17
225:24,25

sites  95:18

sits  152:6

sitting  33:9
50:3
73:16,17
116:2,16,
21 119:20
133:24
143:3
153:20
158:16
225:19

situated
129:20,22
130:25
131:23
132:1,2

situation
15:21 20:2
39:20
59:14
66:22
100:17
154:19
156:16
194:5
195:5
197:7
202:9

situations
156:7

164:10
188:23

six-star
175:5

Slack  100:21

slave  87:21

slightly  8:2
138:13

small  10:15
17:9,10
134:12
154:16
197:2

Smith  4:18,
21

smooth
155:2,3,7

social  17:9
160:1,4
163:12

society  19:4
114:5
163:6
176:14

sole  10:5

solemnly  5:2

solicit  89:8

solutions
109:21

solve
109:19,20,
22 147:20
148:13

198:1

sort  47:12
151:1,2
157:17,23
164:1
178:23

sound  70:15
119:1

sounds  35:22
92:15
133:24
226:16

source
127:13
128:1

space  93:23
111:9
113:6
135:4
152:24
154:24
158:18,19
178:1,3
195:5

space/
conditions
128:22

speak  23:3
28:3 54:3
118:24
148:16

speaking
89:23
144:15
154:22

specialist
154:10

specialization
13:7 22:8

specific
15:1 39:7,
17 41:23
43:19,21,
24 44:13,
18 46:19
47:9,19,25
48:11
52:18
64:1,10,18
75:23
76:13
85:15
93:15
95:16
107:5
131:17
133:1
139:18
161:13
165:5
168:21
181:11
183:3
197:15
199:9,12
208:19
230:12,17
231:14
233:7

specifically
14:22 39:9
48:4 50:15

52:17 56:4
60:24 64:4
70:2 78:24
88:12 89:2
100:9
101:3
103:10,12
108:18
124:22,24
125:5
129:10
135:1,22
148:5
160:22
172:6
183:24
189:8
192:10
200:6,24,
25 205:9
229:8

specifics
228:15

speculative
229:20,24

speed 23:7

spend 120:25
135:25
225:11,14
226:1
231:13

spending
44:19
231:6

spent 71:4

spoke 34:25
60:5,13
204:10

spoken 5:21,
24 27:3,7,
12 28:1
29:1,5,20,
24 30:2
123:16

sports
164:21

spot 162:4
197:21

spots 194:20
195:24
197:15

staff 44:24
47:3,10
58:12
59:6,21,
22,23
60:1,4,13,
21 61:8,17
62:15
63:1,5,22
64:13,17
65:11,12
66:4,7,14,
15 67:10
69:14,17
94:1,2,8,
12 99:10,
13,16
100:8
101:6,19
110:4

135:15,16
138:14,21
139:4
172:20
179:16
180:12,23
183:18
189:14
200:11
203:12
204:9,10,
24 205:4
228:23

staffing
63:15,21
120:23
138:10,19
198:25

staffing-
related
138:12

stairs 76:25

stairwells
90:1

stakeholder
51:25 52:1

stakeholders
51:13,24
52:4

stand 96:10

standard
18:25
19:19
23:18
35:25

36:2,4
56:6
58:15,22,
23 59:2
120:14
202:2,10,
11,16,18
203:2,5
205:14,17
229:5
233:4

standardized
210:9

standards
13:10
207:17,21
229:11

standing
28:16
164:11

stands 18:24
204:19
209:11

start 18:6
23:11
70:25
72:16
111:17
112:20
148:13
191:25
192:1
200:15
214:24
215:14

started

16:21 24:8
44:9 50:14
114:16
161:18
191:23
212:1,6

starting
22:6 86:24
114:11
214:12

starts  43:10
86:11,16,
18 117:11
129:16
170:1
184:4
214:8

state
122:20,23
123:2
164:16

stated  7:3
33:17
80:10
91:22 92:8
223:2

statement
201:10
209:25

states  9:21
17:17,20
111:3

stating
191:3

station

128:21
153:19

stations
71:17

statistics
44:10
105:22
147:22
162:2
200:4

stats  106:4
147:7
161:11

stay  30:12,
19,25
77:9,10,15
95:3
138:20
139:6
189:1
204:4,20

stayed
30:10,22,
23 77:7,8

staying
77:14
97:16

steel  174:25

stenographer
4:24 7:5
115:3,7
127:1
151:15
234:3
235:14,20,

24

step  45:25
46:12
130:12
176:19

stepping
168:12,18

steps  112:21
192:13

sticker
112:13

sticking
49:10

stipulate
7:1 234:24

stipulating
234:18

STIS  133:12

stolen  137:2

stone  71:16
168:12,18

stood  9:25
10:5,17
76:4

stop  157:3,
14 164:24

stopped
54:25

stopping
101:25

stops  125:8,
18

store  153:25

stores  53:9

story  78:22
195:22

stranger
162:16
201:24

Strategic
45:23

street  45:12
48:15 76:5
89:8,11
144:5
195:6,14

stress  43:17

strip  88:20

stripe  37:18

strongest
24:24,25
25:6

structural
45:13 92:2

structure
76:2

struggle
189:17

struggling
191:11

stuck  169:7

studies
42:22,24
115:11,19
117:2,7,8

118:16
189:20
190:6
197:2,4,11
198:3

study  19:9
  23:8
  123:22
  185:7
  190:12
  191:2
  197:11
  201:23

stuff  17:15
  18:7 50:13
  92:16
  119:14,23
  134:7
  155:16
  162:25
  169:13
  175:23
  199:18
  203:1
  206:20
  212:2
  218:14
  229:2

style  178:23

sub-opinions
  33:3 36:5

subcontractors
  193:21

subject
  40:11
  97:12

173:15
229:17

subjected
  121:15

submit  48:19
  80:23
  234:20

submitted
  48:21

subscription
  196:25

subset  191:6

sued  156:5,
  6

suffered
  36:16

sufficient
  60:13

sufficiently
  37:1
  139:23

suggesting
  21:12 22:2

suggests
  126:23

suicide
  177:9

suit  25:6

Suites  4:23
  5:18 7:24
  8:1,7
  34:17 35:7
  40:14

70:13
75:17
77:20,25
99:5 108:1
129:20
138:15
143:14
144:1,20,
22 157:21
171:1
172:3
178:20
179:16
188:1
225:24

Suites'
  179:4
  206:6

summarized
  175:23

summary
  17:24 41:7
  115:17
  231:24

super  153:8,
  9 155:23
  156:2,7,
  11,15,22
  157:6
  170:14

supplement
  42:11 43:3

supplemented
  42:6

support

119:3
123:20
124:10
126:11

supporting
  135:6

supports
  118:20

suppose  67:8

supposed
  176:21

surveillance
  49:21,22
  115:23
  196:3,20

survey  117:6
  216:7

survivor
  14:19

survivors
  14:13,16
  15:14

suspect
  144:3
  183:14

suspected
  101:4
  104:17

suspicion
  36:22
  183:14

suspicious
  169:2
  180:18,24

181:18
182:18,25
183:8,19,
25 189:4
197:7,22
203:13

**swear** 4:11
5:2

**swing**
195:11,20

**sworn** 5:8

**synthesis**
115:17

**system** 82:2,
3,17,22,23
148:6
195:16
196:3

**systematic**
114:22
115:15,16,
20,21
116:25
124:16
133:18

───────────
            **T**
───────────

**table** 40:5,
25 127:21

**Tahir** 29:25
30:3 32:12
35:6,13
70:22
77:23
171:16

**tail** 76:21,
22

**takeaways**
230:9

**takes** 78:16

**taking**
122:20
159:12

**talk** 11:9
32:18
70:20
72:16
88:12
89:24
94:19
114:21
132:22
136:24
137:3
138:10
140:15
155:24,25
156:1
160:21
165:2
173:2
175:17
180:13,17
184:13
185:17
186:23
188:10,11
189:21
194:16
216:5
219:14
226:2

**talked** 60:23
77:18
121:5
123:10
185:25
189:3
205:25
211:19
228:5,8,25
232:15

**talking** 8:5,
6 47:24
49:24
62:25
67:13
82:16
83:13,14
87:9,11,16
88:5,6,11
89:25 92:5
103:10,11
104:11
105:7,10,
18 118:15,
21 130:12
132:15
133:20,22
142:7,9
143:5,25
152:13
153:24
157:1
158:6
170:15
171:11,13,
16 172:1
181:2
185:1,8

193:9
201:17
202:1
214:7,11

**talks** 86:16
90:16
119:17
124:1
130:10
136:18
139:22
151:24
155:13
162:15
179:7
193:6
196:2
214:12

**tangible**
187:8

**target**
150:18
152:12,14,
17 153:11

**targets**
151:4

**taught**
217:11

**taxing** 24:14

**TCOLE** 13:9

**Teams** 78:10

**technological**
96:7

**technologies**

95:19

technology
  96:9 137:6

technology-
wise  109:24

telephone
  67:11
  195:16

telling
  51:15 67:5
  135:24

tells  175:19

temper
  137:24

temperate
  177:23

temporal
  199:10,12

ten  215:1

tenant  155:9

tens  105:8
  106:23

tense  46:18

term  52:5
  81:18
  129:21
  181:4
  215:13

terminology
  144:16

terms  14:21,
  22 19:17
  53:13 63:8

131:1
145:25
197:5
209:17
226:1

terrorism
  121:23

test  19:10,
  11 24:20,
  22 119:23

tested  24:16

testified
  5:9 85:10
  202:5
  205:12

testifies
  193:16

testify
  22:20 23:8
  140:11
  146:7
  193:11

testifying
  145:9

testimony
  5:2 7:15
  9:10,13
  52:7 57:19
  80:17,20
  84:11
  105:13
  142:21
  145:12,16
  146:10,20
  171:8

172:4
176:24
179:2,10,
  18,21
182:14
184:10
186:14
193:14
194:22
213:21
218:11,21,
  24 222:6
226:17,19
227:23
232:18

testing
  119:14

Texas  13:8,
  10 15:21
  17:4 57:5
  111:4
  151:17

text  81:8,
  12 92:12,
  20,22
  93:7,11
  100:20

theft  59:10

thefts  66:2
  175:22

theoretically
  109:15

theories
  151:10

theory

151:9,10,
  12,24
153:2,8
155:11,12

thing  27:1
  42:19 46:2
  48:16
  49:10 55:2
  71:17
  73:5,21
  75:11 76:8
  77:1 82:17
  100:1
  101:14
  109:18
  113:14
  129:2
  133:9
  134:25
  135:6
  136:22
  164:22
  175:13
  181:10
  193:19
  200:6
  201:17
  204:18
  206:18
  208:2
  217:10
  233:17

things
  25:10,20
  26:25 51:2
  59:11
  75:19 76:4

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023                    Index: thinking..today

81:2,19,22
100:2
108:9
109:23
110:2
115:23
117:20
118:1
129:25
130:17,18,
24 134:10
137:25
154:5
163:3,4,7
181:11
186:21
195:13
196:9,14
200:15
201:13
205:9
208:3
212:6
222:25

thinking
14:23
45:11 68:6
99:23
159:18,20

thoroughfare
125:5,19

thought
119:18
166:8
171:4
176:5
204:12

thoughtful
138:6

thousand
106:22
225:7

thousands
105:8
106:23

threat    45:5,
18,20
46:2,4,24
47:9
135:21,22
177:21,25
213:25
214:4,8,11
215:8
224:13,15,
21 225:3

threats
43:21,23
46:13,18
47:17,20,
25 50:18
177:15
215:6

threshold
95:22
198:10

throwing
113:14

thwart    48:7

thwarted
230:15

ties    82:11

202:13

time    4:6
8:19 15:5,
9 17:20
25:5 30:4
31:22
44:19 61:7
67:6 70:4,
5,8 71:4,
25 72:13
77:10
78:12
79:22,23
80:1,4,8,
22 82:12
83:4,8,17,
23 85:6,
12,17,20
101:17
103:21,25
104:4
120:21
121:1
126:1
135:25
136:14
139:2
145:8
146:14
152:24
155:17
160:10
166:23
173:3,4,7,
22,25
183:7
192:7,11
195:8

198:21
199:3
200:18
201:16
203:24
206:14
207:5
217:6
222:15
225:11,14
226:1
227:13,16
228:16
231:7,12
232:3
235:11,18

times    6:13
13:23 18:1
19:22 30:2
80:11 82:1
137:8,12,
14,17
171:10
172:4
194:25
198:24
219:19
220:2

title    61:17,
18

today    5:22
7:23 8:4
9:9,13
24:8 25:8
42:10
71:23 73:5
95:19

96:17,19
109:23
137:7
152:6
180:4
209:11
225:19
226:24
231:23
232:2,10

**Today's** 4:5

**told** 35:13
56:17
60:17,18
72:19
75:20 76:2
77:6 79:7,
8 80:12
84:6,7,11
89:7
123:21
136:11
147:21,24
193:17
196:9
204:10
215:20
219:3

**tone** 128:19

**tool** 133:10

**tools**
124:11,15,
17 130:5
133:17,19

**top** 22:18,
19 49:11

115:15
162:4
165:5,25
171:23
180:1
184:3
188:11

**topic** 115:18
123:17
185:8
191:24

**topics**
120:22
204:2

**total** 62:19
106:21
219:19

**totality**
74:3 215:7

**totally**
195:21

**touched** 78:2

**tour** 82:3

**tourism**
185:20

**town** 17:10

**track** 82:21

**tracking**
82:20,25
83:1

**trade** 11:23
12:11

**traffic**

72:25
118:18
125:8
127:5
194:19
195:13
205:19

**trafficked**
27:17
28:10,20
29:11
33:15
143:20

**trafficker**
108:7
113:7
130:23

**traffickers**
29:6,10,15
92:13
126:12
139:23
143:24
144:14
157:1,22,
23

**trafficking**
14:13,15,
19 15:2,6,
13,19
16:1,13
18:11,14,
16 33:24
34:2,12
39:13,16
42:23
43:12,17,

23 49:5,7
50:10,15,
20 51:4,20
52:11,20
54:19
55:6,8,17,
20 56:2
59:15
66:13,23
86:17
87:10,11,
13,19,23
88:6,7,8,
9,10,11,13
89:2,9,15
90:5,16,23
91:1,3,16
93:18 95:8
99:4
102:8,13,
21 103:3,
8,20
104:19,23
105:4,10,
14,19,24
106:24
107:7,14,
22 108:15,
23 109:4
110:8,12,
22 111:5
112:2,10,
25 113:7
116:4
119:19
121:2
122:2,8,15
123:2,12

124:3,5,23
126:24
127:6,18,
19 129:21
130:16
131:2,4,9,
10,23
132:1,6,
16,18,19
134:16,21,
23 135:2,
13 136:4,
19 137:3
140:24
141:4,6,9
147:14
148:8,11,
22 149:4
156:6
159:16
162:20
172:20
174:21
175:2,7,
10,12,18,
20 176:9,
21 177:21,
24 178:13
185:22
189:15
190:19,23
191:7,17,
24 192:14
204:2,6,8
214:13
217:16,20
218:17,19
220:18,19,

20,25
221:5,18
222:2,4,7
228:24

trafficking-
related
144:9

train  135:15
172:20

trained  13:8
148:10
204:3

training
13:3,5,11,
12 26:23
122:13,19,
22 123:1,8
189:11,18,
24 190:4,
6,21,22,24
191:8
197:19
203:23,25
208:23
217:19,21
228:9
229:6,16

trainings
13:13
69:14,17
185:20
189:14
228:22

trains  122:7

transcript
223:13

230:23

transferred
74:20

transient
87:24
90:16
91:17

transportation
87:3

transported
87:5

treated  44:7

trees  169:7

trend
199:24,25
201:1,2

trends
199:10,11,
13 200:5,7

trespass
100:2
188:22
189:5

trespassed
205:21

trespassing
99:21

tri-  150:15

trial  32:4,
12,25
33:14,19
34:1,10
35:4,20

36:8,15,
18,24
54:10 79:6
140:12
142:21
145:16,19
146:8,10,
15,20,24
147:1
179:2,11,
18,21
184:10
193:11,13
218:11
220:20,22
234:17,19

trials  22:21
115:12,20
116:1
117:1
220:14

triangle
150:18,19,
20 151:2
152:5,7,8,
9,10
153:3,4,6
155:19,22,
23 157:10,
13 163:1

trip  30:24
77:12

truck  125:7,
18

truckers
125:6,19

G.W., ET AL. vs NORTHBROOK INDUSTRIES, INC.
Karim Vellani on 11/28/2023        Index: true..understanding

true  25:8
  145:9
  184:21
  223:3,17

trusting
  8:15

trustworthy
  9:13 113:6

truth  5:3,4

turned  62:11

turns  119:18
  164:13

TV  164:6

TVPRA  15:4
  53:3 148:4
  175:19

two-column
  206:19

two-factor
  193:6
  204:11

two-minute
  101:24

two-step
  194:9

type  18:4
  52:18 86:2
  168:6,7,8
  179:9
  181:10
  199:14
  203:6

types  14:3

  18:14 48:1
  52:15 54:2
  88:5

typical  8:13
  81:2
  116:18
  142:15
  175:14
  176:16
  181:6
  195:11,20
  199:11

typically
  73:7 77:9,
  10 81:22,
  24 82:4
  86:1 87:23
  90:12
  100:3
  115:18
  117:5
  137:10,15
  139:3
  140:7
  142:15
  152:20
  157:6
  161:5
  182:3

_____

      U
_____

U.S.  150:13

ubiquitous
  95:15

UCR  140:7

ultimately
  15:23 16:5
  21:19
  25:15 44:6
  45:1 46:11
  48:9 52:1
  62:7,11
  74:20
  93:24
  114:25
  130:3
  155:18
  158:23
  166:21
  195:4
  201:25
  205:7

umbrella
  111:1

unaccompanied
  102:24,25

unaware
  113:18

undergrad
  13:6 22:12

underlying
  123:20

underneath
  113:16
  178:16
  209:25
  218:15

underreported
  105:24

understand

  5:16,19
  8:10,15
  16:17
  18:19
  24:23
  26:13
  29:24
  35:10 37:5
  47:11,18
  49:24 52:7
  54:15
  56:11 61:5
  63:4 64:25
  79:1 91:9
  97:25
  98:13,16
  110:20
  112:24
  122:10
  131:24
  136:21
  146:19
  150:25
  156:18
  162:5
  165:25
  166:13
  171:14
  215:21,22,
  23,25
  222:24
  223:12
  226:16
  230:6,14
  231:3,22

understanding
  8:4 53:1
  54:12

57:25
60:12,16
63:14
71:14 78:3
79:18 81:7
83:7,20
84:3 91:7
96:17
99:11
128:8
131:18
139:20
146:23
156:19
162:7
184:15
220:2
224:20
228:17

**understood**
95:10
112:23
123:5
125:14
167:5
213:21
218:20

**unequivocally**
147:24

**uniform**
17:15
105:6
140:8
148:5
149:19

**unique**  45:7,
18,19

95:21,24
96:13
101:13
198:10

**unit**  174:23
175:6

**United**  4:18,
23 5:18
7:24,25
8:1,5,7
27:17,22
28:10,20,
24 29:11,
16 30:5,
10,12,14,
16 31:1,16
33:16,21
34:3,11,17
35:7,20
37:2 40:13
57:22 58:8
62:16
64:14
69:19
70:13
74:23
75:17
77:19,24
78:9
79:11,19,
24 80:1,4,
22 82:13,
22 83:2,4,
5,8,9,18,
25 85:6,
12,17,20
91:6

94:14,19
97:6,16
99:4 108:1
129:19
138:15
139:10
141:1,9,10
143:14
144:1,8,
19,22
145:3,24,
25 146:8,
9,21
148:22
154:20,23
156:21
157:20
158:12
159:2,3,6
160:25
162:2,3,8
171:1
172:3,10,
19 176:11,
25 178:19
179:3,8,16
180:23
183:18
185:11
187:10,25
188:16
193:12
194:22
196:2
206:6
217:3
225:24
231:20

**units**  76:14

**university**
151:17
197:4

**unlike**  90:20
129:17

**unlock**  94:5

**unlocks**  94:2

**unpaid**  10:15

**unreasonable**
233:11,13

**unreliable**
119:9,10,
12,13

**unusable**
168:11

**unusual**
181:5,9,
10,13,15,
24 182:2,
3,8,15,19,
25 183:21

**up-to-date**
38:12

**updated**
42:10
206:12
223:24
224:2,4

**upgrades**
73:4,7

**upset**  204:16

**urine**  112:13

113:10

USA    31:11

utter    168:10

─────────────

v

vague    144:16

vaguely
  172:6

validate
  208:2

validates
  208:21

varied    17:20

varying
  203:16

Vegas    168:9

vehicle
  194:16,18
  195:9

vehicles
  51:18 66:2
  199:20

Vellani    4:3,
  25 5:7,12
  7:23 8:10,
  19 9:8,16
  18:19 23:3
  25:10
  28:21
  31:24 34:2
  36:2,25
  37:7 38:8
  39:25

41:8,18
43:7 52:8
54:11
57:10 58:4
64:24
66:18
70:11
79:17 86:6
90:15
92:19
93:17
96:22
104:7
106:10
116:17
117:13
127:4
135:12
144:19
146:7
169:24
174:3
179:24
218:7
226:14,19
227:19
232:2,9
233:20
235:1,11

vendors
  209:10

verb    46:18

verbal    112:3

verifying
  208:25

version

127:18
206:7
207:2

versus    4:4
  106:22
  132:2
  220:3

vice    15:2
  48:1 49:5,
  7 59:17
  171:13

vicinity
  143:24
  144:15

vicious
  169:8

victim    14:19
  15:25 16:4
  87:15
  108:7
  113:7
  124:14
  129:11,12
  130:16,20,
  24 131:1,
  3,6 132:17
  150:18
  152:12,16
  153:11
  217:16

victimization
  112:3
  113:1

victimized
  153:16

victims
  14:13,16
  15:6,14,19
  33:24
  34:12 55:8
  56:2 88:15
  90:21
  107:23
  108:4,19,
  23 109:4,
  14 111:19
  112:2,25
  124:13
  126:24
  129:20
  131:8,23
  132:1
  149:10
  151:4
  158:2
  203:14

video    49:21,
  22 78:10
  115:23
  142:11,18
  143:2,13
  182:8
  196:2,10
  205:13,15

videos    75:1,
  3,6 142:25
  143:13
  196:12

violation
  215:16

violations
  69:20

184:14

violence
  121:2
  164:3,8
  203:14

violent
  175:8,15
  176:17
  184:19,22
  201:24
  219:14

virtually
  140:2
  166:10

virtue  33:25
  163:9,14
  178:14

visibility
  76:12
  96:12

visible
  187:8

visit  30:14
  77:18

visited  30:5
  77:19

visiting
  171:9

visitor
  202:24

visits  74:14
  171:18

volatile
  164:9

volition
  204:7

volume
  171:17

vouch  35:12

Vuitton
  153:20

vulnerabilitie
s  43:18,22,
  24 45:18
  46:14,19
  47:18,21
  48:5,12
  215:21

vulnerability
  45:7,21
  46:8 47:5
  57:8
  214:1,5
  215:17
  216:2,7

vulnerable
  107:11,12

———————————
         W
———————————

Wade  97:8

wait  8:20
  164:7
  165:24

waiver
  231:17

walk  77:2
  89:8
  214:3,4

219:14

walk-through
  157:17

walked  71:6
  76:24,25
  181:7
  205:4
  219:2

walking
  47:12
  99:17
  200:2

walks  94:2

wallet
  152:15

Walmart
  17:10

wanted  30:9
  32:20
  37:18 44:6
  58:2 70:11
  72:15
  104:15
  138:7,12
  160:18
  165:4
  167:5,12
  187:20
  189:12
  226:3,11
  231:20,21

warrant
  196:11
  205:11,12

warrants

49:20

Warren
  201:14,23

watch  141:25
  153:15
  164:5

watched
  141:23

ways  8:3
  90:4
  100:15,16

weaker  25:1

weaknesses
  46:14
  215:25

weapons
  178:6
  181:8

wearing
  153:14

Weber  68:18
  185:17
  189:2

website  85:3

websites
  31:5,8,17
  85:18

week  61:13,
  19 171:10
  172:4

weeks  77:13
  103:1,13
  141:14

whatsoever
   20:16

widely
   207:15
   212:16,18
   228:21

Wilberforce
   15:4 53:3
   175:19
   192:2

William
   192:2

win  20:1

window  76:6,
   19 187:1

windows
   45:15
   153:19
   190:2

Wings  190:11

withheld
   58:1

witnesses
   116:19
   184:11
   210:4
   211:12

woman  70:12

wonderful
   141:5

word  34:6
   87:2,21
   131:20
   163:13

worded  33:22

wording
   133:6

words  24:20
   50:18
   53:20 79:5
   88:16
   132:14
   153:12
   157:20
   159:15
   163:5,24
   167:4
   208:5,9
   210:19
   213:1
   216:20
   232:20

work  10:13
   16:20 18:2
   48:7 50:7,
   12,22,23
   58:10 65:7
   96:16,18,
   19 114:25
   117:20,22
   118:1,4
   172:14
   187:24
   191:13,19,
   22,23
   208:9,11,
   12 209:12
   224:14,18,
   20 225:4,
   15,21,22

worked  10:20
   11:4 12:25
   14:1,12,15
   16:13,17
   56:9,11,
   18,23
   62:25
   63:23 64:6
   66:25
   69:11
   82:15

working
   14:1,25
   17:1 22:10
   44:22,24
   49:16,19
   52:23
   53:12 60:5
   61:6,13,18
   62:11
   64:22
   65:11,13,
   22 66:7,10
   67:17
   83:5,9,11
   122:3
   189:24
   220:1

worklife
   208:24

workplace
   121:2

works  25:19
   49:14
   64:25 65:3
   99:1
   115:1,5

117:24
118:2
138:3
201:17,22

world  19:5
   215:7

worse  148:1
   208:7

write  121:10
   201:21

writers
   99:25

writes
   166:17

writing
   48:22

written  21:6
   22:14 56:6
   57:1 58:22
   81:25 82:8
   166:23,24
   183:23
   184:15
   203:20
   231:11

wrong  64:12
   78:3 118:8
   130:1
   176:4

wrote  49:1
   166:20
   206:14

**Y**

yahoos  116:2
  119:20
  133:24
year  19:9
  53:5,13,15
  63:17,19
  103:14
  105:15
  139:18
  171:2
  173:15
years  16:18
  18:8 19:12
  30:17
  31:22
  47:24
  49:18,25
  50:14
  52:22
  53:4,6,7,
  9,16,17
  54:24 60:2
  63:21
  67:15
  73:3,6
  134:15
  139:16,18
  147:25
  161:9
  173:9,10,
  13,14,19
  176:25
  186:9,13
  191:20
  192:18

yesterday
  206:5
  217:2
  222:17
  223:20
  233:20
  234:15
  235:2
York  99:24
  184:17,20
young  70:12

**Z**

Zaccheus
  27:12,16
  148:21
zoom  25:3
  78:10
  115:2