### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **J.G.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE** |
| **vs.** | : | |
| | : | **NO. 1:20-cv-05233-SEG** |
| **NORTHBROOK INDUSTRIES,** | : | |
| **INC., D/B/A UNITED INN AND** | : | |
| **SUITES,** | : | |
| | : | |
| **Defendant.** | : | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER FEDERAL RULE OF CIVIL PROCEDURE 50 AS TO LIABILITY OR, ALTERNATIVELY, AS TO PUNITIVE DAMAGES

Plaintiff respectfully requests that the Court deny Defendant's renewed Motion for Judgment as a Matter of Law (JMOL), and, in support, submits the enclosed memorandum of law.

## BACKGROUND

At trial, Defendant's owner and manager admitted that commercial sex crimes were a "problem" at United Inn & Suites ("United Inn"), a DeKalb County hotel. (T.100:11-15, T.233:10-13).[1] Plaintiff proved that United Inn is a known hotspot for commercial sex crimes and drug sales. (T.61:5-9, T.76:3-6). Witnesses testified that from 2018 to 2019—when Plaintiff was sex trafficked at the hotel—there were up to 10 to 20 girls or women being sexually exploited on the property at any given point in time. (T.295:8-14, T.346:20-347:5). Two DeKalb County law enforcement officers specializing in commercial sex crimes testified that a hotel's vigilance matters in combatting commercial sex activity, that attentive hotel owners can readily observe signs of commercial sex crimes, and that Defendant's operations allowed commercial sex activity to flourish. (T.33:23-34:16, T.43:17-44:6, T.46:5-14; T.48:24-50:19). The DeKalb County Police Department recommended that Defendant hire more security to combat crime, but Defendant did not. (T.103:21-104:8, 143:10-14). Defendant did not post anti-trafficking notices required under state law, which is a state crime. (T.157:17-159:12, T.551:14-18). Nor did it host staff trainings on sex trafficking indicators. (T.167:3-15). While Defendant's owner and manager testified under oath that he asked off-duty police officers periodically

---

[1] All transcript citations are to Volumes II through V (July 8, 2025 – July 11, 2025). For example, a citation to T.1 would be to page 1 of Volume II.  Starting with Volume II, the court reporter paginated the transcript pages consecutively.

working at the hotel to run background checks on hotel staff, the officers testified any such testimony was not true. (T.117:19-118:10, T.504:1-10). Defendant employed staff with criminal records, including drug convictions. (T.122:10-127:22).

During the relevant period, Defendant generated revenue from renting rooms. (T.184:25-185:15). Defendant was motivated to rent as many rooms as possible—and to keep the occupancy rate high—to maximize the hotel's profits. (T.188:1-3). Defendant's owner discussed selling the property with Defendant's banker after Plaintiff was trafficked at the hotel. (T.191:17-192:22). As part of that discussion, Defendant highlighted the hotel's high occupancy rate during the period Plaintiff's traffickers rented rooms at United Inn and trafficked Plaintiff.[2] (T.191:17-192:22).

Plaintiff was trafficked at United Inn for approximately 35 days across October – November 2018 and January 2019. (T.346:10-13, T.377:3-5). She was 16 years old at the time; she would have been a sophomore in high school. (T.340:9-20). Plaintiff was trafficked by two men, King and Cash. (T.318:1-2). Both men paid Defendant to rent multiple rooms at the property at one time and stayed at the property for extended periods. (T.323:16-18, T.333:3-9). Both men trafficked drugs

---

[2] Defendant's JMOL states that, "[d]iscovery revealed approximately $6.8 million in hotel revenue from 2016-2023." (Doc.247 at 2). Defendant provides no citation for the point, and there is no evidence of that in the trial record. What Defendant presumably meant is that Defendant wanted to sell the hotel for $6.8 million. (T.191:17-192:22).

2

and girls; they ran booming operations, and a steady stream of customers walked to and from their rooms to transact illicit business. (T.331:15-332:3, T.344:23-346:9). In addition to the rooms they rented, Plaintiff's traffickers regularly bought goods at the hotel with Plaintiff, including condoms. (T.337:8-18, T.381:24-382:2).

Plaintiff had sex for money to earn the monetary quota set by her traffickers; on average she had sex with approximately 3 to 12 men per day at United Inn to earn her quota. (T.343:22-344:19). About half of the sessions were in cars parked in the hotel's parking lot, and the other half were in hotel rooms. (T.327:3-13, T.341:5-21). The rooms had drugs, guns, cash, and other paraphernalia out in the open. (T.383:7-17). Housekeeping regularly entered the rooms, and Plaintiff's traffickers did not hide anything when housekeeping arrived. (T.382:11-383:17). Plaintiff found sex buyers from loitering around the hotel's common areas for hours scantily clad. (T.339:20-23, T.391:2-8). Her traffickers also posted ads of Plaintiff on commercial sex websites. (T.325:22-326:10). United Inn was one of the most popular DeKalb County hotels advertised on the websites. (T.23:20-24:1, T.36:16-37:7).

During the period Plaintiff was trafficked at Defendant's hotel, Defendant received multiple Be on the Lookout (BOLO) notices indicating that Plaintiff was a missing child; the BOLOs contained Plaintiff's name, picture, age, and physical description. (T.174:10-178:17). Defendant did not distribute the BOLOs to staff and did not hold any staff trainings in response. (T.178:18-181:1, T.183:18-184:5).

3

Plaintiff continued to be trafficked in hotel rooms and in cars parked in the hotel parking lot after Defendant received the BOLOs. (T.181:2-183:3). Defendant continued to sell her condoms. (*Id.*)

Plaintiff witnessed the night manager at United Inn buy drugs from her trafficker, Cash, on multiple occasions. (T.377:21-23, T.378:11-15). She also saw the night manager act as a lookout for Cash. (T.377:21-378:15; T.379:14 – 380:10). Plaintiff saw the night manager warn Cash when heavy foot traffic to his room risked drawing unwanted attention. (*Id.*) When that occurred, she told him to keep it down or she helped him move to rooms that were less visible to cameras on the property. (*Id.*) She also allowed Cash to check into rooms before they were ready so that he could continue his business. (T.378:3-10).

## <u>LEGAL STANDARD</u>

When reviewing a motion for judgment as a matter of law, the Court must review the facts "in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party." *Walker v. NationsBank of Fla., N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995). "If reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions based on the evidence presented, the motion should be denied." *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts

are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000).

## ARGUMENT

The Court should decline Defendant's JMOL for three reasons. *First*, Plaintiff presented sufficient evidence at trial for a reasonable jury to conclude that Defendant "knowingly benefited" and "participated in a venture" in violation of Section 1595(a). As such, Defendant's sufficiency arguments fail.[3] *Second*, the Court correctly found that Section 1595(a) permits the award of punitive damages—as every other federal court to have considered the question has found. *Third*, the jury's award here was not unconstitutionally excessive under. For these reasons, and those addressed below, Defendant's JMOL should be denied.

## I.    Plaintiff Presented Sufficient Evidence at Trial for a Reasonable Jury to Conclude that Defendant Violated the First Element and Second Element of Section 1595(a).

The Court should reject Defendant's JMOL because a reasonable jury could conclude that Plaintiff proved that Defendant knowingly benefited (element one)

---

[3] Defendant's JMOL does not address the latter two elements of a Section 1595(a) claim. *See Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021) (identifying four elements of Section 1595(a) claim); (Doc.247 at 5 ("The evidence at trial was legally insufficient on the first and second elements[.]")). Plaintiff addresses only the two elements challenged by Defendant.

and that Defendant participated in a venture (element two) in violation of Section 1595(a).

### a. "Knowingly Benefited."

Plaintiff presented sufficient evidence at trial for a reasonable jury to conclude that Defendant "knowingly benefited" under Section 1595(a). Thus, the Court should deny Defendant's JMOL regarding the first element of Section 1595(a).

At trial, the Court charged the jury that:

> Regarding the first element, knowingly benefited, knowledge is an awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact. Under the TVPRA, a defendant may benefit financially or by receiving anything of value.

T.664:2-8. The parties agreed to the instruction. Doc. 212 at 36[4]; *see also* T.613:24-614:2.

Plaintiff presented substantial evidence to establish that Defendant "knowingly benefited." Plaintiff proved that Defendant makes money from renting rooms and selling condoms; that Defendant wants more rooms rented and a high occupancy rate to maximize revenue; that Plaintiff's traffickers repeatedly paid Defendant to rent rooms at the hotel to traffic Plaintiff; that Plaintiff's traffickers rented multiple rooms at a time at the hotel to traffic Plaintiff, other girls, and drugs, and operated booming drug and sex trafficking businesses at the hotel for weeks and

---

[4] Throughout this brief, page numbers are the CM-ECF page numbers stamped on the top of the filed document.

months. Through this evidence, Plaintiff proved that Defendant "knowingly benefited"—*i.e.*, it had knowledge ("awareness or understanding of a fact or circumstance") that it received a benefit (money or "anything of value").

In its JMOL, Defendant argues for the first time that to prove the first element of Section 1595(a), "the benefit must be from participating in the illegal scheme with knowledge of furthering the scheme." (Doc.247). But Defendant agreed to the jury charge on "knowingly benefited," which says nothing of the sort. As such, Defendant waived the issue.

Beyond waiver, Defendant misstates the law. While *perpetrator* liability under Section 1591 may require proof that the defendant had knowledge of furthering the scheme, *beneficiary* liability does not. If it were otherwise, perpetrator liability and beneficiary would be indistinguishable, and Congress' 2008 amendment of Section 1595(a) would be pointless. "A plaintiff can sue a perpetrator of sex trafficking—*i.e.*, someone who has violated the criminal statute—without resort to the beneficiary cause of action." *Red Roof*, 21 F.4th at 724. Congress amended the statute, and created the "beneficiary cause of action," to expand civil liability beyond perpetrators to a new class of persons: beneficiaries. *Id.* at 724.[5]

---

[5] Defendant's argument that, "Shareef did not admit knowingly deriving monetary gains from violations of anti-trafficking laws," (Doc. 247 at 5), is another way of saying that Shareef did not admit to violating criminal trafficking laws (whether directly *or* as a co-conspirator, or an aider and abettor). But this is not a criminal

Defendant cites no authority for its articulation of the meaning of "knowingly benefited" other than page 727 of *Red Roof*. But that portion of the opinion undercuts Defendant's argument. After reviewing the *Red Roof* plaintiff's allegations that the franchisor-defendants received a percentage of room revenues from the franchisee-operated hotels where plaintiffs were trafficked, the Court said, "[t]hese allegations may suggest that the franchisors financially benefitted[.]" *Id.* Exactly—that's the first element of Section 1595(a). *Red Roof*'s reasoning affirms Plaintiff's position, and undercuts Defendant's. The rest of page 727 of *Red Roof* focuses on the second element of Section 1595(a), which is distinct and separate from the first element, and which Plaintiff addresses in the next section.

*G.W.* also does not help Defendant's first-element argument. In *G.W.*, the Court did not consider the first element in its summary judgment order; it only considered the second. *G.W. v. Northbrook Indus., Inc.*, 739 F. Supp. 3d 1243, 1248 (N.D. Ga. 2024), *reconsideration denied*, No. 1:20-CV-05232-JPB, 2025 WL 494620 (N.D. Ga. Feb. 13, 2025) ("The Court's analysis herein will focus on the participation element of the test in light of the arguments advanced by the parties.") Because the Court found the second element was not met, it did "not address the

---

case, and Plaintiff has never argued (or alleged) that Defendant perpetrated sex trafficking.

8

other prongs of the test." *Id.* at 1254, n.6. Thus, Judge Boulee made no findings about the first element in *G.W.* that help Defendant here.

Defendant tries other new arguments about the first element that are similarly unpersuasive. Whether any "witness quantified benefits," or whether the evidence showed that Defendant "charged premiums, accepted bribes, or derived value beyond ordinary hospitality," is not part of the first element. Doc.247 at 6. As the parties agreed, and as the jury was charged, the issue is whether Defendant "knowingly benefited," which includes Defendant's "awareness or understanding" that Defendant "benefit[ed] financially" or "receiv[ed] anything of value." The "benefit" or thing "of value" does not need to be "quantified," and they do not need to be "premiums," "bribes," or "value beyond ordinary hospitality." That is not the test as to the first element.[6]

Without citation, Defendant claims that "the Court's pretrial ruling emphasized that 'knowing benefit' requires more than incidental revenue." (Doc.247 at 7). It is not clear what "pretrial ruling" Defendant is talking about. The Court's summary judgment order says nothing of the sort. In fact, it says, "Northbrook does

---

[6] Regardless, there is evidence that Defendant accepted cash on a regular basis from Plaintiff's trafficker Cash, and, in exchange, allowed him to rent rooms early, warned him of too much traffic to rooms, and helped him move rooms to avoid detection and to enable him to continue his illicit operations. There is also evidence that Plaintiff was trafficked in cars in the hotel parking lot, and that United Inn continued regularly selling condoms to Plaintiff after Defendant received BOLOs notifying it that Plaintiff was a missing child.

*not* dispute that it 'knowingly benefited' during the relevant periods by receiving revenue from hotel rooms paid for by J.G.'s traffickers[.]" (Doc.138 at 11) (emphasis added).[7]

Therefore, Plaintiff presented sufficient evidence for a reasonable jury to find that Plaintiff met the first element of Section 1595(a), and Defendant's arguments to the contrary should be denied.

### b. <u>Participation in a Venture.</u>

Plaintiff also presented sufficient evidence for a reasonable jury to find that Defendant participated in a venture. *Red Roof*, 21 F.4th at 719.

The Eleventh Circuit has held that participation in a venture means, "taking part in a common undertaking or enterprise involving risk and potential profit." *Id.* at 727. Because "the text of Section 1595 does not say 'sex-trafficking venture,' but only 'venture,'" "[n]early every court agrees," and "the Eleventh Circuit has acknowledged" in *Red Roof*, that "the alleged venture can be a 'commercial venture' like running or expanding a business." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (cleaned up).

---

[7] In denying Defendant's Motion to Dismiss, the Court stated that, "[s]everal district courts, including this one, have found that the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard… The Court agrees[.]" (Doc.44 at 7-8).

At trial, Plaintiff presented substantial evidence to prove Defendant took part in a common undertaking or enterprise involving risk and potential profit. Indeed, Plaintiff proved that Defendant operated United Inn and rented hotel rooms to guests for profit, and, in doing so, rented rooms to Plaintiff's traffickers for profit.

The foregoing evidence, standing alone, establishes that Defendant "t[ook] part in a common undertaking or enterprise involving risk and potential profit." The "common undertaking or enterprise" is the business transactions between Defendant and Plaintiff's traffickers—United Inn accepted money from the traffickers, and, in exchange, gave the traffickers rooms. Each side benefited from the bargain—United Inn made money, and the traffickers obtained rooms. There was "risk" from these business transactions, like rooms being damaged, or used for nefarious purposes, like child sex trafficking and drug sales. And there was "profit" from these business transactions, too; the hotel profited from renting rooms for money, and the traffickers profited from running their illegal trafficking operations in the rooms.[8] *See* T.184-186 (Defendant's owner testifying that hotel earns revenue from renting rooms to

---

[8] *Red Roof* agreed with *Ricchio v. McLean*, 853 F.3d 553 (1st Cir. 2017) that "renting a room to the abuser" is one of the "kinds of allegations [that] would establish a hotel operator's participation in a venture with a sex trafficker." 21 F.4th at 725-26. The Eleventh Circuit explained that its "reasoning is consistent with the disposition" in *Ricchio*, where the plaintiff "plausibly alleged that, by renting a room to the abuser, the operators were 'associating with him in an effort to force [the plaintiff] to serve their business objective.'" *Id.* The Eleventh Circuit held, "we agree that these kinds of allegations would establish a hotel operator's participation in a venture with a sex trafficker." *Id.* Notably, *Red Roof* concerned franchisors, not hotel operators.

hotel guests, and room rentals carry the risk of guests committing crimes or other misconduct at hotel).

Defendant cites *K.H.* to argue that taking part in a common undertaking or enterprise involving risk and potential profit requires evidence of more than a hotel operator renting rooms to a trafficker. (Doc.247 at 7 (citing *K.H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063 (11th Cir. Feb. 9, 2024)). As explained below, there are two fatal flaws with this argument. *First*, *K.H.* does not apply here, and Defendant thus posits the wrong test. *Second*, even if it did apply, Plaintiff proved at trial (and a reasonable jury could have concluded) that Defendant did far more than rent rooms to Plaintiff's traffickers—it facilitated and aided Plaintiff's traffickers in their exploitation of Plaintiff.

*First*, *K.H.* does not apply here because it is a non-binding opinion decided at the 12(b)(6) stage involving distinguishable allegations. *K.H.*, like *Red Roof*, concerned a motion to dismiss a complaint that defined and alleged the venture *only* as a sex-trafficking venture. *See Red Roof* at 726 ("We begin with the venture the Does say that the franchisors participated in. Throughout their complaints, the Does alleged that the franchisors participated in 'sex trafficking ventures.'"); *id.* at 727 ("Again, every time the complaints refer to ventures, they refer to 'sex trafficking ventures.' And those ventures were alleged to include the sex traffickers themselves as participants."); *K.H.,* 2024 WL 505063, at *3 ("K.H.'s allegations are much like

the allegations ... in *Red Roof*. K.H. alleges that Riti participated in a *common sex trafficking undertaking* with Laye ....") (emphasis added).

Unlike *Red Roof* and *K.H.*, this case went to trial, and the parties in this case filed, and the Court entered, a consolidated pretrial order, which "supersedes the pleadings." *State Treasurer of State of Michigan v. Barry,* 168 F.3d 8, 9–10 (11th Cir.1999); *see also* Doc.215 at 15 (pretrial order "supersedes the pleadings which are hereby amended to conform hereto"). Plaintiff did not contend in the pretrial order that Defendant participated in a "sex trafficking venture," which distinguishes this case from *Red Roof* and *K.H. See* Doc.196 at 35 (outlining Plaintiff's allegations).[9] Therefore, *K.H.* is a non-binding opinion concerning a motion to dismiss relating to a complaint with distinguishable allegations. It is not applicable here.

But assuming *arguendo* that *K.H.* does apply, and that Defendant accurately states the test to prove the second element of Section 1595(a), Plaintiff nonetheless proved (and a reasonable jury could have found) that Defendant did much more than

---

[9] Even if the pretrial order did not supersede the pleadings (it does), Plaintiff alleged the venture differently than the plaintiffs in *Red Roof* and *K.H.* Unlike the plaintiffs in those cases, Plaintiff in this case alleged the venture as the operation of the hotel and the rental of rooms to Plaintiff's traffickers. *See, e.g.,* Doc. 1 at ₱2(a) (alleging Defendant participated in venture by operating hotel and renting hotel rooms). Plaintiff incorporated that allegation into the substantive TVPRA count (Count I) in her complaint. (Doc. 1 at ₱73). Elsewhere, Plaintiff alleged United Inn violated the TVPRA with language directly from the civil-beneficiary statutory provision. *See* ₱₱ 74, 75, 78, 79.

rent rooms to Plaintiff's traffickers; she proved Defendant's complicity in Plaintiff's trafficking through the actions of Defendant's night manager. Indeed, Plaintiff proved that the night manager regularly bought drugs from Plaintiff's trafficker, Cash, (T.377:21 – 378:15), and helped Cash carry out his drug and sex trafficking businesses at the hotel. (*Id.*; *see also* T.379:14 – 380:10). The manager allowed Cash to check into rooms early. *Id.* She served as a lookout for Cash and warned him to switch rooms on multiple occasions to avoid scrutiny resulting from too much foot traffic to his rooms. *Id.* By regularly moving Cash from one room to another, the night manager helped him evade detection arising from the heavy flow of customers coming and going from his rooms. *Id.* She also helped Cash move to hotel rooms that were "not in direct view of the cameras." Tr. 379:18-22. Through the foregoing evidence, Plaintiff proved (and a reasonable jury could have found) that Defendant did far more than rent hotel rooms to Plaintiff's traffickers—it facilitated and aided Plaintiff's traffickers in carrying out their illegal businesses and exploiting Plaintiff. *See, e.g.*, *Does 1-4 v. Red Roof Inns, Inc.*, 688 F.Supp.3d 1247, 1253–54 (N.D. Ga. 2023) (reasonable jury could find that the participation element was satisfied where, among other things, some employees played the role of lookout and notified traffickers when police were nearby or on the premises, and the hotel's management, upon receiving complaints of prostitution, instructed employees to book suspected

sex workers in rooms located in the back of the hotel where they would be less visible to guests).[10]

Given the above evidence, Defendant's claim that Plaintiff's lookout arguments were "unsupported at trial" is wrong. (Doc.247 at 9).[11] Likewise, Defendant's claim that *K.H.* has "comparable facts," (Doc.247 at 6), is off; there was no evidence in *K.H.* of staff complicity, as there is here. Defendant contends that Judge Boulee considered "identical facts" in *G.W.*, but Judge Boulee explicitly noted in his summary judgment order that there was no lookout evidence in that record. *G.W. v. Northbrook Indus., Inc.*, 739 F. Supp. 3d 1243, 1251 (N.D. Ga. 2024), *reconsideration denied,* No. 1:20-CV-05232-JPB, 2025 WL 494620 (N.D. Ga. Feb. 13, 2025) ("Plaintiff has not presented evidence showing that United did *more* than rent hotel rooms to the traffickers with the knowledge that sex trafficking occurred at its hotel. *For example, Plaintiff has not presented evidence to support the*

---

[10] By finding Defendant liable for violation of Section 1595(a), the jury necessarily concluded that Plaintiff proved that Defendant did more than rent rooms for money to Plaintiff's traffickers. The Court instructed the jury that "benefiting financially from renting hotel rooms to a trafficker standing alone does not constitute participation in a venture for purposes of liability under the TVPRA." T.664:15-18; *see also Raulerson v. Wainwright,* 753 F.2d 869, 876 (11th Cir.1985) ("Jurors are presumed to follow the law as they are instructed."). Defendant does not challenge the jury instructions.

[11] Defendant cites to *some* of Plaintiff's testimony in its JMOL (Doc. 247 at 9 (citing T.347-372)) but ignores entire sections it—for example, pages 377-391. *See* T.277 (showing Plaintiff's testimony went from T.300-435).

*allegation in the Complaint that United's employees served as lookouts for Plaintiff's traffickers*.") (emphasis added).[12]

Even if Defendant's room rentals to Plaintiff's traffickers and/or the night manager evidence did not suffice to prove Defendant's participation in a venture (element two), then Plaintiff also proved that Defendant received multiple Be On the Lookout notices (BOLOs) identifying Plaintiff as a missing 16-year-old *suspected of being at Defendant's hotel*—a known hotspot for commercial sex crimes and drug sales that did not have security recommended by the police; that did not have anti-trafficking notices required by state law, which is a state crime; that did not background check its employees; that hired employees with drug convictions to work unsupervised at the property; and that did not train its employees on trafficking. After Defendant received the BOLOs, Plaintiff continued to be exploited in rooms and cars on the property for weeks—she had sex for money with approximately 3 to

---

[12] Defendant cites two cases to characterize Plaintiff's testimony as "uncorroborated" and "speculative," but neither helps Defendant. (Doc.247 at 9 (citing *Green* and *Palmeri*)). *Palmeri* concerns an affiant's statement in an affidavit that it was the affiant's "impression" that another person "had been drinking." *Green* involved an employment discrimination claim where the employee-plaintiff bore the burden to make a *prima facie* case of "intentional discrimination." The Court found the employee-plaintiff had not met that high burden based on a single alleged statement from her supervisor referring to her as a "Cuban refugee." Both *Palmeri* and *Green* differ factually from this case, and neither involves the extensive and direct evidence that Plaintiff provided about Defendant's complicity in her trafficking.

12 men per day, and roughly half of the sessions occurred in cars in the parking lot. After Defendant received the BOLOs, Defendant continued to sell condoms to Plaintiff (a 16-year-old) from the lobby during what should have been the Fall semester of Plaintiff's sophomore year of high school. After Defendant received the BOLOs, Defendant's employees continued to clean Plaintiff's traffickers' rooms, which were littered with drugs, guns, cash, and other paraphernalia. T.383:10-17 ("no one really cared when housekeeping came… they did not care to hide anything."). That Plaintiff continued to be openly exploited at the hotel after the BOLOs is further evidence of Defendant's complicity—and it circumstantially supports Plaintiff's testimony that the night manager assisted her trafficker. In sum, there is substantial record evidence for a reasonable jury to conclude that Defendant did not just rent rooms to Plaintiff's traffickers, it helped facilitate and further Plaintiff's exploitation on the property.[13]

Because a reasonable jury could conclude that Plaintiff proved that Defendant knowingly benefited (element one) and that Defendant participated in a venture (element two) in violation of Section 1595(a), the Court should reject Defendant's JMOL.[14]

---

[13] Defendant says the participation evidence in this case was not "similar" to the evidence in *Ricchio*. The evidence here was worse. Regardless, *Ricchio* itself says it is merely an example of what time of conduct suffices. 853 F.3d at 557.

[14] Defendant's JMOL makes a passing reference to the general verdict form without any citation to authority. Doc.247 at 5-6. The unsupported argument fails because

## II.    <u>Section 1595(a) Permits Recovery of Punitive Damages</u>.

As this Court previously correctly held, Section 1595(a) permits recovery of punitive damages. Doc.218. Below Plaintiff explains why that is the correct conclusion, and one that aligns with every single federal court to have considered the question. She then addresses the flaws with Defendant's arguments.

Section 1595(a) permits a sex trafficking victim to recover "damages and attorney's fees." The term "damages" is not further defined. As this Court previously noted, "'absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.'" Doc. 218 at 2 (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 70-71 (1992)); *see also id.* at 66 ("From the earliest years of the Republic, the Court has recognized the power of the Judiciary to award appropriate remedies to redress injuries actionable in federal court[.]"); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use

---

"jurors are presumed to follow the law as they are instructed." *Raulerson v. Wainwright,* 753 F.2d 869, 876 (11th Cir.1985); *see also Parker v. Randolph,* 442 U.S. 62, 75 n.7, 99 S.Ct. 2132, 2141 n.7 (1979) ("The 'rule'—indeed, the premise upon which the system of jury trials functions under the American judicial system— is that juries can be trusted to follow the trial court's instructions."). Defendant does not challenge the jury instructions in its JMOL. There is no basis for its attack on the general verdict form given the jury followed and applied the jury instructions.

any available remedy to make good the wrong done.").

The Ninth Circuit was the first circuit to consider whether punitive damages are available under Section 1595(a). The court found that the meaning of "damages" in Section 1595(a) is "ambiguous: it could refer to compensatory damages, punitive damages, nominal damages, or some combination of the three." *Ditullio v. Boehm*, 662 F.3d 1091, 1096 (9th Cir. 2011). It further recognized that, "[t]he Supreme Court has looked to the common law to determine the remedies available under federal statutes creating causes of action sounding in tort." *Id.* at 1097. Relying on the Restatement (Second) of Torts § 908 (1979) to understand the "common law of torts," the court noted that punitive damages in tort actions are "awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Id.* at 1096–97.[15] Because the common law has long provided for punitive damages in tort actions, the *Ditullio* court reasoned that punitive damages should also be available under Section 1595(a), which is rooted in tort, not contract. *Id.* (citing *Barry v. Edmunds*, 116 U.S. 550, 562 (1886)). Looking

---

[15] For over forty years, the Supreme Court has looked to this same section of the Restatement (Second) of Torts to define when punitive damages are available. "Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Smith v. Wade*, 461 U.S. 30, 46–47 (1983) (quoting Restatement (Second) of Torts § 908(2); and citing *id.* cmt. b). Section 908(2) goes on to provide, "In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant."

to common law principles, the Ninth Circuit concluded that, "[p]unitive damages are generally appropriate under the TVPA civil remedy provision because it creates a cause of action for tortious conduct that is ordinarily intentional and outrageous." *Id.* at 1098.

The Tenth Circuit, in *Francisco v. Susano*, agreed that "[p]unitive damages are a well-established component of traditional common law remedies," and noted that the Supreme Court has "recognized punitive damages as a remedy under various federal statutes that did not expressly provide for such relief." *Francisco v. Susano*, 525 F. App'x 828, 833 (10th Cir. 2013). It determined that the TVPA's cause of action for labor trafficking was consistent with "the traditional use of punitive damages . . . to punish and deter misconduct involving an element of outrage." *Id.* at 834. Thus, the *Francisco* court held that punitive damages are available under 18 U.S.C. § 1595(a). *Id.* at 835.[16]

After *Ditullio* and *Francisco*, other circuits have affirmed punitive-damages awards for TVPRA victims without needing to address the availability of such damages. *See Warfaa v. Ali*, 1 F.4th 289, 293, 296 (4th Cir. 2021) (affirming without discussion availability of punitive damages under § 1595); *Roe v. Howard*, 917 F.3d 229, 238, (4th Cir. 2019) (same).

---

[16] As this Court noted, the Fifth Circuit has also remarked, in passing, after citing to *Ditullio* and *Francisco*, that the "the TVPRA authorizes punitive damages[.]" *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 206 (5th Cir. 2017).

Federal district courts around the country likewise agree. *See, e.g.*, *Moore v. Rubin*, 724 F. Supp. 3d 93, 106–07 (E.D.N.Y. 2024) ("[Howard] Rubin's final argument is that the TVPA does not provide for punitive damages. Every Court of Appeals to address this issue (as well as a district court within this district) has held otherwise."); *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1175 (D. Kan. 2018) (holding that "plaintiff deserves to recover punitive damages under the TVPRA and state human trafficking laws"); *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 26 (D.D.C. 2013) ("Where federal statutes sounding in tort are silent on the availability of punitive damage, courts look to common law principles to determine the scope of remedies. . . . Punitive damages are therefore available under the TVPA.").

Defendant's contrary arguments miss the mark. Defendant contends that while the "TVPRA's criminal provisions target traffickers," Section 1595(a) "extends to third parties like [Defendant]," and the trial evidence only "shows [Defendant's] passive inaction at worst, not malice or intentional conduct." (Doc.247 at 17-18). The Court previously considered and rejected a similar argument. (Doc.218 at 7 (rejecting Defendant's argument that "the prescribed conduct is insufficiently outrageous or intentional enough to warrant punitive damages.")). Punitive damages are not limited to "malice or intentional conduct." *Smith v. Wade*, 461 U.S. 30, 48 (1983) ("Punitive damages in tort cases may be awarded not only for actual intent to injure or evil motive, but also for recklessness,

serious indifference to or disregard for the rights of others, or even gross negligence.").

Regardless, as discussed above, there was more than enough evidence for a reasonable jury to conclude that this is not a case about Defendant's "passive inaction." Indeed, the jury was charged that "passive inaction" was not enough to find that Defendant participated in a venture under Section 1595(a). The Court instructed, "[i]n assessing whether Plaintiff has satisfied the second element of her TVPRA claim, you are instructed that observing something is not the same as participating in it," and, "benefiting financially from renting hotel rooms to a trafficker standing alone does not constitute participation in a venture for purposes of liability under the TVPRA." T.664. With those instructions, the jury found Defendant liable for violation of Section 1595(a). Further, the Court charged in the punitive damages phase that, "[b]efore you may impose punitive damages, you would need to find that the Plaintiff proved by a preponderance of the evidence that Defendant's conduct was outrageous, either because of the Defendant's evil motive or reckless indifference to the rights of others." T.728. After hearing that instruction, the jury found Defendant liable for punitive damages. As discussed, juries are presumed to follow instructions. Defendant's JMOL does not challenge the jury charges or suggest that the jury did not follow them. By finding Defendant liable for violation of Section 1595(a), and returning a verdict for punitive damages, the jury

concluded that Defendant did not merely engage in "passive inaction." Therefore, Defendant's "passive inaction" argument fails.

Next, Defendant claims that the term "damages" in Section 1595(a) means "compensatory damages." In support, Defendant cites the definition of "damages" in Black's Law Dictionary from 1999, but that section does not help Defendant, because it includes a list of different *types* of "damages," including punitive damages. Like the Ninth Circuit found in *Ditullio*, the definition in Black's Law Dictionary reflects that the term "damages" encompasses different types of damages. 662 F.3d at 1096 ("damages" is "ambiguous: it could refer to compensatory damages, punitive damages, nominal damages, or some combination of the three.") To use Defendant's line of reasoning, if Congress had meant "compensatory damages" only, it would have specified as much. But Congress intentionally used a broader and more inclusive term, "damages," and in doing so, signaled its intention for Section 1595(a) to provide more than just compensatory damages.

Finally, Defendant says that Section 1595(a) should be "strictly construe[d]," but then asks the Court to ignore the breadth of the term, "damages," in the statutory text. "Absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin*, 503 U.S. 60 at 70-71. There is no "clear direction" by Congress in Section 1595(a) that punitive damages are unauthorized.

To the contrary, there is clear direction that punitive damages are authorized; strict construction of the text requires finding that the term, "damages," is broad and includes punitive damages, among other types of damages.

For these reasons, the Court should reaffirm its holding that punitive damages are available under Section 1595(a)—which every other federal court to have considered the question has also found.

## III.   **The Jury's 3:1 Punitive Damages Award is Not Unconstitutionally Excessive as a Matter of Law and Should be Upheld.**

The jury's 3:1 punitive damages award is not unconstitutionally excessive as a matter of law and it does not violate the Defendant's due process. The Court should uphold the punitive damages award, which punishes and deters Defendant (and other businesses like it) from facilitating and profiting from sex trafficking of children. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996) (punitive damages serve to punish and deter).

To evaluate the constitutionality of a punitive damages award, the Supreme Court has established three "guideposts." *Id.* at 559; *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 415 (2003). The first is the "degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. It is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Id.* It "reflects the accepted view that some wrongs are more blameworthy than others," and that "crimes marked by violence or the threat of violence" are more serious than

24

nonviolent crimes. *Id.* at 576 (cleaned up). In evaluating the reprehensibility "guidepost," the Supreme Court has directed courts to consider a series of factors, including whether:

> [i] the *harm* caused was *physical* as opposed to economic; [ii] *the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others*; [iii] the target of the conduct had *financial vulnerability*; [iv] the *conduct involved repeated actions* or was an isolated incident; and [v] the harm was the result of *intentional malice, trickery, or deceit, or mere accident*.

*Campbell*, 538 U.S. at 419 (emphasis added). The presence of any these factors speaks to the "degree of reprehensibility of the defendant's conduct;" the more factors that apply to a defendant's conduct, the more reprehensible it is. *Rubinstein v. Yehuda*, 38 F.4th 982, 998 (11th Cir. 2022).

All of the reprehensibility factors apply here, underscoring that Defendant's conduct is highly reprehensible. Plaintiff was sex trafficked as a child at Defendant's hotel for 35 days. She endured terrible physical suffering and trauma (first consideration). She was a prime target for her traffickers, who were running their booming businesses out of multiple rooms at Defendant's hotel for extended periods, because she was a missing child who was financially vulnerable and alone at the hotel (third consideration). Plaintiff was exploited at Defendant's hotel for weeks and weeks (fourth consideration) because of Defendant's complicity (second and fifth considerations). The evidence of Defendant's complicity is extensive, it includes the conduct of Defendant's night manager to assist Plaintiff's trafficker;

25

Defendant's lack of response to the BOLOs; Plaintiff's continued victimization in common areas at the property after the BOLOs; Defendant's decision not to hire recommended security, or to train its staff, or to background check its staff; and Defendant's choice to hire staff with drug convictions to work at a property with prevalent drug crime without monitoring or testing the staff.[17] Plaintiff did not feel "safe going to staff at United Inn to report what was happening on the property" because "they were helping" her exploiters. T.386:13-20. When Defendant's owner and manager was confronted about much of this evidence at trial, he repeatedly lied under oath. T.680-682. Thus, the reprehensibility "guidepost," and the associated considerations, all strongly support the punitive damages verdict.

The second "guidepost" identified in *Gore*—the "ratio" of the punitive damages award "to the actual harm inflicted on the plaintiff"—also supports the punitive damages award. *Gore*, 517 U.S. at 580. In *Campbell*, the Supreme Court noted the "long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish." 538 U.S. at 425. The Supreme Court said that such ratios are "instructive"

---

[17] The jury necessarily concluded that Defendant's conduct reflected either "evil motive or reckless indifference." The Court instructed the jury, "[b]efore you may impose punitive damages, you would need to find that the Plaintiff proved by a preponderance of the evidence that Defendant's conduct was outrageous, either because of the Defendant's evil motive or reckless indifference to the rights of others." T.728; *see also Carazani v. Zegarra*, 972 F. Supp. 2d 1, 27 (D.D.C. 2013) ("forced labor and trafficking is particularly depraved.")

and "demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* While there is no bright-line rule, the Eleventh Circuit's "rule of thumb" is that a ratio of 4:1 will "typically be close to the line of constitutional propriety and [ ] few awards exceeding a single-digit ratio to a significant degree will satisfy due process." *Rubinstein*, 38 F.4th at 999.

Here, the jury awarded $10 million in compensatory damages, and $30 million in punitive damages, yielding a 3:1 ratio, which fits within the multipliers of *Campbell* and *Gore*, and is materially lower than the Eleventh Circuit's 4:1 "rule of thumb," which itself is only "close to the line of constitutional propriety," and not necessarily over it.

While it is presumed that J.G. has been made whole for her injuries through the compensatory damages award, punitive damages should be awarded if the defendant's conduct "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.* at 419. As noted, the jury's award of punitive damages means it found that Defendant's conduct "was outrageous, either because of the Defendant's evil motive or reckless indifference to the rights of others." T.728. That makes sense, given the trial evidence that Defendant facilitated and profited from child sex trafficking of Plaintiff and others. The jury's treble punitive damages award reflects the sanction necessary to punish

and deter Defendant (and hotels like it) from facilitating and profiting from child sex trafficking.

The final "guidepost" concerns the difference between the punitive damages awarded by the jury and civil or criminal penalties available in comparable cases. Defendant does not identify any civil or criminal penalties available in comparable cases, so the Court should focus on the first two guideposts instead. *Rubinstein*, 38 F.4th 982, 998 (11th Cir. 2022) ("The third guidepost is not relevant here because the parties have not identified a civil penalty that could apply in a comparable case. Therefore, our analysis turns on the first two guideposts."). Defendant suggests that the $500,000 fine arising from a violation of 18 U.S.C. 1591 is an appropriate comparison. But Defendant ignores that a child sex trafficker who commits one act in violation of 18 U.S.C. 1591(b)(1) or (2) is subject to a $500,000 fine ***and*** imprisonment (up to life). Here, J.G. proved that she was criminally sex trafficked as a child hundreds of times at Defendant's hotel over 35 days because of Defendant's complicity. So, the penalty for a person who commits a single criminal act in violation of Section 1591 is not an apt comparison in this case involving hundreds of criminal acts facilitated by Defendant's conduct. The Supreme Court also has emphasized that fines in criminal statutes have "less utility" in determining a punitive damages award. *Campbell*, 538 U.S. at 428; *see also Kemp v. American Tel. & Tel. Co.*, 393 F.3d 1354, 1365 (11th Cir. 2004) ("[W]e are careful to avoid

placing too much reliance on the size of criminal penalties in assessing the reasonableness of the jury's award.").

Finally, Defendant's cite to *Carazani v. Zegarra*, 972 F. Supp. 2d (D.D.C. 2013) does not help its argument. Doc.247 at 23. *Carazani* found that Section 1595(a) allows punitive damages—which Defendant argues against just pages earlier in its brief. Also, *Carazani* involved FLSA and labor trafficking claims, and did not involve serial sexual mistreatment of a child hundreds of times over 35 days.

Therefore, the jury's verdict is neither unconstitutional nor excessive, and the Court should uphold it.

## <u>CONCLUSION</u>

In light of the foregoing, Plaintiff respectfully requests that the Court deny Defendant's JMOL.

This 19th day of September, 2025.

/s/ David H. Bouchard
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859
Oto U. Ekpo
oto@finchmccranie.com
Georgia Bar No. 327088

FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the foregoing pleading has been prepared with a font and point selection approved by the Court in LR 5.1., NDGA. Specifically, the above-mentioned pleading was prepared using Times New Roman font of 14-point size.

Respectfully submitted,

*/s/ David H. Bouchard*
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certify that Plaintiff, through her attorneys, has served a true and correct copy of the foregoing pleading into this District's ECF System, which will automatically forward a copy to counsel of record in this matter.

Dated: This 19th day of September, 2025.

*/s/ David H. Bouchard*
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859

FINCH McCRANIE, LLP
229 Peachtree Street, NE
Suite 2500
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile